# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANNABEL MELONGO,                    )
                                    )
        Plaintiff,          )
                                    )
    vs.              )No. 13-cv-04924
                                    )
ASA ROBERT PODLASEK, et al.,    )
                                    )
        Defendants.          )

        The deposition of DETECTIVE WILLIAM
MARTIN, called by the Plaintiff, pursuant to notice
and in accordance with the applicable provisions of
the Federal Rules of Civil Procedure of the United
States District Courts pertaining to the taking of
depositions, taken before MARYBETH ROESSLER, CSR,
RPR, CSR License No. 084-002864, a notary public
within and for the County of Will and State of
Illinois, taken at 180 North LaSalle Street,
Chicago, Illinois, on Tuesday, May 8, 2018,
commencing at about the hour of 8:35 a.m.

1   APPEARANCES:
2       Ms. Julia K. Schwartz
        Miller Shakman & Beem
3       180 North LaSalle Street
        Suite 3600
4       Chicago, Illinois  60601
        312.263.3700
5       jschwartz@millershakman.com
          on behalf of Plaintiff;
6
        Ms. Kimberly M. Foxx, State's Attorney of
7       Cook County Illinois, by:
        Ms. Bianca Brown
8       Assistant State's Attorney
        Richard J. Daley Center
9       50 West Washington
        Room 500
10      Chicago, Illinois  60601
        312.603.6638
11      bianca.brown@cookcountyil.gov
          on behalf of all Cook County Defendants;
12
        Mr. Eric D. Kaplan
13      Mr. Christopher S. Wunder
        Kaplan Papadakis & Gournis, P.C.
14      180 North LaSalle Street
        Suite 2108
15      Chicago, Illinois  60601
        312.726.0531
16      ekaplan@kpglaw.com
        cwunder@kpglaw.com
17        on behalf of Defendant William Martin
          and Schiller Park;
18
19
20
21
22
23
24

1   APPEARANCES:  (Continued)
2       Ms. Lisa Madigan, Attorney General,
        State of Illinois, by:
3       Ms. Shirley R. Calloway
        Assistant Attorney General
4       Office of the Attorney General
        100 West Randolph Street
5       Chicago, Illinois  60601
        312.814.5581
6       scalloway@atg.state.il.us
          on behalf of Defendant Kyle French;
7
        Ms. Dina M. Ninfo
8       Angelini, Mills, Woods & Ori Law
        155 North Michigan Avenue
9       Suite 400
        Chicago, Illinois  60601
10      3123.621.0000
        dninfo@amwolawil.com
11        on behalf of Defendant
        Ms. Carol Spizzirri.
12
        Also Present:
13
        Ms. Annabel Melongo (via telephone)
14
15
16
17
18
19
20
21
22
23
24

1           I N D E X
2
    WITNESS                    PAGE
3
    DETECTIVE WILLIAM MARTIN
4
        Examination
5          By Ms. Schwartz        6
6       Continued Examination
           By Ms. Schwartz        140
7
        Examination
8          By Mr. Kaplan          276
9       Examination
           By Mr. Wunder          278
10
        Examination
11         By Ms. Ninfo           285
12      Further Examination
           By Ms. Schwartz        286
13
    PLAINTIFF'S DEPOSITION
14  EXHIBITS MARTIN             PAGE
15      No. 1                   59
        No. 2                   70
16      No. 3                   71
        No. 4                   78
17      No. 5                   79
        No. 6                   86
18      No. 7                   92
        No. 8                   103
19      No. 9                   107
        No. 10                  129
20      No. 11                  129
        No. 12                  134
21      No. 13                  140
        No. 14                  145
22      No. 15                  147
        No. 16                  148
23      No. 17                  149
        No. 18                  151
24      No. 19                  152

ACR REPORTING, LLP  (312) 422-0515

INDEX

PLAINTIFF'S DEPOSITION
EXHIBITS MARTIN                    PAGE
No. 20          156
No. 21          157
No. 22          165
No. 23          177
No. 24          183
No. 25          190
No. 26          192
No. 27          193
No. 28          199
No. 29          202
No. 30          215
No. 31          219
No. 32          224
No. 33          235
No. 34          243
No. 35          246
No. 36          248
No. 37          252
No. 38          258
No. 39          260
No. 40          263
No. 41          265
No. 42          271
No. 43          274

(Witness duly sworn.)

DETECTIVE WILLIAM MARTIN,
called as a witness herein, having been first duly
sworn, was examined and testified as follows:

EXAMINATION

By Ms. Schwartz:

Q    Good morning, Detective Martin.

A    Good morning.

Q    My name is Julia Schwartz.  I represent
the Plaintiff Annabel Melongo in this case.

Before we get started I'll ask everyone
in the room to announce themselves so you know who
they are.  I'll also note that Shirley Calloway,
who represents Defendant Kyle French, is on her way
and she will be joining us shortly.

MR. KAPLAN:  My name is Eric Kaplan.  I'm
representing the deponent.

MR. WUNDER:  Chris Wunder.  I have the
deponent as well.

MS. BROWN:  Bianca Brown, all Cook County
Defendants.

MS. NINFO:  Dina Ninfo, Carol Spizzirri.

MS. SCHWARTZ:  And Miss Melongo is listening
in by the conference line as well.  It's also

possible that one of my colleagues, Michael
Shakman, who also represents Miss Melongo will be
coming in and out during the day.

By Ms. Schwartz:

Q    Would you state your name?

A    Detective William Martin.

Q    Do you prefer I refer to you as
Detective Martin today?

A    It doesn't matter.

Q    I'll go with Detective Martin, unless
you have an issue with that.

A    No, that's fine.

Q    Detective Martin, have you ever been
deposed before?

A    Yes, I believe so, once.

Q    When was that deposition?

A    Oh, gosh.  I don't recall the exact
date.  Roughly 1998 maybe.  And then again --
actually, twice.  I'm trying to think of when that
was.  Probably 2012 maybe, a separate incident.

Q    And let's start with the 1998
deposition.

Was that a litigation in which you were
a party, a defendant or a plaintiff?

A    No.  It was an -- we just had
information.  It was regards to a person that the
Schiller Park Police Department had dealings with
over the years, and she was a -- I don't know how
to call it, but she -- it was one of the Walgreens
daughters, and they were -- I don't know what they
were trying to do as far as the company and the
family, trying to disown her or whatever they were
trying to do to her, but they wanted our
information as far as how many dealings we had with
her and the type of interaction we had with her at
the time.  That's the best I can remember what
happened.

Q    So the case in which you were deposed in
or around 1998 involved a dispute between members
of the Walgreens family, in which you were a
witness with information?

A    Correct.

Q    You were not a party?

A    Correct.

Q    Do you recall the case name or anything
about the case other than?

A    No.  I just remember her and the -- I
think it was the guy she was dating in town is

1    about the only thing I remember.
2        Q    And the deposition that was in 2012,
3    were you a party in that case, a plaintiff or
4    defendant?
5        A    No.  Same thing.  It was -- we had a
6    witness to information.
7        Q    What generally speaking was the facts of
8    that case, the issues?
9        A    There was a chase and the officer --
10   some of the responding officers, there was some
11   shots fired and they ended up killing the guy.  So
12   the insurance I think later on for the deceased
13   wanted information about what I had seen and who
14   did what at the time.
15       Q    So was it a dispute between the
16   insurance company and the deceased?
17       A    I think officers -- no, I think it was a
18   dispute with the insurance companies suing the
19   officers that had shot the gentleman.
20       Q    And you were a witness but not a
21   defendant?
22       A    Correct.
23       Q    Do you recall the name of that case?
24       A    No.  I just know that one of the main

1    police departments was the neighboring town of us,
2    it's Franklin Park.
3        Q    Since this is your third deposition,
4    you've done this before, but I would just like to
5    go over some ground rules for today.
6            First, as you can see, we have a court
7    reporter here today.  For her sake, let's try not
8    to talk over one another.  I'll try to let you
9    finish your answers, if you try to let me finish my
10   questions; is that fair?
11       A    Yes, ma'am.
12       Q    Please give verbal answers.  Head nods
13   and uh-uh's don't translate well onto the
14   transcript; is that fair?
15       A    Yes, ma'am.
16       Q    If I ask a question and you don't
17   understand it, will you let me know?
18       A    Yes, ma'am.
19       Q    If you've answered one of my questions,
20   I will assume that you understood the question; is
21   that fair?
22       A    Yes.
23       Q    If you need a break at any time, please
24   do let me know.  The only thing I would ask is that

1    you answer whatever question I have pending, and
2    then we can take a five-minute break.
3        A    Okay.
4        Q    I'll also be taking breaks throughout
5    the day as well.
6        A    Okay.
7        Q    Detective Martin, is there any reason
8    that you cannot give truthful and accurate
9    testimony here today?
10       A    No, there is not.
11       Q    Are you represented by counsel today?
12       A    I am.
13       Q    Are these your attorneys sitting next to
14   you, Mr. Kaplan and Mr. Wunder?
15       A    Yes.
16       Q    What have you done to prepare for
17   today's deposition?
18       A    Read through my police reports and some
19   of the prior testimonies that were given.
20       Q    And when you say prior testimonies that
21   were given, are you referring to depositions in
22   this litigation?
23       A    Yes.
24       Q    Whose deposition testimony did you

1    review?
2        A    Kyle French and Shahna Monge.
3        Q    Did you review any other deponents'
4    testimony?
5        A    No.
6        Q    Apart from your police report, did you
7    review any other documents in preparation for
8    today?
9        A    The grand jury transcripts.
10       Q    Anything else?
11       A    The forensic summary.
12       Q    Is that Miss Monge's forensic summary?
13       A    Correct.
14       Q    Anything else?
15       A    A couple other pieces of evidence in
16   regards to the -- more of the emails -- or the
17   emails that were in question of being forwarded,
18   but also the email from Tech Support at Web HSP, I
19   believe.  I'm trying to think.  I don't think there
20   was anything else that I can think of off the top
21   of my head.
22       Q    About how much time would you say you
23   spent preparing for today's deposition?
24       A    Maybe six hours or so; about six

1    hours.
2        Q    Did you meet with your lawyers before
3    coming here today?
4        A    Yes.
5        Q    Apart from your lawyers, did you meet
6    with or discuss today's deposition with anyone
7    else?
8        A    No.
9        Q    Detective Martin, I'd like to go over
10   general -- some general background about you,
11   starting with your education.
12       A    Okay.
13       Q    Let's discuss your education since --
14   did you graduate from high school?
15       A    Yes.
16       Q    Let's start with your education after
17   graduating from high school.  Would you walk me
18   through your educational history?
19       A    I went to the University of Illinois
20   down at Champaign for I think it was two years, but
21   I transferred from there to the Lewis University in
22   Romeoville and graduated from there in '92, I
23   believe, '92 or '93.
24       Q    And after graduating from Lewis

1    University, did you have any other education, any
2    other --
3        A    Just like on-the-job training and
4    things.  That's pretty much it that I can think
5    of.
6        Q    In terms of training after -- strike
7    that.
8             What did you do after you graduated in
9    1992 or 1993 from Lewis University?
10       A    I had several jobs.  I'm trying to think
11   where I started after that.  I worked for Nordstrom
12   for a while through college and then when I
13   finished college I worked for them for a period of
14   time.
15            I went to -- I'm trying think what they
16   were called.  It was United Express but they
17   operated -- they operated under the United Express
18   flag.  I'm trying to think of the name.  Great
19   Lakes Airlines is what they were called.
20       Q    And about what years did you work at
21   Great Lakes Airlines?
22       A    '93ish, some time in '93 throughout --
23   till January of '95, when I got hired at the
24   Police Department.

1        Q    So your full-time employment prior to
2    becoming a police officer was Nordstrom and
3    Great Lakes Airlines?
4        A    Yes.
5        Q    Was there any other full-time employment
6    before that that you can recall?
7        A    Not that I can recall.
8        Q    Did you become a police officer in
9    1995?
10       A    I did.
11       Q    Did you have to go through any training
12   before becoming a police officer?
13       A    Yeah.  I went to Chicago's Police
14   Academy.
15       Q    What year was that that you went to
16   Chicago's Police Academy?
17       A    January of '95 I started.
18       Q    How long were you at the
19   Police Academy?
20       A    I believe it was 16 weeks.  I believe we
21   got out some time in April.
22       Q    After completing the Police Academy,
23   what was your next full-time employment?
24       A    That was it.  I've had -- that's the

1    only one I really ever had since then.  I've done
2    part-time gigs here and there for, you know, a
3    little bit of money, but nothing formal really.
4        Q    When you say that was it, are you
5    referring to the Schiller Park Police Department?
6    Did you go straight to the Schiller Park Police
7    Department?
8        A    Yeah.  After I graduated the Academy --
9    Schiller Park sent me.  They hired me January 9th
10   of 1995.  I think I started at the Academy on
11   January 10th.  And then that was the only full-time
12   employment I've had since that time.
13       Q    So you've been with the Schiller Park
14   Police Department full time since 1995?
15       A    Correct.
16       Q    Let's walk through the roles that you've
17   had within the Schiller Park Police Department.
18            When you started in 1995, what was
19   your -- what was your role?
20       A    I was just patrolman.  Then I think it
21   was '96 or '7, shortly -- I wasn't a patrolman very
22   long before I was put into the community policing
23   unit.  And then we did that for a number of years.
24   I don't recall exactly how long, but I was

1    promote -- rough ball park, nine, ten years.
2         Then I got promoted -- well, I shouldn't
3    say promoted.  I got assigned to the detective
4    division.  But as my -- I currently sit -- we are
5    patrolman that are just assigned to the detective
6    division.  It's not a promotion.  It's just
7    assigned a duty.
8         Q    So you are a patrolman assigned to the
9    detective unit?
10        A    Correct.
11        Q    And are you a detective?
12        A    Yes.
13        Q    Do you go by detective?
14        A    Yes.
15        Q    And you've been a detective since about
16   2006, 2007?
17        A    2006, I believe.  I think it was 2006,
18   like March or so of 2006.
19        Q    When you were a patrolman in 1995, 1996,
20   what -- what were your job responsibilities?
21        A    Just, you know, responding to calls.
22   I'm trying to think.  We didn't really have many
23   other than that.  We didn't do any proactive stuff
24   at that point.

1         It was just, you know, you ride with the
2    training officer for a couple of months, get used
3    to each of the shifts, and then they would, you
4    know, allow you to drive and answer calls on your
5    own.
6         Q    So as a patrolman you were mostly
7    responding to --
8         A    Calls for service.
9         Q    -- when individuals called the
10   Schiller Park Police Department?
11        A    Yes.
12        Q    And then when you were with the
13   community policing unit, what were your job
14   responsibilities?
15        A    We were assigned to interact with the
16   public, the business community, trying to establish
17   relationships and the trust within those parts of
18   the community in order to better get involvement
19   from them.  Whether it be assisting us with
20   programs that we were trying to do for the kids or
21   having the comfort level with the Police Department
22   to want to come forward with crimes that had been
23   committed and information that they may have.
24        Q    While you were with the community

1    policing unit, did you work on individual
2    investigations or matters?
3              (At this point in the deposition
4              Ms. Calloway entered the room.)
5         THE WITNESS:  No.  We were more just assigned
6    to, you know, -- like we would do neighbor disputes
7    and things like that.  We would try to go to each
8    one of the neighbors and try to calm the problems
9    or try and assist them in dealing with their issues
10   with one another.  But that was the only type of, I
11   guess, follow up after the initial call for
12   service.
13   By Ms. Schwartz:
14        Q    Would you -- while you were working at
15   the community policing unit would you make arrests,
16   for instance?
17        A    Yes.  We were still patrolman.  We were
18   still -- we were assigned to the unit, but should a
19   call for service need -- an officer needed a backup
20   or things like that, we were still assigned to the
21   street.  So the street sergeant could say hey, you
22   know, assign him to that call, and the dispatcher
23   would send you there.  So if they needed help or
24   they needed backup or something like that, we could

1    still be called to do that kind of thing.
2         Q    So while you worked at the community
3    policing unit, you still had some of the same
4    responsibilities as a patrolman would, --
5         A    Correct.
6         Q    -- which was making arrests, following
7    up --
8         A    Correct.
9         Q    -- on calls?
10        A    And there were times when we were short
11   employees, you know, guys would leave or whatever
12   and they were short on a shift, we would
13   potentially be assigned to a shift.  Again, as a
14   patrolman in that role and not be doing community
15   policing.  We would just, you know, follow the same
16   schedule.
17        Normally when you were in community
18   policing, you had a specific schedule and time that
19   you worked like an eight hour time block that was
20   different from what the actual patrol shifts were.
21        So when you were assigned to patrol, you
22   would just go back and follow that schedule.
23        Q    In terms of your assignment to the
24   detective division, which you testified is where

1  you are currently working at Schiller Park
2  Police Department, what were your -- are your
3  responsibilities as a detective in the detective
4  division?
5      A   We would -- we follow up cases in a
6  sense where there is a call for service and
7  potentially we don't have an arrestee in custody
8  yet, we would basically look for information and
9  attempt to discover who the offender might be, and
10  then arrest that offender.
11      Q   Do you focus on cases where there is
12  some investigative work that needs to be done prior
13  to arrest, is that what you do as a detective?
14      A   Yes.
15      Q   How does your role as a detective differ
16  from your previous role as a patrolman?
17      A   When a patrolman is assigned to a case
18  -- or a call, they basically just get the who,
19  what, where, when, why and how.  It's very basic.
20          Whereas, when we are assigned that
21  follow up, we have to dig further.  We have to look
22  into things, and potentially may discover more
23  ev -- how do I say this -- more evidence, more
24  suspects, and you tend to develop more leads than

1  just specifically documentation of what may have
2  occurred.
3      Q   Did you receive any training to become a
4  detective?
5      A   Yes.
6      Q   What was that training?
7      A   I took I believe it was a 40-hour class.
8  I -- I think it's a NEMRT class, Northeast
9  Multi-Regional Training I think it stands for.
10      Q   And what was the purpose of the
11  training?
12      A   There is -- just, you know, they have
13  different classes that they have to provide to
14  police officers, and this one was the 40-hour
15  detective class.
16      Q   Since becoming a detective have you
17  participated in any other training?
18      A   Yes, several.
19      Q   Can you name a few examples?
20      A   Elderly training -- I'm trying to think
21  of what they call it, but it's crimes against the
22  elderly, gang crimes, computer-related crimes,
23  identity theft-related crimes, crime prevention
24  training.

1      I can't think of anything -- that's
2  pretty much it.  There is a number of them, but
3  it's all related to the same types of things.
4      Q   In terms of computer-related crime
5  training, what does -- what have those trainings
6  focused on?
7      A   It started off with more the internet
8  crimes against children training in the sense of
9  gathering evidence relating to child exploitation
10  and undercover operations and undercover chats.
11      Q   Any other types of computer crime
12  training?
13      A   Yeah.  That's -- I started there and
14  then I moved into more of the identity theft and
15  how those crimes are perpetrated and gathering
16  evidence relating to IP addresses and email
17  addresses, and then on-line activity, social media
18  activity.  And then just within the last couple
19  years computers, cell phones and forensics.
20      Q   And in terms of these trainings for
21  computer crime -- crimes, has the focus of any of
22  those trainings been on how to interpret
23  computer-related evidence?
24      A   Yes.

1      Q   And had you participated in those
2  computer crime trainings -- in any of those
3  computer crime trainings by 2006, before 2006?
4      A   Yeah, I had a few by then.  I'm trying
5  to think.  Early 2000s I started doing that,
6  getting into some of that.
7      Q   Did you specialize -- have you
8  specialized at all as a detective within the
9  detective unit?
10      A   My chief when I first started wanted to
11  have guys that were specialized in specific things.
12  Like, for instance, you know, computers and that
13  type of stuff, cybercrime.  And then we had a guy
14  that was specifically going to do homicides, but as
15  guys -- we had older guys in the unit when I got
16  in.  So as those guys were transitioning out, the
17  chief at the time -- actually lieutenant, then
18  chief, wanted to have these newer guys that were a
19  little younger and more adapt at using computers
20  and things be part of a specific unit, but that
21  never materialized really.
22          I mean, unofficially he would give you
23  the title, but it was never really specifically on
24  paper a unit that was designed or developed.

1    Q   Did you ever officially or unofficially
2  have a specialization in computer crimes?
3    A   Yeah. I mean, he basically told me
4  flat-out that he wanted me to be the cybercrimes
5  guy.
6    Q   When did he tell you that, what year?
7    A   Back when I first started in like
8  2006-ish when he wanted me in there, maybe even a
9  little before that. He was the kind of guy that
10  kind of promised you things and made you want to be
11  one of his team.
12    Q   Did you focus -- starting in 2006 and
13  onward, did you focus exclusively on computer
14  crimes or did you work on many types of cases?
15    A   No, we had everything. It was just that
16  he wanted you to know this in case one of these
17  cases came in. He wanted to be able to have you be
18  assigned to it.
19    Q   When you say he, who are you referring
20  to?
21    A   My lieutenant at the time,
22  Lieutenant Schulze.
23    Q   Was Lieutenant Schulze your supervisor
24  in 2006?

1    A   Yes.
2    Q   And is he still your supervisor today?
3    A   No, he's gone.
4    Q   Who is your supervisor now?
5    A   He is the deputy chief of the Police
6  Department, his name is Joe DeSimone.
7    Q   When did Lieutenant Schulze stop being
8  your supervisor, what year?
9    A   If I had to -- if I had to guess, I'd
10  say 2011 he was promoted to chief.
11    Q   And after that Lieutenant Schulze was
12  still within the Schiller Park Police Department
13  but he was not your direct supervisor?
14    A   Correct.
15    Q   But as chief he runs the entire
16  Schiller Park Police Department?
17    A   Correct.
18    Q   After Lieutenant Schulze was your
19  supervisor then Lieutenant DeSimone?
20    A   No, it was Lieutenant Fargakis, and then
21  when he got promoted to chief then it became Joe.
22    Q   What years was it lieutenant -- could
23  you spell -- say and spell the name again?
24    A   His name is Fargakis, F-a-r-g-a-k-i-s.

1    Q   When did Lieutenant Fargakis become your
2  supervisor?
3    A   Right after Lieutenant Schulze was
4  promoted. Within a couple of months
5  Lieutenant Fargakis came in by us, and then I'm
6  trying to think when he got promoted, but in
7  2013 -- I think 2017 is when he got promoted.
8    Q   So Lieutenant Fargakis would have been
9  your supervisor from around 2011 to around 2017?
10    A   Correct.
11    Q   About how many cybercrimes trainings
12  would you guess that you've done over the years?
13    A   Maybe 20.
14    Q   Do you consider yourself to be an expert
15  in cybercrimes investigations?
16  MR. KAPLAN: Object to the term expert.
17    Go ahead and answer.
18  THE WITNESS: No.
19  By Ms. Schwartz:
20    Q   In terms of the structure of the
21  Schiller Park Police Department, the detective
22  unit, that's the unit you're within today?
23    A   Correct.
24    Q   Is there any additional subdivisions

1  within the Schiller Park Police Department
2  detective unit?
3    A   No.
4    Q   So just one big general unit?
5    A   Well, I wouldn't say big, but yeah.
6    Q   How many people are in the detective --
7    A   Four.
8    Q   There are four detectives?
9    A   Yes.
10    Q   Detective Martin, I'd like to discuss
11  your relationships with the other parties in this
12  litigation.
13    First before I go through each of the
14  parties, just generally speaking have you spoken or
15  communicated with anybody, parties or otherwise,
16  about this lawsuit?
17    A   No.
18    Q   You haven't spoken to any of the other
19  defendants in this case about this litigation?
20    A   No.
21    Q   I want to ask you now about the other
22  parties in this case.
23    Do you know who Robert Podlasek is?
24    A   I do.

1     Q   How do you know Robert Podlasek?

2     A   He was one of the State's Attorneys that

3  was assigned to handle this case.

4     Q   Have you ever met Mr. Podlasek in

5  person?

6     A   Yes.

7     Q   Were your meetings with

8  Mr. Podlasek related to Miss Melongo's case?

9     A   Yes.

10    Q   Have you ever met Mr. Podlasek outside

11  of any dealings related to Miss Melongo's case?

12    A   Other than in passing like when I was

13  handling other cases within his office, I would see

14  him and just say hello.

15    Q   But Mr. Podlasek was not the ASA

16  assigned to any other cases --

17    A   No.

18    Q   -- you've worked on?

19    A   No.

20    Q   Have you ever socialized with

21  Mr. Podlasek outside of a work setting?

22    A   Not that I recall, no.

23    Q   Have you ever sent text messages to

24  Mr. Podlasek?

1     A   I may have during the case. I don't

2  recall if I did or not.

3    Q   Do you know who Julie Gunnigle is?

4    A   Yes.

5    Q   How do you know Julie Gunnigle?

6    A   I met her I believe one time in regards

7  to this case where she was I believe one of the

8  State's Attorneys that was assigned.

9    Q   Apart from that one time you met

10  Miss Gunnigle, did you have other communications or

11  interactions with Miss Gunnigle?

12    A   Just in reference to her arranging

13  meetings with the State's Attorney's Office during

14  the prosecution. Like we would go have to prep or

15  something or there was a motion up that we would

16  need to come down and be available for.

17    Q   Did you have phone calls or emails or

18  other communications with Miss Gunnigle ever?

19    A   Not that I recall.

20    Q   You testified that you met with

21  Miss Gunnigle maybe one time.

22    What do you recall about that meeting

23  with Miss Gunnigle?

24    A   It was just preparation for whatever was

1  up, whatever motion or hearing. I don't recall

2  specifically what it was, but that's about the only

3  time I remember ever talking to her.

4    Q   Do you recall when, what year that would

5  have been?

6    A   No idea.

7    Q   Do you recall anything about the

8  substance of that conversation with

9  Miss Gunnigle?

10    A   No.

11    Q   Do you know who Kate Garcia is?

12    A   I do.

13    Q   How do you know Kate Garcia?

14    A   She is an investigator with the State's

15  Attorney's Office, I believe. She was actually in

16  Schiller Park investigating a matter several years

17  ago and we had -- you know, I'd see her in passing.

18  I was introduced to her once while she was there,

19  and I've seen her a few things afterwards at things

20  and different trainings and within their office.

21    Q   Did you ever work with Kate Garcia on

22  anything related to Miss Melongo, Carol Spizzirri

23  or the Save a Life Foundation?

24    A   Not that I recall, no.

1     Q   The matter you're referring to in which

2  Miss Garcia was working with Schiller Park did not

3  relate to Miss Melongo?

4    A   No.

5    Q   When you met with -- met Kate Garcia,

6  were you aware that you were both defendants in

7  this litigation?

8    A   No. I believe it was prior to that.

9    Q   You haven't talked to Miss Garcia about

10  this litigation?

11    A   No.

12    Q   Have you ever socialized with

13  Miss Garcia outside of a work setting?

14    A   She and her husband were guests at our

15  golf outing. They have a child that has some

16  medical issues, and the FOP raised money for her

17  and her child actually, and some of those medical

18  bills to assist the family. So she was at our golf

19  outing and dinner and stuff that transpired

20  there.

21    Q   What does FOP stand for?

22    A   Fraternal Order of Police. It's our

23  labor union.

24    Q   Apart from the golf outing about which

1    you just testified, have you socialized or
2    interacted with Kate Garcia outside of a work
3    setting any other time?
4        A    Not that I recall, no.
5        Q    Do you know who James Dillon is?
6        A    No.
7        Q    You never interacted or met with
8    James Dillon?
9        A    Not that I know of.
10       Q    Do you know who Antonio Rubino is?
11       A    No.
12       Q    You never interacted with
13   Antonio Rubino?
14       A    Not that I recall, no.
15       Q    Do you know who Richard Lesiak is?
16       A    Nope.
17       Q    Do you know who Randy Roberts is?
18       A    No, I don't think I do.
19       Q    Do you know who Mathew Markos is?
20       A    No.
21       Q    Do you know Kyle French?
22       A    I do.
23       Q    How do you know Kyle French?
24       A    Kyle French was I believe an attorney

1    with the Attorney General's Office in their high
2    tech crimes bureau.
3        Q    When did you -- have you met
4    Kyle French?
5        A    Yes.
6        Q    When did you first meet Kyle French?
7        A    I don't recall if I met him prior to
8    this case.  Schiller Park was a member -- actually
9    Lieutenant Schulze was a member of the Attorney
10   General's Internet Crimes Against Children Task
11   Force, and he -- prior -- just prior to me becoming
12   detective, wanted to get me acclimated with them.
13   So he would take me to their quarterly meetings,
14   and I may have met him there before then, but
15   that's probably would be the only time.
16       Q    The only time prior to working with
17   Mr. French?
18       A    Yes.  If I did, I don't recall if I
19   specifically met him, but that would have been the
20   only time if -- I don't recall any personal
21   interaction with him prior to the -- him coming to
22   Schiller Park.
23       Q    When did he first come to
24   Schiller Park?

1        A    I believe it was in May of '06.
2        Q    And what was that in relation to, his
3    trip to Schiller Park?
4        A    In relation to him and his office
5    offering assistance in this case.
6        Q    When you say this case, what are you
7    referring to?
8        A    The Annabel Melongo intru -- and the
9    Save a Life intrusion.
10       Q    How many times have you met in person
11   with Kyle French?
12       A    Less than a handful.  I don't recall the
13   exact amount.
14       Q    Is the Save a Life intrusion the only
15   matter, investigation that you worked on with
16   Kyle French?
17       A    Yes.
18       Q    Do you know who Carol Spizzirri is?
19       A    I do.
20       Q    How do you know Carol Spizzirri?
21       A    She was the president and founder of the
22   Save a Life Foundation.
23       Q    Have you met Carol Spizzirri in
24   person?

1        A    Yes.
2        Q    When was the first time you met Carol
3    Spizzirri?
4        A    May 5th when she -- we went to
5    Save a Life to speak to her in regards to the
6    report she had made.
7        Q    When you say we, who is we?
8        A    Myself and Lieutenant Schulze.
9        Q    About how many times have you met
10   Miss Spizzirri in person?
11       A    Several.  I couldn't put a number on
12   it.
13       Q    Have you ever interacted or met with
14   Carol Spizzirri outside of a work setting?
15       A    No.
16       Q    Have you ever socialized with
17   Miss Spizzirri, had a drink, gone to an event,
18   anything like that?
19       A    No.
20       Q    Do you know who Annabel Melongo is?
21       A    I do.
22       Q    How did you first hear about Annabel
23   Melongo?
24       A    When we went to meet with the people at

1    Save a Life on May 5th.
2        Q    That was the first time, May 5, 2006,
3    that you heard of Miss Melongo?
4        A    Correct.
5        Q    Have you met Miss Melongo in person?
6        A    I have.
7        Q    How many times have you met Miss Melongo
8    in person?
9        A    Specifically where I'm having a
10   discussion with her?  Because I've seen her in
11   person like obviously in court, so as far as
12   personal interaction with her, I would say just two
13   that I know of, other than in appearances in
14   court.
15       Q    So two personal interactions in which
16   you had some conversation with Miss Melongo and
17   then also you saw her in court?
18       A    Correct.
19       Q    What were the two instances in which you
20   had some interaction with Miss Melongo?
21       A    Once at her home and then once at the
22   police station I believe are the only two.
23       Q    When you saw Miss Melongo in court, did
24   you ever have any personal communication or

1    conversations with her then?
2        A    No.
3        Q    Have you ever spoken to Miss Melongo on
4    the phone?
5        A    I don't recall if I did at all.
6        Q    Have you ever communicated with
7    Miss Melongo over email or text message, anything
8    like that?
9        A    Not that I recall, no.
10       Q    The two times that you testified that
11   you communicated in person with Miss Melongo, once
12   at her house, once at the police station, what
13   dates were those two communications?
14       A    I don't know the exact dates of when I
15   talked to her.  I believe at her home was in June
16   or July of '06 and then later on in the year of '06
17   when the charges -- after the charges were
18   approved, she came to the police station to be
19   processed on the charges.
20       Q    That would have been fall or winter of
21   2006 as well?
22       A    Fall.  It wasn't winter.
23       Q    When you spoke to her at her home, are
24   you referring to the time when a search warrant was

1    executed at Miss Melongo's home?
2        A    Yes.
3        Q    And the fall of 2006 action, you said
4    that was after Miss Melongo was processed on
5    charges?
6        A    It was after the arrest warrant was
7    issued, she came to the police station to be
8    processed on the original charges.
9        Q    So it was during the time -- around the
10   time that she was processed?
11       A    Yes.
12       Q    Apart from those instances we just
13   discussed, the interaction at Miss Melongo's house,
14   interaction at the police station in the fall of
15   2006 and court appearances at which you were
16   present, do you recall meeting Miss Melongo any
17   other time?
18       A    No.
19       Q    What was your role related to
20   Miss Melongo's criminal cases?
21       A    I was assigned as the investigating
22   detective.
23       Q    Who gave you that assignment?
24       A    Lieutenant Schulze.

1        Q    Did you have any involvement in the
2    decision to assign -- to be assigned to that
3    case?
4        A    No.
5        Q    As the investigating detective, what did
6    you do related to Miss Melongo's case or the
7    Save a Life Foundation?
8        A    I would gather the evidence that was
9    available to me, and then I brought that evidence
10   to the -- well, with the assistance of Mr. French
11   and his unit, we were able to take that evidence to
12   the State's Attorney's Office for review and
13   eventually approval of the charges.
14       Q    You testified earlier that you first met
15   Carol Spizzirri on May 5, 2006; is that correct?
16       A    Yes.
17       Q    What do you recall about that meeting on
18   May 5, 2006 with Carol Spizzirri?
19       A    Just that her and some of her
20   executives -- I don't recall exactly who, they
21   provided further insight as to the details that the
22   initial officer had put into his report, and kind
23   of clarified some of the documentation that they
24   provided him as far as how it related to the claims

1  that they were making as to the crime that had been
2  committed.
3      Q   So let's take a step back.
4         What caused you to go meet with
5  Carol Spizzirri on May 5, 2006?
6      A   Well, Save a Life called the police
7  station, reported that a crime had been committed.
8  The initial officer responded to the scene, took a
9  -- the initial report.  And then came back to
10  Schiller Park Police Department and obviously
11  notified Lieutenant Schulze, who then had me
12  assigned and then we went to talk to her.
13      Q   Who was the initial officer?
14      A   I don't recall.  I believe it was
15  Officer Marrazzo, but I don't know for sure.
16         Do you want me to spell it?
17      Q   How do you spell Officer Marrazzo?
18      A   M-a-r-r-a-z-z-o.
19      Q   So Officer Marrazzo or the initial
20  officer first met with Carol Spizzirri of the
21  Save a Life Foundation, and then you met with
22  Carol Spizzirri on a separate, separate occasion;
23  is that correct?
24      A   Yeah.  He -- he went there I believe

1  earlier in the day, and then he came back, and
2  after he had either completed his report or
3  whatever, he notified Lieutenant Schulze of what
4  had transpired or what was being alleged.  And then
5  he assigned me and said hey, let's go over there.
6  But it was the -- I believe it was the same day
7  even.
8      Q   Who was present when you met with Carol
9  Spizzirri on May 5, 2006?
10      A   I don't recall who exactly was there
11  other than her.  There may have been other
12  executives.  I don't recall specifically.
13      Q   What did Carol Spizzirri tell you during
14  that meeting?
15      A   Just that they had two servers that had
16  been accessed -- what they believe to have been
17  accessed remotely and data was deleted off of those
18  servers.
19         And then also she believed that someone
20  had been viewing her personal Save a Life emails,
21  and then they alleged that one of those -- I
22  shouldn't say one, but emails had been removed from
23  that account and transferred to another account.
24      Q   Did she tell you why she believed that

1  the two Save a Life servers had been accessed?
2      A   Because the data had been deleted.
3      Q   Did Carol Spizzirri tell you why she
4  believed someone had viewed her personal email
5  account?
6      A   She had received an email from another
7  one of her employees that was able -- part --
8  included in the body of the message there was -- I
9  think it said something along the lines that it had
10  been forwarded to a Yahoo account.
11      Q   Did you see that email when you met with
12  Miss Spizzirri on May 5, 2006?
13      A   Yes.  I believe she provided us a copy
14  of it.
15      Q   And that email said that an email from
16  Miss Spizzirri's account had been forwarded to
17  another account?
18      A   No.  I believe it had -- at that point
19  we -- there was what was listed as the FW, which
20  means forward, and there was forwarded to a Yahoo
21  account.  And then they had a header for a specific
22  email showing an IP address outside of their
23  internal network.
24      Q   What did that IP address correspond to

1  on the header of the email that you viewed on
2  May 5, 2006?
3      A   I'm not understanding you as far as
4  corresponding to.
5      Q   You testified that there was an email
6  Miss Spizzirri showed you on May 5, 2006.  There
7  was an IP address shown in the header of the email,
8  correct?  Is that what -- was that your testimony?
9      A   One of the -- there was one in the --
10  one of a couple that was inside this header that
11  didn't -- was not one of their internal IP
12  addresses.
13      Q   And did that IP address in the header of
14  the email that you viewed on May 5, 2006, did that
15  IP address correspond to an email that was
16  forwarded out of Carol Spizzirri's account?
17      A   I'm not understanding correspond.  The
18  header provided us a -- I'm trying to think of the
19  word -- a path as to the direction or path that
20  this email took and that the starting point of that
21  was an IP address that was not one of their
22  internal ones and not from their web host, I guess,
23  or email host.
24      Q   Did Miss Spizzirri during that meeting

1   on May 5, 2006, did Miss Spizzirri say anything
2   about who she suspected could have been involved in
3   the alleged intrusion on Save a Life's systems and
4   the alleged email forwarding?
5       A   Yes.
6       Q   What did she say?
7       A   They listed I believe in the initial
8   report that they suspected their ex-IT
9   administrator has committed these crimes because
10  in -- the forwarding address was similar to that of
11  her name.
12      Q   When you say the forwarding address was
13  similar to that of her name, what do you mean?
14      A   The forwarding address of the email that
15  was shown in the header that they saw was forwarded
16  to a Yahoo email address that was listed, that the
17  user name or the email account was Melongo -- I
18  believe it was Melongo_Annabel, so it's similar to
19  her name.
20      Q   Did Carol Spizzirri tell you why -- did
21  Carol Spizzirri indicate whether she thought
22  Miss Melongo had anything to do with the alleged
23  intrusion on Save a Life Foundation's servers?
24      A   She believed that she did.

1       Q   Did she say why she believed that?
2       A   I don't recall if she specifically
3   stated why.
4       Q   Do you recall anything else
5   Miss Spizzirri said to you during that meeting on
6   May 5, 2008 -- 2006?
7       A   No.
8       Q   What did you say to Miss Spizzirri or
9   any of the other people present at that May 5, 2006
10  meeting?
11      A   I don't recall anything specifically
12  that I said to them.
13      Q   Did Miss Spizzirri or anyone else during
14  that May 5, 2006 meeting tell you anything about
15  Miss Melongo?
16      A   I don't recall anything specific about
17  her other than she was their IT administrator.
18      Q   Did she tell you anything about her
19  employment with Save a Life Foundation?
20      A   She said that they terminated her.  I
21  believe it was several days prior, like April 27, I
22  think was the date that they actually had let her
23  go.
24      Q   Did Carol Spizzirri tell you anything

1   else about Miss Melongo's termination?
2       A   Not that I recall specifically, no.
3       Q   What did you do related to the Save a
4   Life Foundation investigation after the May 5, 2006
5   meeting?
6       A   I contacted Yahoo to determine how we
7   may be able to get the information regarding the
8   usage of the Yahoo account and what information may
9   have been captured by them.  And we had knowledge
10  of the IP address that was on the email header that
11  they -- that it was a Comcast IP address.  So I
12  reached out to Comcast in an attempt to figure out
13  how to get information from them.
14      Q   Did you request information from any
15  other sources?
16      A   Not at that specific moment, no.
17      Q   When you say not at that specific
18  moment, what time frame are you referring to?
19      A   Within the first couple of days, the
20  only thing I recall doing was actually talk -- you
21  know, talking to Yahoo and Comcast, and then
22  sending preservation letters to them in regards to
23  saving the account or taking a snapshot of the
24  account.

1       Q   Did you consider whether to preserve any
2   evidence from Save a Life Foundation?
3       A   I think there was a discussion, but I
4   don't recall when, and I think it was later on in
5   that month that because of the fact that the --
6   Save a Life had hired people to attempt to recover
7   the data, there had been multiple people doing
8   multiple things and no one could specifically
9   attest to what exactly they had done, that we
10  couldn't have a clear chain of custody as to where
11  the evidence came from.  So the decision I believe
12  was made to not bother with seizing any computers
13  from them and/or taking any of their computers for
14  analysis.
15      Q   Their computers referring to Save a Life
16  Foundation's --
17      A   Correct.
18      Q   -- computers?
19      A   Correct.
20      Q   Was the same true with respect to
21  Save a Life Foundation's servers?
22      A   Yes.
23      Q   You testified that there was some
24  discussion about whether it made sense to seize or

1    obtain evidence from Save a Life Foundation's
2    computers and servers.
3        Who was that discussion with?
4    A    Well, the other only person would have
5    been Lieutenant Schulze, and then eventually later
6    on potentially Mr. French.
7    Q    Do you recall conversations with
8    Lieutenant Schulze and Kyle French about whether to
9    seize or obtain servers at Save a Life
10   Foundation?
11   A    Not specific conversations but at the
12   time Lieutenant Schulze was advising me on how to
13   proceed.
14   Q    Who made the decision not to seize
15   evidence from Save a Life Foundation's computers or
16   servers?
17   A    The servers specifically was myself and
18   Lieutenant Schulze based upon the chain of custody
19   issue.
20   Q    And what about the servers, who made
21   those decisions?
22   A    Those, the servers.  The computers, I
23   don't recall a specific conversation or the reason
24   why, other than the fact that I think that they --

1    or that Lieutenant Schulze and I decided because
2    the time that had passed and the chain of custody
3    issue, we couldn't verify whether or not anybody
4    had ever tried and attempted to recover anything.
5    Q    Who told you about this chain of custody
6    issue?
7    A    Lieutenant Schulze.
8    Q    Did you talk to anybody at Save a Life
9    Foundation or any other outside individual about
10   the chain of custody issue related to Save a Life
11   Foundation's computers and servers?
12   A    As far as talk to them, I think we told
13   them basically the reasoning, but it wasn't a
14   discussion as to whether or not we would do it or
15   not.
16       We would just advise them saying, we're
17   not going to take your -- we're not going to do
18   this analysis because of the chain of custody
19   issue, and explained the chain of custody and what
20   it means to a case.  That would be it.
21   Q    When you say chain of custody, what do
22   you mean?
23   A    We have -- in a criminal case, we have
24   to verify what -- where we got the information

1    from, and that it's the best evidence in relation
2    to being original.
3        So we can't -- we couldn't say for sure,
4    well, this person did this and this person
5    attempted to recover this, and the specific
6    attempts and/or -- I don't want to say functions,
7    but what each -- the actions were of each
8    individual that may or may not have attempted to do
9    something and what specifically they -- what
10   evidence they collected.
11       So if I can't say where a piece of
12   evidence came from, it's not admissible.  So I have
13   to say it came from this person.  This is the best
14   evidence, and it's original form or as close to the
15   original form as possible.  And I have to keep that
16   contained and note who may have accessed it up
17   until the point where it's, you know, in court.
18   Q    So with respect to Save a Life
19   Foundation computers and servers, you couldn't
20   state with certainty who had done what actions
21   prior to your involvement in the investigation; is
22   that your testimony?
23   A    Correct.
24   Q    So taking a step back in terms of when

1    you first learned about this chain of custody issue
2    as you called it.
3        Who first told you that there was an
4    issue or potential issue related to chain of
5    custody?
6    MR. KAPLAN:  Objection, asked and answered.
7        You can answer.
8    THE WITNESS:  Carol Spizzirri I believe showed
9    us an email that she had received from it was
10   Don Peters, I think the guy's name is, in regards
11   to his attempts and his company's attempts, I
12   should say, to recover data after the intrusion on
13   the 28th.
14   By Ms. Schwartz:
15   Q    What about that email from Don Peters
16   revealed that there may be a chain of custody
17   issue?
18   A    He specifically states in there that he
19   could not provide her with any indication -- or any
20   specific details as to the actions that were taken
21   by what individuals, and he addressed the chain of
22   custody issue.
23   Q    Did you ever speak with Don Peters
24   directly?

1    A    Yeah, I believe I did, and then I asked
2  that he give me a copy of that letter direct from
3  him and...
4    Q    Did he give you a copy of the letter?
5    A    Yeah, I believe he faxed it over to us a
6  couple days later.
7    Q    When you spoke to him, what did
8  Don Peters say?
9    A    He was basically sticking to what he had
10 written to Miss Spizzirri in the sense that he
11 couldn't say for any certainty as to the -- who
12 performed what steps in the recovery process and
13 what information may have been gained by what
14 individual.
15   Q    Did you ask Don Peters any questions
16 about the state of the servers or the computers at
17 Save a Life Foundation?
18   A    I don't recall any specific questions I
19 may have asked him.
20   Q    Do you recall anything else about the
21 conversation you had with Don Peters?
22   A    No.
23   Q    Was there only one conversation you've
24 ever had with Don Peters?

1    A    That I remember, yeah.
2    Q    In terms of the claim that someone had
3  forwarded an email from Miss Spizzirri's email
4  account to a Yahoo account, what steps did you take
5  to determine what that email was?
6    A    I don't understand what the email was.
7    Q    I'll rephrase the question.
8         Did you collect from Carol Spizzirri or
9  Save a Life Foundation any evidence from a computer
10 or server specifically about the allegation that an
11 email had been forwarded from Miss Spizzirri's
12 email account to a Yahoo account?
13   A    We didn't collect any evidence as far as
14 computer evidence.  Like we didn't take any of
15 their computers for analysis.
16   Q    That was true with respect to the email
17 claim --
18   A    Correct.
19   Q    -- allegation as well?
20   A    Correct.
21   Q    Why didn't you take any evidence related
22 to the computers with respect to the email?
23   A    I believe it was because of the same
24 thing, that the computer evidence or Don Peters',

1  his statement of chain of custody and the
2  discussion I had with Lieutenant Schulze, and
3  that's all I can remember at this...
4    Q    Did you ever ask Carol Spizzirri to view
5  her email interface, her sent folder, anything like
6  that?
7    A    I specifically did not, no.  Not that I
8  recall at least.
9    Q    It's your testimony that Carol Spizzirri
10 was the first person to identify Miss Melongo as
11 being a suspect in the alleged intrusion and
12 alleged email forwarding?
13      MS. NINFO:  Objection, it misstates his
14 testimony.
15      THE WITNESS:  I don't recall if it was her
16 specifically, but within the meeting there was --
17 you know, at least Miss Spizzirri and a couple
18 others from Save a Life.  So I don't specifically
19 know if it was her that gave us the name or if it
20 was one of the other people there.
21    By Ms. Schwartz:
22    Q    But it was someone from Save a Life
23 Foundation?
24    A    Correct.

1    Q    Who did you work with on the Save a Life
2  Foundation investigation?
3    A    Lieutenant Schulze, Kyle French, I think
4  that's it, as far as the investigation.
5  Detective Henn did send a preservation letter.
6    Q    Is Detective Henn one of your
7  colleagues?
8    A    He was at the time, yes.
9    Q    Anyone else?
10   A    Not that I recall, no.
11   Q    What was Kyle French's role in the Save
12 a Life Foundation matter?
13   A    He and his office provided support in
14 regards to the computer evidence and the forensics
15 that were done.
16   Q    How did Kyle French get involved in the
17 Save a Life Foundation investigation?
18   A    I don't recall --
19      MR. KAPLAN:  How did Kyle French did you say?
20 Could you read back the question I just missed
21 it.
22    By Ms. Schwartz:
23    Q    How did you Kyle French get involved in
24 the Save a Life Foundation investigation?

1    A    I don't recall specifically how he
2  became involved.  I just know that he was assigned
3  by the Attorney General's Office to help.
4    Q    Do you know how the Attorney General's
5  Office got involved in the Save a Life Foundation
6  investigation?
7    A    Not -- I don't off the top of my head,
8  no.
9    Q    You testified earlier that you first met
10 with Kyle French in May of 2006 about the
11 Save a Life Foundation?
12   A    Correct.
13   Q    What do you recall about that meeting
14 with Kyle French?
15   A    Just that he had been assigned to help
16 us in any way.  He had previously had knowledge of
17 the incident as far as some of the providers,
18 internet service providers that may -- that were
19 involved or may have potentially have evidence, and
20 he sent out some preservation letters on our
21 behalf.
22   Q    Did you describe to him the allegations
23 you were investigating during that May 2006
24 meeting?

1    A    I'm sure I did, but I don't recall
2  specifically what was said.  I know that, you know,
3  we would have discussed some of the stuff that we
4  had been provided from Save a Life and potentially
5  the course of the investigation, a guide as to how
6  to proceed further.
7    Q    Did you provide Kyle French with any of
8  the emails or other documents related to the
9  investigation?
10   A    I don't specifically -- I don't know
11 specifically I gave him a copy of them, but I would
12 show him some of the -- you know, what we had had
13 or would have been provided at that point.
14   Q    What was the division of labor between
15 you and Kyle French in working on the Save a Life
16 Foundation matter?
17   A    Can you describe division of labor?
18   Q    Was one of the lead or?
19   A    He was assigned just to assist me and
20 clarify some of the terminology potentially that we
21 may need to use in regards to the preservation
22 order or to eventually later on the search warrant.
23 You know, the language that needed to be put in to
24 there to get the proper results back.

1    Q    When you say the search warrant, what
2  search warrant are you referring to?
3    A    The search warrant for Yahoo and
4  eventually later on he helped provide assistance in
5  getting the approval of the search warrant for
6  Miss Melongo's home.
7    Q    Did you consider yourself the lead
8  investigator with respect to the Save a Life
9  Foundation investigation?
10   A    Yes.  It was a Schiller Park case, so it
11 would be ours to handle.
12   Q    Do you recall anything else about your
13 first meeting with Kyle French?
14   A    No.
15   Q    I'm handing Detective Martin Plaintiff's
16 Deposition Exhibit 1, Bates numbered CCSAO 000546
17 to 547.
18        (A document was marked Plaintiff's
19         Deposition Exhibit Martin No. 1
20         for identification.)
21 By Ms. Schwartz:
22   Q    Do you recognize Exhibit 1,
23 Detective Martin?
24   A    Yes, I do.

1    Q    What is Exhibit 1?
2    A    It is the initial report completed by
3  Officer Marrazzo.
4    Q    Does this refresh your recollection as
5  to who the initial officer was on the case?
6    A    It does.
7    Q    And that's Officer Marrazzo?
8    A    Correct.
9    Q    Is that his signature down at the bottom
10 left?
11   A    It is.
12   Q    And had you reviewed this report prior
13 to today?
14   A    Yes.
15   Q    Is it a true and accurate copy of the
16 May 5, 2006 police report?
17   A    It appears to be, yes.
18   Q    If you turn to the second page of
19 Exhibit 1, it says R/O was dispatched to
20 9950 Lawrence Avenue, Suite 300, for a report of
21 computer tampering.  Upon arrival R/O spoke to the
22 reverse listed complainant/victim/company president
23 Carol J. Spizzirri who stated the following in
24 summary but not verbatim.

1    Is RO Officer Marrazzo?
2    A    Correct.  RO stands for responding
3  officer.
4    Q    Were you present when Officer Marrozza
5  was dispatched to 9950 Lawrence Avenue on May 5,
6  2006?
7    A    I was working that day, but I was not at
8  9950 Lawrence when he took this report.
9    Q    Is this the initial meeting that you
10  testified about earlier between Carol Spizzirri and
11  an officer with Schiller Park Police Department?
12    A    Yes.
13    Q    And is 9950 Lawrence Avenue, Suite 300,
14  Save a Life Foundation's offices?
15    A    It was, yes.
16    Q    And I believe you testified earlier that
17  the reason Officer Marrazzo was dispatched to
18  Save a Life Foundation offices was the result of a
19  9 -- a call to the Schiller Park Police Department;
20  is that correct?
21    A    Yes.
22    Q    Do you know who made that call to the
23  Schiller Park Police Department?
24    A    I do not.

1    Q    To your knowledge was this meeting
2  involving Officer Marrazzo and Carol Spizzirri the
3  first in-person contact between someone from
4  Schiller Park Police and Carol Spizzirri?
5    A    I'm sorry, can you repeat the question?
6    Q    To your knowledge was the May 5, 2006
7  meeting between Officer Marrazzo and Carol
8  Spizzirri the first interaction between
9  Miss Spizzirri and the Schiller Park Police?
10    MR. KAPLAN:  Objection, calls for speculation.
11    Answer.
12    THE WITNESS:  Typ -- I don't know if this is
13  the first call that Carol ever made to
14  Schiller Park in reference to needing a call for
15  service, but in reference to this case, yes, I
16  believe it is.
17    By Ms. Schwartz:
18    Q    Exhibit 1 states that Miss Spizzirri
19  made a statement to Officer Marrazzo and outlines a
20  summary of the statement.
21    To your knowledge is there any other
22  written documentation of the statement
23  Miss Spizzirri made to Officer Marrazzo?
24    A    No.

1    Q    She didn't sign a version of the
2  statement somewhere else?
3    A    No, not that I know of.
4    Q    Did Officer Marrazzo tell you anything
5  about the meeting with Carol Spizzirri on May 5,
6  2006 after it took place?
7    A    I don't know if he specifically talked
8  to me, but he obviously talked to the lieutenant in
9  regards to assigning this case.
10    Q    Did you read this report, Exhibit 1,
11  prior to your first meeting with Carol Spizzirri on
12  May 5, 2006?
13    A    I don't recall if I read it prior to the
14  meeting, but I would have read it at some point,
15  either prior to or at the meeting itself.
16    Q    I would like to walk through some of the
17  content of Exhibit 1.
18    Again, we're on the second page of
19  Exhibit 1, the third line, about halfway through it
20  it states, on Thursday, 27 april '06, Spizzirri,
21  president and founder of Save a Life Foundation,
22  fired the above-listed employee/suspect Annabel
23  Melongo for performance and attitude problems.
24    Were you ever told about this statement

1  Miss Spizzirri made that Miss Melongo was
2  terminated for performance and attitude problems?
3    A    I may have been, but I don't
4  specifically recall, you know, if I heard that from
5  her, from Miss Spizzirri.
6    Q    Do you have any recollection of
7  Miss Spizzirri ever telling you about the reasons
8  for Miss Melongo's termination?
9    A    I'm -- I'm sure she did at some point,
10  but as far as specific statement, I don't recall
11  what she may have said or when it took place.
12    Q    If you continue to the next paragraph on
13  Exhibit 1, second page it states, on Friday, 28
14  April '06 Spizzirri -- strike that.  I'll read a
15  different portion.
16    We are on Exhibit 1, second page, the
17  second paragraph.  It says, on Friday, 28 April '06
18  between the hours of 0100 to 0300 an unknown
19  offender hacked into the computer server for SALF
20  and deleted all of the files in the server,
21  including financial records and account numbers.
22  The offender then entered Spizzirri's personal
23  email account, pulled out two emails, sent them to
24  a Yahoo.com email address and responded to them

1   from said address.
2       Where did that information in the
3   passage that I just read come from?
4       MR. KAPLAN: Objection, calls for
5   speculation.
6       THE WITNESS: To be honest, I don't know.
7   By Ms. Schwartz:
8       Q   Isn't it true that Miss Spizzirri
9   alleged that her emails were forwarded on May 1,
10  2006 not April 28, 2006 as it states here?
11      A   Yes. We determined that by the email
12  that was provided to us, the copy of the email that
13  was provided to us.
14      Q   That the email was sent on May 1,
15  2006?
16      A   Sent on May 1st, yes, the alleged
17  email.
18      Q   So does this Exhibit 1 contain an error
19  with respect to the date?
20      MR. WUNDER: I'm going to object, calls for
21  speculation.
22      THE WITNESS: Yeah, I believe so.
23  By Ms. Schwartz:
24      Q   Did you consider that, that error

1       A   Confirm as in the 90 percent?
2       Q   As in the 90 percent figure.
3       A   The only -- I believe the only
4   information we were ever provided was Mr. Peters'
5   report had said a number of files, but I don't
6   believe there was a percentage.
7       Q   Turning to the next paragraph of
8   Exhibit 1, second page, it states, Spizzirri stated
9   she believes Melongo is a flight risk due to the
10  fact that she is not a U.S. citizen.
11      Did Miss Spizzirri ever say anything to
12  you about Miss Melongo being a flight risk?
13      A   Not that I recall specifically, no.
14      Q   Did Miss Spizzirri ever say anything to
15  you about Miss Melongo not being a United States
16  citizen?
17      A   Not that I recall.
18      Q   Did you know when you were working on
19  this investigation, Save a Life Foundation
20  investigation, that Miss Melongo was not a
21  U.S. citizen?
22      A   Not until she was being processed, and I
23  don't recall exactly how it came out, but she
24  stated that she was a Camaroon national. And I

1   potentially significant in terms of your
2   investigation?
3       MR. KAPLAN: Objection, calls for speculation
4   and it assumes facts not in evidence that he even
5   considered the error at that time or that there was
6   an error at that time.
7       THE WITNESS: We typically get reports that
8   have errors in them, so it wouldn't have changed my
9   opinion of how the case would proceed.
10  By Ms. Schwartz:
11      Q   If you continue down a little farther on
12  Exhibit 1, down to the fifth paragraph it states,
13  three separate firms have been hired by
14  Miss -- by Spizzirri to attempt to retrieve the
15  lost files. As of the time of this report SALF has
16  recovered 90 percent of the files.
17      Do you know where that information that
18  I just quoted came from?
19      A   I'm assuming based on what's written
20  here is that the officer got that information from
21  Miss Spizzirri.
22      Q   Did you ever confirm the amount of
23  information that the Save a Life Foundation was
24  able to recover from the servers?

1   don't recall how I did it, but I remember having to
2   contact Department of Justice or somebody to advise
3   her of certain detainee rights. And I talked to
4   somebody, I think it was at the DOJ, that said you
5   need to have her fill out this form or whatever.
6   Prior to that, no.
7       Q   So as of the time of this report,
8   Exhibit 1, someone from the Save a Life Foundation
9   had identified Miss Melongo as a potential suspect
10  with respect to the alleged intrusion and alleged
11  email forwarding; is that correct?
12      A   Correct.
13      Q   No investigation had been done by
14  Schiller Park Police Department at the time this
15  report was created, Exhibit 1?
16      A   Correct.
17      MR. KAPLAN: Can we take two minutes?
18      MS. SCHWARTZ: Of course.
19      MR. KAPLAN: Is now a good time?
20      MS. SCHWARTZ: Now is a great time. Why don't
21  we take five minutes.
22      (A recess was taken.)
23  By Ms. Schwartz:
24      Q   Detective Martin, Miss Melongo was

1    alleged to have deleted financial and accounting
2    files from Save a Life Foundation networks; is that
3    correct?
4       A    That was what was alleged in the initial
5    report, yes.
6       Q    Was that one of the allegations that you
7    investigated while you worked on the case?
8       A    Yes.
9       Q    Were you aware that Miss Melongo did not
10   have access to Save a Life Foundation's accounting
11   files as the IT administrator?
12      MR. WUNDER:  Objection, calls for speculation,
13   assumes facts not in evidence.
14      THE WITNESS:  There was a -- I think
15   Miss Melongo stated that she did not possess
16   access.
17      By Ms. Schwartz:
18      Q    Did you ever investigate that particular
19   statement?
20      A    Not, not specifically that I remember,
21   no.
22      Q    I'm handing Detective Martin Plaintiff's
23   Deposition Exhibit 2, identified as Spizzirri
24   000001099 to 1100.

1            (A document was marked Plaintiff's
2            Deposition Exhibit Martin No. 2
3            for identification.)
4    By Ms. Schwartz:
5       Q    Have you seen Exhibit 2 before?
6    MR. KAPLAN:  Look at it.
7    THE WITNESS:  No.  I don't think I have.
8    By Ms. Schwartz:
9       Q    I'll represent to you, Detective Martin,
10   that this is an email dated April 12, 2006 from
11   amelongo@salf.org to someone named Bruce Nawara,
12   who is Save a Life Foundation's accountant.  In the
13   email she, Miss Melongo, asks Mr. Nawara for
14   information about accounting data.
15       Were you aware that Miss Melongo had to
16   request information about accounting data because
17   she did not herself have an access to that from
18   Save a Life Foundation?
19      A    No.  Other than her statement to me,
20   no.
21      Q    I'm handing Detective Martin Plaintiff's
22   Deposition Exhibit 3, Bates numbered Melongo_005215
23   to 5223.
24

1            (A document was marked Plaintiff's
2            Deposition Exhibit Martin No. 3
3            for identification.)
4    By Ms. Schwartz:
5       Q    Is Exhibit 3 a true and accurate copy of
6    a police report that you drafted dated at the
7    bottom October 30, 2006?
8       MR. KAPLAN:  Julia, I would just ask to maybe
9    change the question to does it appear to be,
10   because he would have to look at every single word
11   to know if it's exactly the one that he seems to
12   have reviewed.
13   By Ms. Schwartz:
14      Q    Does this appear to be an accurate --
15   true and accurate copy of the police report you
16   crafted --
17      A    Yes.
18      Q    -- drafted?
19       You have no reason to believe anything
20   has been altered?
21      A    No.
22      Q    And that's your signature at the bottom
23   of each page?
24      A    Yes.

1       Q    Did you draft the narrative portions of
2    Exhibit 3?
3       A    Yes.
4       Q    Does Exhibit 3 document the steps you
5    took to investigate the Save a Life Foundation
6    allegations?
7       A    Yes.
8       Q    Were all significant aspects of your
9    investigation described in this report?
10      A    Yes.
11      Q    Was that the standard practice for
12   Schiller Park Police Department to include
13   important details of an investigation in a police
14   report?
15      A    Yes.
16      Q    Did -- does this report, Exhibit 3,
17   describe all the key evidence that you gathered as
18   part of your investigation?
19      A    Describe or -- can you just clarify what
20   you mean by describe the evidence?
21      Q    Does Exhibit 3 include a general
22   description of the evidence that you gathered and
23   reviewed as part of your investigation?
24      A    Yes.

1    Q    And if you had an important piece of
2  evidence, would you note that in this police
3  report?
4    A    Yes.
5    Q    We've already discussed this a bit, but
6  it's correct -- is it correct that one allegation
7  you were investigating was that someone had
8  accessed the Save a Life Foundation's servers
9  without authorization and destroyed data and files
10  on April 28, 2006?
11    A    Yes.
12    Q    And is it correct that another
13  allegation you were investigating was that someone
14  had accessed Miss Spizzirri's email account without
15  authorization and forwarded an email on
16  May 1, 2006?
17    A    Yes.
18    Q    You testified earlier that you did not
19  make copies of any Save a Life Foundation computers
20  or servers; is that accurate?
21    A    Copies?  Do you want to clarify what you
22  mean by copies?
23    Q    Did you yourself or did you instruct
24  anyone to make copies of the hard drives of any

1  Save a Life Foundation computers?
2    A    No, I did not.
3    Q    Did you yourself or did you ask anyone
4  to make copies of the contents of any of
5  Save a Life Foundation's servers?
6    A    No.
7    Q    Wouldn't it have been standard procedure
8  to make copies of Save a Life Foundation servers
9  and computers at the beginning of the
10  investigation?
11    A    Standard procedure, can you clarify what
12  you mean by standard procedure?
13    Q    Wouldn't it have been important for
14  purposes of evidence preservation to make copies of
15  Save a Life Foundation computers and servers at the
16  beginning of the investigation?
17    MR. KAPLAN:  Can you read back the question,
18  ma'am?
19        (The record was read.)
20    MR. KAPLAN:  I just object to the form of the
21  question.
22        Go ahead and answer it.
23    THE WITNESS:  Are you -- in reference to this
24  investigation specifically or in general to a

1  computer investigation?
2    By Ms. Schwartz:
3    Q    Let's start with this investigation
4  specifically?
5    A    Potentially, depending upon what
6  steps -- if no attempts had been made to recover
7  those devices, specifically the servers.
8    Q    If no attempts had been made to recover,
9  to recover the devices, then it would make -- it
10  would be standard procedure to have copies made of
11  servers and computers for preservation purposes?
12    MR. KAPLAN:  Same objection.
13    THE WITNESS:  In this case specifically that
14  would have been an option, yes.
15    By Ms. Schwartz:
16    Q    But because attempts had been made to
17  recover evidence, you opted not to preserve
18  evidence from Save a Life Foundation servers and
19  computers, correct?
20    A    The attempts to recover the data on the
21  servers, yes.
22    Q    And then generally speaking for a
23  general case where there was an allegation of
24  intrusion, would you generally as a standard

1  practice make copies of the affected servers or
2  computers?
3    MR. KAPLAN:  Objection, asked and answered.
4    THE WITNESS:  We have done that in the past,
5  yes, and then there were times that we didn't.
6    By Ms. Schwartz:
7    Q    So it is case specific?
8    A    Yes.
9    Q    So continuing with Exhibit 3, look to
10  the May 5, 2006 entry, it states, R/I received
11  copies of the emails that had been sent to and from
12  Carol Spizzirri's email account.  The headers on
13  the emails showed that the offender had forwarded
14  the suspected emails from Miss Spizzirri's account
15  to the Yahoo email account of
16  melongo_annabel@yahoo.com.
17        R/I, does that refer to you?
18    A    Yes.  It stands for reporting
19  investigator.
20    Q    And it states that you received copies
21  of emails that had been sent to and from
22  Miss Spizzirri's email account.
23        Who gave you copies of those emails?
24    A    I don't recall specifically.  It would

1     have been the people at -- who were at the
2     meeting.
3          Q    At the May 5, 2006 meeting at
4     Save a Life?
5          A    Yes.
6          Q    And Carol Spizzirri was one of the
7     participants at that meeting?
8          A    Yes.
9          Q    When you received copies of emails from
10    someone at Save a Life Foundation, did you do
11    anything to verify that the copies you received had
12    not been altered in any way from the original
13    emails?
14         A    I did not do anything specifically, no.
15         Q    What specifically were the emails that
16    you received on May 5, 2006?  Could you describe
17    them to me?
18         A    I don't recall exactly what they said.
19    There was some discussion about Annabel attempting
20    to make contact with individuals at Save a Life
21    offering her assistance to fix the computer
22    problems that she was aware of.  And they were I
23    believe questioning why she was calling -- or
24    believed that the reason that she was calling was

1     because she had somehow been involved in deleting
2     the data from the servers.
3          Q    What you just described is the con --
4     what you recall from the content of the emails you
5     received on May 5, 2006; is that accurate?
6          A    That's what I remember.  I don't recall
7     specifically what they said, but that's what I
8     remember about them.
9          Q    I'm handing you Plaintiff's Deposition
10    Exhibit 4, CCSAO 000209 to 212.
11              (A document was marked Plaintiff's
12               Deposition Exhibit Martin No. 4
13               for identification.)
14    By Ms. Schwartz:
15         Q    Have you seen this email before,
16    Detective Martin?
17         A    I don't believe I specifically saw this
18    entire email.  I've seen portions of it.
19         Q    This is not one of the emails you
20    received from Save a Life Foundation on May 5,
21    2006?
22         A    I don't believe so, no.
23         Q    I'm handing you Plaintiff's Deposition
24    Exhibit 5, CCSAO 003415.

1              (A document was marked Plaintiff's
2               Deposition Exhibit Martin No. 5
3               for identification.)
4     By Ms. Schwartz:
5          Q    Have you seen Exhibit 5 before today,
6     Detective Martin?
7          A    Portions of it, yes.  I don't believe
8     this is the one that was provided to us on
9     May 5th.
10         Q    In terms of the content of this email,
11    Exhibit 5, was any of this content what
12    Miss Spizzirri alleged was forwarded out of her
13    email account to Miss Melongo's Yahoo account?
14         A    I believe so, yes.
15         Q    Which portion of this email, could you
16    describe it, or is it all of this email?
17         A    The body it appears -- if I remember
18    correctly, the body of this email is what was
19    alleged to have been forwarded.
20         Q    So let's walk through this.  The
21    first -- if you look at the top portion, it appears
22    to be an email from Annabel Melongo to a number of
23    different recipients.  Carol Spizzirri's email
24    account is not listed on there.  The subject line

1     is how far are you going to go, Carol.  And it
2     says, hey Carol, I've received this email forwarded
3     to me and I can't imagine what a pathological liar
4     you are.
5              Is that an email that was forwarded from
6     Miss Spizzirri's account to Annabel Melongo's
7     account?
8          A    I don't know if it was this specific
9     email, but I believe the text that is written here
10    was contained in what Miss Spizzirri alleged was
11    forwarded out of her account.
12         MR. KAPLAN:  Which text are you referring to?
13         THE WITNESS:  The bottom portion where it says
14    from Carol on down to the last line, t-k-s much for
15    your follow through - we are so behind it hurts.
16    By Ms. Schwartz:
17         Q    The portion that you -- that was alleged
18    to have been forwarded from Carol Spizzirri's
19    account to Miss Melongo's account, referring again
20    to Exhibit 5, is the bottom half of Exhibit 5, and
21    it appears to say from Carol Spizzirri, subject Re:
22    downed system, and the first text is think we found
23    who.
24              Is that the email that you were

1 referring to?
2     A    Yes.  I believe that portion is what
3 Miss Spizzirri was alleged to have been sent from
4 her account or removed from her account.
5     Q    And in this version, Exhibit 5, there is
6 no to line in that portion on the bottom half of
7 Exhibit 5, correct?
8     A    In this text, no, there is no to, other
9 than at the top.
10     Q    Looking at the text of that email that I
11 just referenced on Exhibit 5, Think we found who.
12 Annabel called X4 and stopped in three, left
13 message on my cell offering to fix our problem.
14         Was it your understanding that Carol
15 Spizzirri wrote those words?
16     A    I have no idea who wrote them.  It
17 appears that it was sent from Carol's account, but
18 I have no idea who wrote them.
19     Q    Did you ever ask her?
20     A    I don't recall asking her.
21     Q    In that email that I just read that
22 appears to have been sent from Carol Spizzirri's
23 email account, it appears that Miss Spizzirri was
24 asserting that Miss Melongo was responsible for the

1 intrusion to Save a Life Foundation networks on
2 April 28, 2006, doesn't it?
3     A    I have no idea.  It just says that to
4 fix our problem.  It doesn't say anything as to
5 what that problem was.
6     Q    Did Miss Spizzirri ever tell you that
7 she thought Miss Melongo had something to do with
8 the intrusion on Save a Life system because she had
9 offered to help fix those problems?
10     A    I don't recall her specifically saying
11 that, no.
12     Q    Do you recall Miss Spizzirri telling you
13 why she thought Miss Melongo was responsible for
14 the intrusion on April 28, 2006?
15     A    I don't recall her specifically saying,
16 no.
17     Q    Did Carol Spizzirri ever tell you that
18 the person who forwarded the email we've just been
19 discussing, the bottom half of Exhibit 5 that
20 starts, think we found who, did Carol Spizzirri
21 ever tell you that she thought Miss Melongo had
22 forwarded that email from her account to
23 Miss Melongo's Yahoo account?
24     A    I don't know if she specifically said

1 it.
2     Q    Did Miss Spizzirri ever provide you with
3 an electronic version of any email that was
4 allegedly forwarded from her account to
5 Miss Melongo's account without her authorization?
6     A    Not that I recall.
7     Q    Turning back to Exhibit 4.  At the top
8 left it says Shontay Grant.
9         Do you know who Shontay Grant is?
10     A    No, I do not.
11     Q    I would like to turn your attention back
12 to Exhibit 3, your police report dated October 30,
13 2006.
14         If you turn your attention to the entry
15 dated May 15, 2006, it states, R/I spoke with
16 Comcast Cable Services legal department about how
17 to obtain the necessary account information related
18 to the IP address that was found in the header of
19 the emails that were forwarded to the Yahoo account
20 in question and was assigned to the offender's
21 computer at the time of the intrusion to
22 Save a Life's computer.
23         The information you were seeking from
24 Comcast related to an IP address found in the

1 header of emails forwarded to Miss Melongo's Yahoo
2 account; is that correct?
3     A    It was the IP address listed in the
4 header in regards to the Yahoo account that was
5 also listed in the header.  I don't specifically
6 know that it was hers.
7     Q    You don't specifically know if it was
8 Miss Melongo's?
9     A    Correct.
10     Q    And IP address stands for internet
11 protocol address; is that correct?
12     A    Correct.
13     Q    And doesn't an IP address correspond to
14 a physical location where a computer is used?
15     A    Potentially.
16     Q    What do you mean when you say
17 potentially?
18     A    The IP address is assigned to a specific
19 device.  It's not necessarily, my understanding,
20 relative to a location, but more to a device.
21     Q    So there was a particular IP address
22 that was a focus of your investigation; is that
23 correct?
24     A    One, yes.

1    Q    Was it IP 24.15.202.102?
2    A    Can you repeat it one more time?
3    Q    24.15.202.102?
4    A    Yes.
5    Q    For simplicity I'll refer to that IP
6  address in shorthand as the 102 address; is that --
7    A    Okay.
8    Q    -- okay with you?
9    You testified that the 102 address was
10  first discovered because it was in an email header
11  that you received from the Save a Life
12  Foundation?
13    A    It was one of the ones that were listed
14  in the header, yes.
15    Q    Did the Save a Life Foundation employee
16  who gave you that email address with the header
17  containing the 102 address say anything about that
18  IP address?
19    A    Not that I recall.
20    Q    Why did that IP address become a focus
21  of your investigation?
22    A    Based on its placement or position
23  within the email header, it appeared to be the
24  originating IP.

1    Q    Originating IP of what?
2    A    The transmission of the email in
3  question.
4    Q    I would like to direct -- I'm handing
5  Detective Martin Plaintiff's Deposition Exhibit 6,
6  Martin0012 to 14.
7        (A document was marked Plaintiff's
8        Deposition Exhibit Martin No. 6
9        for identification.)
10  By Ms. Schwartz:
11    Q    Do you recognize Exhibit 6?
12    A    Yes.
13    Q    Is Exhibit 6 one of the emails that you
14  received from Save a Life Foundation on or around
15  May 5, 2006?
16    A    I believe this is one of them, yes.
17    Q    I turn your attention to the second
18  page, it says ps -- at the top, ps, following is
19  the entire email with all headers and raw code, and
20  then below it is a bunch of information that
21  appears to be from an email header.
22    Is this the header that you were
23  referring to when you said there was an IP address
24  located on an email header that you received from

1  Save a Life Foundation?
2    A    Yes, I believe this is the copy that we
3  received.
4    Q    This appears to be an email from
5  Christian Sass to Carol Spizzirri dated May 1, 2006
6  at 11:31 p.m.  I'm referring to the first page --
7    MR. KAPLAN:  Are we on the first page?
8  By Ms. Schwartz:
9    Q    -- of Exhibit 6.
10    MR. KAPLAN:  This top one.
11    THE WITNESS:  Yes.  It was -- the email itself
12  appears it was sent to a number of individuals, one
13  of which is Dave Stolerow, sent Monday, May 1st at
14  11:31 p.m.
15  By Ms. Schwartz:
16    Q    Who is Christian Sass?
17    A    I believe he was the IT administrator
18  that replaced Miss Melongo at Save a Life.
19    Q    Did you ever speak to Christian Sass?
20    A    I don't recall.
21    Q    So it's this -- from your review of this
22  email, Exhibit 6, was it Christian Sass who wrote
23  ps, following is the entire email with all headers
24  and raw code on the second page of Exhibit 6?

1    A    It appears to be based on the body of
2  what's kind of copied in here.
3    Q    Let's walk through this email with
4  headers and raw code as it's referred to in
5  Exhibit 6.
6    If you go about halfway down the second
7  page of Exhibit 6, you see that IP address we've
8  been discussing, the 102 address.  It says
9  received: from and then 24.15.202.102.
10    Is that the IP address in the header of
11  the email that you testified about earlier?
12    A    Yes.
13    Q    Below that IP address, the 102 address
14  on Exhibit 6, the date is Monday, May 1, 2006, from
15  Melongo Annabel with email melongo_annabel.com, and
16  then the subject line is how far are you going to
17  go, Carol.
18    So this email Exhibit 6 shows metadata
19  related to the sender of the email with subject how
20  far are you going to go, Carol; is that correct?
21    A    Yes.
22    Q    And that's the email that says in the
23  body, hey Carol, I've received this email forwarded
24  to me and I can't imagine what a pathological liar

1   you are; is that correct?
2       A   I'm sorry, can you repeat the question?
3       Q   That IP address we've been discussing on
4   Exhibit 6, the 102 address, --
5       A   Uh-huh.
6       Q   -- it says received from. The 102
7   address, does that correspond to the sender of the
8   email with the body hey, Carol, I've received this
9   email forwarded to me and I can't imagine what a
10  pathological liar you are.
11      A   In relation to the text that's here,
12  yes.
13      Q   The email with subject line how far are
14  you going to go, Carol that starts hey, Carol, is
15  not an email that was forwarded from Carol
16  Spizzirri's account to Miss Melongo's account, was
17  it?
18      A   It doesn't appear to be based upon this
19  header, no.
20      Q   And this header on Exhibit 6 does not
21  show the IP address of the sender of any email from
22  Carol Spizzirri's account to Miss Melongo's Yahoo
23  account; is that correct?
24      A   I'm sorry, say it one more time.

1       MS. SCHWARTZ: Could you read back the
2   question.
3           (The record was read.)
4       THE WITNESS: I don't know to be honest with
5   you. It doesn't -- without knowing -- having the
6   exact -- what's the word I'm trying to use?
7           This -- the data that is contained here
8   is cut and pasted from somewhere else obviously.
9   According to Mr. Sass this is the email that he
10  received or the content of the email that he
11  received.
12      By Ms. Schwartz:
13      Q   Did you ask where the data in Exhibit 6
14  was cut and pasted from?
15      A   No, I did not.
16      Q   Did you ever see that IP address, the
17  102 address listed in an email from Carol
18  Spizzirri's account to Miss Melongo's Yahoo
19  account?
20      A   Not in a specific email that I know
21  of.
22      Q   It was assumed that this 102 address was
23  also used by the person who forwarded an email from
24  Miss Spizzirri's account to Annabel Melongo's

1   account; is that correct?
2       A   I have no specific knowledge of who may
3   assume that.
4       Q   Did you ever assume that?
5       A   We had information I believe that from
6   Web HSP in regards to their server log or their
7   access logs that showed that there were emails with
8   that 24 address or 102 address sending emails, but
9   I didn't see the specific email or the body of the
10  emails that were sent.
11      Q   So it was information from Web HSP that
12  caused you to think that the 102 address was used
13  to send an email from Carol Spizzirri's account to
14  Annabel Melongo's account?
15      A   Yes.
16      Q   And what was that information from
17  Web HSP specifically?
18      A   I believe it was their -- their IT or
19  their Technical Support person sending an email to
20  Carol listing search results for that specific IP,
21  and within the results showing that specific IP and
22  the direction of the emails as far as, you know,
23  whether it was incoming or outgoing.
24      Q   I'm showing Detective Martin Plaintiff's

1   Deposition Exhibit 7, CCSAO 000002 through 5.
2           (A document was marked Plaintiff's
3           Deposition Exhibit Martin No. 7
4           for identification.)
5       By Ms. Schwartz:
6       Q   Is Exhibit 7 the email you were just
7   referring to from Technical Support?
8       A   Yes. I don't recall if this was exactly
9   what was provided to us, but some of the
10  information contained in here I do remember
11  seeing.
12      Q   So this is a print-out of an email from
13  tsupport@gmail.com to Carol Spizzirri dated May 4,
14  2006 at 9:41 p.m.?
15      A   Correct.
16      Q   And the substance of this email, the
17  content, is that the content on which you relied
18  from Technical Support to determine that the 102
19  address was potentially used by the person that
20  forwarded the email from Miss Spizzirri's
21  account?
22      A   Yes, that's one of the things we used.
23      Q   What is tsupport@gmail.com?
24      A   From what I remember -- well, it's an

1  email address.  From what I remember it belongs to
2  the Technical Support at Web HSP, which is the
3  email host for Save a Life Foundation.
4      Q    Web HSP was Save a Life Foundation's
5  email host in 2006?
6      A    Yes.
7      Q    It doesn't say anything about Web HSP on
8  Exhibit 7.
9           How did you determine that Technical
10  Support or tsupport@gmail.com had something to do
11  with the Web HSP?
12      A    I think that was information that was
13  provided to us from Carol.
14      MR. KAPLAN:  Can you speak up?
15      THE WITNESS:  I'm sorry.  I believe it was
16  information that was provided to us from
17  Miss Spizzirri.
18      By Ms. Schwartz:
19      Q    What did Miss Spizzirri say about the
20  Technical Support email and its relationship to
21  Web HSP?
22      A    I don't recall specifically what she
23  said.
24      Q    Do you know who actually authored this

1  email?  It says from Technical Support and an email
2  address, but did you ever determine the actual
3  person who wrote this email?
4      A    Me specifically, no.
5      Q    To your knowledge did anyone ever
6  determine the person who wrote this email,
7  Exhibit 7?
8      A    To my knowledge I don't know if the
9  State's Attorney's Office did or not.  I did not.
10      Q    Did you ever do anything to confirm
11  whether tsupport@gmail.com was connected to
12  Web HSP?
13      A    I did not, no.
14      Q    I'd like to walk through the content of
15  this email.
16           How does this Tech Support email show
17  that the IP address, the 102 address, was used to
18  send an email from Miss Spizzirri's account to
19  Miss Melongo's account on May 1, 2006?
20      A    My interpretation of this is that
21  whoever typed this information or Technical Support
22  did a search of the IP address in question and
23  found it appears to be two instances in which
24  emails appear to be leaving Miss Spizzirri's

1  Save a Life account.
2      Q    And when you say you understand that
3  Tech Support did a search of the IP address in
4  question, what did you mean by search?  What was
5  being searched?
6      A    What it says here, of their mail log on
7  the server.
8      Q    And by here you are referring to the
9  first line of the email, Exhibit 7?
10      A    Correct.  Right under the subject line
11  it says, looking for the IP address of the IT
12  person, which the 102 address, from the mail log on
13  the server.
14      Q    What did you -- what did you understand
15  the mail log on the server to mean in this email?
16      A    The record of both inbound and outbound
17  emails through -- to and from the server.
18      Q    And you understood that to be records
19  maintained by Web HSP?
20      A    Yes.
21      Q    And in terms of the actual -- the
22  portion of the Exhibit 7 below what you just read,
23  how does it show two instances of an email leaving
24  Miss Spizzirri's account and going to another

1  outside Yahoo account?
2      A    The way I interpret it, there's two
3  separate times --
4      Q    Okay.
5      A    -- on May 1st of 2006 in reference to
6  what I believe to be the ID of an email.
7      Q    So just for the record we are looking --
8  are you looking at Exhibit 7, the third line,
9  May 1, 2006, and the time appears to be 20:31:40?
10      A    Correct.  And I believe the next section
11  is the ID of the email, and then there is the --
12  what appears to be an arrow pointing to the
13  left, --
14      Q    Okay.
15      A    -- what I interpret to mean that an
16  email was being sent from the email address of
17  cspizzirri@savealife -- I'm sorry -- salf.org.
18      Q    So you interpret that arrow that's
19  pointing to the left on the third line of Exhibit 7
20  to --
21      A    Correct.
22      Q    -- mean that an email is being sent from
23  C. Spizzirri's account?
24      A    Correct.

1    Q    Can you tell from that entry where that
2  email was sent?
3    A    No.  Not from that entry, no.
4    Q    And then I do see that 102 IP address in
5  the next line of Exhibit 7.
6        How does this show that the 102 address
7  is the originating IP for that particular email
8  being sent from cspizzirri@salf.org?
9    A    Can you repeat that one more time?  I'm
10  sorry, or read that back.
11    Q    I'll take a step back.
12    A    Okay.
13    Q    Is this one of the portions of the Tech
14  Support email that we've just been reading, this
15  third line -- starting with the third line down of
16  Exhibit 7, is this one of the documents that made
17  you think that the 102 address related to the
18  originating email of an email that went from Carol
19  Spizzirri's account to Miss Melongo's account?
20    A    Yes.  Based upon Technical Support's
21  description here or what they wrote as far as
22  underneath the text of the two emails it says,
23  record showing her sending the email from Carol's
24  email address to her own Yahoo address.  Note the

1  IP in the log.
2        Then as you read further down it appears
3  that he's referencing the same emails based upon
4  the ID numbers and the time -- the two times that
5  were associated to those prior two that we were
6  discussing.
7    Q    So the ID -- so the time you are
8  referring to, the two dates, 5/1/2006 at 20:31:40
9  hours?
10    A    Yeah, the time of 20:31:40 and the time
11  of 23:01:31 on May 1st of '06.
12    MR. WUNDER:  Julia, do you want him to mark
13  that up or something to show how he is reaching the
14  conclusions?
15    MS. SCHWARTZ:  That might be helpful if we
16  walk through.
17    THE WITNESS:  You want me to come over there?
18    By Ms. Schwartz:
19    Q    I can give you an extra pen.
20    A    So, what -- I guess the items that I'm
21  referring to are --
22    Q    Please circle what you referred to?
23    A    -- here and this here and that arrow and
24  then here.  And then again here, and then this

1  here.  (Marking document.)
2        So in the second grouping --
3    Q    Yep.
4    A    -- where it begins 2006-05-01 20:31:40.
5    MR. WUNDER:  That's the second search, right,
6  just to be clear?
7    THE WITNESS:  Yes.
8    MR. WUNDER:  Okay.
9    THE WITNESS:  It appears that this is a second
10  search that was done for the ID number of the email
11  that was sent on that date and time on May 1, 2006
12  at 20:31:40.
13        He does a second search, and he comes to
14  the conclusion and notes where he found the email
15  being forwarded out of Miss Spizzirri's account,
16  the arrow pointed to the left, and then the IP
17  address associated to this sending of that email.
18  And then he further shows that that continued on to
19  being delivered to melongo_annabel@yahoo.com.
20    By Ms. Schwartz:
21    Q    And just to stop you there, could you
22  put a No. 2 next to that portion you referred to as
23  the second search?
24    A    Correct.

1    Q    So let's put a No. 2 next to there so we
2  know.
3    A    There and there (marking document.)
4    Q    So No. 1 reflects what you believe to be
5  the first search?
6    A    Correct.  And these I believe are search
7  parameters here and here.  (Marking document.)
8        He doesn't list it here, but it looks
9  like -- well, I can't.
10    Q    So one of the search parameters next to
11  No. 1 is the IP address, the 102 address?
12    A    Correct.
13    Q    And the other search parameter in the
14  second search to which you referred is the
15  g-r-e-p -- what follows the word g-r-e-p --
16    A    Correct.
17    Q    -- the second search?
18        And did you rely on the textural
19  descriptions about what these searches mean --
20  meant in the Tech Support email to understand what
21  they meant?
22        So I'm referring specifically to the
23  portion you read where it says, this is the actual
24  record showing her sending the email from Carol's

1  email address to her own Yahoo based email address.
2  Note the IP in the log.
3       Did you rely on that narrative portion
4  to understand what this email meant?
5       A   Some of it, yes, especially the
6  direction of travel as far as the arrows and which
7  way the arrows were pointing.
8       Q   Otherwise would you know what those
9  search results, search No. 1 and search No. 2 meant
10  from a technological perspective?
11      A   I would -- I understand obviously the
12  date, the time, and the -- I can recognize the
13  email addresses that are in here, the IP addresses
14  that are in here.  There is a reference to the
15  server I believe at savealife.org, that's a
16  reference to the server.
17      Q   So the key point of both search 1 and 2,
18  showing the direction of the email are those little
19  arrows?
20      A   Correct, the arrows and then what I
21  perceive to be is the IP address, the originating
22  IP address for those emails.
23      Q   Would you mind circling the arrows that
24  you are referring to with circles just so the

1  record is clear what arrows we're referring to?
2       A   Sure.  (Marking document.)
3       Q   Now, continuing down on Exhibit 7, after
4  the portion that says again, second message going
5  from Carol's address to her Yahoo email address,
6  that -- does the portion below that relate to a
7  second email that appears to have gone from Carol's
8  address to her Yahoo address according to
9  Exhibit 7?
10      A   Yeah.  Up in paragraph 1 or search 1, it
11  looks like there was two emails that were found
12  when he did the search for the IP address.  One
13  being sent at 20:31:40 and the second being sent at
14  23:01:31.  So in the paragraph 3 or what I guess is
15  search 3 --
16      Q   Let's mark that as search 3?
17      A   (Marking document.)  It shows the same
18  time of May 5 -- I'm sorry -- may 1, 2006 at
19  23:01:31, and similar information as to what was
20  contained in the second search.
21      Q   And again, the arrows that show the
22  direction of the email?
23      A   Correct, the arrows, the IP address, and
24  what I understand the meaning is the ID of that

1  particular email itself.
2       Q   And was it this document and the content
3  we've just walked through of Exhibit 7 that -- was
4  that the email that made you think that there was a
5  connection between the 102 address and the sender
6  of an email out of Miss Spizzirri's account to
7  Miss Melongo's Yahoo account?
8       A   Yes.
9       Q   I'm handing Detective Martin Exhibit 8,
10  CCSAO 005385.
11           (A document was marked Plaintiff's
12            Deposition Exhibit Martin No. 8
13            for identification.)
14  By Ms. Schwartz:
15      Q   Have you seen Exhibit 8 before?
16      A   I don't recall seeing this ever.
17      Q   Exhibit 8 appears to be a screenshot of
18  the administrator email interface for the
19  Save a Life Foundation administrator with email
20  address adminstrator@salf.org.
21           Were you aware that anyone with
22  Save a Life Foundation administrator credentials
23  could log on and view Save a Life employees' email
24  accounts?

1       A   I'm aware that an administrator can do
2  that.  I don't know that specifically someone or
3  who that administrator might have been for
4  Save a Life.
5       Q   You are not aware of who had
6  administrator access for Save a Life?
7       A   No.
8       Q   And do you know generally how the
9  administrator access worked for someone with
10  administrator access at Save a Life?
11      A   Not Save a Life, no.
12      Q   Did you ever inquire as to who had
13  administrator access to the Save a Life emails?
14      A   I don't recall specifically asking that
15  question, no.
16      Q   Do you know if Christian Sass, who was
17  the new IT administrator at Save a Life after
18  Miss Melongo had administrator access to the
19  Save a Life Foundation emails?
20      A   I -- no.
21           MR. KAPLAN:  Your answer is I don't know.
22           THE WITNESS:  No, I don't know if he did or
23  not.
24

By Ms. Schwartz:
Q    Apart from the exhibits we've reviewed that you testified that you recognized from your investigation, did you receive any other emails from either Carol Spizzirri or anyone else at the Save a Life Foundation when you were conducting your investigation?
A    I don't recall anything specific. I may have, but I don't recall.
Q    Did we go over the key ones that you recall seeing?
A    I believe so, yes.
Q    Were you aware during your investigation that Miss Spizzirri complained to State's Attorney Richard Devine about Miss Melongo?
MS. NINFO: Object to the form.
MR. KAPLAN: I'll join.
By Ms. Schwartz:
Q    Let me rephrase the question.
Were you aware Miss Spizzirri had written a letter to State's Attorney Richard Devine on May 8, 2006?
MR. KAPLAN: Are you aware that she wrote a letter -- wrote a letter to him?

THE WITNESS: Yes, that was made aware to me.
By Ms. Schwartz:
Q    When did you learn about that?
A    I don't recall a specific date. I vaguely remember getting a copy of the letter she wrote.
Q    Who sent you a copy of the letter Miss Spizzirri wrote?
A    I have no idea.
Q    Apart from receiving a copy of the letter Miss Spizzirri wrote to Richard Devine, did you have any discussions about -- about that letter or any communications between Miss Spizzirri and Mr. Devine?
A    No.
Q    You just received the letter?
A    Yes.
Q    I'm showing Detective Martin Plaintiff's Deposition Exhibit 8, CCSAO 000185 --
MR. KAPLAN: Want to make it No. 9?
MS. NINFO: No. 9.
MS. SCHWARTZ: No. 9, excuse me.
MR. KAPLAN: Yes.

MS. SCHWARTZ: Plaintiff's Deposition Exhibit No. 9, CCSAO 000185 to 187.
(A document was marked Plaintiff's Deposition Exhibit Martin No. 9 for identification.)
By Ms. Schwartz:
Q    Exhibit 9 appears to be a fax in reverse order, the last page as CCSAO 000185 and the first page, the cover sheet, CCSAO 000187.
Is this a copy of a fax you received dated May 26, 2006?
A    It appears to be, yes.
Q    Does it appear to be a true and accurate copy of a fax you received?
A    It appears to be.
Q    And can you tell who sent you the fax, Exhibit 9?
A    I don't know for sure, but it has Carol's name printed on it, as far as --
Q    On the fax cover sheet --
A    -- the from line of -- from Save a Life Foundation, Incorporated, Carol Spizzirri.
Q    Did you speak to anyone at the Save a Life Foundation about this letter dated --

two letters, one dated May 8, 2006 and one dated May 9, 2006?
MR. KAPLAN: Could you read back the question, Miss.
(The record was read.)
THE WITNESS: She may have -- I remember getting the fax. I don't recall if I spoke to anyone specifically in reference to this, other than, you know, hey, I'm sending you this fax.
By Ms. Schwartz:
Q    Did Miss Spizzirri tell you or anyone tell you why this fax was sent to you?
A    Carol offered to involve other agencies; such as, it appears the State's Attorney's Office to offer their assistance in investigating.
Q    Did she offer to involve other agencies in a conversation she had with you?
A    As far as in relation to this fax, I think that's why she was sending it to me, if I remember correctly.
Q    What did she say to you about offering to involve other agencies?
A    Just trying to advance the investigation and proceed appropriately, I guess.

ACR REPORTING, LLP   (312) 422-0515

1     Q    Did she tell you why she thought it
2    would be potentially useful to involve other
3    agencies, including the State's Attorney's
4    Office?
5     A    No.
6     Q    Did she tell you how she could
7    potentially get other agencies involved?
8     A    Not that I recall, no.
9     Q    Did she tell you that she had contacts
10   within the State's Attorney's Office that would
11   help potentially get them involved?
12    MS. NINFO:  Objection, form.
13    THE WITNESS:  Not that I recall.
14    By Ms. Schwartz:
15    Q    Did you think it was necessary to
16   involve other agencies in the investigation?
17    A    That wouldn't have been a decision for
18   me to make.  That would be more with the
19   lieutenant.
20    Q    Did you ever speak with your lieutenant
21   about whether it might make sense to include other
22   agencies in the Save a Life investigation?
23    A    Other than when we spoke to Mr. French
24   of the Attorney General's Office, I don't think we

1    ever really reached out to anybody else as far as
2    getting assistance.
3     Q    After you received this fax, Exhibit 9,
4    did you speak to anyone at the State's Attorney's
5    Office about Miss Spizzirri's allegations?
6     A    I got a phone call from Mr. Devine
7    offering his assistance, but that was it.  At that
8    point I told him -- I vaguely remember telling him
9    we -- it was early on and if I needed something, I
10   would call him.
11    Q    When did that phone call from Mr. Devine
12   take place?
13    A    I don't recall exactly what day that
14   was.
15    Q    Was it around the time you received this
16   fax, May 26, 2006?
17    A    Maybe.  I don't know for sure.
18    Q    About how long was the phone call with
19   Mr. Devine?
20    A    If I had to guess, less than a minute or
21   a minute.
22    Q    Was that the first time you had spoken
23   to Richard Devine?
24    A    Yes.

1     Q    Do you recall what he said to you?
2     A    Nope, other than offering his assistance
3    of his office, that was it.
4     Q    Do you recall anything else of what you
5    said to Mr. Devine?
6     A    No.
7     Q    Was it unusual for you to receive a call
8    from a County's State's Attorney?
9     MR. KAPLAN:  Objection, form.
10    You can answer.
11    THE WITNESS:  At the time I was new, so I
12   would say yes, at the time.
13    By Ms. Schwartz:
14    Q    How many times have you spoken about a
15   case or an investigation to a State's Attorney?
16    A    Hundreds.
17    Q    The State's Attorney of the County?  I'm
18   not referring to Assistant State's Attorneys, but
19   the actual State's Attorney?
20    A    Just that time I think was the only time
21   I've ever spoken to the State's Attorney.
22    Q    Of any county?
23    A    Yeah.
24    Q    So apart from your one phone call with

1    Richard Devine, that's the only time you have
2    spoken to a State's Attorney --
3     A    Yes.
4     Q    -- about an investigation?
5     A    Yes.
6     Q    After that conversation -- let's take a
7    step back.
8     Do you remember anything else about the
9    conversation you had with Mr. Devine?
10    A    No, I do not.
11    Q    And it was a phone call you said?
12    A    Yes.
13    Q    And he initiated that phone call?
14    A    Yes.
15    Q    After that phone call with Mr. Devine,
16   did you have any other contact with anyone at the
17   State's Attorney's Office about the
18   investigation?
19    A    His particular office?
20    Q    His particular office.
21    A    No.
22    Q    Eventually you communicated with someone
23   at the State's Attorney's Office about bringing
24   charges in the fall of 2006; is that right?

1    A    Correct.
2    Q    So between the conversation with
3  Mr. Devine and the fall of 2006 when you spoke to
4  someone at the State's Attorney's Office about
5  bringing charges, did you have any communication
6  with anyone at the Cook County State's Attorney's
7  Office?
8    A    The subpoenas would have been sent to
9  the Third District for approval. So any subpoenas
10  that might have been requested or sent go through
11  the State's Attorney's Office in the LaGrange area,
12  and then we get a copy and send it off to the
13  provider.
14    Q    Apart from communications about
15  subpoenas from the Third District, between the call
16  with Mr. Devine and the fall of 2006 when you spoke
17  to someone at the State's Attorney's Office about
18  bringing charges, did you have any other
19  communication with anyone at the Cook County
20  State's Attorney's Office?
21    A    Not that I recall, no.
22    Q    Did the fact that Mr. Devine contacted
23  you have any impact on the way you handled the
24  Save a Life investigation?

1    A    Nope.
2    Q    It didn't make you prioritize or
3  accelerate the investigation?
4    A    Nope.
5    Q    You testified earlier that Kyle French
6  from the Attorney General's Office, the Illinois
7  Attorney General's Office became involved in the
8  case; is that correct?
9    A    Correct.
10    Q    How often did you meet in person with
11  Kyle French?
12    A    One for sure that I remember. I don't
13  recall if we met in person any other times after
14  that, in reference to this case.
15    Q    Did you work on any other cases with
16  Kyle French?
17    A    I don't think so. Not to my
18  recollection, no.
19    Q    Do you recall when you had that meeting
20  with Kyle French?
21    A    It was May 15th -- May 17th, I'm sorry.
22  May 17th of '06.
23    Q    Would it refresh your --
24    A    I'm sorry, May 6th -- May 16th of '06.

1    Q    May 16th of 2006?
2    A    Correct.
3    Q    That meeting is also referenced, if you
4  look at -- turn to Exhibit 3, the police report, on
5  the first page. It says, R/I and Lt. Schulze,
6  No. 30, met with Kyle French of the Illinois
7  Attorney General's Office in reference to this
8  investigation.
9        Is that the meeting that you just
10  testified about, Detective Martin?
11    A    Yes.
12    Q    It also says on Exhibit 3, first page,
13  Mr. French advised that he was available to assist
14  with the investigation and had already sent
15  preservation requests to Yahoo, Comcast and
16  Roosevelt University.
17        Did Mr. French tell you how he knew to
18  go ahead and send those preservation requests prior
19  to the meeting on May 16, 2006?
20    A    He may have. I don't recall if he did
21  specifically say that.
22    Q    Had you spoken to Mr. French prior to
23  the meeting on May 16, 2006?
24    A    I had not, no.

1    Q    Do you recall any of the substance of
2  the conversation with Kyle French when you met with
3  him on May 16, 2006?
4    A    Other than what's stated in my report,
5  no.
6    Q    When you were working on the
7  investigation, did you speak with Kyle French on
8  the telephone?
9    A    Yes.
10    Q    About how often would you speak with
11  Mr. French on the telephone?
12    A    I don't think I could put a number on
13  it. Maybe a handful of times.
14    Q    Did you exchange emails with Kyle French
15  while you were working on this investigation?
16    A    Yes, I did.
17    Q    If you had to put a number on it, about
18  how many emails would you say you exchanged with
19  Kyle French?
20    A    Maybe ten.
21    Q    Looking at Exhibit 3, still on the first
22  page in the entry dated May 16, 2006, it says R/I
23  and Lt. Schulze went to the listed address for
24  Miss Melongo, and then an address is listed.

1    Why did you go to the address listed for
2 Miss Melongo on May 16, 2006?
3    A    In an attempt to speak to her about the
4 allegations that had been made.
5    Q    Did you speak with Miss Melongo on that
6 date?
7    A    No, we did not.
8    Q    Why not?
9    A    I don't think we made contact.
10    Q    Why did you want to speak to
11 Miss Melongo on that date, May 16, 2006?
12    A    Just like in any case, we are trying to
13 get her side of the story.
14    Q    Did you make any follow-up attempts to
15 try to speak with Miss Melongo after the May 16,
16 2006?
17    A    I did.
18    Q    When were those attempts?
19    A    June 9th of 2006, June 20th of 2006 and
20 again on July 20th when we issued the search
21 warrant.
22    Q    Your attempts prior to July 20th to
23 speak to Miss Melongo were unsuccessful?
24    A    Yes.

1    Q    So I'm still on Exhibit 3, the bottom of
2 the first page and then going into the second, the
3 entry dated May 17, 2006.  It states that you and
4 Lieutenant Schulze met with Robert Barnes and
5 Vincent David -- Davis of Save a Life Foundation on
6 May 17, 2006; is that correct?
7    A    Yes.
8    Q    Who is Robert Barnes?
9    A    An employee of Save a Life.
10    Q    And who is Vincent Davis?
11    A    Also an employee.
12    Q    Why did you meet with Mr. Davis and
13 Mr. Barnes on May 17, 2006?
14    A    We were meeting with them to get some
15 more information that they had obtained in
16 reference to the allegations that were made.
17    Q    What information was that that they had
18 obtained?
19    A    Based on the report it was server log
20 was -- in review of this case for this deposition,
21 it's not logs.  They were screenshots of files that
22 were located on the server -- like screenshots of
23 files that were -- folders, I should say, and files
24 that were on the server.  And he was describing how

1 the times that were listed on that screenshot were
2 in daylight savings time.
3    Q    He, are you referring to Mr. Davis or
4 Mr. Barnes?
5    A    Mr. Barnes.
6    Q    And by screenshots of files located on
7 the servers, are you referring to files located on
8 Save a Life Foundation servers?
9    A    Yes.
10    Q    What was the relevance of those
11 screenshots of Save a Life servers?
12    A    He was showing -- one of the times that
13 was listed on there, according to the operating
14 system, was the last accessed time.  Trying to show
15 that these files had been last accessed and then
16 eventually deleted at that time.
17    Q    What did those -- did you review the
18 copies of the screenshots?
19    A    I did.
20    Q    And what did they show?
21    A    The exact -- I don't recall the exact
22 times, but the screenshots showed that the last
23 access times were between the hours of I think
24 1:00 in the morning to 3:00 in the morning on the

1 28th of 2006 -- I'm sorry, April 28th of 2006.
2    Q    That was the time when the alleged
3 intrusion took place on the Save a Life servers?
4    A    Yes.
5    Q    Was anyone else present when you met
6 with Mr. Barnes and Mr. Davis on May 17, 2006?
7    A    Other than Lieutenant Schulze, I don't
8 believe there was anyone else.
9    Q    Did Mr. Davis and Mr. Barnes give you
10 any other documents when you met on that date?
11    A    I don't recall specific documents, but
12 according to my report there were no other
13 documents.
14    Q    Apart from your report do you recall
15 anything about the conversation with Mr. Davis and
16 Mr. Barnes, what was said during that
17 conversation?
18    A    No.  Other than what is put in the
19 report, no.
20    Q    So you are going off of what is listed
21 in your report, Exhibit 3?
22    A    Yes, ma'am.
23    Q    So let's walk through some of that then.
24 I'm looking at the page at the bottom,

1    Melongo_005216 of Exhibit 3.
2        A    I'm sorry, where are we at?
3        Q    We are on the second page. It has a
4    number at the bottom Melongo_ --
5        A    Oh, yes, sorry.
6        Q    -- 005216. If you look at about the
7    fifth line it says, once her employment was
8    terminated, Miss Melongo had no further access to
9    the computers from within the building and that an
10   employee named Christian changed all of the pass
11   codes to each of the servers after she left the
12   building.
13           Is this a statement that Mr. Barnes told
14   you when you met with him on May 17, 2006?
15       A    Based on what's written here in the
16   report, I believe so, yes.
17       Q    And it's your understanding that
18   Miss Melongo was terminated on April 27, 2006,
19   correct?
20       A    Correct.
21       Q    Do you know who Christian is referred
22   to -- which is referred to in the paragraph I just
23   read?
24       A    To my knowledge it's Christian Sass, the

1    gentleman that was their IT administrator after
2    Miss Melongo was fired.
3        Q    Did you discuss with anyone at
4    Save a Life how Miss Melongo could have accessed
5    their servers if the pass codes had been changed
6    right after she was fired?
7        A    I know that was it -- I'm not sure if it
8    was Mr. Barnes or Mr. Davis, but one of them stated
9    they believed that she thought she went in through
10   the email server, but I don't recall who may have
11   said that.
12           Oh, Mr. Barnes, believed the intrusion
13   to the computer system occurred somehow through the
14   web via the company's email server.
15       Q    So they believed, Mr. Barnes or
16   Mr. Davis, that Miss Melongo accessed Save a Life
17   servers -- the entire servers for the company via
18   the email server?
19       A    That's his assumption, yes.
20       Q    Did they explain why they made that
21   assumption?
22       A    No.
23       Q    Did you investigate if it would be
24   possible to access Save a Life servers using the

1    email server?
2        A    I didn't specifically investigate that
3    route, no.
4        Q    You continue on the page we've just been
5    reading, the second page of Exhibit 3, it says --
6    now towards the end of the first paragraph,
7    Mr. Barnes also believed the intrusion to the
8    computer system occurred somehow through the web
9    via the company's email server, but he was unsure
10   as to how this may have occurred because the
11   company disconnected the DSL lines from the servers
12   after the suspect's employment was terminated.
13           That's the statement you just alluded
14   to --
15       A    Yes.
16       Q    -- in your report?
17       A    Yes.
18       Q    What does DSL stand for?
19       A    I don't know exactly. I believe it
20   stands like direct service line or something like
21   that. I can't recall. It's been a while.
22       Q    Do you know what a DSL line is?
23       A    Yeah, it's an internet connection, a
24   type of internet connection.

1        Q    Would you agree that it would have been
2    impossible to access Save a Life servers via DSL
3    line if the DSL lines were disconnected?
4        A    Can you say it one more time?
5        MS. SCHWARTZ: Would you read it back.
6        THE WITNESS: Would you read that back,
7    please.
8             (The record was read.)
9        THE WITNESS: No, I do not agree to that.
10       By Ms. Schwartz:
11       Q    Why not?
12       A    Because there is multiple ways a
13   computer can be accessed, whether it has actual --
14   that computer specifically has internet connection
15   or not.
16       Q    If remote access is down -- if the
17   internet is down on the servers, could someone
18   remotely access those servers?
19       A    Yes.
20       Q    So in this case what was your view as to
21   how the intruder to Save a Life Foundation's
22   systems could have remotely accessed Save a Life
23   servers if the DSL line was down?
24       A    It just says the DSL lines were

1    disconnected from the servers, which I take to mean
2    that the servers themselves were not accessible to
3    the internet, the outside world -- I shouldn't say
4    the outside world, but the internet itself.
5              But if another computer on that specific
6    network still has internet access, that has the
7    network credentials to connect to those servers, a
8    person could potentially log into those servers and
9    delete data.
10   Q    So a person could access the Save a Life
11   networks even if they were not -- strike that.
12             A person could have accessed Save a Life
13   Foundation servers that were not connected to the
14   internet if that person had network access?
15   A    If the compute -- the computer that is
16   remotely being accessed has the ability to be
17   remotely accessed and is on the internet and
18   discoverable on the network, and they can -- a
19   person could enter like -- it's like entering a
20   door.  If you can get into a door on a house, no
21   matter where that door is located, if that door is
22   accessible, once you are inside, you can navigate
23   throughout as long as your permission level
24   allows.

1    Q    Was that your understanding of how
2    someone accessed Save a Life Foundation servers
3    remotely on April 28, 2006?
4    A    Yes.
5    Q    Continuing on that same page we've been
6    reading of Exhibit 3, second page, at the end of
7    this second paragraph it states, Mr. Davis believed
8    the suspect had been monitoring SALF management's
9    email for some time.
10             Did Mr. Davis tell you why he thought
11   the suspect, Miss Melongo, had been monitoring SALF
12   management's email?
13   A    It was in reference to the fact that she
14   had specific knowledge of communications that had
15   been occurring.  And he makes a reference to at
16   some point only four people knew a specific bite of
17   information, I don't recall what it was, but only
18   four people knew about it, and she was not supposed
19   to be one of the four, but she was aware of it.
20   Q    Do you remember what that information
21   that Miss Melongo had was?
22   A    No, I don't recall.
23   Q    Did Mr. Davis say how he came to
24   discover that Miss Melongo had this information

1    that only four other people should have known?
2    A    No, and I don't know -- no, I don't.
3    Q    The next sentence of Exhibit 3, second
4    page says Mr. Davis also gave R/I the name of the
5    person who they called to repair the server on
6    1, May, 06, Critical Technology Solutions.
7              Was that Don Peters the person from
8    Critical Technology Solutions?
9    A    Yes.  I believe he's the owner of the
10   company or it's his company.
11   Q    And did you speak to Don Peters as part
12   of your investigation?
13   A    Yes, at least once that I remember.
14   Q    Was that also on May 17, 2006?
15   A    Correct.
16   Q    Did Mr. Peters tell you what his company
17   did or was doing related to Save a Life Foundation
18   servers and computers?
19   A    Yes.
20   Q    What did he tell you?
21   A    According to the report, he was told
22   kind of what had happened in regards to the
23   intrusion, and the fact that they were unable to
24   access their data.

1              So she basically told him that several
2    people tried to fix it, but couldn't, and then they
3    called him to do what he could do.  And he told her
4    that evidence discovery as far as what could be
5    presented to the police to use in court, there is
6    no clear chain of custody.  And knowing that, she
7    still decided to move forward with his company's
8    recovery efforts.
9    Q    So that's what Mr. Peters told you he
10   did and said to Carol Spizzirri?
11   A    Yes.
12   Q    Do you recall anything else about that
13   conversation with Don Peters?
14   A    No, other than the fact he was going --
15   I needed -- I wanted a document that stated, you
16   know, his findings basically or his...
17   Q    Did you receive a document stating
18   Critical Technology Solutions' findings?
19   A    I did.  It was a couple days later, I
20   believe.
21   Q    I'm handing Detective Martin Plaintiff's
22   Deposition Exhibit --
23             MR. KAPLAN: 10.
24             MS. SCHWARTZ: -- 10, CCSAO 000188.

1          (A document was marked Plaintiff's
2      Deposition Exhibit Martin No. 10
3      for identification.)
4      By Ms. Schwartz:
5      Q    Is Exhibit 10 a true and accurate copy
6  of an email you received from Donald Peters dated
7  May 18, 2006?
8      A    It appears to be.  And according to this
9  there was an attachment, and I believe it was an
10 attachment that he had provided in the letter that
11 I think he gave to Carol, Miss Spizzirri.
12     Q    So I'll hand you Plaintiff's Deposition
13 Exhibit 11, which is Attorney General's 001365,
14 1366.
15         (A document was marked Plaintiff's
16     Deposition Exhibit Martin No. 11
17     for identification.)
18     By Ms. Schwartz:
19     Q    Is Exhibit 11 the attachment, the report
20 from Critical Technology Solutions to
21 Miss Spizzirri dated May 11, 2006?
22     A    It appears to be, yes.
23     Q    So you received both of these documents,
24 Exhibit 10 and Exhibit 11 as part of your

1  investigation?
2      A    Yes.
3      Q    Let's start with Exhibit 11.
4          Did you review Exhibit 11 when you
5  received it from Donald Peters?
6      A    I did.
7      Q    If you turn to the second page, the
8  first paragraph where he says it is important to
9  note that following the discovery of data loss on
10 April 28th, many technical personnel attempted to
11 perform recovery procedures on the Dell and Sony
12 systems.  These actions were appropriately matched
13 to the technician's skill sets and we apparently
14 carried out in a good faith effort to provide
15 recovery.  With the number of personnel involved
16 and the amount of time prior to our examination, it
17 is not possible to state with complete certainty
18 that the file tag information, dates, times,
19 et cetera, is accurate.
20         Are these some of the chain of custody
21 issues that you referenced earlier today in your
22 testimony?
23     A    Yes.
24     Q    And did you speak to Don, Donald Peters

1  about some of those issues?
2      A    We discussed it as far as, you know,
3  what his opinion was.
4      Q    Doesn't that quoted statement that I
5  just read mean that the condition of Save a Life
6  Foundation servers could have changed between the
7  time of the intrusion on April 28th and the time
8  Mr. Peters' company completed its work?
9      A    I missed it.  Could they have changed?
10     MS. SCHWARTZ:  Would you mind reading the
11 question back.
12         (The record was read.)
13     THE WITNESS:  The condition have changed?
14 Yes, it's possible they could have changed.
15     By Ms. Schwartz:
16     Q    And doesn't the quoted statement I just
17 read of Exhibit 11 mean that it would be difficult
18 to prove the exact condition of the servers
19 immediately after the Save a Life intrusion?
20     A    I don't know that it would be difficult
21 to prove the condition because he states on page 1
22 what the condition was when he got it.
23     Q    But he does say -- Don Peters does say
24 on Exhibit 11, it is not possible to state with

1  compete certainty that the file tag information,
2  dates, times, et cetera is accurate?
3      A    The information that he was able to
4  obtain, and I'm referencing the screenshots that
5  were provided to us, of the server and the file
6  tree that I was referencing earlier, those dates
7  and times.  He's saying that it's not possible to
8  say what the evidence that he obtained from those
9  servers, those times -- he can't state that those
10 times are accurate, but then he goes on to say that
11 it would take an extraordinary effort to modify
12 these -- this information, but that's only at the
13 time that he recovered those items.
14     Q    Let's turn to Exhibit 10, the email.  In
15 Exhibit 10 Don Peters wrote I -- towards the bottom
16 of the first paragraph, I advised the group that
17 with multiple personnel attempting recovery on the
18 drives over the previous days, and no clear chain
19 of custody, the quality of any evidence discovery
20 would be questionable at best.
21     MR. KAPLAN:  Do you have a question?
22     MS. SCHWARTZ:  Yes, I'm thinking.
23     THE WITNESS:  That's what I didn't know if it
24 was a question.  I was going to have you read it

1    back.
2      By Ms. Schwartz:
3      Q    The fact that there was no clear chain
4    of custody and that the quality of any evidence
5    discovery would be questionable at best, didn't
6    that mean that you could not obtain evidence from
7    the Save a Life Foundation servers or computers
8    that was preserved as of the time of the alleged
9    intrusion?
10     MR. KAPLAN:  Objection, calls for speculation.
11     THE WITNESS:  I wouldn't know if there was --
12   it was possible or not.
13     By Ms. Schwartz:
14     Q    What did you understand Mr. Peters to
15   mean when he said the quality of any evidence
16   discovery would be questionable at best?
17     A    The quality evidence in reference to
18   having someone testify specifically to the evidence
19   that was recovered and who might have recovered it
20   and from where it was recovered.
21     Q    Mr. Peters wouldn't be able to say what
22   evidence was recovered and where it was recovered?
23     MR. KAPLAN:  Objection, calls for
24   speculation.

1      By Ms. Schwartz:
2      Q    Is that what he told you?
3      A    The way I understand what he wrote to
4    mean is that the quality of the evidence, which to
5    me means the evidence -- if there was evidence
6    discovered, he specifically couldn't say that this
7    was recovered by what individual at what time, and
8    be usable in court in the sense of when we have
9    evidence, we have to know that.
10     Q    I'm handing you Plaintiff's Deposition
11   Exhibit 12, Attorney General 000106 to 113.
12        (A document was marked Plaintiff's
13        Deposition Exhibit Martin No. 12
14        for identification.)
15     By Ms. Schwartz:
16     Q    This is a report from True Consulting,
17   Inc., dated April 30, 2006.
18        Did you review this True Consulting
19   report as part of your investigation?
20     A    I don't recall if I was provided a copy
21   of this or not.
22     Q    Did you learn about any recovery efforts
23   that were done on the Save a Life Foundation
24   computers or servers by a company called True

1    Consulting, Inc.?
2      A    No.  I was aware of the fact that there
3    were people that were hired or attempted to recover
4    the data, I should say, but I didn't -- I don't
5    specifically remember if I knew it was True
6    Consulting.
7      Q    If you turn to page at the bottom,
8    Attorney General 000107, the paragraph that starts
9    virus/malicious intent?
10     A    I'm sorry, what page of that?
11     Q    107.
12     A    107.
13     MR. KAPLAN:  Page 2 of this report.
14     By Ms. Schwartz:
15     Q    The second page.
16     A    Oh, the second page.
17     Q    In the paragraph that starts
18   virus/malicious intent it says, when viewing the IP
19   log for the network, we noticed that an external IP
20   addressed logged into SALF's servers on Friday and
21   engaged or trolled the server for over four hours.
22        Do you recall learning that someone had
23   discovered that there had been an external IP
24   address that trolled the server for four hours?

1      A    No, not that I recall.
2      Q    Did you ever ask Save a Life Foundation
3    or any of these third-party vendors that worked for
4    Save a Life Foundation to provide you information
5    about IP addresses that accessed their network on
6    April 28, 2006?
7      THE WITNESS:  Can you read back the question,
8    please?
9          (The record was read.)
10     THE WITNESS:  Yes, I did.
11     By Ms. Schwartz:
12     Q    What did you ask for?
13     A    I remember asking Web HSP for whatever
14   information they might have as far as what IP
15   addresses were captured during the time of the
16   alleged incident.  I don't recall if I asked Don
17   Peters or not.
18     Q    Did you ever obtain any information
19   about IP addresses that accessed Save a Life system
20   on April 28, 2006 from Web HSP?
21     A    No, I did not.
22     Q    Did you ever obtain such information
23   from any other source?
24     A    Not that I recall, no.

1    Q    Did you ever speak with Brian Salerno?
2    A    I don't recall if I did or not.
3    MS. SCHWARTZ: Let's take a lunch break now.
4    MR. KAPLAN:  Sure.
5    MS. SCHWARTZ:  Let's go off the record.
6         (A discussion was had off the
7          record.)
8         (Whereupon, a lunch recess was
9          taken until 12:45 p.m., this day,
10         Tuesday, May 8, 2018.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1    APPEARANCES:  (Continued)
2         Ms. Lisa Madigan, Attorney General,
          State of Illinois, by:
3         Ms. Shirley R. Calloway
          Assistant Attorney General
4          on behalf of Defendant Kyle French;
5         Ms. Dina M. Ninfo
          Angelini, Mills, Woods & Ori Law
6          on behalf of Defendant
           Ms. Carol Spizzirri.
7
     Also Present:
8
          Ms. Annabel Melongo (via telephone)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
3    ANNABEL MELONGO,          )
                               )
4         Plaintiff,           )
                               )
5    vs.                       )No. 13-cv-04924
                               )
6    ASA ROBERT PODLASEK, et al.,   )
                               )
7         Defendants.          )
8              180 North LaSalle Street
                Chicago, Illinois
9
                Tuesday, May 8, 2018
10              12:49 p.m.
11
12    The deposition of DETECTIVE WILLIAM MARTIN
13    resumed pursuant to recess.
14
15    APPEARANCES:
16        Ms. Julia K. Schwartz
          Mr. Michael L. Shakman
17        Miller Shakman & Beem
           on behalf of Plaintiff;
18
          Ms. Kimberly M. Foxx, State's Attorney of
19        Cook County Illinois, by:
          Ms. Bianca Brown
20        Assistant State's Attorney
           on behalf of all Cook County Defendants;
21
          Mr. Eric D. Kaplan
22        Mr. Christopher S. Wunder
          Kaplan Papadakis & Gournis, P.C.
23         on behalf of Defendant William Martin
           and Schiller Park;
24

1         MS. SCHWARTZ:  All right.  We are back on the
2    record after lunch.  The same attorneys are present
3    in the room.  Miss Brown, who stepped out, but will
4    be joining us shortly, and Michael Shakman for the
5    plaintiff will probably also be stepping in and out
6    in the afternoon.
7         DETECTIVE WILLIAM MARTIN,
8    called as a witness herein, having been duly sworn,
9    was examined and testified further as follows:
10        EXAMINATION (Continued)
11   By Ms. Schwartz:
12   Q    I'm handing Detective Martin Plaintiff's
13   Deposition Exhibit 13, Melongo_004398.
14        (A document was marked Plaintiff's
15         Deposition Exhibit Martin No. 13
16         for identification.)
17   By Ms. Schwartz:
18   Q    Detective Martin, do you recognize
19   Exhibit 13?
20   A    I believe so, yes.
21   Q    Exhibit 13 is a letter dated November 2,
22   2006 from Carol Spizzirri to Richard Devine.
23        Did you receive a copy of this email
24   around the time it was sent -- of this letter,

1  excuse me, around the time it was sent?
2      A    I don't know when I received it, but I
3  remember receiving a copy of this.
4      Q    In the body of this letter it states, it
5  is with extreme appreciation I write to inform you
6  that due to the professionalism by your executive
7  assistant Randy Roberts working with
8  Detective Martin of the Schiller Park Police
9  Department a warrant has been issued for the arrest
10 of the party who destroyed our computer service.
11     Did you work with executive assistant
12 State's Attorney Randy Roberts --
13     A    I did not.
14     Q    -- on this?
15     A    I specifically did not, no.
16     Q    Do you recall ever meeting Mr. Roberts
17 or speaking to Mr. Roberts about the Save a Life
18 investigation?
19     A    No, I do not.
20     Q    Not on the phone or email or any other
21 form?
22     A    No, ma'am.
23     Q    Do you have any idea why Miss Spizzirri
24 states in this letter, Exhibit 13, that you and

1  Randy Roberts worked together?
2      MR. WUNDER:  Objection, speculation.
3      THE WITNESS:  No, I have no idea why.
4          (At this point in the deposition
5          Ms. Brown reentered the room.)
6  By Ms. Schwartz:
7      Q    I would ask you a few additional
8  questions about Save a Life's DSL lines.
9          Were you aware that at the Save a Life
10 Foundation the DL -- DSL lines were connected
11 through the server?
12     A    The only information we had regarding
13 the DSL lines and the servers were that they were
14 disconnected from them.
15     Q    Were you aware that Save a Life
16 Foundation did not have WiFi?
17     A    I don't recall if we were ever informed
18 of whether they had it or not.
19     Q    Were you aware that at Save a Life
20 foundation, the DSL lines were the only way
21 internet was connected to their organization, given
22 that there was no WiFi at Save a Life?
23     A    I don't think we were ever notified
24 whether they had any additional provider or not.

1      Q    I'd like to turn your attention to
2  Exhibit 3, your police report, the second page, the
3  entry dated May 17, 2006 towards the bottom.  It
4  states, R/I then contact Web HSP in Colorado, the
5  web host for SALF's email server.  R/I was advised
6  to speak to Mike, the owner of the company.  Mike
7  informed R/I that the company should have the IP
8  addresses of any computer accessing his company's
9  servers and that he would send R/I the information
10 collected for the dates of the intrusions.
11     Did you speak with someone named Mike at
12 Web HSP on May 17, 2006?
13     A    I believe so, according to the report.
14     Q    Do you recall independently of the
15 report your conversation with Mike at Web HSP?
16     A    No, not off the top of my head, no.
17     Q    Do you know what Mike's last name was or
18 is?
19     A    No idea.
20     Q    Is there a reason you didn't list Mike's
21 last name in the police report?
22     A    Only that I didn't get it.
23     Q    And was May 17th the on -- 2006, the
24 only time you ever spoke to someone named Mike at

1  Web HSP?
2      A    The best of my recollection, yes.
3      Q    You testified earlier that no one at
4  Web HSP ever sent you -- strike that.
5          Did Mike or anyone at Web HSP ever send
6  you IP addresses of any company that accessed his
7  company's servers on May 1, 2006.
8      A    No, we never received anything other
9  than the email from Web HSP, but we got that from I
10 believe it was Save a Life.
11     Q    The Tech Support email is what you are
12 referring to?
13     A    Correct.  That's the only thing we ever
14 got from -- regards to Web HSP.
15     Q    So you never received Web HSP's server
16 logs?
17     A    No.
18     Q    Wouldn't Web HSP's server logs have
19 shown the IP addresses used to access Carol
20 Spizzirri's email account on May 6, 2006?
21     MR. KAPLAN:  Hold, can you read back the
22 question, please?
23          (The record was read.)
24     MR. KAPLAN:  Objection, calls for speculation.

1    Answer, if you can.
2    THE WITNESS:  I wouldn't -- I wouldn't know.
3    By Ms. Schwartz:
4    Q    I'm showing Detective Martin Exhibit 14,
5    Spizzirri000001093.
6        (A document was marked Plaintiff's
7        Deposition Exhibit Martin No. 14
8        for identification.)
9    By Ms. Schwartz:
10    Q    Is Exhibit 14 a true and accurate copy
11    of an email you sent to Carol Spizzirri dated
12    February 8, 2010?
13    A    It appears to be, yes.
14    Q    You ask Miss Spizzirri, can you locate
15    the contact information for Web HSP in Colorado.
16    They were the company that hosted your SALF email
17    server.
18        On February 8, 2010 you were asking for
19    information related to Web HSP?
20    A    Yes.
21    Q    Why were you asking for information
22    related to Web HSP in February 2010?
23    A    I don't recall the exact reason.
24    Q    Did someone ask you to reach out to

1    Miss Spizzirri about Web HSP?
2    A    I can only assume that someone did,
3    yes.
4    Q    But you don't recall who that might have
5    been?
6    A    No, ma'am.
7    Q    What were you looking for specifically
8    from Web HSP in February 2010?
9    A    It refers to contact information so that
10    we could get ahold of them, and I -- like again, I
11    can only assume that we were still trying to obtain
12    the server logs or locating someone to testify at
13    that point.
14    Q    Apart from May 17, 2006, about which we
15    just talked -- the date we just talked about --
16    strike that.
17        Between May of 2006 and February of
18    2010, did you ever ask Web HSP for information
19    about the email server logs for Save a Life
20    Foundation?
21    A    Other than what was specifically entered
22    in the report on May 17th, I don't recall ever
23    trying to make contact with them personally.
24    Q    I'm handing you Plaintiff's Deposition

1    Exhibit 15, Spizzirri000001087 to 88.
2        (A document was marked Plaintiff's
3        Deposition Exhibit Martin No. 15
4        for identification.)
5    By Ms. Schwartz:
6    Q    Is this a true and accurate copy of an
7    email you received from admin@webhsp.com on
8    February 9, 2010?
9    A    It appears to be, yes.
10    Q    Someone named John Burns from Web HSP is
11    responding to Miss Spizzirri's request for
12    information; is that correct?
13    A    Yeah, it appears to be a response --
14    well, it was forwarded to me -- I shouldn't say
15    forwarded.
16        What was sent to me was the contact
17    information in regards to what appears to be Carol
18    reaching out to the admin web -- excuse me -- the
19    admin@webhsp.com requesting they contact me.
20    Q    And in the email at the top dated
21    February 9, 2010, John Burns states, I have called
22    Detective Martin and left a message and should
23    speak with him today.
24        Did you ever speak with John Burns?

1    A    I don't recall if I actually spoke to
2    him or not.
3    Q    I'm handing you Plaintiff's Deposition
4    Exhibit 16, Spizzirri000001081.
5        (A document was marked Plaintiff's
6        Deposition Exhibit Martin No. 16
7        for identification.)
8    By Ms. Schwartz:
9    Q    Is this a true and accurate copy of an
10    email you received on February 9, 2010 from
11    admin@webhsp.com?
12    A    It appears to be.
13    Q    In Exhibit 16 John Burns, again of
14    Web HSP says, it was nice speaking to you today.
15    As discussed Web HSP does not have any of the log
16    files you were needing for this case.  When Carol
17    canceled her account with Web HSP, those log files
18    would have been destroyed when her VPS was removed
19    from our server.
20        Do you recall speaking to Mr. Burns and
21    him telling you that he did not have log files
22    related to the case?
23    A    I don't recall the conversation, but
24    obviously I did, based upon the email that I

ACR REPORTING, LLP  (312) 422-0515

1 received.
2 Q   Do you know when Miss Spizzirri canceled
3 her account with Web HSPC --
4 A   No.
5 Q   -- with Web HSP?
6 A   No, I do not.
7 Q   I'm handing you Plaintiff's Deposition
8 Exhibit 17, Spizzirri000001073 to 77.
9      (A document was marked Plaintiff's
10      Deposition Exhibit Martin No. 17
11      for identification.)
12 MR. KAPLAN: 17?
13 MS. SCHWARTZ: 17.
14 By Ms. Schwartz:
15 Q   Is this a true and accurate copy of an
16 email Carol Spizzirri sent you on February 14,
17 2010?
18 A   It appears to be. It's similar to the
19 one that we received.
20 Q   It appears she's forwarding you the
21 May 4, 2006 email that we discussed earlier?
22 A   Correct.
23 MR. KAPLAN: Exhibit 7.
24 THE WITNESS: Exhibit 7.

1 By Ms. Schwartz:
2 Q   Which is Exhibit 7.
3      She is forwarding that same email, now
4 with subject line in the February 14, 2010 email,
5 Annabel's footprints you may be looking for.
6      Do you know why Carol Spizzirri sent you
7 this email on February 14, 2010?
8 A   I have no idea why.
9 Q   You had already received this document,
10 the embedded document dated May 4, 2006 from her?
11 A   Yes. Well, from somebody at Save a
12 Life. I don't know it's from her. But this
13 appears -- this Exhibit 17 has not only Exhibit 7,
14 but the following pages are other exhibits that
15 appear to be -- no. The other exhibits are
16 included in here, some of that.
17 Q   Is one of them Exhibit 5 maybe?
18 A   Part of -- it looks like part of
19 Exhibit 4, and then also part of the Exhibit 5, and
20 again copied into Exhibit 6 it looks like.
21 Q   There are a number of emails included?
22 A   Well, it's I think the same text that's
23 been copied throughout those previous exhibits. So
24 not only is it the email from Tech Support -- or

1 tsupport@gmail.com, it's also the other emails that
2 they -- were referenced in those other exhibits.
3 Q   I'm handing you Plaintiff's Deposition
4 Exhibit 18, Spizzirri000001070.
5      (A document was marked Plaintiff's
6      Deposition Exhibit Martin No. 18
7      for identification.)
8 By Ms. Schwartz:
9 Q   Is Exhibit 18 a true and accurate copy
10 of an email you received from Carol Spizzirri on
11 February 21, 2010?
12 A   It appears to be.
13 Q   The subject line is may have the Annabel
14 data you're looking for.
15      What data were you looking for on or
16 around February 21, 2010?
17 A   I -- the only data I was looking for in
18 regards to her was contact information from
19 Web HSP. I wasn't looking for any additional
20 information other than that.
21 Q   So you don't know what she's referring
22 to when she says may have the Annabel data you are
23 looking for and then in the body of the email says
24 while compiling all my Annabel's files for

1 Podlasek, I found seven pages from 4/28/06, paths
2 for deleted files and time between 1:17 a.m. to
3 3:25 a.m.
4      Do you know what she's referring to
5 then?
6 A   I could speculate as to the screenshots
7 from the server showing the files and the modified
8 access and created times.
9 Q   Did she send or fax you any additional
10 information on or around February 21, 2010?
11 A   I don't recall if she did or not. I
12 would assume that she did saying -- because the
13 email says she's going to fax it.
14 Q   You requested records from Comcast and
15 Yahoo as part of your investigation in 2006, did
16 you not?
17 A   I did.
18 Q   I'm handing you Plaintiff's Deposition
19 Exhibit 19, CCSAO 006572 to 74.
20      (A document was marked Plaintiff's
21      Deposition Exhibit Martin No. 19
22      for identification.)
23 By Ms. Schwartz:
24 Q   The first page of Exhibit 19 is a fax

1  cover sheet and the second two pages say at the top
2  grand jury subpoena request.
3       Are these copies of two grand jury
4  subpoena requests that you faxed to Comcast on
5  May 31, 2006?
6    A    They appear to be, yes.
7    Q    And turning to the second and third
8  pages of Exhibit 19, at the bottom is some
9  handwriting.
10       Is that your handwriting?
11    A    Yes.
12    Q    Or just the second page rather is
13  handwriting.
14    A    Correct.  Correct, the second page.
15    Q    Did Kyle French send you a grand jury
16  subpoena request form by email before you sent this
17  to Comcast?
18    A    He had sent some subpoenas to us.  I
19  don't know if it was this specific one, but he did
20  send us some templets and...
21    Q    What was the reason for Mr. French
22  sending you subpoena templets?
23    MR. KAPLAN:  Objection, calls for
24  speculation.

1    THE WITNESS:  Just to provide assistance as
2  far as what information needed to be contained in
3  those documents to get the proper results.
4    By Ms. Schwartz:
5    Q    Did -- was the narrative content on this
6  Exhibit 19, did you draft that content or did Kyle
7  French draft some of that content, or was it a
8  joint effort?
9    A    I don't recall.  I would have typed this
10  information in.  I don't recall if it was language
11  that he compiled or I compiled.
12    Q    In the middle of the page, the second
13  page of Exhibit 19, there is a section that says
14  the facts briefly stated are as follows.
15       Turning to the very last sentence, all
16  of these incidents occurred on the internet using
17  the internet protocol IP address of 24.15.202.102
18  at the above listed times.  The IP address of
19  24.15.202.102 belongs to Comcast Cable Company.
20       Does these incidents in the first
21  sentence I just read refer to the April 28, 2006
22  intrusion on SALF's servers and the May 1, 2006
23  email forwarding?
24    A    Yes, it relates to both.

1    Q    We already talked this morning about the
2  May 1, 2006 email forwarding.
3       Why did you think that the April 28,
4  2006 alleged intrusion occurred using IP address
5  24.15.202.102?
6    A    It was based upon the -- what we
7  believed to be the suspect's IP in relation to the
8  other incident with the email.  We were trying to
9  show that the -- the device that had that IP was
10  on-line at the time that the deletion occurred.
11    Q    So you were trying to show that the 102
12  address, that IP address was used on April 28, 2006
13  at the time of the alleged intrusion?
14    A    Yes.
15    Q    At this time did you have any evidence
16  that that IP address, the 102 address, was used to
17  access SALF's servers in the early morning hours of
18  April 28, 2006?
19    A    I don't think we did at that point.
20    Q    So the statement all of these incidents
21  occurred on the internet using the internet
22  protocol IP address of 24.15.202.102 was not
23  accurate with respect to the April 28, 2006
24  intrusion?

1    A    Correct.
2    Q    I'm handing you Plaintiff's Deposition
3  Exhibit 20, CCSAO 000214 to 215.
4       (A document was marked Plaintiff's
5        Deposition Exhibit Martin No. 20
6        for identification.)
7    By Ms. Schwartz:
8    Q    Is this a true and accurate copy of a
9  grand jury subpoena issued by the grand jury for
10  records from Comcast IP Services?
11    A    It appears to be, yes.
12    Q    The subpoena requests information
13  related to the 102 address we've been discussing;
14  is that right?
15    A    Correct.
16    Q    And was filed with the grand jury
17  May 25, 2006?
18    A    Yes.
19    Q    Did you present this to the grand jury
20  or what was the process to get this filed by the
21  grand jury?
22    A    No.  We just send our subpoenas to the
23  Third District.  They -- the subpoena request I
24  should say goes to the Third District.  They review

1    the request, and then they will take it to the
2    grand jury and have it filed.
3        Q    By Third District, are you referring --
4        A    The Third District courthouse in
5    Rolling Meadows.
6        Q    So it's an Assistant State's Attorney
7    that would present this to the grand jury?
8        A    I believe so, yes.
9        Q    Did Comcast respond to this subpoena,
10   Exhibit 20?
11       A    Yes, they did.
12       Q    I'm handing you Plaintiff's Deposition
13   Exhibit 21, Melongo_004106 to 4116.
14           (A document was marked Plaintiff's
15            Deposition Exhibit Martin No. 21
16            for identification.)
17   By Ms. Schwartz:
18       Q    Is this a true and accurate copy of a
19   fax you sent to Kyle French on June 6 -- June 5,
20   2006, which included Comcast's response to the
21   grand jury subpoena?
22       A    It appears to be.
23       Q    Would you turn to the third page of
24   Exhibit 21, which is marked at the bottom

1    Melongo 4108. The Comcast representative who wrote
2    this letter in response to the subpoena wrote
3    regarding the 102 address, second paragraph,
4    Comcast cannot identify the subscriber account
5    associated with this request.
6            Was it your understanding that Comcast
7    was not able to locate subscriber information
8    related to the 102 address we've been discussing?
9        A    Correct. It says the log files used to
10   make subscriber account identifications were either
11   incomplete or contained an error associated with
12   the registration of the cable modem or other device
13   in question.
14       Q    So they weren't able to produce any
15   records in response to that particular request?
16       A    For those -- yeah, specific dates,
17   yes.
18       Q    The specific dates were April 28, 2006
19   and May 1, 2006?
20       A    Correct.
21       Q    Turning to the next page, Bates stamped
22   at the bottom Melongo_004109, this is a letter from
23   Comcast in response to the subpoena for internet
24   subscriber records pertaining to Annabel Melongo,

1    address 1218 East Long Valley Drive, Apartment 3A
2    in Palatine. The representative wrote based on the
3    information provided pursuant to the subpoena, we
4    are unable to find any information responsive to
5    the request.
6            So Comcast also had no records for a
7    Comcast internet services customer Annabel Melongo
8    at that address for the dates requested; is that
9    correct?
10       A    What -- what was determined days later,
11   I forget what that -- it looks like according to my
12   report, June 7th, I called them in regards to this
13   response, and I was told something along the lines
14   of is when they receive subpoena, the search
15   parameters that are defined within the subpoena,
16   that's what they put in.
17           And so their records -- their search --
18   I forget the word -- their search results would
19   only show if those two parameters were met at the
20   same time.
21       Q    In other words, the address and the name
22   were both identified --
23       A    Together. They have to be together. So
24   they would search both together. If it didn't

1    associate that name with that address in a specific
2    account, they wouldn't come back.
3            So what they suggested we do is we would
4    send -- they suggested we send separate subpoenas,
5    one just for the name and see if that -- then they
6    would search just the name, and then one just for
7    the address and they would search just the
8    address.
9        Q    Did you send separate subpoenas?
10       A    I sent the request. I don't believe
11   they were ever sent out though.
12       Q    Did you ever determine whether
13   Miss Annabel Melongo had a Comcast account in April
14   or May of 2006?
15       A    We had no record from Comcast stating
16   that, that's correct.
17       Q    You were involved in the preparation of
18   a search warrant to search Miss Melongo's home in
19   Palatine, were you not?
20       A    I was.
21       Q    What was your involvement with respect
22   to the search warrant -- preparing the search
23   warrant?
24       A    At that point I would have relied on

1    what Kyle French, offering his assistance in how to
2    draft such a document and have the correct language
3    in it. So he would have -- I believe he provided a
4    templet for me to do so.
5       Q   Did he provide any other assistance in
6    terms of preparing the search warrant?
7       A   I believe he was verifying some of the
8    information as far as -- and the language in that
9    with his supervisor. I don't recall who that was,
10    but.
11       Q   What information and language was Kyle
12    French verifying?
13       A   That I don't recall specifically.
14       Q   How did you decide to seek a search
15    warrant for Miss Melongo's home?
16       MR. KAPLAN: Object to the vagueness of the
17    question.
18       THE WITNESS: That's what I mean, I don't know
19    how to answer that.
20       By Ms. Schwartz:
21       Q   Excuse me, why did you decide to seek a
22    search warrant for Miss Melongo's home?
23       A   Well, obviously we believed that there
24    was a device there that potentially had evidence on

1    it or the apartment may contain evidence in
2    relation to these crimes that had been alleged.
3       Q   Were you specifically interested in any
4    computers or electronic devices of
5    Miss Melongo's?
6       A   Yeah, and anything related to Save a
7    Life at that -- that she might have been in
8    possession of.
9       Q   Turning your attention to your police
10    report, Exhibit 3, the entry dated June 28, 2006.
11       A   Okay.
12       Q   It states, R/I faxed Yahoo's response to
13    the search warrant to Mr. French. Later that day
14    R/I spoke to Mr. French who stated that he reviewed
15    the information that R/I had sent him with his
16    boss. After reviewing the information, both he and
17    his boss believed that with this information there
18    was enough evidence against Miss Melongo for a
19    search warrant for her home could be issued.
20       Did you speak with Mr. French on
21    June 28, 2006?
22       A   I did.
23       Q   Apart from what I just read and that's
24    listed in Exhibit 3, do you recall what was said

1    during that conversation?
2       A   Other than what's written in the report
3    about him in reference to getting the search
4    warrant approved and signed by a judge and
5    discussing potentially when to serve that
6    warrant.
7       Q   There is a reference in the portion I
8    just read of Exhibit 3 to new information in the
9    June 28, '06 entry.
10       What was the new information that French
11    thought was potentially relevant?
12       A   The Yahoo subpoena -- or search warrant
13    response.
14       Q   What about the Yahoo search warrant
15    response was new information that was relevant to
16    determining whether to get a search warrant for
17    Miss Melongo's home?
18       A   We believed that the response showed
19    that the Yahoo account that was in question here of
20    being involved in the incident was an account, you
21    know, and the response showed that it was an
22    account that was controlled by Miss Melongo. It
23    showed the log-ins on or about, around the times
24    that the alleged incidents occurred.

1       It showed -- it captured the IP
2    addresses of the device that were used to access
3    that account, and provided some -- I believe it had
4    some documents in regards to what was contained in
5    what Yahoo calls their briefcase, which is like an
6    on-line storage for documents.
7       Q   If you turn to the entry dated July 10,
8    2006 on Exhibit 3, it states, the second sentence
9    of that entry, Mr. French stated that his boss
10    reviewed his initial draft and stated that it
11    needed more information in it. R/I then emailed
12    Mr. French a copy of this report for him to refer
13    to for the required information. Mr. French stated
14    that he would attempt to get R/I the search warrant
15    by 14 July 2006.
16       This suggests that Kyle French drafted
17    some part of the search warrant; is that true?
18       A   Yes.
19       Q   What portions of the search warrant did
20    Mr. French draft?
21       A   I don't recall what specific portions he
22    may have drafted.
23       Q   The passage I just read of Exhibit 3
24    said -- states that Mr. French said his boss

1   indicated that the search warrant needed more
2   information.
3        Do you know what that information was
4   that was needed?
5        A   I think -- I don't know specifically
6   what information he was looking for.  I know that
7   he requested a copy of my report, up to the point
8   that the request was made.  So he --
9        Q   By your report, you mean your police
10  report?
11       A   Yes, the supplemental report up to that
12  point was sent -- a copy was sent to him.  So I
13  don't know what specific information within that
14  report he was looking for.
15       Q   I'm handing you Plaintiff's Deposition
16  Exhibit 22, Attorney General 001171 to 1181.
17            (A document was marked Plaintiff's
18            Deposition Exhibit Martin No. 22
19            for identification.)
20  By Ms. Schwartz:
21       Q   Exhibit 22 has certain identifying
22  information and addresses redacted.
23       Apart from the redactions, is Exhibit 22
24  a true and accurate copy of the search warrant for

1   Miss Melongo's home and complaint for search
2   warrant?
3        A   It appears to be.
4        Q   And the first page is the actual search
5   warrant and all the remaining pages are the
6   complaint for search warrant; is that correct?
7        A   Yes.  Except for the last page, which is
8   an attachment, listed attachment A.
9        Q   And on the complaint for search warrant
10  pages, is that your signature on the bottom?
11       A   Complaint, yes.  On the complaint,
12  yes.
13       Q   And this is a sworn statement by you for
14  the purpose of seeking the issuance of a search
15  warrant?
16       A   Yes.
17       Q   I would like to turn your attention to
18  the fourth page of the complaint for search
19  warrant, also Bates numbered Attorney
20  General 001175.
21       Look at the bottom of the second full
22  paragraph of that page, it states, according to
23  email server logs, the intruder forwarded email
24  from Miss Spizzirri's email account to the Yahoo,

1   Inc., (Yahoo) email account
2   melongo_annabel@yahoo.com using the internet
3   protocol (IP) address 24.15.202.102.
4        Are the email server logs referenced in
5   that sentence I just read --
6        A   They are.
7        Q   -- the Tech Support -- sorry.
8        Are the email server logs referenced in
9   that sentence I just read, is that the Tech Support
10  email you testified about earlier or is that
11  something else?
12       A   No, it's the Tech Support email.
13       Q   The actual server logs from Web HSP were
14  never sent to Schiller Park, correct?
15       A   Correct.
16       Q   Why did you refer to the Tech Support,
17  tsupport@gmail.com as an email server log?
18       A   It was just a misstatement.
19       Q   This page of Exhibit --
20       A   Yeah --
21       Q   -- 22 contained a misstatement about --
22       A   Well, --
23       Q   -- whether that was the server logs?
24       A   -- the email itself contained excerpts

1   from those logs, so that's what I was referring to,
2   but where we got it from was this Tech Support
3   email.
4        Q   On the next page, which is page 5 of the
5   search warrant complaint, identified as Attorney
6   General 001176, it states additionally and
7   according to server records provided by Yahoo, the
8   same IP address used by the intruder to access Save
9   a Life's servers on or about April 28, 2006 from
10  approximately 1:32 a.m. through 3:25 a.m.,
11  (i.e., 24.15.202.102), was used to access the Yahoo
12  account Melongo_Annabel over 25 times between
13  April 8, 2006 and May 9, 2006.
14       What evidence was there that that 102 IP
15  address was used to access Save a Life servers on
16  April 28, 2006?
17       A   I don't believe we had any at that
18  point.
19       Q   So it's not accurate to say that that IP
20  address, the 102 address, was used by the intruder
21  on April 28, 2006?
22       A   Correct.
23       Q   This Exhibit 22 was signed by a Judge,
24  correct?  The search warrant --

1    A    Yes.
2    Q    -- was signed by a Judge?
3    A    Yes.
4    Q    After the search warrant was signed by a
5  Judge, what did you do in terms of preparation for
6  executing the search warrant?
7    A    Other than talking to Mr. French and
8  having him help us set up the forensic examiners to
9  join in the search, that was probably about it.
10   Q    You testified that certain forensic
11  examiners joined you in the search?
12   A    Correct.
13   Q    Who were those forensic examiners?
14   A    Shahna Monge and Amber, I think it's
15  pronounced Haqqani.
16   Q    Other than you, Shahna Monge and Amber
17  Haqqani was anyone else present when you executed
18  the search warrant at Miss Melongo's home?
19   A    Yeah, my partner at the time
20  Detective Koch, which is spelled K-o-c-h.
21   Q    Was anyone else present?
22   A    No, not at the time of the search, no.
23   Q    You were present for the execution of
24  the search warrant, correct?

1    A    Yes.
2    Q    Why were the forensic examiners,
3  Miss Monge and Miss Haqqani present for the
4  execution of the search warrant?
5    A    We were searching for electronic
6  evidence, and based upon their experience, and they
7  had more experience than I did at the time in
8  regards to what information -- or what types of
9  devices to look for and possible recovery of
10  evidence from those devices.
11   Q    Whose decision was it that Amber Haqqani
12  and Shahna Monge would join for the execution of
13  the search warrant?
14   A    I believe the offer was made by
15  Mr. French to say hey, you know, we have this
16  available to us if you want to use them.  And I of
17  course said yes, because of what we were looking
18  for.
19   Q    The search warrant was executed on
20  July 20, 2006; is that correct?
21   A    Yes.
22   Q    Did you speak with Annabel Melongo
23  during the execution of the search warrant?
24   A    I did.

1    Q    Where did that conversation take
2  place?
3    A    In her apartment.
4    Q    Where in her apartment did the
5  conversation take place?
6    A    I believe it was the kitchen.
7    Q    And while you were speaking to
8  Miss Melongo, where were the others, Miss Haqqani,
9  Miss Monge and is it Detective Koch?
10   A    Correct.  The forensic examiners or the
11  Attorney General's personnel were searching the
12  apartment while myself and Detective Koch spoke
13  with Miss Melongo.
14        (At this point in the deposition
15        Mr. Shakman entered the room.)
16  By Ms. Schwartz:
17   Q    You testified you and Detective Koch
18  were in Miss Melongo's kitchen when you spoke to
19  her?
20   A    Correct.
21   Q    Did you read Miss Melongo her Miranda
22  warnings before you spoke to her?
23   A    I did.
24   Q    What was said during that conversation

1  with Miss Melongo on July 20, 2006?
2    A    Just the -- you know, the summary is
3  listed here in the report, but basically, you know,
4  she was read her Miranda.  She initialed and signed
5  the form that we have saying that she agreed to
6  speak to me without her attorney present.
7        She stated that she had gone to
8  Save a Life on -- excuse me -- on Monday April, 27,
9  2006 to pick up her paycheck.  She overheard that
10  the company was having computer problems and she
11  offered her assistance.
12        At that point, Miss Spizzirri accused
13  her of causing the problem.  Miss Melongo denied
14  the allegations, and she only offered to help
15  because her replacement was not qualified as
16  Miss Melongo -- I'm sorry -- as Miss Melongo
17  alleged with the computers.
18        She continued to state that she was an
19  employee there at Save a Life, and at the time she
20  had job titles of assistant administrator, web
21  designer and programmer.  Part of her job duties
22  were to access -- or she had access to all of the
23  passwords for the Save a Life employees, access to
24  the web server and all the company passwords.

1        Miss Melongo also admitted to accessing
2  the server to get her emails for up to two weeks.
3  She provided I believe the dates of 2007 -- '06 to
4  May 14th of 06.  She claimed that after her exit
5  interview on April 27th of '06, she was checking
6  only her Save a Life email account and did not
7  change any settings or system passwords at that
8  point.
9        She also admitted to viewing
10  Miss Spizzirri's emails in which Miss Spizzirri
11  blamed Miss Melongo for the problems that Save a
12  Life was having with their computer system.
13        After she viewed those she emails,
14  Miss Melongo had forwarded those emails to her
15  Yahoo email account melongo_annabel@yahoo and she
16  claimed that no one else accesses her Yahoo account
17  but her.
18        Do you want me to continue on with her
19  statement?
20     Q    So you're reading from Exhibit 3, which
21  is your police report; is that right?
22     A    Correct.
23     Q    And that's a documentation you made of
24  the conversation you had with Miss Melongo?

1     A    Yeah, it's a summary of what she said.
2     Q    Do you independently remember anything
3  about the conversation with Miss Melongo on
4  July 20, 2006 separate from reading your report?
5     A    No.
6     Q    Do you recall anything you said to
7  Miss Melongo during that conversation?
8     A    Nothing specifically, no.
9     Q    And you don't recall anything she said
10  to you on July 20, 2006?
11     A    Other than what's documented here, no.
12     Q    And you remember what's documented here
13  because it's in this written report?
14     A    Yes.
15     Q    You testified that Detective Koch was
16  also present when Miss Melongo was interviewed by
17  you; is that correct?
18     A    Correct.
19     Q    Do you recall anything he said to
20  Miss Melongo during that conversation?
21     A    No, I do not.
22     Q    Did Detective Koch take any independent
23  notes or make any separate report apart from your
24  report, Exhibit 3?

1     A    No, he did not.
2     Q    He did not?
3     A    No.
4     Q    Miss Melongo did not sign a written
5  statement reflecting the content of your
6  conversation; is that true?
7     A    No, --
8     Q    Did you ask --
9     A    -- no, she did not.  I'm sorry.  Go
10  ahead.
11     Q    Go ahead.
12     A    No, she did not.
13     Q    Did you ask her to sign a written
14  statement?
15     A    No.
16     Q    Why not?
17     A    It wasn't something that we did.  The
18  State's Attorney's Office around that time was
19  hesitant to take written statements from anyone in
20  any case.
21     Q    Do you know why the State's Attorney was
22  hesitant?
23     A    No, I do not.
24     Q    Did you make any notes regarding your

1  conversation with Miss Melongo on July 20, 2006
2  apart from what's in Exhibit 3?
3     A    No, I didn't.
4     Q    Apart from what you've testified to
5  today, and what's listed in Exhibit 3, do you have
6  any other recollection of what Miss Melongo told
7  you on July 20, 2006?
8     A    No, I do not.
9     Q    Now, this isn't the first time you've
10  been asked to testify under oath about
11  Miss Melongo's statements on July 20, 2006,
12  correct?
13     A    Correct.
14     Q    You testified before two grand juries
15  both in January of 20 -- 2007 and May 2008,
16  correct?
17     A    I believe the years are correct.  I
18  don't recall the month.
19     Q    And in both grand juries at which you
20  testified you gave testimony about Miss Melongo's
21  statements to you on July 20, 2006?
22     A    I did.
23     Q    I'm handing you Plaintiff's Deposition
24  Exhibit 23, which is Bates numbered Melongo_005982

1    to 5995.
2              (A document was marked Plaintiff's
3              Deposition Exhibit Martin No. 23
4              for identification.)
5    By Ms. Schwartz:
6         Q    Before we discuss Exhibit 23 in detail,
7    I want to ask you one additional question about
8    Exhibit 3, your police report.
9         A    Okay.
10        Q    When did you prepare Exhibit 3, the
11   contents of Exhibit 3?
12        A    In it's entirety?
13        Q    Let's start, when did you finish
14   Exhibit 3?  When was it finalized?
15        A    Specifically, I don't know the exact
16   date that it was finalized, but the date that I --
17   how to put this -- our reporting system doesn't
18   show the exact time of -- it's this entry here at
19   the top of Exhibit 3, where it says date and time
20   of the report, 30 october 2006, 1530, that is what
21   I would say is the time that I completed it, as far
22   as the -- or I began to type this report.
23             The report summary -- I shouldn't say
24   summary, but the report that was requested by

1    Mr. French prior to that, I forget what day it was,
2    in regards to the search warrant for the home --
3    Miss Melongo's home, that was a partial of this.  I
4    don't recall if I -- there wasn't -- there wouldn't
5    be a date on it.  Like I wouldn't have put a date
6    on the top.  I would have just sent him a copy of
7    what I had at that point, and then I would continue
8    on later on with the report and then I would put
9    the date on it when I would actually print it and
10   submit it.
11        Q    So each of these dated entries starting
12   with May 5, 2006 and ending with October 30, 2006,
13   did you draft that particular narrative content on
14   the day of the entry or after the fact?
15        A    In or around that day.  It may not have
16   been that specific day, but within a day or two
17   potentially of that being written.
18        Q    And when the report was finalized, some
19   time around October 30, 2006, did you go back
20   through and make any edits, corrections to the
21   earlier parts of the report?
22        A    Once it was finalized, no.
23        Q    Did you do that just before it was
24   finalized?

1         A    Well, I would review it, the contents of
2    it prior to submitting it to -- for approval to my
3    boss.
4         Q    In terms of this entry dated July 20,
5    2006 that we've been discussing, the content of the
6    July 20, 2006 entry, when did you write that
7    content?
8         A    I don't know the specific day, but more
9    than likely it was done that day or the following
10   day.
11        Q    Did you make any edits to it before
12   Exhibit 3 was finalized?
13        A    As far as the -- edits as in what's
14   listed here?  I'm not understanding the question as
15   far as edits.
16        Q    So after -- you testified that on or
17   shortly after July 20, 2006 you wrote the narrative
18   content that makes up this July 20, 2006 entry,
19   correct?
20        A    Correct.
21        Q    After you wrote up that content on or
22   around July 20, 2006, after that did you make any
23   edits or changes to that July 20th entry?
24        A    I don't recall that I did, and I would

1    say no.  I wouldn't normally, no.  Other than a
2    typo or something like that, I wouldn't edit it,
3    the content of it.
4         Q    After Exhibit 3 was finalized on Oc --
5    on or around October 30, 2006, were any changes
6    made to Exhibit 3?
7         A    Once it was finalized and submitted, no,
8    no changes were made.
9         Q    So Exhibit 3 has been -- not been
10   altered since around October 30, 2006?
11        A    To my knowledge, no.
12        Q    Let's turn back to Exhibit 23, which is
13   a transcript from the grand jury proceeding dated
14   May 28, 2008.
15             You appeared before the grand jury on
16   May 2008 -- May 28, 2008; is that correct?
17        A    Yes.
18        Q    And is this a -- Exhibit 23 a true and
19   accurate copy of the transcript from the
20   proceedings that day?
21        A    It appears to be.
22        Q    And during the grand jury proceedings
23   you were under oath; is that correct?
24        A    I was.

1    Q   And Robert Podlasek asked you some
2  questions on that date?
3    A  He did.
4    Q  So I would like to turn your attention
5  to page 10 of Exhibit 23.  On page 10, Robert
6  Podlasek asked you the following questions and you
7  gave the following answers:
8       Question, What did Miss Melongo say
9  about the email accounts?
10     Answer, She claimed that she had access
11  because she was the administrator for the
12  company.
13     Question, Did she indicate that she was
14  only trying to check out her email accounts?
15     Answer, Yes.
16     And did she also indicate to you during
17  this conversation that the emails from Carol
18  Spizzirri were actually forwarded to her by
19  another employee?
20     Answer, That was her excuse, yes.
21     You remember being asked those questions
22  and giving those answers in May of 2008?
23    A  I do.
24    Q  In your grand jury testimony that I just

1  read from May 2008, you did not testify that
2  Miss Melongo admitted to forwarding Carol
3  Spizzirri's email -- emails, correct?
4    A  Can you repeat that again?
5     (The record was read.)
6    THE WITNESS:  Not in that page, no.
7    By Ms. Schwartz:
8    Q  And you did not testify anywhere in this
9  grand jury proceeding that Miss Melongo had
10  admitted to forwarding Carol Spizzirri's email --
11  emails, correct?
12    A  Without reviewing it, I don't think so.
13    Q  I'll give you a moment.
14    MR. KAPLAN:  Could you read back the question
15  that's currently pending?
16     (The record was read.)
17    THE WITNESS:  On page 9 there is a reference
18  to:
19     Question, Some time on or about May 1,
20  2006, did Miss Melongo also access the email
21  accounts of Carol Spizzirri?
22     Yes.
23     It's kind of in reference to what was
24  stated, but not specifically saying it's coming

1  from her.
2    By Ms. Schwartz:
3    Q  That question you read does not
4  specifically relate to what Miss Melongo told you
5  on July 20 of 2006, correct?
6    A  In that context, no.  It doesn't say
7  that it was from -- that information was obtained
8  from something Miss Melongo had said.
9    Q  Detective Martin, I'm handing you
10  Plaintiff's Deposition Exhibit 23, Melongo --
11    MR. KAPLAN:  24?
12    MS. SCHWARTZ:  24, excuse me.  Melongo_003387
13  to 3397.
14      (A document was marked Plaintiff's
15      Deposition Exhibit Martin No. 24
16      for identification.)
17    By Ms. Schwartz:
18    Q  Detective Martin, you also appeared
19  before the grand jury on January 17, 2007; is that
20  correct?
21    A  Yes, I did.
22    Q  Is Exhibit 24 a true and accurate copy
23  of a transcript of the grand jury proceedings that
24  day, January 17, 2007?

1    A  It appears to be.
2    Q  And on January 17, 2007 you were under
3  oath, correct?
4    A  I was.
5    Q  And Robert Podlasek asked you questions
6  and you gave answers, correct?
7    A  Yes.
8    Q  I would like to turn your attention to
9  page 7 of Exhibit 24.  At page 7 Robert Podlasek
10  asked you the following questions and you gave the
11  following answers:
12     Question, And what did Miss Melongo say
13  about the email accounts?
14     Answer, She said that she had gone into
15  the email server to check her own account and
16  claimed that the emails were forwarded to her
17  by another employee.
18     Do you remember being asked those
19  questions and giving those answers in January of
20  20 -- 2007?
21    A  I do.
22    Q  In your grand jury testimony in
23  January 2007, you did not testify that
24  Miss Melongo admitted to forwarding any emails

1  from Carol Spizzirri's account?
2      A   No, I don't believe I was ever asked
3  about that.
4      Q    In the portion of the grand jury
5  testimony I just read, you testified that
6  Miss Melongo told you that the emails were
7  forwarded to her by another employee, correct?
8      A   Yes.
9      Q    Your grand jury testimony regarding
10 Miss Melongo's statements to you was inconsistent
11 with the statement we reviewed in Exhibit 3, your
12 police report, correct?
13     MR. KAPLAN:  Hold on a second.
14        Can you repeat that question, please?
15        (The record was read.)
16     MR. KAPLAN:  I would object.  I think that
17 it's argumentative and it's -- assumes facts that
18 are not in evidence.
19        Go ahead and answer, if you can
20 answer.
21     THE WITNESS:  The statement as far as the
22 emails being forwarded to her by another employee
23 is not -- I don't believe is in the report.  I
24 believe we got that information from the email that

1  she had sent to Miss Spizzirri saying that they
2  were forwarded to her.
3      By Ms. Schwartz:
4      Q    So are you testifying today that
5  Miss Melongo did not tell you that she forwarded
6  Miss Spizzirri's emails from Miss Spizzirri's email
7  account to her own email account?
8      A   She didn't specifically say that to me,
9  no, not that I recall.
10     Q    I'd like to turn your attention to
11 Exhibit 3, your police report, page 8.  At the top
12 it says Miss Melongo also admitted to viewing
13 Miss Spizzirri's emails in which Miss Spizzirri
14 blamed Miss Melongo for the problems SALF was
15 having with their computer systems.  After she
16 reviewed those emails, Miss Melongo then forwarded
17 those emails to her Yahoo email account,
18 melongo_annabel@yahoo.com.
19        Is it your testimony that Miss Melongo
20 did not tell you she forwarded emails from
21 Miss Spizzirri's account to her Yahoo email
22 account?
23     A   She did say, that's what -- I wrote it.
24     Q    So your testimony is that Miss Melongo

1  did tell you she forwarded the accounts?
2      A   Uh-huh.
3      MR. KAPLAN:  That's yes?
4      THE WITNESS:  Yes.  I'm sorry.
5      By Ms. Schwartz:
6      Q    But that's not what you said in the 2007
7  and 2008 grand jury, correct?
8      MR. KAPLAN:  Objection.  He testified that
9  wasn't asked of him in either of those hearings.
10     THE WITNESS:  That's correct, I was never
11 asked specifically the question of whether or not
12 she admitted to viewing those emails.
13     By Ms. Schwartz:
14     Q    But you did not testify at either grand
15 jury that Miss Melongo admitted to forwarding
16 Miss Spizzirri's email, correct?
17     A   No, I was never asked that question.
18     Q    Did Robert Podlasek, Julie Gunnigle or
19 anyone else ever ask you about that July 20, 2006
20 conversation with Miss Melongo and her statement to
21 you about forwarding Miss Spizzirri's emails?
22     A   I'm sure we discussed it.  I don't
23 specifically know what questions were asked of me,
24 but I'm sure we discussed it.

1      Q    Did Robert Podlasek, Julie Gunnigle or
2  anyone else ever express any concern that you
3  hadn't testified that Miss Melongo admitted to
4  forwarding the emails at the grand jury?
5      A   No.
6      Q    Do you recall any conversations with
7  Robert Podlasek, Julie Gunnigle or any other
8  Assistant State's Attorney about your conversation
9  with Miss Melongo on July 20, 2006?
10     A   Other than in reviewing it for testimony
11 purposes, no.
12     Q    When you say reviewing it for testimony
13 purposes, what do you mean?
14     A   Well, I testified both at the grand
15 juries and the perjury hearing, so I would -- you
16 know, we discussed what was written in the report
17 and what her statements were to me at that time.
18     Q    So did you discuss with Robert Podlasek
19 your conversation with Miss Melongo on July 20,
20 2006, before the January 2007 grand jury?
21     A   Not that I recall.  Perhaps we may have,
22 but I don't recall.
23     Q    Did you discuss with Robert Podlasek
24 the statements Miss Melongo made to you on

1   July 20, 2006 before the May 2008 grand jury?
2     A   In review for it, yes.
3     Q   What do you recall about those
4   conversations with Mr. Podlasek?
5     A   I don't recall specifically any details
6   about the conversation other than, you know,
7   reviewing it for testimony purposes.
8     Q   Did you discuss your conversation with
9   Miss Melongo on July 20, 2006 with Mr. Podlasek or
10  Julie Gunnigle or anyone else prior to the
11  October 2012 motion to dismiss hearing?
12    A   I don't recall being called for that.
13  If I was called to testify in that, it would have
14  been the same thing, I would have, you know,
15  prepped for my testimony at that point, discussed
16  it then.
17    Q   You testified about a perjury hearing.
18       What were you alluding to when you
19  testified about the perjury hearing?
20    A   There was a hearing in front of -- I
21  believe it was Judge Goebel in regards to whether
22  or not I committed grand -- perjury at these grand
23  jury testimony.
24    Q   When was that hearing?  When did that

1   take place?
2     A   I don't recall.
3       I think his name is spelled G-o-e-b-e-l.
4     MS. SCHWARTZ:  Let's take a five minute break.
5       (A recess was taken.)
6       (At this point in the deposition
7       Mr. Shakman left the room.)
8   By Ms. Schwartz:
9     Q   Detective Martin, I'm showing you
10  Plaintiff's Deposition Exhibit --
11    A   25.
12    Q   -- 25, which is AG, Attorney
13  General 001872.
14       Did I hand somebody a highlighted one?
15  No.
16       (A document was marked Plaintiff's
17       Deposition Exhibit Martin No. 25
18       for identification.)
19   By Ms. Schwartz:
20     Q   Detective Martin, do you recognize
21  Exhibit 25?
22    A   No, I do not.
23    Q   Is that your handwriting on
24  Exhibit 25?

1     A   It is not.
2    Q   Do you know whose handwriting it is on
3  Exhibit 25?
4     MR. KAPLAN:  Do you know?
5     THE WITNESS:  No.
6   By Ms. Schwartz:
7     Q   Did you recover any evidence during the
8   execution of the search warrant on July 20, 2006 at
9   Miss Melongo's home?
10    A   Yes, there were items recovered as far
11  as I...
12    Q   What did you do with those items that
13  were recovered?
14    A   They were initially brought back to the
15  Schiller Park Police Department and then the next
16  day myself and Detective Koch transported them
17  to -- there is a mistake in the report.  I don't
18  think it's regional computer forensic lab, but we
19  transported them to 188 East Randolph and gave --
20  turned the evidence over to Miss Monge and
21  Miss Haqqani.
22      The -- I'm sorry, let me clarify.  The
23  electronic evidence that were going to be
24  forensically analyzed were provided to her.  The

1   other items stayed in Schiller Park.
2    Q   And the -- what you were just reading,
3  you said there might be a mis -- a typo or mistake,
4  was Exhibit 3 of your police report?
5    A   Correct.  Where it says the regional
6  computer forensic lab --
7     MR. KAPLAN:  What page?
8     THE WITNESS:  The bottom of page 8 of the
9  report, which --
10     MR. WUNDER:  5222.
11     THE WITNESS:  -- would be 5222, where it says
12  it was transported to a particular address and the
13  regional computer forensic lab, I don't believe
14  that's their address.  I think it's -- I can't
15  think of the exact address, but I don't think
16  it's -- I don't recall it being at the forensic --
17  computer forensic -- regional computer forensic
18  lab, which is run by the FBI.
19   By Ms. Schwartz:
20    Q   I'm handing you Exhibit 26, Attorney
21  General 001169 to 70.
22       (A document was marked Plaintiff's
23       Deposition Exhibit Martin No. 26
24       for identification.)

1    By Ms. Schwartz:
2    Q    Does Exhibit 26 list what was recovered
3 during the execution of the search warrant on
4 Miss Melongo's home?  I'm specifically looking at
5 the second --
6    A    Yeah.
7    Q    -- page of Exhibit 26.
8    A    Page 2 does list items that were
9 recovered.  To the best of my knowledge this is
10 everything that was seized.
11    Q    And that's your signature at the
12 bottom?
13    A    Yes, electronically.
14    Q    And did you prepare this list on
15 Exhibit 26?
16    A    I did.
17    Q    I'm showing you what's marked
18 Plaintiff's Deposition Exhibit 27, CCSAO 008496 to
19 8498.
20         (A document was marked Plaintiff's
21          Deposition Exhibit Martin No. 27
22          for identification.)
23    By Ms. Schwartz:
24    Q    Do you recognize Exhibit 27?

1    A    I do.
2    Q    Is it a chain of custody form showing
3 transfer of some of the evidence that was collected
4 from Miss Melongo's home to Miss Monge?
5    A    Yes.  This is our submission to her.
6    Q    I'm looking at the second page of
7 Exhibit 27.
8         Is that your signature at the bottom
9 underneath the words chain of custody?
10    A    Yes.
11    Q    And this represents that you turned over
12 evidence from your possession to Miss Monge on
13 7/21/06?
14    A    Yes.
15    Q    And that included among other things two
16 computers, a gray tower and a black laptop?
17    A    Yes.
18    Q    Those were computers that were seized
19 from Miss Melongo's home?
20    A    Yes.
21    Q    Is that your handwriting on the first
22 page of Exhibit 27 and the second page?
23    A    No, that's not.
24    Q    On Exhibit 27, the letters in the far

1 right column on page 1 and page 2, starting with
2 AAA through GGG, --
3    A    Uh-huh.
4    Q    -- do those correspond to the letters on
5 the second page of Exhibit 26?
6    A    It appears so, yes.
7    Q    What's the purpose of Exhibit 27, the
8 chain of custody form?
9    A    To basically document the date and time
10 and the specific items that were basically taken
11 out of -- out of Schiller Park's control and secure
12 facility and provided to another agency, in this
13 case the High Tech Crimes Bureau.
14    Q    Based on your knowledge was forensic
15 examination done on the computers that were seized
16 from Miss Melongo's home?
17    A    Yes.
18    Q    Who did that forensic examination?
19    A    I believe it was Shahna Monge.
20    Q    Were you aware that Shahna Monge's last
21 name is now Voita?
22    A    I read that in one of the deposition
23 papers.
24    Q    So if I refer to Miss Voita, it's the

1 same person, Shahna Monge?
2    A    Yes.
3    Q    Miss Voita worked at the Illinois
4 Attorney General Office's High Tech Crimes Unit,
5 correct?
6    A    Correct.
7    Q    Did you speak with Miss Voita before she
8 began her analysis of Miss Melongo's computers?
9    A    Yes.
10    Q    What did you discuss with Miss Voita?
11    A    At what point?
12    Q    Prior to her analysis of Miss Melongo's
13 computers.
14    A    So in reference -- the discussion you
15 are referring to, you want me to talk about, is
16 just the forensic analysis portion?
17    Q    Did you discuss Miss Voita's forensic
18 analysis before she started working on that
19 analysis?
20    A    Yes, I did.
21    Q    What was the content of those
22 conversation?
23    A    Basically providing her some information
24 about the case and some of the items potentially,

1    the search warrant and evidence -- evidence --
2    items of evidentiary value to the case.
3        Q    What items of evidentiary value did you
4    provide her?
5        A    I believe I provided the search terms of
6    Save a Life or SALF, anything relating to the 102
7    address -- IP address.  I don't recall if there
8    were any others.  There may have been, but I don't
9    know.
10       Q    Those were search terms that you gave to
11   Miss Voita?
12       A    Yeah, in reference to what some of the
13   things we might have been looking for, we wanted to
14   be able to have those be bookmarked within her
15   analysis.
16       Q    So she would be able to specifically
17   look for those terms within the contents of
18   Miss Melongo's computers?
19       A    Correct, and she had a -- she knew the
20   nature of the allegation being made, so she knew to
21   look for emails and evidence of network intrusion,
22   so to speak.
23       Q    Did you tell Miss Voita anything else
24   before she started her forensic examination about

1    her forensic exam?
2        A    No, not that I recall.
3        Q    Did she ask you any questions before she
4    started her forensic examination?
5        A    Not that I recall.
6        Q    You testified that the search terms were
7    SALF, Save a Life, anything related to the 102
8    address we've been discussing.
9            Do you recall any other search terms?
10       A    No, not off the top of my head.
11       Q    Did you talk to Miss Voita about her
12   analysis while she was working on the forensic
13   analysis?
14       A    I don't recall if there was any
15   conversation during the analysis.
16       Q    Did you talk to Miss Voita about her
17   analysis after it was finalized?
18       A    Other than her saying, you know, it's
19   complete, come down and pick up your evidence and
20   provide me, you know, a copy of the -- her forensic
21   report, that was all I remember.
22       Q    Do you recall discussing Miss Voita's
23   forensic analysis with anyone else other than
24   Miss Voita?

1        A    I believe I spoke to Mr. French about
2    it.  I'm sure I spoke to the State's Attorney's
3    Office about it.
4        Q    Do you recall your conversations with
5    Mr. French about Miss Voita's analysis?
6        A    Nothing specifically other than -- I
7    don't recall if I gave him a copy of the forensic
8    summary or not.  Nothing stands out, no.
9        Q    You referred to a forensic summary.
10           Was that a report generated by
11   Miss Voita?
12       A    It was.
13       Q    And you reviewed that forensic summary
14   generated by Miss Voita?
15       A    I did.
16       Q    I'm handing you Plaintiff's Deposition
17   Exhibit, it will be 28, CCSAO 003387 to 3391.
18           (A document was marked Plaintiff's
19           Deposition Exhibit Martin No. 28
20           for identification.)
21   MR. KAPLAN:  28?
22   MS. SCHWARTZ:  28.
23   By Ms. Schwartz:
24       Q    Exhibit 28 has a cover letter followed

1    by a document entitled at the top Office of the
2    Attorney General, High Tech Crimes Bureau, Regional
3    Computer Forensics Lab - Chicago.
4            Is this the forensics summary to which
5    you just referred?
6        A    Yes.
7        Q    The cover letter is dated September 26,
8    2006.  It says Dear Detective Martin, and then it's
9    from Shahna Monge, whose name is now Shahna Voita.
10           In September -- did you receive
11   Miss Voita's report on September 26, 2006?
12       A    I don't recall if I got it that specific
13   day.  Let me just see when we got it.  The 28th she
14   contacted me, said the analysis was complete and
15   the items were ready for -- to be returned to
16   Schiller Park.
17       Q    So based on your police report,
18   Exhibit 3, you received this document, Exhibit 28,
19   on September 28th?
20       A    Correct.
21       Q    From Exhibit 28, she says she included a
22   CD with the report of the forensic examination and
23   hyperlinks of the findings.
24           Did you also receive a CD from

1    Miss Voita?
2        A    I did.
3        Q    Did you review everything on the CD or
4    did you just review the forensic summary?
5        A    I reviewed, yes.
6        Q    Did you have any conversation about the
7    forensic report with Miss Voita on September 28th,
8    the date you just mentioned when you picked up the
9    report?
10       A    No, I don't recall, other than here's
11   your stuff.
12       Q    I'm handing you the giant one, which is
13   Plaintiff's Deposition Exhibit 28.
14       MR. WUNDER:  29.
15       THE WITNESS:  29.
16       MS. SCHWARTZ:  29, excuse me.  So it's a very
17   long document starting Melongo_003423 to 003693,
18   and this version to save paper, we also used for
19   Miss Gunnigle's deposition.
20            (A discussion was had off the
21            record.)
22   By Ms. Schwartz:
23       Q    It will be Martin 29.  I'll represent to
24   you it's the same exact document that was used in

1    Gunnigle, Gunnigle's deposition.
2            (A document was marked Plaintiff's
3            Deposition Exhibit Martin No. 29
4            for identification.)
5        MS. SCHWARTZ:  So Detective Martin's copy is
6    single-sided.  All the other ones I printed are
7    double-sided.
8    By Ms. Schwartz:
9        Q    Did you review Exhibit 29,
10   Detective Martin?
11       A    It appears to be the forensic report.
12       Q    Is this -- without going through every
13   page, is this the long forensic report that Shahna
14   Voita sent you on September 28, 2006?
15       A    It appears to be, yes.
16       Q    I will not ask you to read every single
17   page.
18       A    Thank God.
19       Q    Let's focus on Exhibit 28, the short
20   forensic report summary.
21       A    Okay.
22       Q    First let me ask you a more general
23   question.
24            These two reports, Exhibit 28 and 29,

1    after reviewing these reports in 2006, what did you
2    determine that they showed with respect to the
3    Save a Life allegations?
4        A    In going through the summary, things
5    that stood out to me were the fact that she had
6    this program called Go To My PC, which is a remote
7    access program.
8            The cookie file that had the Comcast IP
9    ending in 102 that we're referring to, and that
10   that cookie was written on 4/28/06 at
11   9:43:13 hours.  The fact that there were numerous
12   instances of that same Comcast IP discovered
13   throughout the report.
14           The URL ftp 70.142.251.242, which is
15   FTP, which is a file tile transfer protocol session
16   that at some point in time was established with
17   that particular site or computer -- I just wanted
18   to verify something.
19            (At this point in the deposition
20            Ms. Ninfo left the room.)
21       By Ms. Schwartz:
22       Q    Just for the record, you are referring
23   to -- you are referring to items that are in
24   Exhibit 28 that you found significant in

1    Miss Voita's forensic summary?
2        A    Correct.
3        Q    Okay.
4        A    Correct.
5        Q    Continue.  I didn't mean to interrupt.
6        A    The URL of the http://mail.salf.org
7    being one of the web addresses that were typed into
8    the computer.
9            Her reference to what she believes to be
10   a user name and password of carol@savealife --
11   excuse me -- carol@salf.org:herman for the website
12   of www.salf.org:2095/webmail.
13       Q    That's a bullet point on CCSAO 003390?
14            (At this point in the deposition
15            Ms. Ninfo reentered the room.)
16       THE WITNESS:  That's correct.  It's the fourth
17   one down in regards to that being located on her
18   device, and then the usage of that particular user
19   name and password to be stored on her computer.
20           The fact that the -- what appears to be
21   another user name and password being typed into the
22   URL of the same -- what is the same 70 address of
23   the ftp site where it appears that this user name
24   and password of sgholar@salf.org,

1  s-g-h-o-l-a-r8899.
2      By Ms. Schwartz:
3      Q    Again, that's on CCSAO 003390?
4      A    Correct.  It appears that -- what else?
5  The fact that the emails associated and web pages
6  associated with the email address of
7  melongo_annabel@yahoo.com.
8          Those were some of the things that
9  really stood out to me as far as evidence.
10     Q    Let's walk through a few of those.
11         First off, apart from the reference to
12  the cookie file, which is on CCSAO 003389, none of
13  these bullet points that you listed include any
14  information on date or time, correct?
15     A    Correct.
16     Q    So they don't show when particular file
17  or piece of data was accessed on Miss Melongo's
18  computers, correct?
19     A    These bullet points do not, correct.
20     Q    And you testified that one of the things
21  that was interesting to you was the Go To My PC
22  references as Go To My PC as a remote access
23  program, correct?
24     A    Correct.

1      Q    Again, there is no dates associated on
2  Exhibit 27 -- 28, there is no dates associated with
3  the Go To My PC uses, are there?
4      MR. KAPLAN:  On that exhibit?
5      By Ms. Schwartz:
6      Q    On Exhibit 28.
7      A    No, nothing in there that -- on the
8  summary.
9      Q    Isn't it true that to access another
10  computer using Go To My PC, you first have to
11  install Go To My PC software on the accessed
12  computer?
13     A    I don't know if that's true or not.
14     Q    Did you ever ask or look to see if any
15  Save a Life Foundation computers had Go To My PC
16  installed on them?
17     A    No, I did not.
18     Q    Did you know that to access another
19  computer using Go To My PC, you first have to
20  register the accessed computer with Go To My PC?
21     A    No, I did not.
22     Q    Isn't it true that to access another
23  computer using Go To My PC you have to register the
24  computer to be accessed as a computer that you, the

1  accessor, have permission to access?  Did you know
2  that's how Go To My PC works?
3      A    No, I did not.
4      Q    Did you do any investigation as to
5  whether Miss Melongo had permission to access any
6  Save a Life Foundation computers using Go To My
7  PC?
8      A    No, I did not.
9      Q    You testified that one of the other
10  bullets that was of interest to you was the one on
11  page CCSAO 003389 about a ftp site and an IP
12  address associated with an ftp, that's the last
13  bullet.
14         Again, there is no date and time listed
15  here for when a ftp was used?
16     A    Correct, it doesn't say.
17     Q    You were aware, were you not, that
18  Miss Melongo was the IT administrator for
19  Save a Life Foundation?
20     A    I was.
21     Q    And as the IT administrator, it wouldn't
22  be surprising for her to have access to Save a Life
23  files and systems, correct?
24     MS. NINFO:  Object to the speculation and

1  form.
2      MR. KAPLAN:  I'll join.
3      THE WITNESS:  As an IT administrator having
4  access makes sense.
5      By Ms. Schwartz:
6      Q    Did you ask Miss Melongo, Miss Spizzirri
7  or anyone else whether Miss Melongo had access to
8  Save a Life servers and networks and computers
9  while she was employed as an IT administrator?
10     A    I don't recall asking that specific
11  question, no.
12     Q    Would that question have been relevant
13  to your investigation?
14     MS. NINFO:  I'm sorry, are you asking when she
15  was at work or outside of work, as an
16  administrator?  Are you talking about when she was
17  working?
18     MS. SCHWARTZ:  Are you talking about time
19  frame?
20     MS. NINFO:  Are you talking about her having
21  access when she was at work?
22     By Ms. Schwartz:
23     Q    I'm saying are you aware -- I'll ask
24  another question to clarify.

1      MS. NINFO: Okay.
2      By Ms. Schwartz:
3      Q     Were you aware whether or not
4  Miss Melongo as an IT administrator had access to
5  Save a Life networks and servers on her personal
6  computers?
7      A     No, we were not aware of that.
8      Q     Did you ask Miss Melongo or anyone else
9  whether she had access on her personal devices and
10  computers to Save a Life networks?
11     A     I don't believe we ever asked that
12  question, no.
13     Q     Did you ever ask whether Miss Melongo as
14  IT administrator had access to passwords for
15  Save a Life Foundation employees?
16     A     Ask who?
17     Q     Miss Melongo or anyone else?
18     A     I asked Miss Melongo and in her
19  statement she said that she did have access to
20  these things.  I don't recall specifically asking
21  whether or not we -- she had access to those
22  passwords, as far as anybody at Save a Life, by
23  asking them that question.  I believe that
24  information was provided to us voluntarily by

1  someone there, said that she was the administrator
2  and that she had those passwords.
3      Q     So someone at Save a Life Foundation did
4  tell you that Miss Melongo while she was IT
5  administrator had access to passwords of Save a
6  Life employees?
7      A     I'm sorry, can you repeat that?
8      (The record was read.)
9      THE WITNESS:  I believe so, yes.
10     By Ms. Schwartz:
11     Q     With the exception to the reference of
12  the cookie file in Exhibit 28, you testified that
13  the other bullet points that we went over don't
14  have dates or times listed in Exhibit 28.
15     Were there dates or times listed to any
16  of the corresponding entries in the larger version
17  of Miss Voita's report, Exhibit 29?
18     A     I'd have to look to be sure.
19     Q     You don't recall as we're sitting here
20  today?
21     A     Not as I recall, not without looking at
22  it.
23     Q     Did you check to see if Exhibit 29 had
24  corresponding date and time entries in 2006?

1      A     Oh, I'm sure I looked through the
2  report.  I don't recall as to a specific bullet
3  point having it within the report.
4      Q     Were you aware that Miss Voita --
5  Miss Spizzirri and Save a Life Foundation had
6  accused Miss Melongo of accessing and deleting
7  financial files from Save a Life Foundation?
8      A     I believe that was in the initial
9  report, they -- that was some of the items that
10  they claimed were deleted off the servers.
11     Q     In her analysis did Miss Voita or anyone
12  else find any information on Miss Melongo's
13  computers related to Save a Life financial
14  documents or financial files?
15     A     I don't recall.  I'd have to look
16  through the report to see if there was.
17     Q     In the bullet points we just discussed
18  of Exhibit 28, is there any indication that there
19  was any Save a Life Foundation financial files on
20  Miss Melongo's computers?
21     A     Nothing specifically stated that I can
22  see.
23     Q     In Exhibit 28, the summary, the forensic
24  summary, is there any -- any information that shows

1  that Miss Melongo actually forwarded an email from
2  Miss Spizzirri's account to Miss Melongo's account
3  on May 1, 2006?
4      A     Nothing that specifically states that,
5  no.
6      Q     And there is nothing in Exhibit 28, the
7  forensic report summary, that states that
8  Miss Melongo accessed Save a Life servers and
9  deleted data on April 28, 2006; is that right?
10     A     Nothing specifically, no.
11     Q     Did anyone ever tell you that additional
12  forensic evidence would be necessary if intrusion
13  charges were to be pursued against Miss Melongo?
14     A     I believe Kyle French brought that to
15  the State's Attorney's attention in our meeting
16  with them -- what day was that -- October 30th of
17  2006 it looks like.
18     Q     What did Kyle French say during that
19  meeting on October 30, 2006?
20     A     I don't recall specifically what was
21  said.  There is nothing in the -- in my report that
22  states specifically what was said.
23     Q     Do you recall what specific additional
24  forensics Mr. French discussed during that

1    August -- October 30, 2006 meeting?
2        A    No, I do not.
3        Q    Did you or anyone else at the
4    October 30, 2006 meeting respond to Mr. French's
5    suggestion that additional forensics would be
6    necessary?
7        A    I don't recall anybody doing it and I
8    know I didn't do it.
9        Q    You don't recall if the Assistant
10   State's Attorney who was present said anything
11   about whether or not there would be additional
12   forensics?
13       A    I don't recall.
14       Q    Do you recall anything else about the
15   October 30, 2006 meeting?
16       A    Other than what's in my report, no.
17       Q    At any other time did Kyle French or
18   anyone else tell you that additional forensic
19   evidence would be necessary if the intrusion
20   charges were to be pursued against Miss Melongo?
21       A    Not that I recall, no.
22       Q    The only one you recall is that
23   October 30, 2006 meeting?
24       A    Correct.

1        Q    What was the purpose of the October 30,
2    2006 meeting?
3        A    To -- an attempt to obtain criminal
4    charges in this case, myself, Mr. French,
5    Miss Monge we went and spoke with ASA, I think it's
6    pronounced Biestek, B-i-e-s-t-e-k, discussing the
7    case and presenting what evidence we had in the
8    matter, in an attempt for them to approve a fel --
9    felony charge.
10       Q    And were you just reading from your
11   report, Exhibit 3?
12       A    Yes. Yes.
13       Q    Do you have independent recollection --
14   apart from the conversation with Mr. French about
15   the forensics, additional forensics, do you recall
16   anything else about that meeting apart from what's
17   in your report?
18       A    No, I do not.
19       Q    Why was it necessary to go to Assistant
20   State's Attorney's -- Assistant State's
21   Attorney Biestek for a review of felony charges?
22       A    Any time we have to get felony charges,
23   it has to be reviewed by the State's Attorney's
24   Office. So we made the appointment I believe to go

1    there and have all of us convene there at the same
2    day and time in order to present it to a State's
3    Attorney for review. It's standard practice.
4        Q    It's only felony charges that require
5    Assistant State's Attorney approval. Do
6    misdemeanor charges also?
7        A    Prior -- prior to actually formal
8    charging in an arrest, yes.
9        Q    Do you also need to seek Assistant
10   State's Attorney approval for misdemeanor
11   charges?
12       A    No, we do not.
13       Q    It's only for felony charges?
14       A    Correct.
15       Q    I'm handing you Plaintiff's Deposition
16   Exhibit 30, CCSAO 002234 to 45.
17            (A document was marked Plaintiff's
18            Deposition Exhibit Martin No. 30
19            for identification.)
20   By Ms. Schwartz:
21       Q    Is this a true and accurate copy of an
22   email and attachment you sent to Kyle French on
23   October 13, 2006?
24       A    It appears to be, yes.

1        Q    Why did you send this attachment to
2    Kyle French on October 13, 2006?
3        A    This was a continuation of the report
4    that I had previously sent to him for review prior
5    to the search warrant for Miss Melongo's home. And
6    the -- I sent this to him so that he could review
7    it so that he was aware of some of the -- how the
8    case had progressed since the last time I updated
9    him on it and prior to our meeting with
10   ASA Biestek.
11       Q    Did he make any suggestions, propose any
12   edits to the narrative of your report?
13       A    Not that I recall, no.
14       Q    Did he -- independent of October 13,
15   2006 did he ever make any suggestions or propose
16   any edits to the content of your report,
17   Exhibit 3?
18       A    Not that I recall, no.
19       Q    What happened after the October 30, 2006
20   meeting in regards to the Save a Life Foundation
21   investigation?
22       A    I'm sorry, I'm not understanding the
23   question as far as after this meeting, like --
24       Q    I'll take a step back.

1          At the October 30, 2006 meeting were
2    there any decisions made as to next steps?
3        A    At that point -- yeah, at that point
4    ASA Biestek had reviewed the reports and evidence
5    that we had gathered at the time, and approved two
6    felony counts of computer tampering against
7    Miss Melongo.
8        Q    Whose decision was it that charges would
9    be brought against Miss Melongo?
10       A    ASA Biestek.
11       Q    Did you make any recommendations to
12   ASA Biestek as to whether you thought charges
13   should be pursued?
14       A    No.
15       Q    Did anyone ask you any questions about
16   the evidence during that October 30, 2006
17   meeting?
18       A    I'm sure they did, but I don't recall
19   what -- they were.
20       Q    If you turn to your report, the final
21   page of Exhibit 3, it says under 30 October 2006,
22   ASA Biestek also stated he would continue to look
23   into other charges that would be filed in this
24   case; i.e., eavesdropping.

1          What does the reference to eavesdropping
2    refer to?
3        A    I believe that was in reference to
4    Miss Melongo's statement as to viewing these emails
5    over the course of time that she had been in the
6    server, and the allegations made by someone at Save
7    a Life, I forget, that her having privy to
8    knowledge that only a certain select view within
9    the company had and one of them was not
10   Miss Melongo.
11       Q    So based on that there was some -- there
12   was some discussion whether eavesdropping charges
13   would be appropriate?
14       A    Correct.
15       Q    To your knowledge were eavesdropping
16   charges ever brought related to the Save a Life
17   allegations that you just mentioned?
18       A    Brought forth by the Cook County State's
19   Attorneys -- or in reference to this investigation?
20       Q    Yes.
21       A    No, not that I know of.
22       Q    Did you obtain an arrest warrant for
23   Miss Melongo's arrest in this case?
24       A    I did.

1        Q    Did you prepare the arrest warrant?
2        A    I don't recall if I specifically did or
3    if that was done by the state and I went before the
4    Judge and --
5        Q    You went before the Judge?
6        A    -- attested to it.
7          Yeah.  I don't recall who prepared the
8    actual document, but I went before the Judge to
9    obtain it.
10       Q    I'm handing Detective Martin Plaintiff's
11   Deposition Exhibit 31, CCSAO 000752.
12            (A document was marked Plaintiff's
13            Deposition Exhibit Martin No. 31
14            for identification.)
15   By Ms. Schwartz:
16       Q    Is Exhibit 31 the arrest warrant in this
17   case?
18       A    Yes.
19       Q    It's dated October 31, 2006?
20       A    Yes.
21       Q    Did you make any statements to the Judge
22   when you requested that he or she sign this arrest
23   warrant?
24       A    I just provided them with the facts of

1    the case as far as what the allegations were and
2    what evidence we had collected.
3        Q    Was that done -- was that an oral
4    presentation or a written presentation?
5        A    Oral.
6        Q    Was anyone else present when you were
7    before the Judge on -- was it October 31, 2006?
8        A    Present from where, like whose office,
9    like my department or --
10       Q    Apart from the Judge and the Judge's
11   staff, was anyone else present from your office,
12   State's Attorney's Office, Save a Life
13   Foundation?
14       A    I believe there was a State's Attorney
15   in the room.  There usually is.  I don't recall if
16   anybody else was there, maybe a clerk or whoever.
17       Q    Was Carol Spizzirri present when the
18   arrest warrant was issued?
19       A    I don't recall.  I don't think so.
20       Q    Would it refresh your recollection to
21   look at your police report, Exhibit 3?
22       A    Yeah, I'm going to look and see.
23       Q    I turn your attention to October 30,
24   2006 entry -- sorry, at the very end, the last full

1  sentence?
2      A    Yes.  So Miss Spizzirri was there to
3  sign the complaint portion of this, in reference to
4  this arrest warrant.
5      Q    And that was -- would have been the same
6  day, same court proceeding as the arrest warrant?
7      A    Yes.  Yes.
8      Q    What does signing the complaint
9  entail?
10     A    That's kind of a vague question.  I'm
11  trying to think how to answer it.
12          Can you rephrase the question?
13     Q    So Miss Spizzirri was present in court
14  on October 31, 2006?
15     A    Correct.
16     Q    And the purpose was for her to lodge
17  some sort of formal complaint against
18  Miss Melongo?
19     A    To -- I guess the complainant comes
20  to -- I don't want to say attest to the facts that
21  are typed into the complaint, but basically show
22  that they want to proceed on these charges that
23  they -- I can't think of a better way of explaining
24  it.

1      Q    And to file the formal complaint, did
2  Miss Spizzirri have to make any sort of
3  presentation to the Judge?
4      A    I don't recall if she did or not.
5      Q    Normally do complaining witnesses have
6  to make a presentation to the Judge when they file
7  a formal complaint?
8      A    The Judge may ask some questions in
9  regards to the case, but I don't recall if the
10  Judge who issued this asked her any questions at
11  the time.
12     Q    Did Miss Spizzirri sign anything in
13  filing the complaint?
14     A    I don't know if she officially signed
15  the complaint or not.
16     Q    Do complaining witnesses generally sign
17  complaints?
18     A    Sometimes they do; sometimes they don't.
19  It's just kind of how things transpire with the
20  courts and the clerk.
21     Q    Are the complaints done by complaining
22  witnesses generally speaking under oath?
23     A    Yes.
24     Q    So would Miss Spizzirri have been under

1  oath when she was before the Court on October 31,
2  2006?
3      A    She would be sworn in prior to the
4  reading of the body of the complaint, but I don't
5  recall if she ever like testified as to what
6  that -- what was contained in it.
7      Q    In addition to the allegations related
8  to the computer tampering and email intrusion,
9  Carol Spizzirri also lodged a complaint about
10  unauthorized charges on Save a Life's credit cards;
11  is that correct?
12     A    I think it was credit cards and their
13  Chase Bank account.
14     Q    What were those allegations?
15     A    There was some fraudulent charges that
16  were made using I want to say it was an American
17  Express Card, and then there was an ACH debit that
18  occurred where money was taken out of the Chase --
19  Safe a Life's Chase Bank account and used to pay a
20  Comcast bill.
21     Q    Showing you Exhibit 32, CCSAO 000044 to
22  45.
23
24

1          (A document was marked Plaintiff's
2           Deposition Exhibit Martin No. 32
3           for identification.)
4  By Ms. Schwartz:
5      Q    Is Exhibit 32 an incident report of
6  Schiller Park related to the allegations of credit
7  card -- unauthorized credit card use?
8      A    It appears to be, yes.
9      Q    Is that your signature on the bottom?
10     A    No, that is not.
11     Q    Do you know whose signature that is?
12     A    I do.
13     Q    Whose signature is that?
14     A    I believe that is Officer Orocco,
15  O-r-o-c-c-o I think is how it's spelled.
16     Q    And had you seen Exhibit 32 prior to
17  today?
18     A    Yes.
19     Q    It says on the second page, the last
20  line, the possible offender, Melongo, is an
21  ex-employee and has tampered with computer files
22  upon termination of employment.
23          Did Carol Spizzirri ever say to you that
24  she thought Miss Melongo was responsible for

1 unauthorized credit card use?
2     A    I don't specifically remember her saying
3 that to me, but she obviously said it to the
4 initial officer who took this report. And because
5 of the time frame, I believe it was while we were
6 still in -- it was roughly, what, 20 days or so
7 after the intrusion that their accounts were being
8 used, she believed that it was Annabel.
9     Q    Did you investigate the allegations
10 related to credit card fraud and bank -- the bank
11 account --
12     A    I did.
13     Q    -- use?
14          And what did you find?
15     A    We -- I have to refer to my report with
16 exactly what was we found from each one.
17          On July 12th of '06, I spoke to Sharma
18 S-h-a-r-m-a, Austin, A-u-s-t-i-n, Comcast Cable,
19 who gave me information regarding the ACH debit and
20 how -- I guess there was a problem with the
21 subpoena, as far as the date that was on the
22 subpoena. The date that was on it was a day after.
23 The actual transaction occurred on the 21st, but
24 didn't post to the account until May 22nd, so she

1 wanted to clarify that.
2          But then later we received a response
3 from them, on 13 July, showing that the ACH debit
4 was applied to a Comcast account belonging to an
5 Andrea Smith, with a Comcast account number, blah,
6 blah -- a really long one.
7     Q    Did your investigation of the
8 unauthorized use of credit cards and bank accounts
9 ever reveal any link to Annabel Melongo?
10     A    The only link that I recall was one of
11 the items found in Miss Melongo's apartment was one
12 of the names that was listed as a point of
13 reference for one of the transactions, was an
14 ex-Save a Life employee, and we found this item in
15 Miss Melongo's apartment with this person's name
16 and I believe a phone number.
17          And when I -- I believe when I was
18 talking to Miss Melongo on the 20th of July of '06,
19 I asked her about why she had this information and
20 who this person was to her, and she stated that it
21 was someone that used to work at Save a Life had
22 contacted her and asked for help with her personal
23 computer, something like that.
24     Q    Was that person Tanya Spears?

1     A    Yes.
2     Q    Was there any other indication based on
3 the evidence you reviewed for your investigation
4 that Miss Melongo was involved in any unauthorized
5 use of credit cards or bank statements -- bank
6 accounts of Save a Life Foundation?
7     A    Not that I recall, no.
8     Q    And she was never arrested for any
9 unauthorized use of credit card or bank account
10 claims?
11     A    Not this specific claim, no. I don't
12 recall any other.
13     Q    Didn't this -- the fact that
14 Miss Melongo's name was not identified in this
15 investigation of the unauthorized credit card use
16 or bank account statements, didn't that suggest
17 that someone else was involved in the credit card
18 and bank account fraud?
19     A    We could never prove who was actually
20 involved. We just had some information provided to
21 us by the banks as far as the information that was
22 provided to them when these transactions were
23 made.
24     Q    Didn't the fact that you couldn't link

1 Miss Melongo to the credit card or bank account
2 fraud alert you to the possibility that whoever did
3 steal the credit card tried to erase that
4 information by deleting Save a Life files on
5 April 28, 2006?
6          MR. KAPLAN: Object to form of the question.
7          MS. NINFO: That's not in evidence.
8          THE WITNESS: Can you repeat that?
9          MR. KAPLAN: Do you understand the question?
10          THE WITNESS: Not totally so I'm going to ask
11 if she can repeat it.
12          (The record was read.)
13          MS. NINFO: Also incomplete hypothetical.
14          THE WITNESS: No, it did not.
15 By Ms. Schwartz:
16     Q    So in Exhibit 3, the last page, it says
17 case closed at the end.
18          What does that mean, case closed?
19     A    When -- at the completion of an
20 investigation, we would either put case closed, in
21 the sense that there -- unless there is further
22 evidence comes forward or additional witness comes
23 forward after the fact, at this point in time, we
24 would -- we are closing the investigation and not

1  going to pursue it any further, at least from
2  Schiller Park's standpoint.
3      Q    Did you pursue any additional
4  investigation after this date, October 30, 2006?
5      A    As far as investigations -- this
6  investigation, no.  Once this report was completed
7  and submitted, I did nothing else, other than the
8  attempt to reach out to Web HSP to provide their
9  contact information.
10     Q    Did you ever arrest or process
11 Miss Melongo on the computer tampering charges?
12     A    I did.
13     Q    Was that on November 15, 2006?
14     A    I don't recall the date.  I believe
15 there is a report that I completed, I think.
16     Q    In the interest -- in the interest of
17 time, do you recall in November 2006 processing
18 Miss Melongo --
19     A    YES.
20     Q    -- on the warrant?
21     A    Yes.
22     Q    But Miss Melongo was not taken into
23 custody that day; is that correct?
24         MR. KAPLAN:  Did you say is it true she was

1  not taken into custody?
2         MS. SCHWARTZ:  (Nodding head.)
3         MR. KAPLAN:  Okay.
4         THE WITNESS:  Well, she was in custody for the
5  time frame that she was at Schiller Park, yes, she
6  was in custody.
7      By Ms. Schwartz:
8      Q    And after that she was released; is that
9  correct?
10     A    Correct.  She was provided a bond, I
11 believe.  I don't recall if it was -- if she put
12 money up or it was an I-bond.
13     Q    After the November 2006 processing, what
14 was your involvement in Miss Melongo's criminal
15 case?
16     A    Other than testifying at different
17 points in times, I don't recall that there was
18 any.
19     Q    How often were you in contact with Carol
20 Spizzirri between May of 2006 and the processing of
21 Miss Melongo in November of 2006?
22     A    I have no idea.
23     Q    Would you guess it was weekly, monthly,
24 more than weekly?

1      A    I have no idea.  I couldn't even tell
2  you.
3      Q    During that time period or from May of
4  2006 till October 30, 2006, was every interaction
5  you had with Miss Spizzirri documented in your
6  police report, Exhibit 3?
7      A    No, I don't think so.  There -- there
8  would have been conversations back and forth as far
9  as like in -- as an example, the email she sent, I
10 forget what the exhibit it was, when she sent it in
11 2010 or whatever.  She would call and just kind of
12 want to know how things were going in the case and
13 things like that, but.
14     Q    And that was true even between May 2006
15 and October 31, 2006 as well?
16     A    Correct.
17     Q    And then after October 31, 2006, she
18 would also contact you periodically?
19     A    Yeah.  I couldn't recall how many times,
20 but once in a while she'd call, you know.
21     Q    Would she ask you for updates about the
22 case?  What were the purpose of the calls when you
23 heard from her?
24     A    I don't recall any specifics as to what

1  the conversations were about.
2      Q    In total how many times have you met
3  Miss Spizzirri in person?
4      A    Less than ten.
5      Q    What was your impression of Carol
6  Spizzirri?  How would you describe her?
7      A    She's a -- she's a victim.  She acts
8  like a victim.
9      Q    What does that mean she acts like a
10 victim?
11     A    Someone that, you know, who has been --
12 a crime has been committed upon them.  She's --
13 they are always afraid that something else is going
14 to happen to them.  They are afraid that if they
15 testify, there is going to be retribution, things
16 like that.
17     Q    Did Miss Spizzirri tell you she was
18 afraid of retribution?
19     A    I think in one of the emails, there is a
20 mention of some sort of retribution.  I forget what
21 the actual line was.  So she always was wondering
22 that there could be additional attempts to get into
23 some of the information that she had or her emails
24 or whatever.  She was always kind of afraid that

1  something else was going to happen, and what was
2  going to happen next.
3      Q   She was worried that Miss Melongo would
4  get into her emails?
5      A   I don't think she specifically said
6  Miss Melongo, but she was always like a victim.
7  They always think something else is going to happen
8  or what's going to happen next.  If this could
9  happen to me, what else could happen.
10     Q   Did she ever -- apart from the
11 allegations that we've been discussing today, the
12 credit card, bank account and intrusion
13 allegations, did Miss Spizzirri ever bring any
14 other allegations to you related to Miss Melongo?
15     A   There was an allegation that she
16 believed that was related to the intrusion that
17 happened on the 28th, some of the files that were
18 contained on one of the servers at the time of the
19 intrusion -- I'm trying to think what she called
20 it.  It was like a book or training manual or
21 something along that lines that had been leaked to
22 the -- I forget who it was leaked to.  I don't know
23 if it was the outside world or news agency or
24 something like that.

1      It was some protected document of some
2  sort that had been leaked that was one of the
3  things that she brought up, but I don't recall
4  anything else as we're sitting here.
5      Q   Did you look into that allegation?
6      A   I basically told her that we had no
7  information at that point in time because this was
8  after the case was closed and the defendant had
9  been charged.
10     She was trying to, you know, a year or
11 two later, trying to come back and say this was all
12 related to this intrusion.  I said without further
13 evidence there is no way we're going to be able to
14 prove that it was coming from that intrusion.
15     Q   So you didn't follow up after that?
16     A   No.
17     Q   What year was this conversation with
18 Miss Spizzirri, would you guess?
19     A   I don't recall exactly, but it was after
20 the case had been concluded, I knew that.
21     Q   Were you aware of an ABC News
22 investigative report that aired in November 2006
23 about Miss Spizzirri and the Save a Life
24 Foundation?

1      A   I am.
2      Q   Did you watch that news report?
3      A   Yeah, I don't think I watched it
4  entirely, but I remember watching part of it,
5  yes.
6      MS. SCHWARTZ:  Go off the record for just one
7  moment.
8          (A discussion was had off the
9          record.)
10     MS. SCHWARTZ:  I'm showing you what's marked
11 Plaintiff's Deposition Exhibit 32.
12     THE REPORTER:  33.
13     MS. SCHWARTZ:  33, Attorney General 001846 to
14 1847.
15         (A document was marked Plaintiff's
16         Deposition Exhibit Martin No. 33
17         for identification.)
18 By Ms. Schwartz:
19     Q   Look to the bottom two-thirds of the
20 first page of Exhibit 33.
21     Is that a true and accurate copy of an
22 email you sent to Miss Monge on November 20, 2006?
23     A   A portion of it, yes.
24     Q   You say, did you see Miss Spizzirri on

1  the ABC News last Thursday night.  If you didn't,
2  check out the link below.  You think our case is
3  shot now?
4      Why did you write you think our case is
5  shot now?
6      A   Just based upon the allegations that --
7  Chuck Goudie I think was the one that did the
8  report.  Based on the allegations that he was
9  trying to -- or not allegations, but the -- I'm
10 trying to think of the word.  How he portrayed
11 Miss Spizzirri within the report.
12     Q   How did Chuck Goudie portray
13 Miss Spizzirri in the ABC News report?
14     A   I vaguely remember it being derogatory.
15 I don't specifically remember exactly what he said.
16 It was derogatory in the sense that there was
17 some -- the basis behind Miss Spizzirri's
18 Save a Life Foundation, that her -- how she
19 described why she had this -- why she created
20 Save a Life, there was apparently what Chuck Goudie
21 found was that the story that she told was
22 inaccurate.
23     Q   Did Chuck Goudie ABC News report cause
24 you concern about your investigation of

1   Miss Melongo?

2     A  Not my investigation, no. I just

3 presented it to Shahna, and just as a point of

4 discussion, you know. Whether or not she -- what

5 her thought was on the article or the investigation

6 that he did.

7     Q  Did you think that the allegations in

8 the Chuck Goudie ABC News report called into

9 question Miss Spizzirri's credibility?

10     A  He said it, in regards to what he

11 investigated. I had no reason to believe that she

12 had -- was anything but truthful when she made the

13 report with me.

14     Q  Did anyone respond to your question in

15 Exhibit 33, your question, do you think our case is

16 shot now?

17     A  I don't think so. I don't recall if

18 Shahna responded in any way.

19     Q  Did you ever discuss the ABC News

20 investigation with Miss Monge, now Miss Voita,

21 Mr. French, or anyone else?

22     A  There was a discussion at the State's

23 Attorney's Office in the Third District of

24 Rolling Meadows. I can't tell you who was present,

1 but they were asking me if I knew about this

2 investigation prior to the formal charging, I

3 believe.

4     Q  And by this investigation, whether you

5 knew about the Chuck Goudie ABC News --

6     A  Correct.

7     Q  -- investigation?

8     A  Correct.

9     Q  What did you say?

10     A  I said no, I didn't know anything about

11 it until it was brought to my attention, you know,

12 after the fact.

13     Q  After the report was aired?

14     A  Yes. Yes.

15     Q  When did that conversation with the

16 Rolling Meadows State's Attorney's Office take

17 place?

18     A  I don't recall. The report aired

19 obviously a couple days before November 20th, so it

20 had to be after that some time. I would assume

21 shortly thereafter because the case was still being

22 prosecuted by the Third District at that point.

23     Q  Do you recall who was present at that

24 meeting with the Rolling Meadows State's Attorney's

1 Office?

2     A  I do not.

3     Q  Do you recall anything else that was

4 said during that meeting?

5     A  No, I do not.

6     Q  I'd like to discuss some of the

7 allegations in the Chuck Goudie ABC News report.

8 Mr. Goudie reported that Carol Spizzirri claimed to

9 be a registered nurse in promoting the Save a Life

10 Foundation, but as it turned out Carol Spizzirri

11 was never a registered nurse.

12     Do you recall that allegation?

13     A  Vaguely, yeah.

14     Q  You learned about it around the time of

15 the report?

16     A  From whatever he said in the report,

17 when he -- when I watched it.

18     Q  The report by Chuck Goudie also stated

19 that Miss Spizzirri had never worked as a nurse at

20 a hospital even though she claimed in promoting

21 Save a Life Foundation to have worked at a nurse --

22 as a nurse at a hospital.

23     Do you remember that allegation from the

24 ABC News report?

1     A  Not specifically, no.

2     Q  And none of this information on the

3 ABC News report suggested to you that

4 Miss Spizzirri was potentially unreliable as a

5 complaining witness in your case?

6     MR. KAPLAN: Objection, asked and answered.

7     Ms. NINFO: Objection, form.

8     THE WITNESS: Not to my case, no.

9     By Ms. Schwartz:

10     Q  Did the ABC News report cause you any

11 concern that Miss Spizzirri might have motives for

12 seeking to blame Miss Melongo for loss of

13 Save a Life Foundation financial records?

14     MS. NINFO: Objection to the speculation.

15     MR. KAPLAN: I'll join.

16     THE WITNESS: No.

17     By Ms. Schwartz:

18     Q  Miss Spizzirri also publicly represented

19 in promoting Save a Life Foundation that her

20 daughter had died in a hit and run car accident and

21 bled to death before emergency responders arrived.

22     Do you know that's what Miss Spizzirri

23 promoted Save a Life -- how Miss Spizzirri promoted

24 Save a Life Foundation?

1    A    I remember it from his report, yes.
2    Q    And Chuck Goudie in his report alleged
3  that certain parts of that story were not true; is
4  that correct?
5    A    Correct.
6    Q    Chuck Goudie in his report alleged that
7  Miss Spizzirri's daughter was not involved in a hit
8  and run car accident but was rather -- died in a
9  drunk driving single person car accident; is that
10  correct?
11    A    I don't recall if it was a hit and run
12  accident or anything like that.  I didn't even
13  think she died.  I thought it was that they
14  reported it or she alleged that she died, but I
15  didn't think it was -- I thought it was something
16  else.
17    Q    But you recall the Chuck Goudie ABC News
18  report had some allegations regarding inaccuracies
19  in Miss Spizzirri's account of how her daughter had
20  died?
21    A    Correct.
22    Q    And that didn't cause you concern
23  either?
24    A    No.

1    Q    Did you ever investigate the possibility
2  that Miss Spizzirri or someone at Save a Life
3  Foundation had destroyed files in order to cover up
4  those files?
5    A    No.
6    MS. NINFO:  I'm sorry, cover up what files?
7    MR. KAPLAN:  The files that were destroyed, is
8  that what you mean?
9    MS. SCHWARTZ:  I'll rephrase the question.
10    By Ms. Schwartz:
11    Q    Did you ever investigate the possibility
12  that Carol Spizzirri or someone at Save a Life
13  Foundation had on or around April 28, 2006
14  destroyed Save a Life financial files as a means of
15  getting rid of those files?
16    A    We investigated the network intrusion.
17  We -- at the point and times that I documented by
18  my report --
19    MR. KAPLAN:  Just answer her question.
20    THE WITNESS:  So we didn't investigate any
21  particular person at all at that point.  We were
22  investigating the intrusion and what evidence we
23  could get from that investigation.
24

1    By Ms. Schwartz:
2    Q    Well, starting on May 5, 2006,
3  Miss Melongo's name was mentioned as the target,
4  correct?
5    A    Correct.
6    Q    So you were investigating Miss Melongo
7  from the outset, correct?
8    A    She was a person of interest, yes.
9    Q    Did you ever investigate anyone other
10  than Miss Melongo as a possible suspect in the
11  Save a Life intrusion?
12    A    No.  No other suspects were developed.
13    Q    Did you ever speak to Robert Podlasek
14  about the ABC News report by Chuck Goudie?
15    A    I don't recall talking to Bob about it
16  at all.
17    Q    I'm showing you Plaintiff's Deposition
18  Exhibit 34, CCSAO 007190.
19        (A document was marked Plaintiff's
20         Deposition Exhibit Martin No. 34
21         for identification.)
22    By Ms. Schwartz:
23    Q    Does Exhibit 34 refresh your
24  recollection as to whether you spoke with

1  Robert Podlasek about the ABC News piece by
2  Chuck Goudie?
3    A    Yes.
4    Q    What do you recall about the discussions
5  with Robert Podlasek about the ABC News piece?
6    A    Well, obviously I sent him the link to
7  the ABC News, the same one that I had sent to
8  Miss Monge on November 20th.
9    Q    Did you talk to him before or after this
10  fax was sent on January 11, 2007?
11    A    Based on what I wrote, I'd infer that I
12  did speak to him --
13    Q    And this --
14    A    -- or I mentioned it to him.
15    Q    Exhibit 34, is that your handwriting on
16  Exhibit 34?
17    A    Yes, it is.
18    Q    And it's dated January 11, 2007, which
19  is six days before your testimony in the first
20  grand jury, correct?
21    A    Correct.
22    Q    Did you have any discussion with
23  Mr. Podlasek about whether it was appropriate to
24  seek an indictment against Miss Melongo in light of

1 the ABC News report?
2    A   No.
3    Q   Do you recall anything else about any
4 discussions with Mr. Podlasek about the ABC News
5 report?
6    A   No.
7    Q   Were you aware that at the time
8 Miss Melongo was terminated from the Save a Life
9 Foundation in April of 2006 there was an ongoing
10 dispute between Carol Spizzirri and the temp agency
11 Robert Half?
12    A   We were made aware of it, but I can't
13 recall as to how.
14    Q   Did you consider that relevant to your
15 analysis?
16    A   It's a bit of information.
17    Q   Were you aware that Carol Spizzirri had
18 alleged that another temp employee other than
19 Miss Melongo had destroyed or inappropriately
20 accessed Save a Life computer files in 2006?
21    A   I was never made aware of that that I
22 can recall.
23    Q   Have you seen the website
24 www.illinoiscorruption.net?

1    A   I have.
2    Q   When did you first learn of the website
3 illinoiscorruption.net?
4    A   I don't recall.
5    Q   I'm handing you Plaintiff's Deposition
6 Exhibit 35, Spizzirri000001071 to 1072.
7        (A document was marked Plaintiff's
8        Deposition Exhibit Martin No. 35
9        for identification.)
10 By Ms. Schwartz:
11    Q   Is this an email exchange between you
12 and Carol Spizzirri?  At the top it says January 4,
13 2010, but embedded are emails from November 2009.
14    A   Yeah, it appears to be portions of them,
15 yes.
16    Q   And is this a true and accurate copy of
17 an email you received from Miss Spizzirri?
18    A   Portions of it, I believe, yeah.
19    Q   If you turn to the last page there is a
20 link to illinoiscorruption.net, which appears to
21 have been forwarded to you November 12, 2009?
22    A   Yes.
23    Q   Were you aware of the Illinois
24 Corruption website by November of 2009?

1    A   I was made aware of -- excuse me.  I was
2 made aware of it around that time.
3    Q   Did you have any conversations with
4 Carol Spizzirri about the Illinois Corruption
5 website?
6    A   I don't recall any specific
7 conversations, no.
8    Q   What did you think of the website
9 illinoiscorruption.net?
10    A   I don't recall my thoughts about it.
11 Just that Miss Melongo was discussing her
12 recollections of some of the things that were going
13 on in regards to this investigation and posting
14 documents from this investigation.
15    Q   Including your police report, correct?
16    A   Yeah, I believe that was one of the
17 items that was up there.
18    Q   Miss Melongo's descriptions of the
19 investigation and prosecution on the website
20 Illinois Corruption were not favorable, correct?
21    A   I don't recall a specific, what she --
22 the favorable results were towards, but based upon
23 some of what I read, I remember it being negative
24 towards myself and others that were involved in the

1 investigation.
2    Q   In fact, on the website at a certain
3 point she did accuse you of perjury, correct?
4    A   Yes.
5    Q   And she linked a copy of her motion to
6 dismiss the indictment based on the alleged
7 perjury, correct?
8    A   I don't know if that was on there
9 specifically.
10    Q   How did you feel about the way you were
11 portrayed on the Illinois Corruption website?
12    A   I really had no thoughts on it either
13 way.
14    Q   How did you feel about the way the
15 investigation and prosecution were portrayed on the
16 Illinois Corruption website?
17    A   That had no bearing on me at all.
18    Q   I'm handing you Plaintiff's Deposition
19 Exhibit 36, Spizzirri000001089 to 90.
20        (A document was marked Plaintiff's
21        Deposition Exhibit Martin No. 36
22        for identification.)
23 By Ms. Schwartz:
24    Q   Is Exhibit 36 a true and accurate copy

1  of a thread of emails between you and Carol
2  Spizzirri dated January 12, 2010?
3      A    Yes, they -- it looks like the beginning
4  of it starts with an email that was sent to
5  Wendy Cohen by herself and then it has
6  Miss Melongo's email to me.
7      Q    Miss Spizzirri's email to you you
8  mean?
9      A    Correct.
10     Q    And starting with the most recent email
11 on the top of the first page, Exhibit 36, the
12 subject says Re: Hi, Det. Martin - Carol calling -
13 stalking awareness month event.  Then in the body
14 it says I'd like you apart of initiative - if you'd
15 agree.
16          What did you understand Miss Spizzirri
17 to mean by initiative?  Did it relate to stalking,
18 what was in the subject line?
19     A    I don't recall exactly what it was
20 about.
21     Q    Did you ever get involved with
22 Miss Spizzirri's cyberstalking initiative or any
23 other initiative that Miss Spizzirri spearheaded?
24     A    No, I did not.

1      Q    In the second line she writes, Lk Co
2  Sheriff's Det. Kathy Kates may call you related to
3  Annabel - took my report this morning, how my X and
4  her are co-spiriting by joint blogs.  Podlasek said
5  he's been monitoring.
6          What did you understand Miss Spizzirri
7  to mean by that statement I just read?
8      A    What she believed to be Miss Melongo and
9  her ex-husband writing blogs and -- yeah, writing
10 blogs together.  That's all I know.
11     Q    Did you ever talk to Miss Spizzirri
12 about Miss Melongo's website?
13     A    Other than maybe the correspondence back
14 and forth of her providing the information, I don't
15 recall any specific conversations, though.
16     Q    Did Miss Spizzirri ever ask you to look
17 into or bring to your attention any allegations
18 related to stalking or cyberstalking?
19     A    I vaguely recall her asking me about it,
20 and I would have directed her towards her local
21 police department where she alleged these events
22 were occurring.
23     Q    The local police department would not
24 have been Schiller Park?

1      A    No, because she didn't live in
2  Schiller Park, and I believe at that point
3  Save a Life was already gone.
4      Q    So you never investigated or looked into
5  any allegations of stalking by Miss Spizzirri?
6      A    No, I did not.
7      Q    In this email Miss Spizzirri invites you
8  to an event.  You say I'm sorry but I have another
9  meeting I have to be at that morning.  I would be
10 interested in attending other events should they
11 come up.
12         Did you ever attend any other events
13 that Miss Spizzirri invited you to?
14     A    I did not.
15     Q    Did you ever tell Miss Spizzirri that
16 you felt there was ample evidence to convict
17 Miss Melongo?
18     A    I don't recall specifically saying that,
19 no.
20     MS. SCHWARTZ:  Let's take a five-minute break.
21         (A recess was taken.)
22 By Ms. Schwartz:
23     Q    I'm handing you Plaintiff's Deposition
24 Exhibit 37, which is Attorney General 001125

1  through 35.
2          (A document was marked Plaintiff's
3          Deposition Exhibit Martin No. 37
4          for identification.)
5  By Ms. Schwartz:
6      Q    Is Exhibit 37 a true and accurate copy
7  of the response you received from Yahoo in response
8  to the search warrant you issued on May 31, 2006?
9      A    It appears to be.  I don't know the
10 exact date.
11     Q    The cover letter --
12     A    Correct.
13     Q    -- appears to have been written June 16,
14 2006?
15     A    Yes.
16     Q    So did you receive this around that time
17 in June 2006?
18     A    Yes, I believe I did.
19     Q    I would like to direct your attention to
20 page -- if we're looking at the bottom right, the
21 last page, page Attorney General 001135.  These are
22 instances in which the Yahoo user Melongo_Annabel
23 logged into the Yahoo account, is that your
24 understanding of what this represents?

1     A    Yes.  Someone that had access to that
2  account logged in at these particular dates and
3  times.
4     Q    And for each entry there is an IP
5  address listed, a date and a time expressed in
6  Greenwich Mean Time?
7     A    Correct.
8     Q    So the alleged intrusion on Save a Life
9  Foundation's servers was in the early morning hours
10  of April 28, correct, --
11     A    Correct.
12     Q    -- 2006?
13     A    Correct.
14     Q    If you look into the entries, there are
15  no entries from April 28, 2006, are there?
16     A    No.  There is one prior to it on
17  April 27th, in the evening hours.
18     Q    But there is no entries on April 28th?
19     A    No.
20     Q    If you're looking at the April 27th
21  entry, there appears to be three different entries
22  of log-ins in Melongo_Annabel on April 27th?
23     A    On this page, yes.
24     Q    On this page.  And only one of them, the

1  last one, does appear to be that 102 IP address,
2  correct?
3     A    Correct.
4     Q    But that's on April 27th, correct?
5     A    Correct.
6     Q    So this didn't show that someone using
7  both the Melongo_Annabel Yahoo account and the 102
8  IP address logged in using that IP address on
9  April 28th, the date of the intrusion, correct?
10     A    This particular document does not show a
11  date of June 28th -- I'm sorry -- of April 28th,
12  correct.
13     Q    So this doesn't show anything about the
14  date of the alleged Save a Life intrusion,
15  correct?
16     A    No, just the date prior to in the
17  evening hours.
18     Q    You testified earlier that you didn't
19  know whether Miss Melongo had access to Save a Life
20  networks and servers on her personal computers; is
21  that correct?
22     A    Correct.
23     Q    I'd like to turn your attention to your
24  police report, Exhibit 3.  If you look at the

1  second page in the entry dated May 17, 2006, about
2  seven or eight lines down from the top it says
3  Mr. Barnes stated that -- stated he had no
4  knowledge of Miss Melongo having any other email
5  accounts other than the Yahoo mail account, but
6  stated that she does have a laptop that she uses
7  from time to time.
8        Mr. Barnes was an employee of
9  Save a Life Foundation, correct?
10     A    Yes.
11     Q    And he knew that Miss Melongo had a
12  laptop that she used, correct?
13     A    Yes.
14     Q    And did he tell you that Miss Melongo
15  used that laptop for work purposes?
16     A    It doesn't say here.  I don't recall him
17  saying that.
18     Q    You also testified earlier about the
19  allegations of unauthorized credit card use and
20  bank account use on Save a Life Foundation's
21  accounts, correct?
22     A    Yes.
23     Q    Isn't it true that names identified in
24  the course of your investigation of those

1  allegations were Toni Smith and a Andrea Chase.
2     A    Let me look back in the report.
3     Q    I'm looking at page 5 of your report is
4  one mention of Andrea Chase?
5     A    There is Toni Smith's that was -- I'm
6  trying to think of where we got that information
7  from right now.  The gentlemen, Bob Curran,
8  C-u-r-r-a-n of American Express fraud department --
9     Q    What page are you reading?
10     A    Page 3, May 19th of 2006, paragraph one,
11  two, three, four, received account statement from
12  Mr. Curran, and was able to contact a -- not sure
13  where this came from -- a person at Old Navy
14  customer research department, who provided me the
15  name that the items that were purchased using
16  Save a Life's credit cards was to be shipped to the
17  name of Toni, T-o-n-i, Smith, common spelling.
18  That was one.
19     Q    And if you turn to page 5 of Exhibit 5,
20  someone at Comcast said one of the unauthorized
21  payments was in the name of an Andrea Chase about a
22  third of the way down the page on page 5?
23     A    Correct, Andrea's Smith's address in
24  Maywood.

1  Q    Then if you turn to page 7, there is an
2  Andrea Smith at the top of page 7, related to --
3      A    Correct.
4      Q    -- one of these ACH debits?
5      None of the names that came up with
6  respect to the credit card or bank account used
7  related to Tanya Spears, correct?
8      A    The name specifically, no, but the --
9  there is a June 5th of 2006, the representative
10 from Comcast stated that the account name that we
11 were referencing belonged to An -- a person by the
12 name of Andrea Smith with an address in Maywood,
13 but the associated email addresses to that account
14 were tspears4@comcast.net and wookie, w-o-o-k-i-e,
15 91@comcast.net.
16     Q    So you thought T. Spears might relate to
17 Tanya Spears, a former SALF employee?
18     A    Potentially, yes.  Also, when we went
19 to, let's see, the house in Glendale Heights, I
20 think the address is the 700 Cynthia Lane in
21 Glendale Heights, one of the plate numbers came
22 back to a -- I'll spell it -- R-e-a-c-h-e-l-l-e,
23 Spears at that address.
24     Q    So those are names that came up during

1  the course of your investigating the credit card
2  and bank account allegations?
3      A    Correct.
4      Q    Again, Miss Melongo's name never came up
5  in response to your research -- your investigation
6  into the credit card or bank account allegations?
7      A    No, other than the fact that she had
8  Miss Spears' phone number.
9      Q    I'm handing you plaintiff's deposition
10 Exhibit 38, Attorney General 001839.
11         (A document was marked Plaintiff's
12         Deposition Exhibit Martin No. 38
13         for identification.)
14 By Ms. Schwartz:
15     Q    Is this a true and accurate copy of an
16 email you received from Kyle French dated July 20,
17 2009?
18     A    It appears to be, yes.
19     Q    In this email he asks that you contact
20 Don Peters and ask him for notes, reports, and
21 emails involving all work he did for Save a Life,
22 as well as any images of data that was in the
23 server he worked on.
24     Do you know why Kyle French was asking

1  you for this information on July 20, 2009?
2      A    I don't recall.
3      Q    Why didn't you or Mr. French have all of
4  that information, notes, reports, emails and images
5  at that time on July 20, 2009?
6      A    The only information I had was initially
7  discussed in what we got from Don Peters sent to
8  me.  I forget which exhibit that was earlier.
9      Q    Which was an email and a letter,
10 correct?
11     A    Correct, an email and the attachment.
12     Q    Did you ever receive any additional
13 documents from Don Peters in or around July of
14 2009?
15     A    I did not.
16     Q    Did you ask for the documents after you
17 received this email from Kyle French, documents or
18 records?
19     A    I don't recall if I reached out to him
20 or not.
21     Q    The second part of this exhibit,
22 Exhibit 38, also requests names and addresses of
23 the others who tried to recover lost data along
24 with notes, reports, emails and any images of data

1  in the server.
2      Again, do you know why Mr. French was
3  asking you to look for that information in July of
4  2009?
5      A    No, I do not.
6      Q    Did you ask any other third-party
7  vendors for information regarding recovery efforts
8  to Save a Life Foundation in or around July 2009?
9      A    Not that I recall, no.
10     Q    Do you recall receiving any additional
11 information after July 20, 2009 from any such
12 vendors?
13     A    No, I did not.
14     Q    I'm handing you plaintiff's Deposition
15 Exhibit 39, CCSAO 002195 to 2196.
16         (A document was marked Plaintiff's
17         Deposition Exhibit Martin No. 39
18         for identification.)
19 By Ms. Schwartz:
20     Q    Exhibit 39 appears to be a forward of an
21 email from Carol Spizzirri to Thomas DiCianni.
22     Have you ever seen Exhibit 39 before,
23 Detective Martin?
24     A    No.

1    Q    I just want to point you to one portion
2    of this email.  In the body on the first page of
3    Exhibit 39, second paragraph it states, we just
4    discovered that up till a few weeks ago Annabel has
5    had access into our server (have evidence) which
6    Martin has been monitoring from his Dept. computer.
7    And this is dated August 28, 2008.
8         Were you monitoring anything related to
9    Miss Melongo or Save a Life servers in or around
10   August of 2008?
11   A    No.
12   Q    Do you know why Miss Spizzirri would say
13   that you were --
14   A    No.
15   Q    -- monitoring?
16   A    No.
17   Q    In the same paragraph of Exhibit 39, a
18   little bit further down it says Judge issued Martin
19   a subpoena for AT&T to release all docs related to
20   our DSL/now static line to our mainframe, which
21   Martin has forward to Podlasek to amend felony
22   charges to four counts.  Possible charges could be
23   brought against Robert Half.
24        Did you -- were you involved in the

1    preparation of a subpoena to AT&T related to
2    documents coming to Save a Life Foundation?
3    A    Not that I remember, no.
4    Q    And were you involved in or around April
5    2 -- August 2008 in any discussions about amending
6    felony charges to four counts?
7    A    No.
8    Q    Were you -- were you ever involved in
9    discussions about whether to amend felony charges
10   to four counts with respect to Miss Melongo?
11   A    No.
12   Q    Were you ever involved in any
13   discussions about whether charges could be brought
14   against Robert Half?
15   A    No.
16   Q    Do you know why Miss Spizzirri suggests
17   that you were involved in Exhibit 39?
18   A    No.
19   Q    I'm handing you Plaintiff's Deposition
20   Exhibit 39.
21   MR. KAPLAN:  40.
22   THE WITNESS:  40.
23   MS. SCHWARTZ:  40, excuse me.  Thank you.
24   Spizzirri000001091 to 92.

1         (A document was marked Plaintiff's
2         Deposition Exhibit Martin No. 40
3         for identification.)
4    By Ms. Schwartz:
5    Q    Is this a true and accurate copy of an
6    email you sent to Carol Spizzirri on February 10,
7    2010?
8    A    It appears to be, yes.
9    Q    And if you turn to the earliest email in
10   the exchange, it's dated February 9, 2010 from
11   Carol Spizzirri to you.  She writes, always
12   wonderful and reassuring talking with you,
13   exclamation mark.  You'll always be my hero.
14        Did you talk to Carol Spizzirri on or
15   around February 9, 2010?
16   A    I must have based upon what's written
17   here.  I don't recall what was specifically said,
18   though.
19   Q    Did she ever call you -- in this email
20   she calls you her hero.
21        Did she ever call you her hero in
22   person?
23   A    Not that I remember, no.
24   Q    She calls you in the -- a little above

1    that, my dearest friend.
2         Did you consider Carol Spizzirri a
3    friend?
4    A    I would never use that word, no.  No.
5    Q    And why not?
6    A    She's an acquaintance.  She's a victim.
7    I wouldn't use the term friend to describe her.
8    Q    Do you have any idea why she says it was
9    reassuring to talk with you?  Did you reassure her
10   about anything around that time?
11   A    Apparently I did, but I don't recall
12   what it would be about.
13   MR. KAPLAN:  I'm just going to tell you not to
14   speculate.  Testify to what you remember, okay.
15   THE WITNESS:  Okay.
16   By Ms. Schwartz:
17   Q    In the next paragraph she writes, you
18   know I'm writing a book about this.  Will leave a
19   chapter just for you, smiley face.  Going to be --
20   going to better seller than that Peter Heimlich
21   one.  I won't forget to include Goudie's role,
22   smiley face.  This email suggests that you spoke to
23   Miss Spizzirri at some point about Chuck Goudie's
24   ABC investigative report.

1      Do you recall any such conversation
2  about Chuck Goudie's investigative report with
3  Carol Spizzirri?
4      A   No.
5      Q   You responded to this email on the top
6  of Exhibit 40, I won't be in the office until
7  1:00 p.m. on Friday.  Unfortunately Thursday is no
8  good. I'm tied up with other cases.  This I think
9  was in response to her asking about stopping by the
10  office.
11      Did you ever meet up with Carol
12  Spizzirri shortly after February 10, 2010?
13      A   Not that I recall, no.
14      Q   Were you trying to avoid meeting up with
15  her?  I see your email is quite curt.
16      A   No, I...
17      Q   No, you don't recall or no, you weren't
18  avoiding her?
19      A   No, I wasn't avoiding her.
20      Q   I'm handing you Plaintiff's Deposition
21  Exhibit 41, CCSAO 09122 to 23.
22          (A document was marked Plaintiff's
23          Deposition Exhibit Martin No. 41
24          for identification.)

1  By Ms. Schwartz:
2      Q   Is Exhibit 41 a true and accurate copy
3  of an email you received from Carol Spizzirri on
4  June 17, 2010?
5      A   It appears to be.
6      Q   You don't recall receiving this email,
7  though?
8      A   Not specifically, no.
9      Q   In this email Carol Spizzirri says each
10  of you have a gigantic amount of expertise in this
11  new and growing war against cyberterror.  She then
12  mentions setting up a conference call.
13      Did you ever participate in a conference
14  call related to cyberterror or cybercrimes set up
15  by Miss Spizzirri?
16      A   Not that I recall, no.
17      Q   She says, halfway down the line, my
18  adopted son Bill's cybertracking expertise is
19  priceless.
20      Do you recall Miss Spizzirri ever
21  referring to you in person or in email as her
22  adopted son?
23      A   No.
24      Q   Do you have any idea why she referred to

1  you as her adopted son?
2      A   No.
3      MR. KAPLAN:  Are you her adopted son?
4      THE WITNESS:  No.
5      MS. SCHWARTZ:  I'm glad we got the record
6  cleared up.
7      THE WITNESS:  Thank you.
8      By Ms. Schwartz:
9      Q   You testified at Miss Melongo's criminal
10  trial, did you not?
11      A   Yes, I did.
12      Q   Prior to your trial testimony, did you
13  speak with anyone about your trial testimony?
14      A   I reviewed it with the State's
15  Attorney's Office prior to making the testimony,
16  yes.
17      Q   Who did you meet with at the State's
18  Attorney's Office prior to your trial testimony?
19      A   I don't recall exactly who it was.
20      Q   Do you recall what was said during those
21  conversations prior to the trial?
22      A   Not specific, no.
23      Q   Do you recall how long you met with the
24  State's Attorneys?

1      A   No, I don't.
2      Q   Do you recall if any of the
3  Assistant State's Attorneys you met with gave you
4  any thoughts about your testimony?
5      A   No, I don't recall.
6      Q   Did you have any difficulty remembering
7  any of the facts about which you were going to be
8  asked to testify?
9      A   I don't recall any, no.
10      Q   Do you recall if they asked you any
11  questions about your conversations with
12  Miss Melongo on July 20, 2006?
13      A   The State's Attorney's Office or on
14  trial?
15      Q   The State's Attorney's Office --
16      A   Prior?
17      Q   -- in your conversations prior to
18  trial?
19      A   I don't recall.
20      Q   Apart from Assistant State's Attorneys
21  involved in the trial, did you talk to anyone else
22  before you testified at Miss Melongo's trial about
23  your trial testimony?
24      A   I don't -- I don't recall any.

1    Q   Carol Spizzirri?
2    A   I don't -- no, I didn't talk to her
3 about it.
4    Q   Did you talk to Miss Voita about your
5 trial testimony?
6    A   No.
7    Q   Do you know the result of Miss Melongo's
8 computer tampering trial?
9    A   I know she was acquitted in regards to
10 the charge of the email issue, yes.
11    Q   Who told you that?
12    A   One of the State's Attorneys after it
13 was over.  I can't remember who it was.
14    Q   What did that State's Attorney say?
15    A   I don't recall specifically, just that
16 she was acquitted.
17    Q   Were you disappointed when you learned
18 of the result of Miss Melongo's trial?
19    A   No.
20    Q   Why not?
21    A   You win some; you lose some.
22    Q   Other than the Assistant State's
23 Attorney did you speak to anyone else about the
24 result of Miss Melongo's trial?

1    A   I'm sure I told the administration at
2 the Police Department what had happened, but.
3    Q   Were you aware that just before trial
4 began two counts of the indictment against
5 Miss Melongo related to the alleged intrusion on
6 April 28, 2006 were dismissed?
7    A   I vaguely remember it, yeah.
8    Q   Do you have any reason why they were
9 dismissed?
10    A   I have no idea.
11    Q   Were you involved with any discussions
12 with anyone about dismissal or potential dismissal
13 of the first two counts of the indictment related
14 to the April 28, 2006 tampering allegation?
15    A   I don't recall any specific
16 conversation.
17    Q   Did anyone ever express concerns to you
18 about the content of your police report that we've
19 been talking about today, Exhibit 3?
20    A   Not that I recall.
21    Q   I'm handing you Plaintiff's Deposition
22 Exhibit 42, Martin 001275 to 1276.
23
24

1    (A document was marked Plaintiff's
2    Deposition Exhibit No. 42 for
3    identification.)
4 By Ms. Schwartz:
5    Q   This is an email -- exhibit 42 is an
6 email from you to Kate Garcia dated September 11,
7 2013.  You write thank you very much.
8    What was this response in response to?
9 What were you thanking Miss Garcia for?
10    A   No idea.
11    Q   To your knowledge does this have
12 anything to do with Miss Melongo's case or the
13 Save a Life investigation?
14    A   No.
15    Q   Detective Martin, did you have any
16 involvement in investigating or prosecuting
17 Miss Melongo for criminal eavesdropping?
18    A   No.
19    Q   Were you aware that Miss Melongo was
20 investigated and prosecuted for eavesdropping?
21    A   Yes.
22    Q   How did you become aware of that?
23    A   I don't recall who specifically told
24 me.

1    Q   But you were never asked to do anything
2 related to the eavesdropping allegations?
3    A   No.
4    Q   Did you have any involvement in
5 investigating or prosecuting Miss Melongo for
6 allegedly threatening a public official?
7    A   No.
8    Q   Were you aware that Miss Melongo was
9 investigated for threatening a public official?
10    A   Yes.
11    Q   How did you become aware of that?
12    A   I don't recall.
13    Q   Do you recall any conversations about
14 the allegations related to threatening a public
15 official?
16    A   No.
17    Q   You were suspended for one day from the
18 Schiller Park Police Department for misstating a
19 police report; is that correct?
20    A   No, that's not correct.
21    Q   Have you ever been suspended for one day
22 from the Schiller Park Police Department?
23    A   Yes.
24    Q   What was the reason for that

1  suspension?
2      A    To -- failure to complete a report in a
3  timely manner.
4      Q    What was the general facts related to
5  that suspension?
6      A    It was a reference to a -- what the
7  chief at the time thought to be a newsworthy case.
8  The initial incident occurred on a Saturday
9  evening.  Our records department wasn't in on
10 Sundays or on weekends at all.  So there was -- the
11 completion of the report wasn't done, and my intent
12 was to finish it on that Sunday when I returned to
13 work in the afternoon.
14         The chief unfortunately saw that it
15 hadn't been completed on Saturday, and he felt that
16 he needed to have something that he could read to
17 the news, should they call.
18     Q    And that was the basis for the
19 suspension?
20     A    Correct.
21     Q    I'm handing you Plaintiff's Deposition
22 Exhibit 43, Bates No. CCSAO 008375 to 8377.
23
24

1          (A document was marked Plaintiff's
2           Deposition Exhibit Martin No. 43
3           for identification.)
4  By Ms. Schwartz:
5      Q    Is this a true and accurate copy of the
6  order of suspension to which you just referred?
7      A    As I remember it, yes.
8      Q    This all happened in 1998, correct?
9      A    Yes.
10     Q    And the finding, I'm turning to the
11 second page of this Exhibit 43, was that on 01 July
12 you finally completed the report and erroneously or
13 fallaciously indicated that the date/time of the
14 report was 30 June 98/2055?
15     A    Correct.
16     Q    And your reason for completing this
17 report a day later was you said because the records
18 group was not open?
19     A    Correct.  The date and time that he
20 references as far as June 30, '98, 2055, that was
21 the time that the -- I initially began the
22 report.
23     Q    But it wasn't the time you actually
24 completed the report?

1      A    Correct.
2      Q    So it was an incorrect date in that
3  sense?
4      A    No.  The -- that was correct really what
5  was written on the report, but ultimately it wasn't
6  completed until later on on July 1st.
7      Q    Have you had any other -- apart from
8  Exhibit 43 and what we've just been discussing,
9  have you had any other disciplinary charges brought
10 against you?
11     A    No.
12     MS. SCHWARTZ:  Just give me one moment.
13     MR. KAPLAN:  If you want, why don't we take
14 one second -- you know, one minute, you can look
15 through.
16         Are you at a point where you're just
17 looking to see if you have anything else?
18     MS. SCHWARTZ:  Yes.  Let's go off the record.
19         (A discussion was had off the
20          record.)
21         (A recess was taken.)
22     MS. SCHWARTZ:  All right.  We are back on the
23 record, and I have no further questions.
24     MR. KAPLAN:  I just have a couple of

1  questions.  Then Chris is going to ask the rest of
2  the questions, if that's okay.
3      MS. SCHWARTZ:  That's fine with me.
4          EXAMINATION
5  By Mr. Kaplan:
6      Q    Detective Martin, I just want to clarify
7  something that's in the record to make sure that
8  we're clear here.
9          Miss Schwartz was asking you about the
10 admissions made by Annabel Melongo in your July 20,
11 2006 interview at her home.
12         Do you remember that?
13     A    I do.
14     Q    And the details of her admission are set
15 forth in your report, am I correct?
16     A    Correct.  This is a summary of what she
17 had said to us.
18     Q    And so in that interview she admitted to
19 accessing the server to get her emails for up to
20 about two weeks after her termination; is that
21 correct?
22     MS. SCHWARTZ:  Objection, leading.
23     THE WITNESS:  Correct.
24

1       By Mr. Kaplan:
2       Q    And what else did she tell you with
3    regard to -- well, did she tell you that she had
4    viewed Miss Spizzirri's emails and forwarded them
5    on to herself?
6       MS. SCHWARTZ:  Objection, leading.
7       THE WITNESS:  Yes, she did.
8       By Mr. Kaplan:
9       Q    And to the extent that those admissions
10   are set forth in your report, they are in your
11   report because she actually said them?
12      MS. SCHWARTZ:  Objection, leading.
13      THE WITNESS:  Yes.
14      By Mr. Kaplan:
15      Q    And what, if any, questions did
16   ASA Podlasek ask you in your grand jury testimony
17   with respect to those admissions?
18      A    I don't recall him ever asking those
19   questions.
20      MR. KAPLAN:  That's all I have and then Chris
21   has some questions.
22
23
24

1                 EXAMINATION
2       By Mr. Wunder:
3       Q    Detective Martin, on Exhibit 28, which
4    is the summary of the forensic report, if you could
5    go to --
6       A    One second.
7       Q    -- what is the third page of the report
8    and it's CCSAO 3390 is the Bates stamp.
9       A    Okay.
10      Q    And you touched on this briefly.  The
11   third, fourth and fifth bullet points at the top
12   there, do you see those, discuss the URL for the
13   mail server and then Carol Spizzirri user name and
14   password, and then the information for someone with
15   the last name Gholar.
16      Do you see that there?
17      A    Yes.
18      Q    And why was it concerning to you when
19   you saw that in this report going back to when you
20   were investigating this?
21      A    Miss Melongo, being an IT administrator,
22   it doesn't make sense as to why she would be typing
23   this information into a URL.  If she needed
24   permission to go somewhere, she had it being the IT

1    administrator.
2       Q    Okay.  So in your opinion there was no
3    real legitimate reason for her to be accessing
4    these email accounts using their log-ins and
5    passwords as set forth here; is that correct?
6       MS. SCHWARTZ:  Objection, leading.
7       THE WITNESS:  That was my interpretation of
8    what -- what is shown here in the summary, yes.
9       By Mr. Wunder:
10      Q    Okay.  And then going to the Yahoo log,
11   which is Exhibit 37, the last page of that counsel
12   was asking you about these log-ins.
13      Do you see the last page there?
14      A    Yes.
15      Q    Okay.  And there is no log-in for
16   April 28th, correct?
17      A    Correct.
18      Q    Why did that not really concern you,
19   though, when you were reviewing this particular
20   log?
21      MS. SCHWARTZ:  Objection, leading.
22      THE WITNESS:  Only because it was logged -- it
23   looks like there was a log-in hours beforehand, and
24   no additional log-ins between the date of

1    April 27th and 29th.  Leading me to believe that
2    the computer -- the account had never been logged
3    out.
4       By Mr. Wunder:
5       Q    Okay.  And is that your same response
6    for the log-in on May 1, 2006?
7       MS. SCHWARTZ:  Objection, leading.
8       THE WITNESS:  Yeah, there is a log-in for
9    May 1st at 15:41:53 Greenwich Mean Time.
10      By Mr. Wunder:
11      Q    Okay.  So when you saw this log, it was
12   your belief that she was perhaps on-line at the
13   time of the intrusion and also the forwarding of
14   the emails; is that correct?
15      MS. SCHWARTZ:  Objection, leading.
16      THE WITNESS:  Yes, based upon the account
17   information and the IP address, yes.
18      By Mr. Wunder:
19      Q    And something else from your report that
20   didn't -- counsel didn't go into too much.
21      You had a conversation with some
22   representatives of the University of Missouri
23   -Kansas City regarding Melongo; is that correct?
24      A    Correct.

```
 1    Q    And what were the results of those
 2  conversations?
 3    A    I spoke to -- let's see.  I spoke to
 4  Professor Oguz, O-g-u-z, in reference to him
 5  receiving some emails from -- X-rated emails I
 6  believe they were that he was receiving, and he was
 7  reporting those to the campus police.  And
 8  Sergeant Leach of the -- L-e-a-c-h, of the U of M
 9  KC campus police department provided me a copy of
10  their report documenting the investigation, but
11  that these emails were sent to Professor Oguz.
12         He believed it to be Miss Melongo or
13  that Miss Melongo had some involvement but they
14  could never prove it because she -- the time that
15  these emails were sent, both her -- both
16  Miss Melongo and her roommate were logged in at the
17  same time.
18    Q    And what was the relevance of this
19  information to you in during your investigation?
20    A    Just the fact that past practice of
21  using email servers and sending these emails and
22  trying to -- because they were sent anonymously it
23  covered her tracks.
24    Q    And during your investigation did you
```

```
 1  come to the belief that Miss Melongo harbored some
 2  animosity toward the Save a Life Foundation?
 3    MS. SCHWARTZ:  Objection, leading.
 4    THE WITNESS:  I recall in one of the emails, I
 5  forgot which exhibit it was, where she says I'll
 6  expose you or something like that.
 7    By Mr. Wunder:
 8    Q    Okay.  Based on that email what, if any,
 9  conclusions did you draw from that?
10    A    Obviously she was unhappy with being
11  terminated and them rejecting her request to help,
12  so I took that as being she's -- she was upset.
13    Q    Okay.  And your report also details
14  conversations you had with Save a Life employees
15  where they indicated that she was calling and
16  contacting them to come in and perhaps fix the
17  computer system.
18         Do you recall that?
19    A    Yeah.  Also in that Exhibit 4, it shows
20  that Annabel called X4, which I'm taking to mean
21  four times, and stopped in three, showing that she
22  had made multiple attempts to contact people
23  there.
24    Q    Okay.  And what was the relevance of
```

```
 1  that information to you?
 2    A    Just in the sense she's trying to atone
 3  for something that she may have done or maybe even
 4  see how much damage or how the damage -- the impact
 5  onto their system and their day-to-day life,
 6  similar to like an arsonist watching a fire that he
 7  lit and being in the crowd as the fire's going.
 8    Q    Okay.  So that's sort of impression,
 9  something that your experience as a police officer
10  is kind of -- kind of taught you; --
11    MS. SCHWARTZ:  Objection.
12    By Mr. Wunder:
13    Q    -- is that correct?
14    MS. SCHWARTZ:  Objection, form.
15    THE WITNESS:  Just gut principles, yeah.
16    By Mr. Wunder:
17    Q    And also during the search warrant of
18  Miss Melongo's apartment, did you locate a password
19  list by her computer?
20    A    Yeah.  I believe that was one of the
21  items that we recovered was a list of -- I don't
22  know if it was user names or just names in general
23  along with their passwords.
24    Q    Okay.  And who else saw that document
```

```
 1  there?
 2    A    I don't recall if it was -- which one of
 3  the forensic examiners, whether Miss Monge or
 4  Miss Haqqani, but.
 5    Q    They were the ones who actually located
 6  it; is that correct?
 7    A    Yes.  I believe one of them saw it or
 8  found it, and then brought it to my attention
 9  after the -- after the fact, after they found it.
10    Q    And where was it located when they found
11  it?
12    A    It was next to one of the computers or
13  nearby one of the computers.  I don't recall which
14  one it was.
15    Q    And were you informed by Save a Life
16  that she -- that Melongo was supposed to turn in
17  all of her password lists, her user ID lists or
18  things of that effect upon her termination?
19    A    I believe we were tendered a document or
20  Miss Melongo's exit interview or something like
21  that that she had signed, and in that document
22  there was a statement similar to the effect of all
23  of the personal property and anything relating to
24  Save a Life be returned to them and that she was
```

1   not -- no longer to possess.
2     Q   Okay.  So is it your belief that she
3   should not have had this document at her apartment
4   at the time of the search warrant?
5     MS. SCHWARTZ:  Objection, leading.
6     THE WITNESS:  Yes.
7     MR. WUNDER:  I believe that's all I have.
8        Eric did you have anything else?  Yes,
9   that's all I have.
10    MS. BROWN:  No questions.
11    MS. NINFO:  I have, real quick.
12            EXAMINATION
13   By Ms. Ninfo:
14    Q   Detective Martin, did your investigation
15   of Miss Melongo's computer tampering allegations,
16   was that investigation based solely on the
17   statements made by Carol Spizzirri?
18    A   The entire investigation?
19    Q   Correct.
20    A   No.
21    Q   Okay.  Were the conclusions you drew as
22   a result of that investigation based solely on the
23   statements of Carol Spizzirri?
24    A   No.

1    Q   And were there allegations made by Carol
2   Spizzirri against Annabel Melongo that were never
3   further investigated by you?
4    A   Yes.
5    MS. NINFO:  Thank you.  I have nothing
6   further.
7    MS. SCHWARTZ:  I have just a few follow-ups.
8    I'm sorry, did you have any questions?
9    MS. CALLOWAY:  No questions.
10    MS. SCHWARTZ:  Just based on Mr. Wunder's
11   questioning, I have a few follow-up questions.
12        FURTHER EXAMINATION
13   By Ms. Schwartz:
14    Q   Detective Martin, related to your
15   conversations with Professor Oguz at Roosevelt
16   University, --
17    A   Uh-huh.
18    Q   -- did Mr. Oguz ever tell you why he
19   believed Miss Melongo was behind the X-rated
20   emails?
21    MR. WUNDER:  Was that Roosevelt?  You said
22   Roosevelt.  Is that Kansas City?
23    MS. SCHWARTZ:  I'm sorry, let me rephrase the
24   question.  I misspoke.

1   By Ms. Schwartz:
2    Q   Directing your attention to your
3   conversations with Professor Oguz at Kansas City,
4   Missouri - Kansas City, which is referred to in
5   your Exhibit 3 in which Mr. Wunder asked about --
6   which Mr. Wunder asked you some questions.
7        In your conversations with
8   Professor Oguz, did he ever explain to you why he
9   believed Miss Melongo was behind these X-rated
10   emails?
11    A   I don't recall him specifically stating,
12   no.
13    Q   Did you ask him why he believed
14   Miss Melongo had something to do with the X-rated
15   emails?
16    A   I don't recall.
17    Q   And based on your investigation you
18   determined that Kansas City, Missouri -- University
19   of Missouri - Kansas City could not determine if
20   Miss Melongo was behind those X-rated emails,
21   correct?
22    A   That's what the police report from
23   Sergeant Leach said, I believe.
24    Q   In fact, you found out that the

1   University of Missouri - Kansas City couldn't
2   determine if Miss Melongo was involved because it
3   could have been her roommate who had access to the
4   same internet system, correct?
5    A   All I know is that her roommate was
6   signed in the University's email server at the
7   exact time that these anonymous emails were sent,
8   both Miss Melongo and her roommate.
9    Q   Mr. Wunder asked you a few questions
10   about the email that Miss Melongo sent to
11   Miss Spizzirri on May 1, 2006 in which she said --
12   she called her a pathological liar and said I will
13   expose you.
14        Did you ever ask Miss Spizzirri or
15   Miss Melongo what I will expose you referred to?
16    A   I don't recall any, no.
17    Q   Did you ever consider that Miss Melongo
18   had information about Miss Spizzirri that
19   Miss Spizzirri had reason to cover up?
20    A   I don't recall, no.
21    Q   You just offered some testimony about
22   the meaning of Carol Spizzirri's email to I believe
23   it was Brian Salerno on May 1, 2006 in which she
24   said that Miss Melongo stopped in four times and

1 called three times.
2     A     Yes, Exhibit 4.
3     Q     That's Exhibit 4.
4     MR. KAPLAN:  Julia, I'm going to leave now.
5 Chris -- you have only a few more minutes but I
6 have to -- I have to run.  Take care.  Write down
7 your cell phone and I'll call you.
8     MS. SCHWARTZ:  I'm nearly done.
9     MR. KAPLAN:  Thank you, everybody.
10         (At this point in the deposition
11          Mr. Kaplan left the room.)
12 By Ms. Schwartz:
13     Q     So referring to Exhibit 5, Mr. Wunder
14 asked you some questions about the email that Carol
15 Spizzirri sent on May 1, 2006 in which she said
16 Annabel called X3 and stopped in three?
17     MR. WUNDER:  X4, sorry.
18     MS. SCHWARTZ:  X4.
19     MR. WUNDER:  You said X3, sorry.
20 By Ms. Schwartz:
21     Q     Annabel called in X4 and stopped in
22 three.  And you speculated that you thought
23 Miss Melongo might be trying to atone for
24 something; is that correct?

1     A     Yes.
2     Q     What's the basis for that -- that
3 thought that Miss Melongo was possibly trying to
4 atone for something?
5     A     Just in a sense that she's trying to
6 stay involved with them, trying to maybe
7 potentially get her job back, and being able to
8 rectify the problem in a sense where if I know what
9 the problem is, and I can fix it faster than
10 somebody who doesn't know.
11     Q     When we discussed this exhibit,
12 Exhibit 5 this morning, you testified that you
13 didn't recall if Miss Spizzirri in sending this
14 email was trying to accuse Miss Melongo of
15 tampering, wasn't that your testimony this
16 morning?
17     A     Correct.
18     Q     So why do you now think that
19 Miss Melongo was trying to atone for something when
20 she stopped in to Save a Life Foundation's
21 offices?
22     MR. WUNDER:  Well, I think you are asking two
23 different questions.  I think the one from this
24 morning, she is not accusing her of computer

1 tampering.  So I don't -- I don't know.  Sorry,
2 maybe it's just a --
3 By Ms. Schwartz:
4     Q     Well, this morning I asked you about the
5 same email, think we found who - Annabel called X4
6 and stopped in three.
7         This morning you testified that reading
8 that email you weren't sure if that meant that
9 Carol Spizzirri was accusing Miss Melongo of
10 anything; is that --
11     A     Correct.
12     Q     -- is that correct?
13     A     Correct.
14     Q     Now you are interpreting that same email
15 just a different -- the part of it about Annabel
16 calling X4 and stopping in three, correct?
17     A     Correct.
18     Q     And you are interpreting the meaning of
19 Miss Spizzirri's email on that day, correct?
20     A     I'm interpreting what's written here as
21 far as Miss Melongo's actions, of why she may be
22 reaching out to them.
23     Q     Did you consider the possibility that
24 Miss Melongo was reaching out to help because she

1 has expertise in IT-related areas?
2     A     Potentially, yes.
3     Q     Did you consider that when you did the
4 investigation?
5     A     Yes.
6     MS. SCHWARTZ:  I have nothing further.
7     MR. WUNDER:  All right.  We're all set.  Let's
8 go ahead and reserve, just because I think Eric
9 would want to, so we'll reserve signature.
10
11         DEPOSITION CONCLUDED
12
13
14
15
16
17
18
19
20
21
22
23
24

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3    ANNABEL MELONGO,          )
 4       Plaintiff,            )
                               )
 5       vs.         )No. 13-cv-04924
 6    ASA ROBERT PODLASEK, et al.,   )
 7       Defendants.           )
 8
 9         I, DETECTIVE WILLIAM MARTIN, being first
10   duly sworn, on oath, say that I am the deponent in
     the aforesaid deposition, and that I have read the
11   foregoing transcript of my deposition, consisting
     of pages 1 through 295, inclusive, taken on
12   May 8, 2018, at the aforesaid place and that the
     foregoing is a true and correct transcript of my
     testimony so given.
13
14            _____corrections were made
15            _____no corrections were made
16
17
18            _____
              DETECTIVE WILLIAM MARTIN
19
20   SUBSCRIBED AND SWORN TO
21   before me this _____ day
     of _____ A.D., 2018.
22
23   _____
     NOTARY PUBLIC
24
```

```
 1   STATE OF ILLINOIS )
                       )SS.
 2   COUNTY OF W I L L )
 3         I, MARYBETH ROESSLER, a notary public
 4   within and for the County of Will and State of
 5   Illinois, do hereby certify that DETECTIVE WILLIAM
 6   MARTIN personally appeared before me on May 8,
 7   2018, as a witness in a cause now pending and
 8   undetermined in the United States District Court,
 9   Northern District of Illinois, Eastern Division,
10   wherein Annabel Melongo is Plaintiff and ASA Robert
11   Podlasek, et al., are Defendants, No. 13-cv-04924.
12         I further certify that the said
13   DETECTIVE WILLIAM MARTIN was by me first duly sworn
14   to testify the truth, the whole truth and nothing
15   but the truth in the cause aforesaid before the
16   taking of his deposition; that the testimony given
17   was stenographically recorded in the presence of
18   said witness by me, and afterwards reduced to
19   typewriting, and that the foregoing is a true and
20   correct transcript of said testimony.
21         I further certify that there were present
22   at the taking of this deposition the aforementioned
23   counsel.
24         I further certify that I am not counsel
```

```
 1   for nor in any way related to any of the parties to
 2   this suit, nor am I in any way interested in the
 3   outcome thereof.
 4         IN TESTIMONY WHEREOF, I have hereunto set
 5   my hand and seal this 24th day of May, 2018.
 6
 7
 8
 9   _____
     NOTARY PUBLIC
     WILL COUNTY, ILLINOIS
10   CSR NO. 084-002864
     CSR Expires: May 31, 2019
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3    ANNABEL MELONGO,          )
 4       Plaintiff,            )
                               )
 5       vs.         )No. 13-cv-04924
 6    ASA ROBERT PODLASEK, et al.,   )
 7       Defendants.           )
 8
 9         THE CHANGES IN MY TESTIMONY ARE AS
     FOLLOWS:
10
11   PAGE_____ LINE_____
12   CHANGE_____
13   TO_____
14   REASON_____
15
16   PAGE_____ LINE_____
17   CHANGE_____
18   TO_____
19   REASON_____
20
21
22
               _____
23             DETECTIVE WILLIAM MARTIN
24
```

```
1    PAGE_____ LINE_____
2    CHANGE_____
3    TO_____
4    REASON_____
5
6    PAGE_____ LINE_____
7    CHANGE_____
8    TO_____
9    REASON_____
10
11   PAGE_____ LINE_____
12   CHANGE_____
13   TO_____
14   REASON_____
15
16   PAGE_____ LINE_____
17   CHANGE_____
18   TO_____
19   REASON_____
20
21
              _____
22            DETECTIVE WILLIAM MARTIN
23
24
```