# Exhibit 28

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   STATE OF ILLINOIS )
                      )   SS:
2   COUNTY OF COOK    )

3
            IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
4                COUNTY DEPARTMENT-CRIMINAL DIVISION

5   PEOPLE OF THE STATE OF ILLINOIS       )
                                          )
6              -vs-                        )   No. 10 CR 8092 01
                                          )
7   ANNABEL MELONGO                        )

8

9                              REPORT OF PROCEEDINGS had at the

10  hearing of the above-entitled cause before Steven J. Goebel, one

11  of the judges of said division, on the 19th day of June, A.D.,

12  2012:

13
             PRESENT:
14
             MS. ANITA ALVAREZ, Cook County State's Attorney by
15           MR. ROBERT PODLASEK, Assistant State's Attorney,

16                  on behalf of the People;

17           MS. ANNABEL MELONGO,

18                  pro se.

19

20

21

22  ELIZABETH A. REYES
    CERTIFIED SHORTHAND REPORTER
23  2650 SOUTH CALIFORNIA AVENUE
    CHICAGO, ILLINOIS 60608
24  ILLINOIS CSR LICENSE NO. 084-001910

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1                          I N D E X

2

3    PROCEEDINGS                                    PAGE

Argument, Defendant's motion to dismiss
4        by Defendant Melongo                        4
         by Mr. Podlasek                             6
5        by Defendant Melongo                       11

6    Ruling                                         13

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    THE CLERK:  Annabel Melongo.

2    DEFENDANT MELONGO:  Good morning, Judge.

3    THE COURT:  Good morning, Miss Melongo.  Good morning, Mr.

4  Podlasek.

5    MR. PODLASEK:  Good morning, Judge.  Judge, for the record

6  Robert Podlasek, P O D L A S E K, on behalf of the State.

7    DEFENDANT MELONGO:  For the record Annabel Melongo, pro se.

8    THE COURT:  All right.  Case is up for ruling today after I

9  previously had given everyone the new cites of the Federal

10  District Appeals Court case and Miss Melongo did file a new brief

11  in support of her position.  Mr. Podlasek, are you ready to go

12  forward?

13    MR. PODLASEK:  I am.

14    DEFENDANT MELONGO:  Actually I haven't filed --

15    MR. PODLASEK:  She didn't file any --

16    DEFENDANT MELONGO:  I mean those were just notes.  I prepared

17  my argument.

18    THE COURT:  Okay.

19    DEFENDANT MELONGO:  Okay.

20    THE COURT:  All right.  Go ahead briefly, Miss Melongo.  You

21  may argue.

22    DEFENDANT MELONGO:  How many minutes?

23    THE COURT:  I'll tell you when.  Go ahead.

24    DEFENDANT MELONGO:  Okay.  Because it's going to take like 15

MELONGO V. PODLASEK, et al., 13 C 4924
CCSAO 002391

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    minutes.

2         THE COURT:  How about five or ten?

3         DEFENDANT MELONGO:  Okay.  Yes.  Actually --

4         THE COURT:  Just hit your -- hit your main points please.

5         DEFENDANT MELONGO:  Okay.  Like you said Seventh Circuit

6    Federal Court of Appeal made its ruling in the case ACLU versus

7    Alvarez.

8         THE COURT:  All right.  For the record that's 211 U.S.

9    District Lexis 208 -- no.  That's the other one.  That's the wrong

10   cite.

11        MR. PODLASEK:  It's 2012 U.S. App. Lexis 9303.

12        THE COURT:  Yeah.  That was the one that was modified.  All

13   right.  The United States Court of Appeals per the Seventh Circuit

14   is Number 11-1286.

15        DEFENDANT MELONGO:  Yes.

16        THE COURT:  It's entitled American Civil Liberties Union of

17   Illinois, Plaintiff/Appellant, versus Anita Alvarez,

18   Defendant/Appellee.  Go ahead.  Proceed.

19        DEFENDANT MELONGO:  Okay.  At page like 23 they said that

20   "Audio and audiovisual recording are media of expression commonly

21   used for the preservation and dissemination of information and

22   idea and thus are included within the free speech and free press

23   guaranty of the First and 14th Amendment."  So that is one point

24   that's important, the First Amendment issue.

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       At Page 24 we have another point where it's stated, "The
2   eavesdropping statute operates at the front end of the speech
3   process by restricting the use of a common, indeed ubiquitous,
4   instrument of communication.  Restricting the use of an audio or
5   audiovisual recording device suppresses speech just as effectively
6   as restricting the dissemination of the resulting recording."
7       Then at Page 26 we have this:  "Audio and audiovisual
8   recording are communication technology and as such they enable
9   speech.  Criminalizing all non-consensual audio recording
10  necessarily limits the information that might be published or
11  broadcast whether to the general public or to a single family
12  member or friend and thus burden First Amendment right."
13      So at Page 28 we have this:  "Moreover, the First
14  Amendment goes beyond protection of the press and self-expression
15  of individual to prohibit government from limiting the stock of
16  information from which member of the public might draw."
17      And then at Page 39 we have this:  "Either way" -- Page
18  39.  You have it?
19  THE COURT:  Yes.  Go ahead, Miss Melongo.
20  DEFENDANT MELONGO:  "Either way it should be clear by now that
21  its effects on First Amendment interests is far from incidental.
22  To the contrary, the statute specifically targets a communication
23  technology; the use of an audio recorder, a medium of expression,
24  triggers criminal liabilities.  The law's legal sanction is

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    directly leveled against the expressive element of an expressive

2    activity. As such, the statute burdens First Amendment right

3    directly, not incidentally."

4         Last but not least, "The Illinois eavesdropping statute

5    obliterates the distinction between private and non-private by

6    criminalizing all non-consensual audio recording regardless of

7    whether the communication is private in any sense. If protecting

8    privacy is the justification for this law, the law must be closely

9    tailored to serve that interest in order to avoid trampling on

10   speech and press right."

11        So, Judge, verbatim everything I say in my amended

12   motion to dismiss has been echoed in this ruling. So at this

13   point I would ask you to dismiss the case because the Illinois

14   eavesdropping law is unconstitutional on its face on the First and

15   14th Amendment and as applied to the Defendant trampled on her

16   freedom of the press, speech, petition and due process right.

17        THE COURT: Thank you, Miss Melongo. Mr. Podlasek, you may

18   respond.

19        MR. PODLASEK: Just briefly, Judge. The court in this case

20   was very specific and they limited the question raised and the

21   question as the court stated, "The question is here whether the

22   First Amendment prevents Illinois prosecutors from enforcing the

23   eavesdropping statute against people who openly record police

24   officers performing their official duties in public." And it goes

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    on to state that, "Openly making audiovisual recordings of police

2    officers performing their duties in public places and speaking at

3    a volume audible to bystanders." That's the first issue that

4    needs to be looked at, Judge. That's what the court addressed in

5    this ruling.

6             They did not address privacy issues. What you have here

7    is the ACLU has three points that -- that were addressed by the

8    court. They were openly recording police officers performing

9    their public duties in a public place where third parties were

10   present, in this case the general public whether they were walking

11   by incidentally or standing around listening. They were speaking

12   loud enough for others in the public way to hear.

13            In Miss Melongo's case, she surreptitiously recorded a

14   private conversation, a conversation that but for that recording

15   would not have been audible to anybody else besides the speaker

16   and the listener. That was a telephone conversation, three of

17   them. That's what this case is about.

18        THE COURT: All right. Mr. Podlasek, though if the statute is

19   unconstitutional in part, how do -- how do you say a court of law

20   can hold it constitutional as to certain facts but not other

21   facts?

22        MR. PODLASEK: Well, first of all, Judge, in this case the

23   court did not specifically find that the statute was

24   unconstitutional. In this case -- their ruling was that -- I'm

7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    just going to read specifically what the last paragraph of this

2    ruling is.

3        THE COURT:  Go ahead.

4        MR. PODLASEK:  "For those reasons we conclude that the ACLU

5    has a strong likelihood of success on the merits of its First

6    Amendment claim.  The Illinois eavesdropping statute restricts an

7    expressive medium used for the preservation and dissemination of

8    information and ideas.  On the factual premise of this case, the

9    statute," the premise of this case, Judge, not Miss Melongo's

10    case, "the statute does not serve the important governmental

11    interest of protecting conversational privacy.  Applying the

12    statute in the circumstances alleged here," again this case, "is

13    likely unconstitutional," but they never at any point state that

14    this statute is unconstitutional.

15        THE COURT:  No.  They say --

16        MR. PODLASEK:  Here --

17        THE COURT:  Hold on.  They say it's likely unconstitutional.

18        MR. PODLASEK:  Likely but --

19        THE COURT:  So that's a Federal District Appeals Court telling

20    essentially me that this statute is likely unconstitutional.

21        MR. PODLASEK:  No.  A very narrow portion of the statute,

22    Judge, not the entire statute if that's the case.  The Court went

23    on to say in their ruling what they -- they did.  They --

24    "Accordingly we reverse and remand with the following

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    instructions:  The District Court shall reopen the case and allow

2    the amended complaint, enter a preliminary injunction enjoining

3    the State's Attorney from applying the Illinois eavesdropping

4    statute against the ACLU and its employees or agents who openly

5    audio record the audible communications of law enforcement

6    officers or others whose communications are incidentally captured

7    when the officers are engaged in their official public duties in

8    public places and conduct such further proceedings as are

9    consistent with this opinion."

10        They're not stating that everybody now has the right to

11   go ahead and start recording private conversations and then

12   publishing them.

13   THE COURT:  Which gets back to my first question.  If the

14   statute is unconstitutional in part, how could it be enforced?

15   Does it sense facts specific?

16   MR. PODLASEK:  In this case, Judge --

17   THE COURT:  Does the judge have to then decide what facts --

18   MR. PODLASEK:  That's exactly --

19   THE COURT:  -- there are before --

20   MR. PODLASEK:  That's exactly what this Court has to do.

21   THE COURT:  -- hearing whether or not the statute is

22   unconstitutional or not?

23   MR. PODLASEK:  In point of fact the court I think addresses

24   that issue, Judge.

9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      (Pause in proceedings)

2      MR. PODLASEK: The court does --

3      THE COURT: First of all, let me just say the last paragraph

4   you read from is the remedy the court gave --

5      MR. PODLASEK: That's correct.

6      THE COURT: -- because they found the statute is likely

7   unconstitutional so the remedy they gave is specifically against

8   the statute as its written right now.

9      MR. PODLASEK: It's specific --

10     THE COURT: So that shows that their remedy is modifying the

11  statute and disregarding the statute and they issued and granted

12  that injunction and said the State could not enforce that section

13  of the statute.

14     MR. PODLASEK: That section of the statute which applies to

15  police officers, Judge. That's not the section of the statute

16  that we're dealing with in this case. The court specifically

17  says --

18     DEFENDANT MELONGO: Judge, may I?

19     THE COURT: Not yet. Go ahead.

20     MR. PODLASEK: "That unlike the federal wiretapping statute

21  and the eavesdropping laws of most other states the gravamen of

22  the Illinois eavesdropping offense in this case is not the secret

23  interception or surreptitious recording of private communication."

24  That's -- that's not what they're addressing in this case.

10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    They're addressing the public recording of police officers, public

2    employees who are doing their duty publicly in a public place

3    where others can see them and hear them.  That's not what we have

4    factually in this case.

5         The court did not find the statute unconstitutional.

6    They didn't overturn the statute.  The statute still exists.  And

7    the only thing that they've done, the only remedy they gave the

8    ACLU was for that specific limited section of the statute which

9    goes strictly to not recording audio -- audio -- audible

10   recordings of police officers.  That's what they did.  In this

11   case, they were very, very careful to structure this in a very

12   limited way.

13        We don't believe that this case applies to Miss

14   Melongo's case and her case should go forward and the next step

15   should be a trial in this case, a retrial.

16   THE COURT:  All right.  Miss Melongo.  Go ahead.

17   DEFENDANT MELONGO:  Judge, I think Mr. Podlasek is living like

18   in his own world, you know, because everything -- first, the

19   Defendant conversation with Mrs. Taylor was not a private

20   conversation.  It was about the transcript being forged by Mrs.

21   Laudien who is a Court Reporter, so there was nothing private in

22   that conversation.  The conversation was not about Mrs. Taylor

23   husband.  It was not about her family.  It was not about something

24   she does outside of her professional occupation.  So it was a

11

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     public conversation discussing about a public matter and Mrs.

2     Taylor was speaking at a volume audible to any unassisted ear. It

3     was on the phone and she was in her office and she was speaking

4     loudly. So there was not a private conversation.

5              And the second issue is actually -- believe me, Judge, I

6     was actually surprised by this ruling myself because what the --

7     the Seventh Circuit Court of the state did it went beyond of

8     the -- the issue that ACLU asked them to address. ACLU come and

9     ask can we speak -- ACLU come with the issue of the willing

10    speaker. ACLU come with the issue of police officer but the

11    Seventh Circuit Federal Court of Appeal actually went beyond that.

12    It didn't even address the issue of a willing speaker. It went on

13    and addressed the -- the defect of the statute itself because it

14    say the statute -- what is wrong about the statute is that it

15    target a communication device regardless of whether the person

16    being recorded is a police officer or Pamela Taylor or anybody.

17    The -- the -- the Seventh Circuit Court of Appeal restricted its

18    judgment on the communication device itself.

19             Actually it went to the core of the matter. So it

20    really doesn't matter in this case who is being recorded as long

21    as the conversation is not private. So Mr. Podlasek bringing the

22    issue of police officer or whoever, it was not about that. It was

23    the substance of the law. The law should not target a

24    communication technology -- technology device. Thank you, Judge.

12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    THE COURT:  Okay.  On Page 47 of the United States District
2  Court of Appeals opinion, it does say, and I quote, "Of course,
3  the First Amendment does not prevent the Illinois General Assembly
4  from enacting greater protection for conversational privacy than
5  the common law tort remedy provides nor is the legislature limited
6  to using the Fourth Amendment reasonable expectation of privacy
7  doctrine as a benchmark, but by legislating this broadly by making
8  it a crime to audio record any conversation, even those that are
9  not in fact private, the State has severed the link between the
10  eavesdropping statute's means and its end.  Rather than attempting
11  to tailor the statutory prohibition to the important goal of
12  protecting personal privacy Illinois has banned nearly all audio
13  recording without consent of the parties including audio recording
14  that implicates no privacy interests at all."

15         The Court is relying on that language as well as the
16  Court does not believe that it can be severed out.  This case
17  obviously -- the appeals case from the Federal District Court
18  obviously dealt with recording police officers and not
19  specifically to the facts of this case; however, I do not believe
20  that the statute can be severed out like that.

21         And additionally this Court is adopting Judge Sacks'
22  opinion in the People of the State of Illinois versus Christopher
23  Drew.  Obviously not the facts 'cause the facts are different, but
24  I'm adopting Judge Stacks -- Judge Sacks', S A C K S, opinion in

13.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   10 CR 00046 in People of the State of Illinois versus Christopher

2   Drew.

3           And thus Miss Melongo's motion to declare the statute --

4   eavesdropping statute unconstitutional is granted.

5       DEFENDANT MELONGO:  Thank you, Judge.

6       MR. PODLASEK:  We're asking for a 30 day appeal date.

7       THE COURT:  Where are we with discovery on the other case

8   'cause we're going to now move this case to the forefront and get

9   the computer tampering case to trial.

10      MR. PODLASEK:  Judge, we're not going to be ready to go to

11  trial until sometime in November or October.  I have four major

12  trials that go right into September.

13      THE COURT:  No.  This case is going to have to go.

14      MR. PODLASEK:  Judge, there's no way I can get it ready.

15      DEFENDANT MELONGO:  Well, Judge, actually the case has a

16  pending motion to dismiss so Mr. Podlasek has to respond to that

17  motion to dismiss.

18      THE COURT:  All right.  Do you have a motion to dismiss on

19  that case?

20      DEFENDANT MELONGO:  Yes.  He has a pending motion to dismiss.

21                      (Pause in proceedings)

22      DEFENDANT MELONGO:  So I think Mr. Albukerk sent you the copy

23  of the motion.  I'm not going to rewrite the motion so you can

24  just answer that motion and then we argue it.

14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     MR. PODLASEK:  How about July 19th, Judge?  We will not be

2   answering that motion at that time.  We're asking for that date to

3   determine whether or not we're taking this up on appeal.

4     THE COURT:  Oh, I understand.  I fully expect obviously the

5   State's Attorney's office would appeal this matter.

6     MR. PODLASEK:  July --

7     THE COURT:  But that's not going to delay the other case.

8   We're still going --

9     MR. PODLASEK:  I understand that, Judge.

10    THE COURT:  We're still going to move with very -- speed to

11  get this done 'cause this is on the old case call.  How many of

12  your other cases are on the old case call?

13    MR. PODLASEK:  Roberto Rivera, July 9th.

14    THE COURT:  That's a bench trial.

15    MR. PODLASEK:  35 witnesses.  I have a second trial that month

16  before Judge Joyce, People versus Rafino.  Carl Ogelsby is being

17  set before Judge Linn in the middle of August and I have a Lake

18  County case that's going ahead on the 13th in August.

19    THE COURT:  I know, Mr. Podlasek, these cases can be somewhat

20  complicated.

21    MR. PODLASEK:  Well, Judge, it's more than that.

22    THE COURT:  We still need to move this along.

23    MR. PODLASEK:  It's a matter of gathering all the witnesses

24   for this case too.

15

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     THE COURT:  All right.  Well, start now and we're going to set

2     this obviously for Miss Melongo's motion to dismiss and we'll

3     hear -- we'll hear that on July 19th.  So it's going to be set

4     with for motion.

5         DEFENDANT MELONGO:  He hasn't answered the motion yet.

6         THE COURT:  I thought you said you had a motion on file.

7         DEFENDANT MELONGO:  The motion has been filed by the

8     Defendant.  Mr. Albukerk filed the motion so I don't want to

9     rewrite the motion so if he can just answer to the motion and then

10    we argue it.

11        THE COURT:  Right.  We're going to set it for argument.  You

12    filed it already or Mr. Albukerk filed it so we're setting it for

13    July 19th for argument.

14        DEFENDANT MELONGO:  For argument?

15        MR. PODLASEK:  For my response?  I haven't responded.

16        DEFENDANT MELONGO:  He hasn't responded.

17        THE COURT:  We can hear it.

18        MR. PODLASEK:  Pardon me?

19        THE COURT:  It's not that complicated.  What's your motion?

20        DEFENDANT MELONGO:  No, Judge.  He has to respond to it so

21    that I know how to make the argument.  I'm not going to argue out

22    of the blue.

23        THE COURT:  All right.  Both sides seem to want to -- to delay

24    this so we'll set it for State's response 'til July 19th.

16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      DEFENDANT MELONGO:  Okay.

2      MR. PODLASEK:  By agreement?

3      THE COURT:  By agreement.  There's a motion on file.

4      DEFENDANT MELONGO:  And, Judge, what about my I bond?  I want

5      my I bond reinstated because I was put on -- sent to jail and now

6      put on E.M. because I violated a condition of my I bond by

7      catching a new case but now that the case has been dismissed I

8      want the condition of my I bond reinstated.

9      THE COURT:  Mr. Podlasek.

10     MR. PODLASEK:  State, would object to that, your Honor.

11     DEFENDANT MELONGO:  On what basis?

12     THE COURT:  Well, you're not to address Mr. Podlasek, but

13     she's obviously asking me what basis.  Do you wish to address that

14     on July 19th as well?

15     MR. PODLASEK:  I'll address it then, Judge.

16     THE COURT:  All right.  If you have any response to that

17     motion, file that on July 19th.  Miss Melongo, we'll address all

18     those matters on July 19th.

19     DEFENDANT MELONGO:  So I still have to stay on E.M.?  So,

20     Judge, it really doesn't make sense.

21     THE COURT:  Well, she is on E.M.  All right.  I've just

22     declared the statute unconstitutional, in effect dismissing it.

23     State obviously has a right to appeal that.  They're going to make

24     that decision.  I fully expect them to appeal it.  Even if they

17

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    did appeal it, at this point I still could require you to remain

2    on E.M. during that period of time and that's what the State is

3    objecting to. So they're asking that you stay on E.M. while

4    that's pending. I don't see that there's a reason to do that.

5    DEFENDANT MELONGO: Yes.

6    THE COURT: Mr. Podlasek, I'm going to let you make your

7    argument now as to whether or not Miss Melongo --

8    DEFENDANT MELONGO: Yes.

9    THE COURT: -- should stay on E.M.

10    MR. PODLASEK: Judge, we're just going to make a general

11    objection.

12    THE COURT: Just a general objection? All right. I'm going

13    to strike E.M. I bond will be reinstated.

14    DEFENDANT MELONGO: Thank you, Judge.

15    THE COURT: And Miss Melongo will be off E.M.

16    MR. PODLASEK: Thank you.

17    THE COURT: Thank you.

18    DEFENDANT MELONGO: Judge, you don't have a ruling? You

19    should give us a ruling that I can read about your ruling.

20    THE COURT: No. I did not issue a written ruling. Mine is

21    oral only.

22         As I stated, I'm also adopting as it applies to the law

23    Christopher Drew and I'm basing it on the United States Appellate

24    District's opinion. So that's my ruling.

18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    DEFENDANT MELONGO:  Okay.

2    THE COURT:  Okay?

3    DEFENDANT MELONGO:  Thank you, Judge.  Should I have to call

4  E.M. or go to E.M.?

5    THE COURT:  Stuart, you have to prepare something for Miss

6  Melongo that she's off E.M.

7    THE CLERK:  Yes, I will do that.

8    THE COURT:  Thank you.

9    DEFENDANT MELONGO:  Thank you.

10                    (Which were all the proceedings had)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

19

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    STATE OF ILLINOIS )
                        )  SS:
 2    COUNTY OF COOK    )

 3              I, ELIZABETH A. REYES, Official Shorthand Reporter of

 4    the Circuit Court of Cook County, County Department-Criminal

 5    Division, do hereby certify that I reported in shorthand the

 6    evidence had in the above-entitled cause and that the foregoing is

 7    a true and correct transcript of all the evidence heard.

 8

 9

10                                    _____
                                      Official Shorthand Reporter
11                                    License No. 084-001910
                                      Circuit Court of Cook County
12                                    County Department
                                      Criminal Division
13

14    Dated this   20   day of June, 2012.

15

16

17

18

19

20

21

22

23

24
```

20

# Exhibit 29

**ENTERED**
JUDGE STEVEN J. GOEBEL-1954

JUL 26 2012

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS, )
)
    Plaintiff )
)
v. )        10 CR 8092
)
ANNABEL K. MELONGO, )
)        Honorable Steven J. Goebel
    Defendant. )        Judge Presiding
)

## ORDER

On June 19, 2012, this court granted defendant, Annabel K. Melongo's, motion to declare the Illinois Eavesdropping Statute (720 ILCS 5/14-2) unconstitutional. Defendant has now filed an emergency motion requesting that this court amend its June 19, 2012 order declaring the Illinois Eavesdropping Statute unconstitutional in order to comply with Supreme Court Rule 18.

## BACKGROUND

Defendant was charged with six counts of eavesdropping in violation of 720 ILCS 5/14-2(a)(1)(a)(3) (West 2008). Count I alleged that defendant "knowingly and intentionally used an eavesdropping device...for the purpose of recording a conversation...between [defendant] and Pamela Taylor...and without the consent of all parties such conversation." Counts II and III alleged the same acts against the same victim on two other occasions. Counts IV, V and VI alleged that defendant "used or divulged any information which she knew or reasonably should have known was obtained through the use of an eavesdropping device...an audio recording of a conversation between [defendant] and Pamela Taylor...knowing that such a recording was obtained without Pamela Taylor's consent."

CCSAO1800125

## PROCEDURAL HISTORY

On December 13, 2010, Judge Brosnahan denied defendant's motion to declare the Illinois Eavesdropping Statute to be unconstitutional based on *People v. Bearsley*, 115 Ill. 2d 47 (1986).

On November 14, 2011, defendant filed an amended motion to declare the Illinois Eavesdropping Statute unconstitutional, arguing that the Statute is unconstitutional on its face and as applied to defendant and violates substantive free speech, freedom of the press, petition and due process guarantees.

On February 14, 2012, the State filed a response in opposition to defendant's motion to declare 720 ILCS 5/14 unconstitutional, arguing that the Eavesdropping Statute: (1) does not violate the first amendment; (2) does not violate due process; and (3) is constitutional as applied to defendant.

On June 19, 2012, this court granted defendant's motion to declare the Illinois Eavesdropping Statute (720 ILCS 5/14-2) unconstitutional.

On June 22, 2012, defendant filed an emergency motion requesting that this court amend its June 19, 2012 order declaring the Illinois Eavesdropping Statute unconstitutional in order to comply with Supreme Court Rule 18.

## ANALYSIS

All statutes are presumed to be constitutional, and the burden of rebutting that presumption is on the challenger, who must clearly establish a constitutional violation. *People v. Greco*, 204 Ill. 2d 400 (2003).

The Illinois Eavesdropping Statue (the "Statute") provides:

"A person commits eavesdropping when he:

2

C00407

CCSAO1800126

(1) Knowingly and intentionally uses an eavesdropping device for the purpose of hearing and recording all or any part of any conversation or intercepts, retains, or transcribes electronic communication unless he does so (A) with the consent of all of the parties to such conversation or electronic communication ***

(2) Uses or divulges *** any information which he knows or reasonably should know was obtained through the use of an eavesdropping device."

720 ILCS 5/14 *et seq.*

The Statute allows citizens to make silent video of police officers performing their duties in public. 720 ILCS 5/14 *et seq.* However, the Statute elevates this conduct to a class 1 felony when a person audio records all or any part of any conversation unless all parties to the conversation give their consent. 720 ILCS 5/14 *et seq.* The Statute applies to all oral communication regardless of whether the communication was intended to be private. 720 ILCS 5/14 *et seq.* A party's consent may be inferred from the surrounding circumstances indicating that the party knowingly agreed to the surveillance, but express disapproval defeats any inference of consent. 720 ILCS 5/14 *et seq.*

In the instant case, defendant argues that the Statute is unconstitutional on its face because it violates her First Amendment and due process rights. Defendant also argues that the Statute is unconstitutional as applied to her because Ms. Pamela Taylor was a willing speaker during the conversation and defendant had the right to receive the information and record its protected content if she so wished.

The State asks this court to interpret the court's ruling in *ACLU* as a limited ruling. Specifically, the State contends that the *ACLU* court only addressed the section of the Statute that

CCSAO1800127

applies to audio recordings of police officers in a public place where others can see and hear them. The State argues that the facts in the instant case are distinguishable from those in *ACLU* and that the case should therefore move forward and go to trial.

As noted above, this court issued an oral opinion granting defendant's motion to declare the Illinois Eavesdropping Statute (720 ILCS 5/14-2) unconstitutional on June 19, 2012. In making this decision, this court relied on a recent decision by the United States Court of Appeals for the Seventh Circuit where the court held that the Statue was likely unconstitutional based on First Amendment considerations and the issues presented in that case. The court subsequently issued a preliminary injunction enjoining the State's Attorney from applying the Statute against the ACLU and its employees or agents. *ACLU v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012).

In *ACLU*, the court noted that the Statute is not closely tailored to the government's interest in protecting conversational privacy. Rather, "the gravamen of the Illinois eavesdropping offense is not the secret interception or surreptitious recording of a private communication. Instead, the statute sweeps much more broadly, banning *all* audio recording of *any* oral communication absent consent of the parties regardless of whether the communication is or was intended to be private." *Id.* at 595. The court went on to note that:

> "Of course, the First Amendment does not prevent the Illinois General Assembly
> from enacting greater protection for conversational privacy than the common-law
> tort remedy provides. Nor is the legislature limited to using the Fourth
> Amendment "reasonable expectation of privacy" doctrine as a benchmark. But by
> legislating this broadly – by making it a crime to audio record *any* conversation,
> even those that are *not* in fact private – the State has severed the link between the
> eavesdropping statute's means and its end. Rather than attempting to tailor the

C 0 0 4 0 9

CCSAO1800128

statutory prohibition to the important goal of protecting personal privacy, Illinois has banned nearly all audio recording without consent of the parties – including audio recording that implicates *no* privacy interests at all."

*ACLU*, 679 F. 3d at 606. Although the *ACLU* court did not find make a specific finding that the Statute was unconstitutional, the court concluded that the ACLU has a "strong likelihood of success on the merits of its First Amendment claims." *Id.* at 608.

Additionally, this court relied on Associate Judge Stanley Sacks' recent opinion in *People v. of the State of Illinois v. Christopher Drew*, case number 10 CR 00046 (March 2, 2012) where the court ruled that the Illinois Eavesdropping Statute was unconstitutional on its face and as applied to the defendant. *Drew*, at p. 12. In *Drew*, the court stated that, although the Statute clearly sets forth the prohibited physical acts, the fault of the Statute is that it does not require an accompanying culpable mental state or criminal purpose for a person to be convicted of a felony. *Drew*, at p. 11.

Here, this court also finds that the Statute appears to be vague, restrictive and makes innocent conduct subject to prosecution. At this stage, this court will not conduct any fact-finding nor will this court filter the Statute and deem certain sections to be constitutional and others to be unconstitutional.

Therefore, based on the foregoing discussion, this court finds that the Illinois Eavesdropping Statute is unconstitutional on its face and as applied to defendant pursuant to Illinois Supreme Court Rule 18. This court holds that the Illinois Eavesdropping Statute lacks a culpable mental state, subjects wholly innocent conduct to prosecution, and violates substantive due process under the Fourteenth Amendment to the United States Constitution (U.S. Const. Amend. XIV) and Article I, Section 2 of the Illinois Constitution (Ill. Const. 1970, Art. I, Sec. 2).

CCSAO1800129

This court further finds that the statute cannot be constructed in a manner that would preserve its validity, and judgment cannot rest upon an alternative ground. Notice under Illinois Supreme Court Rule 19 has been given.

## CONCLUSION

Based upon the foregoing discussion, this court grants defendant's motion to declare the Illinois Eavesdropping Statute (720 ILCS 5/14-2) unconstitutional.

ENTERED: _____

Hon. Steven J. Goebel
Circuit Court of Cook County
Criminal Division

DATED: _____7-26-12_____

CCSAO1800130

# Exhibit 30

1      STATE OF ILLINOIS )
                            )SS

2      COUNTY OF COOK     )

3

      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

4      CRIMINAL DEPARTMENT/CRIMINAL DIVISION

5                 THE PEOPLE OF THE      )
                 STATE OF ILLINOIS,   )

6                              )
                 PLAINTIFF,         )

7                              )
                 VS.               )10CR08092-01

8                              )
                 ANNABEL MELONGO,     )

9                              )
                 DEFENDANT.         )

10

11              REPORT OF PROCEEDINGS had at the

12     hearing of the above-entitled cause, before the

13     HONORABLE STEVEN GOEBEL, on the 19th day of July,

14     A.D., 2012.

15              PRESENT:

16              HON. ANITA M. ALVAREZ,
              State's Attorney of Cook

17              County, by MR. RICHARD PODLASEK,
              Assistant State's Attorney,

18              appeared on behalf of the People;

19              MS. MELANIE MELANGO,
              Pro se.

20

21

22

23     GAIL DUFF, C.S.R./R.P.R.,
      Official Court Reporter

24     Circuit Court of Cook County
      Criminal Division
                 SSS1

```
 1              THE COURT:  Annabel Melango.  Your name
 2      for the record?
 3              MR. PODLASEK:  Robert Podlasek,
 4      P-o-d-l-a-s-e-k.
 5              THE COURT:  Okay.  Ms. Melango is here.
 6              MS. MELANGO:  Hi.
 7              THE COURT:  All right.  Case was up for my
 8      ruling today.  Both sides know that I'm going to
 9      need another week, and I'll rule in another week.
10      If someone can't be here in a week, I can make it a
11      little bit longer so I'll officially file my written
12      ruling in a week.  My ruling is stayed until
13      obviously I file that written ruling.
14              MR. PODLASEK:  Would that be on the 26?
15              THE COURT:  How's that?
16              MS. MELANGO:  That's fine, Judge.
17              MR. PODLASEK:  If Ms. Melango wants to
18      come upstairs, and you'll let me take that back,
19      I'll copy, give her a copy and make a copy for
20      myself and the Court, of course, and I'll bring it
21      back down to your chambers, if there's no objection.
22              THE COURT:  All right.  I'm going to allow
23      it.
24              Ms. Melango, I think you were trying to
```

SSS2

```
 1    track me down earlier in the week, and I did receive

 2    a call from one of the clerks to reference some

 3    subpoenas.

 4              MS. MELANGO:  Judge, I was just trying to

 5    file subpoena, the one we did I don't know what

 6    cause but then actually I was kind of surprised that

 7    I went to the Clerk's Office just to file the

 8    subpoena, and I was told that because those

 9    subpoenas, they are made with my own phone --

10              THE COURT:  You have to file the regular

11    format of the subpoena.

12              MS. MELANGO:  Yes.  And that was actually

13    the issue because that's not the first time I filed

14    a subpoena and we discussed about the subpoena in

15    court and then -- any way the reason I was told they

16    told me because I'm a pro se I cannot file custom

17    subpoena.  I have to go by the subpoena and then I

18    told the clerk that was not the first time I filed a

19    subpoena in this format.

20              THE COURT:  I know but that's kind of

21    where we had trouble before, remember?  So I think I

22    mentioned to you that I would like you to file the

23    form of the regular court issued subpoenas that's

24    standard for -- my clerk is looking for some copies
```

1    for you right now and he'll make sure that you get

2    some of those.  But I want you to follow that format

3    and use those subpoenas.

4          MS. MELANGO:  Okay.  I know actually the

5    State was suppose to give us a Response to the

6    Motion to Dismiss.  You asked me the last time to

7    bring that Response today.

8          THE COURT:  Mr. Podlasek, what is the

9    status of that?

10         MR. PODLASEK:  Judge, I have not been able

11    to locate a copy of Mr. Albukerk's motion.  I

12    contacted Mr. Albukerk and talked to him.  He said

13    he'd look on his computer for copies of that motion,

14    and he'd be happy to email or fax me over one.

15       His memory of this was that it was filed

16    sometime in May or June of 2010 for Judge Brosnahan.

17       Judge Brosnahan's transcripts, which I don't

18    have with me, indicate sometime in July a ruling was

19    issued on both the motions.  There was a Motion to

20    Dismiss and then there was a motion regarding

21    computer experts and a Motion to Appoint

22    Mr. Albukerk, an attorney from the court system.  I

23    believe Ms. Melongo may recall that Motion was filed

24    so he could be paid that way.

1          Somewhere in there, I believe that Judge

2     Brosnahan did rule.  I can't make really anything

3     out of the half sheets.  There was a Motion that was

4     denied on the defense part that was not the motion

5     to dismiss so I need to find this motion for Mr.

6     Albukerk.

7          Sometime in that same period, we had filed

8     an eavesdropping case, and I don't know and Mr.

9     Albukerk does not remember, whether the motion was

10    towards the computer case or whether the motion was

11    directed towards the eavesdropping case.  It appears

12    that all the notes in the Clerk's files that

13    referenced both cases.   They were both before Judge

14    Brosnahan at that time.

15         So what I'm suggesting is that I can get

16    copies of transcripts for all the days.  I have most

17    of them right now, and I'll go through them and I'll

18    make copies for Ms. Melango and we'll bring them to

19    court; and in the meantime, Mr. Albukerk can mail me

20    what he has and I will take a look at them.

21              THE COURT:  Mr. Podlasek, go ahead.

22              MR. PODLASEK:  I do know that Ms. Melango

23    filed several Motions to Dismiss, amended Motion to

24    Dismiss.  Those were responded to so I've been

SSS5

1    unable to find, like I said, Mr. Albukerk's motion.

2         THE COURT:  All right.  Ms. Melango.

3         MS. MELANGO:  Judge, you are now reviewing

4    the case that is over six years old.  It has seen

5    five judges, four State's attorneys, four private

6    lawyers.  And I mean, I remember telling you once,

7    Judge, if you thought the computer tampering case

8    was bad -- the eavesdropping case was bad, wait

9    until we get to the computer tampering case.

10   Because the eavesdropping case in fact was created

11   to actually go away from the computer tampering

12   case.  And all the things that have happened in the

13   computer tampering case are now coming back.

14        Now, Mr. Podlasek comes to this courtroom,

15   tells you that Albukerk never gave him --

16        MR. PODLASEK:  Judge, I'm going to object.

17   I never said that.  I said he doesn't remember.

18        THE COURT:  Let her argue.  Go ahead.

19        MS. MELANGO:  Albukerk now coming to this

20   courtroom and tells you he never saw the Motion to

21   Dismiss.

22        Judge, that Motion to Dismiss is over three

23   years old.  When I was pro se, I heard that Motion

24   to Dismiss and when I was arrested for that Motion

SSS6

1       to Dismiss, I hired Mr. Albukerk to rewrite that

2       Motion to Dismiss and to argue it and to escape from

3       the computer tampering case I was charged with an

4       eavesdropping case.

5            And, Judge, if you want to put this case

6       back on this call at 1:00 p.m. I have a copy of a

7       fax stating that on July 4th Albukerk faxed that

8       motion to Mr. Podlasek.  I have the receipt of that

9       fax.  Everything is -- and then faxed him the

10      motion, that Motion to Dismiss.  He also faxed him

11      the discovery for the computer tampering case and he

12      also faxed a motion to request computer expert.

13           And also when I became pro se, when I was

14      released from Cook County Jail, I find out that

15      those motions were not appropriately filed.  They

16      were filed but they were filed in the Civic Division

17      and you wonder what, why Albukerk who has 18 years

18      as a criminal lawyer, he doesn't know when to

19      appropriately file a Motion to Dismiss.  So I came

20      here with a motion asking you to refile that motion

21      in the Criminal Division.  And Mr. Podlasek was also

22      aware of me filing that motion in the Criminal

23      Division.

24           Actually, I issued a nunc pro tunc, I issued

SSS7

1      and then you granted that motion and Mr. Podlasek

2      was aware of that motion so if Mr. Podlasek want a

3      motion, Judge, just put it at 1:00 p.m. call and I

4      bring him the motion and I also bring you the fax,

5      the receipt of the fax stating that the fax was sent

6      to Mr. Podlasek on July 4th, two days prior to the

7      motion being filed.  So for Mr. Podlasek to come

8      here and said he's not aware of the motion that

9      Judge Brosnahan had not ruled on that motion is not

10     true.  Because Judge Brosnahan had not ruled on the

11     motion that was even had.

12            THE COURT:  Maybe it never even made it to

13     the file.  It sounds like maybe he did possibly file

14     in the Daley Center and it perhaps never made it's

15     way here.

16            MR. PODLASEK:  Judge, here's a copy of the

17     Clerk's computer that says on 7-6-10, defendant

18     files a Motion to Dismiss.

19            MS. MELANGO:  Extend no --

20            MR. PODLASEK:  No, seven, July 6.

21            MS. MELANGO:  No.  The motion was filed

22     July 6.

23            MR. PODLASEK:  2010.

24            THE COURT:  Mr. Podlasek, the bottom-line

                          SSS8

1     is you want to --

2          MR. PODLASEK:  I just want a copy of it

3     that's all.

4          MS. MELANGO:  I can mail you a copy so

5     give me your e-mail address and I will mail you the

6     copy.  But that's not true that nowhere --

7          THE COURT:  Hold on.  I don't want you

8     guys fighting between yourselves here.   We are

9     still trying to find out whether or not the Motion

10    to Dismiss has been heard, is that right?

11         MS. MELANGO:  Yes, never been heard.

12         THE COURT:  Mr. Podlasek, you are saying

13    don't think it's been heard but you're not sure.

14         MR. PODLASEK:  I'm not sure, Judge.  If it

15    comes down to it, I'll go to see Judge Brosnahan and

16    ask her to look in her book.  The next court date

17    was 7-14.  It says a Motion to Dismiss was filed.

18    I'm not quite sure whether we have one being filed

19    on July 6th of 2010, but another --

20         THE COURT:  What I'm going to do is this,

21    I'm going to let you look into it until next

22    Thursday and then depending on what we find out on

23    next Thursday, we're going to set it down for what

24    it sounds like a probable hearing might have been

SSS9

1    filed.  I looked through the half sheets as well and

2    it does not look like it was ever ruled on.

3         MS. MELANGO:  It was never ruled.

4         THE COURT:  I will check with Judge

5    Brosnahan myself to see if she recalls ruling a

6    Motion to Dismiss.  I'm going to go by the half

7    sheet and I don't see where -- so I'm going to

8    assume at this point it's not been ruled on unless

9    you can show me to the contrary, I'm going to let

10   you have until Thursday to show me that.  I will

11   also check with Judge Brosnahan in between now and

12   next Thursday to see if it has been ruled on.

13        MS. MELANGO:  Judge, this is the

14   underlying issue, the motion is about relatively

15   civil --

16        MR. PODLASEK:  We responded to that motion

17   and it was argued when she filed it.

18        MS. MELANGO:  Judge, you didn't an answer

19   to that motion.  The motion is about civil conduct,

20   forgery of the State prosecuted (inaudible)

21   prosecutor to the misconduct.

22        So Mr. Podlasek for someone if Mr. Podlasek

23   was an ordinary prosecutor he would have come and

24   dismissed this case.  But he completely ignored that

1    motion and he now come, he doesn't know about the

2    motion.  That motion for Podlasek to receive it and

3    on Thursday I'm going to bring you the receipt of

4    the fax.

5         THE COURT:  I am going to allow you to,

6    and I already have to refile that motion.  I'd let

7    you on Thursday as well, Ms. Melango, to have any

8    and all motions relating to that Motion to Dismiss

9    ready to be filed on Thursday.  Give a keep to the

10   Court, give a copy to Mr. Podlasek.

11        MR. PODLASEK:  Can we do it in open court,

12   Judge?

13        THE COURT:  Yes, in open court, that's

14   fine.

15        MS. MELANGO:  Judge, that motion has

16   already been filed.

17        THE COURT:  Do you have anything else that

18   you want filed for the Motion to Dismiss.

19        MS. MELANGO:  No.  I said last time I'm

20   going to argue Mr. Albukerk's Motion to Dismiss

21   because you have to understand the story of that

22   motion, when I was pro se --

23        THE COURT:  We are not going to argue that

24   right now.  I just want to make sure that we have

SSS11

1 that copy of that Motion to Dismiss.

2   MR. PODLASEK:  Just so the Court is clear,

3 when I said I'm aware of this motion, I have some

4 pro se motions filed by Ms. Melongo.  You could

5 correct me if I'm wrong, please, there was Motion to

6 Dismiss and then an amended Motion to Dismiss that

7 you filed before Mr. Albukerk.

8   MS. MELANGO:  When I was pro se I filed a

9 motion to dismiss and then when you found out the

10 case was not going your way, I was charged with

11 eavesdropping and then I hired Mr. Albukerk to

12 rewrite the Motion to Dismiss the computer tampering

13 case and then he went on and filed that motion after

14 receiving the fax.

15   THE COURT:  Hold on, Ms. Melango, do you

16 have a copy of that motion?

17   MS. MELANGO:  Yes, I have a dope of the

18 motion.

19   THE COURT:  I want you to have a copy of

20 that motion and your amended motion on Thursday.

21 Okay?

22   MS. MELANGO:  Sure, Judge.

23   MR. PODLASEK:  What's the date on that?

24   THE COURT:  I can't read it it's too

1      faint.  Is this a copy of your motion?

2           MS. MELANGO:  Yes.

3           MR. PODLASEK:  This is the motion that I

4      am suppose to respond to.  I'll make a copy if you

5      want me to take it out of the court file.

6           THE COURT:  Sure.

7           MS. MELANGO:  Then you have motion for

8      computer expert and a Motion for Discovery.  Those

9      are the three motions Mr. Albukerk filed and faxed

10     them to you.

11          THE COURT:  I also have an amended motion

12     to dismiss indictment.

13          MS. MELANGO:  That's the motion when I was

14     pro se.  That's the motion when I was arrested and

15     sent to jail.  I hired Mr. Albukerk to rewrite the

16     motion and then I was charged with eavesdropping.

17          MR. PODLASEK:  This motion was filed

18     July 6.

19          THE COURT:  That's the motion we are

20     dealing with.

21          MS. MELANGO:  That was one filed in the

22     civil department and then I issued nunc pro tunc.

23          THE COURT:  It made it to the file.  We'll

24     go by agreement July 26, a week from today.  I will

1    have my written ruling and we will set this down for

2    argument.

3            MR. PODLASEK:  I won't be ready for

4    argument on that day.  I'm starting a trial.

5            THE COURT:  I said we are going to set it

6    down.

7            MR. PODLASEK:  You want me to file a

8    written response?

9            THE COURT:  That's up to you.

10           MR. PODLASEK:  Okay.

11           THE COURT:  By agreement, July 26.  If you

12   would make these copies and bring them back.

13           MS. MELANGO:  Judge, this is just a

14   request.  Judge, I just have a request because I

15   will eventually add to this motion and this motion

16   is going to be like putting the case marginally the

17   same because he called me, Judge Hibbler called me

18   perjury, so I would ask if you can let me obtain a

19   motion to suppress because I have never done arguing

20   a motion and evidentiary motion if I can obtain some

21   of your Motion to Suppress to know how to go about

22   arguing a motion like this.

23           THE COURT:  This is a Motion to Dismiss.

24           MS. MELANGO:  Eventually, I'm going to

SSS14

```
 1          subpoena Detective Martin to come to the stand,

 2          that's why I am asking you if have some similar

 3          motion like motion to suppress evidence or

 4          evidentiary motion so I can obtain and see how it's

 5          being done.

 6                    THE COURT:  You're welcome to come into

 7          the courtroom at any time and watch what goes on.  I

 8          don't want anything exact there's a difference

 9          between a motion to quash arrest and suppress which

10          is fairly routine here at 26th & California as

11          opposed to what you are alleging which is a Motion

12          to Dismiss based on perjury, apparently is what your

13          grounds are.  Those I do not have any of those

14          pending so that's really more along the lines of a

15          Motion to Dismiss the Indictment.

16                    MS. MELANGO:  I just want to know how you

17          put somebody on the stand like a police officer and

18          how you question him that's it so any motion to

19          suppress --

20                    THE COURT:  Usually on a Motion to Dismiss

21          Indictment so I don't know what your grounds are.  I

22          haven't reviewed your motion but usually on a Motion

23          to Dismiss Indictment, it's done by presenting

24          factual documents as far as either parties stipulate
```

SSS15

```
 1      to police reports, stipulating to grand jury

 2      testimony, or something like that.  That's how it's

 3      usually done, but I don't know how you wish to

 4      proceed and I'm not precluding you at this time for

 5      proceeding in any way you want subject to the normal

 6      Rules of Evidence of course because I'm not sure

 7      exactly how you wish to proceed and what your exact

 8      arguments are.

 9              MS. MELANGO:  I am going to subpoena

10      Detective Martin to come to the stand, and I am

11      going to question him while on the stand.

12              MR. PODLASEK:  During trial, Judge?

13              THE COURT:  No.  She's talking about for

14      her motion.

15              MS. MELANGO:  For arguing the motion to

16      dismiss.

17              MR. PODLASEK:  To dismiss?

18              MS. MELANGO:  Yes.

19              THE COURT:  We can argue this a week from

20      now because we're not going to set this down for

21      argument until July 26.  On that day, we'll set it

22      down for a hearing for either testimony or simple

23      argument.

24              Have your responses ready at that time, Mr.
```

SSS16

1  Podlasek.

2     MS. MELANGO: How do I know -- can I asked

3  your clerk things like motion to suppress and stuff?

4     THE COURT: Sure.

5     MS. MELANGO: Thank you.

6     (WHEREUPON, the above-entitled cause

7     was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

2      STATE OF ILLINOIS        )
                                )  SS
3      COUNTY OF COOK           )

4

5      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

6      CRIMINAL DEPARTMENT/CRIMINAL DIVISION

7

8              I, Gail Duff, an Official Court

9      Reporter for the Circuit Court of Cook County,

10     Criminal Department, do hereby certify that I

11     reported in shorthand the proceedings had at the

12     hearing of the above-entitled cause; that I

13     thereafter caused the foregoing to be transcribed

14     into typewriting, which I hereby certify to be a

15     true and correct transcript of the proceedings.

16

17     _____

18     Official Court Reporter

19              084-003875

20     Dated this 12th

21     of December 2012.

22

23

24

                        SSS18

# Exhibit 31

STATE OF ILLINOIS )
               ) SS
COUNTY OF COOK )

FILED

AUG 09 2012

DOROTHY BROWN
CLERK OF CIRCUIT COURT

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT-CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS )
        Plaintiff-Appellant, )     Case No. 10CR-8092
               )
               )
        vs. )
               )     Honorable
ANNABEL MELONGO, )     Steven J. Goebel,
        Defendant-Appellee. )     Trial Judge
               )

NOTICE OF APPEAL

An appeal is taken from the order or judgment described below:

1. Court to which appeal is taken: **Supreme Court of Illinois**

2. Name of Appellee's Attorney and address to which notices shall be sent:

    Name: Annabel Melongo, *Pro Se*
    Address: P.O. Box 5658
             Chicago, IL 60680

    If Appellee is indigent and has no attorney; does he want one appointed? _____

3. Name and address of Appellant's attorney on appeal:

    Name: Cook County State's Attorney
    Address: 309 Richard J. Daley Center
              Chicago, Illinois 60602
    Phone: 312-603-5496

4. Date of Judgment of Order: July 26, 2012 √

5. Appeal is taken from: Trial court's ruling that the Illinois Eavesdropping Statute, 720 ILCS 5/14, is unconstitutional.

ROBERT PODLASEK
Assistant State's Attorney

Notice filed date: 8-9-12
Appeal check date: 8-28-12

C00245

A29

CCSAO1800367

# Exhibit 32

6 N.E.3d 120, 379 Ill.Dec. 43

2014 IL 114852
Supreme Court of Illinois.

The PEOPLE of the State of Illinois, Appellant,
v.
Annabel MELONGO, Appellee.

No. 114852.
|
March 20, 2014.

**Synopsis**
**Background:** Defendant was charged for violations of eavesdropping statute arising out of her recording and publication of telephone conversations with court reporter's supervisor. After first trial ended in mistrial, defendant filed motion to declare statute unconstitutional. The Circuit Court, Cook County, Steven J. Goebel, J., 2012 WL 8016610, declared eavesdropping statute to be unconstitutional on its face and as applied. People appealed.

**Holdings:** The Supreme Court, Garman, C.J., held that:

defendant's First Amendment challenge to eavesdropping statute was adequately preserved for appellate review;

defendant did not waive First Amendment overbreadth challenge to eavesdropping statute simply by arguing alternative, statutory basis for dismissal;

statute making it crime to knowingly and intentionally use eavesdropping device to hear or record all or any part of any conversation, unless done with consent of all parties to conversation or authorized by court order, was unconstitutionally overbroad on its face; and

statute making it crime for defendant to publish recorded conversations amounted to naked prohibition against disclosure that was unconstitutionally overbroad on its face.

Affirmed.

**West Codenotes**

**Held Unconstitutional**
S.H.A. 720 ILCS 5/14–2(a)(1, 3)

**Attorneys and Law Firms**

**\*122** Lisa Madigan, Attorney General, Springfield, and Anita M. Alvarez, State's Attorney, Chicago (Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People.

Gabriel Bankier Plotkin, Daniel M. Feeney and Alexandra K. Block, Miller Shakman & Beem LLP, Chicago, for appellee.

Harvey Grossman and Adam Schwartz, Roger Baldwin Foundation of ACLU, Inc., Chicago, and Richard J. O'Brien and Sean Siekkinen, Sidley Austin LLP, Chicago, for amicus curiae American Civil Liberties Union of Illinois.

**OPINION**

Chief Justice GARMAN delivered the judgment of the court, with opinion.

**\*\*45** ¶ 1 Defendant Annabel Melongo was charged with violations of section 14–2 of the Criminal Code of 1961 (720 ILCS 5/14–2 (West 2008)), which defines the offense of eavesdropping. The circuit court of Cook County found the statute unconstitutional. Thus, appeal lies directly to this court. Ill. S.Ct. R. 302 (eff. Oct. 4, 2011).

¶ 2 We allowed the American Civil Liberties Union of Illinois to file a brief *amicus curiae* pursuant to Supreme Court Rule 345. Ill. S.Ct. R. 345 (eff. Sept. 20, 2010).

¶ 3 For the following reasons, we affirm the judgment of the circuit court.

**¶ 4 BACKGROUND**

¶ 5 Defendant was charged with computer tampering in an unrelated case. The arraignment was set for June 18, 2008. The docket sheet, the judge's half sheet, and the court call sheet for that date indicate that defendant was not in court and that the arraignment did not take place.

¶ 6 Defendant later obtained an official court transcript of the June 18, 2008, proceeding, which stated that she was present and was arraigned on that date. Her efforts to have the court reporter change the transcript were unsuccessful. The court reporter referred defendant to her supervisor, Pamela Taylor, the Assistant Administrator of the Cook County Court Reporter's Office, Criminal Division. In their first telephone conversation, Taylor explained to defendant that any dispute over the accuracy of a transcript should be presented to the judge for resolution.

¶ 7 Defendant surreptitiously recorded three subsequent telephone conversations with Taylor and posted the recordings and **46 *123 transcripts of the conversations on her website. She was charged with three counts of eavesdropping (720 ILCS 5/14–2(a)(1) (West 2008)), and three counts of using or divulging information obtained through the use of an eavesdropping device (720 ILCS 5/14–2(a)(3) (West 2008)).

¶ 8 In a motion to dismiss, she stipulated that she recorded the conversations and posted them on her website, but claimed her conduct was permitted under an exception to the statute. Specifically, she claimed she was allowed to record a conversation "under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person * * * and there is reason to believe that evidence of the criminal offense may be obtained by the recording." 720 ILCS 5/14–3(i) (West 2008).

¶ 9 The State argued that the exception did not apply in this case because the court reporter whom defendant accused of creating a forged transcript was not a party to the recorded conversations. Thus, the State asserted, defendant should not be allowed to claim that the exception of section 14–3(i) applied to her recordings of Taylor. The trial court granted the State's motion *in limine* to preclude defendant from raising this defense at trial.

¶ 10 In her motion to reconsider, defendant argued that Taylor was a party to a criminal conspiracy and, thus, the statutory exception should be available to her at trial. The trial court denied her motion to reconsider.

¶ 11 Defendant then filed a motion to dismiss on the basis that the eavesdropping statute is unconstitutional under the due process clauses of both the Illinois and United States Constitutions because there is "no rational relationship between requiring two party consent and a legitimate state interest." Two days later, this motion was argued and denied.

¶ 12 The matter proceeded to trial. The jury was unable to reach a unanimous verdict, and the court declared a mistrial. The matter was assigned to a second judge.

¶ 13 Thereafter, defendant filed a *pro se* motion to declare the statute unconstitutional, raising first amendment and due process claims. The State filed a response arguing that the statute does not violate either the first amendment or due process and that it is constitutional as applied to defendant.

¶ 14 After a hearing on the motion, the court found the statute both facially unconstitutional and unconstitutional as applied to defendant. The court's subsequent written order stated that "the statute appears to be vague, restrictive and makes innocent conduct subject to prosecution." Further, the court observed, the statute "lacks a culpable mental state, subjects wholly innocent conduct to prosecution, and violates substantive due process" under both the United States and Illinois Constitutions. In reaching this decision, the circuit court relied in part on *American Civil Liberties Union v. Alvarez,* 679 F.3d 583 (7th Cir.2012) (finding that plaintiff had a strong likelihood of success in its first amendment claim that the Illinois eavesdropping statute was unconstitutional as applied to its plan to record police officers performing their duties in public places).

¶ 15 ANALYSIS

¶ 16 Section 14–2 of the Criminal Code provides that:

"(a) A person commits eavesdropping when he:

(1) Knowingly and intentionally uses an eavesdropping device for the purpose **47 *124 of hearing or recording all or any part of any conversation or intercepts, retains, or transcribes electronic communication unless he does so (A) with the consent of all of the parties to such conversation or electronic communication or (B) in accordance with Article 108A or Article 108B of the 'Code of Criminal Procedure of 1963', approved August 14, 1963, as amended; or

People v. Melongo, 2014 IL 114852 (2014)

6 N.E.3d 120, 379 Ill.Dec. 43

* * *

(3) Uses or divulges, except as authorized by this Article or by Article 108A or 108B of the 'Code of Criminal Procedure of 1963', approved August 14, 1963, as amended, any information which he knows or reasonably should know was obtained through the use of an eavesdropping device." 720 ILCS 5/14–2 (West 2008).

¶ 17 As appellant, the State argues in its opening brief that the statute does not violate due process on its face because it does contain a culpable mental state requiring both knowledge and intent. The State further argues that the statute is not unconstitutional as applied to defendant because she admits having recorded and divulged the contents of the conversations knowingly and intentionally. The State's opening brief does not address defendant's first amendment claim, stating that although the circuit court cited extensively in *Alvarez,* a first amendment case, the court "relied exclusively on the substantive due process clause" in reaching its conclusion.

¶ 18 Defendant frames four issues. She argues that section 14–2(a)(1), the "recording provision," is unconstitutional on both first amendment and due process grounds; similarly, she argues that section 14–2(a)(3), the "publishing provision," also violates the first amendment and due process. In the alternative, she argues that if the statute is not found unconstitutional on its face, it is nevertheless unconstitutional as applied to her recording of a public official who was acting in his official capacity when she engaged in the recorded conversation.

¶ 19 The State responds to the first amendment arguments in its reply brief, arguing that the statute is a content-neutral restriction on the time, place, and manner of the exercise of first amendment rights and that it is narrowly tailored. However, the State reiterates its position that no first amendment issue is at stake.

¶ 20 The constitutionality of a statute is a question of law that we review *de novo. People v. Madrigal,* 241 Ill.2d 463, 466, 350 Ill.Dec. 311, 948 N.E.2d 591 (2011). We presume that a statute is constitutional and, thus, the party challenging its constitutionality bears a burden of clearly establishing that the statute violates the constitution. *People v. Kitch,* 239 Ill.2d 452, 466, 347 Ill.Dec. 655, 942 N.E.2d 1235 (2011). In addition, if it is reasonably

possible to construe the challenged statute in a manner that preserves its constitutionality, we have a duty to do so. *People v. Hollins,* 2012 IL 112754, ¶ 13, 361 Ill.Dec. 402, 971 N.E.2d 504.

¶ 21 As an initial matter, we reject the State's suggestion that the trial court's ruling in the present case was based entirely on due process. The defendant's motion raised a first amendment challenge. The trial court gave careful consideration and significant weight to the Seventh Circuit's opinion in *Alvarez,* a first amendment case. Finally, in its written order, the trial court specifically described the statute as "vague" and noted that it subjects innocent conduct to prosecution; in effect, the court found the statute to be overbroad. While vagueness and overbreadth may be considered in a due process challenge, they are also properly applied **\*125  \*\*48** in the first amendment context. See, *e.g., People v. Sharpe,* 216 Ill.2d 481, 527, 298 Ill.Dec. 169, 839 N.E.2d 492 (2005) (if first amendment rights are not at stake in a vagueness challenge, "due process is satisfied if: (1) the statute's prohibitions are sufficiently definite, when measured by common understanding and practices, to give a person of ordinary intelligence fair warning as to what conduct is prohibited, and (2) the statute provides sufficiently definite standards for law enforcement officers and triers of fact that its application does not depend merely on their private conceptions" (internal quotation marks omitted)); *City of Chicago v. Pooh Bah Enterprises, Inc.,* 224 Ill.2d 390, 442, 309 Ill.Dec. 770, 865 N.E.2d 133 (2006) ("[W]here a law threatens to inhibit the exercise of constitutionally protected rights such as those protected under the first amendment, the Constitution demands that a more stringent vagueness test be applied. In such a scenario, a statute is void for vagueness if it reaches a substantial amount of constitutionally protected conduct.").

¶ 22 Although the trial court did not specifically invoke the first amendment, it stated that it was relying on the Seventh Circuit's analysis in *Alvarez.* In addition, the court's findings of vagueness and overbreadth are consistent with both first amendment and due process grounds. We find that the first amendment issue is sufficiently implicated by the circuit court's ruling to permit consideration of defendant's first amendment argument here.

¶ 23 The State also argues that defendant should be barred from raising a constitutional challenge to the

statute because her constitutional claims are inconsistent with her defense at trial. At trial, she admitted that she made the recordings but argued she was permitted to do so by the statutory exception permitting an individual to record a conversation "under reasonable suspicion that another party to the conversation is committing, is about to commit, or has committed a criminal offense against the person * * * and there is reason to believe that evidence of the criminal offense may be obtained by the recording." 720 ILCS 5/14–3(i) (West 2008). The State asserts that because defendant admits that she made the recordings and that she was aware at the time that her conduct was a crime if not justified by the statutory exception, she cannot now claim that the statute is vague or overbroad.

¶ 24 Defendant raised a due process challenge before the mistrial, and she raised both due process and first amendment challenges after the mistrial. The State does not explain why a criminal defendant may not argue in the alternative that the statute under which she was charged is unconstitutional and, failing that, that an exception to the statute excused her conduct. In any event:

"Overbreadth is a judicially created doctrine which recognizes an exception to the established principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. Under the doctrine, a party being prosecuted for speech or expressive conduct may challenge the law on its face if it reaches protected expression, even when that person's own activities are not protected by the first amendment. The reason for this special rule in first amendment cases is apparent: an overbroad statute might serve to chill protected speech. A person contemplating protected activity might be deterred by the fear of prosecution. The doctrine reflects the conclusion that **49 *126 the possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted." *Pooh Bah,* 224 Ill.2d at 435–36, 309 Ill.Dec. 770, 865 N.E.2d 133.

¶ 25 Thus, we find it appropriate to reach the merits of defendant's first amendment claim.

¶ 26 On the same day that oral arguments were heard in the present case, the court heard arguments in the case of *People v. Clark,* 2014 IL 115776, 379 Ill.Dec. 77, 6 N.E.3d 154. Although the cases were not consolidated, they involved similar issues, including a first amendment challenge to section 14–2(a)(1) of the eavesdropping statute, which defendant describes as the "recording provision." Our analysis in the present case is guided by our holding in *Clark.*

¶ 27 Defendant suggests that the statute is subject to intermediate scrutiny; the State does not specifically address the constitutional standard, but does assert that the statute is content-neutral, which invites intermediate scrutiny. *Holder v. Humanitarian Law Project,* 561 U.S. 1, 5–6, 130 S.Ct. 2705, 2723, 177 L.Ed.2d 355 (2010). A content-neutral regulation will be sustained under the first amendment if it advances important governmental interests unrelated to the suppression of free speech and does not substantially burden more speech than necessary to further those interests. *Turner Broadcasting System, Inc. v. Federal Communications Comm'n,* 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997); *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

¶ 28 The State and defendant agree that the purpose of the eavesdropping statute is to protect conversational privacy. However, the statute as now written deems all conversations to be private and, thus, not subject to recording absent consent, even if the participants have no expectation of privacy. The State argues that the choice between a law that might be over-inclusive and one that might be under-inclusive is a policy matter for the legislature, not the courts.

¶ 29 When that policy criminalizes a wide range of innocent conduct, however, it cannot be sustained. The statute criminalizes the recording of conversations that cannot be deemed private: a loud argument on the street, a political debate on a college quad, yelling fans at an athletic event, or any conversation loud enough that the speakers should expect to be heard by others. None of these examples implicate privacy interests, yet the statute makes it a felony to audio record each one. Judged in terms of the legislative purpose of protecting conversational privacy, the statute's scope is simply too broad. *Clark,* 2014 IL 115776, ¶¶ 22–23, 379 Ill.Dec. 77, 6 N.E.3d 154.

¶ 30 Further, even when the recorded conversation is held in private, the statute does not distinguish between

open and surreptitious recording. The statute prohibits any recording of a conversation absent the consent of all parties. Thus, rather than knowing that he or she can proceed legally by openly recording a conversation so that all parties are aware of the presence of an operating recording device, the individual must risk being charged with a violation of the statute and hope that the trier of fact will find implied consent. See *People v. Ceja,* 204 Ill.2d 332, 349–50, 273 Ill.Dec. 796, 789 N.E.2d 1228 (2003) (holding that consent under the eavesdropping statute may be express or implied; implied consent is consent in fact, inferred from the surrounding circumstances that indicate the individual knowingly agreed to the recording). **127 **50 *Clark,* 2014 IL 115776, ¶ 22, 379 Ill.Dec. 77, 6 N.E.3d 154.

¶ 31 We conclude as we did in *Clark,* 2014 IL 115776, 379 Ill.Dec. 77, 6 N.E.3d 154, that the recording provision of the eavesdropping statute (720 ILCS 5/14–2(a)(1) (West 2008)), burdens substantially more speech than is necessary to serve a legitimate state interest in protecting conversational privacy. Thus, it does not survive intermediate scrutiny. We hold that the recording provision is unconstitutional on its face because a substantial number of its applications violate the first amendment. See *United States v. Stevens,* 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) (a statute may be invalidated as overbroad if a substantial number of its applications are unconstitutional when judged in relation to the statute's legitimate sweep).

¶ 32 Defendant raises an additional claim that is not present in *Clark.* She argues that what she describes as the "publishing provision" of the statute (720 ILCS 5/14–2(a)(3) (West 2008)), is also unconstitutional. The plain language of this provision criminalizes the publication of any recording made on a cellphone or other such device, regardless of consent. This alone would seem to be sufficient to invalidate the provision.

¶ 33 The State defends the provision in its brief by noting that Illinois Pattern Jury Instructions on this offense "read in" a requirement that the recording being divulged have been obtained in violation of the recording provision of section 14–2(a)(1). See Illinois Pattern Jury Instructions, Criminal, 12.03X (4th ed.2000). Further, the State argues that defendant is not prohibited from making public the content of the conversation she recorded, she is merely prohibited from "preserving the speech of the other person

in the precise manner that she would prefer," *i.e.,* a recording.

¶ 34 At oral argument, however, the State conceded that if the recording provision is found unconstitutional, the publishing provision must also fail, in light of the Supreme Court's decision in *Bartnicki v. Vopper,* 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). In *Bartnicki,* the Court considered the constitutionality of state and federal statutes prohibiting the intentional disclosure of illegally intercepted communications that the disclosing party knew or should have known were illegally obtained. The Court observed that the "naked prohibition against disclosures" in the challenged statutes was "fairly characterized as a regulation of pure speech" by an innocent party. *Id.* at 526, 121 S.Ct. 1753. The Court held that under the first amendment, the state may not bar the disclosure of information regarding a matter of public importance when the information was illegally intercepted by another party who provided it to the disclosing party. *Id.* at 535, 121 S.Ct. 1753.

¶ 35 Because we have held that the statutory provision criminalizing defendant's recording of the three conversations is unconstitutional on its face, she is in the position of an innocent party who is subject to a "naked prohibition against disclosure." It matters not whether the contents of the recorded conversations were a matter of public interest because, unlike in *Bartnicki,* the recordings cannot be characterized as illegally obtained.

¶ 36 We hold that defendant cannot be constitutionally prosecuted for divulging the contents of the conversations she recorded, just as the media defendants in *Bartnicki* could not be prosecuted for disclosing recorded communications. We, therefore, find the publishing provision to be overbroad as well.

*128 **51 ¶ 37 CONCLUSION

¶ 38 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 39 Circuit court judgment affirmed.

Justices FREEMAN, THOMAS, KILBRIDE, KARMEIER, BURKE, and THEIS concurred in the judgment and opinion.

**All Citations**

2014 IL 114852, 6 N.E.3d 120, 379 Ill.Dec. 43

---

**End of Document**                         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 33

STATE OF ILLINOIS      )
                            )    SS
COUNTY OF COOK       )

The MAY 2008 Grand Jury of the
Circuit Court of Cook County

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oath present that from on or about April 28, 2006 and continuing to on or about May 1, 2006, at and within the County of Cook, Illinois.

### ANNABEL K. MELONGO

committed the offense of **COMPUTER TAMPERING**

in that  SHE, KNOWINGLY, AND WITHOUT THE AUTHORIZATION OF THE COMPUTER'S OWNER, ACCESSED OR CAUSED TO BE ACCESSED A COMPUTER OR ANY PART THEREOF, AND DAMAGED OR DESTROYED THE COMPUTER, WITH THE INTENT TO COMMIT AN OFFENSE ESTABLISHED UNDER THE ILLINOIS COMPUTER CRIME LAW (720 ILCS 5/16D), TO WIT: THAT ON OR ABOUT APRIL 28, 2006 ANNABEL K. MELONGO ACCESSED SAVE A LIFE FOUNDATION, INC.'S (N.F.P.) COMPUTER DATA SERVER LOCTED IN SCHILLER PARK, ILLINOIS AND PERMANENTLY DELETED, REMOVED AND/OR ALTERED HUNDREDS OF COMPUTER FILES CRITICAL TO SAVE A LIFE FOUNDATION, INC.'S (N.P.F.) OPERATIONS AND IN THE PROCESS PERMANENTLY DESTROYED THE COMPUTER. THESE ACTS WERE DONE WITHOUT THE AUTHORIZATION, KNOWLEDGE OR CONSENT OF THE COMPUTER'S OWNER.

IN VIOLATION OF CHAPTER 720, SECTION 5/16D-3(a)(3) OF THE ILLINOIS COMPILED STATUTES 2006 AS AMENDED AND

Contrary to the statute, and against the peace and dignity of the same people of the state of Illinois.

Criminal Code: 1066300

434
melongo

## COUNT 2

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oath present that from on or about April 28, 2006 and continuing to on or about May 1, 2006, at and within the County of Cook. Illinois.

### ANNABEL K. MELONGO

committed the offense of **COMPUTER TAMPERING**

in that--SHE, KNOWINGLY, AND WITHOUT THE AUTHORIZATION OF THE COMPUTER'S OWNER, ACCESSED OR CAUSED TO BE ACCESSED A COMPUTER PROGRAM OR DATA, AND DELETED A COMPUTER PROGRAM OR DATA , WITH THE INTENT TO COMMIT AN OFFENSE ESTABLISHED UNDER THE ILLINOIS COMPUTER CRIME LAW (720 ILCS 5/16D), TO WIT: THAT ON OR ABOUT APRIL 28, 2006 ANNABEL K. MELONGO ACCESSED SAVE A LIFE FOUNDATION, INC.'S (N.F.P.) COMPUTER DATA SERVER LOCTED IN SCHILLER PARK, ILLINOIS AND PERMANENTLY DELETED, REMOVED AND ALTERED HUNDREDS OF COMPUTER FILES CRITICAL TO SAVE A LIFE FOUNDATION, INC.'S (N.P.F.) OPERATIONS. THESE ACTS WERE DONE WITHOUT THE AUTHORIZATION, KNOWLEDGE OR CONSENT OF THE COMPUTER'S OWNER.

IN VIOLATION OF CHAPTER 720, SECTION 5/16D-3(a)(3) OF THE ILLINOIS COMPILED STATUTES 2006 AS AMENDED AND

Contrary to the statute, and against the peace and dignity of the same people of the state of Illinois.

Criminal Code: 1066300

435
melongo

## COUNT 3

The Grand Jurors chosen, selected and sworn, in and for the County of Cook, in the State of Illinois, in the name and by the authority of the People of the State of Illinois, upon their oath present that from on or about April 28, 2006 and continuing to on or about May 1, 2006, at and within the County of Cook, Illinois.

### ANNABEL K. MELONGO

committed the offense of **COMPUTER TAMPERING**

in that SHE, KNOWINGLY, AND WITHOUT THE AUTHORIZATION OF THE COMPUTER'S OWNER, ACCESSED A COMPUTER PROGRAM AND DATA OR ANY PART THEREOF, AND ALTERED THE COMPUTER PROGRAM AND DATA, WITH THE INTENT TO COMMIT AN OFFENSE ESTABLISHED UNDER THE ILLINOIS COMPUTER CRIME LAW (720 ILCS 5/16D), TO WIT: THAT ON OR ABOUT MAY 1, 2006 ANNABEL K. MELONGO ACCESSED SAVE A LIFE FOUNDATION, INC.'S (N.F.P.) FOUNDER'S COMPUTER EMAIL, THROUGH HER COMPUTER, WHICH WAS PHYSICALLY LOCTED IN SCHILLER PARK, ILLINOIS AND ACCESSED THE EMAILS OF CAROL SPIZZIRRI. SAVE A LIFE FOUNDATION, INC.'S (N.P.F.) PRESIDENT AND FOUNDER: THESE ACTS WERE DONE WITHOUT THE AUTHORIZATION. KNOWLEDGE OR CONSENT OF THE COMPUTER'S OWNER.

IN VIOLATION OF CHAPTER 720, SECTION 5/16D-3(a)(3) OF THE ILLINOIS COMPILED STATUTES 2006 AS AMENDED AND

Contrary to the statute, and against the peace and dignity of the same people of the state of Illinois.

Criminal Code: 1066300

436
melongo

# Exhibit 34

From: Carol Spizzirri [cspizzirri@saif.org]
Sent: Wednesday, May 17, 2006 9:27 PM
To: Brian Salerno; dpeters@thinkcritical.com
Cc: Vince Davis; rbarnes@saif.org
Subject: RE: Thank you!

Importance: High

Dear Brian and Don - Update - Det.'s here today - AttyG and State Atty (Dick Devine is a
personal friend) - keeping close tabs on progress - Please keep all docs available - they
will need - need your audits Don asap - could you forward here to Vince or Robert our Acct?

I want to thank you Brian! Robert told me of your generosity -

Det's also stated they feel confident we can retrieve data off SONY and would like for you
Don to contact them to walk you through how.

Learned much from them - FYI - if ever you are faced with anything like happened to us - THEY
WILL COME IN IMMED. AND DO COMPUTER AUDITS.AT NO COST!
THEY WILL ALSO KEEP ALL DOCS AS EVIDENCE FROM THOSE AUDITS.So it's better to do nothing -
call police first!!!
Kind of like a 9-1-1 for computer tampering.

Carol

PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI    4
5-11-18         BK

SPIZZIRRI000000514

# Exhibit 35



**SALF**

Save A Life Foundation

*National Headquarters*
9950 W. Lawrence Ave Ste 300
Schiller Park, Illinois 60176-1216
Ph: (847) 928-9683
Fax: (847) 928-9684
Website: www.salf.org

**Carol J. Spizzirri**
Founder / President

Monday, May 08, 2006

Richard A. Devine State's Attorney of Cook County
Illinois State Attorney of Cook County
% Jinx Kotowski Administrative Assistant
2650 S. California
Chicago, IL 60608

Dear Honorable Devine:

It is unfortunate I need to bring this matter to your attention but both Mayor Rita Mullins and I felt it necessary since the following has caused irreversible damage to SALF.

Several months ago we contacted Robert Half Technology, a temporary IT employment agency, to subcontract technicians for our computer and web site needs after the death of our IT Director. December 2005, Robert Half subcontracted Annabel Melongo to provide programming, network support and maintain our hard and software. From the beginning Ms. Melongo had difficulty working with fellow employees, she disregarded in lieu of her computer skills. March 27th, 2006 Robert Half terminated Melongo as their contractor and since Melongo was in the midst of a important project we retained her full time. Her malevolens towards colleagues intensified until April 27th when Vince Davis, Director of Military Affairs, felt it necessary to terminate Ms. Melongo from SALF.

As a standard termination policy, Mr. Davis accompanied Ms. Melongo while she collected her belongings, verified our computer passwords and exit her to the door. Since Ms. Melongo had knowledge to all our passwords our Web Designer Mr. Christian Sass immediately changed as many passwords he knew to secure entry into our computer system from the outside, but failed to remember our DSL line and web/emails sites.

The following morning, Friday April 28th, our employees were unable to access their computer files. With further investigation we uncovered that all our files, data bases, etc., had been deleted. Throughout the day Ms. Melongo came to the office, totally three times, and phoned, totaling four times, wanting to see only me. From Friday through Sunday morning Mr. Davis and outside vendors True Consulting and Critical Technology Solutions worked continually to recover the missing computer files unsuccessfully.

May 2nd, several employees alerted me that they received a disturbing e-mail from Ms. Melongo. Her e-mail indicated she was responding to an emailed I sent to Brian Salerno, Pres. True Consulting that had been forward to her. May 4th we contacted our web and e-mail provider, WebHSP in Colorado, who was able to foot print Ms. Melongo's actions from entry into SALF's e-mail system through Snailmail by using my password, retrieve and forward two of my personal emails to her account and then e-mail back to several of our employees with a personal message (see attached).

May 5th we filed a complaint with the Schiller Park Police Department # 06-3219 of which Officer Marrazzo stated he would forward to their Detectives.

This afternoon I and my staff received another lengthy e-mail from Ms. Melongo. Apparently she is not satisfied with our lack of response. Ms. Melongo is not a U.S. Citizen but has a student Visa from Cameroon Africa and lives in Palatine which all concerns Mayor Mullins.

We would appreciate your advise in this sensitive matter.

Sincerely,

Carol J. Spizzirri
President/Founder
encl.

Melongo v. Podlasek, et al.

PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI 3
5-11-18 B2

394
melongo

13cv4824

Attorney General 000656

# Exhibit 36

**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

**COUNTY OF COOK**

**OFFICE OF THE STATE'S ATTORNEY**

RICHARD A. DEVINE
STATE'S ATTORNEY

May 9, 2006

69 W. WASHINGTON, SUITE 3200
CHICAGO, ILLINOIS 60602
(312) 603-2440

Carol J. Spizziri
President/Founder
SALF
9950 W. Lawrence, Suite 300
Schiller Park, IL 60176-1216

Dear Ms. Spizziri:    *Carol*

    I am in receipt of your letter of May 8, 2006, regarding your former employee, Annabel Melongo.

    I am forwarding your correspondence to Randy Roberts, Executive Assistant to the State's Attorney, for his review.

    Thank you for writing.

Very truly yours,

Richard A. Devine
State's Attorney

RAD:jk

cc:    Randall Roberts, Executive Assistant to the State's Attorney

PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI    7



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 **SALF**

Save A Life Foundation

*National Headquarters*
9950 W. Lawrence Ave Ste 300
Schiller Park, Illinois 60176-1216
Ph: (847) 928-9683
Fax: (847) 928-9688
Website: www.salf.org

Carol J. Spizzirri
Founder / President

Monday, May 08, 2006

Richard A. Devine State's Attorney of Cook County
Illinois State Attorney of Cook County
% Jinx Kotowski Administrative Assistant
2650 S. California
Chicago, IL 60608

Dear Honorable Devine:

It is unfortunate I need to bring this matter to your attention but both Mayor Rita Mullins and I felt it necessary since the following has caused irreversible damage to SALF.

Several months ago we contacted Robert Half Technology, a temporary IT employment agency, to subcontract technicians for our computer and web site needs after the death of our IT Director. December 2005, Robert Half subcontracted Annabel Melongo to provide programming, network support and maintain our hard and software. From the beginning Ms. Melongo had difficulty working with fellow employees, but we disregarded in lieu of her computer skills. March 27th, 2006 Robert Half terminated Melongo as their contractor and since Melongo was in the midst of a important project we retained her full time. Her malevolens towards colleagues intensified until April 27th when Vince Davis, Director of Military Affairs, felt it necessary to terminate Ms. Melongo from SALF.

As a standard termination policy, Mr. Davis accompanied Ms. Melongo while she collected her belongings, verified our computer passwords and exit her to the door. Since Ms. Melongo had knowledge to all our passwords our Web Designer Mr. Christian Sass immediately changed as many passwords he knew to secure entry into our computer system from the outside, but failed to remember our DSL line and web/emails sites.

The following morning, Friday April 28th, our employees were unable to access their computer files. With further investigation we uncovered that all our files, data bases, etc., had been deleted. Throughout the day Ms. Melongo came to the office, totally three times, and phoned, totaling four times, wanting to see only me. From Friday through Sunday morning Mr. Davis and outside vendors True Consulting and Critical Technology Solutions worked continually to recover the missing computer files unsuccessfully.

May 2nd, several employees alerted me that they received a disturbing e-mail from Ms. Melongo. Her e-mail indicated she was responding to an emailed I sent to Brian Salerno, Pres. True Consulting that had been forward to her. May 4th we contacted our web and e-mail provider, WebHSP in Colorado, who was able to foot print Ms. Melongo's actions from entry into SALF's e-mail system through Snailmail by using my password, retrieve and forward two of my personal emails to her account and then e-mail back to several of our employees with a personal message (see attached).

May 5th we filed a complaint with the Schiller Park Police Department # 06-3219 of which Officer Marrazzo stated he would forward to their Detectives.

This afternoon I and my staff received another lengthy e-mail from Ms. Melongo. Apparently she is not satisfied with our lack of response. Ms. Melongo is not a U.S. Citizen but has a student Visa from Cameroon Africa and lives in Palatine which all concerns Mayor Mullins.

We would appreciate your advise in this sensitive matter.

Sincerely,

Carol V. Spizzirri
President/Founder
encl.

05/26/2006   15:21   SAVE A LIFE FOUNDATION → 18476719465                NO.142   P01

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



**Date:**   **Friday, May 26, 2006**

**To:**     **Detective Martin**
            **Schiller Park Police Department**
            **Fax: 847-671-9465**

**From:**   **Save A Life Foundation, Inc.**
            **Carol Spizzirri**
            **Phone: 847-928-9683**
            **Fax:     847-928-9684**

**Pages:**      **3 including cover page**

# Exhibit 37

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    STATE OF ILLINOIS )
                        )  SS.
 2    COUNTY OF C O O K )

 3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
      THE PEOPLE OF THE     )
 5    STATE OF ILLINOIS,    )
                           )    Criminal
 6          Plaintiff,      )
                           )
 7          vs.             )    No. 08 CR 10502-01
                           )
 8    ANNABEL MELONGO,      )
                           )
 9          Defendant.      )

10                  REPORT OF PROCEEDINGS

11          REPORT OF PROCEEDINGS had at the hearing in the

12    above-entitled cause before the Honorable STEVEN J.

13    GOEBEL, Judge of said court, on the 11th day of

14    October, 2012.

15    APPEARANCES:

16          HON. ANITA M. ALVAREZ,
                State's Attorney of Cook County, By:
17
            MR. ROBERT PODLASEK and
18          MS. NANCY SARCOS,
                Assistant State's Attorneys,
19          for the People of the State of IL.

20
            Defendant appeared pro se.
21

22
      L. B. STONE, CSR
23    Official Court Reporter
      2650 California Ave.
24    Chicago, Illinois 60608
```

DAILY COPY-1

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 003981

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1
                              I N D E X
2

3    NAME OF CASE:  ANNABEL MELONGO

4    DATE OF HEARING:  October 11, 2012

5    MOTION TO DISMISS

6    Page 1 through Page 90

7    Daily Copy transcript

8        LIST OF WITNESSES:  DX   CX   RDX   RCX

9        DWAYNE MARTIN        15   65

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24


                        DAILY COPY-2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1

2          THE CLERK:  Annabel Melongo.

3          MR. PODLASEK:  Good morning, Judge.  Judge, for

4     the record, Robert Podlasek, P-o-d-l-a-s-e-k, on behalf

5     of the State.

6          THE DEFENDANT:  Judge, for the record (Inaudible)

7          COURT REPORTER:  I'm sorry, I couldn't hear --

8          THE DEFENDANT:  Annabel Melongo, pro se.

9          THE COURT:  All right.  I asked to be called

10    because obviously as both of you can see, I'm tied up

11    with this call, and I do have to give the court

12    personnel a lunch recess.  So I wanted to, rather than

13    have both of you just sit here, tell you that we're

14    going to hear this motion at 1:00 o'clock.

15         THE DEFENDANT:  Okay.

16         THE COURT:  So you're excused until 1:00 o'clock.

17    And I'll see everyone back in this courtroom at 1:00.

18         THE DEFENDANT:  Okay.

19                    (Whereupon, the case was passed.)

20                         *  *  *  *  *

21         THE CLERK:  Annabel Melongo.

22         THE COURT:  All right.  Both parties have

23    identified themselves earlier.  We're here on the

24    defense's motion to dismiss the indictment.

                         DAILY COPY-3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                    Are both sides ready?

 2         MR. PODLASEK:  Well, there's some preliminary

 3    matters.

 4         THE COURT:  Go ahead.

 5         MR. PODLASEK:  Judge, I'd just like to point out

 6    that there's some reference to a 2007 Grand Jury

 7    transcript.  The 2007 case was nolle'd and superceded

 8    by the 2008 case.  I'm not sure that that's relevant.

 9    I'm just pointing it out to the Court, though.

10         THE COURT:  All right.  Was it raised in the 2008

11    proceedings, the 2007 Grand Jury?

12         MR. PODLASEK:  It's referenced in there in

13    Paragraph 3 of the motion to dismiss.  There's a

14    paragraph that states that both the original

15    January 2007 indictment and the subsequent 2008

16    indictment Schiller Park Police Officer William Martin

17    offered material (Inaudible).

18         THE COURT:  All right.  I'm going to allow it.

19         MR. PODLASEK:  Judge, I have an objection

20    because --

21         THE COURT:  I thought you wanted it heard.

22         MR. PODLASEK:  No, I want to know the Grand Jury,

23    the '08 Grand Jury because they have two Grand Jury,

24    you can prove that maybe the statement was false --
```

DAILY COPY-4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     THE COURT:  All right.  I'm looking at your

2     memorandum, your argument, and you're saying -- you're

3     talking about the '08 and '07 Grand Jury, I just said

4     I'm going to allow you to do that, so I ruled in your

5     favor.

6          Okay, proceed.

7     MR. PODLASEK:  Last week, Miss Melongo requested

8     that I provide her with a USB flash drive that she was

9     going to load it with data relevant to this proceeding.

10    Once we had done that, she had picked up the USB flash

11    drive and loaded it on, she left me a phone message

12    saying she wasn't going to give me the data.  I'm just

13    requesting that she return the USB flash drive, it's

14    not mind, it belongs to another ASA.  I don't really

15    care what she does with the data, but I need the USB

16    back, so I'm requesting it back for the record.

17    THE DEFENDANT:  Judge, the phone call was I'm

18    going to give you the data (Inaudible) and I told him

19    when you call (Inaudible), just also bring the phone

20    (Inaudible) and remember the gmail account we talk

21    about, and then he said he had some information, he's

22    going to give me about John Burge (Phonetic), a certain

23    John Burge, and so.  So I --

24    THE COURT:  John Burge?

DAILY COPY-5

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 003985

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       MR. PODLASEK:  Burns, Burns.

2       THE DEFENDANT:  John Burns.

3       THE COURT:  Burns, okay.

4       THE DEFENDANT:  So I asked him bring that

5   information, too, and I'm going to bring the USB and

6   all the copies of the subpoena, and they are going to

7   put it on record, and I gave the subpoena and gave me

8   the information on the email account.  So I never said

9   I'm going to keep the USB.  Why am I --

10      THE COURT:  All right.  Do you have the USB for

11  him, then?

12      THE DEFENDANT:  Yes, I have it.

13      THE COURT:  Please give it to him.

14      THE DEFENDANT:  And on the record, I gave --

15      THE COURT:  All right.  For the record, it's been

16  tendered to Mr. Podlasek.

17      THE DEFENDANT:  And can he give me the email --

18  the information on the email, the gmail account?  You

19  asked him -- you remember when I asked you to photocopy

20  the subpoena and then he say he's going to give me that

21  information?

22      THE COURT:  Do you have that?

23      MR. PODLASEK:  No.

24      THE COURT:  Why not?

DAILY COPY-6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      MR. PODLASEK:  Because I forgot it.  I left it in

2  my office.

3      THE DEFENDANT:  But it's part of your motion, so I

4  cannot --

5      MR. PODLASEK:  Which g -- Judge, then I'm as

6  confused as to which gmail account we're talking about.

7  If we're talking about the gmail account that says text

8  support that gmail dot com --

9      THE DEFENDANT:  Yes.

10      MR. PODLASEK:  The information I had for her

11  related to the company where she can get in touch with

12  people.

13      THE DEFENDANT:  No, the Judge asked --

14      THE COURT:  What were you looking for again?

15      THE DEFENDANT:  Yes, the Judge asked me --

16  Remember I asked you I wanted to know who created the

17  email and all of those kinds of information.

18      THE COURT:  Right, I remember that.

19      THE DEFENDANT:  You asked him to bring that in

20  because he said he had that information, and they don't

21  need to go to Canada, don't need to use state money to

22  get that information.  He has that information.  So

23  today we have the motion to dismiss, and he has that

24  email as an exhibit to his motion.  How am I going to

DAILY COPY-7

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 003987

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    argue this motion without that information?

2         THE COURT:  Well, it's really what was presented

3    to the Grand Jury.  That's what we're talking about

4    here.

5         THE DEFENDANT:  It was never presented, Judge.

6         MR. PODLASEK:  (Inaudible).

7         THE DEFENDANT:  Okay.

8         THE COURT:  All right.  So we are going to go

9    ahead and proceed with the motion, but I do recall that

10   I did ask Mr. Podlasek to get that information, and you

11   still need to get that.

12        MR. PODLASEK:  I understand, and just so the Court

13   understands, this information that we have as to where

14   it came from, the telephone calls, they were all taken

15   off of the internet from our research as to this

16   company that Miss Spizzirri had hired.  All right.

17        THE DEFENDANT:  No --

18        MR. PODLASEK:  So that's where we got the

19   information.  John Burns --

20        THE COURT:  Hold on, let him finish.

21        MR. PODLASEK:  There are emails from John Burns,

22   those were tendered to every one of the attorneys.  I

23   have emails from John Burns to Miss Spizzirri, and I

24   can tender those again if Miss Melongo's lost them.

                    DAILY COPY-8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    THE DEFENDANT:  No.  Judge -- I mean Mr. Podlasek

2    wants me to actually put (Inaudible).  The issue is he

3    has an exhibit attached to his motion.

4    MR. PODLASEK:  Right.

5    THE DEFENDANT:  And then the issue was give me the

6    information about that exhibit, who created that

7    exhibit, what was the (Inaudible) in relation to Save a

8    Life, that was information I want.

9    MR. PODLASEK:  Judge, I'm going to show you a copy

10   of -- this is attached to --  as you can see, there are

11   headers, there are individuals who signed that.  Again,

12   I'm not sure who she's specifically asking me to look

13   for.  Christian Sass (Phonetic) is in there, I believe,

14   Miss Spizzirri might be there.  So if she can identify

15   which part of that email she's looking for, who created

16   it, maybe we can get to the bottom of this.

17   THE COURT:  It looks like there's a couple of

18   emails here.

19   THE DEFENDANT:  No, the one on top.

20   THE COURT:  Which one?

21   THE DEFENDANT:  Judge, he used this email as part

22   of his exhibit, he's attached the exhibit to his

23   response to my motion to dismiss, and then remember if

24   you (Inaudible) today, I would not even talk about

DAILY COPY-9

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    this.  You either have the person who forward this

2    email, and this motion would have been ready to go, but

3    then Mr. Podlasek said no we shouldn't waste state

4    money, he can give you that information.  Then you say,

5    you say, Judge, oh, you actually don't if he had that

6    information, let's not waste state money.  So he hasn't

7    given me that information, he attached the email to his

8    motion.  So how am I going to argue this motion if he

9    doesn't give me who created that email and everything

10   about that defaults.  I'm not talking about the reply,

11   every single person who put those lines here on top.

12        MR. PODLASEK:  This (Indicating).

13        THE DEFENDANT:  All those lines from here to here

14   (Indicating).  I want to know who is this text support,

15   who is that person.

16        MR. PODLASEK:  This is from accompany called HSP.

17   We talked to John Burns at HSP.

18        THE DEFENDANT:  Okay, can you go on the record

19   saying this is from John Burns?

20        MR. PODLASEK:  No, I'm telling you that we talked

21   to John Burns from HSP.  They have a text support

22   department.  The text support department may or may not

23   be in Canada at times, they out source the text support

24   for telephone calls.

DAILY COPY-10

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     THE COURT:  Let me see the email.

2     THE DEFENDANT:  Judge, please --

3     THE COURT:  Hold on, let me read it.

4     (Whereupon, a pause was had.)

5     THE COURT:  All right.  Mr. Podlasek, do you know

6  who exactly made this email that says this is the

7  actual record showing her sending email from Carol's

8  email address to her own Yahoo based email address,

9  note the IP in the log, who sent that email?

10    MR. PODLASEK:  Can I see that?

11    (Whereupon, a pause was had.)

12    MR. PODLASEK:  I'm assuming text support sent that

13  email.

14    THE COURT:  Who from text support?

15    THE DEFENDANT:  Who from text support?

16    THE COURT:  Hold on.

17    MR. PODLASEK:  It's called HSP, I don't know.

18    THE COURT:  All right.  You need to do that.  You

19  told me you were going to do that, so I need to you do

20  that.

21    MR. PODLASEK:  I will, but let me make my record.

22    THE COURT:  Go ahead.

23    MR. PODLASEK:  Last time we were in court

24  regarding this email, we provided her with everything

DAILY COPY-11

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    we used to make contact with John Burns, including

2    telephone numbers, locations.  Just so the Court's

3    aware, we are not hiding anything from Miss Melongo,

4    and I want made played clear for the record.

5        THE COURT:  No one said you were hiding anything.

6    You said you would get that.  I'm asking you if you got

7    it.  You didn't yet, so you need to do that.  I need a

8    name, not just text support from that company, who.

9        MR. PODLASEK:  Okay.

10       THE COURT:  Because it indicates who possibly did

11   it.  I mean if that's not provided, that information is

12   not coming in to trial, it's that simple.

13       MR. PODLASEK:  Okay.

14       THE COURT:  She has a right to discovery, she has

15   a right to a name, not text support, Court's not going

16   to accept if we even get that far, text support, I need

17   a name.

18       MR. PODLASEK:  Understood, Judge.  I'm just trying

19   to explain the situation as to how the companies work.

20       THE COURT:  Are you ready to proceed, then, or

21   not?

22       THE DEFENDANT:  Yes.  For the sake of the motion,

23   since I don't have information, can you just ask the

24   State not to even mention this email?

DAILY COPY-12

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    THE COURT:  Well, it's in front of a Judge

2    obviously, I can take it into account, or not take it

3    into account.  It depends on how everything comes out

4    here, and I'll make my ruling, but I want to proceed

5    with the motion as long as both sides are ready.

6    MR. PODLASEK:  We're ready, Judge.

7    THE COURT:  If I need to disregard it, I'll

8    disregard it.

9    THE DEFENDANT:  Can I have a table, please?

10    THE COURT:  You can have a seat at counsel's table

11    if you wish.

12    Mr. Podlasek, you can have a seat at

13    counsel's table.

14    MR. PODLASEK:  Right.  I just want to make a

15    record that Detective Martin is in court pursuant to

16    (Inaudible) by Miss Melongo.

17    THE COURT:  Okay, the detective's in court.

18    THE DEFENDANT:  Okay, Judge, I'm ready for the

19    State.

20    THE COURT:  All right.  You may proceed then.

21    THE DEFENDANT:  Before we start, Judge, since

22    this is my motion, I actually want to organize how it's

23    going to be done.  I want the first part to be like the

24    detective is going to be cross-examined, then the State

DAILY COPY-13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      is going to examine him, and then I am going to rebut,

2      and then the second part is going to be about arguing

3      my motion based on the detective answer.

4          THE COURT:  All right.  So you want to call the

5      detective?

6          THE DEFENDANT:  Yes, the detective for the first

7      part of the argument.  The detective is going to be on

8      the stand, and then I'm going to examine him, then the

9      State, and the second part --

10         THE COURT:  There's a couple things you said that

11     I'm going to have to correct you on, and that is you

12     don't get to cross-examine him, but if you're calling

13     him, he's your witness, and you have to ask him

14     non-leading questions, okay?

15         THE DEFENDANT:  Okay.

16         THE COURT:  I'm going to allow you to call him.

17     The State will then cross-examine him.

18         THE DEFENDANT:  Okay.

19         THE COURT:  And if you wish to give an opening

20     remark before you begin, you may, and then I'll allow

21     the State to do that as well.

22         THE DEFENDANT:  And that's why I was in question,

23     that the second part of it is now going to be arguing

24     my actual motion based on this.  I don't understand if

DAILY COPY-14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1    you understand.

2         THE COURT:  I understand, but we're going to do it

3    my way according to the Court's procedures, and not

4    your way.

5         THE DEFENDANT:  That's fine.

6              So I'm now calling Detective William

7    Martin.

8         THE COURT:  All right.  Detective Martin, please

9    take the stand.  Please stand right up into the witness

10   box, remain standing, and raise your right hand to be

11   sworn.

12                   (Witness duly sworn.)

13        THE COURT:  All right.  Detective's ready.  You

14   may proceed.

15                   WILLIAM MARTIN,

16   a witness herein, called on behalf of the petitioner,

17   having been first duly sworn, was examined and

18   testified as follows:

19              DIRECT EXAMINATION

20                   BY

21              THE PETITIONER:

22        Q    So will you state your name and spell your

23   last name for the record, please?

24        A    William Martin, M-a-r-t-i-n.
```

DAILY COPY-15

MELONGO V. PODLASEK, ET AL., 13 C 4924

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        Q       And where are you employed?

2        A       The Schiller Park Police Department.

3        Q       What is your star number?

4        A       29.

5        Q       In what unit are you employed?

6        A       The detective division.

7        Q       What is detective division?

8        A       I'm a patrolman that's assigned to that

9    division to investigate cases.

10       Q       So you are no longer a cyber crime detective?

11       A       I do investigate cyber crimes, but I also

12   investigate other crimes.

13       Q       So you are now in patrol division.  You used

14   to be a cyber crime detective, right?

15       A       No, ma'am.  I am a patrolman that is assigned

16   to the detective division.

17       Q       How many experience do you have as a crime

18   detective, cyber crime detective?

19       A       I've been a detective for six and a half

20   years.

21       Q       Can you state what a cyber crime because this

22   is a cyber crime --

23       A       I'm sorry.

24       Q       I'm sorry.  I didn't understand.

DAILY COPY-16

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 003996

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          Q     Let's just focus on being a cyber crime, you

2    know, don't -- I want to know exactly your experience

3    being a detective -- a cyber crime detective.

4          A     I've been a detective for six and a half to

5    seven years.

6          Q     And how much of it have you been in cyber

7    crimes?

8          A     Cyber crimes are things that I investigate

9    along with other investigations.

10         Q     Six and a half year?

11         A     Yes.

12         Q     When you investigate cyber crime, this case

13   is over a year -- over six year, it means you actually

14   had -- you didn't even have a year in this case when

15   you investigated it?

16         MR. PODLASEK:  Objection, Judge.  If she's going

17   to make a statement, fine.  If she's going to ask a

18   question, let her ask a question.

19         THE COURT:  Well, I think it's kind of a question.

20              Do you understand the question?

21         THE WITNESS:  Could you have her repeat it --

22         THE COURT:  Yeah.

23              Miss Melongo, it was a little bit

24   duplicatus.  So just rephrase it.

                     DAILY COPY-17


             MELONGO V. PODLASEK, ET AL., 13 C 4924
                        CCSAO 003997

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      THE DEFENDANT  Q  Okay, you say you have six and a

2  half year as a detective?

3      A    That's correct.

4      Q    So I was wondering, this case, you started

5  this investigation in April of 2006?

6      A    I believe it was May, but, yes, May of '06.

7      Q    And you are in October of 2011, and that's

8  why I was wondering, so when you did this

9  investigation, you didn't even have a year experience

10  as a cyber crime detective?

11     A    That's correct.

12     Q    So you had -- So you didn't have a year

13  experience when you investigated this case?

14     A    No, I've only been assigned to the detective

15  division for a short time.

16     Q    Okay, thank you.  That's what I'm

17  (Inaudible).  Okay, have you ever been suspended in

18  your career as a detective?

19     A    Suspended?

20     Q    Yes.

21     MR. PODLASEK:  Objection, Judge.

22     THE COURT:  Sustained.

23     THE WITNESS:  Yes.

24     THE COURT:  I sustained the objection.

DAILY COPY-18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        THE WITNESS:  Oh, sorry.

2        THE DEFENDANT  Q  Okay, you say, detective, how

3    important is police reports for investigation?  I mean

4    is it something that you have to rely on a hundred

5    percent?  Just tell me how important a police report is

6    to an investigation.

7        A    I'm not following your question.

8        Q    I said when you are a detective, right, you

9    file some police report, and then I say can it be

10   relied on a 100 percent.  Let's say if I go to your

11   police report and then I read it, can I rely on it

12   100 percent that's exactly what happened?

13       A    I still can't quite follow the question.

14       Q    Okay, I say, you are a detective, right?

15       A    Correct.

16       Q    At the end of the day you file some -- you

17   make some police report, right?  How reliable is that

18   police report?  Let's say can you tell me if you read

19   that police report, it's exactly how it happened?  How

20   reliable is the police report you actually gave me?  Is

21   it 100 percent, can I 100 percent rely on it, or maybe

22   I forgot something, or I didn't put this, or I didn't

23   put that?

24       A    Are you referring to an initial report taken

DAILY COPY-19

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

 1    by an officer, or are you referring to an

 2    investigative --

 3         Q    An investigative report?

 4         A    An investigative report is a summary of the

 5    investigation and based upon the actions performed by a

 6    detective.

 7         Q    So everything -- let's say every mention that

 8    happened in that investigation has to reflect in the

 9    police report, in that investigative report, right?

10         A    It should be, yes.

11         Q    Okay, thank you.

12              As a cyber crime detective, your job

13    entails dealing with technical items, and those terms

14    are like server, IP address, DSL line, the modem,

15    server logs, remote accessing.  So for the sake of this

16    charge, I'm going to ask you to explain to this Court,

17    I'm going to go by one by one over those terms, and

18    then you are just going to -- because this case is

19    about those terms, so we are going to go one by one

20    over those terms and try to put it in a language that

21    this Court understands what those terms means.  So I'm

22    going to start with --

23         THE COURT:  All right.  Miss Melongo, we're not

24    going to go over computer terminology, that's not part

DAILY COPY-20

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    of your motion, so --

2         THE DEFENDANT:  Judge, this case is eventually

3    about -- because when we are going to get into what he

4    said to the Grand Jury, he talk about those terms.  So

5    I'm not going to talk about those terms if we haven't

6    explained those terms, things like IP address, modem,

7    and then remote accessing, we have to explain so that

8    when we --

9         THE COURT:  If I have a question, I'll ask him

10   what it is, but I understand all those terms, so move

11   on.

12        THE DEFENDANT:  Okay.

13        THE DEFENDANT  Q  So as a cyber investigation, on

14   a scale of one to ten, how important is an IP address?

15        A    I think it's dependent upon the type of

16   investigation we're working on.

17        Q    Like this kind of investigation, like

18   intrusion, hacking and stuff, how important is an IP,

19   how material is it?

20        A    It's one of the main factors.

21        Q    I said on a scale of one to ten.  Let's say

22   you are investigating --

23        MR. PODLASEK:  Objection, Judge.

24        THE DEFENDANT  Q  You Are investigating an

DAILY COPY-21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    intrusion, on the scale of one to ten, how important is

 2    it to know the origin of the IP address to know who

 3    actually had that IP address at a certain time or the

 4    time you spent in the (Inaudible) or the time he exit,

 5    how important is having that information on a scale of

 6    one to ten?

 7         THE COURT:  All right.  Objection sustained.  You

 8    can ask him how important it is, but we are not going

 9    to get on to scales in the meantime.

10         THE DEFENDANT  Q  How important is it?

11         A    It's one of the main factors.

12         Q    So that's one to one match between an IP

13    address and a computer, right?

14         A    I'm not quite understanding the question.

15         Q    An exact time, can two computers have the

16    same IP address?  Let's say exactly at 2:03, and those

17    two computer access the internet, can they have the

18    same IP address?

19         A    No.

20         Q    So there is a one to one match.  Every

21    computer accessing the internet has a unique IP

22    address, right?

23         A    Yes.

24         Q    And can someone access a computer remotely
```

DAILY COPY-22

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    when that person doesn't have an internet?

2         A    No.

3         Q    And can the reverse also happen.  Can I

4    access somebody computer when that person doesn't have

5    internet?

6         A    At which end?

7         Q    I said -- you told me I cannot access the

8    internet if I don't have a DSL, and then I told -- I

9    gave you another scenario, can I access somebody

10   computer remotely if that person is disconnected from

11   the internet?

12        MR. PODLASEK:  Judge, I'm going to object to this.

13   Right now we're doing nothing but hypotheticals, we're

14   not getting into any of the facts of the motion

15   whatsoever.

16        THE COURT:  I'm going to allow it, it's limited at

17   this point.

18                   Go ahead, you can answer that question.

19        THE WITNESS:  If I understand your question

20   correctly, the person that's being intruded upon has no

21   internet access?

22        Q    Yes.

23        A    You're correct, they -- you cannot access a

24   computer unless on line or if you are directly in front

DAILY COPY-23

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004003

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    of that computer.

 2           Q     No, I said --

 3           A     Remote access, no, you're correct.

 4           Q     Yes, I cannot access if they're not connected

 5    to the internet, right?

 6           A     Remotely, correct.

 7           Q     Thank you.

 8                 Okay, now, drawing your attention to

 9    April 2 and May 2, you were assigned to an

10    investigation involving an organization called Save a

11    Life Foundation, is that correct?

12           A     I didn't quite catch the dates, but I was

13    assigned to investigate a case, yes.

14           Q     I said around April 28 and May 1, you were

15    assigned to an investigation involving Save a Life

16    Foundation, right?

17           A     I believe it was a few days after that, but,

18    yes, I was assigned to investigate it, yes.

19           THE COURT:  Are you referring to 2006,

20    Miss Melongo?

21           THE DEFENDANT:  Yes, 2006.

22           THE WITNESS:  That's correct.

23           THE DEFENDANT  Q  In May and April of 2006, you

24    were at some time assigned to an investigation at Save
```

DAILY COPY-24

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    a Life Foundation, is that correct?

2        A    Correct, I believe it was in May.

3        Q    Is that organization still operating --

4        COURT REPORTER:  I'm sorry?

5        THE DEFENDANT  Q  Is that organization still

6    functioning?

7        A    I do not know.

8        Q    You don't know if they are closed or if they

9    still open --

10       MR. PODLASEK:  Objection, Judge, it's been asked

11   and answered.

12       THE COURT:  Sustained.  He says he doesn't know.

13       THE DEFENDANT  Q  So what of type of service at

14   the time you investigated Save a Life Foundation, what

15   type of service were they providing?

16       A    As far as I know, they were teaching life

17   saving skills to remote areas of Illinois, I believe.

18       Q    Do you know the name of the founder

19   (Inaudible) of that organization?

20       A    I believe the -- I know the president was

21   Carol Spizzirri.

22       Q    Can you spell it for the record, please?

23       A    I believe it's spelled, S-p-i-z-z-i-r-r-i?

24       Q    So, now, since you were the investigator,

DAILY COPY-25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    what type of server did Save a Life had?   I mean I

 2    want you -- they had some distinctive server because

 3    there's a difference between server.  So you have to

 4    tell me exactly what type of server they have.  I don't

 5    want nobody had server.  Detectives ask you you have

 6    certain server --

 7         MR. PODLASEK:  Judge, I'm going to object to

 8    this --

 9         THE DEFENDANT:  You were the investigator --

10         THE COURT:  Hold on, when there's an objection,

11    you have to stop, okay?

12              What's your objection?

13         MR. PODLASEK:  Judge, she was not letting him

14    answer the question.  She first poses a question, and

15    then she puts the parameters on it.

16         THE COURT:  All right.  It was a very long

17    question, and you have to have short other questions,

18    Miss Melongo, and maybe multiple questions.

19         THE DEFENDANT  Q  Can you tell us the type of

20    servers Save a Life Foundation had at the time you were

21    assigned to that investigation.

22         A    Are you referring to an actual computer, or

23    are you referring to a web email server?

24         Q    The charge -- the defendant intruded hacking
```

DAILY COPY-26

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    into computers and servers, servers with an S.  So --

2    and like I say server is kind of server, a kind of

3    specialized computer?

4         MS. SARCOS:  Objection.

5         THE COURT:  Sustained.

6         THE DEFENDANT  Q  So tell me exactly the type of

7    server Save a Life Foundation had.  You were assigned

8    the investigator that day, and you worked in a cyber

9    crime.

10        A    Are you referring to a web email server, or

11   are you referring to a computer -- network computer?

12        Q    No, just tell -- Save a Life have different

13   kind of servers.  Just tell me the exact server that

14   that company had at the time you investigated it.

15        THE COURT:  Do you know, sir?

16        THE WITNESS:  Your Honor, to clarify, is she

17   referring to a web email server?

18        THE COURT:  I don't know what she's referring to.

19        THE WITNESS:  I can't answer that the question.

20        THE COURT:  All right.  He can't answer the

21   question.  Next question.

22        THE DEFENDANT:  Judge, I have something here to

23   refresh his memory.  Judge, I'm just -- this is the

24   investigator in this case.  He charged the

DAILY COPY-27

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    defendant --

2        MR. PODLASEK:  Judge, I'm going to object.  This

3    is now argument.

4        THE DEFENDANT:  I'm explaining my case.  He

5    charged the defendant of accessing Save a Life servers,

6    and then I'm just asking him the simple question, what

7    were those servers, he cannot tell me the servers.

8        THE COURT:  He doesn't know based on your

9    question.  He can't answer it.  So the objection is

10   sustained.  He's answered it.  Next question.

11       THE DEFENDANT  Q  Okay, the record show that there

12   were actually two investigators in this incident, you

13   and Mr. Kyle French of the Illinois Attorney General,

14   can you tell me which one of you was the lead

15   investigator?

16       A    I was the investigator assigned by the

17   Schiller Park Police Department, and Mr. French was

18   assigned to assist me in the investigation by the

19   attorney general.

20       Q    So you were the lead investigator?

21       A    Yes.

22       Q    And you were first assigned to the case,

23   right before Kyle French, or Kyle French was first

24   assign to the case?  Who was the first to be assigned

                    DAILY COPY-28

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     to the case?

2         A     I was.

3         Q     You were?  Okay, and can you tell me the date

4     when you were assigned to the case, the exact date?

5         A     No, I believe -- No, I don't know the exact

6     date.

7         Q     If I gave you your police report, can you

8     tell me the exact date?

9         A     Yes.

10                        (Whereupon, a pause was had.)

11        THE DEFENDANT:  Judge, may I approach?

12        THE COURT:  You may approach.  You got to show it

13    to Mr. Podlasek first.

14                        (Whereupon, a pause was had.)

15        MR. PODLASEK:  That's fine, Judge.

16        THE COURT:  All right.  You can mark that

17    Petitioner's Exhibit No. 1.

18        THE DEFENDANT:  I just want to know exactly when

19    you were assigned to the case.

20        THE COURT:  All right.  Miss Melongo, we're going

21    to mark that Petitioner's Exhibit No. 1.  Everything

22    you show to a witness has to be marked.

23                        (Whereupon, a pause was had.)

24        THE COURT:  All right.  The record will reflect

                        DAILY COPY-29

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Miss Melongo showed Detective Martin Petitioner's

2    number one, which purports to be what?

3        THE DEFENDANT:  Exhibit number one is the Schiller

4    Park investigative photo of the report.

5            Q  So you just saw in Exhibit 1, can you

6    tell us the exact date when you were assigned to this

7    case?

8        A    May 5, 2006.

9        Q    During the course of the investigation, you

10   subpoenaed various companies regarding the IP address

11   24 --

12       MR. PODLASEK:  Judge, I could provide the IP

13   address if it would speed things up.

14       THE DEFENDANT:  No, Judge, I have it.

15       THE COURT:  Miss Melongo wants the IP address.

16       THE DEFENDANT  Q  Okay, the IP address 24, 15,

17   202, 102.

18       THE COURT:  202 what?

19       THE DEFENDANT:  202, 102.

20           Q  Can you tell this Court how you got

21   that IP address, and what company -- First, how you got

22   the IP address since your record show that the day you

23   were actually assigned before --

24       THE COURT:  All right.  Miss Melongo, that's not a

DAILY COPY-30

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    question, you're making a statement.  Just ask

2    questions.

3         THE DEFENDANT  Q  Can you tell this Court because

4    on May 5, you already had this IP address, can you tell

5    this Court how you got that IP address?

6         A    The initial officer that took the report from

7    the Save a Life Foundation was provided emails, and in

8    those email headers, it showed that IP address.

9         Q    So what email headers -- Can you be specific?

10   Is it the email I sent to Carol Spizzirri, or is it --

11   what email that got that IP address from?

12        A    It was an email sent to, I believe,

13   Miss Spizzirri after they looked into the incident.

14        Q    And who sent that email?

15        A    I don't recall.

16        Q    If I say that the IP address was actually

17   recover from the email the defendant sent to Save a

18   Life Foundation, is it going to be correct?

19        MR. PODLASEK:  Objection.

20        THE COURT:  Overruled.

21                  You can answer.

22        THE WITNESS:  I'm sorry, I didn't hear the

23   question correctly, I'm sorry.

24        THE DEFENDANT  Q  I said if I sent the email, that

DAILY COPY-31

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      IP address was taken from the email the defendant sent

2      on May 1 to Save a Life Foundation, is it going to be

3      correct?

4          A     The email that was provided to the initial

5      officer was, from my understanding, the email that was

6      sent to Miss Spizzirri from there, I believe it was

7      their web email host after they had looked into the

8      matter, and the -- in reference to the intrusion that

9      was done on Miss Spizzirri's email account.

10         Q     And what that email --

11         A     I'm sorry?

12         Q     Can I have that -- Can you show me that

13     email, please?  Because I never had that email.  You

14     say you were assigned to this case May 5, and then you

15     said a person, the officer who after you was the one

16     who got that email address, so that email was never

17     provided to me, so where was that IP address taken from

18     since by that time you hadn't subpoenaed anybody to get

19     that IP address?

20         A     I don't understand the question.

21         Q     I say what email that IP address was taken

22     from?  Mr. Martin, please make this easy, you were the

23     investigator in this case.  Don't come and tell me here

24     you didn't know the IP -- the email the IP address --

DAILY COPY-32

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          MR. PODLASEK:  Judge, I'm going to object.

2          THE COURT:  Sustained.

3                Miss Melongo, you cannot address the

4     witness in that shape or form and phrase those

5     questions the way you're phrasing them.  I know I'm

6     giving you a little bit of leeway because you don't

7     have legal experience and didn't go to law school;

8     however, the questions you're asking are multiple,

9     compound questions that contains statements, ideas,

10    thoughts, your opinions, and you can't ask questions

11    that way.

12         THE DEFENDANT  Q  May 5, you were assigned to this

13    case, and then May 5, you already had an IP address.

14    Can you tell me how you got that IP address?

15         A    The IP address was listed in an email header

16    provided to the initial officer at the time he took the

17    report from Save a Life.

18         Q    And what email was it?  Who sent that email,

19    and who received that email?

20         A    I don't recall who sent the email, but it was

21    sent to Miss Spizzirri.

22         Q    So you know who sent -- you don't know who

23    sent it, but you received it.  Can I have a copy of

24    that email?

DAILY COPY-33

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A    Sure.  It's in the evidence that was

2  collected.

3      Q    That email has never been given to me.  So if

4  you can ask the State if I could have a copy of that

5  email?

6      THE COURT:  All right.  Miss Melongo, you can't

7  address that to the witness like that --

8      THE DEFENDANT:  Can I have a copy of the email,

9  please?   That was never given to me.

10     THE COURT:  State, has that been tendered?

11     MR. PODLASEK:  Judge, if he's referring to the

12  same email that we discussed earlier, then it's

13  attached as part of our response, so it's sitting right

14  in front of her, but I'm not sure if that's the email

15  or not.  I still don't know which email she is talking

16  about.

17     THE DEFENDANT:  Judge, it can't be that email.

18  That email was sent May 4.  According to Mr. Martin's

19  statement is the first investigator who got assigned to

20  this case, and that investigator, I think, his first

21  contact with the foundation was the 28th.

22     THE COURT:  Well, here's the situation, no one

23  knows what email you're talking about.  So you need to

24  narrow that down and ask the witness exactly what email

DAILY COPY-34

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    that you're referring to.

2         THE DEFENDANT:  That's why I actually asked him,

3    and then he said he doesn't know.  He knows who

4    received it, but he doesn't know who sent it.

5         THE COURT:  All right.  Then you have to ask some

6    more questions.

7         THE DEFENDANT  Q  So the email address you were

8    given, you started your investigation with, prior to

9    that, you never made a subpoena, a subpoena was never

10   made prior to receiving that email, that IP address,

11   prior to receiving that IP?

12        A    I'm not understanding your question.

13        Q    Okay, on May 5, you started your

14   investigation, and then on the (Inaudible), you had an

15   IP address.  My question is how did you get that IP

16   address?

17        A    It was provided in the email header.

18        Q    What email, the date of the email -- Since

19   you don't know the sender, but you know (Inaudible)

20   what the exact date of that email address?

21        A    I don't know, I don't recall.

22        MR. PODLASEK:  Judge, may the defendant and I

23   approach the bench?  Maybe we could resolve this issue

24   so we could move on?

DAILY COPY-35

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          THE COURT:  Please.

2                    Miss Melongo, step up, please.  We're

3     off the record.

4                         (Whereupon, an off the record

5                          discussion was had.)

6          THE COURT:  Both sides can have a seat at

7     counsel's table.  We're back on the record.

8                    For the record, State and Miss Melongo

9     and I have had a little conference, and State has given

10    a copy of the email, Miss Melongo agrees that is the

11    email.  It was tendered in discovery.

12                    And you may ask your next question.

13         THE DEFENDANT  Q  So the email you got you started

14    on this investigation was -- the IP address was taken

15    from the header of the email the defendant sent to

16    Carol Spizzirri, is that correct?

17         A    The email that I believe you're referring to,

18    the header contained an IP address as the sending IP.

19         Q    And that email is the one the defendant sent

20    on May 01 206 at 11:31 p.m. to Save a Life Foundation,

21    is that correct?

22         A    I don't recall the exact date and time, but

23    the email that you sent was that IP address.

24         Q    Okay, thank you.  And during the course of

DAILY COPY-36

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    your investigation, did you find out what company that

2    IP belong to?

3         A    Yes, I did.

4         Q    And what company did it belong to?

5         A    Comcast.

6         Q    The server -- the individual server company

7    were hired by Save a Life and did assist you in your

8    investigation.  Can you tell us the individual, the

9    expert that was hired by Save a Life Foundation, to the

10   incident that happened on April -- the alleged incident

11   that happened April 28 going on to May 1.  What expert

12   did Save a Life Foundation hired?

13        A    The one that I'm aware of is, I believe it's

14   called Critical Technologies.

15        Q    The one you are aware of, right?  You recall

16   you told me that in your 100 percent reliable police

17   report that two experts you put in your police report,

18   Brian Salerno and Don Peters?

19        A    Okay.

20        Q    Can this refresh your memory that those were

21   the two experts as stated in your police report, those

22   were the two experts --

23        A    If that's what if says in the report, yes.

24        Q    Just for the record, Save a Life Foundation

DAILY COPY-37

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    hired two companies, Critical Technology and two

2    consulting --

3         MR. PODLASEK:  Judge, I'm going to object at this

4    point.  If Miss Melongo is going to continue to

5    testify, I'd ask that she be put under oath and present

6    herself for cross-examination later on.

7         THE COURT:  All right.  You cannot phrase

8    statements -- make statements or phrase questions in

9    that form, so the objection is sustained.

10        THE DEFENDANT  Q  Save a Life hired two

11   consultants, is that correct?

12        A     That I'm aware of, yes.

13        Q     And Save a Life also hired Critical

14   Technology for the incident, is that correct?

15        A     That was one of them, yes.

16        Q     What are those two experts -- were there

17   other experts hired by Save a Life?

18        A     I'm not aware of any other ones that I'm

19   aware of.

20        Q     Thank you.

21              Okay, which one of those two expert

22   hired by Save a Life was able to identify the defendant

23   had intruded into Save a Life computer and service?

24        A     I don't believe any of them did.

DAILY COPY-38

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004018

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      THE DEFENDANT:  Judge, may I approach?

2      THE COURT:  You may.

3      MR. PODLASEK:  Can I see that, Judge.

4      THE COURT:  Yes.

5      THE DEFENDANT  Q  Okay, for the record, can you

6      read to the Court as what you just said --

7      contradictory to what you state in the Grand Jury,

8      could you read to the Court Page 8 Line 15, 224 --

9      THE COURT:  Okay, Miss Melongo, there's certain

10     procedures that have to be followed, and I'm going to

11     allow you a little bit of leeway.  But first of all,

12     you have to mark that as Petitioner's Exhibit No. 2.

13     You have to show it to him and ask him if that is a

14     transcript of the Grand Jury, it has to be identified.

15     And then the date, you have to lay a foundation for it,

16     and if he, in fact, testified in front of the Grand

17     Jury on that date, and is that what he said, okay?

18     THE DEFENDANT:  Yes.

19     Q  In exhibit number two, Page 8, can

20     you read Line 15 to Line 24, please?

21     MR. PODLASEK:  Judge, is this part of the

22     foundation, or is this the actual evidence --

23     THE COURT:  I understand.  We're going to give

24     Miss Melongo some leeway.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          Detective, is that a transcript of your

2    Grand Jury testimony?  Take a look at it.

3         THE WITNESS:  Yes, I believe it is, your Honor.

4         THE COURT:  How many pages is it?

5         THE WITNESS:  It appears to be 13.

6         THE COURT:  What day were you at the Grand Jury?

7         THE WITNESS:  It looks like June 18 of '08.

8         THE COURT:  Do you recall that?

9         THE WITNESS:  Yes, your Honor.

10        THE COURT:  All right.  I'm going to ask you to

11   look at the whole transcript.  Is that an accurate

12   transcript of your testimony in front of Grand Jury of

13   on June 8 of '08?

14        MS. SARCOS:  Your Honor, for the record, we

15   believe that is the arraignment date, the June date,

16   this was a May Grand Jury jury.

17        THE COURT:  So is that your Grand Jury testimony?

18        THE WITNESS:  It appears to be, yes, your Honor.

19        THE COURT:  And what's the date on the transcript?

20        THE WITNESS:  It says arraignment date of June 18

21   of '08 before special Grand Jury May of 2008, 28th day

22   of May, 2008.

23        THE COURT:  So it happened the 28th day of May,

24   2008?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      THE WITNESS:  Yes, your Honor.

2      THE COURT:  All right.  Take a look at it.

3      THE WITNESS:  Okay.

4                          (Whereupon there was a short pause

5                           in the proceedings)

6      THE WITNESS:  Okay.

7      THE COURT:  What's your question now,

8  Miss Melongo?

9      THE DEFENDANT  Q  Page 8 Line 15 to 24, can you

10  read that for us?

11      THE WITNESS:  "These experts that were hired by

12  Save a Life did -- did your investigation reveal that

13  they were able to trace the individual responsible for

14  intruding on the system.  Answer, yes.  Question, and

15  this was done by tracing the actual intrusion by back

16  stepping it.  Answer, yes.  They went into the server

17  log which kept track of single computer that accessed

18  the server and used those logs and the IP address

19  search, retracted back to Miss Melongo's computer.

20      Q    So you just told me it doesn't actually

21  reflect what you told me that those experts were not

22  able to identify the defendant as the intrusion, right?

23      A    Those two specific experts that you referred

24  to, no, not solely based on their records and their

DAILY COPY-41

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    recovery efforts.

2        Q    And then you also told me those are the two

3    expert hired by Save a Life, correct?

4        A    That's correct.

5        THE DEFENDANT:  Judge, may I?

6        THE COURT:  You may retrieve your exhibit.

7        THE DEFENDANT  Q  And which of those experts

8    stated the defendant deleted files?

9        A    Deleted files?

10        Q    Deleted.

11        A    I don't recall which expert was able to

12    recover the deleted files.

13        Q    No, I said which one point at the defendant

14    as having deleted files because the defendant is being

15    charged of deleting and accessing?

16        A    The two experts that were hired, one of them

17    recovered files from the computer.  Yeah, one of the

18    experts, I don't recall which one, was able to recover

19    some of the deleted files.

20        Q    Did Mr. Salerno, the first expert, did he

21    point at the defendant as being the owner of the

22    deletion?

23        A    I don't believe he did.  I don't recall -- I

24    don't recall which expert recovered the deleted files.

DAILY COPY-42

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004022

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     Q    No, that's not what I'm asking.  I said did

2  he tell you that it's the defendant who deleted the

3  files?

4     A    No, he did not.

5     Q    Mr. Don Peter, the second expert hired, did

6  he tell you that it is the defendant, according to what

7  he did, did he tell you that it was the defendant who

8  deleted the files?

9     A    No, he did not.

10    Q    And did Brian Salerno, the first expert, did

11 he tell you that the defendant changed the password

12 from Save a Life Foundation and ended up deleting the

13 files?

14    A    No.

15    Q    Did Mr. Don Peter, the second expert, did he

16 tell you that the defendant was the one who changed the

17 password, reset and end up deleting the file?

18    A    No.

19    THE DEFENDANT:  Judge, may I approach again with

20 the same exhibit two?

21    THE COURT:  Yes, you may.

22    THE DEFENDANT  Q  Now, can you read to the Court

23 Line seven to 14, Page 8?

24    A    "Question, in this case, do you know how the

DAILY COPY-43

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004023

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    computer in the investigation that you performed was

 2    caused to crash.  Answer, yes, someone had changed the

 3    password, and, therefore, the administrators had

 4    entered in a master password reset.  In doing so, this

 5    caused the server to automatically initiate a program

 6    that cleaned out and wiped out the whole hard drive and

 7    every file that was located on it."

 8         Q    So according to the expert, Brian Salerno and

 9    Don Peter, that someone was not the defendant, is that

10    correct?

11         A    No.

12         THE COURT:  No, that's not correct, or --

13         THE WITNESS:  No, that is not correct.

14         THE DEFENDANT  Q  During your investigation, did

15    you ever subpoena Comcast regarding the IP address, 24,

16    dot 15 dot 202 dot 102?

17         A    Yes.

18         Q    How many times did you subpoena Comcast?

19         A    Once.

20         Q    That's not what it (Inaudible)?

21         COURT REPORTER:  I'm sorry?

22         THE DEFENDANT  Q   I say how many times did you

23    subpoena Comcast?

24         A    For that IP address, once.
```

DAILY COPY-44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       THE DEFENDANT:  Judge, I'm going to enter

2   Exhibit 4 and Exhibit 5.

3       THE COURT:  What happened to three?

4       THE DEFENDANT:  It's a response to the Comcast --

5       THE COURT:  What happened to Exhibit 3?  Do you

6   have Exhibit 3?

7       THE DEFENDANT:  We don't have Exhibit 3?  Okay,

8   Exhibit 3 and exhibit --

9       MR. PODLASEK:  Can I see copies of those, please,

10  Judge?

11      THE DEFENDANT:  I'm going to show it to you.

12                      (Whereupon, a pause was had.)

13      THE DEFENDANT:  So this is the response of the

14  Comcast subpoena the witness sent to Comcast, sent

15  through subpoena to Comcast?

16      MR. PODLASEK:  Fine, Judge.

17      THE COURT:  You can approach.

18      THE DEFENDANT:  Judge, may I approach?

19      THE COURT:  Yes.

20      THE DEFENDANT  Q  So you sent two subpoenas to

21  Comcast, and for the Court, can you identify the

22  subpoena, please?

23      A    In Exhibit 3 is a subpoena sent or subpoena

24  response received from Comcast in which I requested

DAILY COPY-45

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    subscriber information for you at your home address in

2    Palatine, Illinois.  Exhibit 4 is a Comcast subpoena

3    response for the IP address 24, 15, 202, 102."

4        Q    Thank you.  So now you're on the same page?

5    So when you subpoena Comcast with subscriber

6    information regarding the IP address, 24, 15, 202, 102,

7    did Comcast ever respond stating that defendant had an

8    account, bid, was bid for that IP address?

9        A    No.

10        Q    Did Comcast ever reply to you stating that

11    the defendant used the IP address between on or about

12    April 28 going on to May 1, 2006?

13        A    No.

14        Q    Did Comcast ever told you that IP address was

15    assigned to a modem bid to the defendant?

16        A    No.

17        Q    You still have my Grand Jury, the '08?  Do

18    you have the copy there?

19            Judge, may I approach with the same

20    Exhibit 2, and I just want the detective to read the

21    statement?

22        THE COURT:  You may approach.

23        THE DEFENDANT  Q  Is Page 11, Line 12 to 17,

24    Exhibit 2.

DAILY COPY-46

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A      "Question during your investigation, were you

2  able to determine from what location Miss Melongo

3  accessed the computer on both April 28 of 2006 and May

4  1 of 2006.  Yes, it was a Comcast IP address that was

5  billed to and assigned to the modem at Miss Melongo's

6  address in Palatine."

7      Q      Thank you.  So based on the Comcast response

8  to your subpoena, this statement is not true, correct?

9      A      I'm sorry, can you repeat the question?

10      Q      Based on the response to Comcast, the

11  statement you just gave to the Grand Jury was not

12  correct?

13      A      Correct.

14      Q      And when you're investigating, actually

15  assigned as investigator to Save a Life Foundation, was

16  Miss Spizzirri's computer ever hacked into?

17      A      I don't have that knowledge, no.

18      THE DEFENDANT:  Judge, may I approach?

19      THE COURT:  Yes.  Show it to --

20      THE DEFENDANT:  Exhibit number two.

21      THE COURT:  The Grand Jury, okay, you may

22  approach.

23      THE DEFENDANT  Q  Okay, read Page 11, Line 3

24  through 9.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A    "Answer, the email account, the IP address

2    that was used to access the server and access

3    Miss Spizzirri's computers email was also the same one

4    that the emails was sent to.  So basically it was like

5    sending an email to herself."  I'm sorry, you want me

6    to go to Line 9?

7    Q    Yes.

8    A    "Miss Melongo went into the Carol Spizzirri's

9    email and transferred those emails directly to her own

10   Yahoo account."

11   Q    So, according to what you just read,

12   Miss Spizzirri's computer was also (Inaudible), right?

13   A    Her email, yes.

14   Q    Not her computer?

15   A    I don't know have that information, I don't

16   know if it was her computer or just her email.

17   Q    I want to know what -- the email are located

18   somewhere.  They're not -- Was the computer -- Was

19   Mrs. Spizzirri's computer located at Schiller Park, was

20   it also intruded in, yes or no?

21   A    I don't recall.

22   Q    When the email was, you say part of the

23   email, where was -- What computer were those email

24   located?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A      I believe they were in Miss Spizzirri's

2   email which was located on her computer.

3      Q      In Colorado or at Save a Life Foundation --

4   at Schiller Park?

5      A      I believe it was in Schiller -- it should --

6   it was located on her computer in Schiller Park.

7      Q      So her computer was also intruded in?

8      A      Yes.

9      Q      So did you ever check or preserve evidence on

10   her computer?

11      A      No.

12      Q      Did you ever check or preserve evidence on

13   the older computer that were also intruded in?

14      A      No.

15      Q      Did you ever check or preserve evidence on

16   the server, I don't know exactly know how many servers

17   but did you ever check or preserve evidence on the

18   server that were intruded in?

19      A      No.

20      Q      According to your police report on Page 2 of

21   the supplemental, I think this is Exhibit 1, you say

22   the DSL line was disconnected after the defendant left,

23   is that correct?

24      A      I'd have to refer to my report, I don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    recall that.

2         THE DEFENDANT:  Judge, may I?

3         THE COURT:  You may.

4         THE DEFENDANT:  This was already entered --

5         THE COURT:  Number one?

6         THE DEFENDANT:  One.

7              Q  And it's Page 2, I think it is the

8    first paragraph.

9         MR. PODLASEK:  What page was that?

10        THE DEFENDANT:  Page 2, the part on the top --

11        THE COURT:  What's your question now?

12        THE DEFENDANT:  I just want to confirm that the

13   DSL according to his police reports were disconnected.

14        THE WITNESS:  Okay, can you ask your question

15   again, I'm sorry.

16        THE DEFENDANT  Q   The DSL line was disconnected

17   after the defendant left?

18        A    According to Mr. Barns, an employee of Save a

19   Life, yes, he said that they disconnected them.

20        Q    Thank you.  If you recall earlier, I asked

21   you if somebody had access computer DSL line is

22   disconnected, so the DSL line was disconnected.  So

23   nobody could have hacked into Save a Life computer with

24   disconnected server, right?

DAILY COPY-50

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A    Not to my knowledge.

2      Q    Thank you.  So it was disconnected, DSL line

3  disconnected, the defendant could not have hacked into

4  Save a Life computer, right?

5      A    I don't know.

6      Q    Can you be -- yes or no?

7      A    I don't know.

8      Q    You answered the question earlier?

9      MS. SARCOS:  Objection, asked and answered, he

10  said he didn't know.

11      THE COURT:  Objection sustained, and you're

12  arguing.

13      THE DEFENDANT  Q  The DSL line connected Save a

14  Life computer to the internet, those DSL lines were

15  disconnected from the internet who the defendant be

16  able to intrude in those computer disconnected to the

17  internet?

18      A    Based upon my experience, my level of

19  expertise, I don't know that that could be done, I

20  don't have that information.

21      Q    Thank you.

22           During your investigation at Save a Life

23  Foundation, did you meet an individual called Christian

24  Sass (Phonetic)?

DAILY COPY-51

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       A     No.

2       Q     You never talked to Christian Sass?

3       A     I don't recall if I talked to him, but I

4    never met him face to face.

5       Q     Do you know who took over after the defendant

6    left, who took over the IT department after the

7    defendant left?

8       A     I believe it was Mr. Sass.

9       Q     Why is it you never talked to Mr. Sass?

10       MR. PODLASEK:  Judge, objection.  He didn't say he

11   didn't talk to him, he said he never met him face to

12   face.

13       THE COURT:  Sustained.

14       THE DEFENDANT  Q  So you never got technical

15   expertise from Mr. Sass?

16       A     Not that I recall, no.

17       Q     Did you ever talk to Mr. Salerno?

18       THE COURT:  Salerno?

19       THE DEFENDANT:  (Indicating).

20       THE WITNESS:  I don't recall if I did or not.

21       THE DEFENDANT  Q  Mr. Salerno was the first expert

22   assigned to the alleged incident, is that correct?

23       A     I don't know if he was the first.  I know he

24   was one of the people that did.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        Q    Who was the first, Mr. Don Peter or

2    Mr. Salerno?

3        A    I don't have that information.

4        THE DEFENDANT:  Judge, I'm now introducing exhibit

5    number five.  I'm going to show it to the State.

6        THE COURT:  Thank you.

7                          (Whereupon there was a short pause

8                           in the proceedings)

9        THE DEFENDANT  Q  Officer, this email was sent,

10   actually it was an email exchanged between

11   Miss Spizzirri and Mr. Salerno at the wake of the

12   incident.  I want you to read on the record, please,

13   and this is Exhibit 5.

14       MR. PODLASEK:  Judge, I'm going to object to this.

15   He didn't create this email, he didn't send this email,

16   he didn't receive this email.

17       THE DEFENDANT:  No, I'm looking for information.

18       MR. PODLASEK:  She wants to put this email in.

19   This isn't proper foundation for it.  I'm going to have

20   a general objection as to how far afield --

21       THE COURT:  I don't even know what it is, yet.

22   so --

23       THE DEFENDANT  Q  That's the email creating the

24   situation because Mr. Salerno was the first responder

DAILY COPY-53

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    and he sent that email to Mr. Martin.

2        MR. PODLASEK:  This is hearsay, Judge.

3        THE COURT:  This is something that was sent to the

4    detective, is that what you are saying?

5        THE DEFENDANT:  Yes, it was sent to the detective.

6        THE COURT:  Do you recognize that exhibit,

7    Detective Martin?

8        THE WITNESS:  No, your Honor, I don't -- not at

9    this point.

10       THE COURT:  Was that sent to you?

11       THE WITNESS:  No, your Honor, I don't believe it

12    was.

13       THE COURT:  All right.

14       THE DEFENDANT:   Okay, anyway I want to

15    (Inaudible).

16       MR. PODLASEK:  Judge, I'm going to object to this.

17       THE COURT:   He doesn't know what it is, he

18    doesn't recognize it, it wasn't sent to him.  He can't

19    just read anything into the record, Miss Melongo.  He

20    has to have knowledge of it.

21       MR. PODLASEK:  Judge, if I may, rather than

22    interrupt --

23       THE COURT:  No, you may not.

24       THE DEFENDANT:  Judge, I have evidence that this

DAILY COPY-54

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    email was sent to Mr. Martin.

2         MR. PODLASEK:  Judge, objection.

3         THE COURT:  You may proceed.  You may check.  Go

4    ahead.

5                        (Whereupon there was a short pause

6                         in the proceedings)

7         THE DEFENDANT:  Judge, now I'm going to enter into

8    record Exhibit 6.  And this is an email Mr. Kyle French

9    sent to Mr. Martin asking information about Don Peter

10   and Salerno.

11        MR. PODLASEK:  Objection, Judge.

12        THE COURT:  All right.  You may approach.

13        THE DEFENDANT:  Judge, may I?

14        THE COURT:  Yes.

15        THE DEFENDANT  Q  So this is information that

16   Mr. Kyle French from the Illinois Attorney General

17   requested of you.  Do you recognize that email?

18        A    Yes, I recognize the email.

19        Q    And that email is requesting email from

20   Mr. Salerno and Mr. Don Peter, is that correct?

21        A    It's asking for information about Don Peters.

22        Q    And then the second one?

23        A    It names addresses of others who try to

24   recover lost data.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q    And you said Salerno was somebody who tried

2    to recover lost data, is that correct?

3    A    Yes, I believe so.

4    Q    So Mr. Salerno, you had email (Inaudible)

5    from Mr. Salerno, is that correct?

6    A    I'm sorry, I didn't hear the question

7    correctly.

8    Q    So Mr. Salerno was an expert hired by Save a

9    Life to fix the incident, is that correct?

10   A    Yes.

11   Q    And this email is asking you for information

12   about anybody who tried to fix the system, and among

13   those was Mr. Salerno, is that correct?

14   A    Yes.

15   Q    Did you provide that information to Mr. Kyle

16   French?

17   A    I don't recall if I provided it to him or

18   not.

19   Q    Did you have that information with you?

20   A    I don't recall the time that I received this

21   email, whether I had information about Mr. Salerno or

22   not.

23   Q    You had information about Don Peter?

24   A    I believe so at that time.

DAILY COPY-56

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q    But you didn't have information about

2   Mr. Salerno?

3      A    I don't recall if I did at that time or not.

4      Q    Now, I'm going to introduce in the record

5   exhibit number six --

6                Where are we now?

7      THE COURT:  Seven.

8      THE DEFENDANT:  This is an email Don Peters sent

9   to Detective Martin, a summary of (Inaudible).

10             Judge, may I approach?

11     THE COURT:  Sure.

12     THE DEFENDANT  Q  Can you recall (Inaudible)

13  highlight it.

14     THE COURT:  First of all, what is that, so the

15  record, is clear, what is it, detective?

16     THE WITNESS:  Judge, it is an email from Donald

17  Peters at Think Critical dot com to myself.

18     THE COURT:  All right.  Do you recognize that

19  email?

20     THE WITNESS:  Yes, I do.

21     MR. PODLASEK:  Judge, could we ask the defendant

22  to make sure she's marking these exhibits so later on

23  we're not confused about it?

24     THE COURT:  Yes.  Have you been marking them,

DAILY COPY-57

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Miss Melongo?

2           THE DEFENDANT:  That's a good idea.

3           THE COURT:  Go ahead, you can read it.

4           THE WITNESS:  "It was good to speak with you

5    yesterday regarding your efforts to assist the Save a

6    Life Foundation.  As per our discussion, I have

7    attached a letter I sent to Carol providing a rough

8    overview of the discovery and actions taken by Critical

9    Technology Solutions.  When I was first introduced to

10   Carol and apprised of the situation and actions taken

11   prior to my arrival, we discussed the next steps

12   required for recovery versus preservation of evidence.

13   There was an uncertainty as to the catalyst for data

14   logs as several maintenance actions were performed just

15   prior to discovery of the problem.  I advised the group

16   that with multiple personnel attempting recovery of the

17   drives over the previous days and no clear chain of

18   custody, the quality of any evidence discovery would be

19   questionable at best.  Carol's decision was to move

20   forward with recovery efforts when it was learned that

21   the previous back ups were incomplete or missing."

22          THE DEFENDANT  Q  Thank you.

23                  So you went on with your investigation

24   after having read this email?

DAILY COPY-58

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004038

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A    That's correct.

2    Q    Did you ever review the data recovered from

3    Don Peters, just reviewed the data to know where the

4    data are?

5    A    The initial officer that took the report was

6    given copies of what I believed to be screen shots of

7    data file folder structure of the data that was

8    recovered.

9    Q    So you only reviewed the screen shot, you

10   never reviewed the actual data recovered?

11   A    No, that's correct.

12   Q    And were you aware that long before you were

13   assigned to the case the data was already recovered and

14   sent to Carol Spizzirri on May 2, I think.

15   A    I'm sorry, on May 2 you said?

16   Q    Yes.

17   A    I don't recall that information, no.

18   Q    So you were not aware that the data was

19   recovered when you were assigned the investigation?

20   A    I believe the initial officer was told that

21   they had recovered a certain percentage of the

22   information, yes.

23   Q    So did you ever question Carol Spizzirri

24   about preservation versus recovery?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A    I don't recall having that conversation, no.

2    Q    Based on your investigation, you rely on the

3    date, April 28 going on to May 1, 2006, is that

4    correct, you rely on those dates as the date of the

5    intrusion, is that correct?

6    A    The two separate incidents, yes, those are

7    the dates of the two separate incidents.

8    Q    And you also relied on the time of the

9    intrusion from 1:00 a.m. to 3:00 a.m.?

10    A    Yes, I believe that's what they were, I don't

11    recall exactly.

12    THE DEFENDANT:  Judge, I'm now going to enter into

13    Exhibit 8.  This is an information Don Peters sent to

14    Carol Spizzirri, but the same information was also sent

15    to Mr. Martin when he requested it from Don Peters.

16    THE COURT:  Show it to counsel.

17    THE DEFENDANT:  I am going to show it to the

18    State.

19    THE COURT:  You may approach.

20    THE DEFENDANT  Q  Detective Martin, I want you to

21    identify if you are aware of this Exhibit 8?

22    MR. PODLASEK:  Judge, I know you are allowing

23    hearsay, but I'm going to object to this.  This was

24    sent by a third party.

DAILY COPY-60

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004040

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        THE DEFENDANT:  No, that information was sent to

2    Detective Martin.

3        THE COURT:  Well, you need to ask a question.

4        THE DEFENDANT  Q  Do you recall having received

5    that information from Mr. Don Peters?

6        A    I don't recall if I got it from Don Peters or

7    if it was tendered by Miss Spizzirri.

8        Q    But you recall having read that?

9        A    Yes.

10       Q    Now, if you turn the page over, please.  I

11   highlighted the yellow one, can you read that for the

12   record, please?

13       MR. PODLASEK:  Judge, I'm going to object to parts

14   of the letter being read.  If it's going to be allowed

15   into evidence for there hearing, I'd ask the entire

16   document be read into the record.

17       THE COURT:  I will read it.  Go ahead, read the

18   parts that's highlighted.

19       THE WITNESS:  "With the number of personnel

20   involved and the amount of time prior to our

21   examination, it is not possible to state with complete

22   certainty that the file tag information, in

23   parentheses, it's dates, times, etcetera, is accurate.

24   Let me clarify that no less than an extraordinary

DAILY COPY-61

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    effort would be required to modify this tag

2    information.  However, I am unable to speak to any

3    actions taken or not taken prior to the arrival of

4    Critical Technology Solutions Incorporated.

5         THE COURT:  Additionally, Mr. Podlasek, you can

6    cross-examine on any of these exhibits whichever form

7    yo choose.

8         MR. PODLASEK:  Thank you, Judge.

9         THE DEFENDANT  Q  So based on these information,

10   there's no hundred percent certainty that the intrusion

11   happened on April 28 going on to May 1, is that

12   correct?

13        A    Based solely on his opinion.

14        Q    Is that correct?

15        A    That's correct.

16        Q    Also based on the information of the expert

17   hired by Save a Life, is it correct that the data

18   intrusion didn't happen between 1:00 a.m. and

19   3:00 a.m., is that correct?

20        A    I can't answer to that.

21        Q    I said based on what the information he gave

22   you?

23        A    Based on that letter, he cannot say the

24   exact -- that the dates and times are correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        THE DEFENDANT:  Judge --

2              Q  This information was sent to you.  I

3    said based on what he state?

4        A    Uh-huh.

5        MR. PODLASEK:  Judge, I'm going to object, it's

6    asked and answered, and she's becoming argumentative,

7    and she's not hearing the exact words that she wants to

8    hear, so she wants to put it into the witness' mouth.

9    He's already answered this.

10       THE COURT:  She can rephrase it.

11              Rephrase it.

12       THE DEFENDANT  Q  Based on Don Peters, an expert

13   hired by Save a Life, to recover and evaluate the

14   incident, is it possible that the intrusion never

15   happened April 28 going on to May 1?

16       A    Based solely on what he says there, that's

17   correct.

18       Q    Also based on Don Peters, an expert hired by

19   Save a Life to evaluate and recover data, is it

20   possible the intrusion that didn't happened between

21   1:00 a.m. and 3:00 a.m.?

22       A    That's his opinion, yes.

23       Q    Is it also true that prior to Don Peters,

24   there were several individuals attempting recovery of

DAILY COPY-63

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004043

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    the (Inaudible)?

2         A    From what Miss Spizzirri told the initial

3    officers and us, yes, that's correct.

4         Q    Did you ever watch the ABC report on Save a

5    Life Foundation?

6         MR. PODLASEK:  Objection, Judge.

7         THE COURT:  Sustained.

8              Miss Melongo, this is about a motion to

9    dismiss indictment, okay.  This is not a deposition of

10   the detective.  I've allowed you a lot, a lot of leeway

11   here.  So I'm going to ask you to wind this up, get to

12   your point as it relates to a motion to dismiss

13   indictment.  We're not conducting a deposition here.

14        THE DEFENDANT:  Okay.

15             Q  During your investigation, the

16   defendant was also charged with various credit card

17   fraud -- accused, not charged, accused of various

18   credit card fraud.

19        MR. PODLASEK:  Objection, Judge, relevance.

20        THE COURT:  Sustained.

21        THE DEFENDANT:  Okay, Judge, at this time I am

22   going to wind up.

23        THE COURT:  Okay, you may cross.

24        MR. PODLASEK:  Judge, could I have half hour so I

                        DAILY COPY-64

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   can go over my notes?

2          THE COURT:  No.

3          MR. PODLASEK:  It's been extensive.

4          THE COURT:  Let's go.

5                    CROSS EXAMINATION

6                         BY

7                    MR. PODLASEK:

8          Q    Detective Martin, did you execute a search

9    warrant on or about July 20 of 2006?

10         A    Yes.

11         Q    Where did you execute that search warrant?

12         A    At Miss Melongo's apartment in Palatine.

13         Q    Who was present besides yourself?

14         A    Myself, Miss Melongo, Detective Dan Cook,

15   Shauna Monge (Phonetic) of the Illinois Attorney

16   General's Office and her partner, Amber Hiconnie

17   (Phonetic).

18         Q    And where did the execution of the search

19   warrant take place?  Do you recall the address?

20         A    Not off the top of my head, no.

21         Q    Was it in Palatine, Illinois?

22         A    Yes.

23         Q    Was it on Valley Lake Drive?

24         A    I believe so, I don't recall the exact

                    DAILY COPY-65

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    address.

2         Q    Was this location the apartment of

3    Miss Melongo at that time?

4         A    Yes.

5         Q    Was she in possession of that apartment?

6         A    Yes.

7         Q    Did Miss Melongo allow you into her

8    apartment?

9         A    Yes, she did.

10        Q    Did you conduct a search of that apartment?

11        A    Yes, we did.

12        Q    During the course of that search, did you

13   personally conduct a search, or did you have a

14   conversation with the defendant?

15        A    Both.

16        Q    At some point during the execution of the

17   search warrant, did you conduct a conversation with the

18   defendant?

19        A    Yes, I did.

20        Q    Where did that conversation take place?

21        A    I believe it was her kitchen table.

22        Q    Who else was present for that conversation?

23        A    Detective Cook.

24        Q    Was Miss Melongo read her Miranda rights?

DAILY COPY-66

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A      Yes, she was.

2      Q      Did she waive her Miranda rights?

3      A      Yes, she did.

4      Q      During the course of that conversation, did

5  Miss Melongo make any admissions to you?

6      A      Yes, she did.

7      Q      What admissions did she make, if any,

8  regarding the Save a Life Foundation intrusions?

9      A      She stated that she had been accessing the

10  emails system for approximately two weeks after she had

11  been fired from Save a Life.

12      Q      How was she accessing the Save a Life emails

13  after she had been fired?

14      A      She was remotely accessing their web servers.

15      Q      Did Miss Melongo explain to you what her

16  position had been before she was terminated from Save a

17  Life?

18      A      Yes, she was their IT administrator.

19      Q      Did Miss Melongo explain to you that IT

20  administrator had access to the email servers and to

21  the servers whether it was remotely or on site?

22      A      Yes.

23      Q      Did Miss Melongo tell you during that

24  conversation that she had access to Carol Spizzirri's

DAILY COPY-67

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    email accounts?

2         A    Yes.

3         Q    Did Miss Melongo tell you during that

4    conversation that she viewed an email from Carol

5    Spizzirri referring to her?

6         A    Yes.

7         Q    Meaning the defendant?

8         A    Yes.

9         Q    Did Miss Melongo tell you what she did with

10   that email?

11        A    Yes.

12        Q    What did she do?

13        A    She forwarded it to her Yahoo email account.

14        Q    Now, when you say forwarded, she didn't

15   destroy or manipulate that email, did she?

16        A    Not to my knowledge.

17        Q    She just forwarded to herself as if Carol

18   Spizzirri had forwarded to her, is that correct?

19        A    Correct.

20        Q    I'm going to show you what I'm marking as

21   People's Exhibit 1 and show it to the defendant.

22                   May I approach, Judge?

23        THE COURT:   You may.

24        MR. PODLASEK   Q   I'm going to show you what's been

DAILY COPY-68

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004048

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1 marked as People's Exhibit 1, could you please look at

2 that and describe it physically for the record. Take

3 your time, review it, detective. You recognize that

4 document?

5  A Yes, I do.

6  Q How many pages is that document?

7  A Four.

8  Q Please go to the third page. Is there any

9 emails specifically sent by the defendant to Carol

10 Spizzirri on that page?

11  A Yes.

12  Q What's the date of that email, if you can

13 identify it?

14  A It appears to be Monday, May 1, 2006.

15  Q Would you read the contents of that email out

16 loud into the record?

17  A "Hey, Carol, I've received this email

18 forwarded to me, and I can't imagine what a

19 pathological liar you are. I've learned about your

20 issue today, and I offered my help because while

21 working there, I got the same issue. The problem with

22 you, Carol, you lie too much just to get what you want.

23 I hope that you're still going to have your trial with

24 Robert Haff (Phonetic). I will expose you."

DAILY COPY-69

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004049

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       Q       Is there anything else written on that email?

2       A       Just what was forwarded out of Miss

3    Spizzirri's account.

4       Q       What did Miss Spizzirri's say?

5       A       "Think we found who Annabel called X four and

6    stopped in stream.  Left message on my cell offering to

7    fix our problem.  Very similar to former IT who corrupt

8    the system, have not spoke with her.  She refuse to

9    speak with Christian.  Go figure.  T K S much for your

10   follow through.  We are so behind, it hurts."

11      Q       Who did she send that to, that's Carol

12   Spizzirri?

13      A       That's Carol sending it to Miss Melongo.

14          THE DEFENDANT:  Judge, that's not true.  I want to

15   object.

16          THE COURT:  What's the basis of your objection?

17          THE DEFENDANT:  That's the email Mr. Martin said

18   he never received, the exchange between Salerno and

19   Miss Spizzirri.  I can show you the complete email.

20          THE COURT:  All right.  I'll allow to you redirect

21   on it.  The objection is overruled for now.

22          MR. PODLASEK  Q  The message that you read from

23   Miss Melongo to Miss Spizzirri in response to

24   Miss Spizzirri's email, alleged email to Miss Melongo,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    is there an email address that you can read from that?

2        A    Yes.

3        Q    What's the IP address?

4        A    24 dot 15 dot 202 dot 102.

5        Q    Is there an email address that you can

6    ascertain from that information?

7        A    Melongo underscore Annabel at Yahoo dot com.

8        Q    Detective, during the course of your

9    investigation, did you have an opportunity to subpoena

10   Yahoo dot com for Annabel Melongo's emails?

11       A    Yes.

12       Q    Did you recover an email log from Yahoo dot

13   com for the period in question, meaning sometime

14   between April 27 of 2006 and May 5 or 6 of 2006?

15       A    Yes.

16       Q    And did you have a chance to review those

17   email logs?

18       A    Yes, I did.

19       Q    And, in fact, those email logs were tendered

20   to Miss Melongo, weren't they?

21       A    I believe show.

22       Q    And that was pursuant to a subpoena

23   Miss Melongo sent to you?

24       A    That's correct.

DAILY COPY-71

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q    Were you able to ascertain from those email

2    logs whether or not Miss Melongo on the dates in

3    question was logged in and using that IP address of

4    24.15.202.102?

5    A    Yes.

6    Q    And were you able to also ascertain whether

7    or not Miss Melongo logged in during the time period in

8    question?

9    A    Yes.

10   Q    Detective, did you also take IP 24.15.202.102

11   and actually try to ascertain the location of where

12   that IP address was being used?

13   A    Yes.

14   Q    Is there a program that you can go on line

15   and do that with?

16   A    Yes.

17   Q    And, in fact, there are more than one

18   program, is that correct?

19   A    That's correct.

20   Q    Now, drawing your attention to May 4 of 2006,

21   did you use a program called WWW dot DNS stuff dot com?

22   A    Yes, I did.

23   MR. PODLASEK:   I'm going to mark this page as

24   People's Exhibit No. 2.

DAILY COPY-72

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1          THE COURT:  All right.  Show it to Miss Melongo.

 2                       (Whereupon there was a short pause

 3                        in the proceedings)

 4          MR. PODLASEK  Q  Do you recognize that document?

 5          A    Yes, I do.

 6          Q    What is that?

 7          A    It's the IP information for 24 dot 15 dot 202

 8     dot 102.

 9          Q    Does it give you a location of where that was

10     being used?

11          A    Palatine, Illinois.

12          Q    Is there any other information on there?

13          A    The reverse DNS shows that it's leased to dot

14     com dot net.

15          Q    Who leased it to Comcast dot net, is that

16     information available?

17          A    No, I believe AT&T is the backbone for them,

18     but I don't have that particular information.

19          Q    Detective, when you were doing your

20     investigation during the time between approximately May

21     5, I believe, or May 6 of 2006, did that investigation

22     culminate in the indictment of Annabel Melongo on or

23     about January 17, 2007?

24          A    Yes, it did.
```

DAILY COPY-73

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q    Did you rely on the information you gained or

2  garnered through that investigation which began in May

3  and ended sometime just before January of 2007?

4      A    Yes, I did.

5      THE DEFENDANT:  Judge, I'm going to object.

6      THE COURT:  What's your basis?

7      THE DEFENDANT:  The indictment -- this motion is

8  about what he said during the Grand Jury, not what

9  happened with the investigation.

10     THE COURT:  Well, you went extensively into the

11  investigation, so that is allowed.

12     MR. PODLASEK  Q  As part of your investigation,

13  were you working with the Attorney 's Office?

14     A    Yes, I was.

15     Q    And, in fact, were you working with a

16  specialized area of the Attorney General's Office?

17     A    Yes, I was.

18     Q    And what area was that?

19     A    The high tech crime bureau.

20     Q    And what you know the high tech crime bureau

21  specialize in?

22     A    Computer crimes.

23     Q    I'm going to show you what I've marked as

24  People's Exhibit three, I will show it to the

DAILY COPY-74

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    defendant?

2         THE DEFENDANT:  Judge, I'm also going to object to

3    this for two reasons.  This part does not confirm to

4    the (Inaudible) evidence, how an evidence was provided,

5    and the defendant has asked countless of times how this

6    examiner came up with this information.  That was never

7    provided to the defendant.

8         THE COURT:  You didn't receive that report?

9         THE DEFENDANT:  No.

10        MR. PODLASEK:  That's not true, Judge.  This

11   report has been turned over --

12        THE DEFENDANT:  No, what I didn't receive.  I

13   didn't receive how she came up with that information.

14   Under Supreme Court Rule 705, how an expert should

15   deliver -- how an expert in court has to be delivered,

16   and I asked for that information.  That information was

17   never provided to me.

18        THE COURT:  Well, I'm sure the expert will speak

19   to you, but the report obviously will speak for itself,

20   and your objection is overruled.  But if you want to

21   know more information about how the expert reached his

22   or her opinion, you can obviously talk to that expert.

23        THE DEFENDANT:  Okay.

24        MR. PODLASEK   Q  Detective, I'm going to show you

DAILY COPY-75

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    what's been marked as People's Exhibit No. 3, ask you

2    to review that document.

3                          (Whereupon there was a short pause

4                          in the proceedings)

5          MR. PODLASEK   Q  Do you recognize that document?

6          A    Yes, I do.

7          Q    Is that document actually addressed to you?

8          A    Yes, it is.

9          Q    Did you receive the original copy of this

10   document?

11         A    Yes.

12         Q    And that document was dated September 26 of

13   2006?

14         A    Yes.

15         Q    And can you tell us who Shauna Monge is,

16   M-o-n-g-e?

17         A    She was the forensic analyst that was

18   assigned to assist with the search warrant and to

19   analyze Miss Melongo's -- or the evidence collected

20   from Miss Melongo's apartment.

21         Q    And is this document, and five pages, a

22   summary of her forensic examination of what you

23   recovered in Miss Melongo's apartment through the

24   search warrant?

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004056

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A    Yes.

2    Q    And what did you recover that you tendered to

3   Miss Monge for review?

4    A    I believe it was Miss Melongo's laptop and

5   other information regarding Save a Life, passwords and

6   disks that had information regarding Save a Life in

7   their service.

8    Q    Without going through this line by line to

9   shorten the procedure, on Page 1 of this report, which

10  is dated RCFL Case No. HTCB dash 06 dash 01 dash 1028,

11  can you just read us the heading on that first

12  paragraph?

13   A    Forensic procedure summary.

14   Q    And then can you tell us in a short succinct

15  manner what follows under that heading?

16   A    An exact copy of the defendant's hard drive

17  was made and analyzed for specific information relating

18  to this incident.

19   Q    Do you know why they make an exact copy of

20  the hard drive and don't just look at the original hard

21  drive?

22   A    So that the evidence is retained and that the

23  original drive is not tampered in any way.

24   Q    And there's a second sub heading, what is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    that sub heading state, that's on Page 2 of this

2    document?

3         A    Forensic report summary.

4         Q    And through that summary which goes on for --

5    from Page 2 to 4, is there evidence that was recovered

6    off the defendant's hard drive that was a program

7    called Go To My PC?

8         A    Yes.

9         THE DEFENDANT:  Judge, I'm going to object, that

10   was not part of the indictment.  We are making a motion

11   on what he said during the Grand Jury.  This is part of

12   the examination of Miss Shauna who was not even working

13   at the Illinois Attorney General who cannot be

14   contacted, and it was not part of this motion.

15        THE COURT:  Quite frankly, I don't really know

16   what was part of the Grand Jury because you never put

17   it in.  I really don't know at this point.

18        THE DEFENDANT:  Okay, Judge, I'm going to put it

19   in now.

20        THE COURT:  I'm going to allow it.  If it doesn't

21   apply to the motion, I'm going to disregard it.

22        THE DEFENDANT:  Thank you, Judge.

23        THE COURT:  Okay.

24              You may proceed.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     MR. PODLASEK   Q   Was a program Go To My PC

2  recovered from Miss Melongo's computer?

3     A     Log files for that program were discovered,

4  yes.

5     Q     What exactly if you know is Go To My PC?

6     A     It's a program that is installed on a

7  computer to gain remote access into other computers.

8     Q     Without going into each and every line, was

9  there evidence recovered from Miss Melongo's computer

10  that would indicate she had access to the Save a Life

11  Foundations computers remotely?

12     A     Yes.

13     Q     What information do you observe that would

14  indicate that Miss Monge summarized in that document?

15     A     She said within a restored point of

16  Miss Melongo's hard drive, there was a text document

17  that's automatically created by windows for the domain

18  Save a Life, FOU.

19     Q     And FOU is in relation to foundation?

20     A     Yes, that's correct.

21     Q     Was there also any IP addresses recovered

22  from that computer?

23     A     Yes, there were.

24     Q     What IP addresses were recovered?

DAILY COPY-79

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004059

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    A    According to the reports, several incidents

2    of the IP, 24, 15, 202, 102 were discovered on the

3    evidence.

4    Q    And, finally, on Page 3, I draw your

5    attention to the fourth line down, is there an

6    indication that Carol Spizzirri's email address and

7    password were on the defendant's computer?

8    A    Yes.  Name and password Carol at SALF dot org

9    for the web site WWW dot SALF dot org --

10   COURT REPORTER:  I'm sorry, could you repeat that,

11   please?

12   THE WITNESS:  I'm sorry, the user name and

13   password Carol at SALF dot org for the web site WWW dot

14   SALF dot org slash web mail.

15   Q    Is there a password next to that?

16   A    Yes.

17   Q    This isn't a complete list of everything,

18   this is just a summary that you received from

19   Miss Monge?

20   A    That's correct.

21   Q    Did you eventually receive the disks that she

22   created with her complete analysis of the computers?

23   A    The summary was included on the disk.

24   Q    This was on the disk?

DAILY COPY-80

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A     Correct.

2          MR. PODLASEK:  Can I have one minute, Judge?

3          THE COURT:  You may have a minute.

4                           (Whereupon there was a short pause

5                            in the proceedings)

6          MR. PODLASEK  Q  Detective, did your investigation

7     show that there were two separate intrusions at two

8     different locations of Save a Life Foundation servers?

9     Let me rephrase that.  Was there an intrusion on the

10    two servers that were located physically at Save a Life

11    Foundation on or about April 28, 2006?

12         A     Yes.

13         Q     Do you know the model or the makes of the two

14    servers?

15         A     Yes.

16         Q     What were they?

17         A     I believe one was a Dell and one was a Sony.

18         Q     Was there anything recovered from the Sony to

19    the best of your knowledge?

20         A     No, there was not.

21         Q     Do you know why?

22         A     Yes.

23         Q     Can you explain to the Court why nothing was

24    recovered from the Sony server?

DAILY COPY-81

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 004061

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      A    Built in the operating system of the server,

2  if someone tries to enter the administrative password

3  too many times, the server will automatically -- I'm

4  sorry, the wrong password too many times, the server

5  software will automatically erase the files.  It

6  returns to the default state like day one when you buy

7  it.

8      Q    As the administrator of Save a Life

9  Foundation, did Annabel Melongo have the ability to

10  change passwords?

11     A    Yes.

12     Q    Did she have the ability to change passwords

13  of other individuals so that they could not get into

14  the server?

15     A    Yes.

16     Q    To the best of your knowledge, when you say a

17  percentage of the files were recovered, was that

18  recovery from the Dell server?

19     A    Yes.

20     Q    And that was not a 100 percent recovery, is

21  that correct?

22     A    That's correct.

23     Q    The second intrusion that took place was on

24  May 1 of 2006, on or about, is that correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          A    That's correct.

2          Q    Was that intrusion on the email server?

3          A    That's correct.

4          Q    Do you know where the email servers are

5     located?

6          A    The email host for Save a Life, I believe is

7     located in Colorado.

8          Q    Is that HSP?

9          A    Web HSP, yes.

10         Q    And that's something that the victim in this

11    case, Save a Life Foundation, would pay for their

12    services?

13         A    That's correct.

14         Q    Can you just explain to the Court in --

15    briefly, what does web host does or what it's meant to

16    do?

17         A    It provides --

18         THE DEFENDANT:  Judge, I'm going to object.

19         THE COURT:  Overruled.

20         THE WITNESS:  It provides a hub, like a transfer

21    station when -- to disseminate emails.

22         Q    So emails to and from Save a Life Foundation

23    would go to this hub in Colorado?

24         A    Correct.

DAILY COPY-83

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q    Once an email goes to a certain individual at

2    Save a Life Foundation, for example, Carol Spizzirri,

3    where would it go on the computer?

4    A    Are you referring to Carol's computer?

5    Q    Yes, I'm referring to Carol specifically in

6    this case?

7    A    Depending on the type of program or how

8    Miss Spizzirri accesses her email, if it's a locally

9    based program on her computer, the email would be

10   delivered to her in box at that computer.

11   Q    Would that in box be in something like a

12   program like Microsoft Outlook?

13   A    Yes.

14   Q    So the email would physically be on the

15   computer then?

16   A    That's correct.

17   Q    Detective, when you testified before the

18   Grand Jury both in 2007 and 2008, you weren't relying

19   solely on your specific single investigation, were you?

20   A    No.

21   Q    Were you relying on the other individuals

22   involved in this investigation?

23   A    That's correct.

24   Q    That would include your conversations with

DAILY COPY-84

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Don Peters, Brian Salerno, Shauna Monge, Kyle French,

2    and others?

3         A    That's correct.

4         Q    That would include your review of their work

5    product, is that correct?

6         A    That is correct.

7         Q    That would include Shauna Monge's analysis of

8    Miss Melongo's computer?

9         A    That's correct.

10        Q    That would include a review of the Yahoo

11   email account logs of Miss Melongo?

12        A    That's correct.

13        Q    So you didn't go into the Grand Jury and

14   answer questions posed to you based solely on your own

15   knowledge gained -- garnered by yourself, is that

16   correct?

17        A    That's correct.

18        Q    You relied on other individuals?

19        A    Correct.

20        Q    When you were testifying in the Grand Jury,

21   what role did Shauna Monge's investigation -- forensic

22   investigation play, was it related to the email

23   servers, was it related solely to Miss Melongo's

24   computer, or was it related to the servers, or all

DAILY COPY-85

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    three of those?

2        A    The evidence was collected, and Miss Monge

3    reviewed that evidence collected from Miss Melongo's

4    apartment.

5        Q    Did Miss Monge also offer any assistance with

6    regards to theories or advice as to how to pursue the

7    intrusion on email servers or the servers that were

8    located at Save a Life foundation?

9        A    No, she did not.

10       Q    Did HSP web services provide you with any

11   assistance?

12       A    Yes.

13       Q    And that was in relation to the email

14   instructions?

15       A    Correct.

16    MR. PODLASEK:  One second, Judge.

17    THE COURT:  You may.

18                   (Whereupon there was a short pause

19                   in the proceedings)

20    MR. PODLASEK  Q I'm going to show you once again

21   what I marked as People's Exhibit 1.  Was this given to

22   you by Miss Spizzirri or one of the other experts?

23    THE DEFENDANT:  Judge, can I see that, please?

24    MR. PODLASEK:  I'm sorry, People's Exhibit one.

DAILY COPY-86

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          THE COURT:  You already did see it.

2                    But show it to her again.  It's number

3     one.

4                    You want to see it again.

5          THE DEFENDANT:  No, that's fine.

6          THE COURT:  Okay.

7          THE WITNESS:  I don't recall if I received this

8     directly from Miss Spizzirri or if she tendered it to

9     the initial officer.

10         MR. PODLASEK  Q  The information that's at the top

11    of that email, that's from HSP's text support?

12         A    From what I understand, yes, the text support

13    at gmail dot com is the technical support company for

14    web HSP.

15         Q    Okay, and is that where the information

16    linking Miss Melongo's emails and IP addresses came

17    from?

18         A    Yes, the email sent from text support at

19    gmail dot com to Miss Spizzirri.

20         Q    And that was the one that Miss Melongo had

21    sent to Miss Spizzirri in response to -- again

22    Miss Spizzirri's email that you read earlier?

23         A    Correct.

24         MR. PODLASEK:  Judge, we have no other questions.

DAILY COPY-87

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      THE COURT:  All right.  Detective Martin, are you

2  available Monday, the 15th?

3      THE WITNESS:  I believe so, your Honor.

4      THE COURT:  Okay.  I'm holding this matter over to

5  Monday, October 15.

6          Detective Martin, you're not to discuss

7  your testimony because you're still on the witness

8  stand with anybody, okay?

9      THE WITNESS:  Okay.

10     THE COURT:  And I believe Miss Melongo will have

11  some questions for you then on October 15.

12     THE WITNESS:  Yes, your Honor.

13     MR. PODLASEK:  Thank you.

14     THE COURT:  We'll hear this matter, Room 315, at

15  10:00 a.m.

16     THE DEFENDANT:  Monday, the 15th?

17     THE COURT:  Right, Monday.

18     THE DEFENDANT:  And by then, can I have that

19  information by then, who created the email and

20  everything.

21     THE COURT:  I'm going to ask Mr. Podlasek, as I

22  did before provide who exactly wrote that email, okay?

23     MR. PODLASEK:  Yes.

24     THE DEFENDANT:  Thank you.

DAILY COPY-88

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          THE COURT:  Okay, October 15.

2          THE WITNESS:  Am I excused, your Honor?

3          THE COURT:  You are excused.

4                    (WHICH WERE ALL THE PROCEEDINGS HAD

5                     AT THE HEARING OF THE

6                     ABOVE-ENTITLED CAUSE)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1          IN THE CIRCUIT COURT OF THE COOK JUDICIAL CIRCUIT

 2                    COOK COUNTY, ILLINOIS

 3

 4              I, LINDA B. STONE, an Official Court

 5    Reporter for the Circuit Court of Cook County, County

 6    Department-Criminal Division, do hereby certify that I

 7    reported in shorthand the report of the proceedings had

 8    in the above-entitled cause; that I thereafter caused

 9    the foregoing to be transcribed into computation, which

10    I hereby certify to be a true and accurate transcript

11    of the proceedings had before the Honorable STEVEN J.

12    GOEBEL, Judge of said court.

13

14

15                        _____
                          LINDA B. STONE
16                        Official Court Reporter

17

18

19

20

21

22

23    Dated this 11th

24    of October, 2012.
```

DAILY COPY-90

# Exhibit 38

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** ROBERT M PODLASEK (States Attorney) [robert.podlasek@cookcountyil.gov]
**Sent:** Wednesday, May 21, 2014 10:42 AM
**To:** MICHAEL P GOLDEN (States Attorney)
**Subject:** RE: accounting trip cost

We don't. I could probably put on the cyber expert (Minn.) on in one day. The Canadian is the connection to the initial IP address discovery. There is an email that he sent after the intrusion was discovered that led to the final identification of Melongo. French (Alaska) was the primary investigative attorney that put the case together and resulted in Melongo being arrested. I can put him on in less than a day. I do not anticipate this trial lasting more than 2-3 days depending on cross and defendant's case. I can prep the witnesses by phone and/or emails.

I think victim witness was basing the estimates on worst case scenario. I can have the witnesses come in on Sunday. If they are early enough I can prep them that day. Monday we would pick, openings and try to get on as many witnesses as possible. If we can start early enough I think Goebel would work late to finish this as fast as possible.

From: MICHAEL P GOLDEN (States Attorney)
Sent: Wednesday, May 21, 2014 10:15 AM
To: ROBERT M PODLASEK (States Attorney)
Subject: RE: accounting trip cost

Why do we need all witnesses for seven days?

From: ROBERT M PODLASEK (States Attorney)
Sent: Wednesday, May 21, 2014 9:08 AM
To: MICHAEL P GOLDEN (States Attorney)
Subject: FW: accounting trip cost

Melongo witness travel cost estimates.

Bob

From: ELIZABETH BACEROTT (States Attorney)
Sent: Monday, May 19, 2014 12:11 PM
To: ROBERT M PODLASEK (States Attorney)
Subject: Re: accounting trip cost

see attachment

Elizabeth Bacerott

# Exhibit 39

#5 Exhibit

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Cjean

| | |
|---|---|
| **From:** | carol [cspizzirri@salf.org] |
| **Sent:** | Wednesday, July 09, 2008 1:10 PM |
| **To:** | 'dhobbs@mercurycc.com' |
| **Subject:** | RE: Problem with at&t DSL service |

Could you include that "since Carol Spizzirri would have been the only one who could have authorized this movement from DSL to Static Dynamic, and I didn't (I thought we were on DSL until you stated below) the only person who would have had access and prior knowledge to (passwords) would have been Annabel because you've been doing our web/computer repairs.

I've already spoke with Schiller Park Police - Det Martin is awaiting your explanation and will forward to Atty Gen today for court on 16th.

**From:** dhobbs@mercurycc.com [mailto:dhobbs@mercurycc.com]
**Sent:** Wednesday, July 09, 2008 12:56 PM
**To:** cspizzirri@salf.org
**Subject:** Problem with at&t DSL service
**Importance:** High

According to AT&T billing department, the DSL service was changed from static to dynamic on 10/04/07 and in the notes for the account it says Nick Pro Dynamic. Of course, no one at Save a life recalls making such a change nor have they heard of Nick from Pro Dynamic.

In the SALF network documentation, It states that the Account originator is Annabel Melongo who may have provided specific personal information which could be used to make a change to the account. Information such as last four of SSAN and date of birth. Also, she may have been privy to the Question and answer. This question and answer does not appear in the network documentation. Maliciously making such a change could not gain a person access to the network, it would simply frustrate the company. That it took till now to cause problems is likely due to at&t not deleting old accounts immediately.

Here is the new information

Dynamic IP address--It can change at any time.
DNS: existing dns entries continue to work: 68.94.156.1 68.94.157.1
Account email address: savealifeorg1@sbcglobal.net
password: uIY256 - that is (lowercase 'u') (lowercase 'L') (uppercase 'Y') 256
Question: What is your favorite color? Answer: red yellow and blue

The problem with this change from static to dynamic is that with static you had a range of IP addresses that never change. These addresses are necessary to access web servers inside of SALF, for example the Boris server has such an external IP address--right now, that address is not working. Add to that problem that it is unlikely you could get back those ip addresses if you switch back to static DSL service. So, you would change back to static, then make changes in the sonicwall for the new IP address range, then change the information in various Domain name services.

Dave Hobbs
Mercury Consulting
1 847-233-6421
dhobbs@mercurycc.com

PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI 20
7-11-18

# Exhibit 40

JULIE GUNNIGLE - APRIL 23, 2018

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2      NORTHERN DISTRICT OF ILLINOIS
          EASTERN DIVISION
3   ANNABEL K. MELONGO,          )
                                 )
4           Plaintiff,           )
                                 )
5       vs.                      ) 13-cv-04924
                                 )
6   ASA ROBERT PODLASEK, et al., )
                                 )
7           Defendants.          )

8

9        The deposition of JULIE GUNNIGLE, called by
10  the Plaintiff, taken pursuant to the Federal Rules
11  of Civil Procedure of the United States District
12  Courts pertaining to the taking of depositions,
13  taken before PEGGY CURRAN, CSR, CRR, RPR, CSR
14  License No. 084-002016, a notary public within and
15  for the County of DuPage and State of Illinois,
16  taken at 180 North LaSalle Street, Suite 3600,
17  Chicago, Illinois, on Monday, April 23, 2018,
18  commencing at the hour of 9:20 a.m.
19
20
21
22
23
24

**Page 2**

1   APPEARANCES:

2        Ms. Julia K. Schwartz
         Mr. Michael L. Shakman
3        Miller Shakman & Beem, LLP
         180 North LaSalle Street
4        Suite 3600
         Chicago, Illinois  60601
5        312.263.3700
         jschwartz@millershakman.com
6          on behalf of the Plaintiff;

7
         Ms. Anita Alvarez, State's Attorney of
8        Cook County Illinois, by:
         Ms. Bianca Brown
9        Assistant State's Attorney
         Richard J. Daley Center
10       50 West Washington
         Room 500
11       Chicago, Illinois  60601
         312.603.3369
12       bianca.brown@cookcountyil.gov
           on behalf of all Cook County Defendants;

13
14       Mr. Christopher S. Wunder
         Kaplan Papadakis & Gournis, P.C.
15       180 North LaSalle Street
         Suite 2108
16       Chicago, Illinois  60601
         312.726.0531
17       cwunder@kpglaw.com
           on behalf of Defendant William Martin
18         and Schiller Park;
19
20
21
22
23
24

**Page 3**

1   APPEARANCES: (continued)

2        Ms. Lisa Madigan, Attorney General,
         State of Illinois, by:
3        Ms. Shirley R. Calloway
         Assistant Attorney General
4        Office of the Attorney General
         100 West Randolph Street
5        Chicago, Illinois  60601
         312.814.5581
6        scalloway@atg.state.il.us
           on behalf of Defendant Kyle French;

7
         Ms. Dina M. Ninfo
8        Angelini, Mills, Woods & Ori Law
         155 North Michigan Avenue
9        Suite 400
         Chicago, Illinois  60601
10       312.621.0000
         dninfo@amwolawil.com
11         on behalf of Defendant Ms. Carol
           Spizzirri.
12
    Also Present:
13
         Ms. Annabel K. Melongo - via the telephone
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1                  I N D E X

2   WITNESS                        PAGE

3   JULIE GUNNIGLE

4   EXAMINATION
5     By Ms. Schwartz               5

    EXAMINATION (continued)
6     By Ms. Schwartz              138

7   GUNNIGLE DEPOSITION EXHIBITS  FOR ID

8   No. 1                          62

9   No. 2                          70

10  No. 3                          74

11  No. 4                          74

12  No. 5                          76

13  No. 6                          83

14  No. 7                          89

15  No. 8                          98

16  No. 9                         104

17  No. 10                        105

18  No. 11                        107

19  No. 12                        109

20  No. 13                        115

21  No. 14                        119

22  No. 15                        121

23  No. 16                        128

24  No. 17                        138

JULIE GUNNIGLE - APRIL 23, 2018

```
 1              I N D E X
 2  GUNNIGLE DEPOSITION EXHIBITS   FOR ID
 3    No. 18                    139
 4    No. 19                    146
 5    No. 20                    150
 6    No. 21                    151
 7    No. 22                    156
 8    No. 23                    161
 9    No. 24                    169
10    No. 25                    170
11    No. 26                    171
12    No. 27                    178
13    No. 28                    187
14    No. 29                    190
15    No. 30                    192
16    No. 31                    194
17    No. 32                    198
18    No. 33                    203
19    No. 34                    204
20    No. 35                    209
21    No. 36                    212
22    No. 37                    216
23
24
```

5

```
 1          (Witness duly sworn.)
 2              JULIE GUNNIGLE,
 3  called as a witness herein, having been first duly
 4  sworn, was examined and testified as follows:
 5              EXAMINATION
 6    By Ms. Schwartz:
 7    Q    Good morning.  My name is Julia Schwartz
 8  and I represent the plaintiff Annabel Melongo.
 9          Before we get going, I would ask that
10  everyone introduce themselves and who they
11  represent for the record and for Ms. Gunnigle's
12  benefit.
13    MS. BROWN:  Bianca Brown for all Cook County
14  defendants.
15    MR. WUNDER:  Chris Wunder, William Martin and
16  Schiller Park.
17    MS. NINFO:  Dina Ninfo, Carol Spizzirri.
18    MS. SCHWARTZ:  And Shirley Calloway will be
19  joining us shortly.  She represents Kyle French.
20          It's possible that Michael Shakman will
21  be coming in and out.  He also represents plaintiff
22  Annabel Melongo.
23    By Ms. Schwartz:
24    Q    Please state your name for the record.
```

6

```
 1    A    Julie Gunnigle.
 2    Q    How do you spell your last name?
 3    A    G-u-n-n-i-g-l-e.
 4    Q    Have you ever been deposed before,
 5  Ms. Gunnigle?
 6    A    No.
 7    Q    So just before we get going, I would
 8  like to go over a couple of general ground rules.
 9          First as you can see, we have a court
10  reporter here today.  I just ask that we try not to
11  talk over one another.  I will try to let you
12  finish your answers and if you will try to let me
13  finish my questions, that would be great.
14          Does that sound fair to you?
15    A    Yes.
16    Q    Please give verbal answers, uh-huh, head
17  nods don't translate well on the transcript.  Is
18  that okay with you?
19    A    Yes.
20    Q    If I ask a question and you don't
21  understand it, will you let me know?
22    A    Yes.
23    Q    And if you answer, I will assume that
24  you understood the question.  Is that fair?
```

7

```
 1    A    Yes.
 2    Q    If at any time today you need a break,
 3  please just let me know.  I would only ask that you
 4  finish answering whatever question is pending at
 5  that time.  Is that okay with you?
 6    A    Yes.
 7    Q    Ms. Gunnigle, is there any reason you
 8  cannot give truthful and accurate testimony here
 9  today?
10    A    No.
11    Q    Are you represented by counsel here
12  today?
13    A    Yes.
14    Q    That's Ms. Brown?
15    A    Yes.
16    Q    What have you done to prepare for
17  today's deposition?
18    A    I have met with my attorneys.
19    Q    Did you review any documents in advance
20  of today's deposition?
21    A    Yes.
22    Q    What documents did you review?
23    A    I reviewed many of the documents that
24  are on illinoiscorruption.net, and some of the
```

8

1 documents that were in my attorney's office.

2     Q     About how much time did you spend

3 preparing for today's deposition?

4     A     Approximately two hours.

5     Q     Apart from your attorney, did you meet

6 with or discuss today's deposition with anybody

7 else?

8     A     Yes.

9     Q     Who was that?

10     A     I have spoken with Bob Podlasek and Kate

11 O'Hara.  It is my understanding she goes by a

12 different last name now.

13     Q     Is that Kate Garcia?

14     A     Yes.

15     Q     When did you speak with Bob Podlasek

16 about the deposition?

17     A     Approximately two weeks ago.

18     Q     What was the substance of that

19 conversation with Mr. Podlasek?

20     A     Mostly that I did not recall almost any

21 of the details surrounding this case.

22     Q     Who initiated that call?

23     A     I believe he did.

24     Q     What did he say when he called you?

9

1     A     I don't recall.

2     Q     What did he explain as the purpose of

3 the phone call?

4     A     It was more or less a friendly phone

5 call because we were trial partners and I haven't

6 been in Chicago for two years.

7     Q     Was the purpose of Mr. Podlasek's phone

8 call about two weeks ago to discuss your upcoming

9 depositions?

10     A     No.

11     Q     What was the purpose of the phone call

12 with Mr. Podlasek?

13     A     To set up a time where we could go out

14 for drinks as friends.

15     Q     So you were, because you were in

16 Chicago, you planned to meet with Mr. Podlasek?

17     A     Right.

18     Q     Did you meet with Mr. Podlasek on this

19 trip to Chicago?

20     A     I did.

21     Q     When was that?

22     A     Yesterday.

23     Q     Did you discuss Ms. Melongo's criminal

24 case or the pending civil litigation during that

10

1 meeting?

2     A     No.

3     Q     This was just a social meet-up then?

4     A     Yes.

5     Q     On the phone call with Mr. Podlasek,

6 which you testified was approximately two weeks

7 ago, did you discuss the substance of this civil

8 litigation or Ms. Melongo's criminal cases?

9     A     In part.

10     Q     What did you discuss?

11     A     He asked -- and this is obviously not

12 verbatim -- if I remembered anything.  And I

13 responded that I remember very little.  And that

14 what I was reviewing was Ms. Melongo's website to

15 help refresh my recollection, but it was not

16 working.

17     Q     Did you say anything else to

18 Mr. Podlasek during that phone call?

19     A     We had extensive conversation about our

20 family and personal matters.

21     Q     Did Mr. Podlasek discuss any of the

22 details of Ms. Melongo's criminal case or this

23 civil litigation?

24     A     No.

11

1     Q     He didn't discuss his recollection of

2 this case or the underlying criminal cases?

3     A     He said he didn't remember many of the

4 details.

5     Q     Do you recall anything else about that

6 phone call with Mr. Podlasek?

7     A     No.

8     Q     You also testified that you spoke in

9 advance of this deposition to Kate Garcia, who now

10 goes by Kate O'Hara, so I will refer to her

11 throughout the deposition today as Kate O'Hara.

12 When was your conversation with Ms. O'Hara?

13     A     The same day.

14     Q     Who initiated that conversation?

15     A     It was the same phone call.

16     Q     Were all three of you on the same phone

17 call?

18     A     Yes.

19     Q     And you testified that it was

20 Mr. Podlasek who initiated that phone call?

21     A     Right.

22     Q     What was the purpose of Mr. Podlasek

23 including Ms. Garcia on that phone call?

24     A     I don't know.

12

JULIE GUNNIGLE - APRIL 23, 2018

1    Q    Was she also involved when you met up
2  with Mr. Podlasek this weekend?
3    A    No.
4    Q    You haven't seen Ms. Garcia?
5    A    Sadly, no.
6    Q    Did you discuss the substance of the
7  underlying criminal cases against Ms. Melongo or
8  this civil litigation with Ms. Garcia?
9    A    Briefly, yes.
10   Q    What did you discuss?
11   A    That I remembered very little, but I was
12 looking at Ms. Melongo's website in order to
13 prepare.
14   Q    What did Ms. Garcia say on that phone
15 call?
16   A    I don't believe she said much of
17 anything relating to this case.
18   Q    Did she testify about her
19 recollection -- did she speak on that phone call
20 about her recollection?
21   A    I don't remember.
22   Q    About how long was that phone call with
23 Ms. Garcia and Mr. Podlasek?
24   A    About a half an hour.

                                                    13

1    Q    Do you recall anything else about the
2  substance of what was discussed with Ms. Garcia and
3  Mr. Podlasek?
4    A    No.
5    Q    Apart from that phone call about which
6  you have just testified and your conversations with
7  your attorney, have you spoke to anyone else about
8  your deposition here today?
9    A    No, I haven't.
10   Q    Ms. Gunnigle, I would like to go over
11 some general background questions about your work
12 and education history.
13        First I would like to discuss your
14 education.  Can you walk me through your education
15 since graduating from high school?
16   A    I graduated from Northern Arizona
17 University in 2003 with a B.S. in chemistry.
18        I graduated from the University of
19 Notre Dame Law School in 2006 with a J.D.
20   Q    Do you have any other degrees apart from
21 those two?
22   A    No, I don't.
23   Q    Did you go straight from undergraduate
24 to Notre Dame Law School?

                                                    14

1    A    Yes, I did.
2    Q    While you were at Northern Arizona you
3  studied chemistry?
4    A    Yes.
5    Q    I would like to go over your work
6  history starting in law school, any summer jobs,
7  any full-time employment you had during law school.
8  Can you walk me through starting in 2003 what has
9  your full-time work employment history been?
10   A    During my first summer after my first
11 year, I worked for the Morris Institute For Justice
12 as a full-time legal fellow.
13        After my second year of law school, I
14 worked for Professor Blakey in Notre Dame Law
15 School as a research assistant.
16   Q    What is the Morris Institute For
17 Justice?
18   A    It is the umbrella corporation for the
19 nonprofit legal services in Arizona.  And it takes
20 those cases that community legal services is
21 unequipped to take.
22   Q    Were you in Arizona during that
23 summer?
24   A    I was.

                                                    15

1    Q    What sort of work were you doing for the
2  Morris Institute For Justice?
3    A    I was working on several litigation
4  issues.
5    Q    What sorts of cases were those?
6    A    I was working on an issue wherein our
7  state has decided to not fund renal transplants for
8  those who were undocumented.
9        I was also working on several
10 landlord/tenant issues.
11        And a report on the justice court's
12 handling of evictions.
13   Q    In terms of your second year, summer
14 during law school, you testified that you worked
15 for Professor Blakey at Notre Dame as a research
16 assistant.  What sort of topics were you
17 researching that summer?
18   A    I was researching organized crime and
19 how the Racketeer Influenced and Corrupt
20 Organizations Act resulted in longer sentences and
21 more complete trials.
22        The results of my research are available
23 on the Syracuse Journal of International Law.
24   Q    Did you coauthor a piece, an article

                                                    16

JULIE GUNNIGLE - APRIL 23, 2018

1  with Professor Blakey, or was that an article that
2  you authored?
3      Q    I authored that article.
4      Q    Solo?
5      A    Yes.
6      Q    Do you have any other publications that
7  you have published during your career?
8      A    Yes. I have been published in the
9  Journal of Prolotherapy, p-r-o-l-o, therapy. I
10 believe that's it.
11     Q    What was the subject of the piece in the
12 Journal of Prolotherapy?
13     A    They were titled the Opening Argument
14 for Prolotherapy. And it was an argument that this
15 particular treatment be covered by insurance.
16     Q    What particular treatment is that?
17     A    Prolotherapy.
18     Q    What is prolotherapy?
19     A    It's a direct injection into the joint
20 of an irritant that stimulates the joint to regrow.
21 It's a therapy now, since the publication, commonly
22 used at the Mayo Clinic and in many sports injury
23 practices.
24     Q    So apart from the Journal of

17

1  Prolotherapy and the Syracuse Journal articles, do
2  you have any other publications?
3      A    No.
4      Q    What was your first full-time employment
5  after law school?
6      A    I worked for the prosecutor's office in
7  Elkhart County, Indiana.
8      Q    What years did you work at the Elkhart
9  County Prosecutor's Office?
10     A    Upon my graduation in 2006, I worked
11 there for approximately two years.
12     Q    Was your title there prosecutor or did
13 you have a more specialized or specific title while
14 you were at the Elkhart County Prosecutor's
15 Office?
16     A    Initially I was a legal intern. Upon
17 bar results, I became a deputy prosecutor. I was
18 briefly the head of the juvenile division.
19     Q    What types of cases did you work on
20 while you were at the Elkhart County Prosecutor's
21 Office?
22     A    Everything from traffic to the low level
23 felonies. And I specialized in juvenile on
24 juvenile sex offenses.

18

1      Q    Did you work on any cyber crime cases
2  while you were at Elkhart County Prosecutor's
3  Office?
4      A    There were no cyber cases in Elkhart
5  County, Indiana.
6      Q    You testified that you were at the
7  Elkhart County Prosecutor's Office for about two
8  years, from 2006 to approximately 2008; is that
9  right?
10     A    That is correct.
11     Q    After that, what was your next full-time
12 employment?
13     A    After that I had a brief solo practice,
14 based in both Illinois and Indiana.
15     Q    What years were you involved in your
16 solo practice?
17     A    Approximately 2008 to 2009.
18     Q    What sorts of cases did you work on in
19 your solo practice?
20     A    Small business law, patent and
21 trademark.
22     Q    Did you do any criminal work while you
23 were in solo practice?
24     A    No.

19

1      Q    After your solo practice, what was your
2  next full-time employment?
3      A    I worked for the Cook County State's
4  Attorney's Office.
5      Q    When did you start at the Cook County
6  State's Attorney's Office?
7      A    September or November of 2009 through
8  approximately July of 2011.
9      Q    What were your roles within the Cook
10 County State's Attorney's Office during that
11 period?
12     A    I was a part-time state's attorney in
13 the financial crimes division.
14     Q    Was that the entire time you were at the
15 Cook County State's Attorney's Office?
16     A    Yes.
17     Q    When you say part time, what do you
18 mean, what did that entail?
19     A    I only worked 25 or 30 hours. I can't
20 remember the exact hours. Less than a full-time
21 schedule.
22     Q    What sort of cases did you work on in
23 the financial crimes division?
24     A    I worked a fair number of public

20

1 corruption cases. I worked cases involving large
2 and methodical thefts.
3      I worked cases involving perjury in the
4 Cook County courts.
5      I did receive a fair number of referrals
6 for computer cases as well.
7 Q    By a "fair number," about how many
8 computer cases did you work on while you were at
9 the Cook County State's Attorney's Office?
10 A    There were about a half a dozen referred
11 to me. There was only one charged case that I
12 worked on.
13 Q    Was that Ms. Melongo's case?
14 A    That's right.
15 Q    The other referred cases about which you
16 testified, did those result in charges that other
17 prosecutors worked on or did they not result in
18 charges at all?
19 A    They didn't result in charges at all to
20 my knowledge.
21 Q    What was the reason for that, do you
22 recall?
23 A    Insufficient evidence.
24 Q    When you say referred cases, what does

21

1 that mean, what is a referred case?
2 A    Well, the special prosecutions unit at
3 Cook County can receive cases in a variety of ways.
4 We had our own investigators. We also received
5 referral of cases from a diverse array of state and
6 federal prosecuting authorities. And the
7 occasional citizen complaint.
8 Q    So a referred case would be one of the
9 ones that came to the state's attorney's office
10 from another law enforcement agency?
11 A    Or a citizen complaint, yes.
12 Q    What was the process for reviewing those
13 referred cases and determining whether charges
14 would be appropriate?
15 A    They went through the supervisor, were
16 assigned to a state's attorney. From there
17 sometimes, but certainly not always, an indictment
18 memo was produced. Then often, but not always, the
19 attorney who produced the indictment memo would
20 continue on with the case through indictment,
21 discovery and trial.
22 Q    You testified that approximately five of
23 the six computer-related referrals that you worked
24 on during your time at the State's Attorney's

22

1 Office did not result in charges due to
2 insufficient evidence.
3      What was the process by which you or
4 someone else determined whether evidence was
5 sufficient for those roughly five or six cases?
6 A    Well, some of it was review with the
7 referring agency. One of the problematic aspects
8 was that computer cases involving child pornography
9 went one direction in our office, and I had no
10 involvement with that.
11      If it did not involve child pornography,
12 it arrived in my office with the referring agency.
13 We engaged in a collaborative review process where
14 we talked through what I could expect the evidence
15 to be, and if any further investigation was
16 required. If I believed probable cause existed and
17 there was a reasonable likelihood of success on the
18 merits, I would charge.
19 Q    By charge, you mean pursue an
20 indictment?
21 A    Correct.
22 Q    Were you involved in that process for
23 Ms. Melongo's computer tampering criminal case?
24 A    No, I was not.

23

1 Q    Why is that?
2 A    I was not in the office.
3 Q    You testified earlier about an
4 indictment memo in certain cases. Was the
5 indictment memo generally prepared prior to
6 indictment or after indictment?
7 A    Prior to.
8 Q    What were the general contents of an
9 indictment memo?
10 A    An indictment memo would have been the
11 attorney's work and legal conclusions about a case
12 and then a recommendation as to what to indict for
13 and the likelihood of success.
14 Q    To your knowledge was an indictment memo
15 prepared for any of Ms. Melongo's criminal cases in
16 Cook County?
17 A    I don't remember with respect to
18 computer tampering. I don't believe so with
19 respect to the eavesdropping.
20 Q    So during your time at the Cook County
21 State's Attorney's Office, what were your general
22 responsibilities?
23 A    I worked on a few policy issues,
24 including the recommendation to send to Springfield

24

1 different bills. I also worked on my own
2 caseload.
3    Q    In terms of your caseload, how did you
4 receive work assignments while you were at the Cook
5 County State's Attorney's Office?
6    A    Typically they were assigned by my
7 supervisor.
8    Q    Who was your supervisor at the Cook
9 County State's Attorney's Office?
10    A    Had two. John Mahoney was the
11 supervisor of the unit. And his deputy was Mike
12 Golden.
13    Q    How was Ms. Melongo's case first
14 assigned to you?
15    A    Ms. Melongo's case was first assigned to
16 me when I was asking for assignments. And in
17 particular I asked my office mate if he had any
18 research issues for me to work on.
19    Q    Who was your office mate?
20    A    Bob Podlasek.
21    Q    When was that interaction with
22 Mr. Podlasek about Ms. Melongo's case?
23    A    It would have been one of my first weeks
24 in the office, so approximately September,

25

1 November, of 2009.
2    Q    Did John Mahoney or Mike Golden have any
3 involvement in that assignment process or was that
4 done one on one just with Mr. Podlasek?
5    A    I don't recall.
6    Q    Other than in this particular
7 litigation, have you had any complaints made
8 against you for anything you did while at the Cook
9 County State's Attorney's Office?
10    A    No.
11    Q    Were you ever disciplined or reprimanded
12 formally for any of your work while you were at the
13 Cook County State's Attorney's Office?
14    A    No.
15    Q    Why did you leave the Cook County
16 State's Attorney's Office?
17    A    Family reasons.
18    Q    What was your next employment full time
19 after leaving the Cook County State's Attorney's
20 Office?
21    A    Arizona Summit Law School.
22    Q    What years did you work at Arizona
23 Summit Law School?
24    A    Fall of 2012 through January of 2018,

26

1 with some gaps for leave.
2    Q    What did you do at the Arizona Summit
3 Law School?
4    A    I was originally hired as an associate
5 professor -- I'm sorry, an assistant professor of
6 professional practice. I was promoted to Dean of
7 Students.
8          When I returned from a prolonged
9 maternity leave, I was promoted to assistant
10 professor of law.
11    Q    During that time, fall 2012 to January
12 of 2018, did you work on any individual cases in
13 addition to your responsibility as a teacher,
14 professor?
15    A    Yes.
16    Q    What sorts of cases were those?
17    A    I have an academic and personal interest
18 in maternal care and took cases on behalf of
19 mothers and providers who had experienced adverse
20 outcomes.
21    Q    Was that through your position at the
22 law school or separate from your position at the
23 law school?
24    A    Both. We briefly set up a midwifery law

27

1 clinic and used students to support litigation. I
2 also had my own private practice during that
3 time.
4    Q    During what years did you have your own
5 private practice?
6    A    From May of 2015 through the present.
7    Q    What is that practice called?
8    A    The Law Office of Julie Gunnigle,
9 PLLC.
10    Q    You testified earlier that you left the
11 Cook County State's Attorney's Office in July of
12 2011 and that you started at Arizona Summit Law
13 School in the fall of 2012; is that correct?
14    A    That is correct.
15    Q    What did you do during that year in
16 between?
17    A    I did a little bit of practice of law
18 with respect to my still active Indiana license.
19 Otherwise I was on maternity leave.
20    Q    What sort of cases did you work on
21 during that year, 2011 to 2012?
22    A    Advised small businesses and startups.
23    Q    Why did you leave Arizona Summit Law
24 School in January of 2018?

28

1    A    Family reasons.
2    Q    Are you currently employed?
3    A    Yes.
4    Q    What is your current employment?
5    A    I am self-employed at the Law Office of
6 Julie Gunnigle, PLLC.
7    Q    Has that been your employment since
8 January of 2018?
9    A    Yes.
10    Q    What sort of cases do you currently work
11 on?
12    A    Midwifery law, education law, a little
13 bit of patent and trademark, and some small
14 business law.
15    Q    Since you left the Cook County State's
16 Attorney's Office, have you practiced any criminal
17 law cases?
18    A    No.
19    Q    In terms of your position at the Cook
20 County State's Attorney's Office, were you fired or
21 asked to resign from that position?
22    A    No.
23    Q    I would like to discuss your
24 communications with the other parties in this

29

1 litigation.
2         Apart from the conversation and meeting
3 you had with Mr. Podlasek and phone call with
4 Ms. Garcia about what you have already testified,
5 have you spoken with or communicated with anybody
6 about this lawsuit, apart from your attorneys in
7 this lawsuit?
8    A    No.
9    Q    You testified earlier about Robert
10 Podlasek, who you said was your office mate.  Was
11 he your office mate the entire time you were at the
12 Cook County State's Attorney's Office?
13    A    No.
14    Q    About how long were you office mates?
15    A    Approximately three months.
16    Q    Did you work with Mr. Podlasek on many
17 cases?
18    A    Yes.
19    Q    About how many cases would you guess?
20    A    About half dozen.
21    Q    When did you first meet Mr. Podlasek?
22    A    When I joined the office in
23 approximately September or November of 2009.
24    Q    Apart from your recent meeting with

30

1 Mr. Podlasek, while you were working together, did
2 you socialize outside of work?
3    A    Yes.
4    Q    About how frequently?
5    A    Approximately once a month.
6    Q    What sort of social interactions were
7 those?
8    A    I don't understand the question.
9    Q    Did you go to lunch, were they drinks
10 after work?
11    A    There were drinks and sometimes food
12 involved.
13    Q    Did you ever meet each other's
14 families?
15    A    Yes.
16    Q    In what context was that?
17    A    I met his wife once in the context of a
18 party I think.
19    Q    Have you ever e-mailed with Mr. Podlasek
20 about this civil litigation?
21    A    Not that I recall.
22    Q    Have you ever text messaged Mr. Podlasek
23 about this civil litigation?
24    A    Not that I -- not that I recall.  I did

31

1 tell him in text that I was headed to the
2 deposition.
3    Q    Was that this morning?
4    A    That was when I got on my flight.
5    Q    When was that?  Which day was that?
6    A    I left on Friday.
7    Q    You testified earlier about Kate Garcia,
8 formerly Kate O'Hara.  When did you first meet Kate
9 O'Hara?
10    A    In approximately September, November of
11 2009.
12    Q    About how many matters did you work on
13 with Ms. O'Hara?
14    A    About a half dozen.
15    Q    Did you interact with Ms. O'Hara outside
16 of a work setting?
17    A    Occasionally.
18    Q    By occasionally, about how often do you
19 mean?
20    A    Less than once a month.
21    Q    What sort of interactions were those?
22    A    Social with food and/or drink.
23    Q    Have you ever e-mailed with Ms. O'Hara
24 about this civil litigation?

32

1      A      No.

2      Q      Have you ever text messaged with
3  Ms. O'Hara about this civil litigation?

4      A      No.

5      Q      Do you know who James Dillon is?

6      A      Yes.

7      Q      Who is James Dillon?

8      A      He is somehow involved with law
9  enforcement, but I couldn't tell you the agency.

10      Q      Do you know him personally?  Have you
11  met Mr. Dillon?

12      A      I don't believe so.

13      Q      How is it that you have heard of the
14  name James Dillon?

15      A      I believe he is a named defendant.

16      Q      Outside of the context of being named in
17  this lawsuit, have you had any interactions with
18  James Dillon?

19      A      I don't recall.

20      Q      Do you know who Antonio Rubino is?

21      A      Only that he is a named defendant.

22      Q      Have you ever met or interacted with
23  Antonio Rubino?

24      A      Not that I recall.

                                                    33

1      Q      Same questions for Richard Lesiak, do
2  you know who Richard Lesiak is?

3      A      No.

4      Q      You never interacted with, spoken with,
5  been together with Richard Lesiak?

6      A      Not that I recall.

7      Q      Do you know who Randy Roberts is?

8      A      Yes.

9      Q      How do you know who Randy Roberts is?

10      A      He was involved on the law enforcement
11  side I believe on the computer tampering case.

12      Q      What's your recollection of Mr. Roberts'
13  involvement?

14      A      I don't ever remember meeting him.  I
15  believe I saw his name on reports.

16      Q      Do you recall what reports those were?

17      A      No, I don't.

18      Q      Have you ever personally interacted
19  with, communicated with, met with Randy Roberts?

20      A      Not that I recall.

21      Q      Do you know who William Martin is?

22      A      Yes.

23      Q      How do you know who William Martin is?

24      A      He was involved with the law enforcement

                                                    34

1  side of the computer tampering case.

2      Q      Have you ever spoken to William
3  Martin?

4      A      Not that I recall.

5      Q      Have you ever met with Mr. William
6  Martin?

7      A      Not that I recall.

8      Q      Have you ever exchanged written
9  communications or any other form of communications
10  with William Martin?

11      A      Not that I recall.

12      Q      Do you know who Kyle French is?

13      A      Yes.

14      Q      How do you know who Kyle French is?

15      A      Kyle French was a member of the Attorney
16  General's Office who was involved with the computer
17  tampering case.

18      Q      Did you work with Kyle French in any
19  capacity during your time at the Cook County
20  State's Attorney's Office?

21      A      He wasn't employed by the Cook County
22  State's Attorney's Office, if that's what you are
23  asking.

24      Q      Did you work with him on any cases while

                                                    35

1  he was at the Attorney General's Office?

2      A      Yes.  He was of counsel or had some
3  relationship to Annabel Melongo's computer
4  tampering case.

5      Q      Did you meet with Mr. French?

6      A      Yes.

7      Q      About how many times did you meet with
8  Mr. French?

9      A      About a half dozen.

10      Q      Did you exchange emails or other
11  communications with Mr. French?

12      A      Not that I recall.

13      Q      Do you know who Matthew Markos is?

14      A      No.  Yes.  Yes, I do.

15      Q      How do you know who Matthew Markos is?

16      A      I believe that was the doctor that
17  Judge Brosnahan sent Annabel Melongo to for BCX.

18      Q      What does BCX stand for?

19      A      I am not sure.

20      Q      What does BCX mean?

21      A      It's a competency and fitness
22  examination.

23      Q      Have you ever spoken with Matthew Markos
24  or communicated with Matthew Markos in any way?

                                                    36

JULIE GUNNIGLE - APRIL 23, 2018

```
1     A    Not that I recall.
2     Q    Ms. Gunnigle, do you know who Carol
3  Spizzirri is?
4     A    Yes.
5     Q    How do you know who Carol Spizzirri
6  is?
7     A    She was the alleged victim in the
8  computer tampering case.
9     (At this point Ms. Calloway entered the room.)
10  By Ms. Schwartz:
11    Q    Have you ever met Ms. Spizzirri?
12    A    Yes.
13    Q    When did you meet Ms. Spizzirri?
14    A    During my time at the Cook County
15  Attorney's office.  I don't know which month or
16  even which year.
17    Q    How many times did you meet with
18  Ms. Spizzirri?
19    A    To my recollection just once.
20    Q    Do you recall around when that meeting
21  was?
22    A    It would have been later in my time,
23  towards the end of my tenure as a state's
24  attorney.
```
37

```
1     Q    Do you recall what was discussed at that
2  meeting with Ms. Spizzirri?
3     A    I don't remember very much about that at
4  all in fact.
5     Q    Do you remember anything about the
6  meeting?
7     A    Yes.  I remember that I was pregnant and
8  she tried to give me a small gift for my baby and I
9  had to politely refuse.
10    Q    Why did you politely refuse?
11    A    Because I didn't believe that taking a
12  gift from a potential victim would have been
13  appropriate.
14    Q    Apart from that meeting, did you
15  communicate with Ms. Spizzirri in other manners,
16  text, email?
17    A    I don't recall.
18    Q    Have you communicated with Ms. Spizzirri
19  in any way since leaving the Cook County State's
20  Attorney's Office?
21    A    No.
22    Q    Have you ever socialized with
23  Ms. Spizzirri outside of the work setting?
24    A    No.
```
38

```
1     Q    Have you ever spoken to Ms. Spizzirri
2  about this lawsuit?
3     A    No.
4     Q    We have discussed Ms. Melongo before,
5  but do you know who Ms. Annabel Melongo is?
6     A    Yes.
7     Q    How did you first hear of Ms. Melongo?
8     A    When my office mate asked me to help him
9  on a motion.
10    Q    That was Mr. Podlasek?
11    A    That's right.
12    Q    What sort of motion did he ask you to
13  help with?
14    A    I don't recall.
15    Q    What do you recall about Annabel
16  Melongo?
17    A    I remember that she was a defendant in a
18  criminal case, who was later charged with a second
19  offense of eavesdropping.
20    Q    What were the first charges to which you
21  just alluded?
22    A    I believe they were computer tampering
23  charges.
24    Q    How would you describe Annabel
```
39

```
1  Melongo?
2     A    She was a defendant in a criminal
3  case.
4     Q    Did you ever meet Ms. Melongo in
5  person?
6     A    Yes.
7     Q    About how many times?
8     A    Approximately a dozen.
9     Q    Were all of those meetings in court or
10  were any of them out of court?
11    A    All of those meetings were in court,
12  with the exception of one wherein Judge Brosnahan
13  had asked us to tender discovery and Ms. Melongo
14  came up to the 13th floor where we tendered
15  discovery.
16    Q    How would you describe Ms. Melongo's
17  personality?
18    A    I don't remember.
19    Q    How do you feel about Ms. Melongo?
20    A    I have no feelings about Ms. Melongo.
21    Q    How would you describe your role related
22  to Ms. Melongo's criminal cases?
23    A    I was the second chair in the
24  eavesdropping case and second chair in the computer
```
40

1  tampering case.
2     Q     When you say "second chair," what does
3  that mean?
4     A     It means I am the junior assistant
5  state's attorney assigned to work on it.  It's not
6  my case.  I'm working under the direction of
7  another.
8     Q     Who is the first chair assistant state's
9  attorney assigned?
10     A     Bob Podlasek.
11     Q     That was for both the eavesdropping and
12  the computer tampering?
13     A     That's right.
14     Q     You testified earlier that Kyle French
15  was involved for a time on one of Ms. Melongo's
16  cases.  What was his involvement?  What was his
17  role?
18     A     I'm not sure if it was formally defined.
19  I would define it as an of counsel.
20     Q     When you say "of counsel," what do you
21  mean?
22     A     He was not involved with decision making
23  on the case, but was help advising on the computer
24  issues.

41

1     Q     Apart from Mr. Podlasek and Mr. French,
2  who else was involved in Ms. Melongo's criminal
3  cases while you were at the Cook County State's
4  Attorney's Office?
5     A     Do you mean from the Cook County State's
6  Attorney's Office?
7     Q     I mean in any capacity working on the
8  case.
9     A     Working on the case -- I want to make
10  sure I understand your question right.
11        Your question is is anyone else from law
12  enforcement working on Ms. Melongo's case apart
13  from the people we just discussed?
14     Q     Correct.
15     A     No.
16     Q     Did you do any work related to
17  Ms. Melongo other than work on the eavesdropping
18  and computer tampering cases to which you have
19  already testified?
20     A     No.
21     Q     Ms. Gunnigle, have you seen the website
22  www.illinoiscorruption.net?
23     A     Yes.
24     Q     When did you first learn of that

42

1  website?
2     A     During my time as a state's attorney.  I
3  couldn't tell you exactly when.
4     Q     How were you first made aware of the
5  website www.illinoiscorruption.net?
6     A     Bob told me that it existed.
7     Q     Was that in person or via email or in
8  another manner?
9     A     It was in person.
10     Q     What did he say?
11     A     He said that the defendant in the case
12  was maintaining a website.
13     Q     Do you recall anything else about that
14  conversation?
15     A     No, I don't.
16     Q     Did he offer any commentary about the
17  contents of the website or his views on the
18  website?
19     A     Not that I recall.
20     Q     Did you read the contents of the website
21  www.illinoiscorruption.net?
22     A     Yes.
23     Q     When did you first read the contents of
24  the website?

43

1     A     I'm not sure.  It would have been early
2  in my tenure as a state's attorney.
3     Q     How would you describe the contents of
4  the website, www.illinoiscorruption.net?
5     A     It appeared to be Ms. Melongo's
6  chronicling of the case against her.
7     Q     What sorts of events were chronicled on
8  the website?
9     A     To make sure I understand your question,
10  do you mean initially or do you mean later, because
11  that website has changed?
12     Q     To clarify my question, when you first
13  discovered Ms. Melongo -- strike that.
14        When you first discovered the website
15  www.illinoiscorruption.net, how would you describe
16  the general content of what was on that website?
17     A     It was a court date by court date
18  blogging effort that detailed what Ms. Melongo
19  appeared to perceive from her court encounters.
20     Q     It's fair to say that Ms. Melongo's
21  depiction of law enforcement, State's Attorney's
22  Office, was extremely critical; is that correct?
23     A     Yes.
24     Q     It's fair to say that Ms. Melongo's

44

1 depiction of you was fairly critical on the website
2 illinoiscorruption.net, correct?
3    Q    Do you mean initially or do you mean as
4 the site evolved?  I am just not sure what your
5 question is.
6    Q    Let's start with initially.  When you
7 first discovered the website
8 illinoiscorruption.net, the depictions of your work
9 related to Ms. Melongo's case were fairly critical,
10 were they not?
11    A    I wasn't on the website.
12    Q    In terms of later on, it's fair to say
13 that the depictions of you on the website
14 www.illinoiscorruption.net were fairly critical; is
15 that correct?
16    A    Yes.
17    Q    What was your reaction to the way that
18 the investigation and prosecution of Ms. Melongo
19 were portrayed on the www.illinoiscorruption.net
20 website, let's say prior to April 2010?
21    A    I didn't have a reaction.
22    Q    Prior to April 13, 2010, did you discuss
23 www.illinoiscorruption.net with anyone?
24    A    Yes.

45

1    Q    Who did you discuss the website with?
2    A    Bob Podlasek.
3    Q    Did he ever share his reaction to the
4 website with you?
5    A    Not that I recall.
6    Q    Prior to April 13, 2010, did you discuss
7 the contents of www.illinoiscorruption.net with
8 anyone else apart from Bob Podlasek?
9    A    I don't recall.
10    Q    Did you find Ms. Melongo's comments
11 about law enforcement and the prosecution on the
12 website www.illinoiscorruption.net to be
13 irritating?
14    A    No.
15    Q    Did the content of the website
16 www.illinoiscorruption.net make you angry?
17    A    No.
18    Q    Do you think the criticisms of law
19 enforcement on www.illinoiscorruption.net were fair
20 criticisms?
21    A    No.
22    Q    What do you mean by that?
23    A    On that site there is a broad conspiracy
24 theory posited that is untrue.

46

1    Q    What is untrue about the conspiracy
2 posited on the website
3 www.illinoiscorruption.net?
4    A    There is no fraud conspiracy involving
5 President Obama, Ernie Dunkin and the Save A Life
6 Foundation, at least not to my knowledge.
7    Q    Did you ever ask Kyle French to have
8 somebody forensically capture the contents of
9 www.illinoiscorruption.net?
10    A    I don't recall.
11    Q    To your knowledge did anyone ever ask
12 Mr. French to have someone forensically capture the
13 contents of www.illinoiscorruption.net?
14    A    I don't recall.
15    Q    Were you ever involved in any
16 discussions related to the forensic capture of the
17 website www.illinoiscorruption.net?
18    A    Yes.
19    Q    When were those conversations?
20    A    Someone was asked, I don't recall who,
21 to capture that, to preserve it for trial.
22    Q    And were you involved in those
23 conversations about whether to capture the
24 website?

47

1    A    Yes.
2    Q    When roughly did those conversations
3 take place?
4    A    I don't recall.
5    Q    What was the purpose of the forensic
6 capture?
7    A    To preserve it for trial.
8    Q    When you say to preserve it for trial,
9 that suggests that there was some thought that
10 there was evidence on that website
11 www.illinoiscorruption.net that would be relevant
12 to a criminal prosecution; is that correct?
13    A    Yes.
14    Q    What information on
15 www.illinoiscorruption.net was that?
16    A    There were taped conversations in
17 violation of the eavesdropping statute and links
18 wherein one could listen to those conversations.
19    Q    Tell me a little bit more about those
20 taped conversations.  What were the taped
21 conversations?
22    A    To my recollection they were three
23 conversations between Ms. Melongo and Ms. Pamela
24 Taylor of the court reporter's office.

48

1    Q    And those three conversations were
2 posted to the website www.illinoiscorruption.net?
3    A    No, they were linked from the website.
4    Q    You testified that those conversations
5 were linked in violation of the criminal
6 eavesdropping statute. Why did you believe that
7 they violated the criminal eavesdropping statute?
8    A    Because at that time in the State of
9 Illinois to capture a conversation without the
10 knowledge or consent of the other party was a
11 violation of the law and to disseminate those
12 conversations was another violation of the law.
13    Q    Were the three conversations between
14 Ms. Melongo and Ms. Taylor captured without the
15 consent of Ms. Taylor?
16    A    Yes.
17    Q    How did you know they were captured
18 without the content of Ms. Taylor?
19    A    Two reasons. One, in listening to the
20 conversations, there is no permission on the face
21 of the conversation.
22         Second, there was later contact with
23 Ms. Taylor where she confirmed that she was unaware
24 that she was being tape recorded.

49

1    Q    Who made that later contact with
2 Ms. Taylor?
3    A    I don't recall.
4    Q    Did you ever speak to Ms. Taylor?
5    A    Yes.
6    Q    What do you recall about those
7 conversations with Ms. Taylor?
8    A    That she told me that she had not
9 consented to being tape recorded.
10    Q    When did that conversation take place?
11    A    I don't recall.
12    Q    Was it prior to the indictment for
13 eavesdropping charges in this case?
14    A    Yes.
15    Q    How did you first become aware of
16 recordings of Pamela Taylor on the website
17 illinoiscorruption.net?
18    A    I don't recall.
19    Q    Apart from your conversation with
20 Ms. Taylor, do you recall discussing those
21 recordings with anyone else?
22    A    Yes.
23    Q    Who else?
24    A    I have discussed those recordings with

50

1 Bob Podlasek.
2    Q    What was the nature of those
3 conversations prior to April 13, 2010 with
4 Mr. Podlasek?
5    A    I couldn't tell you before the
6 eavesdropping conversations were posted and I'm not
7 recalling the timeline.
8    Q    You testified that there was a forensic
9 capture done of the website for preservation for
10 trial purposes. After that forensic capture was
11 completed, what did you do with that capture?
12    A    I believe we introduced it at trial.
13    Q    Did you analyze it before that in any
14 way?
15    A    No. Strike that. I am not sure what
16 you mean by analyzed.
17    Q    Did you review the contents of the
18 forensic capture in any way after it was
19 generated?
20    A    I mean, I certainly looked at it. But
21 in any technical sense, to analyze or run through a
22 computer program, no, that didn't happen.
23    Q    But you did review the general contents
24 of the written documentation on that capture?

51

1    A    Of course.
2    Q    After that forensic capture was made,
3 did you continue to monitor the website
4 illinoiscorruption.net?
5    A    I'm not sure what you mean by
6 "monitor".
7    Q    Let's take a step back. So when a
8 forensic capture was made, it captures the website
9 I assume at a point in time; is that correct?
10    A    Yes.
11    Q    So after that forensic capture was
12 completed, if there were posts ongoing to the
13 website, did you review those new posts on the
14 actual website?
15    A    Yes, but not with any frequency or
16 regularity implied by the term monitor.
17    Q    About how often would you guess prior to
18 April 13, 2010, did you view
19 illinoiscorruption.net, did you log onto?
20    A    Once a month.
21    Q    When you looked at
22 illinoiscorruption.net, what were you looking
23 for?
24    A    Before the posting of the conversations,

52

JULIE GUNNIGLE - APRIL 23, 2018

1 nothing in particular.
2     Q     What about after the postings of the
3 conversations?
4     A     Content related to her criminal case and
5 anything that could be construed as an admission.
6     Q     Did you find anything that could be
7 construed as an admission on the website?
8     A     Yes.
9     Q     What was that?
10     A     Ms. Melongo admitted to taping
11 conversations.  And even went so far as I recall of
12 posting the law on her website as well.
13     Q     Did you conduct any other review or
14 research regarding Ms. Melongo's website prior to
15 April 13, 2010?
16     A     No.
17     Q     What did you do to evaluate the
18 allegations that Ms. Melongo illegally recorded
19 conversations with Pamela Taylor?
20     A     I looked at the website, I listened to
21 the recordings, a state's attorney, I can't
22 remember if it was myself or Mr. Podlasek, spoke to
23 Ms. Taylor.  I don't remember anything else.
24     Q     What did you do to determine whether

53

1 Ms. Melongo was responsible for the content of
2 illinoiscorruption.net?
3     A     There came points in time where we
4 obtained subpoenas and search warrants to confirm
5 that she owned a site.
6     Q     And did you confirm that she owned the
7 site?
8     A     Yes.
9     Q     How did you do that?
10     A     I believe there was a return on the
11 subpoena and the search warrant.
12     Q     What did that return on the subpoena and
13 search warrant show?
14     A     I believe it showed that Ms. Melongo
15 owned the site.
16     Q     In your conversations with Pamela
17 Taylor, what did she say about the recordings on
18 the website?
19     A     She said that, I believe she said that
20 she had received an email guiding her to the
21 website.  She said that she did not consent to the
22 recordings.
23     Q     Did she ask that criminal charges be
24 brought against Ms. Melongo?

54

1     A     I don't recall.
2     Q     Do you recall anything else about your
3 conversations with Ms. Taylor?
4     A     No, I don't.
5     Q     Were you involved in a determination
6 whether to bring charges related to the recordings
7 of Ms. Taylor?
8     A     I was.
9     Q     How was it decided that charges were
10 appropriate for the recordings?
11     A     There was discussion amongst the state's
12 attorneys and at one point in time our supervisors
13 and the determination was made that there was
14 probable cause and a reasonable likelihood of
15 success on the merits.
16     Q     Who was involved in those
17 conversations?
18     A     Myself, Bob Podlasek.  And I know there
19 was some sort of approval, but I can't recall which
20 of the supervisors was involved.
21     Q     Assistant state's attorneys have
22 discretion in whether to bring criminal charges; is
23 that correct?
24     A     Yes.

55

1     Q     There are situations in which an
2 assistant state's attorney may believe he could
3 successfully prove a particular charge, but
4 nonetheless exercises discretion in not bringing
5 that charge; is that correct?
6     A     Yes.
7     Q     Can you think of any examples of such a
8 case from your personal experience?
9     A     Where I had both probable cause and a
10 reasonable likelihood of success on the merits and
11 decided not to bring charges?
12     Q     That's right.
13     A     I don't recall.
14     Q     Do you recall any such case during the
15 time you worked at the Cook County State's
16 Attorney's Office?
17     A     I don't recall.
18     Q     Did you ever discuss with anyone whether
19 to exercise discretion in bringing the charges
20 against Ms. Melongo for the eavesdropping?
21     A     Yes.
22     Q     Why was it decided that in this case
23 charges would be appropriate?
24     A     Well, in this case, this case came to us

56

1  fully investigated with a bow on it and an
2  admission of guilt.
3      Q    When you say "fully investigated," what
4  do you mean by that?
5      A    There wasn't very much to do to workup
6  this case to bring this to trial.
7      Q    Who was responsible for that
8  investigation?
9      A    I'm sorry, I don't understand the
10  question.
11      Q    You testified that the case was fully
12  investigated by the time charges were brought.  Who
13  had done that investigation that you are referring
14  to?
15      A    At that point in time it would have been
16  Kate O'Hara at our office.
17      Q    What was Ms. O'Hara's involvement?
18      A    She and I talked through the subpoenas,
19  talked through the search warrants, talked through
20  the available evidence, and discussed whether or
21  not there was probable cause and a reasonable
22  likelihood of success on the merits.
23      Q    In deciding whether to charge
24  Ms. Melongo for recording conversations with

57

1  Ms. Taylor, did it matter whether Ms. Taylor
2  objected to being recorded?
3      A    No.  My recollection of the statute is
4  that it does not matter.  It's the lack of consent
5  that mattered.
6      Q    Do you think it's good for the operation
7  of our government for a citizen who talks to a
8  government employee about government business to be
9  prosecuted for recording what that employee says
10  about government business?
11      A    Sorry, I don't understand the
12  question.
13      Q    As a policy matter, do you think it's a
14  good idea to prosecute a citizen for recording a
15  conversation with a government employee about
16  government business?
17      MS. BROWN:  Objection; speculation.
18      You can answer.
19      THE WITNESS:  When that person is breaking the
20  law, they should be prosecuted.
21      By Ms. Schwartz:
22      Q    As a policy matter, do you think that
23  government transparency is a factor that should be
24  taken into account in deciding whether to charge a

58

1  person with a crime for recording a conversation
2  with a public employee about government business?
3      MS. BROWN:  Objection; speculation.
4      THE WITNESS:  I don't make policy, but when
5  someone is breaking the law, they should be
6  prosecuted.
7      MS. SCHWARTZ:  Let's take a five-minute break.
8      (A recess was had.)
9  By Ms. Schwartz:
10      Q    You testified earlier this morning about
11  Kyle French's involvement in the computer tampering
12  case.  I would like to go a little bit deeper into
13  that.
14      What role exactly did Kyle French play
15  in the computer tampering allegations or charges?
16      A    I'm not sure if there was a formal title
17  for his involvement, but it was that of an of
18  counsel.
19      Q    What sort of work did he do on
20  Ms. Melongo's case?
21      A    Very little.
22      Q    You testified that his role was focused
23  primarily on the computer technical aspects; is
24  that correct?

59

1      A    That is correct.
2      Q    So what sort of involvement on the
3  computer technical aspects did he have?
4      A    He was somehow involved -- although I
5  couldn't say with certainty because it was before
6  my tenure at the office -- with the forensic report
7  on Ms. Melongo's laptop.
8      Q    Do you know what his involvement on the
9  forensic report of Ms. Melongo's laptop was?
10      A    I couldn't tell you.
11      Q    During your tenure.
12      A    I don't know.
13      Q    Did he appear in court?
14      A    He did.
15      Q    Did he -- was he involved in the
16  decision making process with respect to case
17  strategy or issues involving the case?
18      A    Not that I recall.
19      Q    Do you recall anything in particular he
20  did while you were involved with Ms. Melongo's
21  criminal cases?
22      A    No, I don't.
23      Q    You testified this morning that you
24  generally took direction from Mr. Podlasek who was

60

JULIE GUNNIGLE - APRIL 23, 2018

1 the first chair on both cases. What instructions
2 or direction did Mr. Podlasek give you?
3     A     I don't recall any specific
4 instructions.
5     Q     When decisions were to be made involving
6 Ms. Melongo's cases, who was the final decision
7 maker?
8     A     I would think it would have either been
9 Bob or one of our supervisors.
10          Strike that. It depends on the nature
11 of the decision.
12     Q     Take for example the decision to
13 initiate charges in the eavesdropping case of
14 Ms. Melongo, who made that decision?
15     A     It was a collaborative process between
16 myself, Mr. Podlasek, and likely a supervisor,
17 although I can't remember who.
18     Q     You testified earlier that you were
19 involved with Ms. O'Hara in discussing search
20 warrants and subpoenas related to the eavesdropping
21 allegations. Did Mr. Podlasek advise you or
22 instruct you to do those steps?
23     A     I don't recall.
24     Q     How would you describe the division of

61

1 labor between yourself and Mr. Podlasek on
2 Ms. Melongo's criminal cases?
3     A     About 50/50.
4     Q     In terms of the workload?
5     A     That's correct.
6     Q     How did you choose who did what task?
7     A     While he would disagree with this
8 assessment, I am a better writer than Bob is, so
9 much of the written work I produced.
10     Q     And what were his areas of focus,
11 generally speaking, in the case?
12     A     Strategy, interviewing, trial prep.
13          (A document was marked as
14              Plaintiff's Deposition Exhibit
15              Gunnigle No. 1 for
16              identification.)
17 By Ms. Schwartz:
18     Q     I am showing Ms. Gunnigle what will be
19 marked as Plaintiff's Deposition Exhibit 1, which
20 is Bates numbered CCSAO 008124 and 8125.
21          Ms. Gunnigle, have you seen Plaintiff's
22 Deposition Exhibit 1 before?
23     A     I don't remember.
24     Q     It appears to be a memorandum from Walt

62

1 Hehner to ASA Robert Podlasek dated December 21,
2 2009.
3          Who is Walt Hehner, do you know who that
4 is?
5     A     It says he's chief deputy.
6     Q     Did you have any interaction with Walt
7 Hehner while you were at the Cook County State's
8 Attorney's Office?
9     A     No.
10     Q     You testified earlier this morning that
11 you looked at the website illinoiscorruption.net
12 for the recordings for one piece of content that
13 was of interest and also potential admissions on
14 the website for another.
15          Was there anything else about the
16 website that was of interest to you?
17     A     Not really.
18     Q     Was there anything else in particular
19 you were looking for on the website?
20     A     No.
21     Q     You testified that you engaged in some
22 discussions with Bob Podlasek about whether to
23 charge Ms. Melongo for eavesdropping; is that
24 correct?

63

1     A     Yes.
2     Q     Did you engage in any discussions about
3 whether Ms. Melongo should be arrested?
4     A     I don't remember.
5     Q     In any of your conversations before
6 April 13, 2010 about Ms. Melongo about the website
7 illinoiscorruption.net, did anyone say hey, maybe
8 we should not charge this particular offense?
9     A     I don't recall.
10     Q     Were you aware that there were certain
11 exemptions to the offense of illegally recording a
12 conversation?
13     A     Yes.
14     Q     Were you aware that one such exemption
15 made recording a conversation without the consent
16 of the person recorded legal if the recording was
17 made under reasonable suspicion that another party
18 to the conversation was committing or had committed
19 a criminal offense and there was reason to believe
20 that evidence of the criminal offense might be
21 obtained by that recording?
22     A     I don't have the statute in front of me.
23 I know that there was an exemption.
24     Q     You are aware that generally there was

64

JULIE GUNNIGLE - APRIL 23, 2018

1 an exemption for recording when there was a
2 reasonable suspicion of a criminal offense having
3 taken place?
4     A     Yes.
5     Q     Did you consider before charges were
6 brought whether that exemption applied to
7 Ms. Melongo's case?
8     A     Yes.
9     Q     Did you engage in any discussions with
10 anyone about whether that exemption applied before
11 charges were brought against Ms. Melongo?
12     A     Yes.
13     Q     What were those discussions?
14     A     There was discussion with Bob Podlasek.
15 In particular I remember discussions about whether
16 or not there was an element of the offense or an
17 affirmative defense, but in any event, it didn't
18 apply here.
19     Q     Why didn't it apply in this case?
20     A     Because she was alleging that the
21 recordings were evidence of treason.
22     Q     You didn't think there was evidence of
23 treason having taken place?
24     A     There is no evidence of treason in this

65

1 case.
2     Q     Did you discuss that, whether there was
3 evidence of treason or any other crime related to
4 the recording with Mr. Podlasek?
5     A     I did.
6     Q     Was anyone else involved in any of those
7 conversations?
8     A     Not that I recall.
9     Q     What did Mr. Podlasek say about whether
10 the exemption for recordings related to criminal
11 conduct applied?
12     A     He shared my opinion that they did
13 not.
14     Q     Do you recall anything else about
15 conversations prior to charges being brought about
16 that particular exception to the eavesdropping
17 statute?
18     A     No.
19     Q     You were aware, were you not, that
20 Ms. Melongo had complained about inaccuracy in the
21 court records in her cases?
22     A     Yes.
23     Q     You were aware that Ms. Melongo stated
24 that she was not present at the June 18, 2008

66

1 hearing in her computer tampering case, even though
2 the official transcript stated that she was?
3     A     Yes.
4     Q     Did you do anything to determine whether
5 there was an error in the June 18, 2008
6 transcript?
7     A     There was discussion in the trial
8 wherein the court reporter in the courtroom
9 testified to the accuracy of the transcript.
10          Secondarily, there are other issues with
11 the theory of treason related to altering a
12 transcript.  In particular, if the defendant wasn't
13 there on that date, the Judge would have issued a
14 warrant and she would have been arrested.
15          Additionally, at the arraignment, one
16 receives a copy of the Grand Jury transcript.  She
17 had that copy as it was posted to her website.
18     Q     Prior to eavesdropping charges being
19 brought, did you or anyone else reach out to the
20 court reporter involved in the June 18, 2008
21 hearing to determine whether the transcript was
22 accurate?
23     A     I believe so.
24     Q     What do you recall about that contact?

67

1     A     There came a point in time where we
2 reached out to, I believe her name was Laurel
3 Laudien, and asked her what she knew about the
4 transcript.
5     Q     What did Ms. Laudien say?
6     A     My recollection is that she said that
7 she had produced the transcript for Ms. Melongo at
8 her request, but that upon reducing the transcript
9 from tape recordings to the printed out verbatim
10 form that we think of as a lined transcript, her
11 computer program automatically deletes the audio
12 recording.
13     Q     Did Ms. Laudien say either way during
14 that conversation whether Ms. Melongo was present
15 at the June 18, 2008?
16     A     She did.
17     Q     What did she say?
18     A     She was there.
19     Q     This conversation took place prior to
20 charges being brought on the eavesdropping?
21     A     I don't recall.
22     Q     You were involved in this conversation;
23 is that correct?
24     A     Yes.

68

1    Q    Was anyone else present for the
2  conversation, apart from Ms. Laudien?
3    A    I don't recall.
4    Q    If the transcript was altered on purpose
5  to make it inaccurate, that could constitute the
6  crime of forgery; is that correct?
7    A    I don't remember the Illinois forgery
8  statute, but typically forgery involves a gain of
9  some sort.
10   Q    Could it be a crime for someone to cover
11 up the intentional falsification of a transcript?
12   A    Sure.
13   Q    You were aware that similar
14 eavesdropping statutes had been struck down as
15 unconstitutional, were you not?
16   A    No.
17   Q    Were you aware that news reporters
18 regularly recorded conversations without the
19 consent of all parties in and before April 2010?
20   A    No.
21   Q    We discussed previously Mr. French's
22 role in the computer tampering case.  What was
23 Mr. French's role in the eavesdropping case against
24 Ms. Melongo?

69

1    A    It was extremely limited.
2    Q    What was it limited to?
3    A    I don't recall any work that Mr. French
4  did on the eavesdropping case.
5    Q    Were you involved in the preparation of
6  any search warrant or subpoena for information
7  related to illinoiscorruption.net?
8    A    I was.
9    Q    What was your involvement?
10   A    I remember subpoena or possibly more
11 that was prepared.  I remember a search warrant or
12 possibly more than one that was executed.
13            (A document was marked as
14              Plaintiff's Deposition Exhibit
15              Gunnigle No. 2 for
16              identification.)
17 By Ms. Schwartz:
18   Q    I am handing Ms. Gunnigle what will be
19 marked as Plaintiff's Deposition Exhibit 2.  It is
20 Bates numbered CCSAO 000920 to 924.
21         Ms. Gunnigle, this is a search warrant
22 complaint signed by Kate O'Hara dated March 23,
23 2010; is that right?
24   A    That is correct.  No.  March 23rd,

70

1  yes.
2    Q    Is this one of the search warrants about
3  which you just testified that you were involved in
4  discussions about?
5    A    Yes.
6    Q    Is it a true and accurate copy of a
7  search warrant complaint dated March 23, 2010?
8    A    Yes.
9    Q    You drafted the contents of the search
10 warrant complaint; is that correct?
11   A    I don't recall.
12   Q    Ms. Garcia testified during her
13 deposition that you were the one who prepared the
14 contents of the search warrant complaint and then
15 walked through it together with Ms. Garcia.  Does
16 that refresh your recollection?
17   A    No, it doesn't.
18   Q    Is that your handwriting on the side
19 margins of each page of Exhibit 2?
20   A    Yes, it is.
21   Q    What does the information in the side
22 margin mean, do you know of anything in
23 particular?
24   A    I can see the first entry is the date.

71

1  Above and beyond that, this is somehow a control
2  number, but I can't tell you how it arrived
3  there.
4    Q    And that's your name next to the
5  numbers?
6    A    It is.
7    Q    What does it mean that your name is
8  reflected on the side of this document,
9  Exhibit 2?
10   A    That I was the ASA handling the search
11 warrant.
12   Q    This complaint, Exhibit 2, requests
13 subscriber names and information and other records
14 of user activity from godaddy.com related to the
15 website illinoiscorruption.net; is that correct?
16   A    Yes.
17   Q    If you turn to the third page of
18 Exhibit 2, Bates number at the bottom
19 CCSAO 000922, section marked Roman numeral IV.  It
20 says that the company registering the particular
21 website, illinoiscorruption.net, was Wild West
22 Domains, and the host was Go Daddy.
23         Did you identify that the registrar on
24 the site was Wild West Domains?

72

JULIE GUNNIGLE - APRIL 23, 2018

```
 1    A    I don't remember.
 2    Q    Did you identify that the host of that
 3 particular website was godaddy.com?
 4    A    I don't remember.
 5    Q    Kate Garcia testified during her
 6 deposition that you had identified the host company
 7 and registrar and showed her that information
 8 before she signed this particular document.  Does
 9 that refresh your recollection?
10    A    No.
11    Q    On that same page, towards the bottom of
12 Exhibit 2, there is the description of website
13 entries on illinoiscorruption.net with dates
14 December 10, December 15 and 16, 2009.
15         Are those the dates of the phone
16 conversations recorded and posted to
17 illinoiscorruption.net related to Ms. Taylor?
18    A    I don't remember.
19    Q    If you turn to the next page, page 4 of
20 5 of the complaint for search warrant Exhibit 2,
21 also Bates number CCSAO 000923, the first full
22 paragraph says, Ms. Taylor confirms that she is one
23 of the voices on the tape and that she was unaware
24 that she was being recorded.
```

73

```
 1         You had confirmed that information with
 2 Ms. Taylor; is that correct?
 3    A    I don't remember.
 4         (A document was marked as
 5              Plaintiff's Deposition Exhibit
 6              Gunnigle No. 3 for
 7              identification.)
 8 By Ms. Schwartz:
 9    Q    I am handing Ms. Gunnigle what will be
10 marked as Plaintiff's Deposition Exhibit 3, Bates
11 No. 000859 to 860.
12         Is Exhibit 3 a true and accurate copy of
13 the search warrant for Go Daddy records that was
14 signed by a judge?
15    A    Appears to be so.
16    Q    Did Go Daddy send any documents in
17 response to this search warrant to you or to anyone
18 else to your knowledge?
19    A    I don't remember.
20         (A document was marked as
21              Plaintiff's Deposition Exhibit
22              Gunnigle No. 4 for
23              identification.)
24
```

74

```
 1 By Ms. Schwartz:
 2    Q    I am handing Ms. Gunnigle what will be
 3 marked as Plaintiff's Deposition Exhibit 4, Bates
 4 numbered CCSAO 000874 to 880.
 5         Ms. Gunnigle, is this a true and
 6 accurate copy of a search warrant and search
 7 warrant complaint dated March 23, 2010 for records
 8 from Yahoo, Inc.?
 9    A    Yes.
10    Q    The first two pages appear to be the
11 actual search warrant itself; is that correct?
12    A    Yes.
13    Q    And then the last pages, CCSAO 876
14 through 880, are the complaint for search warrant;
15 is that correct?
16    A    Yes.
17    Q    Turning to this complaint for search
18 warrant, did you draft the contents of the
19 complaint for search warrant?
20    A    I don't remember.
21    Q    Garcia, Kate Garcia testified that you
22 drafted the contents of this document and discussed
23 those contents with her.  Does that refresh your
24 recollection?
```

75

```
 1    A    No.
 2    Q    Exhibit 4 requests customer and
 3 subscriber account information related to the Yahoo
 4 account concernedillinoiscitizen@yahoo.fr; is that
 5 correct?
 6    A    Yes.
 7    Q    And information was requested from Yahoo
 8 about that particular Yahoo account for what
 9 reason, do you recall?
10    A    It was involved in the eavesdropping
11 case.
12    Q    Was it because the website
13 illinoiscorruption.net directed questions to that
14 particular Yahoo email account?
15    A    That's what this complaint says.
16    Q    Did Yahoo produce any documents in
17 response to this search warrant, Exhibit 4?
18    A    I don't recall.
19         (A document was marked as
20              Plaintiff's Deposition Exhibit
21              Gunnigle No. 5 for
22              identification.)
23 By Ms. Schwartz:
24    Q    I am handing Ms. Gunnigle what will be
```

76

JULIE GUNNIGLE - APRIL 23, 2018

1 marked Plaintiff's Deposition Exhibit 5,
2 CCSAO 000866.  Exhibit 5 is a grand jury subpoena
3 for documents related to illinoiscorruption.net
4 directed to Wild West Domains; is that right?
5     A     Yes.
6     Q     Based on the stamp, it was filed
7 March 29, 2010?
8     A     Yes.
9     Q     Is this a true and accurate copy of a
10 subpoena for records from Wild West Domains, Inc.,
11 for information about illinoiscorruption.net?
12    A     It appears to be.
13    Q     That's your name at the bottom,
14 correct?
15    A     Yes.
16    Q     Did you prepare this subpoena?
17    A     I don't remember.
18    Q     The first full paragraph of Exhibit 5,
19 it refers to a John Doe investigation.  What is a
20 John Doe investigation?
21    A     I don't remember.
22    Q     What is the reason for requesting
23 records from Wild West Domains via a grand jury
24 subpoena as opposed to via a search warrant?

77

1     A     I don't remember.
2     Q     Do you remember generally, not in this
3 particular case, why one would use a search warrant
4 as compared to a grand jury subpoena?
5     A     I don't remember.
6     Q     This document, Exhibit 5, requests
7 information about the subscribers associated with
8 illinoiscorruption.net?
9     A     Yes.
10    Q     Did Wild West Domains produce any
11 documents in response to this grand jury
12 subpoena?
13    A     I don't remember.
14          (At this point in the proceedings
15           Mr. Shakman entered the room.)
16 By Ms. Schwartz:
17    Q     You appeared in court on Ms. Melongo's
18 computer tampering criminal case on March 3, 2010,
19 when she was ordered to undergo a psychological
20 evaluation, correct?
21    A     Yes.
22    Q     What do you recall about that court
23 date?
24    A     Very little.  It was almost a decade

78

1 ago.
2     Q     Did the Judge order Ms. Melongo to
3 undergo a psychological evaluation?
4     A     She did.
5     Q     What was the reason for that order for a
6 psychological evaluation?
7     A     My recollection is that Ms. Melongo
8 wanted to represent herself.
9     Q     And were psychological evaluations
10 always ordered in cases where criminal defendants
11 wanted to represent themselves?
12    A     I don't remember.
13    Q     Did you or Mr. Podlasek or Mr. French
14 request that psychological examination?
15    A     I don't remember.
16    Q     Did you think that a psychological
17 examination was appropriate for Ms. Melongo?
18    A     I do not remember.
19    Q     You knew, did you not, that Ms. Melongo
20 was scheduled to have that same psychological
21 examination on April 13, 2010, didn't you?
22    A     I don't remember.
23    Q     As a general matter, how would you
24 describe Ms. Melongo's conduct in court?

79

1     A     I don't remember.
2     Q     Do you remember anything about
3 interacting with Ms. Melongo in or out of court?
4     A     I remember very little.  I believe on
5 the day that she was ordered to undergo the BCX
6 hearing that she might have been behaving
7 erratically, but I don't recall any details.
8     Q     When you say "erratically," what do you
9 mean?
10    A     Just was loud, wasn't necessarily making
11 sense.
12    Q     Ms. Gunnigle, did you have any
13 involvement in the allegation that Ms. Melongo was
14 involved in intimidating or threatening a public
15 official?
16    A     No.
17    Q     At any point did you believe that there
18 were statements on illinoiscorruption.net that were
19 threats to a public official?
20    A     I don't remember.
21    Q     Do you remember anything about an
22 allegation that there were threats to a public
23 official on illinoiscorruption.net?
24    A     I remember being told that there was

80

1 federal interest because Ms. Melongo was in
2 Judge Lefkow's court, but I don't remember anything
3 beyond that.
4    Q    Who told you that there was federal
5 interest?
6    A    I believe it was Bob Podlasek.
7    Q    What did he say?
8    A    I don't recall.
9    Q    Do you recall when that conversation or
10 communication took place?
11   A    No, I don't.
12   Q    When you say federal interest, what did
13 you mean?
14   A    That some federal law enforcement body
15 that was not the Cook County State's Attorney's
16 Office had become interested in that statement.
17   Q    What was that statement?
18   A    I don't recall the verbatim statement
19 that she made.
20   Q    Do you recall that it had something to
21 do with Judge Lefkow?
22   A    It had something to do with
23 Judge Lefkow.
24   Q    And that that somehow sparked federal

                                                      81

1 law enforcement interest?
2    A    Yes.
3    Q    Did anyone from federal law enforcement
4 approach you about alleged threats on Ms. Melongo's
5 website?
6    A    Not that I recall.
7    Q    Did you ever meet with anyone from the
8 U.S. Marshal's Office about any statements on
9 Ms. Melongo website?
10   A    I don't remember.
11   Q    Did Mr. Podlasek ever talk to you about
12 meeting with employees from the U.S. Marshal's
13 Office about the illinoiscorruption.net website?
14   A    He was the one who told me that there
15 was federal interest. Whether or not he met with
16 somebody, I can't remember.
17   Q    Do you recall anything else about your
18 conversations or communications with Bob Podlasek
19 about federal interest in the website
20 illinoiscorruption.net?
21   A    No.
22   Q    Did you participate in any discussions
23 regarding whether Ms. Melongo had committed the
24 crime of threatening a public official or

                                                      82

1 intimidation?
2    A    No, that was not -- that was not
3 referred for my prosecution.
4    Q    When you say "referred," what does that
5 mean?
6    A    There was no complaint, there was no
7 referral, at least made to me.
8             (A document was marked as
9             Plaintiff's Deposition Exhibit
10            Gunnigle No. 6 for
11            identification.)
12   By Ms. Schwartz:
13   Q    I am handing Ms. Gunnigle Plaintiff's
14 Deposition Exhibit No. 6, which is Bates numbered
15 CCSAO 000885 through 913.
16            Ms. Gunnigle, do you recognize
17 Exhibit 6?
18   A    I do.
19   Q    What is Exhibit 6?
20   A    It appears to be a printout from
21 www.illinoiscorruption.net, but I can't tell you
22 with certainty when it was made. It appears to
23 bear a date in the far right corner of 3/8 of
24 2010.

                                                      83

1    Q    Did you generate this printout on
2 March 8, 2010?
3    A    I don't remember.
4    Q    If you turn to page 28 of Exhibit 6,
5 which is Bates numbered at the bottom CCSAO 000912,
6 at the bottom of the page -- this is an entry with
7 a date of March 3, 2010. It reads, Annabel has a
8 big surprise in store for the Court in its attempt
9 to push her out of the case by pretending she is
10 psychologically unbalanced. This surprise will be
11 known on April 14, 2010.
12            Have you seen this particular entry
13 before?
14   A    I have.
15   Q    When did you first see it?
16   A    I don't remember.
17   Q    Do you remember the context in which you
18 first saw that particular statement?
19   A    I saw it on her website.
20   Q    Who alerted you to that statement on
21 illinoiscorruption.net?
22   A    I don't remember.
23   Q    Do you remember about when you first saw
24 the statement on illinoiscorruption.net?

                                                      84

1    A    I don't remember.
2    Q    Is that particular statement that I just
3 read to you from Exhibit 6, is that particular
4 statement a threat?
5    A    I don't know.
6    Q    Does that particular statement sound
7 threatening to you at all?
8    A    If you are asking me in context could
9 that be perceived as a threat, I think the answer
10 is yes.
11    Q    Why is that?
12    A    My recollection is at the time she was
13 involved in Judge Levco's courtroom and there is
14 special sensitivity with respect to that particular
15 Judge.
16        Apart from that, I don't really know.  I
17 wasn't investigating Ms. Melongo for threatening a
18 public official.
19    Q    If you look up on that same page we have
20 been discussing, page 28 of Exhibit 6, Bates
21 No. CCSAO 00912, the preceding sentence reads,
22 Judge Brosnahan forcing Annabel to undergo a
23 psychological evaluation en lieu of letting her
24 argue her motions is yet another move from the

85

1 state and the Court to block a motion to dismiss
2 based on seven counts of perjury by
3 Detective Martin and three counts of prosecutorial
4 misconduct by Joseph Podlasek.
5        Does that provide any additional context
6 to the statement that follows which says, Annabel
7 has a big surprise in store for the Court in its
8 attempt to push her out of the case?
9    A    I don't know.  I didn't write those
10 words.
11    Q    Did you read this statement that I just
12 read on Ms. Melongo's website?
13    A    Yes.
14    Q    Ms. Melongo accused your colleague,
15 Mr. Podlasek, of prosecutorial misconduct on her
16 public website; is that right?
17    A    No, she accused Joseph Podlasek.
18    Q    Did you understand her to be referring
19 to Bob Podlasek or Mr. Podlasek?
20    A    I didn't attempt to read anything more
21 into this.  I didn't write these words.
22    Q    When you were at the Cook County State's
23 Attorney's Office, was there anyone named Joseph
24 Podlasek?

86

1    A    I don't know.
2    Q    When you read this statement on
3 illinoiscorruption.net, what did you think about
4 the allegations of three counts of prosecutorial
5 misconduct by Joseph Podlasek or Bob Podlasek?
6    A    I don't remember.
7    Q    When you read this statement on
8 illinoiscorruption.net, what did you think of the
9 statement that there had been counts of perjury by
10 Detective Martin?
11    A    I believe there was motion practice
12 surrounding those -- that allegation.
13    Q    What do you recall about that
14 allegation?
15    A    That it was untrue.
16    Q    Why did you think it was untrue?
17    A    It was untrue because there was no
18 perjury in the grand jury.  And in her motion to
19 dismiss, the things that the defendant asserts to
20 be misstatements or contradictory were not in fact
21 misstatements, nor were they contradictory.
22    Q    This page of Exhibit 6, 28 of 29, Bates
23 No. CCSAO 00912, do you have any recollection of
24 discussing this page with anyone?

87

1    A    No.
2    Q    Turning your attention to page 10 of
3 Exhibit 6, Bates No. CCSAO 000894, which is an
4 entry dated December 9, 2009, and turning to the
5 next page, page 11, CCSAO 00895, farther on in that
6 entry, it says, but little did he know that Annabel
7 had a surprise in the form of substituting a judge
8 as a right.
9    A    I am sorry, where?
10    Q    I am on page 11 of 29, about midway down
11 the page.  A little farther than midway down.
12    A    Yes, I see it.
13    Q    But little did he know that Annabel had
14 a surprise in a form of substituting a judge as a
15 right.
16    A    Yes.
17    Q    Do you recall reading that statement on
18 illinoiscorruption.net?
19    A    I don't remember.
20    Q    You don't believe that invoking a
21 statutory right to substitute a judge sounds like a
22 threat, do you?
23    A    No.
24

88

1           (A document was marked as
2           Plaintiff's Deposition Exhibit
3           Gunnigle No. 7 for
4           identification.)
5    By Ms. Schwartz:
6    Q    I am handing Ms. Gunnigle what will be
7  marked Plaintiff's Deposition Exhibit No. 7, which
8  is Bates numbered CCSAO 003108 to 3109.
9        We are looking at Exhibit 7,
10  CCSAO 003108.  Do you recognize Exhibit 7?
11    A    I don't.
12    Q    At the top it says CL report.  Do you
13  know what CL report means or stands for?
14    A    I don't remember.
15    Q    Have you seen a report generally in this
16  format from your time at the Cook County State's
17  Attorney's Office?
18    A    I don't remember.
19    Q    Is there any indication on Exhibit 7 who
20  prepared this report?
21    A    I see two initials by ASA, and I see
22  what could be my initials up here on the left, but
23  I don't remember anything about this document.
24    Q    Those initials, and the other

89

1  handwritten words, do you know whose handwriting
2  any of those handwritten words in the margin are?
3    A    No.
4    Q    You said you saw on Exhibit 7 what
5  appears to be your initials.  Where were you
6  referring?
7    A    It says ASA in the uppermost left
8  corner.  And my initials are JRG.  It kind of looks
9  like what's up there.
10    Q    Is that your handwriting?
11    A    Probably.
12    Q    If you turn to the note section on the
13  first page of Exhibit 7, it says, target was
14  indicted for computer tampering/intrusion in case
15  08CR-10502.  The charges stemmed from an incident
16  where the target (as a former employee) entered the
17  computer systems of a nonprofit organization and
18  deleted donor lists and other data.  While that
19  case is pending, Ms. Melongo has maintained a
20  website detailing the, quote, corruption of the
21  attorney general's office, our office, and the
22  court system.
23        Did you write that narrative portion I
24  just read?

90

1    A    I don't remember.
2    Q    Would you agree that whoever did write
3  this portion that I just read believed it was
4  relevant that Ms. Melongo viewed the attorney
5  general's office, your office, and the court system
6  as corrupt?
7    A    Yes.
8    Q    Do you believe that someone who holds
9  those particular views should be charged with a
10  crime for stating those opinions?
11    A    No.  But that's not why Ms. Melongo was
12  charged.
13    Q    You knew that Ms. Melongo's website
14  described what she viewed as corruption in the
15  court system and in the attorney general's office
16  and in the Cook County State's Attorney's Office,
17  correct?
18    A    Yes.
19    Q    How did you learn that?
20    A    I read the site.
21    Q    Do you have any idea why the word
22  corruption in that statement I just read is in
23  quotes?
24    A    I don't know.

91

1    Q    A citizen who believes there is
2  corruption in public office is free to state that
3  opinion, isn't that true?
4    MS. BROWN:  Objection; speculation.
5    THE WITNESS:  Yes.
6    By Ms. Schwartz:
7    Q    The note portion on Exhibit 7 continues
8  as follows, she has been calling the court
9  reporter's office and (without their knowledge or
10  permission) taped the conversations.  Target then
11  posts the conversation to the site as an audio file
12  and accompanying transcript.
13        Do you recall writing that content?
14    A    I don't remember anything about this
15  document.
16    Q    Continuing on, the next paragraph, it
17  says, an additional concern with target is that she
18  posts vague threats, paren, quote, has a big
19  surprise in store for the court, close quote, on
20  the next court date, close paren, on the website
21  and has told attorneys she wants, quote, the head
22  of the dog prosecutor, parens, Podlasek.  We hope
23  to have enough to arrest her before the next court
24  date.

92

1    Do you recall any allegation about the
2 head of the dog prosecutor?
3    A    No.  I mean, I find that funny.  But I
4 don't remember anything about this document.
5    Q    Have you heard the phrase head of the
6 dog prosecutor in connection with any of
7 Ms. Melongo's cases before today?
8    A    No, you'd think I would remember
9 something like that, but I just don't.
10    Q    Do you recall anything about vague
11 threats on Ms. Melongo's website?
12    A    It appears that the memo is referring to
13 has a big surprise in store for the Court in that
14 statement.  Apart from that, I don't remember
15 anything else about this document.
16    Q    Do you think the statement, the head of
17 the dog prosecutor sounds like a threat?
18    A    I mean, I suppose so.  I don't see a
19 context, so I can't tell you with any certainty.
20    Q    You said it is kind of funny, right?
21    A    Yes, it is funny.  Especially because
22 Bob's a cat person.
23    Q    At the time you worked at the State's
24 Attorney's Office, did the office have a policy for

93

1 how to deal with threats defendants made against
2 prosecutors?
3    A    I don't remember.
4    Q    Final sentence that I had just read was,
5 we hope to have enough to arrest her before the
6 next court date.
7    Do you have any recollection of
8 conversations regarding the timing of Ms. Melongo's
9 arrest?
10    A    I don't remember.
11    Q    Do you recall that Ms. Melongo was
12 arrested on April 13, 2010?
13    A    Yes.
14    Q    Were you involved in any discussions
15 related to the decision to arrest her on that
16 date?
17    A    I don't remember.
18    Q    Were you involved in discussions on
19 whether to arrest Ms. Melongo at all?
20    A    I don't remember.
21    Q    Kate Garcia testified that Ms. Melongo
22 was arrested on April 13, 2010, because there were
23 concerns over potential threats on Ms. Melongo's
24 website.

94

1    Does that refresh your recollection as
2 to why Ms. Melongo was arrested on April 13,
3 2010?
4    A    No, it doesn't.
5    Q    Did you give any instructions to arrest
6 Ms. Melongo on April 13, 2010?
7    A    I don't remember.
8    Q    Do you recall being involved in the
9 preparation of an arrest warrant for Ms. Melongo's
10 arrest?
11    A    I don't remember.
12    MS. SCHWARTZ:  Let's take a five-minute break.
13    (At this point Mr. Shakman left the
14       proceedings.)
15    By Ms. Schwartz:
16    Q    Ms. Gunnigle, you testified earlier that
17 the website illinoiscorruption.net was forensically
18 captured in order to preserve it for trial; is that
19 correct?
20    A    Yes.
21    Q    That capture was done end of 2009, early
22 2010; is that correct?
23    A    I don't remember.
24    Q    The forensic capture was done prior to

95

1 indictment in this case; is that correct?
2    A    I don't remember.
3    Q    The indictment in this case wasn't until
4 May of 2010, after Ms. Melongo's arrest; is that
5 correct?
6    A    That is correct.
7    Q    If the forensic capture was done for
8 purposes of preserving the evidence for trial, why
9 was it done so early prior to any indictment in the
10 case?
11    A    I don't know.
12    Q    Were you thinking of trial in advance
13 when the forensic capture was done, is that the
14 reason?
15    A    I don't remember doing the forensic
16 capture.  I don't remember any involvement of
17 that.
18    Q    You testified earlier this morning about
19 the factual background of the eavesdropping charges
20 in this case.  It's true, is it not, that
21 Ms. Melongo always maintained that the arraignment
22 never took place on June 18, 2008?
23    A    Yes.
24    Q    It's also true, is it not, that the

96

1 Judge's notes and court sheets for that date,
2 June 18, 2008, reflect that Ms. Melongo was not
3 present?
4    Q    That is not my recollection.
5    Q    The Judge's notes and the court sheets
6 from that date don't show that the defendant
7 Ms. Melongo was present, isn't that true?
8    A    That is not my recollection.
9    Q    What do you recall?
10   A    I remember that there is a Judge's half
11 sheet. I remember some dispute about the notation.
12 But a notation that somebody wasn't arraigned and
13 there was no warrant issued, that's not true.
14   Q    Were the court sheets and the half
15 sheets to which you just referred, were those
16 evidence at the trial for the eavesdropping
17 charges?
18   A    They were.
19   Q    Were you present for that trial?
20   A    I was.
21   Q    You testified earlier this morning,
22 Ms. Gunnigle, that Ms. Melongo was loud and erratic
23 in court on March 3, 2010. What did you mean by
24 loud and erratic?

97

1    A    Loud means that she was speaking loudly
2 with I suppose an increased volume.
3         Erratic, I believe I said that she
4 wasn't making a whole lot of sense.
5    Q    Was that true of just that particular
6 date or was that a more general characteristic that
7 you noticed in your interactions and observation of
8 Ms. Melongo?
9    A    I don't remember.
10               (A document was marked as
11               Plaintiff's Deposition Exhibit
12               Gunnigle No. 8 for
13               identification.)
14 By Ms. Schwartz:
15   Q    I am going to show you, Ms. Gunnigle,
16 Plaintiff's Deposition Exhibit 8, which bears Bates
17 Nos. MELONGO_003130 through 3133.
18        Do you recognize Exhibit 8?
19   A    Yes.
20   Q    Is it a true and accurate copy of an
21 arrest warrant and a complaint for an arrest
22 warrant for the arrest of Ms. Melongo dated
23 April 18, 2010?
24   A    It appears to be so, yes.

98

1    Q    Whose handwriting is on the first page
2 in the top under the caption section?
3    A    The top right, I don't know. On the top
4 left, it is mine.
5    Q    Where it says Annabel K. Melongo?
6    A    That's right.
7    Q    That's your handwriting?
8    A    Uh-huh.
9    Q    So you drafted certain portions of this
10 arrest warrant?
11   A    Yes.
12   Q    Were you present in court when this
13 arrest warrant was entered by the Judge?
14   A    I don't remember.
15   Q    It's signed by a Judge on the first
16 page, correct?
17   A    Yes, it is.
18   Q    Turning to the second page, 003131 on to
19 3133, that's the complaint section of the arrest
20 warrant, complaint for arrest warrant?
21   A    Yes.
22   Q    Did you draft that complaint for arrest
23 warrant?
24   A    I don't remember.

99

1    Q    Kate Garcia testified during her
2 deposition that you drafted the complaint for
3 arrest warrant. Does that refresh your
4 recollection?
5    A    It doesn't.
6    Q    Turn to the page Bates numbered at the
7 bottom MELONGO_003132. At the top it says, a
8 further investigation of the site revealed that it
9 was registered to Thomas Fisher and Honorine Mbabe
10 Essono, but paid for with Annabel Melongo's Visa
11 credit card. The site is organized chronologically
12 and contains an entry for each court date.
13        This refers to the website
14 illinoiscorruption.net?
15   A    Yes.
16   Q    And the section I just read discusses a
17 further investigation of the site?
18   A    Yes.
19   Q    What does that further investigation
20 refer to?
21   A    The words say that there is a further
22 investigation that was registered to Mr. Fisher and
23 Ms. Essono.
24        I don't, I don't know. I don't

100

1 remember.
2     Q     What was your role in the investigation
3 of Ms. Melongo's website, any investigation into
4 Ms. Melongo's website?
5     A     I don't remember.
6     Q     On the last page, which is signed by
7 Kate O'Hara, the last paragraph says, based upon
8 the evidence as outlined herein, I believe that
9 there is probable cause to believe that Annabel
10 Melongo committed the felony offenses of
11 eavesdropping in violation of both
12 720 ILCS 5/14-2 (a) and (c).
13         What was the evidence supporting
14 probable cause to arrest Ms. Melongo?
15     A     Well, the arrest warrant -- the
16 complaint for arrest warrant says that the site
17 contained tape recordings of conversations with
18 only one party consent and that Ms. Melongo was the
19 voice on the recording and that Ms. Melongo paid
20 for the site.  And that's what it says.
21     Q     Did you believe there was probable cause
22 to arrest Ms. Melongo for eavesdropping?
23     A     Yes.
24     Q     For the same reasons you just

101

1 mentioned?
2     A     Yes.
3     Q     The arrest warrant was signed by a Judge
4 on April 13, 2010, at 2:49 p.m.; is that correct?
5     A     Yes.
6     Q     The complaint for arrest warrant doesn't
7 make any mention of whether -- the exemption for
8 recording a conversation to document the occurrence
9 of a crime; isn't that correct?
10     A     No, it does not say anything about
11 that.
12     Q     But you testified that you did consider
13 whether that exemption was applicable; is that
14 correct?
15     A     Yes.
16     Q     And you didn't think it was applicable
17 in this case?
18     A     It was not.
19     Q     Did you ever question why you were
20 having Ms. Melongo arrested for something as
21 innocuous as tape recording a conversation with a
22 government employee about government work?
23     A     I'm sorry, I don't understand the
24 question.

102

1     Q     I will ask a different question.
2         Would you agree that it was pretty minor
3 to record a phone call with a public employee about
4 public business?
5     A     No, I wouldn't agree with that.
6     Q     Why not?
7     A     Because it's an invasion of privacy.
8     Q     Isn't it true that part of the reason
9 that the charges were brought was that
10 Ms. Melongo's website included content that was
11 incredibly critical of law enforcement and the
12 State's Attorney's Office?
13     A     No, that's not true.
14     Q     Wouldn't you agree that trying to punish
15 Ms. Melongo for what she wrote on her website --
16 strike that.  It's not --
17         Ms. Melongo was incarcerated after this
18 arrest warrant was issued; is that right?
19     A     Yes.
20     Q     She was housed in the Cook County
21 jail?
22     A     Yes.
23     Q     In fact, she was there for nearly two
24 years while charges were pending?

103

1     A     I don't know.
2     Q     After this arrest warrant was signed,
3 Exhibit 8, did you send it to the Cook County
4 Sheriff's Office?
5     A     I don't remember.
6     Q     When an arrest warrant is signed like
7 Exhibit 8, what are the next steps to initiate an
8 arrest?
9     A     I don't remember.
10     Q     Did you ever review police reports
11 related to Ms. Melongo's arrest on April 13,
12 2010?
13     A     I don't remember.
14         (A document was marked as
15         Plaintiff's Deposition Exhibit
16         Gunnigle No. 9 for
17         identification.)
18 By Ms. Schwartz:
19     Q     I am handing Ms. Gunnigle Plaintiff's
20 Deposition Exhibit 9, Bates No. MELONGO_003414.
21         This is a police report related to
22 Ms. Melongo's April 13, 2010 arrest.
23         Have you seen this police report
24 before?

104

1    A    I don't remember.

2    Q    Generally if you were working on a case

3  while you were at the State's Attorney's Office,

4  would you receive the police reports as part of

5  your file?

6    A    If it was related to the crime that was

7  being investigated, yes.

8            (A document was marked as

9            Plaintiff's Deposition Exhibit

10           Gunnigle No. 10 for

11           identification.)

12   By Ms. Schwartz:

13   Q    I am handing Ms. Gunnigle Plaintiff's

14  Deposition Exhibit 10, Bates No. MELONGO_003415

15  through 3417.

16         Exhibit 10 is a supplementary police

17  report related to Ms. Melongo's arrest of April 13,

18  2010.

19         Have you seen this exhibit before,

20  Ms. Gunnigle?

21   A    I don't remember.

22   Q    Did you turnover any police reports

23  related to Ms. Melongo's April 13, 2010 arrest to

24  Ms. Melongo or her attorneys during either of the

105

1  two criminal cases against her?

2    A    I don't remember.

3    Q    Were you aware that Ms. Melongo while

4  she was representing herself served a subpoena on

5  the Cook County Sheriff Police requesting records

6  related to her April 13, 2010 arrest?

7    A    I don't know.

8    Q    Were you working at the Cook County

9  State's Attorney's Office on April 28, 2012?

10   A    No.

11   Q    You had already left by that point?

12   A    I had.

13   Q    Do criminal defendants generally receive

14  copies of police reports related to their criminal

15  cases?

16   A    I don't remember what Cook County's

17  policy was.

18   Q    Were you aware that Ms. Melongo did not

19  receive all police reports related to her April 13,

20  2010 arrest after she requested them?

21   A    I have no recollection of that.

22   Q    Were you involved in any discussions

23  about what Ms. Melongo's bond should be following

24  her April 13, 2010 arrest?

106

1    A    I don't remember.

2    Q    Were you present in court on April 14,

3  2010, when Ms. Melongo first appeared in court

4  after her arrest?

5    A    I don't remember.

6            (A document was marked as

7            Plaintiff's Deposition Exhibit

8            Gunnigle No. 11 for

9            identification.)

10   By Ms. Schwartz:

11   Q    I am handing you Plaintiff's Deposition

12  Exhibit 11, Bates No. CCSAO 003296.

13         Do you recognize Exhibit 11,

14  Ms. Gunnigle?

15   A    I don't.

16   Q    Is that your handwriting in the caption,

17  in the points No. 1 and 2 section of Exhibit 11?

18   A    It is.

19   Q    There is a date in the bottom right

20  corner on a stamp that says April 14, 2010,

21  correct?

22   A    That's what it says.

23   Q    Is this a true and accurate copy of an

24  order that was entered April 14, 2010?

107

1    A    It appears to be so.

2    Q    There is no reason to believe it's not a

3  true and accurate copy?

4    A    No.

5    Q    Based on this document, Exhibit 11, the

6  state's position was that Ms. Melongo violated a

7  condition of her bail on the computer tampering

8  case by committing the offense of eavesdropping;

9  isn't that correct?

10   A    That's what it says.

11   Q    That's what you represented to the Court

12  in filing this document, correct?

13   A    Yes.  Although I don't see, I don't see

14  who the actual affiant is on this.  This doesn't

15  appear to be signed, at least not by me.

16   Q    What does it mean that it's not signed?

17  Was this entered as an order without signature?

18   A    That's what appears to have happened,

19  yeah.

20   Q    Would that be unusual?

21   A    I don't remember any of the process

22  involved in initiating her criminal case in Cook

23  County.  It has just been too long.

24   Q    At the bottom under the order section it

108

1 says, leave is granted to the state to file this
2 petition. Bail is set at no bond.
3      What does no bond mean?
4   A   That the person wouldn't be able to bond
5 out absent a new bail hearing.
6   Q   So this document means that even if
7 Ms. Melongo could have paid a bond in any amount,
8 she would not have been released under this
9 order?
10   A   I think so, but again, I really don't
11 recall the process in Cook County during the time
12 that I was there.
13      (A document was marked as
14      Plaintiff's Deposition Exhibit
15      Gunnigle No. 12 for
16      identification.)
17 By Ms. Schwartz:
18   Q   I am handing Ms. Gunnigle Plaintiff's
19 Deposition Exhibit 12, Bates No. CCSAO 000332.
20      Is this an immigration and customs
21 enforcement detainer for Ms. Melongo?
22   A   Yes, that's what it appears to be.
23   Q   Have you seen this document before,
24 Exhibit 12?

109

1   A   I don't remember.
2   Q   Did you generally receive immigration
3 and custom enforcement detainers on cases you were
4 working on?
5   A   I don't remember.
6   Q   There is some handwritten portions on
7 this document. Is that your handwriting anywhere
8 on the document?
9   A   No, it is not.
10   Q   Do you recognize whose handwriting it
11 is?
12   A   No, I do not.
13   Q   Were you present at the hearing on
14 April 20, 2010, when Ms. Melongo's bond was set to
15 $500,000?
16   A   I don't recall.
17   Q   Were you aware that the state requested
18 no bond be awarded on April 20, 2010?
19   A   I don't recall.
20   Q   Under what circumstances would a request
21 for no bond be made by the Cook County State's
22 Attorney's Office, based on your experience?
23   A   I -
24   Q   Would no bond only be requested in

110

1 particularly serious cases?
2   A   I don't recall.
3   Q   Did you think Ms. Melongo was
4 dangerous?
5   A   I don't remember.
6   Q   Did you think Ms. Melongo posed a flight
7 risk?
8   A   I don't remember.
9   Q   On May 5, 2010, Ms. Melongo's bond was
10 reduced to 300,000. Were you present at that
11 hearing?
12   A   I don't remember.
13   Q   In or around July of 2010, the state
14 decided to proceed with the eavesdropping charges
15 and put the tampering case on hold; is that
16 correct?
17   A   I don't remember.
18   Q   Do you remember any conversations about
19 which of the two cases should be prioritized, the
20 computer tampering case or the eavesdropping?
21   A   I remember there was an election that
22 was made. I don't remember when. I don't remember
23 the conversation involving the circumstances or
24 why.

111

1   Q   Do you remember that the charges were
2 elected to proceed?
3   A   Oh, yes, there was an election made on
4 the eavesdropping charges, to go forward with
5 those.
6   Q   What does an election mean?
7   A   Well, when someone is charged with
8 multiple different crimes, it's a system of
9 priority, which gets tried first.
10   Q   From your time at the Cook County
11 State's Attorney's Office, what were the factors in
12 play generally when deciding what election to make
13 in a case with two different criminal charges?
14   A   I don't remember.
15   Q   So if in fact the eavesdropping case was
16 elected to go forward, that was thought to be the
17 priority of the two sets of charges?
18   A   I'm sorry, could you ask that again?
19   Q   I will take a step back.
20      The prosecution decided to elect to
21 proceed with the eavesdropping charges as opposed
22 to the computer tampering charges, correct?
23   A   Yes.
24   Q   Did that mean that the eavesdropping

112

JULIE GUNNIGLE - APRIL 23, 2018

1 charges were to be the priority at that time?

2    A   My hesitancy to respond to that question

3 involves the word priority. So an election is

4 which case goes first in terms of a trial. It

5 doesn't mean that one charge is more important than

6 the other. That word can mean both things.

7        But the election was made to proceed on

8 the eavesdropping first, meaning that it got tried

9 first. So it got priority in that sense.

10    Q   That is what you meant by a system of

11 prioritizing?

12    A   Yes.

13    Q   Do you recall why the eavesdropping

14 charges were decided to be tried first?

15    A   I don't remember.

16    Q   Ms. Melongo was in custody from

17 April 13, 2010, when she was arrested, until

18 October 13, 2011 when she was released on

19 electronic monitoring; is that correct?

20    A   I don't know.

21    Q   Were you involved in Ms. Melongo's case

22 in November of 2011?

23    A   No.

24    Q   Had you left the Cook County State's

113

1 Attorney's Office at that time?

2    A   Yes.

3    Q   So did you have anything to do with the

4 decision to arrest Ms. Melongo on November 10,

5 2011?

6    A   I don't remember.

7    Q   You were gone by that time, November 10,

8 2011?

9    A   Oh no, I was gone by that time. I

10 wouldn't have had any authority to do anything in

11 Cook County.

12    Q   I would like to discuss in greater

13 detail the computer tampering allegations against

14 Ms. Melongo.

15        What was your role in the charges

16 brought against Ms. Melongo related to computer

17 tampering?

18    A   I arrived after the charges had already

19 been brought. In fact, after Ms. Melongo had been

20 reindicted on those charges. So I sat second chair

21 to Bob and I suppose to Kyle French as well in the

22 prosecution of those before the election to the

23 computer tampering case.

24    Q   When you say you sat second to Robert

114

1 Podlasek and Kyle French, what do you mean by that?

2    A   I was the most junior attorney on the

3 case.

4    Q   That was after the reindictment on the

5 computer tampering charges, as you testified?

6    A   Yes.

7        (A document was marked as

8        Plaintiff's Deposition Exhibit

9        Gunnigle No. 13 for

10        identification.)

11 By Ms. Schwartz:

12    Q   I am showing Ms. Gunnigle Plaintiff's

13 Deposition Exhibit 13, Bates No. CCSAO 001602

14 through 1604.

15        Is Exhibit 13 the reindictment to which

16 you just referred?

17    A   Yes, it appears to be so.

18    Q   Do you know whose handwriting is listed

19 at the top of Exhibit 13?

20    A   No, I don't.

21    Q   Do you know why the case was reindicted

22 in 2008?

23    A   I don't.

24    Q   Exhibit 13 is a true and accurate copy

115

1 of the reindictment of Ms. Melongo?

2    A   It appears to be so.

3    Q   There is no reason to think it's not a

4 true and accurate copy?

5    A   No.

6    Q   Did you have any involvement in any of

7 the grand jury proceedings related to Ms. Melongo's

8 computer tampering case?

9    A   No, I did not.

10    Q   With respect to the eavesdropping case,

11 did you have any involvement in the grand jury

12 proceedings with respect to eavesdropping

13 charges?

14    A   Yes, I did.

15    Q   Did you appear before the grand jury --

16    A   I did.

17    Q   -- to secure an indictment in

18 Ms. Melongo's case?

19    A   I did.

20    Q   In terms of the computer tampering case

21 against Ms. Melongo, who did you interact with in

22 working on that case?

23    A   Bob Podlasek and Kyle French.

24    Q   Did you interact with anyone else in

116

1 working on the case?
2    A    I'm trying to remember. I'm sure I did
3 as we believed it was going to get closer to trial,
4 but I can't remember who.
5    Q    What was your understanding of the
6 factual basis of the computer tampering charges
7 against Ms. Melongo?
8    A    The factual basis for these three
9 counts -- again speaking in broad generalities,
10 because it's been eight years -- was that she
11 worked for the Save A Life Foundation, and that one
12 morning the head of the Save A Life Foundation
13 tried to access, I believe they were donor lists.
14 She received a phone call later -- I can't tell you
15 if it was in the morning or the afternoon -- from
16 Annabel Melongo, saying, I think you might be
17 having computer issues, do you need any help.
18 Ms. Melongo had been recently terminated.
19         Upon investigation, there was evidence
20 in Ms. Melongo's computer showing that she had been
21 active on her computer and on -- I forget which
22 networking system -- during the time of the
23 intrusion, and that there had similarly been an
24 intrusion into the head of Save A Life's email

117

1 account.
2    Q    What was the evidence in Ms. Melongo's
3 computer that she had accessed Save A Life systems
4 and the Save A Life email account of the head of
5 Save A Life?
6    A    I can't recall in specifics, but there
7 was a forensic report that was prepared that
8 detailed the different pieces of evidence on
9 Ms. Melongo's computer.
10    Q    Did you review that forensic report?
11    A    I did.
12    Q    What did you know about the
13 investigation that had been done relating to the
14 computer tampering allegation prior to your
15 involvement in the case?
16    A    I'm sorry, I don't understand.
17    Q    You testified earlier that Robert
18 Podlasek asked you to become involved in the
19 computer tampering case; is that correct?
20    A    That's right.
21    Q    Shortly after you started at the Cook
22 County State's Attorney's Office?
23    A    That's right.
24    Q    It was after the indictment and the

118

1 reindictment?
2    A    That's right.
3    Q    What did you know about any
4 investigation that had been done prior to that time
5 when you became involved in Ms. Melongo's case?
6    A    Well, when I became involved in it, I
7 didn't know anything of the investigation before.
8    Q    What did you learn while working on the
9 case had been done prior to your involvement?
10    A    I reviewed the forensic report. There
11 were -- there was a police report. There were
12 several police reports.
13         Without my file in front of me, it's
14 hard to say what else was in there. But there was
15 a substantial file with respect to the computer
16 tampering charge.
17         (A document was marked as
18          Plaintiff's Deposition Exhibit
19          Gunnigle No. 14 for
20          identification.)
21 By Ms. Schwartz:
22    Q    I am handing you, Ms. Gunnigle,
23 Plaintiff's Deposition Exhibit 14, Bates
24 No. CCSAO 000209 through 212.

119

1         Do you recognize Exhibit 14?
2    A    Yes.
3    Q    What is Exhibit 14?
4    A    It appears to be a 2006 email chain
5 involving Carol Spizzirri and Brian Salerno that
6 was forwarded to melongo_annabel@yahoo.
7    Q    Is this a copy of the email that was
8 allegedly forwarded to Ms. Melongo on May 1,
9 2006?
10    A    I don't remember.
11    Q    The most recent email that's forwarded
12 on this printout appears to be from someone named
13 Brian Salerno to Carol Spizzirri which says in the
14 body, wow, dot, dot, dot, and still wow. Why
15 doesn't she just mail in a confession.
16         That's what it says, correct?
17    A    That is what it says, yes.
18    Q    From Exhibit 14, it appears that that
19 particular email on the string of earlier embedded
20 emails were forwarded from Carol Spizzirri's email
21 account to the email account
22 melongo_annabel@yahoo.com on May 1, 2006,
23 correct?
24    A    Yes. That's what the email header says,

120

1  yes.

2      Q    Do you believe that this was the email

3  that was allegedly unlawfully forwarded without

4  Ms. Spizzirri's authorization?

5      A    I don't remember.

6               (A document was marked as

7               Plaintiff's Deposition Exhibit

8               Gunnigle No. 15 for

9               identification.)

10  By Ms. Schwartz:

11      Q    I am handing you Plaintiff's Deposition

12  Exhibit 15, which is Bates No. CCSAO 003415.

13          Do you recognize Exhibit 15,

14  Ms. Gunnigle?

15      A    I do.

16      Q    How do you recognize Exhibit 15?

17      A    I remember at least seeing this, this

18  first part before the embedded email before, but I

19  can't tell you when or where in the investigation I

20  was when I saw this.

21      Q    When you say "this first part," do you

22  mean the email with the spotty Hey Carol, I've

23  received this email forwarded to me and I can't

24  imagine what a pathological liar you are?

121

1      A    Yes, that's the one.

2      Q    And at the bottom of the page is another

3  printout of an email that says -- it appears to be

4  from Carol Spizzirri with a sent date of May 1,

5  2006, subject line downed system.  And the content

6  is, think we found who, Annabel called x4 and

7  stopped in three, left message on my cell offering

8  to fix our problem.

9          And then the body continues after that.

10          Is this Exhibit 15 the email that was

11  allegedly forwarded to Ms. Melongo's Yahoo account

12  from Carol Spizzirri's Save A Life account on

13  May 1, 2006?

14      A    I don't know.  And part of it is I don't

15  remember.  Part of this seems strange.  There is a

16  from, there is a sent, there is a subject.  There

17  is no to.  And that seems very odd.

18      Q    Normally when you forward an email there

19  would be a to line as well?

20      A    Right.  I just don't remember.

21      Q    Do you remember the general content of

22  this email that says, I think we found who -

23  Annabel called x4 and stopped in three while you

24  worked on the case?

122

1      A    I think so.

2      Q    An email with this content included in

3  it was the email that was allegedly forwarded to

4  Ms. Melongo's Yahoo account; is that correct?

5      A    I don't remember.

6      Q    In this email, the bottom half of

7  Exhibit 15, Ms. Spizzirri appears to be asserting

8  that Ms. Melongo was behind the intrusion to Save A

9  Life's network a few days earlier; is that

10  correct?

11      MS. NINFO:  Objection; speculation, form.

12      THE WITNESS:  I am not sure I understand.

13      By Ms. Schwartz:

14      Q    That -- I am sorry.

15      A    Go ahead.

16      Q    I will take a step back.

17          The allegation in the computer tampering

18  indictment is that Ms. Melongo allegedly accessed

19  Save A Life's networks on April 28, 2006; isn't

20  that correct?

21      A    The first two speak to that and I

22  believe Count III speaks to an intrusion upon

23  email.

24      Q    Counts I and II of the indictment relate

123

1  to the alleged intrusion on Save A Life's system on

2  April 28, 2006; is that right?

3      A    That's what it says.

4      Q    So did you understand in this email

5  printout, Exhibit 15, where Carol Spizzirri says, I

6  think we found who - Annabel called x4 and stopped

7  in three - left message on my cell offering to fix

8  our problem.  Did you understand her to be accusing

9  Ms. Melongo of being involved with the, quote,

10  problem?

11      A    I don't remember the context for this

12  email.

13      Q    Do you recall that Ms. Spizzirri had

14  accused Ms. Melongo of intruding on Save A Life's

15  systems on April 28, 2006?

16      A    Yes.

17      Q    What was the basis for that allegation

18  that Ms. Melongo had intruded on the Save A Life's

19  systems on April 28, 2006?

20      A    Apart from what I previously told you,

21  that they weren't able to access the files.  She

22  called several times offering her help after being

23  previously terminated.  And then the later forensic

24  report on the computer.

124

JULIE GUNNIGLE - APRIL 25, 2018

1    I don't remember anything else about the
2 basis for the computer tampering case.
3    Q    Why was Ms. Melongo offering to help to
4 fix any computer problems seen as evidence that she
5 might have been involved in those computer
6 problems?
7    A    Because at that point in time she didn't
8 work for the Save A Life Foundation and would have
9 otherwise not known that there were in fact
10 computer problems but for her intrusion upon the
11 founder's email.
12    Q    Could she possibly have learned of
13 computer problems from other employees of the
14 Save A Life Foundation?
15    A    I don't know.
16    Q    So you testified that you recognize the
17 top portion of this email, Exhibit 15, the subject
18 line, how far are you going to go, Carol, question
19 mark; is that correct?
20    A    Yes.
21    Q    And that's an email dated May 1 from
22 Melongo_Annabel to a number of different
23 recipients, correct?
24    A    Yes.

125

1    Q    Do you have any information about
2 whether someone at the Save A Life Foundation told
3 law enforcement that Ms. Melongo forwarded an email
4 from Ms. Spizzirri's account to
5 melongo_annabel@yahoo.com?
6    A    I know there was an allegation made that
7 an email was forwarded or it could have been more
8 than one email that was forwarded.  I don't
9 remember.  And I know that that was reported, but I
10 don't remember any of the details.
11    Q    Carol Spizzirri never actually provided
12 you or anyone in law enforcement a copy of any
13 email that was forwarded from her account to
14 Ms. Melongo's account on May 1, 2006; isn't that
15 right.
16    MS. NINFO:  Objection to form.
17    By Ms. Schwartz:
18    Q    Ms. Spizzirri testified at her trial --
19 at Ms. Melongo's criminal trial in the tampering
20 case that she did not provide the state with a copy
21 of the email that was allegedly forwarded.
22    Did you know that?
23    A    I did not know that.
24    Q    Doesn't IP address stand for internet

126

1 protocol address?
2    A    Yes.
3    Q    Doesn't an IP address generally
4 correspond to a physical location where a computer
5 is used?
6    A    Often.  Not always.
7    Q    When you say "not always," what do you
8 mean?
9    A    Well, for example, someone can use a
10 VPN, a virtual personal network, and use that to
11 disguise the actual physical location.  Sometimes
12 going through many VPNs.  And that would be a way
13 of concealing the original source.
14    Q    The IP address 24.15.202.102 was a focus
15 in the investigation and prosecution of
16 Ms. Melongo; is that right?
17    A    I have no idea.
18    Q    Do you remember a particular IP address
19 being a focus in the prosecution of Ms. Melongo?
20    A    Yes.
21    Q    What do you remember about that IP
22 address, if not the actual number?
23    A    There was an IP address associated with
24 the investigation.  I couldn't tell you if it was

127

1 derived from email headers or from the forensic
2 report or both, but there was an IP address
3 involved.
4    Q    Do you recall based on your work on the
5 case where that IP address was first discovered?
6    A    I don't know.
7            (A document was marked as
8             Plaintiff's Deposition Exhibit
9             Gunnigle No. 16 for
10            identification.)
11    By Ms. Schwartz:
12    Q    I am handing Ms. Gunnigle Plaintiff's
13 Deposition Exhibit 16, Bates No. Martin0012 through
14 14.
15    Have you seen Exhibit 16 before,
16 Ms. Gunnigle?
17    A    Yes, I have.
18    Q    In what context have you seen
19 Exhibit 16?
20    A    It was part of the file on the computer
21 tampering case.
22    Q    Is this a true and accurate copy of an
23 email printout that was part of your file in the
24 computer tampering case?

128

1    A    Yes, I believe so.

2    Q    And in this printout someone named
3 Christian Sass wrote an email to Carol Spizzirri
4 dated May 1, 2006, correct?

5    A    Yes.

6    Q    And it looks like he has copied a few
7 other people?

8    A    Yes.

9    Q    If you turn to the second page, Bates
10 numbered Martin0013, at the top it says, ps,
11 following is the entire email with all headers and
12 raw code.

13       What was your understanding of what raw
14 code means in reference to this case?

15    A    My understanding is a little prosaic,
16 but when you send an email, there is essentially
17 metadata attached that most people don't view.
18 It's called a header.  And in this case, it
19 indicated a return path, delivery date, an IP
20 address.  The domain key signature, I can't
21 decipher for you.  But there is -- this is the data
22 that is generated when you send an email.

23    Q    And in the context of this particular
24 email that we were looking at on the second page of

129

1 Exhibit 16, the data that's generated is for an
2 email with the subject line, how far are you going
3 to go, comma, Carol, question mark; is that
4 correct?

5    A    Yes.

6    Q    And that's an email that appears to have
7 been from melongo_annabel@yahoo.com to a number of
8 different recipients, including sgholar@salf.org,
9 dneal@salf.org and a few others; is that correct?

10    A    Yes.

11    Q    This metadata does not correspond to an
12 email that was sent from Carol Spizzirri's email
13 account to Ms. Melongo's email account; is that
14 right?

15    A    This appears to be the header for the
16 message from Annabel to those individuals that you
17 just mentioned.

18    Q    About midway down the page, there is a
19 line that says received, colon, from, then the IP
20 address 24.15.202.102.  That particular IP address
21 corresponds to the sender of the email, with
22 subject line, how far are you going to go, Carol?

23    A    Potentially.  There are instances where
24 that would not be true though that I have

130

1 previously mentioned.

2    Q    If someone had gone in through a VPN or
3 made some other efforts to disguise the IP
4 address?

5    A    Right.

6    Q    But even if it were disguised, would
7 that still be an IP address somehow associated with
8 the sending of this particular email, with the
9 subject line, how far are you going to go, Carol?

10    A    Yes.  Although that's piling kind of
11 assumption on top of assumption.

12       I suppose the most important assumption
13 is that Christian Sass prepared this accurately.
14 And I have no idea who that is.

15    Q    Did you ever do anything to determine
16 whether this document was accurately prepared while
17 you worked on the case?

18    A    I remember reaching out to several
19 individuals who worked at Save A Life, but I don't
20 remember what they said or what they did to prepare
21 this.

22    Q    Who did you reach out to at
23 Save A Life?

24    A    I don't remember.

131

1    Q    You don't remember if Christian Sass was
2 one of those people?

3    A    I don't remember.

4    Q    Do you remember anything about those
5 contacts with individuals from Save A Life
6 Foundation?

7    A    No, I don't.

8    Q    What was the purpose of your reaching
9 out to those individuals at Save A Life
10 Foundation?

11    A    Trial preparation.

12    Q    When you say "trial preparation," what
13 time frame are you referring to?  Which trial are
14 you referring to?

15    A    Trial preparation on the computer
16 tampering case, before the election to the
17 eavesdropping case.

18    Q    Was the tampering case scheduled for
19 trial before election was switched over to the
20 eavesdropping case?

21    A    I don't remember.

22    Q    You were starting to prepare for trial
23 at least?

24    A    Yes.

132

JULIE GUNNIGLE - APRIL 23, 2018

**Page 133**

1  Q    What's the purpose of contacting
2  Save A Life employees as part of trial
3  preparation?
4  A    Well, in this case, we had a digital
5  crime scene that was secured well before my entry
6  into the office, and it would have been useful,
7  although not essential in proving the charges to
8  have at least one person familiar with that crime
9  scene testify.
10 Q    When you say that crime scene, in this
11 case, what was the crime scene?
12 A    The Save A Life servers.
13 Q    Did you identify anyone who could
14 testify about the digital crime scene?
15 A    I don't remember.
16 Q    You testified that it would be useful
17 but not, the word used was essential, to have
18 someone from Save A Life testify about the digital
19 crime scene.  Why would that have been useful?
20 A    It would have been useful because
21 Ms. Melongo appeared to be asserting a defense that
22 she merely changed permissions and not deleted the
23 data.  And confirming that would have been helpful.
24 Q    We had been speaking earlier about

**Page 134**

1  Exhibit 16 and the metadata on the second page,
2  specifically this received from line, with the IP
3  address 24.15.202.102.  Was it this particular line
4  that caused law enforcement to focus on that IP
5  address in Ms. Melongo's criminal computer
6  tampering case?
7  A    I don't remember.
8  Q    Isn't it correct that law enforcement
9  assumed that the person who improperly accessed
10 Ms. Spizzirri's account on May 1, 2006, also used
11 that particular IP address?
12 A    I don't know.
13 MR. WUNDER:  Objection; speculation.
14 THE WITNESS:  I still don't remember.
15 By Ms. Schwartz:
16 Q    You were informed, were you not, that
17 the alleged intrusion on Save A Life Foundation's
18 servers was on April 28, 2006, correct?
19 A    I don't remember.
20 Q    That's what the indictment states in
21 this case, correct?
22 A    That is what the indictment states.
23 Q    And it was the state's theory that the
24 intruder on the Save A Life Foundation servers on

**Page 135**

1  April 28, 2006, used that same IP address from the
2  May 1, 2006, how far are you going to go email that
3  you have just been discussing?
4  A    I don't remember.
5  Q    If the IP address 24.15.202.102
6  corresponded to a particular coffee shop or library
7  or other place Ms. Melongo frequented when she
8  accessed her email account, it wouldn't be
9  surprising that instances of that IP address would
10 be found on her computer?
11 MS. BROWN:  Objection; speculation.
12 THE WITNESS:  I don't know.
13 MS. SCHWARTZ:  I think now is a good time to
14 break for lunch.
15
16      (A lunch recess was taken.)
17
18
19
20
21
22
23
24

**Page 136**

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION
3  ANNABEL K. MELONGO,        )
                              )
4            Plaintiff,       )
                              )
5      vs.                    )  13-cv-04924
                              )
6  ASA ROBERT PODLASEK, et al., )
                              )
7            Defendants.      )
8
9      The continued deposition of JULIE GUNNIGLE
   resumed pursuant to recess.
10
11
12              180 North LaSalle Street
                Suite 3600
13              Chicago, Illinois
                Monday, April 23, 2018
14              1:30 p.m.
15
16
17
18
19
20
21
22
23
24

1  APPEARANCES:

2       Ms. Julia K. Schwartz
        Miller Shakman & Beem, LLP
3         on behalf of the Plaintiff;

4       Ms. Anita Alvarez, State's Attorney of
5       Cook County Illinois, by:
        Ms. Bianca Brown
6       Assistant State's Attorney
          on behalf of all Cook County Defendants;

7

8       Mr. Christopher S. Wunder
        Kaplan Papadakis & Gournis, P.C.
9         on behalf of Defendant William Martin
          and Schiller Park;

10

11      Ms. Lisa Madigan, Attorney General,
        State of Illinois, by:
12      Ms. Shirley R. Calloway
        Assistant Attorney General
13        on behalf of Defendant Kyle French;

14      Ms. Dina M. Ninfo
        Angelini, Mills, Woods & Ori Law
15        on behalf of Defendant Ms. Carol
          Spizzirri.

16  Also Present:

17      Ms. Annabel K. Melongo - via the telephone

18

19

20

21

22

23

24

                                            137

---

1                   JULIE GUNNIGLE,

2  called as a witness herein, having been previously

3  duly sworn, was examined and testified further as

4  follows:

5               EXAMINATION (continued)

6  By Ms. Schwartz:

7       Q    We are going back on the record.

8            We discussed before the lunch break your

9  involvement in the grand jury proceedings for the

10 eavesdropping allegations against Ms. Melongo and

11 you testified that you did present the case to the

12 grand jury; is that correct?

13      A    Yes.

14      Q    And was that on April 27, 2010?

15      A    I don't remember the date.  I'm sorry.

16              (A document was marked as

17              Plaintiff's Deposition Exhibit

18              Gunnigle No. 17 for

19              identification.)

20 By Ms. Schwartz:

21      Q    I am going to hand you Plaintiff's

22 Deposition Exhibit 17, which is Bates numbered

23 CCSAO 012292.

24           Now this exhibit, Exhibit 17, is a

                                            138

---

1  notice to Ms. Melongo that she was indicted for

2  eavesdropping on April 27, 2010; is that correct?

3       A    That's what it says.

4       Q    Does this refresh your recollection as

5  to the date Ms. Melongo was indicted for

6  eavesdropping?

7       A    No.  I don't know that I have ever seen

8  this piece of paper before.

9       Q    Was it around April, late April, early

10 May, 2010?

11      A    Yes.

12      Q    And Ms. Melongo's website, the

13 illinoiscorruption.net was forensically captured by

14 January of 2010.  Why was Ms. Melongo not arrested

15 until April of 2010?

16      A    I don't remember.

17      Q    Why wasn't the eavesdropping case

18 presented to the grand jury until late April, early

19 May 2010?

20      A    I don't remember.

21              (A document was marked as

22              Plaintiff's Deposition Exhibit

23              Gunnigle No. 18 for

24              identification.)

                                            139

---

1  By Ms. Schwartz:

2       Q    I am handing you Plaintiff's Deposition

3  Exhibit 18, which is Bates numbered CCSAO 0006248

4  through 6250.

5            Ms. Gunnigle, do you recognize

6  Exhibit 18?

7       A    Yes, I do.

8       Q    What is Exhibit 18?

9       A    It appears to be a photocopy of a letter

10 that I wrote to Ms. Taylor in the court reporter's

11 office asking her to produce transcripts from

12 Ms. Melongo's case.

13      Q    And this is your handwriting on this

14 document?

15      A    Yes, it is.

16      Q    And if you turn to the last page, Bates

17 numbered CCSAO 006250, the last paragraph, you

18 write, our next hearing is 4/14/10, but I know this

19 is an extraordinary large request.  Please call me

20 if there are any issues.  Julie Gunnigle.

21           Did you send Ms. Taylor Exhibit 18 prior

22 to April 14, 2010?

23      A    Yes.

24      Q    At the beginning of Exhibit 18, at the

                                            140

1  beginning of exhibit 18, you write, per the request
2  of Judge Brosnahan, I am requesting every
3  transcript of every court date involving
4  Ms. Melongo.
5          What request had been made by
6  Judge Brosnahan at the time you wrote this
7  particular letter?
8      A    Judge Brosnahan had requested every
9  transcript of the case.  I don't remember if it was
10  every transcript going forward or every transcript
11  ever.  But nevertheless, we requested every
12  transcript.
13      Q    What was the reason she requested every
14  transcript?
15      A    I don't remember.
16      Q    Did it relate to Ms. Melongo's
17  allegation that she was not arraigned on June 18,
18  2008?
19      A    I don't remember.
20      Q    But this letter was written before the
21  arrest warrant for eavesdropping, which was dated
22  April 13, 2010?
23      A    I can't say for sure, but probably.
24      Q    Was this around one of the -- was this

141

1  Exhibit 18 created around the time of one of your
2  conversations with Ms. Pamela Taylor?
3      A    I don't remember.
4      Q    You testified this morning that you were
5  present for the eavesdropping trial of Ms. Melongo;
6  is that correct?
7      A    That's right.
8      Q    And that trial resulted in a hung
9  jury?
10      A    Yes.
11      Q    Why do you think that occurred?
12      A    Well, a hung jury is where you can't get
13  a unanimous verdict.  So there was a less than
14  unanimous verdict.
15      Q    Do you have any idea why the jurors
16  decided that way?  Did you speak to any of the
17  jurors?
18      A    We polled the jurors after.  I think
19  there -- I don't remember, but I think there was
20  one holdout in what otherwise would have been a
21  conviction.
22      Q    Did you learn any information as to the
23  reason, the potential reason for that holdout?
24      A    No, I did not.

142

1      Q    Did you discuss the result of the jury
2  trial, eavesdropping trial with anyone, Bob
3  Podlasek, anyone else?
4      A    Oh yeah, we discussed the hung jury with
5  practically the entire special pros unit.
6      Q    Why is that?
7      A    It's just odd to get a hung jury.  And
8  in that case it was -- it would have been nice to
9  have the jury deliberate longer.
10      Q    How long did they deliberate?
11      A    I don't remember.
12      Q    When you say you discussed the hung jury
13  with nearly all of the special prosecutions unit,
14  what was discussed, what was the nature of those
15  conversations?
16      A    Teasing the ASA's for getting a hung
17  jury.
18      Q    Were you upset about the hung jury?
19      A    No, disappointed that -- disappointed
20  that the deliberations didn't continue on longer.
21  But no, I mean, never, never angry or upset, just
22  disappointed.
23      Q    Could the reason for the hung jury have
24  been that the jurors thought Ms. Melongo had

143

1  reasonable suspicion to believe a crime had taken
2  place when she recorded Ms. Taylor?
3      MS. BROWN:  Objection; speculation.
4      THE WITNESS:  I have no idea what the jurors
5  were thinking.
6      By Ms. Schwartz:
7      Q    Were you still working on Ms. Melongo's
8  eavesdropping case when the eavesdropping charges
9  were dismissed in 2012?
10      A    No.
11      Q    Did you hear about the dismissal of the
12  eavesdropping charges?
13      A    I don't remember.
14      Q    Were you aware that the eavesdropping
15  case was dismissed on the grounds that the Illinois
16  eavesdropping statute then applicable was found to
17  be unconstitutional?
18      A    I have later learned that, yes.
19      Q    How did you learn that?
20      A    I don't remember.
21      Q    Did you ever talk to anybody about the
22  dismissal of the eavesdropping charges?
23      A    I don't remember.
24      Q    Were you disappointed when you learned

144

JULIE GUNNIGLE - APRIL 23, 2018

1 the eavesdropping charges were dismissed?

2   A   I'm not sure that I had a reaction.

3   Q   Do you remember either way?

4   A   I don't remember.

5   Q   I would like to turn back to the

6 computer tampering charges against Ms. Melongo.  I

7 started talking about those charges prior to the

8 lunch break.

9       What exactly was the evidence that

10 Ms. Melongo had committed computer tampering?

11   A   To the best of my recollection -- and

12 again I haven't been given my file and it's been

13 eight years -- but there was a forensic report that

14 tied her to the computer intrusion.  There was

15 emails and an instance where she had somehow

16 accessed the email of the founder of Save A Life.

17 And there was the circumstantial evidence of her

18 calling immediately after the tampering.  Amongst

19 other things.

20   Q   You don't remember any of the other

21 things?

22   A   No.  That is what I remember.

23

24

                                                145

1                 (A document was marked as

2                 Plaintiff's Deposition Exhibit

3                 Gunnigle No. 19 for

4                 identification.)

5 By Ms. Schwartz:

6   Q   I am handing Ms. Gunnigle Plaintiff's

7 Deposition Exhibit 19, Bates numbered

8 MELONGO_004178.

9       Do you recognize Exhibit 19?

10   A   I think so.

11   Q   Is this one of the emails to which you

12 were referring that was evidence in Ms. Melongo's

13 tampering case?

14   A   I don't know what was introduced as

15 evidence in her tampering case.

16   Q   Is this an email from, appears to be

17 tsupport@Gmail.com to Carol Spizzirri dated May 4,

18 2006?

19   A   That's what it says, yes.

20   Q   Do you recall having this email in your

21 file?

22   A   This was part of the file.

23   Q   And what is this document?

24   A   I don't know.

                                                146

1   Q   Does it show anything about the computer

2 tampering allegations against Ms. Melongo?

3   A   I don't know.  There was always an issue

4 trying to discover who tsupport@gmail was and how

5 that fit into the case.  And I cannot remember if

6 we ever ended up solving that, at least during my

7 time at the office.

8   Q   What do you recall about the issue of

9 trying to determine who tsupport@gmail.com was?

10   A   I think it was one of the 40 subpoenas,

11 might have been involved with one of the 40

12 subpoenas that Ms. Melongo put forward, but I can't

13 say that with certainty.

14   Q   You never found out who actually sent

15 the tsupport@gmail.com email?

16   A   If I did, I don't remember.

17   Q   In Exhibit 19, there is a lot of what

18 appears to be metadata.  Does any of the content of

19 that metadata mean anything to you as involves this

20 case?

21   A   There is what appears to be some IP

22 addresses.  But whether or not they are to or from,

23 or some handoff in between, I just couldn't tell

24 you.

                                                147

1   Q   Did you ever ask who sent Exhibit 19,

2 the tsupport@gmail.com email?

3   A   I know I asked Bob, but I don't remember

4 if there ever was an answer.

5   Q   What did you ask Bob in particular?

6   A   If we knew who tsupport was.

7   Q   What did he say?

8   A   I don't remember.

9   Q   Did you review any reports done by any

10 of the companies that Save A Life Foundation hired

11 in 2006 to perform data recovery and repairs?

12   A   I don't remember.

13   Q   Were you aware that law enforcement

14 personnel never took possession of any evidence

15 related to the Save A Life Foundation servers or

16 Save A Life Foundation computers?

17   A   Yes, I did know that.

18   Q   How did you know that?

19   A   I believe it was through talking with

20 Bob, Mr. Podlasek, and trying to figure out how to

21 respond to some of the motions.

22       Understandably they couldn't take

23 possession of the servers, it would have shut down

24 the company.

                                                148

1    Q    You were aware that no analysis was done
2 on the Save A Life's servers or Save A Life's
3 computers, were you not?
4    A    That no analysis was done on the
5 Save A Life computer.  That is not my
6 recollection.
7    Q    What is your recollection?
8    A    My recollection is that there was
9 analysis that was done, but I can't tell you who
10 did it.
11    Q    In your recollection, did the State's
12 Attorney's Office ever obtain any evidence directly
13 from a Save A Life computer or a Save A Life
14 server?
15    A    I don't know.
16    Q    You testified before lunch that you
17 reached out to certain Save A Life employees as
18 part of trial preparation in the tampering case,
19 correct?
20    A    That's right.
21    Q    And you testified that you were not sure
22 if one of those employees was Christian Sass, is
23 that correct?
24    A    That's correct.

149

1    Q    In Exhibit 20 it says, as this case gets
2 closer to trial, I would appreciate some of your
3 time to discuss what happened at Save A Life, your
4 findings that morning, and whether we would need to
5 call you as a witness should this case go to trial.
6         Do you recall discussing with Christian
7 his findings that morning?
8    A    I do not remember.
9    Q    It's fair to say that from Exhibit 20
10 you did speak to Christian Sass at some point?
11    A    Yes.
12    Q    You don't recall any of the details of
13 those conversations?
14    A    I don't.
15    Q    It's fair to say that at times during
16 Ms. Melongo's case you had concerns about the
17 forensic evidence in the computer tampering case;
18 isn't that correct?
19    A    That's not my recollection.
20         (A document was marked as
21          Plaintiff's Deposition Exhibit
22          Gunnigle No. 21 for
23          identification.)
24

151

1         (A document was marked as
2          Plaintiff's Deposition Exhibit
3          Gunnigle No. 20 for
4          identification.)
5 By Ms. Schwartz:
6    Q    I would like to show you Plaintiff's
7 Deposition Exhibit 20, which is Bates numbered
8 CCSAO 005409.
9         This is an email dated February 23,
10 2010, from you to sastian, s-a-s-t-i-a-n,
11 @gmailcom; is that correct?
12    A    That's correct.
13    Q    Is this a true and accurate copy of an
14 email that you wrote to Christian Sass on
15 February 23, 2010?
16    A    I don't remember writing it, but I have
17 no reason to believe it's been altered.
18    Q    In it you say, in the body of the email,
19 Exhibit 20, you say, Dear Christian, I appreciate
20 you taking the time to talk with me today.
21         Does that refresh your recollection as
22 to whether you spoke to Christian Sass?
23    A    I have no independent recollection of
24 whether or not I talked to Christian Sass.

150

1 By Ms. Schwartz:
2    Q    I am handing you Plaintiff's Deposition
3 Exhibit 21, which is Bates numbered CCSAO 09136 to
4 09137.  Exhibit 21 is a series of emails back and
5 forth between you and Daniel Spillman dated
6 July 20, July 19, July 16, 2010; is that correct?
7    A    Yes.
8    Q    Is this a true and accurate copy of
9 emails between you and Daniel Spillman dated
10 July 20, July 19, and July 16, 2010?
11    A    I don't remember writing them, but I
12 have no reason to believe they have been altered.
13    Q    Who is Daniel Spillman?
14    A    I have no idea independent of the fact
15 that it looks like his email address goes to the
16 AG, ATG.  I think that's the AG's office.
17    Q    Would it refresh your recollection if I
18 told you that Mr. Spillman worked in the high-tech
19 crimes bureau at the Illinois Attorney General's
20 Office?
21    A    That sounds right.
22    Q    In your email dated July 19, 2010, about
23 halfway down the first page, you write at the
24 bottom, do you have a credible theory as to how

152

JULIE GUNNIGLE - APRIL 25, 2018

1  someone could access these servers if they were
2  disconnected from the DSL, (as our witness claims)?
3  Could she have accessed the servers through a
4  webmail portal?  I am trying to draft a response to
5  this motion and this keeps coming up.
6          What motion were you referring to in
7  this email of July 19, 2010?
8      A    I don't remember.
9      Q    You ask Mr. Spillman if he has a
10 credible theory about how someone could access
11 these servers.  Is that referring to the
12 Save A Life servers?
13     A    I don't know.
14     Q    In one of the police reports prepared by
15 Schiller Park, Detective Martin in particular, it
16 says that Detective Martin was informed that
17 SALF's DSL lines were disconnected at the time of
18 the intrusion.
19          Is that what you are referring to in
20 this Exhibit 21?
21     A    I don't know.
22     Q    You refer to, as our witness claims.
23 What witness are you referring to there?
24     A    I have no idea.

153

1      Q    If Save A Life Foundation's DSL lines
2  were disconnected at the time of the alleged
3  intrusion, then someone could not access those
4  servers remotely, isn't that true?
5      A    No, I don't think that's true.  I think
6  that's what the second question goes to, is whether
7  or not it could have been accessed through a
8  webmail portal.
9          At least my understanding at the time is
10 that there were multiple ways.  Over the DSL was
11 the most likely way.  But I don't remember beyond
12 that.
13     Q    It would be a big hole in the state's
14 theory if the manner in which one accesses the
15 servers remotely was discontinued at that time;
16 isn't that correct?
17     A    Not necessarily in a case like this
18 where there was some circumstantial evidence.  But
19 it was certainly a hole that we would have liked to
20 understand better.
21     Q    If you go up the page a bit,
22 Mr. Spillman responds on July 20, 2010, I do not
23 have the motions.  We need more info on the DSL
24 disconnection.

154

1      Q    Do you recall talking to Mr. Spillman
2  about the DSL disconnection?
3      A    I don't even remember who Mr. Spillman
4  is.
5      Q    If you turn up the page, at the top,
6  first email on the first page of Exhibit 21, dated
7  July 20, 2010, it says, the lack of detail is scary
8  at times (like the offhanded remark in the police
9  reports about the DSL being disconnected).  I was
10 hoping that you and I could sit down together with
11 the forensic reports and piece together how she did
12 it and if it is possible that everything our
13 witnesses are saying is true (at least one might
14 have been fibbing to make himself look good.)
15          Who were you referring to when you said
16 that one of the witnesses might be, quote,
17 fibbing?
18     A    I have no idea.
19     Q    What did you mean by the word fibbing?
20     A    It looks to me here like there might
21 have been inconsistencies as we were interviewing
22 witnesses in preparation for trial.  I couldn't
23 tell you who those people were or which ones they
24 were in relation to this case.

155

1      Q    It concerned you if one of your
2  witnesses was potentially not telling the truth if
3  you were going to put him or her on the stand,
4  correct?
5      A    I would never put someone on the stand
6  if I knew they were not telling the truth.
7      Q    So you wanted to get to the bottom of
8  any inconsistencies in statements; is that
9  correct?
10     A    Yes.
11     Q    You refer to the offhanded remark in the
12 police reports about the DSL being disconnected.
13 Were you referring to the Schiller Park Police
14 reports related to the Save A Life investigation?
15     A    I have no idea.
16          (A document was marked as
17           Plaintiff's Deposition Exhibit
18           Gunnigle No. 22 for
19           identification.)
20 By Ms. Schwartz:
21     Q    I am handing you Plaintiff's Deposition
22 Exhibit 22, which is Bates numbered MELONGO_005215
23 through 5223.
24          Exhibit 22 is a report with Schiller

156

1  Park Police Department at the top, dated at the
2  bottom October 30, 2006; is that correct?
3      A      Yes.
4      Q      Have you seen this police report
5  before?
6      A      I have.
7      Q      To your knowledge was this report,
8  Exhibit 22, prepared by Detective Martin?
9      A      That's what it says.
10      Q      Is this the report you were discussing
11  in your email of Exhibit 21?
12      A      I don't know.
13      Q      I direct your attention to the page
14  that's Bates numbered at the bottom MELONGO_005216.
15  The first paragraph of that page, towards the
16  bottom, it says, Mr. Barnes also believed the
17  intrusion to the computer system occurred somehow
18  through the web via the company's email server, but
19  he was unsure as to how this may have occurred
20  because the company disconnected the DSL lines from
21  the servers after the suspect's employment was
22  terminated.
23      Is that the reference to DSL in the
24  police report that you were referring to in your

157

1  email Exhibit 21?
2      A      Maybe.  I'm not sure.
3      Q      A bit above that it states, Mr. Barnes
4  stated that Ms. Melongo had no prior knowledge that
5  she was being fired on 27 April 06.  Once her
6  employment was terminated, Ms. Melongo had no
7  further access to the computers from within the
8  building and that an employee named Christian
9  changed all of the passcodes to each of the servers
10  after she left the building.
11      Do you know who Mr. Barnes is,
12  Mr. Robert Barnes?
13      A      I don't.
14      Q      This refers to passwords to the
15  Save A Life Foundation servers.  If those server
16  passwords were changed after Ms. Melongo was
17  terminated on April 27, 2006, how is it possible
18  that Ms. Melongo could have accessed the servers
19  without the new passwords?
20      A      Well, that's the part where we weren't
21  clear.  We knew that she had, from the forensic
22  report, accessed her computer during the same time
23  as the intrusion, but that she was also in IT.  So
24  we weren't sure if there was a back door through

158

1  webmail or through some other source.
2      Q      What did you do to determine how exactly
3  the alleged intrusion had taken place?
4      A      I don't remember.
5      Q      If you go down this page a bit, it says,
6  R/I then contacted Web HSP in Colorado, the web
7  host for SALF's email server.  R/I was advised to
8  speak to Mike, the owner of the company.  Mike
9  informed R/I that the company should have the IP
10  addresses of any computer accessing his company's
11  servers and that he would send R/I the information
12  collected for the dates of the intrusions.
13      Did you read that section of the police
14  report when you were working on Ms. Melongo's
15  case?
16      A      I don't remember.  Probably.
17      Q      Did you read generally this police
18  report as part of your case file?
19      A      Yes.
20      Q      And Web HSP was the email server for
21  Save A Life Foundation in 2006?
22      A      That I am unsure of actually.
23      Q      Assuming Web HSP was Save A Life
24  Foundation's email server at the time of the

159

1  alleged intrusion and unauthorized forwarding,
2  Web HSP would have been the entity to try to locate
3  records about any login's to Carol Spizzirri's
4  email account; isn't that correct?
5      A      Potentially.  There could be others.
6      Q      And the allegation in this case was, one
7  of the allegations in this case I should say, was
8  that Ms. Melongo accessed Carol Spizzirri's email
9  account without Carol Spizzirri's authorization on
10  May 1, 2006?
11      A      That's right.
12      Q      So it would have been important to
13  determine when any login attempts were made onto
14  Ms. Spizzirri's email account on May 1, 2006?
15      A      Potentially.  The issue of email becomes
16  that you can have different hosts and different
17  forwards.  And there are ways of accessing email
18  that don't belong to you and proving that beyond
19  having the login entries.
20      But I can't remember what we did in this
21  case.
22      Q      The state never received any documents
23  showing the IP addresses of any computer accessing
24  Web HSP's server between April 27 and May 1, 2006;

160

1 isn't that correct?

2   A   I don't remember.

3   Q   In fact, in February 2010,

4 Detective Martin asked Carol Spizzirri to contact

5 Web HSP in Colorado.  Did you instruct Detective

6 Martin to request any records from Web HSP in

7 Colorado?

8   A   I don't remember.

9   Q   Did you ever see any records from the

10 Save A Life Foundation's email server?

11   A   I don't remember.

12           (A document was marked as

13            Plaintiff's Deposition Exhibit

14            Gunnigle No. 23 for

15            identification.)

16 By Ms. Schwartz:

17   Q   I am handing Ms. Gunnigle Plaintiff's

18 Deposition Exhibit 23, which is Bates numbered

19 SPIZZIRRI000001078.

20           Do you recognize Exhibit 23,

21 Ms. Gunnigle?

22   A   No, I don't.

23   Q   Exhibit 23 appears to be an email dated

24 February 9, 2010, from CS at probelle.net to

161

1 admin@webhsp.com.  That's the top email.  Then

2 embedded is an email from admin@webhsp.com to

3 bmartin@villageofschillerpark.com.

4           In that embedded email from Web HSP

5 administration, it says, as discussed, Web HSP does

6 not have any of the log files you were needing for

7 this case.

8           Do you know why log files had not been

9 requested for this case prior to around February

10 2010?

11   A   I don't know.

12   Q   At the top of Exhibit 23, an email

13 that's from CS at probelle.net to admin@hsp.com.

14 It says, thank you John for talking with Bill/Det

15 Martin - spoke with the state's attorney too - both

16 feels they have amply evidence to convict.

17           Did you tell Carol Spizzirri or anyone

18 else that there was ample evidence to convict in

19 February of 2010?

20   A   I don't remember.

21   Q   I want to turn your attention back to

22 Exhibit 22, the police report.  At the bottom of

23 page marked MELONGO_005216.  It says, at 1700 hrs

24 R/I was contacted by Ms. Spizzirri who stated that

162

1 she was informed about some unauthorized charges on

2 the company's American Express account.

3           Did Detective Martin or anyone else tell

4 you that Save A Life Foundation's credit cards had

5 been improperly used in 2006?

6   A   I learned that somehow, but that wasn't

7 related to Ms. Melongo.

8   Q   It's true that the investigation of the

9 alleged unauthorized credit card access didn't show

10 any connection to Ms. Melongo?

11   A   I didn't perform that investigation, but

12 she wasn't -- I was not prosecuting her.  And there

13 is no indication in this police report that she had

14 committed the credit card fraud at issue.

15   Q   Wasn't the fact that there were

16 potential unauthorized charges around the same time

17 that were not linked to Ms. Melongo and Ms. Melongo

18 was not charged, wasn't that relevant to the

19 computer tampering charges?

20   A   No.

21   Q   Didn't it suggest that someone else

22 could have been responsible for the alleged

23 intrusions?

24   A   Not with the evidence we had.

163

1   Q   You spoke earlier about an IP address

2 that was the focus of the investigation and

3 prosecution of Ms. Melongo for computer tampering.

4 What do you recall about the particular IP address

5 that was the focus of the investigation?

6   A   Not a whole lot.  I wasn't involved in

7 that investigation.

8   Q   If you turn to Exhibit 22, the police

9 report, the page Bates numbered MELONGO_005218, the

10 entry dated 5 June 06, states, R/I received a

11 response from the subpoenas sent to Comcast.

12 Comcast claimed that their records for the IP

13 address of 24.15.202.102 for the dates and times

14 requested by R/I were incomplete or contained an

15 error associated with the cable modem or other

16 device.

17           Do you recall a Comcast IP address

18 24.15.202.102 being one piece of evidence in the

19 case against Ms. Melongo?

20   A   Only insofar as this police report says

21 so.

22   Q   Later on that same page it says, in

23 response to the subpoena for account information

24 for Ms. Melongo at 1218 East Long Valley Drive,

164

1 Apt. #3A in Palatine, Illinois, Comcast stated that
2 they have no information responsive to R/I's
3 request.
4        Based on Comcast records, Ms. Melongo
5 did not have a Comcast as her home internet service
6 provider during the time period April and May of
7 2006, isn't that right?
8    A    No.  That's not, that's not how to read
9 this.
10    Q    How should I have read that?  What's the
11 correct way to read that?
12    A    There was a return on a subpoena for the
13 IP address that was incomplete.  Their servers
14 had -- or at least what Comcast had communicated to
15 Bob, to Mr. Podlasek I believe, was that there was
16 extensive down time in their servers.
17        With respect to -- and when I mean down
18 time, I mean with respect to recording which IP
19 addresses were responsive to Comcast.
20        The way it was explained to me is that
21 when you have an IP address, those are basically
22 purchased in chunks.  So Comcast, for example, owns
23 several chunks.  But the chunks of IP that they
24 owned rotated and changed and that they don't

165

1 always have complete records for which account
2 would have been associated with it.
3        That is, of course, even assuming that
4 someone was using a static IP address.  A static IP
5 address is one that does not consistently refresh
6 and remains the same, that is static.
7        So to say definitively that
8 24.15.202.102 could never have belonged to Annabel
9 Melongo, that's not what this supports.
10        With respect to the account information,
11 I can't recall with certainty, but I believe one of
12 the things that was retrieved was a bill at
13 Ms. Melongo's house for Comcast services.
14    Q    You testified that you thought Bob had
15 spoken to someone at Comcast.  Were you referring
16 to Bob Podlasek?
17    A    Yes.
18    Q    How did you know that Mr. Podlasek spoke
19 to someone at Comcast?
20    A    He would have told me.
21    Q    Do you recall around when this
22 conversation took place?
23    A    I don't.
24    Q    Do you recall anything else about what

166

1 Bob Podlasek conveyed to you about the Comcast
2 records?
3    A    No.
4    Q    If you turn a few pages ahead in
5 Exhibit 22, to page MELONGO_005222, at the end of
6 the second paragraph, it says, when asked about her
7 residency, she claimed this she has lived in
8 Palatine for approximately 18 months and initially
9 had Comcast as her internet service provider until
10 about four months ago when she switched to SBC
11 Yahoo DSL as her current ISP.
12        This is part of Detective Martin's
13 report reflecting a statement of what he and
14 Ms. Melongo spoke about.
15        So based on this, Ms. Melongo had said
16 she no longer used a Comcast IP address at the time
17 of the alleged intrusion, isn't that right?
18    A    That is what she said.
19    Q    But she did previously use Comcast as
20 her internet service provider?
21    A    Yes.  To be perfectly clear, that
22 doesn't rule out a VPN that also went through
23 Comcast services.
24    Q    Was there any evidence that the IP

167

1 address 24.15.202.102 was the IP address of
2 Ms. Melongo's home wireless network at the time she
3 allegedly accessed Save A Life Foundation's email
4 and servers?
5    A    I don't remember.
6    Q    On the same page we have been discussing
7 of Exhibit 22, MELONGO_005222, it states, at the
8 top, Ms. Melongo also admitted to viewing
9 Ms. Spizzirri's emails in which Ms. Spizzirri
10 blamed Ms. Melongo for the problems SALF was having
11 with their computer systems.  After she viewed
12 those emails, Ms. Melongo then forwarded those
13 emails to her Yahoo email account,
14 melongo_annabel@yahoo.com.
15        Did you ever have any concern about the
16 accuracy of this statement Ms. Melongo allegedly
17 made to Detective Martin?
18    A    I don't remember.
19    Q    Did you ever talk to Detective Martin
20 about statements Ms. Melongo allegedly made to
21 him?
22    A    I don't remember.
23    Q    We spoke about Daniel Spillman earlier.
24 Did you ever meet with Daniel Spillman to discuss

168

JULIE GUNNIGLE - APRIL 23, 2018

1 the evidence in Ms. Melongo's case?
2      A      I don't remember.
3                    (A document was marked as
4                    Plaintiff's Deposition Exhibit
5                    Gunnigle No. 24 for
6                    identification.)
7      By Ms. Schwartz:
8      Q      I am handing you Plaintiff's Deposition
9 Exhibit 24, CCSAO 09177 to 78.  This exhibit
10 indicates that a meeting between you, Daniel
11 Spillman and Amber Haqqani was scheduled for
12 July 23, 2010?
13      A      That's what it says.
14      Q      Does that refresh your recollection as
15 to whether you ever met with Daniel Spillman?
16      A      I have no idea who that is.
17      Q      Is this a true and accurate copy of an
18 email exchange between you and Daniel Spillman
19 dated July 23, 2010, through July 21, 2010?
20      A      I don't remember writing these, but I
21 have no reason to believe they have been altered.
22      Q      Do you recall ever meeting Amber
23 Haqqani?
24      A      No, I don't.

169

1      Q      Do you know who Amber Haqqani is?
2      A      No idea.
3      Q      You testified earlier that one of the
4 items you reviewed while you worked on
5 Ms. Melongo's case was a forensic report.  Was that
6 the forensic report of Shahna Monge, whose name is
7 now Shahna Voita, of the Illinois Attorney
8 General's Office?
9      A      Yes.
10      Q      Ms. Voita performed forensic analysis on
11 Ms. Melongo's computers in 2006, isn't that
12 right?
13      A      Yes.
14                    (A document was marked as
15                    Plaintiff's Deposition Exhibit
16                    Gunnigle No. 25 for
17                    identification.)
18      By Ms. Schwartz:
19      Q      I am handing you Plaintiff's Deposition
20 Exhibit 25, which is Bates numbered CCSAO 003387
21 through 90.
22             Do you recognize Exhibit 25,
23 Ms. Gunnigle?
24      A      Yes, I do.

170

1      Q      Is this a summary of Ms. Voita's
2 forensic report?
3      A      Yes, it appears to be so.
4      Q      Did you review this as part of your work
5 involving Ms. Melongo's's cases?
6      A      Yes, I did.
7      Q      Did you review a longer version, the
8 complete forensic report performed by Shahna
9 Voita?
10      A      I'm not sure.  I believe so.
11                    (A document was marked as
12                    Plaintiff's Deposition Exhibit
13                    Gunnigle No. 26 for
14                    identification.)
15      By Ms. Schwartz:
16      Q      I am going to hand you -- my apologies
17 to the court reporter -- this is Plaintiff's
18 Deposition Exhibit 26, which is Bates numbered --
19 it's a long range -- MELONGO_003423 through 3977.
20             Do you recall reviewing this long
21 forensic report, Exhibit 26, as part of your work
22 on Ms. Melongo's case?
23      A      No.
24      Q      You recall reviewing the short summary

171

1 Exhibit 25, but not this long version,
2 Exhibit 26?
3      A      I don't recall this long version.
4      Q      Let's turn to the short version, the
5 short summary, Exhibit 25.  If you turn to the
6 second page, CCSAO 003388.  I am sorry, the page
7 after that, 003389.
8             It says, during the course of the
9 examination I observed the following.  And then it
10 lists a bunch of bullet points.
11             Do any of those bullet points on
12 Exhibit 25 show the date or time a particular file
13 or piece of data was accessed?
14      A      Yes, the sixth bullet point down says, a
15 cookie file containing IP information for Comcast
16 server with IP 24.15.202.102 was discovered.  And
17 it looks like that file was last written on 4/28/06
18 at 9:43:13 hours.
19      Q      Apart from that particular bullet point
20 you just read, do any of the other bullet points
21 reflect a date and time?
22      A      No.
23      Q      What's your understanding of what this
24 forensic, summary forensic report, Exhibit 25, was

172

1  analyzing? You testified earlier that you reviewed
2  a forensic report that related to Ms. Melongo's
3  laptop. Is this what you were referring to?
4      A    This is the forensic report I was
5  referring to.
6      Q    So this report documents the information
7  that was on Ms. Melongo's laptop?
8      A    That's correct.
9      Q    Apart from that bullet point you just
10 read, without dates in the other bullet points,
11 it's not possible to determine that Ms. Melongo
12 accessed data or files referenced in the report on
13 a particular date; isn't that correct?
14     A    I don't know.
15     Q    Ms. Voita didn't reach any conclusions
16 from her examination of Ms. Melongo's computers,
17 correct?
18     A    No.
19     Q    Ms. Voita's forensic report, Exhibit 25,
20 does not show that Ms. Melongo actually forwarded
21 an email from Ms. Spizzirri's account to
22 Ms. Melongo's email account on May 1, 2006, isn't
23 that true?
24     A    I don't know.

                                                    173

1  County, it was noted that prior to an
2  indictment or any grand jury presentation,
3  that I told the person that I was referring it
4  to in Arlington Heights, that if they wanted
5  to pursue the intrusion aspect, that we
6  recommend they do additional forensics.
7      And I'm sure I mentioned that to Bob
8  and/or Julie Gunnigle in the meetings I had
9  with them about this case.
10     And that's what I would have been
11 referring to in terms of additional
12 forensics.
13 Do you recall any conversation with Kyle
14 French in which he suggested the State's Attorney's
15 Office do additional forensic examination if your
16 office was to pursue intrusion charges against
17 Ms. Melongo?
18     MS. CALLOWAY: Objection to form.
19     THE WITNESS: The charges were pursued before
20 I got there. I don't remember any such
21 conversation.
22     By Ms. Schwartz:
23     Q    Do you remember any conversations
24 with Kyle French generally in which he advised that

                                                    175

1      Q    Ms. Melongo was accused of improperly
2  accessing and deleting Save A Life financial files;
3  isn't that correct?
4      A    That is not my recollection.
5      Q    What do you recall about the files that
6  were allegedly deleted?
7      A    Files I remember. And to put a finer
8  point on it, the permissions being changed were
9  donor lists among other company files.
10     Q    I wanted to ask you a few questions
11 related to what Kyle French testified at his
12 deposition as part of this case.
13     During his deposition Kyle French
14 testified, it's at page 76 of his deposition, he
15 testified as follows, I asked the question:
16     You testified that you discussed with
17     Mr. Podlasek additional forensics that could
18     have been done to bolster the evidence.
19     What were you referring to when you said
20     that?
21     Then there was an objection. Then the
22 answer was as follows:
23     My recollection is with the additional
24     forensics, when the case was referred to Cook

                                                    174

1  additional computer forensics could be useful for
2  the case?
3      A    Additional information is always useful.
4  But I don't remember those conversations.
5      Q    Did Mr. Podlasek ever tell you that Kyle
6  French told him additional forensics would be
7  useful for the case?
8      A    I don't remember.
9      Q    Did anyone ever tell you that additional
10 forensic examination, in addition to Ms. Voita's
11 reports from 2006, would be helpful in the case
12 against Ms. Melongo?
13     A    I don't remember.
14     Q    Kyle French testified at his deposition,
15 and this is at page 137 and 138:
16     I do have a recollection though that
17     there was an issue with matching IP addresses
18     to certain conduct and that the IP
19     addresses -- the IP address or addresses did
20     not necessarily match up.
21     Were you aware of Mr. French's view that
22 there was an issue with matching IP addresses to
23 certain conduct?
24     MS. CALLOWAY: Objection to the form,

                                                    176

1 mischaracterizes his testimony.
2     THE WITNESS: I don't recall.
3     By Ms. Schwartz:
4     Q     Were you aware generally of an issue
5 with matching IP addresses in the case against
6 Ms. Melongo?
7     A     I don't remember.
8     Q     Do you have any recollection of any
9 issue in the case against Ms. Melongo related to IP
10 allocation and the IP associated with the conduct
11 alleged not matching up in terms of the evidence?
12     A     I don't remember.
13     Q     Did Kyle French ever tell you that he
14 thought the State's Attorneys's Office had not --
15 was not charging the most provable offense related
16 to the tampering charge?
17     A     I do not recall him ever telling me
18 that.
19     Q     Do you ever recall Mr. French expressing
20 any concerns about the computer tampering charge
21 and the evidence supporting those charges to you?
22     A     No, I don't.
23     Q     Did you ever have any concerns about
24 whether the evidence connected Ms. Melongo to the

177

1 computer tampering crimes with which she had been
2 charged?
3     A     Evidently I was concerned with one of
4 our witnesses, but apart from that, I don't
5 remember any worry.
6                 (A document was marked as
7                 Plaintiff's Deposition Exhibit
8                 Gunnigle No. 27 for
9                 identification.)
10     By Ms. Schwartz:
11     Q     I am handing you Exhibit 27, Plaintiff's
12 Deposition Exhibit 27, which is Bates numbered
13 CCSAO 09868 through 09870.
14         Exhibit 27 is an email dated June 16,
15 2014 from Shahna Voita to Robert Podlasek.
16         Have you ever seen Exhibit 27?
17     A     No.
18     Q     If you turn to the second page of
19 Exhibit 27 at the bottom, Ms. Voita writes, after
20 tearing my report apart, there unfortunately isn't
21 much there to prove that she was the one that
22 accessed their system when she wasn't supposed to.
23         Were you aware that Ms. Voita expressed
24 concerns about the forensic evidence in this case

178

1 to Robert Podlasek or to anyone else?
2     A     No.
3     Q     It's correct, is it not, that in order
4 to prove that Ms. Melongo was responsible for
5 forwarding emails from Carol Spizzirri's email
6 account to her own email account, it was important
7 to be able to prove that Ms. Spizzirri did not
8 forward the email to Ms. Melongo herself?
9     MR. WUNDER: Could you read that question
10 back. I got kind of lost.
11         (The record was read.)
12     THE WITNESS: Not when Ms. Melongo had
13 confessed to forwarding the emails to herself.
14     By Ms. Schwartz:
15     Q     The confession was an important part of
16 your case then?
17     A     Sure.
18     Q     Setting the confession aside, it's
19 possible that Carol Spizzirri could have forwarded
20 her own email to Ms. Melongo's email account,
21 correct?
22     MS. BROWN: Objection; speculation.
23     MS. NINFO: Join.
24     THE WITNESS: I suppose anything is

179

1 possible.
2     By Ms. Schwartz:
3     Q     Did you do anything to rule out possible
4 ways Ms. Melongo could have received an email from
5 Ms. Spizzirri's account lawfully on May 1, 2006?
6     A     I wasn't involved in anything leading up
7 to the charging on this case, so no, I didn't do
8 that.
9     Q     Did you ever consider requesting that
10 additional forensic examination be done of
11 Ms. Melongo's computers?
12     A     I don't recall.
13     Q     The computer tampering trial for
14 Ms. Melongo occurred in July of 2014; is that
15 correct?
16     A     I don't know.
17     Q     You were no longer at the State's
18 Attorney's Office; is that correct?
19     A     Correct.
20     Q     Were you aware that the trial was
21 proceeding in July of 2014? Did anyone reach out
22 to you to tell you about the progress?
23     A     No.
24     Q     Did you ever learn of the results of the

180

JULIE GUNNIGLE - APRIL 23, 2018

1 trial?
2    A    Yes.
3    Q    How did you learn of the results of the
4 trial?
5    A    I believe Mr. Podlasek told me.
6    Q    When did he tell you?
7    A    I don't remember.
8    Q    Was it around the time that the trial
9 had ended?
10    A    No, I don't think so.
11    Q    What did Mr. Podlasek tell you about the
12 trial?
13    A    He told me the result was a directed
14 verdict.
15    Q    What else did he tell you during that
16 conversation about the trial?
17    A    That's all I remember.
18    Q    Was he disappointed in the results of
19 the trial?
20    A    I don't remember.
21    MS. BROWN:  Objection; form.
22    By Ms. Schwartz:
23    Q    Were you disappointed in the result of
24 the trial?

181

1    A    No.  I had no feeling.  It wasn't my
2 case anymore.
3    Q    Are you familiar with the Rule of Brady
4 versus Maryland?
5    A    Yes, I am.
6    Q    What's the rule of Brady versus
7 Maryland?
8    A    Exculpatory evidence is to be tendered
9 to the defendant.
10    Q    When relative to a criminal trial is
11 Brady material or exculpatory evidence tendered to
12 the defendant?
13    A    I'm sorry, I don't understand the
14 question.
15    Q    How shortly before a trial is Brady
16 material generally tendered to a defendant; weeks,
17 months?
18    A    It's been awhile.  I don't know.
19    Q    In your view is Exhibit 27, in which
20 Ms. Voita sends an email to Mr. Podlasek saying,
21 after tearing my report apart, there unfortunately
22 isn't much to prove that she was the one that
23 accessed their system when she wasn't supposed to,
24 do you think that constitutes Brady material that

182

1 should have been turned over to the defense?
2    MS. BROWN:  Objection.
3    MR. WUNDER:  Objection, calls for a legal
4 conclusion.
5    MS. NINFO:  Joined.
6    THE WITNESS:  I am not licensed to practice
7 law in the State of Illinois, so I feel very
8 uncomfortable giving you legal advice on this right
9 now.
10    By Ms. Schwartz:
11    Q    I am not asking for legal advice to be
12 clear.  I will rephrase the question.
13        When you were a prosecutor in the State
14 of Illinois, you were licensed in Illinois,
15 correct?
16    A    That is right.
17    Q    And you followed the rule of Brady
18 versus Maryland when you worked at the State's
19 Attorney's Office, correct?
20    A    Yes.
21    Q    Generally that rule is exculpatory
22 evidence must be turned over to the defense?
23    A    Yes.
24    Q    In your view would Exhibit 27 constitute

183

1 Brady material?
2    A    I don't know.
3    Q    You testified that you weren't present
4 for Ms. Melongo's computer tampering trial in July
5 of 2014.  Did you have any involvement in the
6 preparation leading up to the July 2014 trial?
7    A    No.
8    Q    Were you in court for any part of that
9 trial?
10    A    No.
11    Q    Apart from the conversation you
12 testified about with Mr. Podlasek related to the
13 directed verdict, did you speak to anyone else
14 about Ms. Melongo's trial for computer tampering?
15    A    No.
16    MS. SCHWARTZ:  Let's take a five-minute break.
17        (A recess was had.)
18    By Ms. Schwartz:
19    Q    Is it true that the financial crimes
20 unit of the Cook County State's Attorney's Office
21 focused on public corruption cases?
22    A    That was one of the focuses, yes.
23    Q    What were the other focuses?
24    A    So public corruption, financial crime.

184

1 We were the repository for computer cases that did
2 not involve child pornography. Benefits fraud.
3 What else were we taking? It's typically large
4 scale and systematic frauds.
5     Q     Did Ms. Melongo's case involve a large
6 scale systematic fraud or public corruption or
7 anything of the sort?
8     A     No, it didn't.
9     Q     Why was it assigned to the financial
10 crimes unit?
11     A     Because there was no other home for
12 it.
13     Q     When you worked on Ms. Melongo's case,
14 did you ever speak to Carol Spizzirri?
15     A     I met Carol Spizzirri once in person. I
16 don't recall if I spoke to her at all over the
17 phone.
18     Q     Do you recall exchanging emails with
19 Carol Spizzirri?
20     A     I don't remember.
21     Q     What was your general impression of
22 Carol Spizzirri?
23     A     She was a victim in a criminal case, an
24 alleged victim in a criminal case.

185

1     Q     Did you find her to be trustworthy?
2     A     Yes.
3     Q     Were you aware that Carol Spizzirri
4 considered herself a personal friend of State's
5 Attorney Richard Devine?
6     A     I believe I learned that on
7 Ms. Melongo's website. Ms. Spizzirri never to my
8 recollection told me so.
9     Q     Did anyone in the office tell you that
10 she had a personal relationship with Richard
11 Devine?
12     A     No.
13     Q     Were you aware that Ms. Spizzirri had
14 contacted State's Attorney Richard Devine about her
15 accusations against Ms. Melongo in May of 2006?
16     A     Yes, I was.
17     Q     How did you become aware of that?
18     A     It was on the defendant's website.
19     Q     Apart from the defendants website,
20 Ms. Melongo's website, were you made aware of that
21 in any other way?
22     A     No.
23     Q     It wasn't part of the case file or your
24 records related to --

186

1     A     No. No, it was not. At least not to my
2 recollection.
3     Q     Did anyone from the State's Attorney's
4 Office, administrative office ever contact you
5 about the prosecution of Ms. Melongo?
6     A     Not that I recall.
7     Q     Carol Spizzirri wanted you to bring
8 additional charges in addition to the three
9 computer tampering charges in the reindictment; is
10 that correct?
11     A     That is not my recollection.
12     Q     You don't recall her asking you to bring
13 any additional charges?
14     A     No, I do not.
15           (A document was marked as
16            Plaintiff's Deposition Exhibit
17            Gunnigle No. 28 for
18            identification.)
19 By Ms. Schwartz:
20     Q     I am handing you Plaintiff's Exhibit 28,
21 Bates No. CCSAO 09268. This is a May 13, 2010
22 email from cs@probelle.net to you and Robert
23 Podlasek; is that correct?
24     A     Yes.

187

1     Q     Is cs@probelle.net Carol Spizzirri's
2 email?
3     A     That's what it looks like from this
4 paper, but I don't remember.
5     Q     Is this a true and accurate copy of an
6 email Carol Spizzirri sent to you on May 13,
7 2010?
8     A     It appears that something has been
9 redacted. Apart from that, I don't have any reason
10 to think it's been altered.
11     Q     Do you remember receiving this email?
12     A     No, I don't.
13     Q     In this email Spizzirri states, my
14 Blackberry emails disappeared prior to the arrest
15 of Annabel and since none have disappeared.
16           She then says, I did, discovering they
17 keep emails for three months (90 days) and have
18 agreed to work with you and Blackberry if you
19 forward a subpoena to legal at bluehost.com or by
20 mail. And the address is given.
21           She is asking you and Robert Podlasek in
22 this email to send a subpoena to Blackberry; is
23 that right?
24     A     That's what it looks like.

188

JULIE GUNNIGLE - APRIL 23, 2018

1    Q    Did you send a subpoena to Blackberry
2  relating to Ms. Spizzirri's emails?
3    A    I don't remember.
4    Q    In this email it says, I explained,
5  Annabel had access/passwords to SALF's emails
6  (which you have in evidence).  Ameekul@blackberry
7  said she must still have and could have intervened
8  the Blackberry since the phone/Blackberry is the
9  same.
10        This email shows that four years after
11  the alleged intrusion at SALF in 2006 Carol
12  Spizzirri was claiming that Ms. Melongo had
13  accessed her Blackberry; isn't that true?
14    MS. NINFO:  Objection; form and assuming facts
15  not in evidence.
16    THE WITNESS:  That's what it looks like.  I
17  don't remember this email.
18    By Ms. Schwartz:
19    Q    Does this email suggest to you that
20  Carol Spizzirri was trying to find claims and
21  charges to bring against Ms. Melongo?
22    MS. NINFO:  Objection to form.
23    MS. BROWN:  Objection to form.
24    THE WITNESS:  This email indicates that she

189

1  has been having trouble with her Blackberry and
2  that someone at Blackberry told her that Annabel
3  could be responsible.
4    By Ms. Schwartz:
5    Q    At the bottom she states, I will stop by
6  Monday to discuss additional information and get
7  your input.
8    Q    Did Ms. Spizzirri stop by and speak to
9  you after sending this email?
10    A    I don't remember, but if she did, I
11  likely wouldn't have been there, being part time
12  and not coming in on most Mondays.
13        Additionally, I don't remember meeting
14  Ms. Spizzirri until the end of my time at state's
15  attorney's, just before my daughter was born in
16  February.
17    Q    Do you recall any discussion about
18  potentially bringing charges related to access to
19  Ms. Spizzirri's Blackberry?
20    A    No.
21            (A document was marked as
22            Plaintiff's Deposition Exhibit
23            Gunnigle No. 29 for
24            identification.)

190

1  By Ms. Schwartz:
2    Q    I am handing you Plaintiff's Deposition
3  Exhibit 29, which is Bates numbered CCSAO 09303 to
4  307.  This is an email dated February 18, 2010,
5  from Carol Spizzirri to you and also cc's Robert
6  Podlasek; is that correct?
7    A    That's what it looks like, yes.
8    Q    Is this a true and accurate copy of an
9  email you received from Ms. Spizzirri?
10    A    I don't remember receiving it.  I don't
11  have any reason to believe that it has been
12  altered.
13    Q    At the end of this email she writes,
14  question, could you use law student volunteer/s to
15  help you.  I have access to some.
16        Do you recall if you responded to this
17  email?
18    A    I don't remember.
19    Q    Did you accept Ms. Spizzirri's offer to
20  refer law student volunteers?
21    A    No.
22    Q    Would it have been appropriate for you
23  to take on law student volunteers recommended by
24  Ms. Spizzirri's, one of the victims in your

191

1  cases?
2    A    No.
3            (A document was marked as
4            Plaintiff's Deposition Exhibit
5            Gunnigle No. 30 for
6            identification.)
7    By Ms. Schwartz:
8    Q    I am handing you Plaintiff's Deposition
9  Exhibit 30, which is Bates numbered CCSAO 09132.
10  Exhibit 30 is an email dated June 26, 2010, from
11  Carol Spizzirri to you; is that correct?
12    A    Yes.
13    Q    Is it a true and accurate copy of an
14  email Ms. Spizzirri sent you on June 26, 2010?
15    A    I don't recall seeing it.  I don't have
16  any reason to believe it's altered except for the
17  fact that it's a new email address, snowy@probelle
18  versus CS.
19    Q    It's a different email address
20  associated -- that appears to be associated with
21  Ms. Spizzirri; is that correct?
22    A    It just says Carol, but yes.
23    Q    In this email, Ms. Spizzirri writes
24  about FOIA requests related to Save A Life

192

1    Foundation's finances.
2           She also says, Thursday morning found my
3    home was broken in again (x5) through garage.
4           Did she complain to you about any
5    burglary or theft or anything like that?
6    A    I don't remember.
7    Q    At the end of this email she writes,
8    there must be more to Annabel than meets the eye.
9    Please follow the money.  Follow the money is in
10   all caps with three exclamation points.
11          Did Ms. Spizzirri suggest to you that
12   Ms. Melongo was behind a burglary or theft of her
13   home?
14   A    Not that I remember.
15   Q    In fact, Ms. Melongo was in the Cook
16   County jail at the time this email was written,
17   June 26, 2010; isn't that correct?
18   A    I don't know.  I don't remember.
19   Q    It appears Ms. Spizzirri is blaming
20   Ms. Melongo for something.  She says there is more
21   to Annabel than meets the eye.  Please follow the
22   money.
23          Is that the way you understood this
24   email?

193

1    A    I don't remember receiving this email.
2    Q    Do you have any idea what please follow
3    the money referred to?
4    A    I have no idea.
5    Q    Did you ever talk to Ms. Spizzirri after
6    this email or about this email?
7    A    I spoke to Ms. Spizzirri in person
8    around the end of my tenure as state's attorney.  I
9    don't remember talking to her otherwise.
10   Q    There is an article linked at the top or
11   a website hyperlink in the content of Exhibit 30.
12   Do you recall following that hyperlink to see what
13   it said?
14   A    I don't remember.
15          (A document was marked as
16           Plaintiff's Deposition Exhibit
17           Gunnigle No. 31 for
18           identification.)
19   By Ms. Schwartz:
20   Q    I am handing you Plaintiff's Deposition
21   Exhibit 31.  I will represent to you that this is
22   what came up when I typed in the -- that particular
23   web address that's in Exhibit 30.  It was April 19,
24   2018, just a couple days ago.

194

1           Exhibit 31 appears to be an article with
2    the date of June 9, 2010, called The Safe-A-Life
3    Foundation Story, A Study in the Chicago Way.
4           Do you recall ever seeing this
5    article?
6    A    No.
7    Q    In the first paragraph it discusses a
8    November 2006 ABC News Chicago television
9    investigative report by Chuck Goudie of ABC News.
10          Do you recall seeing an ABC News story
11   about the Save A Life Foundation and Carol
12   Spizzirri by Chuck Goudie?
13   A    Yes, I do.
14   Q    What do you recall about that report?
15   A    It's been a really long time.  I
16   remember there was a challenge to how many students
17   Ms. Spizzirri's organization had trained.
18          And I believe at some point in time
19   there was a challenge as to how Ms. Spizzirri's
20   daughter died and the account surrounding her
21   death.
22   Q    When did you first learn about the
23   November 2006 ABC News report done by Chuck
24   Goudie?

195

1    A    I learned about it because I believe
2    there was a link from Ms. Melongo's website to it.
3    It wasn't from this.  I don't remember when I
4    clicked that link.
5    Q    It was some time after you started
6    working on Ms. Melongo's case?
7    A    That's right.
8    Q    Did watching that report cause you any
9    concern about the truth of Ms. Spizzirri's
10   allegations against Ms. Melongo?
11   A    No, it did not.
12   Q    Why not?
13   A    A few different reasons.  First, it did
14   seem like there wasn't anything to it with respect
15   to what Ms. Melongo was alleging, a large scale
16   financial fraud.
17          Second, Ms. Melongo linked to other
18   documents related to Ms. Spizzirri.  As I recall,
19   it was documents relating to her divorce that were
20   in particularly bad taste, challenging how her
21   daughter died.  And it seemed more like a vast
22   conspiracy theory than anything that had any truth
23   or credibility behind it.
24   Q    To take a step back though, Chuck Goudie

196

1 of ABC News prepared an investigative report about
2 the Save A Life Foundation, that's correct,
3 right?
4    A    That's right.
5    Q    Ms. Melongo had nothing to do with that
6 ABC News report?
7    A    No.
8    Q    In that ABC News report, the
9 circumstances surrounding the death of
10 Ms. Spizzirri's daughter were called into question;
11 is that correct?
12    A    That's right.
13    Q    Ms. Melongo again didn't have anything
14 to do with that report?
15    A    No.
16    Q    Similarly, the ABC News report prepared
17 by Chuck Goudie in November 2006 did raise some
18 questions about the number of students trained by
19 the Save A Life foundation, did it not?
20    A    It did.
21    Q    The November 2006 ABC News report also
22 revealed that Ms. Spizzirri was not a certified
23 nurse as she had claimed in Save A Life promotional
24 materials, do you recall that?

197

1    A    I don't remember that.
2    Q    The fact that a local news investigative
3 journalist had exposed some issues with Save A Life
4 Foundation and the stories that Ms. Spizzirri had
5 told related to Save A Life Foundation, that didn't
6 cause you any concern whatsoever?
7    A    No, it didn't.
8    Q    Turning back to Exhibit 30, at the very
9 end, it says, before I leave, would like to meet
10 for your directions.
11        Do you have any idea what Ms. Spizzirri
12 meant when she said before I leave?
13    A    I have no idea.
14    Q    Did you discuss this email with anyone?
15 Do you recall discussing this email with anyone?
16    A    I don't remember this email at all.
17            (A document was marked as
18             Plaintiff's Deposition Exhibit
19             Gunnigle No. 32 for
20             identification.)
21    By Ms. Schwartz:
22    Q    I am handing you Exhibit 32, which is
23 Bates No. CCSAO 09185.  This is an email dated
24 August 23, 2010, from Carol Spizzirri to you; is

198

1 that correct?
2    A    Yes.  Although it looks like Bob might
3 have been on this email too.
4    Q    Is it a true and accurate copy of an
5 email that Ms. Spizzirri sent you on August 23,
6 2010?
7    A    Again, I don't remember receiving it.  I
8 have no reason to believe it's been altered.
9    Q    Ms. Spizzirri writes, about halfway down
10 the page, has Bob found an attorney referral for
11 me.  Been looking around myself.  No one believes
12 this, dot, dot, dot.  I am really desperate.  Can
13 you help me.
14        Did you discuss with Mr. Podlasek
15 providing Carol Spizzirri a referral for an
16 attorney?
17    A    I don't remember.
18    Q    Do you recall Carol Spizzirri asking you
19 any questions about trying to get an attorney?
20    A    I don't remember.
21    Q    Did Spizzirri ever, Ms. Spizzirri ever
22 talk to you about any legal troubles she was having
23 for which she might need an attorney?
24    A    I don't remember.

199

1    Q    Wasn't it inappropriate for
2 Ms. Spizzirri to be asking you and Mr. Podlasek,
3 government prosecutors, for legal advice about --
4    MS. NINFO:  Objection.
5    MS. BROWN:  Join.
6    MS. SCHWARTZ:  Let me finish the question and
7 then you can object.  I will start again.
8    By Ms. Schwartz:
9    Q    Wasn't it inappropriate for
10 Ms. Spizzirri to ask you and Mr. Podlasek,
11 government prosecutors, for legal advice related to
12 legal troubles she was having?
13    MS. NINFO:  Objection; form, foundation,
14 assuming facts not in evidence.
15    MS. BROWN:  Join.
16    THE WITNESS:  I don't remember Ms. Spizzirri
17 asking me for legal advice ever.
18    By Ms. Schwartz:
19    Q    Wasn't it inappropriate for
20 Ms. Spizzirri to ask for an attorney referral from
21 you as a prosecutor?
22    MS. NINFO:  Objection; form, foundation.
23    MS. BROWN:  Join.
24    THE WITNESS:  I don't remember her asking for

200

1  an attorney referral.  From this email it appears
2  that she may have asked Bob.  I don't remember.
3          By Ms. Schwartz:
4      Q     In the next line of Exhibit 32, it
5  states, read of -- I'm sorry.  It states, read of
6  case your colleagues are prosecuting - Judge
7  ordered all (websites/related) to be taken down -
8  can you make this possible in this case too?
9  (After the trial of course - as we discussed.)
10          Ms. Spizzirri was asking you to try to
11  get the illinoiscorruption.net website taken down;
12  is that correct?
13     A     I don't --
14     MS. NINFO:  Objection to form, foundation,
15  speculation.
16     THE WITNESS:  I don't remember.
17          By Ms. Schwartz:
18     Q     Do you recall her ever asking you to try
19  to get the website taken down?
20     A     I don't remember.
21     Q     Do you recall ever telling her that she
22  had to wait until after trial to get the website
23  taken down?
24     A     I don't remember.

                                                    201

1      Q     At the end it says, I need some
2  vindication.  What did you understand Ms. Spizzirri
3  to be referring to?
4      A     I don't remember receiving this email.
5      Q     Were you aware that the Save A Life
6  Foundation was investigated by the Illinois
7  Attorney General's Office for financial
8  irregularities?
9      A     That was not my understanding.
10     Q     What was your understanding?
11     A     I believe that it had at one point in
12  time been audited and there was an issue with their
13  nonprofit, their nonprofit standing, but I don't
14  remember the details.
15     Q     Did you consider that relevant to the
16  case against Ms. Melongo in any way?
17     A     No.
18     Q     Why not?
19     A     Because irrespective of whatever is
20  going on with the nonprofit, she admitted to going
21  into the founder's email and forwarding emails to
22  herself.
23     Q     Were you aware that Ms. Spizzirri
24  alleged that other temporary employees, other than

                                                    202

1  Ms. Melongo, had destroyed Save A Life Foundation
2  computer files in 2006?
3      A     I don't remember.
4      Q     Do you recall Ms. Spizzirri ever trying
5  to get you involved in her initiative related to
6  cyber stalking?
7      A     I don't remember.
8              (A document was marked as
9              Plaintiff's Deposition Exhibit
10             Gunnigle No. 33 for
11             identification.)
12          By Ms. Schwartz:
13     Q     I am showing you Plaintiff's Deposition
14  Exhibit 33, which is SPIZZIRRI000001094 to 1095.
15          Is it a true and accurate copy of an
16  email Ms. Spizzirri sent you on April 7, 2010?
17     A     I don't remember receiving it.  I don't
18  see any reason to believe that it's been altered.
19     Q     In the signature block it says,
20  C. Spizzirri Probelle Interlink.  Do you know what
21  Probelle Interlink is?
22     A     I don't.
23     Q     In this email Ms. Spizzirri says she is
24  attaching a concept chart and she says, quote,

                                                    203

1  please share with Bob and tell him it's gaining a
2  lot of interest by IL legislators and that I found
3  money, which is denoted with two dollar signs.
4          Do you know what this concept chart to
5  which she refers in the email is?
6      A     I don't.
7      Q     Do you know what Ms. Spizzirri meant
8  when she said, please share with Bob and tell him
9  it's gaining a lot of interest by Illinois
10 legislators?
11     A     I don't.
12     Q     Do you know what money she is referring
13 to when she says I found money?
14     A     I don't know.
15             (A document was marked as
16             Plaintiff's Deposition Exhibit
17             Gunnigle No. 34 for
18             identification.)
19          By Ms. Schwartz:
20     Q     I am handing you what will be marked
21 Plaintiff's Deposition Exhibit 34, which is
22 CCSAO 09122 through 23.
23          This is an email dated June 17, 2010,
24 from Carol Spizzirri to you, Robert Podlasek and a

                                                    204

1 few other email addresses; is that correct?

2     A     That's what it appears to be.

3     Q     Is it a true and accurate copy of an

4 email dated June 17, 2010 from Ms. Spizzirri to

5 you?

6     A     I don't know.  I don't remember

7 receiving it.  I have no reason to believe that

8 it's been altered.

9     Q     In this email she says, each of you have

10 a gigantic amount of expertise in this new and

11 growing war against cyber terror.

12         She lists what appear to be names of the

13 recipients of this email.

14         Is she trying to get -- was she at this

15 time trying to get you involved in some initiative

16 related to a growing war against cyber terror?

17     A     I don't know.

18     MS. BROWN:  Objection to form.

19     THE WITNESS:  I don't know.

20     By Ms. Schwartz:

21     Q     Later down on the page, towards the

22 bottom, it says, Bob and Julie are experts in the

23 legal aspect of cyber terror, and soon to be

24 recognized nationally.

205

1         Do you know -- do you have any idea what

2 she meant by "soon to be recognized nationally"?

3     A     I have no idea.

4     Q     Were you ever recognized nationally for

5 cyber terror?

6     A     No.

7     Q     In this email Ms. Spizzirri suggests

8 orchestrating a conference call with the recipients

9 of this email.

10         Did you ever participate in a conference

11 call?

12     A     Not that I recall.

13     Q     You testified earlier that the

14 confession, the alleged confession that Ms. Melongo

15 made was important to the computer tampering case,

16 is that accurate?

17     A     Yes.

18     Q     What was your understanding of that

19 statement Ms. Melongo allegedly made?

20     A     That it was in the police report and one

21 of the bases for charging Ms. Melongo.

22     Q     To whom did Ms. Melongo make that

23 statement?

24     A     Apart from looking at a police report, I

206

1 wouldn't know.

2     Q     Let's turn to the police report, which

3 is Exhibit 22.  I will direct your attention to

4 page Bates number MELONGO_005222.  In the third

5 full sentence at the top it says, Ms. Melongo also

6 admitted to viewing Ms. Spizzirri's emails in which

7 Ms. Spizzirri blamed Ms. Melongo for the problems

8 SALF was having with their computer systems.  After

9 she viewed those emails, Ms. Melongo then forwarded

10 those emails to her Yahoo email account

11 Melongo_Annabel@yahoo.com.

12         Is that the portion of the police report

13 to which you had been referring?

14     A     Yes.

15     Q     Did you ever speak to Detective Martin

16 about statements Ms. Melongo made to him on

17 July 20, 2006?

18     A     I don't remember.

19     Q     Do you remember ever meeting

20 Detective Martin?

21     A     I do not remember.

22     Q     Do you remember ever exchanging emails

23 or other communications with Detective Martin?

24     A     I do not remember.

207

1     Q     Detective Martin did not obtain a signed

2 statement from Ms. Melongo with this information in

3 it that I just read?

4     MR. WUNDER:  Is that a question?

5     By Ms. Schwartz:

6     Q     Was it unusual for there to be an

7 allegation that a criminal defendant confessed, but

8 for there to be no signed statement?

9     A     No, that's not unusual.

10     Q     Why would it be the case that there

11 would be -- why would it be the case that there

12 would be no signed statement indicating a

13 confession?

14     A     Different police departments operate

15 with different protocols.

16     Q     Do you know what the Schiller Park

17 Police protocols were in 2006 with respect to

18 confessions?

19     MS. BROWN:  Objection to form, speculation.

20     THE WITNESS:  No.  And I wasn't in the office

21 during that period of time either.

22     By Ms. Schwartz:

23     Q     What did you do to determine whether

24 this statement in the police report related to the

208

1  alleged confession was accurate?
2     A    Well, as I was working up the case for
3  trial, it appears that I reached out to several
4  people in the police report. I don't know if I
5  reached out to the detective.
6     Q    Are you aware of cases from your work
7  where a police officer has fabricated a
8  confession?
9     A    That has not been the case in any of the
10  cases I have worked on to my knowledge.
11    Q    Did you review the grand jury
12  transcripts in the computer tampering case?
13    A    I did.
14    Q    Did you review Detective Martin's
15  testimony regarding the statements Ms. Melongo
16  allegedly made to him from the grand jury
17  transcripts?
18    A    I did.
19            (A document was marked as
20             Plaintiff's Deposition Exhibit
21             Gunnigle No. 35 for
22             identification.)
23  By Ms. Schwartz:
24    Q    I am handing you what I am marking as

209

1  Plaintiff's Deposition Exhibit 35, which is
2  MELONGO_005982 to 5995.
3            This is a copy of the transcript from
4  the May 28, 2008, grand jury; is that correct?
5     A    Yes.
6     Q    I would like to turn your attention to
7  page 10, Bates number at the bottom,
8  MELONGO_005992. This is a portion of
9  Detective Martin's testimony before the grand jury.
10    MS. NINFO:  Did you say 92?
11    MS. SCHWARTZ:  92.
12  By Ms. Schwartz:
13    Q    I will just read you the testimony
14  starting at line 12.
15            Q    What did Ms. Melongo say about the
16  email accounts?
17            A    She claimed that she had access
18  because she was the administrator for the
19  company.
20            Q    Did she indicate that she was only
21  trying to check out her email accounts?
22            A    Yes.
23            Q    And did she also indicate to you
24  during this conversation that the emails from

210

1  Carol Spizzirri were actually forwarded to her
2  by another employee?
3            A    That was her excuse, yes.
4            In this Grand Jury testimony in May of
5  2008, Exhibit 35, Detective Martin testified that
6  Ms. Melongo did not admit to forwarding Carol
7  Spizzirri's emails; isn't that correct?
8     A    I mean, that's not necessarily the way I
9  read this.
10    Q    How do you read this?
11    A    It appears that they had discussion
12  about emails. I'm not sure that that rules out
13  what's in here, that they were -- that she had
14  access to the account as the administrator for the
15  company.
16    Q    What about on page 10, lines 19 through
17  22:
18            Q    And did she also indicate to you
19            during this conversation that the emails from
20            Carol Spizzirri were actually forwarded to her
21            by another employee?
22            A    That was her excuse, yes.
23    A    I don't know what he is referring to
24  with respect to those emails.

211

1     Q    In this statement it appears
2  Detective Martin is saying that Ms. Melongo told
3  him that another employee, another person forwarded
4  Ms. Spizzirri's emails to her. Isn't that a fair
5  reading of this testimony?
6     A    I don't know.
7     MS. BROWN:  Objection; form.
8     MR. WUNDER:  Objection; speculation.
9     THE WITNESS:  I don't know.
10            (A document was marked as
11             Plaintiff's Deposition Exhibit
12             Gunnigle No. 36 for
13             identification.)
14  By Ms. Schwartz:
15    Q    I am handing you Plaintiff's Deposition
16  Exhibit 36, MELONGO_003387 to 97.
17            This is a copy of the transcript from
18  the grand jury dated January 17, 2007; is that
19  correct?
20    A    That's what it says.
21    Q    You said you reviewed the transcript
22  from that grand jury as well; is that right?
23    A    That's right.
24    Q    I would like to turn your attention to

212

JULIE GUNNIGLE - APRIL 23, 2018

1 page 7, Bates numbered MELONGO_003393. This is
2 part of Detective Martin's testimony before the
3 grand jury.
4       Q   And what did Ms. Melongo say about
5 the email accounts?
6       A   She said that she had gone into the
7 email server to check her own account and
8 claimed that the emails were forwarded to
9 her by another employee.
10      In his grand jury testimony in January
11 of 2010, Detective Martin testified Ms. Melongo did
12 not admit to forwarding Carol Spizzirri's emails;
13 isn't that correct?
14      A   I am sorry, where are you?
15      Q   At line 15 through 19, of page 7 of
16 Exhibit 36.
17      Q   And what did Ms. Melongo say about
18 the email accounts?
19      A   She said that she had gone into
20 the email server to check her own account and
21 claimed that the emails were forwarded to her
22 by another employee?
23      A   Yes.
24      Q   So there Detective Martin in January

213

1 2007 testified that Ms. Melongo did not admit to
2 forwarding Carol Spizzirri's emails; isn't that
3 correct?
4       MR. WUNDER:  Objection; speculation, form.
5       MS. NINFO:  Form.
6       THE WITNESS:  And again, I don't know what he
7 is trying to say in these two.  And I don't know if
8 there was a later statement, an initial statement
9 or if something else happened.  But it appears the
10 forensic examination in any event, at least his
11 testimony is, that showed that that wasn't correct,
12 that it had been forwarded from Ms. Spizzirri's
13 account.
14      By Ms. Schwartz:
15      Q   I am just asking you about the
16 conversation Detective Martin had stated at various
17 times that he had with Ms. Melongo in July of 2006.
18      A   Yes.  And I don't know whether or not
19 she stated multiple things.  If there was initially
20 an excuse and a later statement.  I'm not sure.
21      Q   These are slightly inconsistent
22 variations of the alleged conversation between
23 Detective Martin and Ms. Melongo, isn't that
24 right?

214

1       A   Again, I don't know without the greater
2 context.
3       Q   Do you recall reviewing these when you
4 worked on Ms. Melongo's case?
5       A   I do.
6       Q   And didn't you read these inconsistent
7 versions of the alleged confession Ms. Melongo made
8 to Detective Martin?
9       A   I don't remember.
10      Q   Do you recall having any concern about
11 Detective Martin's description of his conversation
12 with Ms. Melongo in July of 2006?
13      A   No, I don't.
14      Q   Are you aware that Detective Martin was
15 suspended for one day from the Schiller Park Police
16 Department because he erroneously or fallaciously
17 misstated a police report?
18      A   No, I'm not.
19      Q   You never became aware of that during
20 your time working on Ms. Melongo's case?
21      A   No, I did not.
22      MS. SCHWARTZ:  I would like to take a
23 five-minute break.
24      (A recess was had.)

215

1       By Ms. Schwartz:
2       Q   Ms. Gunnigle, did you ever receive any
3 training on cyber crimes, prosecutions or
4 investigations or any cyber crime related issues?
5       A   Not that I can recall.
6       Q   You testified a bit today about some of
7 the technological aspects of the allegations in
8 this case.  Is that knowledge just from general
9 experience in working on this and other cyber crime
10 cases?
11      A   It is.  I did a lot of my own
12 research.
13      Q   How did you do your own research?
14      A   Online.  I asked -- I would read almost
15 everything I could about headers.
16      My knowledge is dated, but it was a lot
17 of self-study.
18      (A document was marked as
19      Plaintiff's Deposition Exhibit
20      Gunnigle No. 37 for
21      identification.)
22      By Ms. Schwartz:
23      Q   I would like to hand you one final
24 exhibit, which will be Plaintiff's Deposition

216

**Page 217**

1 Exhibit 37, which is Bates numbered

2 CCSAO 005385.

3          Do you recognize Exhibit 37,

4 Ms. Gunnigle?

5     A    No, I don't.

6     Q    This is an image of the web system of

7 the Save A Life Foundation.  On the left are the

8 names of people in the Save A Life Company.  And

9 at the top it says, inbox for

10 administrator@salf.org.

11          Were you aware that the administrator

12 for the Save A Life Foundation, this administrator

13 account, had access in 2006 to everybody's email

14 accounts for Save A Life Foundation?

15     A    I don't remember.

16     Q    And anyone who logged in as an

17 administrator for the Save A Life Foundation could

18 access the contents of those accounts, were you

19 aware of that?

20     A    I don't remember.

21     Q    The dates on this particular screen

22 shot, which is an image of C. Spizzirri's email

23 inbox, the dates listed are all May 1, 2006; is

24 that correct?

**Page 218**

1     A    That's what it says.

2     Q    Ms. Melongo didn't work at Save A Life

3 Foundation on May 1, 2006; isn't that

4 correct?

5     A    That's correct.

6     Q    And in fact, after she left, the

7 passwords were changed for accessing the email

8 accounts; is that correct?

9     A    That information is in one of the police

10 reports.  I obviously didn't independently verify

11 that.

12     Q    Is it possible that someone logging in

13 as the administrator for the Save A Life email

14 accounts could have forwarded emails from Carol

15 Spizzirri's email account to Annabel Melongo's

16 email account?

17     MS. BROWN:  Objection; speculative.

18     MS. NINFO:  And form.

19     THE WITNESS:  I don't know.

20     MS. SCHWARTZ:  I have nothing further.

21     MS. CALLOWAY:  I have no questions.

22     MS. NINFO:  I have no questions.

23     MS. BROWN:  I have no questions.

24     MR. WUNDER:  Nothing.

**Page 219**

1     MS. SCHWARTZ:  No further questions.

2     MS. BROWN:  Bianca Brown for Cook County

3 defendants, I will reserve signature of

4 Ms. Gunnigle's testimony.

5

6

7          DEPOSITION CONCLUDED

**Page 220**

1          IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3 ANNABEL K. MELONGO,        )
                             )
4          Plaintiff,        )
                             )
5     vs.                    )  13-cv-04924
                             )
6 ASA ROBERT PODLASEK, et al., )
                             )
7          Defendants.       )

8

9     I, JULIE GUNNIGLE, being first duly sworn,

on oath, say that I am the deponent in the

10 aforesaid deposition, and that I have read the

11 foregoing transcript of my deposition, consisting

12 of pages 1 through 222, inclusive, taken on April

13 23, 2018, at the aforesaid place and that the

14 foregoing is a true and correct transcript of my

15 testimony so given.

16

17          _____ corrections were made

18          _____ no corrections were made

19

20          _____

21               JULIE GUNNIGLE

SUBSCRIBED AND SWORN TO

22 before me this _____ day

of _____ , 2018.

23 _____

24 _____
     Notary Public

STATE OF ILLINOIS )
)SS:
COUNTY OF DU PAGE )

I, PEGGY CURRAN, CSR, CRR, License No. 084-002016, notary public within and for the County of DuPage and State of Illinois, do hereby certify that heretofore, to wit, on the 23rd day of April, 2018, JULIE GUNNIGLE personally appeared before me as a witness in a cause now pending and undetermined in the United States District Court, Northern District of Illinois, Eastern Division, wherein Annabel K. Melongo is Plaintiff and ASA Robert Podlasek, et al., are Defendants, No. 13-cv-04924.

I further certify that the said JULIE GUNNIGLE was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid before the taking of her deposition; that the testimony given was stenographically recorded in the presence of said witness by me, and afterwards transcribed upon a computer, and that the foregoing is a true and correct transcript of said testimony.

I further certify that there were present

221

at the taking of the deposition the aforementioned counsel.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

In testimony whereof, I have hereunto set my hand and seal this 27th day of April, 2018.

Peggy Curran
____________________________
Notary Public
DuPage County, Illinois
CSR No. 084-002016

222

<Dates>
27 april 06 158:5
4/14/10 140:18
4/28/06 172:17
5 june 06 164:10
April 13, 2010 45:22, 46:6, 51:3, 52:18, 53:15, 64:6, 79:21, 94:12, 94:22, 95:2, 95:6, 102:4, 104:11, 104:22, 105:17, 105:23, 106:6, 106:19, 106:24, 113:17, 141:22
April 14, 2010 84:11, 107:2, 107:20, 107:24, 140:22
April 18, 2010 98:23
April 19, 2018 194:23
April 20, 2010 110:14, 110:18
April 2010 45:20, 69:19
April 23, 2018 1:23, 136:21, 220:19
April 27 160:24
April 27, 2006 158:17
April 27, 2010 138:14, 139:2
April 28, 2006 123:19, 124:2, 124:15, 124:19, 134:18, 135:1
April 28, 2012 106:9
April 7, 2010 203:16
April, 2018 221:9
April, 2018. 222:8
August 23, 2010 198:24, 199:5
December 10, december 15 73:14
December 21, 2009 63:1
December 9, 2009 88:4
February 18, 2010 191:4
February 2010 161:3, 162:9
February 23, 2010 150:9, 150:15
February 9, 2010 161:24
January 17, 2007 212:18
January 2007 213:24
July 16, 2010 152:10
July 19, 2010 152:22, 153:7
July 20, 2006 207:17
July 20, 2010 154:22, 155:7
July 20, july 19 152:10
July 20, july 19, july 16, 2010 152:6
July 2014 184:6
July 21, 2010 169:19
July 23, 2010 169:12, 169:19
June 16, 2014 178:14
June 17, 2010 204:23, 205:4
June 18, 2008 66:24, 67:5, 67:20, 68:15, 96:22, 97:2, 141:17
June 26, 2010 192:10, 192:14, 193:17
June 9, 2010 195:2
March 23, 2010 70:22, 71:7, 75:7
March 23rd 70:24
March 29, 2010 77:7
March 3, 2010 78:18, 84:7, 97:23
March 8, 2010 84:2
May 1 125:21
May 1, 2006 120:8
May 1, 2006 120:22, 122:4, 122:13, 126:14, 129:4, 134:10, 135:2, 160:10, 160:14, 160:24, 173:22, 180:5, 217:23, 218:3
May 13, 2010 187:21, 188:6
May 2010 139:19
May 28, 2008 210:4
May 4, 2006 146:17
May 5, 2010 111:9
May, 2010 139:10
November 10, 2011 114:4, 114:7
November 2006 195:8, 195:23, 197:17, 197:21
October 13, 2011 113:18
October 30, 2006 157:2
September, november 25:24, 32:10
#3A 165:1
$500,000 110:15
(90 188:17
)SS 221:2

<0>
000209 119:24
000332. 109:19
0006248 140:3
000859 74:11
000866. 77:2
000874 75:4
000885 83:15
000894 88:3
000912 84:5
000920 70:20
000922 72:19
000923 73:21
001602 115:13
003108 89:8
003108. 89:10
003131 99:18
003296. 107:12
003387 170:20
003388. 172:6
003389. 172:7
003415. 121:12
005385. 217:2
005409. 150:8
006250 140:17
008124 62:20
00895 88:5
00912 85:21, 87:23
012292. 138:23
084-002016 1:20, 221:6, 222:17
08CR-10502 90:15
09122 204:22
09132. 192:9
09136 152:3
09137. 152:4
09177 169:9
09185. 198:23
09268. 187:21
09303 191:3
09868 178:13
09870. 178:13

<1>
1 4:15, 62:15, 62:19, 62:22, 107:17, 220:19
10 88:2, 105:10, 105:14, 105:16, 210:7, 211:16
100 3:8
10105 4:33
104 4:31
105 4:33
107 4:35
109 4:37
1095. 203:14
11 88:5, 88:10, 107:8, 107:12, 107:13, 107:17, 108:5

223

11107 4:35
115 4:39
119 4:41
12 109:15, 109:19, 109:24
12. 210:14
121 4:43
12109 4:37
1218 164:24
128 4:45
13 115:9, 115:13, 115:15, 115:19, 115:24
13-cv-04924 1:9, 136:9, 220:9, 221:15
13115 4:39
137 176:15
138 4:11, 4:47
138: 176:15
139 5:4
13th 40:14
14 119:19, 119:23, 120:1, 120:3, 120:18
14. 128:14
14119 4:41
146 5:6
15 121:8, 121:12, 121:13, 121:16, 122:10, 123:7, 124:5, 125:17, 213:15
150 5:8
151 5:10
15121 4:43
155 3:16
156 5:12
16 73:14, 128:9, 128:13, 128:15, 128:19, 130:1, 134:1
1604. 115:14
161 5:14
16128 4:45
169 5:16
17 138:18, 138:22, 138:24
170 5:18
1700 162:23
171 5:20
17138 4:47
178 5:22
18 139:23, 140:3, 140:6, 140:8, 140:21, 140:24, 141:1, 142:1, 167:8
180 1:22, 2:6, 2:29, 136:18
18139 5:4
187 5:24
19 146:3, 146:7, 146:9, 147:17, 148:1, 211:16, 213:15
190 5:26
19146 5:6
192 5:28
194 5:30
198 5:32
1:30 136:22

<2>
2 4:17, 70:15, 71:19, 72:9, 72:12, 72:18, 73:12, 73:20, 107:17
2. 70:19
20 150:3, 150:7, 150:19, 151:1, 151:9
2003 14:17, 15:8
2006 14:19, 18:10, 19:8, 120:4, 148:11, 159:21, 163:5, 165:7, 170:11, 176:11, 186:15, 189:11, 203:2, 208:17, 215:12, 217:13
2006. 214:17
2008 19:8, 19:17, 115:22, 211:5
2009 19:17, 20:7, 30:23, 32:11, 95:21
2009. 26:1, 73:14
2010 83:24, 95:22, 96:4, 111:13, 139:15, 162:19, 213:11
2010. 139:14
2011 20:8, 28:12, 28:21, 113:22
2012 26:24, 27:11, 28:13, 28:21, 144:9
2014 180:14, 180:21
2014. 184:5
2015 28:6
20150 5:8
2018 26:24, 27:12, 28:24, 29:8
2018. 220:35
203 5:34
204 5:36
209 5:38
21 151:22, 152:3, 152:4, 153:20, 155:6, 157:11, 158:1
2108 2:30
21151 5:10
212 5:40
212. 119:24
216 5:42
22 156:18, 156:22, 156:24, 157:8, 162:22, 164:8, 167:5, 168:7
22. 207:3
22156 5:12
222 220:19
22: 211:17
23 161:14, 161:18, 161:20, 161:23, 162:12
23. 204:22
23161 5:14
23rd 221:8
24 169:5, 169:9
24.15.202.102 127:14, 135:5, 164:13, 164:18, 166:8, 168:1, 172:16
24.15.202.102. 130:20, 134:3
24169 5:16
25 20:19, 170:16, 170:20, 170:22, 172:1, 172:12, 172:24, 173:19
25. 172:5
25170 5:18
26 171:13, 171:18, 171:21, 172:2
26171 5:20
27 178:8, 178:11, 178:12, 178:14, 178:16, 178:19, 182:19, 183:24
27178 5:22
27th 222:8
28 84:4, 85:20, 87:22, 187:17, 187:20
28187 5:24
29 5:26, 87:22, 88:10, 190:23, 191:3
2:49 102:4

<3>
3 4:19, 74:6, 74:10, 74:12
3/8 83:23
30 20:19, 192:5, 192:9, 192:10, 198:8
30. 194:11, 194:23
300,000. 111:10
30192 5:28
307. 191:4
31 5:30, 194:17, 195:1
31. 194:21
3109. 89:8
312.263.3700 2:9

224

JULIE GUNNIGLE - APRIL 23, 2018

| | | | |
|---|---|---|---|
| **312.603.3369** 2:22 | **6** 4:25, 83:10, 83:14, | @gmailcom 150:11 | **189:**9, 206:24, | 31:5, 32:10, 40:8, | arrived 213:12, 72:2, |
| **312.621.0000** 3:19 | 83:17, 83:19, | | 160:14, 160:9, | 167:8 | 214:18 |
| **312.726.0531** 2:32 | 84:4, 85:3, 85:20, | **<A>** | 164:23, 166:1, | April 139:9, 139:15, | article 16:24, 17:1, |
| **312.814.5581** 3:10 | 87:22, 88:3 | **a.m.** 1:24 | 166:10, 168:13, | 139:18, 165:6 | 17:3, 194:10, |
| **3133** 99:19 | **60601** 2:8, 2:21, | ABC 195:8, 195:9, | 173:21, 173:22, | Apt. 165:1 | 195:1, 195:5 |
| **3133.** 98:17 | 2:31, 3:9, 3:18 | 195:10, 195:23, | 176:6, 179:20, | areas 62:10 | articles 18:1 |
| **32** 198:19, 198:22, | **62** 4:15 | 197:1, 197:6, | 180:5, 195:20, | argue 85:24 | ASA 1:11, 63:1, |
| 201:4 | **6250.** 140:4 | 197:8, 197:16 | 207:10, 211:14, | Argument 17:13 | 72:10, 89:21, |
| **32198** 5:32 | | 197:21 | 213:7, 213:20, | 17:14 | 90:7, 136:11, |
| **33** 203:10, 203:14 | | able 109:4, 124:21, | 214:13, 217:13, | Arizona 14:16, 15:2, | 147:15, 220:11, |
| **33203** 5:34 | **<7>** | 175:7 | 218:15, 218:16, | 15:19, 15:22, | 221:13 |
| **34** 5:36, 204:17, | **7** 4:27, 89:3, 89:7, | Above 72:1, 158:3 | 218:18, 218:8, | 26:21, 26:22, | aside 179:18 |
| 204:21 | 89:9, 89:10, | absent 109:5 | 218:14 | 27:2, 28:12, 28:23 | aspect 175:5, 26:23 |
| **3417.** 105:15 | 89:19, 90:4, | academic 27:17 | accuracy 67:9, | Arlington 175:4 | aspects 23:7, 59:23, |
| **35** 209:21, 210:1, | 90:13, 92:7, | accept 191:19 | 168:16 | around 37:20, | 60:3, 216:7 |
| 211:5 | 213:1, 213:15 | access 117:13, | accurate 8:8, 67:22, | 111:13, 139:9, | asserting 123:7, |
| **35209** 5:38 | **704** 4:17 | 124:21, 153:1, | 71:6, 74:12, 75:6, | 141:24, 142:1, | 133:2:7 |
| **36** 212:12, 212:16 | **720** 101:12 | 153:10, 154:3, | 77:9, 98:20, | 162:9, 163:16, | asserts 87:19 |
| **36.** 213:16 | **74** 4:19, 4:21 | 158:7, 163:9, | 107:23, 108:3, | 166:21, 181:8 | assessment 62:8 |
| **3600** 1:22, 2:7, | **76** 4:23, 174:14 | 190:18, 191:15, | 115:24, 116:4, | around 142:9, | assigned 22:16, |
| 136:19 | **78.** 166:9 | 210:17, 211:14, | 128:22, 150:13, | 141:17 | 25:6, 25:14, |
| **36212** 5:40 | | 217:13, 217:18 | 152:9, 169:17, | arraignment 67:15, | 25:15, 41:5, 41:9, |
| **37** 216:20, 217:1, | | access/passwords | 188:5, 191:8, | 95:21 | 185:9 |
| 217:3 | **<8>** | 189:5 | 192:13, 199:4, | array 22:5 | assignment 26:3 |
| **37216** 5:42 | **8** 4:29, 98:12, 98:16, | accessed 118:3, | 203:15, 205:3, | arrest 92:23, 94:5, | assignments 25:4 |
| **3977.** 171:19 | 98:18, 104:3, | 123:18, 134:9, | 206:16, 209:1 | 94:9, 94:15, | 16:16 |
| | 104:7 | 135:8, 145:16, | accurately 131:13, | 94:19, 95:5, 95:9, | Assistant 2:17, 3:6, |
| **<4>** | **8125.** 62:20 | 153:3, 154:7, | 131:16 | 95:10, 96:4, | 15:15, 16:16, |
| **4** 4:21, 73:19, 74:22, | **83** 4:25 | 158:18, 158:22, | accusation 131:13, | 96:21, 96:22, | 27:5, 27:9, 41:4, |
| 75:3, 76:2, 76:17 | **860.** 74:11 | 181:8, 168:3, | 131:16 | 99:10, 99:13, | 41:8, 55:21, 56:2, |
| **40** 147:10, 147:11 | **876** 73:13 | 172:13, 173:12, | accusations 186:15 | 99:19, 99:20, | 109:3, 110:23, |
| **400** 3:17 | **880** 75:14 | 178:22, 182:23, | accused 86:14, | 99:22, 99:23, | 109:5, 112:1, |
| | **880** 75:4 | 189:13 | 86:17, 124:14, | 101:14, 101:15, | 112:11, 114:1, |
| **<5>** | **89** 4:27 | accesses 154:14 | 174:1 | 101:16, 101:22, | 115:2, 118:22, |
| **5** 4:8, 4:23, 73:20, | | accessing 159:10, | accusing 124:8 | 102:3, 102:6, | 137:8, 137:11, |
| 76:21, 77:1, 77:2, | **<9>** | 160:17, 160:23, | Act 16:20 | 103:18, 104:2, | 137:20, 137:23, |
| 77:18, 78:6 | **9** 104:16, 104:20 | 174:2, 218:7 | active 28:18, 117:21 | 104:6, 104:8, | 149:12, 152:19, |
| **5/14-2** 101:12 | **90.** 170:21 | accompanying | activity 72:14 | 105:17, 105:23, | 162:15, 170:7, |
| **50** 2:19 | **9104** 4:31 | 121:2 | actual 52:14, 75:11, | 106:6, 106:20, | 175:14, 180:18, |
| **50/50** 64:23 | **913.** 83:15 | account 58:24, 76:3, | 108:14, 127:11, | 106:24, 107:4, | 183:19, 184:22, |
| **500** 2:20 | **92** 210:10 | 76:4, 76:8, 76:14, | 127:22 | 144:21, 144:21, | 186:5, 186:14, |
| **5223.** 156:23 | **92.** 210:11 | 118:1, 118:4, | actually 126:11, | 188:14 | 187:3, 192:15, |
| **5995.** 210:2 | **924.** 70:20 | 120:21, 122:11, | 147:14, 159:22, | arrested 64:3, 67:14, | 194:8, 199:10, |
| | **97.** 212:16 | 122:12, 123:4, | 173:20, 211:1, | 94:12, 94:22, | 199:23, 200:20, |
| **<6>** | **98** 4:29 | 126:4, 126:13, | 211:20 | 95:2, 102:20, | 201:1, 202:7 |
| | **9:20** 1:24 | 126:14, 130:13, | addition 27:13, | 113:17, 139:14 | Attorneys 8:18, |
| | **9:43:13** 172:18 | 134:10, 135:8 | 176:10, 187:8 | | 30:6, 55:12, |
| | | | | | 55:21, 92:21, |
| | | | | | 212:24 |

225     227

| | | | |
|---|---|---|---|
| Additional 86:5, | 537:, 57:2 | 138:10, 147:2, | ample 162:18 | 105:24, 177:14 | 137:12, 137:17, | big 84:8, 86:7, |
| 92:17, 174:17, | admissions 63:13 | 160:7, 196:10, | amply 162:16 | audio 68:11, 92:11 | 137:24, 137:28 | 92:18, 93:13, |
| 174:23, 175:6, | admit 211:6, 213:12, | 216:7 | analysis 149:1, | audited 202:12 | behaving 80:6 | 154:13 |
| 175:11, 175:15, | 214:1 | alleged 37:7, 82:4, | 149:4, 149:9, | authored 17:2, 17:3 | behind 123:8, | bill 166:12 |
| 176:1, 176:3, | admitted 53:10, | 124:1, 134:17 | 170:10 | authorities 22:6 | 193:12, 196:23 | Bill/debt 162:14 |
| 176:6, 176:9, | 168:8, 202:20, | 154:2, 159:3, | analyze 51:13, 51:21 | authority 114:10 | believe 9:23, 13:16, | bit 28:17, 29:13, |
| 180:10, 187:8, | 207:6 | 160:1, 163:9, | analyzed 51:16 | authorization 121:4, | 17:10, 24:18, | 48:19, 59:12, |
| 187:13, 190:6 | advance 8:19, 12:9, | 163:22, 167:17, | analyzing 173:1 | 160:9 | 33:12, 33:15, | 154:21, 158:3, |
| **Additionally** 67:15, | 96:12 | 177:11, 185:24, | and/or 32:22, 175:8 | automatically 68:11 | 34:11, 34:15, | 159:5, 216:6 |
| 190:13 | adverse 27:19 | 189:11, 202:24, | Angelini 3:15, | available 16:22, | 36:19, 38:11, | Blackberry 188:14, |
| address 138:24, | advice 183:8, | 206:14, 208:1 | 137:21 | 57:20 | 36:16, 38:11, | 188:18, 188:22, |
| 127:1, 127:3, | 183:11, 203:3, | 214:22, 215:7 | angry 48:16, 143:21 | Avenue 3:16 | 51:12, 54:10, | 189:1, 189:8, |
| 127:14, 127:18, | 200:11, 200:17 | allegedly 120:8, | Anita 2:14, 137:8 | awarded 110:18 | 54:14, 54:19, | 189:13, 190:1, |
| 127:22, 127:23, | advise 61:21 | 121:3, 122:11, | Annabel 1:5, 3:26, | aware 43:4, 50:15, | 56:2, 64:19, | 190:2, 190:19 |
| 128:2, 128:5, | Advised 28:22, | 123:3, 123:18, | 6:8, 6:22, 36:3, | 64:10, 64:14, | 67:23, 68:2, 80:4, | Blakey 15:14, 16:15, |
| 129:20, 130:20, | 159:7, 175:24 | 126:21, 168:3, | 36:17, 39:5, | 64:24, 66:19, | 80:17, 81:6, | 17:1 |
| 131:4, 131:7, | advising 41:23 | 168:16, 168:20, | 39:15, 39:24, | 69:23, 69:13, | 87:11, 88:20, | blamed 169:10, |
| 134:3, 134:5, | affiant 108:14 | 174:6, 206:19 | 84:7, 85:22, 86:6, | 69:17, 106:3, | 91:8, 98:3, 101:8, | 207:7 |
| 134:11, 135:1, | affirmative 65:17 | 209:16 | 88:6, 88:13, 99:5, | 108:18, 110:17, | 101:9, 101:21, | blaming 193:19 |
| 136:5, 136:9, | aforementioned | alleging 65:20, | 100:10, 101:9, | 144:14, 146:13, | 108:2, 117:13, | block 88:1, 203:19 |
| 152:15, 164:1, | 22:1 | 156:15 | 117:16, 122:6, | 149:1, 178:21, | 121:2, 123:22, | blogging 44:18 |
| 164:4, 164:13, | aforesaid 220:17, | allocation 177:10 | 122:23, 124:6, | 177:4, 178:23, | 123:1, 144:1, | bluehost.com |
| 164:17, 165:13, | 220:20, 221:19 | alluded 39:21 | 130:16, 136:5, | 186:20, 202:5, | 148:19, 150:17, | 188:19 |
| 165:21, 166:4, | afternoon 117:15 | almost 9:20, 78:24, | 137:33, 166:8 | 202:23, 206:18, | 152:12, 165:15, | bmartin@allageofs |
| 166:5, 167:16, | afterwards 221:22 | 216:14 | 149:11, 158:5, | 215:14, 215:19 | 168:9, 191:11, | chileryork 162:3 |
| 168:1, 176:19, | AG 152:16 | already 30:4, 42:19, | 153:7, 152:3, | 217:11, 217:19 | 171:10, 181:5, | Bob 9:10, 9:15, |
| 188:20, 192:17, | agency 22:10, 23:7, | 106:11, 114:18 | 157:14, 157:14, | awhile 182:18 | 186:6, 191:11, | 25:20, 41:10, |
| 192:19, 194:23 | 23:12, 33:9 | altered 69:4, 150:17, | 166:12, 185:5, | | 192:16, 195:18, | 43:6, 46:2, 46:8, |
| addresses 147:22, | ago 9:17, 10:8, 11:7, | 152:12, 169:21, | 166:12 | **<B>** | 198:1, 199:8, | 51:1, 55:18, 61:9, |
| 159:10, 160:23, | 79:1, 167:10, | 188:10, 191:12, | answer 7:23, 58:18, | baby 38:8 | 202:11, 203:18, | 62:8, 63:22, |
| 165:19, 176:17, | 194:24 | 192:16, 193:8, | 58:24, 148:4, | back 52:7, 112:19, | 205:7 | believed 23:16, 91:3, |
| 176:19, 176:22, | agree 91:2, 103:2 | 203:18, 205:8 | 174:22 | 123:16, 138:7, | BCX 36:17, 36:18, | 117:3, 157:16 |
| 177:5, 205:1 | agreed 188:18 | altering 67:11 | answering 8:4 | 146:1, 152:4, | 36:20, 80:5 | believes 92:1, |
| admin @hsp 162:13 | ahead 123:15, 167:4 | Although 60:4, | answers 7:12, 7:16 | 153:8, 153:17, | bear 83:23 | 192:1 |
| admin@webhsp | a 1:11, 136:11, | 61:17, 108:13 | Antonio 33:20, | 154:5, 152:4, | bears 98:16 | beyond 116:23, |
| 162:2 | 220:11, 221:14 | 131:10, 133:7, | 33:22 | 158:24, 162:21, | became 18:17, | 143:2, 148:3, |
| admin@webhsp.co | alerted 84:20 | 199:2 | anybody 9:6, 30:5, | 179:10, 196:24, | 119:5, 119:6, | 148:5, 148:20, |
| m 162:2 | allegation 80:13, | Alvarez 2:14, 137:8 | 144:21 | 198:8 | 215:19 | 165:15, 166:14, |
| administration | 80:22, 87:12, | Amber 169:11, | Apart 9:5, 14:5, | becomes 50:15, | Benefits 186:2 | 166:16, 167:1, |
| 162:5 | 87:14, 93:1, | 169:22, 170:1 | 14:20, 17:24, | 81:16, 118:18, | best 145:11 | 175:7, 199:2 |
| administrative 187:4 | 118:14, 123:17, | Amaekul@blackber | 30:2, 30:4, 90:24, | 186:17 | better 62:8, 154:20 | 199:10, 201:2, |
| administrator | 124:17, 126:6, | ry 189:6 | 38:14, 42:1, | becomes 160:15 | beyond 72:1, 81:3, | 204:1, 204:8, |
| 210:18, 211:14, | 124:17, 160:6, | American 163:2 | 42:12, 46:8, | Beem 23:5, 137:4 | 154:11, 160:18 | 205:22 |
| 217:11, 217:12, | 208:7 | among 174:9 | 50:19, 69:2, | beginning 140:24, | Bianca 2:16, 6:13, | body 81:14, 120:14, |
| 217:17, 218:18 | allegations 53:18, | Amongst 55:11, | 85:16, 93:14, | 141:1 | 137:10, 219:2 | 122:6, 150:18 |
| administrator@aalf | 59:15, 61:21, | 145:18 | 124:20, 172:19, | behalf 2:11, 2:24, | bianca.brown@coo | bolster 179:18 |
| 217:10 | 87:4, 114:13, | amount 109:7, | 173:9, 178:4, | 2:34, 3:12, 3:21, | kcountyil.gov | bond 106:23, 109:2, |
| admission 53:5, | | 205:10 | 178:20, 182:21, | 27:18, 137:5, | 2:23 | 109:3, 109:4, |
| | | | 184:11, 186:19, | | | |

226     228

JULIE GUNNIGLE - APRIL 23, 2018

109:7, 110:14,
110:18, 110:21,
110:24, 111:9
born 190:15
bottom 72:18, 73:11,
77:13, 84:5, 84:6,
100:7, 107:19,
108:24, 122:2,
123:6, 152:24,
156:7, 157:2,
157:14, 157:16,
162:22, 178:19,
190:5, 205:22,
210:7
bow 57:1
Brady 182:3, 182:6,
182:11, 182:15,
182:24, 183:17,
184:1
break 8:2, 59:7,
95:12, 135:14,
138:8, 145:8,
184:16, 215:23
Brian 12:15, 120:13
brief 10:13
Briefly 13:9, 18:18,
27:24
bring 55:6, 55:22,
56:11, 57:6,
187:7, 187:12,
189:21
bringing 56:4, 56:19,
190:18
broad 46:23, 117:9
broken 193:3
Brosnahan 36:17,
40:12, 65:22,
141:2, 141:6,
141:8
brought 54:24,
57:12, 65:6, 65:11,
66:15, 67:19,
69:20, 103:9,
114:16, 114:19
Brown 2:16, 6:13,
8:14, 137:10,
219:2

building 158:8,
158:10
bullet 172:10,
172:11, 172:14,
172:19, 172:20,
173:9, 173:10
bunch 172:10
bureau 152:19
burglary 193:5,
193:12
business 19:20,
29:14, 58:8,
58:10, 58:16,
59:2, 103:4
businesses 28:22

<C>
C. 203:20, 217:22
cable 164:15
call 9:22, 10:3, 10:5,
10:8, 10:11, 11:5,
11:18, 12:6,
12:15, 12:17,
12:20, 12:23,
13:15, 13:19,
13:22, 14:5, 30:3,
103:3, 117:14,
140:19, 151:5,
206:8, 206:11
called 1:15, 6:3,
9:24, 28:7, 122:6,
122:23, 124:6,
124:22, 129:18,
138:2, 196:2,
197:10
calling 92:8, 145:18
Calloway 3:5, 6:18,
37:9, 137:22
calls 183:3
capacity 36:19, 42:7
caps 193:10
caption 99:2, 107:16
capture 47:8, 47:12,
47:16, 47:21,
47:23, 48:6, 49:9,
51:9, 51:10,
51:11, 51:16,

51:24, 52:2, 52:8,
52:11, 95:21,
95:24, 96:7,
96:13, 96:16
captured 49:14,
49:17, 95:18,
133:13
captures 52:8
card 100:11, 163:9,
163:14
cards 163:4
care 27:18
career 17:7
Carol 3:21, 6:17,
37:2, 37:5, 120:5,
120:13, 120:20,
121:22, 122:4,
122:12, 124:5,
125:18, 126:11,
129:3, 130:3,
130:12, 130:22,
131:9, 137:28,
146:17, 160:3,
160:8, 160:9,
161:4, 162:17,
179:5, 179:19,
185:14, 185:15,
185:19, 185:22,
186:3, 187:7,
188:1, 188:6,
188:11, 189:20,
191:5, 192:11,
192:22, 195:11,
198:24, 199:15,
211:1, 211:6,
211:20, 213:12,
214:2, 218:14
case 9:21, 10:24,
11:22, 12:2,
13:17, 21:11,
21:13, 22:1, 22:8,
22:20, 23:23,
24:11, 25:13,
25:15, 25:22,
34:11, 35:1,
35:17, 36:4, 37:8,
39:18, 40:3,

40:24, 41:1, 41:6,
41:23, 42:8, 42:9,
42:12, 43:11,
44:6, 45:9, 50:13,
53:4, 56:8, 56:14,
56:22, 56:24,
57:6, 57:11,
59:12, 59:20,
60:16, 60:17,
61:13, 62:11,
65:7, 65:19, 66:1,
67:1, 69:22,
69:23, 70:4,
76:11, 78:3,
78:18, 84:9, 86:8,
90:14, 90:19,
96:1, 96:3, 96:10,
96:20, 102:17,
105:2, 108:8,
108:22, 111:15,
111:23, 112:13,
112:15, 113:4,
113:21, 114:23,
115:3, 115:21,
116:8, 116:10,
116:18, 116:20,
116:22, 117:1,
118:15, 118:19,
119:5, 119:9,
122:24, 125:2,
128:20, 128:5,
128:21, 128:24,
129:14, 129:18,
131:17, 132:16,
132:17, 132:18,
132:20, 133:4,
133:11, 134:6,
134:21, 138:11,
139:17, 140:12,
141:3, 143:8,
144:8, 144:15,
146:13, 146:15,
147:5, 147:20,
149:18, 151:1,
151:5, 151:16,
151:17, 154:17,
155:24, 159:15,
159:18, 160:6,

229

clarify 44:12
clear 158:21, 167:21,
183:12
clicked 196:4
Clinic 17:22, 28:1
close 12:19, 92:20
closer 117:3, 151:2
coauthor 16:24
code 129:12, 129:14
coffee 135:6
collaborative 23:1,
61:15
colleague 86:14
colleagues 201:6
collected 159:12
colon 13:19
Colorado 159:6,
161:5, 161:7
com 162:1, 162:3,
162:5, 162:6,
207:11
Comcast 164:11,
164:12, 164:17,
165:1, 165:4,
165:9, 165:12,
165:15, 165:22,
166:13, 166:15,
166:19, 167:1,
167:9, 167:16,
167:19, 167:23,
172:15
coming 6:21, 153:5,
190:12
comma 130:3
commenting 1:24
commentary 43:16
comments 46:10
committed 64:18,
82:23, 101:10,
145:10, 163:14
committing 64:16,
108:8
commonly 17:21
communicate 38:15
communicated 30:5,
34:19, 38:24,
38:18, 165:14
communication

81:10
communications
23:24, 35:9,
36:11, 82:18,
207:23
community 15:20
companies 148:10
Company 72:20,
73:6, 148:24,
157:18, 157:20,
159:8, 159:9,
159:22, 163:2
collaborative 23:1,
174:9, 210:19
211:15, 217:8
compared 78:4
competency 36:21
complain 193:4
complained 66:20
complaint 22:7,
22:11, 70:22, 71:7,
71:10, 71:14,
72:12, 73:20,
75:7, 75:14,
75:17, 75:19,
76:15, 83:6,
98:21, 99:19,
99:20, 99:22,
100:2, 101:16,
102:6
complaints 26:7
complete 16:21,
166:1, 171:8
completed 51:11,
52:12
complete 21:6, 21:8,
23:8, 23:23,
24:18, 34:11,
35:1, 35:16, 36:3,
37:8, 39:22,
40:24, 41:12,
41:23, 42:18,
51:22, 59:11,
59:15, 59:23,
60:3, 67:1, 68:11,
69:22, 78:18,
90:14, 90:17,
108:7, 111:20,
110:21, 112:10,

114:16, 114:23,
115:5, 116:8,
116:20, 117:6,
117:17, 117:20,
117:21, 118:3,
118:9, 118:16,
119:13, 119:15,
123:17, 124:24,
125:2, 125:4,
125:5, 125:10,
125:13, 127:4,
128:20, 128:24,
132:15, 134:5,
135:10, 145:6,
145:10, 145:14,
147:1, 149:5,
149:13, 151:17,
157:17, 158:22,
159:10, 160:23,
163:19, 164:3,
168:11, 176:1,
177:22, 178:1,
180:13, 184:4,
184:14, 185:1,
187:9, 203:2,
206:15, 207:8,
209:12, 221:23
computer-related
22:3
computers 148:16,
149:3, 158:7,
170:11, 173:16,
180:11
concealing 127:13
concept 203:24,
204:4
concern 92:17,
156:1, 156:9,
198:6, 215:10
concerned 156:1,
178:3
concernedilllinoiscit
izen@yahoo.f
76:4
concerns 94:23,
151:16, 177:20,
177:23, 178:24
CONCLUDED 219:7

conclusion 183:4
conclusions 24:11,
173:15
condition 108:7
conduct 53:13,
66:11, 79:24,
176:18, 176:23,
177:10
conference 206:8,
206:10
confessed 179:13,
209:1
confession 120:15,
179:15, 179:18,
206:14, 208:13,
209:1, 209:8,
215:7
confessions 208:18
confirm 54:4, 54:6
confirmed 49:23,
74:1
confirming 133:23
confirms 73:22
connected 177:24
correction 93:6,
163:10
consent 49:10,
49:15, 54:21,
58:4, 64:15,
69:19, 101:18
consented 50:9
consider 65:5,
102:12, 180:9,
202:15
considered 186:4
consistently 166:5
consisting 220:18
conspiracy 46:23,
47:1, 47:4, 195:22
constitutes 182:24
construed 53:5, 53:7
contact 49:22, 50:1,
67:24, 161:4,
187:4
contacted 159:6,
162:24, 186:14

231

160:7, 160:21,
162:7, 162:9,
164:19, 169:1,
170:5, 171:22,
174:12, 174:24,
175:9, 176:2,
176:7, 176:11,
177:5, 177:9,
178:24, 179:16,
180:7, 180:22,
185:5, 185:13,
185:23, 185:24,
186:23, 196:6,
201:6, 201:8,
202:16, 206:15,
208:10, 208:11,
209:2, 209:4,
209:12, 215:4,
215:20, 216:8
caseload 25:2, 25:3
cases 11:8, 12:2,
13:7, 15:20, 16:5,
18:19, 19:1, 19:4,
19:18, 20:22,
21:1, 21:3, 21:6,
21:8, 21:15,
21:24, 22:3, 22:5,
22:13, 23:5, 23:8,
24:4, 24:15,
certainly 22:17,
27:18, 28:20,
29:10, 29:17,
30:17, 30:19,
35:24, 40:22,
41:16, 42:3,
42:18, 60:21,
61:1, 61:6, 62:2,
66:21, 79:10,
93:7, 108:1,
108:15, 110:3,
111:1, 111:19,
171:5, 184:21,
185:1, 192:1,
206:6, 209:10,
216:10
cat 93:22
cause 23:16, 55:14,
56:9, 57:21,

101:9, 101:14,
101:21, 196:8,
198:6, 221:10,
221:19
caused 134:4
cc 191:5
CCSAO 62:20,
70:20, 72:19,
73:21, 75:4,
75:13, 77:2,
83:15, 84:5,
85:21, 87:23,
88:3, 88:5, 89:8,
89:10, 107:12,
109:19, 115:18,
119:24, 121:12,
138:23, 140:3,
140:17, 150:8,
152:3, 169:9,
170:20, 172:6,
178:13, 187:21,
191:3, 192:9,
198:23, 204:22,
217:2
cell 122:7, 124:7
Center 2:18
certain 24:4, 64:10,
99:9, 149:17,
176:18, 176:23
certainly 22:17,
51:20, 154:19
certainty 60:5,
83:22, 93:19,
147:13, 166:11
certified 197:22
certify 221:8,
221:16, 221:25,
222:3
chain 120:4
chair 40:23, 40:24,
41:2, 41:8, 61:1,
114:20
challenge 195:16,
195:19
challenging 196:20
changed 44:11,
133:22, 158:9,
158:16, 165:24,

174:8, 218:7
characteristic 98:6
charge 23:18, 23:19,
55:3, 56:5, 57:23,
58:24, 63:23,
116:15, 119:16,
177:16
charged 21:11,
39:18, 91:9,
91:12, 112:7,
163:18, 178:2
charges 21:16,
21:18, 21:19,
22:13, 23:1,
39:20, 39:23,
53:13, 54:23,
55:6, 55:9, 55:22,
56:11, 56:19,
59:23, 61:13,
65:5, 65:11,
66:15, 67:18,
68:20, 90:15,
98:19, 97:17,
103:9, 103:24,
111:14, 112:1,
112:16, 112:21,
112:22, 113:1,
113:14, 114:15,
114:18, 114:20,
115:5, 116:13,
117:6, 133:7,
144:8, 144:12,
144:22, 146:1,
145:6, 145:7,
163:1, 163:16,
163:19, 177:26,
178:6, 178:23,
187:13, 189:21,
190:18
charging 177:15,
180:7, 206:21
chart 203:24, 204:4
check 210:21, 213:7,
213:20

chemistry 14:17,
15:3
Chicago 1:23, 2:8,
2:21, 2:31, 3:9,
3:18, 10:6, 10:16,
10:19, 136:20,
195:3, 195:8
chief 6:3, 5
child 23:8, 23:11,
136:2
choose 62:6
chris 6:15
Christian 129:3,
131:13, 132:1,
149:22, 150:14,
150:19, 150:22,
150:24, 151:6,
151:10, 158:8
Christopher 2:27,
137:15
chronicled 44:7
chronicling 44:6
chronologically
100:11
Chuck 195:9,
195:12, 195:23,
196:24, 197:17
chunks 165:22,
165:23
circumstances
110:20, 111:23,
197:9
circumstantial
145:17, 154:18
circumstantially
87:20, 201:6
87:21
civil 1:17, 10:24,
11:7, 11:23, 13:8,
31:20, 31:23,
32:24, 33:3
CL 89:12, 89:13
claimed 164:12,
167:7, 197:23,
210:17, 213:8,
213:21
claiming 189:12
claims 153:2,
153:22, 189:20

contacting 133:1
contacts 132:5
contained 101:17,
164:14
containing 172:15
contains 100:12
Content 44:16,
46:15, 48:16,
53:4, 54:1, 63:12,
92:13, 103:10,
122:5, 122:21,
122:22, 147:18,
194:11
contents 24:8,
43:17, 43:20,
43:23, 44:3, 46:7,
47:8, 47:13,
51:17, 51:23,
71:9, 71:14,
75:18, 75:22,
75:23, 217:18
content 31:16,
31:17, 33:16,
84:17, 85:8, 86:5,
93:12, 124:11,
138:18, 129:23,
231:12
continue 22:20,
52:3, 143:20
continued 3:1, 4:10,
136:15, 138:5
continues 92:7,
122:9
Continuing 92:16
contradictory 87:20,
87:21
control 72:1
conversation 11:19,
11:10, 12:12,
12:14, 10:21,
43:14, 49:9,
49:21, 50:10,
50:19, 58:15,
59:1, 64:12,
64:15, 64:18,
68:14, 68:19,
68:22, 69:2, 81:9,
92:11, 102:8,

112:21, 111:23,
166:22, 175:13,
175:21, 181:16,
184:11, 210:24,
211:19, 214:16,
214:22, 215:17
conversations 14:6,
47:19, 47:23,
48:2, 48:16,
48:18, 48:20,
48:21, 48:23,
49:1, 49:20,
50:7, 51:3, 51:6,
52:24, 53:3,
53:11, 53:19,
54:16, 55:3,
55:17, 57:24,
64:5, 66:7, 66:15,
69:18, 73:16,
82:18, 92:10,
199:4, 203:15
conviction 31:16,
31:17, 33:16,
84:18, 100:17,
111:18, 142:2,
143:15, 151:13,
175:23, 176:4
conveyed 167:1
convict 162:16,
142:3
conviction 142:21
Cook 2:15, 2:24,
6:13, 2:23, 2:35,
2:29, 20:15, 21:4,
21:9, 22:23, 24:16,
24:20, 25:4, 25:8,
26:8, 26:13,
26:15, 26:19,
28:11, 29:15,
29:19, 30:12,
35:19, 35:21,
37:14, 38:19,
42:3, 42:5, 58:15,
63:7, 81:15,
86:22, 89:16,
91:16, 103:20,
104:3, 106:5,
106:18, 113:18,
120:16, 120:23,

234:4, 123:10,
123:20, 125:19,

112:24, 114:11,
118:21, 137:9,
137:12, 174:24,
184:20, 193:15,
219:2
cookie 172:15
copied 123:6
copies 108:14
copy 67:16, 67:17,
71:6, 74:12, 75:6,
77:9, 98:20,
107:23, 108:3,
115:24, 116:4,
120:7, 126:12,
126:20, 128:22,
130:13, 152:8,
169:17, 188:5,
191:8, 192:13,
193:4, 203:15,
219:12, 220:12,
193:17, 196:2,
187:23, 191:6,
192:1, 192:12,
193:17, 194:21,
197:8
corner 83:23, 90:8,
107:20
corporation 15:8
Correct 19:10,
23:21, 28:13,
28:14, 42:14,
44:22, 45:2,
46:15, 48:12,
52:9, 55:23, 56:5,
59:24, 60:1, 62:5,
63:24, 68:23,
74:2, 75:11,
75:15, 76:5,
77:14, 78:20,
91:17, 95:19,
95:22, 98:1, 96:5,
98:6, 99:16,
102:4, 102:9,
102:14, 107:21,
108:9, 108:12,
111:16, 112:22,
113:19, 118:18,
120:16, 120:23,
123:4, 123:10,
123:20, 125:19,

125:23, 129:4,
130:4, 130:9,
134:8, 134:18,
134:21, 138:12,
139:2, 142:6,
143:24, 149:1,
149:24, 153:11,
150:12, 151:18,
152:6, 154:16,
156:4, 156:9,
157:2, 160:4,
161:1, 165:11,
173:8, 173:13,
173:17, 174:3,
179:3, 179:21,
180:15, 180:18,
180:19, 183:15,
183:18, 185:19,
187:23, 191:6,
192:11, 193:21,
193:17, 194:21,
197:8
correction 220:24,
220:26
correspond 127:4,
130:11
corresponded 135:6
corresponds 130:21
Corrupt 16:19, 91:6
corruption 21:1,
90:20, 91:14,
92:2, 184:22,
184:21, 184:24,
185:6
counsel 8:11, 36:2,
41:19, 41:20,
191:22, 221:24,
222:3
Count 220:18
Counts 86:2, 86:3,
87:4, 87:9, 117:9,

232

123:24
County 1:21, 2:15, 2:24, 6:13, 18:7, 18:9, 18:14, 18:20, 19:2, 19:5, 19:7, 20:3, 20:5, 20:10, 20:15, 21:4, 21:9, 22:3, 24:16, 24:20, 25:5, 25:9, 26:9, 26:13, 26:15, 26:19, 28:11, 29:15, 29:20, 30:12, 36:19, 35:21, 37:14, 38:19, 42:3, 42:5, 56:15, 63:7, 81:15, 86:22, 89:16, 91:16, 103:20, 104:3, 106:5, 106:8, 106:16, 108:23, 109:11, 110:21, 112:10, 113:24, 114:11, 118:22, 137:9, 137:12, 175:1, 184:20, 193:16, 219:2, 221:3, 221:7, 222:16
couple 2:8, 194:24
course 52:1, 166:3, 172:8, 201:9
Court 1:1, 7:9, 16:11, 40:9, 40:10, 40:11, 44:17, 44:19, 48:24, 60:13, 66:21, 67:8, 67:20, 78:17, 78:22, 79:24, 80:3, 81:2, 84:8, 86:1, 86:7, 90:22, 91:5, 91:15, 92:8, 92:19, 92:23, 94:6, 97:1, 97:5, 97:14, 97:23,

99:12, 100:12, 107:2, 107:3, 108:11, 136:1, 140:10, 141:3, 171:17, 184:8, 220:1, 221:11
courtroom 67:8, 85:13
Courts 1:18, 21:4
cover 69:10
covered 17:15
created 142:1
credibility 136:13
credible 152:24, 153:10
credit 100:11, 163:4, 163:9, 163:14
crime 16:18, 19:1, 59:1, 66:3, 69:6, 69:10, 62:24, 91:10, 102:5, 105:6, 106:16, 108:23, 133:5, 133:8, 133:10, 133:11, 133:14, 133:19, 144:1, 184:24, 216:4, 216:9
crimes 20:13, 20:23, 112:8, 152:19, 178:1, 185:10, 216:3
criminal 10:23, 11:8, 11:22, 12:2, 13:7, 19:22, 23:23, 24:15, 29:16, 39:18, 40:2, 40:22, 42:2, 48:12, 49:5, 49:7, 53:4, 54:23, 55:22, 60:21, 62:2, 64:15, 64:20, 65:2, 66:10, 78:18, 79:10, 106:1, 109:13, 106:14, 108:22, 112:13, 126:19, 134:5, 182:10, 185:23,

185:24, 208:7
critical 44:22, 45:1, 45:9, 45:14, 103:11
criticisms 46:18, 46:20
CRR 1:19, 221:5
CS 161:24, 162:13, 192:18
cs@probelle.net 187:22, 188:1
CSR 1:19, 221:5, 222:17
CURRAN 1:19, 221:5
current 29:4, 167:11
currently 29:2, 29:10
custody 113:16
custom 110:3
customer 76:2
customs 109:20
cwunder@lpglaw.com 2:3
cyber 19:1, 19:4, 20:3:6, 205:11, 205:16, 205:23, 206:5, 216:3, 216:4, 216:9

<D>
Daddy 72:22, 74:13, 74:16
Daley 2:18
Dame 14:19, 14:24, 15:14, 16:15
dangerous 111:4
Daniel 152:5, 152:9, 152:13, 168:23, 168:24, 169:10, 169:13, 169:16
data 90:18, 129:21, 130:1, 133:23, 148:11, 172:13, 173:12
date 44:17, 67:13, 71:24, 78:23, 83:23, 84:7, 182:10, 185:23,

13:10, 14:13, 29:23, 45:22, 46:1, 46:6, 56:18, 66:2, 114:12, 143:1, 151:3, 168:24, 190:4, 198:14, 199:14
daughter 180:15, 195:20, 196:21, 197:10
day 12:13, 32:5, 80:5, 215:15, 220:24, 221:8, 222:8
days 123:9, 188:17, 194:24
deal 94:1
Dean 27:6
Dear 150:19
death 195:21, 197:9
decided 16:7, 55:9, 56:11, 55:22, 111:14, 112:20, 113:14, 142:16
decipher 129:21
decision 41:22, 60:16, 61:6, 61:11,

20:13, 20:23, 61:24, 136:3, 220:3, 221:12
divorce 196:19
dneal@salf.org 130:9
dninfo@anrwotawil.com 33:23
doctor 36:16
document 62:13, 70:13, 72:8, 73:8, 74:4, 74:20, 75:22, 76:19, 78:6, 83:8, 89:1, 89:23, 92:15, 93:4, 93:15, 98:10, 102:8, 104:14, 105:8, 107:6, 108:5, 108:12, 109:23, 110:7, 110:8, 115:7, 119:17, 121:6, 128:7, 131:16, 139:16, 132:21, 140:14, 145:11, 146:11, 149:1, 149:4, 149:9, 174:18, 180:10, 195:23,
documents 8:19, 8:22, 8:23, 9:1, 74:16, 76:16, 77:3, 78:11, 160:22, 173:6, 196:18, 196:19, 197:1
Doe 77:19, 177:20
dog 92:22, 93:2, 93:6, 93:17
doing 16:1, 96:15,

20:13, 20:23, 61:24, 136:3, 220:3, 221:12
domain 129:20
Domains 72:22, 72:24, 77:4, 77:10, 77:23, 78:10
done 16:16, 26:4, 51:9, 57:13, 95:21, 95:24, 96:7, 96:9, 96:13, 118:13, 119:4, 119:9, 148:3, 149:1, 149:4, 149:9, 174:18, 174:9
donor 90:18, 117:13, 174:9
door 158:24
dot 122:14, 129:12
down 69:14, 88:10, 88:11, 130:18, 148:23, 152:20, 155:10, 159:5, 165:16, 165:17, 172:14, 199:9, 201:7, 201:11, 201:13, 201:19, 215:19

<E>
e-mailed 31:19, 32:23
earlier 24:3, 28:10, 30:9, 32:7, 41:14, 59:10, 61:18, 63:10, 95:16, 96:18, 97:21, 118:17, 120:19, 123:9, 133:24, 164:1, 168:23, 170:3, 173:1, 206:13
eavesdropping 24:19, 39:19, 40:24, 41:11, 42:17, 48:17,

23:24
deposition 1:15, 4:13, 5:2, 8:17,

derived 128:1
describe 39:24, 40:16, 40:21, 44:3, 44:15, 61:24, 79:24
described 91:14, 215:11
description 73:12, 215:11
desperate 199:12
destroyed 203:1
detail 114:13, 118:7
detailed 44:18, 118:8
detailing 90:20
details 9:21, 11:22, 124, 80:7, 126:10, 151:12, 232:14
detainer 109:21
detainers 110:3
Detective 86:3, 87:10, 153:15, 153:16, 157:8, 161:4, 161:5, 163:3, 167:12, 168:17, 168:19, 207:15, 207:20, 207:23, 208:1, 209:5, 209:14, 210:9, 211:5, 212:2, 213:2, 213:21, 213:24, 214:16, 214:23, 215:8, 215:11, 215:14
determination 154:24, 155:2
determine 53:24, 67:4, 67:21, 131:15, 147:2, 159:2, 169:13, 173:11, 208:23
determined 23:4
determining 22:13
device 164:16
Dime 186:5, 186:11, 186:14
died 195:20, 196:12
Different 9:12, 26:1,

103:1, 112:8, 112:13, 118:8, 125:22, 130:8, 160:16, 192:19, 196:13, 208:14, 20:15
digital 133:4, 133:5, 133:7, 133:11, 33:14, 33:18
Dillon 33:5, 33:7, 33:11, 33:14, 33:18
Dime 3:14, 6:17, 137:26
direct 17:19, 157:13, 20:7:3
directed 76:13, 77:4, 181:13, 184:13
direction 23:9, 41:6, 60:24, 61:2
directions 108:10
directly 149:12
disagree 62:7
disappeared 188:14, 188:15
disappointed 143:1, 143:22, 144:24, 181:18, 181:23
disciplined 26:11
disconnected 153:2, 153:17, 154:2, 155:9, 156:12, 157:20
disconnection 154:24, 155:2
discontinued 154:15
discover 147:4
discovered 44:13, 44:14, 45:7, 128:5, 172:16
discovering 188:16
discovery 22:21, 40:13, 40:15
discretion 55:22, 79:24, 56:6
discuss 9:6, 10:8, 10:23, 11:7, 11:10, 11:21, 12:1, 13:6,

49:6, 49:7, 50:13, 51:6, 60:22, 61:13, 61:20, 63:23, 66:16, 67:18, 68:20, 69:14, 69:23, 70:4, 76:10, 93:19, 97:16, 101:11, 101:22, 108:8, 111:14, 111:20, 112:2, 112:15, 112:21, 113:24, 113:18, 113:3, 116:10, 116:12, 132:17, 132:20, 138:10, 139:2, 139:6, 139:17, 141:21, 142:5, 143:2, 144:8, 144:12, 144:14, 144:18, 144:22, 145:1
education 14:12
14:14, 29:12
effort 44:18
efforts 131:3
eight 117:10, 145:13
either 61:8, 68:13, 105:24, 145:3, 202:24
elect 112:20
elected 112:2, 112:16
election 111:21, 112:3, 112:6, 112:12, 113:3, 113:7, 114:22, 132:16, 132:19
electronic 113:19
element 65:16
Elkhart 18:7, 18:8, 18:14, 18:20, 192:19, 194:19, 197, 54:20, 76:14, 117:24, 118:4, 120:4, 120:7, 120:11, 120:19,

49:6, 49:7, 50:13, 120:20, 120:21, 120:24, 121:2, 121:18, 121:22, 122:10, 122:18, 122:22, 123:2, 123:6, 123:24, 124:12, 125:11, 125:17, 125:22, 126:3, 126:7, 126:8, 126:13, 129:2, 129:11, 129:16, 130:2, 130:6, 130:9, 130:19, 130:21, 131:8, 132:1, 132:8, 132:18, 133:21, 135:2, 135:6, 140:18, 144:9, 144:14, 144:18, 146:5, 146:8, 146:16, 146:20, 147:15, 148:2, 149:1, 150:9, 150:14, 150:18, 152:15, 152:22, 152:9, 158:8, 159:22, 159:24, 160:4, 160:16, 160:4, 160:13, 160:14, 160:18, 160:19, 160:7, 161:10, 162:1, 162:2, 162:4, 162:12, 162:16, 163:3, 163:13, 169:18, 172:3, 173:21, 173:23, 173:24, 173:7, 176:6, 179:20, 180:4, 180:9, 181:22, 186:6, 188:2, 188:9, 189:10, 189:17, 189:19, 189:24, 190:9, 191:4, 191:9, 191:13,

191:17, 192:10, 192:14, 192:17, 192:19, 193:16, 193:7, 193:16, 193:24, 194:1, 194:6, 198:14, 198:15, 198:16, 198:21, 198:23, 199:1, 199:3, 200:21, 200:22, 203:16, 203:23, 204:5, 204:23, 205:1, 205:4, 205:9, 205:13, 206:7, 206:9, 207:10, 210:16, 210:21, 213:6, 213:7, 213:18, 217:22, 218:7, 218:13, 218:15, 218:16
emails 36:10, 36:12, 120:20, 145:15, 146:11, 152:4, 152:9, 168:8, 168:13, 168:18, 179:5, 179:13, 185:18, 188:14, 188:17, 189:2, 189:20, 207:6, 207:9, 207:10, 207:22, 210:24, 211:7, 211:12, 211:19, 211:24, 212:4, 213:8, 213:21, 217:5, 218:14
employed 29:2, 35:21
employee 58:8, 58:9, 58:15, 58:2, 90:16, 102:22, 103:3, 158:8
Ernie 47:5

211:2, 211:21, 212:3, 213:9, 213:22
employees 82:12, 125:13, 133:2, 149:17, 149:22, 202:7
employment 15:7, 15:9, 18:4, 19:12, 20:2, 26:18, 29:4, 29:7, 57:21, 61:24
en 85:23
encounters 44:19
end 37:23, 95:21, 167:5, 191:14, 191:13, 193:7, 194:8, 198:9, 202:1
ended 147:6, 181:9
enforcement 22:10, 33:9, 34:10, 34:24, 42:12, 44:21, 46:11, 46:19, 91:14, 82:1, 82:3, 103:11, 109:21, 110:3, 126:3, 126:12, 134:4, 134:8, 148:3
engage 44:2, 66:9
engaged 23:13, 63:21
enough 92:23, 94:5
entail 20:18
entered 37:9, 78:15, 90:16, 99:13, 107:24, 108:17
embedded 120:19, 121:18, 122:2, 162:4
entertain 20:14, 30:11, 123:11, 143:5
entity 160:2
entries 73:13, 160:19
entry 71:24, 84:6, 84:12, 88:4, 88:6, 100:12, 133:5, 164:10
Ernie 47:5

233

234

235

236

**Page 237**

Erratic 97:22, 97;24, 99:3
erratically 80:7, 80:8
erroneously 215:16
error 67:5, 164:15
Especially 93:21
essential 133:7, 133:17
essentially 129:16
Essono 100:10, 100:23
et 11, 136:11, 220:11, 221:14
evaluate 53:17
evaluation 78:20, 79:3, 78:6, 85:23
evaluations 79:9
event 65:17, 214:10
events 44:7
everybody 217:13
everyone 6:10
Everything 18:22, 155:12, 216:15
evictions 16:12
evidence 21:23, 23:2, 23:4, 23:14, 48:10, 57:20, 64:20, 65:21, 65:22, 65:24, 66:3, 96:8, 97:16, 101:8, 101:13, 117:19, 118:2, 118:8, 125:4, 145:9, 145:17, 146:12, 146:15, 148:14, 149:12, 151:17, 154:18, 162:16, 162:18, 163:24, 164:18, 167:24, 169:1, 174:18, 177:11, 177:21, 177:24, 178:24, 182:8, 182:11, 183:22, 189:6, 189:15, 200:14
Evidently 178:3
evolved 45:4

exact 20:20
exactly 43:3, 59:14, 145:9, 193:2
EXAMINATION 4:7, 4:10, 6:5, 36:22, 79:14, 79:17, 79:21, 138:5, 172:9, 173:16, 175:15, 176:10, 180:10, 214:10
examined 6:4, 138:3
example 61:12, 127:9, 165:22
examples 56:7
except 192:16
exception 40:12, 66:16
exchange 36:10, 169:18
exchanged 35:8
exchanging 185:18, 207:22
exclamation 193:10
Exculpatory 182:8, 182:11, 183:2
excuse 211:3, 211:22, 214:20
executed 70:12
exemption 64:14, 64:23, 65:1, 66:6, 65:10, 66:19, 102:7, 102:13
exemptions 64:11
exercise 56:19
exercises 56:14
Exhibit 62:14, 62:22, 70:14, 70:19, 71:19, 72:9, 72:12, 72:18, 73:12, 73:20, 74:5, 74:10, 74:12, 74:21, 75:3, 76:2, 76:17, 76:20, 77:1, 77:2, 77:18, 78:6, 83:9, 83:14, 83:17, 83:19, 84:4, 85:3, 85:20,

87:22, 88:3, 88:2, 89:7, 89:9, 89:10, 89:19, 90:4, 90:13, 92:7, 98:11, 98:16, 98:18, 104:3, 104:20, 105:9, 105:14, 105:16, 105:19, 107:7, 107:12, 107:13, 107:17, 108:5, 109:14, 109:19, 109:24, 115:8, 115:13, 115:15, 115:19, 115:24, 119:18, 119:23, 120:1, 120:3, 120:18, 121:7, 121:12, 121:18, 121:16, 122:10, 123:7, 124:5, 125:17, 128:8, 128:13, 128:15, 128:19, 130:1, 134:1, 138:17, 138:22, 138:24, 139:22, 140:3, 140:6, 140:8, 140:21, 140:24, 141:1, 142:1, 146:2, 146:7, 146:9, 147:17, 148:1, 150:2, 150:7, 150:19, 151:1, 151:9, 151:21, 152:3, 152:4, 153:20, 155:6, 156:17, 156:22, 156:24, 157:8, 157:11, 158:1, 161:13, 161:18, 161:20, 161:23, 162:12, 166:22, 164:8, 167:5, 168:7, 169:4, 169:9, 170:15, 170:20,

170:22, 171:12, 171:18, 171:21, 172:1, 172:2, 172:5, 172:12, 172:24, 173:19, 178:7, 178:11, 178:12, 178:14, 178:16, 178:19, 182:19, 183:24, 187:16, 187:20, 193:22, 191:3, 192:4, 192:9, 192:10, 194:11, 194:16, 194:21, 194:23, 195:1, 198:3, 198:18, 198:22, 201:4, 203:9, 203:14, 204:16, 204:21, 207:3, 209:20, 210:1, 211:5, 212:11, 212:16, 213:16, 216:19, 216:24, 217:1, 222:12
EXHIBITS 4:13, 5:2
existed 23:16, 43:6
expect 23:14
experience 56:8, 172:2, 216:9
experienced 27:19
expertise 205:10
experts 205:22
explain 10:2
explained 165:20, 169:4
exposed 198:3
Express 163:2
expressed 178:23
expressing 177:19
extensive 11:19, 165:16
extraordinary 140:19
extremely 44:22, 70:1
eye 193:8, 193:21

237

**Page 238**

<F>
fabricated 209:7
face 49:20
fact 38:4, 87:20, 103:23, 112:15, 114:19, 125:9, 152:14, 161:3, 163:15, 192:17, 193:15, 198:2, 230:6
factor 68:23
factors 112:11
facts 189:14, 200:14
factual 96:19, 117:6
fair 7:14, 7:24, 20:24, 21:5, 21:7, 44:20, 44:24, 45:12, 46:19, 151:9, 151:15, 212:4
fairly 45:1, 45:9,
Fall 26:24, 27:11, 28:13
fallaciously 215:16
falsification 69:11
familiar 133:8, 182:3
families 31:14
Family 11:20, 26:17, 29:1
far 53:11, 83:23, 125:18, 130:2, 130:22, 131:9, 230:6
farther 88:5, 88:11
February 162:19, 190:16
Federal 1:16, 22:6, 81:1, 81:4, 81:12, 81:14, 81:24, 82:3, 82:15, 82:9, 19 163:7
feeling 192:1
feelings 40:20
feels 162:16
fellow 15:12

felonies 18:23
felony 101:10
few 24:23, 123:9, 129:6, 130:9, 167:4, 174:10, 196:13, 205:1
fibbing 155:14, 155:17, 155:19
figure 148:20
file 92:11, 105:5, 109:1, 119:13, 119:15, 128:20, 128:23, 145:12, 146:21, 146:22, 159:18, 172:12, 172:15, 172:17, 189:23
filed 77:6
Files 124:21, 162:6, 162:8, 173:12, 174:2, 174:5, 174:7, 174:9, 203:2
filing 108:12
Final 61:6, 94:4, 216:23
finances 193:1
financial 20:13, 20:23, 174:2, 184:19, 184:24, 186:9, 196:16, 202:7
find 46:10, 53:6, 99:3, 186:1, 199:20
findings 151:4, 151:7
finer 174:7
finish 7:12, 7:13, 8:4, 20:6
fired 29:20, 193:5
First 6:3, 7:9, 14:13, 15:10, 18:4, 25:13, 25:15, 25:23, 30:21, 32:8, 39:7, 39:20, 41:8, 42:24, 43:4, 43:23, 44:12,

44:14, 45:7, 50:15, 61:1, 71:24, 73:21, 75:10, 77:18, 84:15, 84:18, 84:23, 90:13, 93:1, 93:15, 107:3, 112:9, 113:4, 113:8, 113:9, 113:14, 121:18, 121:21, 123:21, 128:5, 152:23, 155:6, 157:15, 195:7, 195:22, 196:13, 220:15, 221:17
Fisher 100:9, 100:22
fit 147:7
fitness 36:21
five 22:22, 23:5, 137:17, 138:13
fix 122:8, 124:7, 125:4
flight 32:4, 111:6
floor 40:14
focus 62:10, 127:14, 127:19, 134:4, 164:2, 164:5
focused 69:22, 184:21
focuses 184:22, 184:23
FOIA 192:24
Follow 193:9, 193:21, 194:2
followed 183:17
following 106:23, 108:11, 129:19, 194:12
follows 6:4, 86:6, 92:8, 138:4, 174:15, 174:22
format 89:16
former 90:16
formerly 32:8
forth 155:5
forward 112:4, 112:16, 112:18,

forensic 47:16, 48:5, 51:8, 51:10, 51:18, 52:2, 52:8, 52:11, 60:6, 60:9, 95:24, 96:7, 96:13, 96:15, 118:7, 118:10, 119:10, 124:23, 128:1, 145:13, 151:17, 155:11, 159:21, 170:5, 170:10, 171:2, 171:6, 171:21, 172:24, 173:2, 173:4, 173:19, 175:15, 176:10, 178:24, 180:10, 214:10
forensically 47:8, 47:12, 95:17, 133:13
forensics 174:17, 174:24, 175:6, 175:12, 176:1, 176:6
forgery 69:6, 69:7, 69:8
forget 117:21
Form 35:9, 68:10, 123:11, 123:18, 175:18, 176:24, 181:21, 189:14, 189:22, 189:23, 201:14, 205:18, 208:19, 212:7, 214:4, 214:8, 218:18
formal 59:16
formally 26:12, 41:18
format 89:16
former 90:16
formerly 32:8
forth 155:5
forward 112:4, 112:16, 112:18,

238

**Page 239**

141:10, 147:12, 179:8, 188:19
forwarded 120:6, 120:8, 120:11, 120:20, 121:3, 121:23, 122:11, 123:3, 126:3, 126:7, 126:8, 126:13, 126:21, 168:12, 173:20, 179:19, 207:9, 211:1, 211:20, 212:3, 213:8, 213:21, 214:12, 218:14
forwarding 160:1, 179:5, 179:13, 202:21, 211:6, 213:12, 214:2
forwards 160:17
found 122:6, 122:22, 124:6, 135:10, 144:16, 147:14, 193:2, 199:10, 204:2, 204:13
Foundation 117:11, 117:12, 125:8, 125:14, 126:2, 132:6, 132:10, 134:17, 134:24, 148:10, 148:15, 149:16, 154:1, 158:15, 159:21, 159:24, 160:13, 168:3, 193:1, 195:3, 195:11, 197:2, 197:19, 198:4, 198:5, 200:13, 200:22, 201:14, 202:6, 203:1, 217:7, 217:12, 217:14, 217:17, 218:3
founder 125:11, 146:16, 162:17
four 167:10, 189:10
frame 132:13

fraud 47:4, 163:14, 185:2, 185:6, 196:16
frauds 185:4
free 92:2
French 3:12, 6:19, 35:12, 35:14, 35:15, 35:18, 36:5, 36:8, 36:11, 41:14, 42:1, 47:7, 47:12, 59:11, 59:14, 69:21, 69:23, 70:3, 79:13, 114:21, 115:1, 116:23, 137:20, 137:23, 152:19, 170:8, 185:21, 202:7, 216:8
frequency 52:15
frequented 135:7
frequently 31:14
Friday 32:6
friend 186:4
friendly 10:4
friends 10:14
front 64:22, 119:13
full 26:18, 73:21, 77:18, 207:5
full-time 15:7, 15:9, 15:12, 18:4, 19:11, 20:2, 20:20
fully 57:1, 57:3, 57:11
fund 167
funny 93:3, 93:20, 93:21

<G>
G-u-n-n-i-g-l-e 7:3
gain 69:8
gaining 204:1, 204:9
gaps 27:1
garage 193:3
Garcia 9:13, 12:9, 12:23, 13:4, 13:8,

13:14, 13:23, 14:2, 30:4, 32:7, 71:12, 71:15, 73:5, 75:21, 145:9, 153:4,
General 3:3, 3:6, 3:7, 7:8, 14:11, 24:8, 34:1, 35:16, 36:1, 44:16, 51:23, 79:23, 90:21, 91:5, 91:15, 98:6, 122:21, 137:20, 137:23, 152:19, 170:8, 185:21, 202:7, 216:8, 137:16
generalities 117:9
Generally 24:5, 60:24, 62:11, 64:24, 78:2, 89:15, 105:2, 106:13, 110:2, 112:12, 127:3, 159:17, 175:24, 177:17, 183:21
generate 84:1
generated 51:19, 129:22, 130:1
gets 112:9, 151:1
getting 143:16
gift 38:8, 38:12
gigantic 205:10
give 7:16, 8:8, 38:8, 61:2, 95:5
given 145:12, 188:20, 220:22, 221:20
giving 183:8
goddaddy.com 72:14, 73:3
Golden 25:12, 26:2
good 155:14
Goudie 195:9, 195:12, 195:24, 196:24, 197:17
Gournis 2:28, 137:16

government 58:7, 58:8, 58:10, 58:15, 58:16, 58:23, 59:2, 102:22, 200:3, 200:11
graduated 14:16, 14:18
graduating 14:15
graduation 18:10
Grand 67:16, 77:2, 77:23, 78:4, 78:11, 87:18, 116:7, 116:11, 116:15, 138:9, 138:12, 139:18, 175:2, 209:11, 209:16, 210:4, 210:9, 211:4, 212:23, 212:12, 213:3, 213:10
granted 103:1
great 7:13
greater 114:12, 73:1
ground 7:8
grounds 144:15
growing 205:11, 205:16
guess 30:19, 52:17
guiding 54:20
guilt 57:2
GUNNIGLE 1:15, 4:5, 4:13, 5:2, 6:2, 6:11, 7:1, 7:5, 8:7, 14:10, 28:8, 29:6, 37:2, 42:21, 62:15, 62:18, 62:21, 70:15, 70:18, 70:21, 74:6, 74:9, 74:22, 75:2, 75:5, 76:21, 76:24, 80:12, 83:10, 83:13, 83:16, 89:6, 95:16, 97:22, 98:12, 98:15, 104:16, 104:19

239

**Page 240**

105:10, 105:13, 105:20, 107:8, 107:14, 109:15, 109:18, 115:9, 115:12, 119:19, 119:22, 121:6, 121:14, 128:9, 128:12, 128:16, 136:15, 138:1, 138:18, 139:23, 140:5, 140:20, 146:3, 146:6, 150:3, 151:22, 156:18, 161:14, 161:17, 161:21, 169:5, 170:16, 170:23, 171:13, 175:8, 178:8, 178:17, 187:17, 190:23, 192:5, 194:17, 198:19, 204:17, 203:22, 212:12, 216:2, 216:20, 217:4, 219:4, 220:3, 221:9, 221:17

<H>
had 58:8, 184:17, 215:24
half 23:11, 24:10, 30:20, 32:14, 99:17, 97:14, 122:6
halfway 152:23, 199:9
hand 138:21, 171:16, 216:23, 222:8
handing 70:18, 74:9, 75:2, 76:24, 83:13, 88:6, 104:19, 107:11, 109:18, 111:20, 119:22, 121:11, 128:12, 140:2,

146:6, 152:2, 156:21, 161:17, 169:8, 170:19, 178:11, 187:20, 191:2, 192:8, 194:20, 198:22, 204:20, 208:24, 212:15
handling 16:12, 72:10
handoff 147:23
handwriting 71:18, 90:1, 90:7, 90:10, 99:1, 99:7, 107:16, 110:7, 110:10, 115:18, 140:13
handwritten 90:1, 90:2, 110:6
happen 51:22
happened 108:18, 151:3, 214:9
Haopani 169:1, 169:23, 170:1
hard 119:14
head 7:16, 18:18, 92:21, 93:2, 93:5, 93:16, 117:12, 117:24, 118:4
headed 32:1
header 120:24, 129:18, 130:15
headers 128:1, 129:11, 216:15
hear 39:7, 144:11
heard 33:13, 93:5, 93:16
hearing 67:1, 67:21, 80:6, 109:5, 110:13, 111:11, 140:18
Hehner 63:1, 63:3, 63:7
Heights 175:4
help 11:15, 39:8, 39:13, 41:23, 117:17, 124:22, 125:3, 191:15, 199:13
helpful 133:23,

176:11
hereby 221:7
herein 6:3, 101:8, 138:2
heretofore 221:8
herself 79:8, 108:4, 179:8, 179:13, 186:4, 202:22
hesitancy 113:1
high 14:15
high-tech 152:18
hired 27:4, 148:10
history 14:12, 15:6, 15:9
hold 111:15
holdout 142:20, 142:23
holds 91:8
hole 154:13, 154:19, 165:5, 168:2, 185:11, 193:13, 193:13
Honorine 100:9
hope 92:22, 94:5
hoping 156:10
host 72:22, 73:2, 73:6, 159:7
hosts 160:16
hour 1:24, 13:24
hours 9:4, 20:19, 20:20, 172:18
house 166:13
housed 103:20
hrs 162:23
HSP 192:6, 159:20, 159:23, 160:2, 160:24, 161:5, 161:6, 162:4, 162:5
hung 142:8, 142:12, 143:4, 143:7, 143:12, 143:16, 143:18, 143:23
hyperlink 194:11, 194:12

<I>
ID 4:13, 5:2
idea 58:14, 91:21, 127:17, 131:14, 142:15, 144:4, 152:14, 153:24, 155:18, 159:15, 169:16, 170:2, 194:2, 194:4, 198:11, 198:13, 206:1, 206:3
identification 62:16, 70:16, 74:7, 74:23, 76:22, 83:11, 89:4, 98:13, 104:17, 105:11, 107:9, 109:16, 115:10, 119:20, 121:9, 128:10, 139:19, 130:4, 134:22, 150:4, 151:23, 156:19, 161:15, 169:6, 170:17, 171:14, 178:9, 187:18, 193:24, 192:6, 194:18, 198:20, 204:18, 208:22, 212:13, 216:21
identified 73:6
identify 72:23, 73:2, 133:13
II 123:24
III 123:22
IL 204:2
ILCS 101:12
illegally 53:18, 64:11
Illinois 1:2, 1:21, 1:23, 2:8, 2:15, 2:21, 2:31, 3:4, 3:9, 3:18, 19:14, 49:9, 69:7, 136:2, 136:20, 137:9, 137:21, 144:15, 152:19, 163:1, 170:7, 183:7, 183:14, 221:6

240

204:9, 220:2,
221:1, 221:7,
221:12, 222:16
**illinoiscorruption.ne**
t 8:24, 45:2, 45:8,
50:17, 52:4,
52:19, 52:22,
54:2, 63:11, 64:7,
70:7, 72:15,
72:21, 73:13,
73:17, 76:13,
77:3, 77:11, 78:8,
80:18, 80:23,
82:13, 82:20,
84:21, 84:24,
87:3, 87:8, 88:18,
95:17, 100:14,
139:13, 201:11
**image** 217:6, 217:22
**imagine** 121:24
**immediately** 145:18
**immigration** 109:20,
110:2
**implied** 52:16
**important** 113:5,
131:12, 160:12,
179:6, 179:15,
206:15
**impression** 185:21
**improperly** 134:9,
163:5, 174:1
**inaccuracy** 66:20
**inaccurate** 69:5
**inappropriate** 200:1,
200:9, 200:19
**inbox** 217:9, 217:23
**Inc.** 75:8, 77:10
**incarcerated** 103:17
**incident** 90:15
**included** 103:10,
123:2
**including** 12:23,
24:24, 130:8
**inclusive** 220:19
**incomplete** 164:14,
165:13
**inconsistencies**
155:21, 156:8

**inconsistent** 214:21,
215:6
**increased** 98:2
**incredibly** 103:11
**independent** 150:23,
152:14
**independently**
218:10
**Indiana** 18:7, 19:5,
19:14, 28:18
**indicate** 210:20,
210:23, 211:18
**indicated** 129:19
**indicates** 169:10,
189:24
**indicating** 208:12
**indication** 89:19,
163:13
**indict** 24:12
**indicted** 90:14,
138:1, 138:5
**indictment** 22:17,
22:19, 22:20,
23:20, 24:4, 24:5,
24:6, 24:9, 24:10,
24:14, 50:12,
96:1, 96:3, 99:9,
116:17, 118:24,
123:18, 123:24,
134:20, 134:22,
175:2
**individual** 27:12
**individuals** 130:16,
131:19, 132:5,
132:9
**influenced** 16:19
**info** 154:23
**information** 48:14,
70:6, 71:21,
72:13, 73:7, 74:1,
76:3, 76:7, 77:11,
78:7, 126:1,
142:22, 159:11,
164:23, 165:2,
168:10, 172:15,
173:6, 176:3,
190:6, 208:2,
218:9

**informed** 134:16,
153:16, 159:9,
163:1
**initial** 214:8
**Initially** 18:16, 44:10,
45:3, 45:6, 167:8,
214:19
**initials** 89:21, 89:22,
89:24, 90:5, 90:8
**initiate** 61:13, 104:7
**initiated** 9:22, 12:14,
12:20
**initiating** 108:22
**initiative** 203:5,
203:15
**injection** 17:19
**injury** 17:22
**innocuous** 102:21
**input** 190:7
**insofar** 164:20
**instance** 145:19
**instances** 130:23,
136:9
**Institute** 15:11,
15:16, 16:2
**instruct** 61:22, 161:5
**instructions** 61:1,
61:4, 95:5
**Insufficient** 21:23,
23:2
**insurance** 17:15
**intentional** 69:11
**interact** 32:15,
116:21, 116:24
**interacted** 133:22,
34:4, 34:18
**interacting** 80:3
**interaction** 23:15,
45:18, 57:8,
57:13, 77:19,
77:20, 100:8,
100:17, 100:19,
100:22, 101:2,
101:3, 117:19,
118:13, 119:4,
119:7, 121:19,
127:15, 127:24,
156:14, 163:8,
163:11, 164:2,

222:5
**Interlink** 203:20,
203:21
**intern** 18:16
**International** 16:23
**internet** 126:24,
165:5, 167:9,
167:20
**intervened** 189:7
**interviewing** 62:12,
155:21
**intimidating** 80:14
**intimidation** 83:1
**introduce** 6:10
**introduced** 51:12,
148:14
**intruded** 124:18
**intruder** 124:24
**intruding** 124:14
**intrusion** 117:23,
117:24, 123:8,
123:22, 124:1,
125:10, 134:17,
145:14, 153:18,
156:10, 156:12,
158:23, 159:3,
160:1, 167:17,
175:5, 175:16,
189:11
**intrusions** 159:12,
163:23
**invasion** 103:7
**investigated** 57:1,
57:3, 57:12,
105:7, 202:6
**investigating** 85:17
**investigation** 23:15,
45:18, 57:8,
59:8:9, 196:12
**left** 28:10, 29:15,
32:6, 89:22, 90:7,
95:13, 99:4,
106:11, 113:24,
122:7, 124:7,
158:10, 217:7,
218:6

**legal** 15:12, 15:19,
15:20, 18:16,
24:11, 64:16,
183:3, 183:8,
183:11, 188:19,
199:22, 200:3,
200:11, 200:12,
200:17, 205:23
**legislators** 204:2,
204:5
**Lesiak** 34:1, 34:2,
34:5
**Less** 10:4, 20:20,
32:20, 142:13
**letter** 140:9, 141:7,
141:20
**lawfully** 180:5
**lawsuit** 30:6, 30:7,
33:17, 39:2
**leading** 180:6, 184:6
**leans** 192:15,
190:15
**Lasalle** 1:22, 2:6,
2:9, 136:18
**last** 7:2, 9:12, 75:13,
141:10, 180:24,
181:3, 195:22
**learned** 125:12,
134:24, 144:24,
163:6, 186:6,
196:1
**least** 47:6, 83:7,
108:15, 121:17,
132:23, 133:8,
147:6, 154:9,
155:13, 165:14,
187:1, 214:10
**Leave** 26:15, 27:1,
27:9, 28:19,
28:23, 109:1,
189:9, 196:12
**leaving** 26:19, 38:19
**Lefkow** 81:2, 81:21,
81:23
**letting** 85:23
**Levco** 86:13
**level** 18:22
**liar** 121:24
**library** 135:6
**License** 1:20, 28:18,
221:5
**licensed** 183:6,
183:14
**lie** 180:23
**lines** 153:17, 154:1,
157:20, 216:1
**link** 1:96:2, 196:4
**linked** 49:3, 49:5,
163:17, 194:10,
198:17
**links** 48:17
**Lisa** 3:3, 137:20
**listed** 115:18, 217:23
**listen** 48:18
**listened** 53:20
**listening** 49:19
**lists** 90:18, 117:13,
172:10, 174:9,
205:12
**litigation** 10:24,
11:8, 11:23, 13:8,
16:3, 26:7, 28:1,
30:1, 31:20,
31:23, 32:24, 33:3
**little** 11:13, 13:11,
28:17, 29:12,
48:19, 59:12,
59:21, 78:24,
80:4, 88:6, 88:11,
88:13, 129:15
**lived** 167:7

241        243

165:4, 164:7
**investigations** 216:4
**investigative** 196:9,
197:1, 198:2
**investigators** 22:4
**invoking** 88:20
**involve** 23:11, 185:2,
185:5
**involved** 13:1, 19:15,
23:22, 31:12,
33:8, 34:10,
34:24, 36:16,
41:15, 41:22,
42:2, 47:15,
47:22, 55:5,
55:16, 55:20,
60:4, 60:15,
60:20, 61:19,
66:6, 67:20,
70:22, 70:5, 71:3,
76:10, 80:14,
85:13, 94:14,
94:18, 95:8,
108:22, 108:22,
113:18, 113:18,
119:5, 119:6,
124:9, 125:5,
128:3, 147:11,
164:6, 180:6,
203:5, 205:15
**involvement** 23:10,
26:3, 34:13,
41:16, 57:17,
59:11, 59:17, 60:2,
70:8, 70:9, 80:13,
96:16, 116:6,
116:11, 118:15,
119:9, 138:9,
184:5
**involves** 69:8, 113:3,
147:19
**involving** 21:1, 21:3,
23:8, 47:4, 60:17,
61:5, 111:23,
120:5, 141:3,
171:5
**IP** 126:24, 127:3,
127:14, 127:18,

127:21, 127:23,
128:2, 128:5,
129:19, 130:19,
130:20, 131:3,
131:7, 134:2,
134:4, 134:11,
135:1, 135:5,
136:9, 147:21,
159:9, 160:23,
164:1, 164:4,
164:12, 164:17,
166:13, 165:18,
165:21, 165:23,
166:4, 167:16,
167:24, 168:1,
172:15, 172:16,
176:6, 167:16,
176:17, 176:18,
176:19, 176:22,
177:5, 177:9,
177:10
**irregularities** 220:8
**irrespective** 202:19
**irritant** 17:20
**irritating** 46:13
**ISP** 167:11
**issue** 16:6, 147:3,
147:8, 160:15,
163:14, 176:17,
176:22, 177:4,
177:9, 202:12
**issued** 67:13, 97:13,
103:18
**issues** 16:4, 16:10,
24:23, 25:18,
41:24, 60:17,
67:10, 117:17,
140:20, 198:3,
216:4
**items** 170:4
**itself** 75:11
**IV** 72:19

**January** 26:24,
27:11, 28:24, 29:8,
139:14, 213:10
**jobs** 15:6
**John** 25:10, 26:2,
77:19, 77:20,
182:14
**Join** 179:23, 200:5,
200:15, 200:23
**Joined** 30:22, 183:5
**joining** 6:19
**joint** 77:19, 177:20
**Joseph** 86:4, 86:17,
86:23, 87:5
**Journal** 16:23, 17:9,
17:12, 17:24, 18:1
**journalist** 198:3
**JRG** 90:8
**jschwartz@millersh**
akman.com 2:10
**Judge** 36:17, 43:12,
67:13, 74:14,
79:2, 81:2, 81:21,
81:23, 85:13,
85:15, 85:22,
88:7, 88:14,
88:21, 97:1, 97:5,
97:10, 99:13,
99:15, 102:3,
141:2, 141:6,
141:8, 201:6
**Julia** 2:3, 67, 137:3
**JULIE** 1:15, 4:5, 6:2,
7:1, 28:8, 29:6,
136:15, 138:1,
140:20, 175:8,
205:22, 220:15,
220:31, 221:9,
221:16
**July** 20:8, 28:11,
111:13, 180:14,
180:21, 184:4,
214:17, 215:12
**junior** 41:4, 193:2
**juries** 142:15,
142:17, 142:18,
143:24, 144:4
**Jury** 67:16, 77:2,

77:23, 78:4,
78:11, 87:18,
116:7, 116:11,
116:15, 138:9,
138:12, 139:18,
142:9, 142:12,
143:1, 143:4,
143:7, 143:9,
143:12, 143:17,
175:2, 209:11,
209:18, 210:4,
211:24, 212:1,
212:18, 212:22,
213:3, 213:10
**Justice** 15:11, 15:17,
16:2, 16:11
**juvenile** 18:18,
18:23, 18:24

**K** 1:5, 2:3, 3:26,
99:5, 136:5,
133:7, 133:23,
220:5, 221:13
**Kaplan** 2:28, 137:16
**Kate** 9:10, 9:13,
12:9, 12:10,
12:17, 32:7, 32:8,
57:16, 70:22,
73:5, 75:21,
94:21, 100:1,
101:7
**keep** 108:17
**keeps** 153:5
**key** 129:20
**kind** 90:8, 93:20,
131:10, 179:10
**knowledge** 21:20,
24:14, 47:6, 47:11,
49:10, 74:18,
92:9, 157:7,
158:4, 209:6,
218:8, 216:16
**known** 84:11, 125:9,
218:8, 216:16
**Kyle** 3:12, 6:19,
35:12, 35:14,

**LLP** 2:5, 137:4
**local** 198:2
**locate** 160:2
**location** 127:4,
127:11
**log** 52:19, 162:6,
162:8
**logged** 217:16
**logging** 218:12
**login** 160:3, 160:13,
160:19
**Long** 13:22, 30:14,
108:23, 143:10,
164:24, 171:19,
171:20, 172:1,
172:3, 195:15
**longer** 16:20, 149:9,
143:20, 167:16,
171:7, 180:17
**looked** 51:20, 52:21,
53:20, 63:11
**looking** 13:12,
52:22, 63:19,
129:11, 136:24,
139:11, 208:24
**looks** 90:8, 123:6,
152:15, 155:20,
172:17, 188:3,
188:22, 189:16,
191:7, 198:2
**lost** 179:10
**lot** 98:4, 147:17,
164:6, 204:2,
204:22, 216:11,
216:16
**Loud** 80:10, 97:22,
97:24, 98:1
**loud** 98:1
**louder** 98:1
**love** 18:22
**lunch** 31:9, 135:14,
135:16, 138:8,
145:8, 149:16

**M** 3:14, 137:26
**Madigan** 3:3, 137:20

**Mahoney** 25:10, 28:2
**mail** 120:15, 188:20
**maintained** 90:19,
96:21
**maintaining** 43:12
**maker** 61:7
**manner** 43:8, 154:14
**manners** 33:15
**margin** 71:22, 90:2
**margins** 71:19
**mark** 125:19, 130:3
**marked** 62:13,
70:19, 72:19,
77:20, 74:20,
74:24, 74:20,
89:1, 89:7, 98:10,
104:14, 105:8,
107:6, 109:13,
155:7, 159:21,
157:6, 157:12,
161:11, 161:21,
162:16, 182:24,
184:1
**materials** 197:24
**maternity** 27:9,
28:19
**mates** 30:14
**matter** 58:1, 58:4,
58:13, 58:22,
79:23
**mattered** 58:5
**matters** 11:20, 32:12
**Matthew** 36:13,
36:15, 36:23,
36:24
**Mayo** 17:22
**Mbabe** 100:9
**mean** 20:18, 22:1,
23:19, 32:19,
38:20, 41:3,
41:21, 42:5, 42:7,
42:10, 42:18,
42:22, 51:16,
46:22, 51:16,
51:20, 52:5, 57:4,
71:22, 72:7, 80:9,
80:4, 83:18, 98:3,
93:18, 97:23,
108:16, 109:3,

192:24, 195:11,
197:2, 197:19,
197:23, 198:3,
198:5, 202:5,
203:1, 217:7,
217:8, 217:12,
217:14, 217:17,
218:2, 218:13
**likelihood** 23:17,
234:13, 55:4,
56:10, 57:22
**likely** 61:16, 154:11,
150:11
**limited** 70:1, 70:2
**line** 12:25, 12:19,
125:18, 130:2,
130:19, 133:22,
131:9, 134:2,
134:3, 201:4,
210:14, 213:15

**Martin** 0:012 218:12
**Martin** 0:013 129:10
**Maryland** 182:4,
182:7, 183:18
**match** 176:20
**matching** 176:17,
176:20, 177:5,
177:11
**mate** 25:17, 25:19,
30:10, 30:11, 39:8
**material** 182:11,
182:16, 182:24,
184:1
**meeting** 11:1, 30:2,
30:24, 34:14,
37:20, 38:2, 38:6,
168:24, 198:9
**meetings** 40:9,
40:11, 175:8
**meets** 193:8, 193:21
**Melongo** 1:7, 1:9,
3:3, 9:25, 10:1,
100:7
**MELONGO_003130**
133:14
**MELONGO_003132**
181:2
**MELONGO_003387**
212:16
**MELONGO_003393**
213:1
**MELONGO_003414**
104:20
**MELONGO_003415**
105:14
**MELONGO_003423**
171:19
**MELONGO_004178**
146:8
**MELONGO_005215**

242        244

ACR REPORTING, LLP    312.422.0515

JULIE GUNNIGLE - APRIL 23, 2018

## [Column — page 245]

156:22
MELONGO_005216 157:14, 162:23
MELONGO_005218 164:9
MELONGO_005222 167:5, 168:7, 207:4
MELONGO_005982 210:2
MELONGO_005992 210:8
Melongo_annabel 125:22
Melongo_annabel@ yahoo 120:6, 168:14, 207:11
melongo_annabel@ yahoo. 120:22, 126:5, 130:7
member 35:15
memo 22:18, 22:19, 24:4, 24:5, 24:9, 33:12
memorandum 62:24
mention 102:7
mentioned 102:1, 130:17, 131:1, 175:7
merely 133:22
merits 23:18, 55:15, 56:10, 57:22
message 122:7, 124:7, 130:16
messaged 31:22, 33:2
met 3:18, 13:1, 31:17, 33:1, 33:22, 34:19, 35:5, 37:11, 82:15, 169:15, 188:15
metadata 129:17, 130:11, 134:1, 147:18, 147:19
methodical 21:2

Michael 2:4, 6:20
Michigan 3:16
midway 88:10, 88:11, 130:18
Midwifery 23:11, 23:12
Mike 25:11, 26:2, 159:8
Miller 2:5, 137:4
Mills 3:15, 137:27
mine 99:4
minor 103:2
mischaracterizes 177:1
misconduct 86:4, 88:15, 87:5
misstated 215:17
misstatements 87:20, 87:21
modern 164:15
Monday 1:23, 136:21, 193:6
Mondays 190:12
money 193:9, 193:22, 194:3, 204:3, 204:12
Monge 170:6
monitor 52:3, 52:6, 52:9
monitoring 113:19
month 31:5, 32:20, 37:15, 52:20
months 30:15, 167:8, 167:10, 182:17, 188:17
morning 6:7, 32:3, 59:10, 60:23, 63:10, 96:18, 97:21, 117:12, 117:15, 145:4, 151:7, 193:2
Morris 15:11, 15:16, 16:2
Mostly 9:20
mothers 27:19
motion 39:9, 39:12,

86:1, 87:11, 87:18, 153:5, 153:6
motions 85:24, 148:21, 154:23
move 85:24
MR. WUNDER 6:15, 134:13, 179:9
MS. BROWN 16:13, 58:17, 59:3, 135:11, 144:3, 179:22, 181:21, 183:2, 189:23, 200:5, 200:15, 200:23, 205:18, 208:19, 212:7, 218:17, 218:23, 261:16
MS. CALLOWAY 175:18, 176:24, 218:21
MS. SCHWARTZ 6:18, 59:7, 95:12, 135:13, 184:16, 200:6, 210:11, 215:22, 218:20, 219:1
Ms. Schwartz 6:6, 6:23, 37:10, 58:21, 59:9, 62:17, 70:17, 74:8, 75:1, 76:23, 78:16, 83:12, 89:5, 92:6, 95:15, 98:14, 104:18, 105:12, 107:10, 109:17, 115:11, 119:21, 121:10, 123:13, 126:17, 128:11, 134:15, 138:6, 138:20, 140:1, 144:6, 146:5, 150:5, 152:1, 156:20, 161:16, 169:7

170:18, 171:15, 175:22, 177:3, 178:10, 179:14, 180:2, 181:22, 183:10, 184:18, 187:19, 189:18, 190:4, 191:1, 192:7, 194:19, 198:21, 200:8, 200:18, 201:3, 201:17, 203:12, 204:19, 205:20, 208:5, 208:22, 209:23, 210:12, 212:14, 214:14, 216:1, 216:22
multiple 112:8, 154:10, 214:19
Myself 53:22, 55:18, 61:16, 199:11

<N>
name 6:7, 6:24, 7:2, 9:12, 33:14, 34:15, 68:2, 72:4, 72:7, 77:13, 170:6
named 33:15, 33:16, 33:21, 86:23, 120:12, 129:2, 159:8
names 72:13, 205:12, 217:8
narrative 90:23
nationally 205:24, 206:2, 206:4
nature 51:2, 61:10, 143:14
nearly 103:23
necessarily 80:10, 154:17, 176:20, 211:8
need 62:1, 117:17, 151:4, 154:23, 199:23, 202:1
needing 162:6
network 123:9,

245

## [Column — page 246]

127:10, 168:2
networking 117:22
networks 123:19
nevertheless 141:11
new 52:13, 109:5, 158:19, 192:17, 205:10
News 68:17, 195:8, 195:9, 195:10, 195:23, 197:1, 197:6, 197:8, 197:16, 197:21, 198:2
next 19:11, 20:2, 26:18, 72:4, 73:19, 88:5, 92:16, 92:23, 94:6, 104:7, 140:18, 201:4
nice 143:8
NINFO 3:14, 6:17, 123:11, 126:16, 137:26, 179:23, 183:5, 189:14, 189:22, 200:4, 200:13, 200:22, 201:14, 210:10, 214:5, 218:18, 218:22
No. 1:20, 4:15, 4:17, 4:19, 4:21, 4:23, 4:25, 4:27, 4:29, 4:31, 4:33, 4:35, 4:37, 4:39, 4:41, 4:43, 4:45, 4:47, 5:4, 5:6, 5:8, 5:10, 5:12, 5:14, 5:16, 5:18, 5:20, 5:22, 5:24, 5:26, 5:28, 5:30, 5:32, 5:34, 5:36, 5:38, 5:40, 5:42, 36:14, 51:15, 68:3, 62:15, 63:9, 70:15, 70:24, 74:6, 74:11, 74:22, 76:21,

83:10, 83:14, 85:21, 87:23, 88:3, 89:3, 89:7, 91:11, 93:3, 98:12, 104:16, 104:20, 105:10, 105:14, 107:8, 107:12, 107:17, 109:15, 109:19, 115:9, 115:13, 116:5, 119:19, 119:24, 121:8, 121:12, 128:9, 128:13, 138:18, 139:7, 139:23, 145:22, 146:3, 150:3, 151:22, 159:18, 161:14, 165:8, 169:5, 170:16, 171:13, 178:6, 182:1, 187:1, 187:17, 187:21, 190:23, 192:5, 194:17, 195:6, 198:19, 198:22, 203:10, 204:17, 208:20, 208:21, 212:12, 216:20, 221:6, 221:15, 222:17

97:12
note 90:12, 92:7
noted 175:1
notes 97:1, 97:5
Nothing 53:1, 197:5, 218:20, 218:24, 221:18
notice 139:1
noticed 98:7
Notre 14:19, 14:24, 15:14, 16:15
November 20:7, 30:23, 113:22
number 20:24, 21:5, 21:7, 72:2, 72:18, 73:21, 127:22, 130:7, 197:18, 207:4
observation 98:7
observed 17:20
obtain 149:12, 208:1
obtained 54:4, 64:21
obviously 11:11, 218:10
occasional 22:7
Occasionally 32:17, 32:18
occurred 142:11, 157:17, 157:19, 160:14
occurrence 162:8
odd 122:17, 143:7
offense 39:19, 64:8, 64:11, 64:19, 64:20, 65:2, 65:16, 108:8, 177:15
offenses 18:24, 101:10
offer 43:16, 191:19
offering 122:7, 124:7, 124:22, 125:3
offhanded 155:8, 156:11
Office 3:7, 9:1, 18:6, 18:9, 18:15, 18:21, 19:3, 19:7, 20:4, 20:15, 21:9, 22:9, 23:1, 23:9, 23:12,

objected 58:2
Objection 58:17, 58:3, 92:4, 123:11, 126:16, 134:13, 135:11, 144:3, 174:21, 175:18, 176:24, 177:15, 179:22, 181:21, 183:2, 189:14, 189:22, 200:4, 200:13, 200:22, 201:14, 205:18, 208:19, 212:7, 212:18, 214:5, 216:20, 218:9
occasional 22:7
occasion 149:12, 208:1
obtained 54:4, 64:21
obviously 11:11, 218:10
odd 122:17, 143:7
offense 39:19, 64:8, 64:11, 64:19, 64:20, 65:2, 65:16, 108:8, 177:15
offenses 18:24, 101:10
offer 43:16, 191:19
offering 122:7, 124:7, 124:22, 125:3
offhanded 155:8, 156:11
Office 3:7, 9:1, 18:6, 18:9, 18:15, 18:21, 19:3, 19:7, 20:4, 20:15, 21:9, 22:9, 23:1, 23:9, 23:12,

objected 58:2
numbers 72:5
numeral 72:19
nurse 197:23

<O>
Ohara 9:11, 12:10, 12:11, 12:12, 32:8, 32:9, 32:13, 32:15, 32:23, 33:3, 57:16, 57:17, 61:19, 70:22, 101:7
oath 220:16
Obama 47:5
object 200:7

Normally 122:18
North 1:22, 2:6, 2:29, 3:16, 138:18
Northern 1:2, 14:16, 15:2, 136:2, 221:22, 221:12
Nos. 98:17
Notary 1:20, 220:39, 221:6, 222:15
notation 97:11,

246

## [Column — page 247]

24:2, 24:21, 25:5, 25:9, 25:17, 25:19, 25:24, 26:9, 26:13, 26:16, 26:20, 28:8, 28:11, 29:5, 29:16, 29:20, 30:10, 30:11, 30:12, 30:14, 30:22, 35:16, 35:20, 35:22, 36:1, 37:15, 38:20, 39:8, 42:4, 42:6, 44:22, 48:24, 57:16, 60:6, 63:8, 81:16, 82:8, 82:13, 86:23, 89:17, 90:21, 91:5, 91:15, 91:16, 92:2, 93:24, 93:9, 93:12, 104:4, 105:3, 106:9, 110:22, 112:11, 114:1, 116:22, 133:6, 140:11, 147:7, 149:12, 152:16, 152:20, 170:8, 175:16, 177:14, 180:18, 183:19, 184:20, 186:9, 187:4, 202:7, 208:20

officer 203:7
official 67:2, 80:15, 80:19, 80:23, 82:24, 85:18
Often 22:18, 32:18, 52:17, 127:5
okay 7:18, 8:5
Once 31:5, 31:17, 32:20, 37:19, 52:22, 158:5, 185:15
One 7:11, 21:11, 22:8, 23:7, 23:9, 25:23, 26:4,

40:12, 41:15, 48:18, 49:19, 55:12, 61:9, 63:12, 64:14, 67:15, 70:12, 71:2, 71:13, 73:22, 78:3, 82:14, 101:18, 113:5, 117:11, 122:1, 126:8, 132:2, 133:6, 141:24, 142:1, 142:20, 146:11, 147:10, 147:11, 149:22, 153:14, 154:14, 155:13, 155:16, 156:1, 160:6, 164:18, 166:5, 166:11, 170:13, 178:2, 178:21, 182:22, 184:22, 191:24, 199:11, 202:11, 206:20, 215:15, 216:23, 218:9, 222:13, 225:23, 226:4,

Oni 3:15, 137:27
orchestrating 206:8
order 13:12, 79:2, 79:5, 95:18, 107:24, 108:17, 108:24, 109:9, 179:3
ordered 78:19, 79:10, 80:5, 201:7
organization 90:17, 195:17
Organizations 16:20
organized 16:18

100:11
Ori 3:15, 137:27
original 127:13
originally 27:4
others 130:9, 160:5
Otherwise 28:19, 125:9, 142:20, 194:9
outcome 222:6
outcomes 27:20
outlined 101:8
Outside 31:2, 32:15, 33:16, 38:23
own 22:4, 25:1, 28:2, 28:4, 179:6, 179:20, 213:7, 213:20, 216:11, 216:13
owned 54:5, 54:6, 54:15, 165:24
owner 159:8
owns 165:22

<P>
p-r-o-o 17:9
p.m. 102:4, 136:22
PAGE 4:3, 71:19, 72:17, 73:11, 73:19, 84:4, 84:6, 85:19, 85:20, 87:22, 87:24, 88:2, 88:5, 88:10, 88:11, 90:13, 91:9, 99:16, 99:18, 101:6, 122:2, 129:9, 129:24, 130:18, 134:1, 140:16, 152:23, 154:21, 155:6, 155:18, 157:15, 159:5, 162:23, 164:9, 164:24, 167:5, 168:6, 172:6, 174:14, 176:15, 178:18, 191:16,

205:21, 207:4, 210:7, 211:16, 213:1, 213:15, 221:3
pages 75:10, 75:13, 167:4, 220:19
109:7
Palatine 165:1, 167:8
Pamela 49:23, 50:16, 53:19, 54:16
Papadakis 2:28, 137:16
paper 130:8, 188:4
paragraph 73:22, 77:18, 92:16, 101:7, 140:17, 150:15, 165:24
paren 92:18, 92:20
parens 92:22
Park 2:35, 6:16, 137:18, 153:15, 156:13, 157:1
Part 1:19, 20:17, 103:8, 105:4, 121:21, 122:14, 122:15, 128:20, 128:23, 133:2, 146:22, 149:18, 158:20, 159:18, 160:3
part-time 20:12
participate 82:22, 206:10
particular 17:15, 17:16, 20:17, 26:6, 53:1, 58:3, 60:19, 63:18, 64:8, 65:15, 66:16, 67:12,

247

## [Column — page 248]

71:23, 72:20, 73:3, 73:8, 76:8, 76:14, 78:3, 84:12, 84:18, 86:2, 86:3, 85:6, 85:14, 91:5, 120:19, 127:18, 129:23, 130:20, 131:8, 134:3, 134:11, 135:6, 141:7, 148:5, 153:15, 164:4, 172:12, 172:19, 173:13, 194:22, 199:23, 204:9, 205:1, 211:22, 221:10
particularly 111:1, 198:20
parties 2:24, 29:19, 224:4
partners 10:5
party 31:18, 49:10, 64:17, 101:18
passcodes 158:9
passwords 158:14, 158:16, 158:19, 218:7
patent 19:20, 29:13
path 129:19
pathological 121:24
PEGGY 1:19, 221:5
pending 8:4, 10:24, 90:19, 103:24, 221:10
people 42:13, 127:9, 129:17, 132:2, 155:23, 208:4, 217:8
per 141:1
perceive 4:19
perceived 86:9
perfectly 167:21
perform 148:11, 163:11
performed 170:10, 171:8
period 20:11, 165:6, 208:21
perjury 21:3, 86:2,

89:7, 89:18
permission 49:20, 92:10
permissions 133:22, 174:8
person 40:5, 43:7, 43:9, 59:1, 64:16, 93:22, 109:4, 133:8, 134:9, 175:3, 186:15, 194:7, 212:3
personal 11:20, 27:17, 56:8, 127:10, 186:4
personally 40:17, 29:19, 34:18, 221:9
personnel 149:14
petition 109:2
phone 10:3, 10:4, 10:7, 10:11, 11:5, 11:18, 12:6, 12:15, 12:16, 12:20, 12:23, 13:14, 13:19, 13:22, 14:5, 30:3, 73:15, 103:3, 117:14, 186:17
phone/blackberry 189:8
photocopy 140:9
physical 127:4
piece 16:24, 17:11, 63:2, 138:8, 155:11, 164:18, 172:13
pieces 118:8
piling 131:10
place 48:3, 50:10, 65:3, 68:23, 69:13, 81:10, 96:22, 135:7, 144:2, 159:3

166:22, 220:20
Plaintiff 1:7, 1:16, 2:11, 6:8, 6:22, 62:14, 62:19, 62:21, 70:14, 70:19, 74:5, 74:10, 74:21, 75:3, 76:20, 77:1, 83:13, 89:2, 89:7, 98:11, 104:15, 104:19, 109:18, 115:8, 115:12, 119:23, 121:7, 121:11, 128:12, 136:7, 140:2, 146:2, 146:6, 150:2, 156:17, 156:21, 161:17, 169:4, 169:8, 170:19, 171:12, 171:17, 178:11, 178:16, 187:20, 190:22, 191:2, 194:6, 194:16, 195:4, 198:18, 203:9, 204:16, 204:21, 209:20, 212:11, 216:19, 216:23, 220:7, 221:13
planned 10:16
play 59:14, 61:2, 12
player 6:24, 7:16, 68:1, 78:14, 80:8, 80:17, 95:13, 106:11, 125:7, 151:10, 172:14, 172:19, 173:9, 193:9, 193:21, 194:2, 204:1, 174:8, 195:18, 202:11

PLLC 2:8, 9:29, 6
Podlasek 1:11, 9:10, 9:15, 9:19, 10:7, 10:12, 10:16, 10:18, 11:5, 11:18, 11:21, 12:6, 12:20, 12:22, 13:2, 13:23, 14:3, 25:20, 25:22, 26:4, 30:3, 30:10, 30:16, 30:21, 31:1, 31:19, 31:22, 39:10, 41:10, 42:1, 46:2, 46:8, 51:1, 51:4, 53:22, 55:18, 60:24, 61:2, 61:16, 61:21, 62:1, 63:1, 63:22, 65:4, 65:9, 65:14, 66:9, 79:13, 81:6, 82:11, 115:3, 118:18, 136:11, 143:3, 148:20, 165:15, 166:16, 168:16, 173:1, 174:14, 176:15, 178:15, 178:18, 179:1, 181:5, 181:11, 182:20, 184:12, 187:23, 188:18, 191:9, 191:18, 196:10, 200:2, 200:10, 204:24, 220:11

248

**[Page 249]**

points 54:3, 107:17, 172:10, 172:11, 172:21, 173:10, 193:10
Police 104:10, 104:21, 104:23, 105:4, 105:16, 105:22, 106:5, 106:14, 106:19, 119:11, 119:12, 153:14, 156:8, 156:12, 156:13, 157:1, 157:4, 157:24, 159:13, 159:17, 162:22, 163:13, 164:8, 164:20, 206:20, 206:24, 207:2, 207:12, 208:14, 208:17, 208:24, 208:4, 209:7, 215:15, 215:17, 218:9
policy 24:23, 58:13, 58:22, 59:4, 93:24, 109:17
politely 38:9, 38:10
polled 142:18
pornography 23:8, 23:11, 165:2
portal 153:4, 154:8
portion 90:23, 91:3, 92:7, 125:17, 207:12, 210:8
portions 93:9, 110:6
portrayed 45:19
posed 111:6
posited 46:24, 47:2
position 27:21, 27:22, 29:19, 221:20, 106:6
possession 148:14, 148:23
possible 6:20, 155:12, 158:17, 173:11, 179:19, 180:1, 180:3, 201:8, 218:12

possibly 70:10, 70:12, 125:12
posted 49:2, 51:6, 67:17, 73:16
posting 52:24, 53:12
postings 53:2
posts 52:12, 52:13, 92:11, 92:18
potential 38:12, 63:13, 94:23, 142:23, 163:16
Potentially 130:23, 156:2, 160:5, 160:15, 190:18
practically 143:5
practice 19:13, 19:16, 19:19, 19:23, 20:1, 27:6, 28:2, 28:5, 28:7, 28:17, 87:11, 183:6
practiced 29:16
practices 117:23
preceding 65:21
pregnant 38:7
prep 62:12
preparation 70:5, 95:9, 132:11, 132:12, 132:15, 133:3, 149:18, 155:22, 184:6
prepare 8:16, 13:13, 77:16, 131:20, 132:22
prepared 24:5, 24:15, 70:11, 71:13, 89:20, 118:7, 131:13, 131:16, 153:14, 157:8, 197:1, 197:16
preparing 9:3
presence 221:21
Present 3:24, 28:6, 68:24, 68:14, 69:1, 97:3, 97:7, 97:19, 99:12, 107:2, 110:13

111:10, 137:31, 138:11, 142:5, 184:3, 221:25
presentation 58:24
presented 139:18
preservation 51:9
preserve 47:21, 48:7, 48:8, 95:18
preserving 96:8
President 47:5
pretending 84:9
pretty 103:7
previously 69:21, 124:20, 124:23, 131:1, 138:2
primarily 59:23
printed 68:9
printout 83:20, 84:1, 120:12, 122:3, 124:5, 128:23, 129:2
Prior 24:5, 24:7, 45:20, 45:22, 46:6, 50:12, 51:3, 52:17, 53:14, 66:15, 67:18, 68:19, 95:24, 96:9, 118:14, 119:4, 119:9, 140:21, 145:7, 158:4, 162:9, 175:1, 188:14
prioritized 111:19
prioritizing 113:11
priority 112:9, 112:17, 113:1, 133:3, 113:9
privacy 103:7
private 28:2, 28:5
probable 23:16, 55:14, 56:9, 57:21, 101:9, 101:14, 101:21
Probably 93:11, 141:23, 159:16
Probelle 203:20, 203:21

probelle.net 161:24, 162:13
problem 122:8, 124:8, 124:10
problematic 23:7
problems 125:4, 125:6, 125:10, 125:13, 168:10, 207:7
Procedure 1:17
proceed 111:14, 112:2, 112:21, 113:7
proceeding 180:21
proceedings 78:14, 116:7, 116:12, 138:9
proceedings 95:14
process 22:12, 23:3, 23:13, 23:22, 28:3, 60:16, 61:15, 108:21, 109:11
produce 76:16, 78:10, 140:11
produced 22:19, 22:19, 62:9, 68:7
professional 27:6
Professor 15:14, 16:11, 17:11, 27:5, 27:10, 27:14
program 51:22, 68:11
progress 180:22
prolonged 27:8
Prolottorary 17:9, 17:12, 17:14, 17:17, 17:18, 18:1
promoted 27:6, 27:9
promotional 197:23
pros 143:5
prosaic 129:15
prosecute 58:14
prosecuted 58:9, 58:20, 59:6
prosecuting 22:6, 163:12, 201:6
prosecution 45:18,

**249**

**[Page 251]**

95:8, 97:9, 109:11, 110:16, 110:19, 110:23, 111:2, 113:13, 118:6, 124:13, 128:4, 146:20, 147:8, 151:6, 151:12, 155:1, 164:4, 164:17, 166:11, 166:21, 166:24, 169:22, 171:20, 171:24, 172:3, 174:5, 175:13, 177:2, 177:17, 177:19, 180:12, 185:16, 185:18, 187:6, 187:12, 190:17, 191:16, 192:15, 194:12, 195:4, 195:10, 195:14, 196:18, 197:24, 198:15, 199:18, 201:18, 201:21, 203:4, 206:12, 216:3, 215:10
recalling 51:7
receive 21:5, 22:3, 25:4, 105:4, 108:13, 108:19, 110:2, 216:2
received 22:4, 54:20, 117:14, 121:23, 130:18, 134:2, 160:22, 164:10, 180:4, 191:9
receives 67:16
receiving 188:11, 191:10, 194:1, 199:7, 202:4, 203:17, 205:7
recent 32:24, 120:11
recently 117:18
recess 59:13, 136:16, 184:17, 215:24

recipients 125:23, 130:8, 205:13, 206:8
recognize 83:16, 89:10, 98:18, 107:13, 110:10, 120:1, 121:13, 121:16, 125:16, 140:5, 146:9, 161:20, 170:22, 217:3
recognized 205:24, 206:2, 206:4
recollection 111:5, 12:1, 13:10, 180:12, 185:16, 185:18, 187:16, 187:12, 190:17, 191:16, 192:15, 194:12, 195:4, 195:10, 195:14, 196:18, 201:18, 201:21, 203:4, 218:15, 218:24
record 6:11, 6:24, 10:3, 138:7, 179:11
recorded 49:24, 50:9, 53:18, 58:2, 64:16, 69:18, 73:16, 73:24, 144:2, 221:21
recording 57:24, 58:9, 58:14, 59:1, 64:11, 64:15,

recordings 50:16, 53:21, 53:24, 53:21, 54:17, 54:22, 55:6, 55:10, 63:12, 68:23, 69:3, 69:11, 70:1
records 69:21, 72:13, 74:13, 75:7, 77:10, 77:23, 106:5, 160:3, 161:6, 161:9, 164:16, 167:2, 186:24
recovery 148:11
redacted 188:9
reduced 111:10
reducing 68:8
refer 12:10, 100:20, 153:22, 156:11, 191:20
reference 129:14, 157:23
referenced 173:12
referral 22:5, 83:7, 199:10, 199:15, 200:20, 201:1
referrals 21:5, 22:23
referred 21:10, 21:15, 21:24, 22:1, 22:8, 22:13, 83:3, 83:4, 97:15, 101:16, 174:24, 194:3
referring 23:7, 23:12, 57:13, 86:18, 90:6, 93:12, 132:13, 132:14, 146:12, 153:6, 153:11, 153:19, 153:23, 155:15, 156:13, 157:24, 166:15,

173:3, 173:5, 174:19, 175:3, 175:11, 202:3, 204:12, 207:13, 211:23
refers 77:19, 100:13, 158:14, 204:5
reflect 97:2, 172:21
reflected 72:8
reflecting 167:13
refresh 11:15, 71:16, 73:9, 75:23, 95:1, 100:3, 139:4, 150:21, 152:17, 166:5, 169:14
regard 53:14, 82:23, 94:8, 209:15
registered 100:9, 102:12
registering 72:20
registrar 72:23, 73:7
regrow 17:20
regularly 52:16
regularly 62:18
reindicted 114:20, 115:21
reindictment 115:4, 115:15, 116:1, 119:1, 187:9
relate 123:24, 141:16
related 40:21, 42:16, 45:9, 47:16, 53:4, 55:6, 61:20, 66:3, 66:10, 67:11, 70:7, 72:14, 73:17, 76:3, 77:3, 94:15, 104:11, 104:21, 105:6, 105:17, 105:23, 106:6, 106:14, 106:19, 114:16, 116:7, 148:15, 156:24, 157:4, 157:7,

**251**

**[Page 250]**

46:11, 48:12, 83:3, 112:20, 114:22, 127:15, 127:19, 164:3, 187:5
prosecutions 22:2, 143:13, 216:3
Prosecutor 18:6, 18:9, 18:12, 18:14, 18:17, 18:20, 19:2, 19:7, 92:22, 93:2, 93:6, 93:17, 183:13, 200:21
prosecutorial 86:3, 86:15, 87:4
prosecutors 21:17, 94:2, 200:3, 200:11
protocol 127:1
protocols 208:15, 208:17
provable 177:15
prove 56:3, 178:21, 179:4, 179:7, 179:22
provided 88:5, 128:20
provided 126:11
provider 165:6, 167:9, 167:20
providers 208:15
providing 193:15
proving 133:7
ps 129:10
psychological 78:19, 79:3, 79:6, 79:9, 79:14, 79:16, 79:20, 85:23
psychologically 84:10
Public 1:20, 20:24, 59:2, 80:14, 80:19, 80:22, 82:24, 85:18, 86:16, 92:2, 103:3, 103:4, 184:21, 184:24,

185:6, 220:39, 221:6, 222:15
publication 17:20
publications 17:6, 18:2
published 17:7, 17:8
punish 103:14
purchased 165:22
purpose 10:2, 10:7, 10:11, 12:22, 48:5, 69:4, 132:8, 133:1
purposes 51:10, 96:8
pursuant 1:16, 136:16
pursue 23:19, 175:5, 175:16
pursued 175:19
push 84:3, 84:8
put 111:15, 147:12, 156:3, 156:5, 174:7

**<Q>**

question 7:20, 7:24, 8:4, 31:8, 42:10, 42:11, 44:9, 44:12, 45:5, 57:10, 58:12, 102:19, 102:24, 103:1, 113:2, 125:18, 130:3, 154:6, 174:15, 174:9, 182:14, 183:12, 191:14, 197:10, 206:6, 208:4
questions 7:13, 14:11, 34:1, 76:13, 174:10, 197:18, 199:19, 218:21, 218:22, 219:1
quote 90:20, 92:18, 92:19, 92:21, 124:9, 155:16,

203:24
quotes 91:23

**<R>**

R. 3:5, 137:22
RII 159:6, 159:7, 159:9, 159:11, 162:24, 164:10, 164:14, 165:2
Racketeer 16:19
raise 197:17
Randolph 3:8
Randy 34:7, 34:9, 34:19
range 171:19
reasons 26:17, 29:1, 49:19, 101:24, 198:10
recall 9:20, 10:1, 12:5, 14:1, 21:22, 26:5, 31:21, 31:24, 33:19, 33:24, 34:6, 34:16, 34:20, 35:4, 35:7, 35:11, 36:12, 37:1, 37:20, 38:1, 38:17, 38:14, 39:15, 43:13, 43:19, 46:5, 46:9, 47:10, 47:14, 47:20, 48:4, 50:3, 50:6, 50:11, 50:18, 50:20, 53:11, 55:1, 55:2, 56:13, 56:19, 56:14, 56:17, 60:18, 60:19, 61:3, 61:23, 64:9, 67:24, 68:21, 69:3, 70:3, 71:11, 76:9, 76:18, 78:22, 80:7, 81:8, 81:8, 81:16, 81:20, 82:6, 82:17, 87:13, 88:17, 92:13, 93:1, 93:10, 94:11,

64:19, 76:9, 77:22, 79:5, 96:14, 103:8, 108:2, 116:3, 141:13, 142:23, 143:23, 150:17, 152:12, 169:21, 188:9, 191:11, 192:16, 199:8, 203:18, 205:7
reasonable 23:17, 55:14, 56:10, 57:21, 64:17, 65:2, 144:1
reaches 26:7
re 129:12, 129:13
reach 67:19, 131:22, 173:15, 180:21
reached 68:2, 149:17, 209:3, 209:5
reaching 131:18, 132:8
reaction 45:17, 45:21, 46:3, 145:2
read 43:20, 43:23, 85:3, 86:11, 86:12, 86:20, 87:2, 87:7, 90:24, 91:3, 91:8, 92:13, 94:4, 100:16, 159:13, 159:17, 165:8, 165:10, 165:16, 172:20, 173:10, 179:9, 201:5, 208:3, 210:13, 215:6, 216:14, 220:17
read 179:11
reading 88:17, 212:5
reads 84:7, 85:21
really 63:17, 85:16, 109:10, 195:15, 199:12
reason 8:7, 21:21, 93:1, 93:10, 94:11,

181:4, 182:3, 193:3, 193:8
reasonable 23:17, 55:14, 56:10, 57:21
really 63:17
reason 8:7, 21:21, 93:1, 93:10, 94:11, 94:3

**250**

**[Page 252]**

184:12, 186:24, 190:18, 192:24, 196:18, 198:5, 200:11, 203:5, 205:16, 208:24, 216:4, 222:4
relating 13:17, 118:13, 189:2, 196:19
relation 155:24
relationship 36:3, 199:10
relative 182:10
released 109:8, 113:18
relevant 48:11, 91:4, 163:18, 202:15
remains 166:6
remark 155:8, 156:16
remember 11:13, 12:3, 13:21, 20:20, 24:17, 34:14, 38:3, 38:5, 38:7, 39:17, 43:18, 53:22, 53:23, 61:17, 62:23, 64:4, 65:15, 69:7, 70:10, 71:13, 73:4, 73:18, 74:3, 74:19, 75:20, 77:17, 77:21, 78:1, 78:2, 78:5, 78:13, 79:12, 79:15, 79:18, 79:22, 80:1, 80:2, 80:4, 80:20, 80:21, 80:24, 81:2, 82:10, 82:16, 82:18, 84:16, 84:17, 84:22, 84:23, 85:1, 87:6, 88:9, 88:14, 89:18, 89:23, 91:1, 92:14, 93:4, 93:8, 93:14, 94:3,

94:10, 94:17, 94:20, 95:7, 95:11, 95:23, 96:2, 96:15, 96:16, 97:10, 97:11, 97:15, 99:14, 99:24, 101:1, 101:5, 104:5, 104:9, 104:13, 105:1, 105:21, 106:2, 106:16, 107:1, 107:5, 108:21, 108:23, 108:24, 108:4, 109:3, 109:14, 110:1, 110:6, 111:2, 111:17, 112:16, 113:15, 119:10, 119:18, 119:20, 119:21, 119:22, 119:23, 119:24, 133:8, 133:9, 133:10, 133:12, 134:1, 134:7, 134:14, 134:19, 135:4, 138:15, 139:16, 139:20, 141:9, 141:15, 141:19, 142:3, 142:19, 143:11, 144:13, 144:16, 144:20, 144:23, 145:20, 145:22, 147:5, 147:16, 148:3, 148:8, 148:12, 150:16, 151:8, 152:11, 153:8, 154:11, 154:19, 154:14, 154:20, 157:17, 158:4, 158:16, 158:22, 159:11, 159:16, 160:20, 161:2, 161:8,

remembered 11:12, 13:11
remotely 154:4, 154:15
renal 16:7
repairs 148:11
rephrase 183:12, 184:6
report 16:11, 60:6, 60:9, 69:12, 71:22, 82:16, 84:3, 84:16, 84:17, 84:22, 84:23, 85:1, 85:6, 89:19, 89:20, 104:21, 104:23, 105:17, 118:7, 118:10, 119:10, 119:11, 119:18, 119:22, 119:23, 119:24, 124:8, 145:13, 156:24, 157:4, 157:7,

161:11, 162:20, 168:5, 168:18, 168:22, 169:2, 169:20, 174:7, 175:20, 175:24, 176:4, 176:8, 176:13, 177:7, 177:12, 178:5, 181:7, 181:17, 181:20, 185:20, 186:4, 189:11, 189:15, 189:23, 190:10, 190:13, 190:16, 191:3, 191:18, 193:6, 193:18, 193:21, 194:3, 194:9, 195:6, 195:14, 195:23, 196:8, 197:1, 197:6, 197:8, 197:14, 197:17, 197:21, 197:22, 202:2, 203:3, 203:19, 203:17, 205:6, 207:18, 207:19, 207:21, 207:12, 208:24, 209:4, 215:17
reported 126:3
reporter 7:10, 49:24, 67:8, 67:20, 92:9, 140:10, 171:17
reports 34:15, 34:16, 104:10, 105:4, 105:22, 106:14, 106:19, 119:12, 155:9, 155:11, 155:23, 156:12, 156:14, 156:16
repository 185:1
represent 6:8, 6:11, 79:8, 79:11, 194:21
represented 8:11, 10:18
representing 106:4
represents 6:19, 6:21
reprimanded 26:11
request 69:8, 79:14, 110:20, 140:19, 141:1, 141:5, 161:6, 165:3
requested 76:7,

**252**

JULIE GUNNIGLE - APRIL 23, 2018

106:20, 110:17,
110:24, 141:8,
141:11, 141:13,
162:9, 164:14
requesting 77:22,
106:5, 141:2,
180:9
requests 72:12,
76:2, 78:6, 192:24
required 23:16
research 16:15,
16:15, 16:22,
25:18, 63:14,
216:12, 216:18
researching 16:17,
16:18
reserve 219:3
residency 167:7
resign 29:21
respect 24:17,
24:19, 28:18,
60:16, 85:14,
116:10, 116:12,
119:15, 165:17,
165:18, 166:10,
198:14, 208:17,
211:24
respond 113:2,
148:21
responded 11:13,
191:16
responds 154:22
response 74:17,
76:17, 78:11,
153:4, 164:11,
164:23
responsibilities
24:22
responsibility 27:13
responsible 54:1,
57:7, 163:22,
179:4, 190:3
responsive 165:2,
169:19
result 21:16, 21:17,
21:19, 23:1,
143:1, 181:13
181:23

resulted 16:20,
142:8
results 16:22, 18:17,
180:24, 181:3,
181:18
resumed 136:16
retrieved 166:12
return 54:10, 54:12,
129:19, 165:12
returned 27:8
revealed 100:8,
197:22
review 8:19, 8:22,
23:6, 23:13,
51:17, 51:23,
52:13, 53:13,
104:10, 118:10,
148:9, 171:4,
171:7, 209:11,
209:14
reviewed 8:23,
119:10, 170:4,
173:1, 212:21
reviewing 11:14,
22:12, 171:20
171:24, 215:3
Richard 2:18, 34:1,
34:2, 34:5, 186:5,
186:10, 186:14
risk 111:7
Robert 1:11, 30:9,
63:1, 114:24,
118:17, 136:11,
158:12, 178:15,
179:1, 187:22,
188:21, 191:5,
204:24, 220:11,
221:14
Roberts 34:7, 34:9,
34:12, 34:19
role 40:21, 41:17,
59:14, 59:22,
69:22, 69:23,
101:2, 114:15
roles 20:9
Roman 72:19
Room 2:20
room 37:9, 78:15

rotated 165:24
roughly 23:5, 48:2
RPF 1:19
Rubino 33:20, 33:23
Rule 167:22, 180:3,
182:3, 182:6,
183:17, 183:21
Rules 1:16, 7:8,
211:12
run 51:21

<S>
s-a-s-t-i-a-n 150:10
S. 2:27, 137:15
Sadly 135
Safe-a-life 195:2
Salerno 120:5,
120:13
SALF 153:17, 159:7,
168:10, 189:5,
189:11, 207:8
Sass 129:3, 131:13,
132:1, 149:22
150:14, 150:22,
150:24, 151:10
sastian 150:10
sat 114:20, 114:24
Save 47:5, 117:11,
117:12, 117:24,
118:3, 118:4,
118:5, 122:12
123:8, 123:19
124:1, 124:14,
125:4, 126:2,
131:19, 131:23,
132:5, 132:9,
133:2, 133:12,
133:18, 134:17,
134:24, 145:16,
148:10, 148:15,
148:16, 149:2
149:5, 149:13
149:17, 151:3
153:12, 154:1,
156:14, 158:15,
159:21, 159:23,

161:10, 163:4,
168:3, 174:2,
192:24, 195:11,
197:2, 197:19,
197:23, 198:3,
198:5, 202:5,
203:1, 217:7,
217:8, 217:12,
217:14, 217:17,
218:2, 218:13
saw 34:15, 84:18,
84:19, 84:23,
90:4, 121:20
saying 117:16,
115:13, 182:20,
212:2
says 58:9, 63:5,
72:20, 73:22,
78:15, 86:6, 88:6,
88:12, 90:7,
90:13, 92:17,
99:5, 100:7,
101:7, 101:16,
101:20, 107:20,
107:22, 108:10,
108:1, 120:13,
120:16, 120:17,
120:24, 122:3,
122:22, 124:3,
124:5, 139:10,
130:19, 139:3,
146:19, 151:1,
153:16, 155:7,
157:9, 157:16,
158:5, 162:5,
162:14, 162:23,
164:20, 164:22,
167:6, 169:13,
172:8, 172:14,
188:16, 189:4,
192:22, 193:2,
193:20, 198:9,
202:1, 203:19,
203:23, 203:24,
204:13, 205:9,
205:22, 207:5,
212:20, 217:9,
218:1

sixth 172:14
slightly 214:21
Small 19:20, 28:22,
29:13, 38:8
snow@grobelle
192:17
Social 11:3, 31:6,
32:22
socialize 31:2
socialized 38:22
Solo 17:4, 19:13,
19:16, 19:19,
19:23, 20:1
solving 147:6
somebody 47:8,
82:16, 97:12
somehow 33:8,
60:4, 72:1, 81:24,
131:7, 145:15
157:17, 163:6
Someone 23:4,
47:12, 47:20,
59:5, 69:10, 91:8,
112:7, 120:12
126:2, 127:5,
129:2, 131:2,
133:18, 153:1,
153:10, 154:3,
156:5, 163:21,
166:4, 166:15,
166:19, 190:2
218:12
Sometimes 22:17,
31:11, 127:11
sort 26:23, 126:6
Sorry 27:5, 57:9,
59:11, 88:9,
102:23, 112:18,
138:15, 172:6,
192:13, 201:5,
213:14
sort 16:1, 16:16,
20:22, 28:20,
29:10, 31:6,
32:21, 38:12,
55:19, 59:19,
60:2, 69:9, 186:7

sorts 16:5, 19:18,
27:16, 44:7
sound 7:14, 85:6
sounds 88:21,
93:17, 152:21
source 127:13,
159:1
sparked 81:24
speaking 62:11,
98:1, 117:9,
133:24
speaks 123:22
special 22:2, 85:14,
143:5, 143:13
specialized 18:13,
18:23
specific 18:13, 61:3
specifically 134:7
specifics 118:6
speculation 59:17,
59:3, 92:4, 123:11,
134:13, 135:11,
144:3, 179:22,
201:15, 208:19,
212:3, 214:4
speculative 218:17
spell 7:2
spend 9:2
Spillman 152:5,
152:9, 152:13,
152:18, 153:3
154:22, 155:1
155:3, 165:17
166:24, 169:11,
169:19, 169:22,
218:12
Spizzirri 3:22, 6:17,
37:3, 37:5, 37:11,
37:13, 37:18,
38:2, 38:15,
38:18, 38:23,
39:1, 120:5,
120:13, 120:20,
121:4, 122:4,
122:12, 123:7,
124:5, 124:13,
126:18, 129:3,
130:12, 134:10,

137:23, 146:17,
160:3, 160:8,
160:9, 160:14
161:4, 162:17,
162:24, 168:9,
173:21, 179:5,
179:7, 179:19,
180:5, 185:14
185:15, 185:19,
185:22, 186:3,
186:7, 186:13,
187:7, 188:1,
188:6, 188:13
189:2, 189:12
189:20, 190:8,
190:14, 190:19,
191:5, 191:13
191:19, 191:24,
192:11, 192:14,
194:5, 194:7,
195:12, 195:17,
195:19, 196:9
196:13, 196:18,
197:2, 197:9,
197:22, 198:6,
198:11, 198:24,
199:5, 199:9,
199:15, 199:18,
199:21, 200:22,
200:10, 200:16,
200:20, 201:10,
202:2, 202:23
203:4, 203:16,
203:20, 203:23,
204:7, 204:24
205:4, 206:7,
207:6, 207:7,
211:1, 211:7,
211:20, 212:4,
213:12, 214:2,
214:12, 217:22,
215:3, 216:2
SPIZZIRRI0000107
8:161:19
SPIZZIRRI0000109
4 203:14
spoke 12:8, 14:7,

53:22, 150:22,
162:15, 164:1,
166:18, 167:14,
168:23, 185:16,
194:7
spoken 9:10, 30:5,
34:4, 36:2, 36:23,
39:1, 166:15
sports 17:22
spotty 121:22
Springfield 24:24
stalking 203:6
staph 77:6, 107:20
stand 36:18, 126:24,
156:3, 156:5
standing 202:13
stands 8:13
start 20:5, 45:6,
200:7
started 28:12,
118:3, 145:7,
196:5
starting 15:6, 15:8,
13:22, 210:14
startups 28:22
State 1:21, 2:14,
2:17, 3:4, 6:24,
16:7, 20:3, 20:6,
20:10, 20:12,
20:15, 21:9, 22:5,
22:9, 22:16,
22:24, 24:21,
25:5, 25:9, 26:9,
26:13, 28:16,
26:19, 28:19,
29:15, 29:20,
30:12, 35:20,
35:22, 37:23,
38:19, 41:5, 41:8,
42:3, 42:5, 43:2,
44:2, 44:21, 48:8,
53:21, 55:11,
55:21, 56:2,
56:15, 63:7,
81:15, 86:1,
86:22, 89:16,
91:16, 92:2,
93:23, 103:12,

SBC 167:10
scale 185:4, 185:6,
196:15
scalloway@atg.stat
e.il.us 3:11
scary 155:7
scare 133:5, 133:9,
133:10, 133:11,
133:14, 133:19
schedule 20:21
scheduled 79:20,
132:18, 169:11
Schiller 2:35, 6:16,
137:18, 153:15,
163:16, 215:18,
208:16, 215:15
School 14:15, 14:19,
14:24, 15:6, 15:7,
15:13, 15:15,
16:14, 18:5,
28:21, 28:23,
27:3, 27:22,
27:23, 28:13,
28:24
Schwartz 2:3, 4:8,
4:11, 6:7, 137:3
screen 217:21
seal 222:8
search 54:4, 54:11,
54:13, 57:19,
61:19, 70:6,
70:11, 70:21, 71:2
71:7, 71:9, 71:14,
72:10, 73:20,
73:24, 76:17,
75:6, 75:11, 75:14
75:17, 75:19,
76:17, 77:24, 78:3
Second 15:13,
18:13, 39:18,
40:23, 40:24,
41:2, 49:22,
99:18, 114:20,
114:24, 129:9,
129:24, 134:1,
154:6, 167:6,
172:6, 178:18,
196:17

Secondarily 67:10
section 72:19,
90:12, 99:2,
99:19, 100:16,
107:17, 108:24,
159:13
secure 116:17
secured 133:5
seeing 121:17,
192:15, 195:4,
195:10
seem 198:14
seemed 196:21
seems 122:15,
122:17
seen 13:4, 42:21,
62:21, 84:12,
89:15, 104:23,
105:19, 109:23,
125:4, 128:15,
128:18, 137:7,
157:4, 178:16
self-employed 29:5
self-study 216:17
send 24:24, 74:16,
104:3, 129:16
129:22, 142:21,
159:11, 188:22,
189:1
sender 130:21
sending 131:8,
190:9
sends 182:20
sense 51:21, 80:11,
98:4, 113:9
sensitivity 85:14
sent 36:17, 122:4,
122:16, 130:12,
147:14, 148:1,
164:11, 188:6,
192:14, 199:5,
203:16
sentence 85:21,
sentences 16:20
separate 27:22
September 20:7,
30:23

series 152:4
serious 111:1
served 106:4
server 149:14,
157:18, 158:15,
159:7, 159:20,
159:24, 160:24,
161:10, 172:16,
213:7, 213:20
servers 133:12,
134:18, 134:24,
148:15, 148:23,
149:2, 153:1,
153:3, 153:11,
153:12, 154:4,
154:15, 157:21,
158:9, 158:15,
158:18, 159:11,
165:13, 165:16,
168:4
service 165:5, 167:9,
167:20
services 15:19,
15:20, 166:13,
167:23
set 10:13, 27:24,
109:2, 110:14,
223:10, 203:19,
219:3
sets 112:17
Setting 32:16, 38:23,
179:18
seven 86:2
several 16:3, 16:8,
119:12, 124:22,
131:18, 165:23,
222:3
sex 18:24
sexual 18:24
similar 69:13
Similarly 117:23,
197:16
sit 155:10
site 45:4, 46:23,
54:5, 54:7, 54:15,
72:24, 91:20,
92:11, 100:8,
100:11, 100:17,
101:16, 101:20
situations 56:1
six 22:23, 23:5,

sheet 97:10
sheets 97:1, 97:5,
97:14, 97:15
Sheriff 104:4, 106:5
Shirley 3:5, 6:18,
137:22
shop 135:6
short 171:24, 172:4,
172:5
Shortly 6:19, 118:21,
182:15
shot 217:22
showed 54:13, 97:6,
98:15, 147:1,
150:6, 163:9,
172:12, 173:20
showed 54:14, 73:7,
124:11
showing 62:18,
116:2, 117:20,
165:1, 214:16,
214:19
shows 189:10
shut 148:23
side 34:11, 35:1,
71:18, 71:21, 72:8
72:9, 120:3, 203:19
203:13
signed 70:22, 73:8,
74:14, 99:15,
101:6, 102:3,
104:2, 104:6,
108:15, 108:16,
208:1, 208:8,
208:2, 208:8,
212:1, 214:8
signs 204:3
similar 69:13
Similarly 117:23,
197:16
sit 155:10
site 45:4, 46:23,

105:3, 108:9,
108:6, 109:1,
110:17, 110:21,
111:13, 112:11,
113:24, 118:22,
126:20, 134:23,
137:8, 137:11,
137:21, 149:11,
154:13, 160:22,
162:15, 175:14,
177:14, 180:17,
183:17, 183:21
183:18, 184:20,
186:4, 186:14,
187:3, 190:14,
194:9, 221:1,
221:7
stated 66:23, 67:2,
158:4, 162:24
165:1, 214:16,
214:19
statement 81:16,
81:17, 81:18,
84:18, 84:20,
84:24, 85:2, 85:4,
85:6, 86:6, 86:11,
87:2, 87:7, 87:9,
88:17, 91:22,
93:14, 93:16,
167:13, 168:16,
206:19, 208:23,
208:2, 208:8,
208:12, 208:24,
212:1, 214:8
statements 80:18,
82:8, 156:8,
168:20, 207:16,
209:15
States 1:1, 1:17,
134:20, 134:22,
136:1, 158:3,
164:10, 168:17,
168:13, 190:5,
201:5, 220:1,
207:4, 212:14,
212:17, 216:8
static 166:4, 166:6
stating 91:10

statute 48:17, 49:6,
49:7, 58:3, 64:22,
68:17, 68:8,
144:16
statutes 69:14
statutory 88:21
stemmed 90:15
stenographically
221:21
step 52:7, 112:19,
123:16, 196:24
steps 61:22, 109:7
stimulates 17:20
stop 190:5, 190:8
stopped 122:7,
122:23, 124:6
store 84:6, 86:7,
158:4, 162:24
stories 198:4
Story 195:3, 195:10
straight 144:3
strange 122:15
Strategy 60:17,
62:12
Street 1:22, 2:6,
2:15, 2:20, 3:6
Strike 44:13, 51:15,
61:10, 103:16
string 120:19
struck 69:14
student 191:14,
191:20, 191:23
Students 27:7, 28:1,
195:16, 197:18
studied 15:3
Study 195:3
subject 17:11, 122:5,
122:16, 125:17,
130:12, 130:22
131:9
subpoena 54:11,
54:12, 70:6,
70:10, 77:2,
77:10, 77:16,
187:24, 188:4,
78:12, 109:4,
164:23, 165:12,
188:19, 188:22,

189:1
subpoenas 54:4,
57:18, 61:20,
147:10, 147:12,
164:11
SUBSCRIBED
220:33
subscriber 72:13,
76:3
subscribers 18:9
substance 9:18,
11:7, 13:6, 14:2
substantial 119:15
substitute 88:21
substituting 88:7,
88:14
success 23:17,
24:13, 55:15,
56:10, 57:22
successfully 56:3
sufficient 23:5
suggest 63:2
189:19, 193:11
suggested 175:14
suggests 48:9,
48:17
suit 222:5
Suite 1:22, 2:7, 2:30,
3:17, 136:19
summary 171:1,
171:24, 172:5,
172:24
summer 15:6, 15:10,
15:23, 16:13,
16:17
Summit 28:21,
26:23, 27:2,
28:12, 28:23
supervisor 22:15,
25:7, 25:8, 55:11,
61:16
supervisors 55:12,
55:20, 61:9
supplementary
105:16
support 28:1
supporting 101:13,
177:21

189:1
supports 166:9
suppose 93:18,
98:2, 114:21,
131:12, 179:24
supposed 178:22,
18:2:23
surprise 84:8, 84:10,
86:7, 88:7, 88:14,
92:19, 93:13
surprising 135:9
surrounding 9:21,
87:12, 135:20,
197:9
suspect 157:21
suspended 215:15
suspicion 64:17,
65:2, 144:1
switched 132:19,
167:10
SWORN 6:14, 138:3,
220:15, 220:33,
221:17
sworn 6:1
Syracuse 16:23,
18:1
system 90:22, 91:5,
91:15, 112:8,
113:10, 117:22,
122:5, 124:1,
152:17, 178:22,
172:22
systematic 185:4,
185:6
systems 90:17,
118:3, 124:15,
124:19, 168:11,
207:8

<T>
taken 135:16
talked 214:17, 57:18,
57:19, 150:24
talks 58:7
tampering 23:23,
24:18, 34:11, 35:1,
35:17, 36:4, 37:8,
39:22, 41:1,

JULIE GUNNIGLE - APRIL 23, 2018

## Page 257

41:12, 42:18, 59:11, 59:15, 67:1, 69:22, 78:18, 108:7, 111:15, 111:20, 112:22, 114:13, 114:17, 114:23, 115:5, 116:8, 116:20, 117:6, 118:14, 118:19, 119:16, 123:17, 125:2, 128:19, 129:21, 132:24, 132:16, 132:18, 134:6, 145:6, 145:10, 145:18, 146:13, 146:15, 147:2, 149:18, 151:17, 163:19, 164:3, 177:16, 177:20, 178:1, 180:13, 184:4, 184:14, 187:9, 206:15, 209:12

tampering/intrusion 90:14

tape 49:24, 50:9, 68:9, 73:23, 101:17, 102:23

taped 48:16, 48:20, 92:10

taping 53:10

Target 90:13, 90:16, 92:10, 92:17

task 62:6

taste 186:20

Taylor 48:24, 49:14, 49:15, 49:18, 49:23, 50:2, 50:4, 50:7, 50:16, 50:20, 53:19, 53:23, 54:17, 55:3, 55:7, 58:1, 73:17, 73:22, 74:2, 140:10, 140:21, 142:2, 144:2

teacher 27:13

tearing 178:20, 182:21

Teasing 143:16

technical 51:21, 59:23, 60:3

technological 216:7

telephone 3:26, 137:33

television 195:8

temporary 202:24

tender 40:13

tendered 40:14, 182:8, 182:11, 182:16

tenure 37:23, 44:2, 60:6, 60:11, 194:8

term 52:16

terminated 117:18, 124:23, 157:22, 158:6, 158:17

terms 16:13, 23:3, 23:19, 45:12, 62:4, 113:4, 116:20, 175:11, 177:11

terror 205:11, 205:16, 205:23, 206:5

testified 6:4, 11:6, 12:8, 12:19, 14:6, 18:14, 19:6, 21:16, 22:22, 24:3, 28:10, 30:4, 30:9, 32:7, 41:14, 42:19, 49:4, 51:8, 57:11, 59:17, 59:22, 60:23, 61:18, 63:10, 63:21, 67:9, 71:3, 71:12, 73:5, 75:21, 94:21, 95:16, 96:18, 97:21, 100:1, 102:12, 115:5, 118:17, 125:16, 128:18, 133:16, 138:3, 138:11, 142:4, 149:16

200:12

true 71:6, 74:12, 75:5, 77:9, 92:3, 96:20, 96:24, 97:7, 97:13, 98:5, 98:20, 103:8, 103:13, 107:28, 108:3, 115:24, 116:4, 128:22, 130:24, 150:13, 152:8, 154:4, 154:5, 155:13, 163:8, 169:17, 173:23, 184:19, 188:5, 189:13, 191:8, 192:13, 199:4, 203:15, 205:3, 220:21, 221:23

trustworthy 186:1

truth 158:2, 156:8, 196:9, 198:22, 201:21

truthful 8:8

try 7:10, 7:11, 7:12, 160:2, 201:10, 201:18

trying 103:14, 117:2, 147:4, 147:9, 148:20, 153:4, 189:20, 193:19, 203:4, 205:14, 205:15, 210:21, 214:7

tsupport 148:6

tsupport@gmail 147:4

tsupport@gmail.co m 146:17, 147:9, 147:15, 148:2

Turn 72:17, 73:19, 84:4, 90:12, 100:6, 129:9, 140:16, 145:5, 155:5, 162:21, 164:8, 167:4, 172:4, 172:5, 178:18, 207:2

149:21, 166:14, 170:3, 173:1, 174:11, 174:14, 174:15, 174:16, 176:14, 184:3, 184:12, 200:13, 211:5, 213:11, 214:1, 216:6, testify 13:18, 138:9, 133:14, 133:18, 221:17

testimony 8:8, 177:1, 209:15, 210:9, 210:13, 211:4, 212:5, 213:2, 213:10, 214:11, 219:4, 220:22, 221:20, 221:24, 222:7

text 31:22, 32:1, 33:2, 38:16, theft 113:5, 193:12

thefts 212:4

themselves 6:10, 7:9:11

theory 46:24, 47:11, 134:23, 152:24, 153:10, 154:14, 196:22

therapy 17:9, 177:21

thereof 22:24

thinking 96:12, 144:5

third 72:17, 207:4

Thomas 10:3:9

though 67:1, 130:24, 176:16, 196:24

threat 85:4, 85:9, 88:22, 93:17

threatening 80:14, 62:24, 85:7, 86:17

threats 80:19, 80:22, 82:4, 92:18, 93:11, 94:1, 94:23

three 12:16, 13:15, 48:22, 48:1, 49:13, 86:3, 87:4, 117:8, 122:7

122:23, 124:7, 187:8, 188:17, 193:10

throughout 12:11

Thursday 193:2

tied 145:14

timeline 51:7

timing 94:8

title 18:12, 18:13, 59:16

titled 17:13

today 7:10, 8:2, 8:9, 8:12, 8:17, 8:20, 9:3, 9:6, 12:11, 14:8, 93:7, 150:20, 216:6

together 31:1, 34:5, 71:15, 155:10, 155:11

took 27:18, 60:24, 68:19, 81:10, 96:22, 148:14, 166:22

top 89:12, 99:2, 99:3, 100:7, 115:19, 125:17, 129:10, 131:11, 155:5, 157:1, 162:1, 162:12, 168:4, 194:10, 207:5, 217:9

topics 16:16

towards 37:23, 73:11, 157:15, 205:21

trademark 19:21, 29:13

traffic 18:22

trained 195:17, 197:18

training 216:3

transcribed 221:22

transcript 7:17, 67:2, 67:6, 67:9, 67:12, 67:16, 67:21, 68:4, 68:7, 68:8, 68:10, 69:4, 69:11, 92:12

257

## Page 258

141:3, 141:9, 141:10, 141:12, 141:14, 210:3, 212:17, 212:21, 220:18, 220:21, 221:24

transcripts 140:11, 209:12, 209:17

translate 7:17

transparency 58:23

transplants 16:7

treason 65:21, 65:23, 65:24, 66:3, 67:11

treatment 17:15, 17:16

Trial 10:5, 22:21, 47:21, 48:7, 48:8, 51:10, 51:12, 57:6, 62:12, 67:7, 95:18, 98:8, 96:12, 97:16, 97:19, 113:4, 117:3, 126:18, 128:19, 132:11, 132:12, 132:18, 132:15, 132:18, 133:22, 142:5, 142:8, 143:2, 149:18, 151:2, 151:5, 155:22, 180:13, 180:20, 181:1, 181:4, 181:8, 181:12, 181:16, 181:19, 181:24, 182:10, 182:15, 184:4, 184:6, 184:9, 184:14, 201:9, 201:22, 209:3

trials 16:21

tried 38:8, 112:9, 113:8, 113:14, 117:13

trip 10:19

trouble 190:1

troubles 199:22

210:6, 212:24, turned 183:1, 183:22

Turning 75:17, 88:2, 88:4, 99:18, 196:8

turnover 150:22

Two 9:4, 9:17, 10:6, 10:8, 11:6, 14:21, 18:11, 19:7, 49:19, 75:10, 89:21, 103:23, 106:1, 111:10, 112:13, 112:17, 123:21, 204:3

two 25:10, 214:7

typed 194:22

types 18:19

Typically 25:6, 68:8, 185:3

<U>

umbrella 15:18

unanimous 142:13, 142:14

unauthorized 160:1, 163:1, 163:9, 163:16

unaware 49:23, 73:23

unbalanced 84:10

uncomfortable 183:8

unconstitutional 69:15, 144:17

undergo 78:19, 79:3, 80:5, 86:22

undergraduate 14:23

underlying 12:2, 13:7

understand 7:21, 31:8, 42:10, 44:9, 57:9, 58:11, 86:18, 102:23, 118:16, 123:12, 124:4, 124:8, 154:20, 182:13, 202:2

Understandably 148:22

understanding 9:11, 117:5, 129:13, 129:15, 154:9, 172:23, 202:10, 202:18

understood 7:24, 193:23

undetermined 221:11

unbound 16:8

unequipped 15:21

unfortunately 178:20, 182:21

unit 22:2, 25:11, 143:5, 143:13, 184:20, 185:10

United 1:1, 1:17, 12:6, 120:1, 221:11

University 14:17, 14:18

unlawfully 121:3

unsure 157:19, 159:22

until 96:3, 113:17, 139:15, 139:18, 167:9, 190:14, 201:22

unusual 108:20, 203:20

upcoming 10:8

uppermost 90:7

upset 143:18, 144:2

useful 133:6, 133:16, 133:19, 133:20, 176:1, 176:3, 176:7

user 72:14

using 166:4

<V>

27:12, 28:20, 29:10, 30:16, 31:2, 31:10, 32:12, 32:16, 35:18, 35:24, 38:23, 41:5, 42:16, 42:17, 43:8, 59:19, 62:9, 70:3, 102:22, 125:8, 128:4, 171:4, 171:21, 188:18, 209:6, 2182

worked 15:11, 15:14, 16:16, 16:10, 18:10, 20:19, 20:24, 21:1, 21:3, 21:12, 21:17, 22:23, 24:23, 25:1, 56:15, 93:23, 117:11, 122:24, 131:17, 131:19, 152:18, 170:4, 183:18, 185:13, 209:10, 215:4

Working 11:16, 16:3, 16:6, 16:9, 31:1, 41:6, 42:7, 42:9, 42:12, 105:2, 108:8, 110:4, 116:22, 117:1, 119:8, 144:7, 159:14, 196:6, 156:2, 178:4, 200:20, 216:9

workload 62:4

workup 57:5

worry 178:5

wow 120:14

write 86:9, 86:21, 90:23, 91:2, 91:8, 181:18, 181:9, 181:11, 152:23

writer 62:8

writes 178:19, 191:13, 192:23, 193:7, 199:9

writing 92:13, 150:16, 152:11, 169:20

written 35:8, 51:24, 62:9, 141:20, 142:17, 193:16

wrote 103:15, 129:3, 140:10, 141:6, 150:14

Wunder 2:27, 6:15, 137:15

www.illinoiscompti on.net 42:22

43:5, 43:21, 44:4, 44:15, 45:14, 45:19, 46:23, 46:7, 46:12, 46:16, 46:19, 47:2, 47:9, 47:17, 48:11, 48:15, 49:2, 83:21

<X>

x4 122:6, 122:23, 124:6

x5 193:3

<Y>

Yahoo 75:8, 76:3, 76:7, 76:8, 76:14, 76:16, 122:11, 123:4, 167:11, 168:13, 207:10

year 15:11, 15:13, 16:13, 28:15, 28:21, 37:16

years 10:6, 18:8, 18:11, 19:8, 19:15, 26:22, 28:4, 103:24, 117:10, 145:13, 169:10

Yesterday 10:22

yourself 62:1

258

## Page 259

vague 92:18, 93:10

Valley 164:24

variations 214:22

variety 22:3

various 214:19

vear 196:21

verbal 7:16

verbatim 11:12, 68:9, 81:18

verdict 142:13, 142:14, 181:14, 194:13

verify 218:10

version 171:7, 172:1, 172:3, 172:4

versions 215:7

versus 182:4, 183:18, 192:18

via 33:6, 43:7, 177:23, 77:24, 137:33, 157:18

victim 37:37, 38:12, 185:23, 185:24

victims 191:24

view 52:16, 129:17, 176:21, 182:19, 183:24

viewed 91:4, 91:14, 166:11, 207:9

viewing 166:8, 207:6

views 43:17, 91:9

vindication 202:2

violated 49:7, 108:6

violation 48:17, 48:5, 49:11, 49:12, 101:11

virtual 127:10

Visa 101:10

voice 101:19

voices 73:23

Volta 170:7, 170:10, 171:1, 171:9, 173:15, 173:19, 178:10, 178:16, 178:19, 178:23, 182:20

volume 98:2

volunteers 191:14, volunteers 191:20, varias 214:22

VPN 127:10, 131:2, 167:22

Vpns 127:12

vs 1:9, 136:9, 220:9

<W>

wait 201:22

walk 14:14, 15:8

walked 71:15

Walt 62:24, 63:3

wanted 79:8, 79:11, 158:7, 174:10, 175:4, 187:7

wants 92:21

war 206:11, 205:16

warrant 54:11, 54:13, 67:14, 70:6, 70:11, 70:21, 71:7, 71:10, 71:14, 72:11, 72:20, 74:13, 74:17, 75:6, 75:7, 75:11, 75:14, 75:18, 75:19, 76:17, 77:24, 78:3, 95:9, 97:13, 98:21, 98:22, 99:10, 99:13, 99:20, 101:15, 101:16, 102:3, 102:6, 103:18, 104:2, 104:6, 141:21

warrants 54:4, 57:19, 61:20, 71:2

Washington 2:19

watching 166:8

ways 22:3, 154:10, 160:17, 180:4

Web 157:18, 159:6, 159:20, 159:23, 160:2, 160:24,

161:5, 161:6, 162:4, 162:5, 194:23, 217:6

webmail 153:4, 154:8, 159:1

website 111:14, 13:12, 42:21, 43:1, 43:5, 43:12, 43:17, 43:18, 43:20, 43:24, 44:4, 44:8, 44:11, 44:14, 44:16, 45:1, 45:7, 45:17, 45:13, 45:20, 46:4, 46:9, 46:12, 46:15, 47:2, 47:13, 47:17, 47:24, 48:10, 49:2, 49:3, 50:16, 51:9, 52:3, 52:8, 52:13, 52:14, 53:7, 53:12, 53:14, 53:20, 54:18, 54:21, 63:11, 63:14, 63:16, 63:19, 64:6, 67:17, 72:15, 72:21, 73:3, 73:12, 76:12, 82:5, 82:9, 82:13, 82:19, 84:19, 86:12, 86:16, 90:20, 91:13, 92:20, 93:11, 94:24, 95:17, 100:13, 101:3, 101:4, 103:10, 103:15, 139:12, 186:7, 186:18, 186:19, 186:20, 194:11, 196:2, 201:11, 201:19, 201:22

websites/related 201:7

weekend 13:2

weeks 9:17, 10:8, 11:6, 25:23,

259

## Page 260

219:3

William 2:34, 6:15, 34:21, 34:23, 35:2, 35:5, 35:10, 137:17

wireless 168:2

with 221:8

within 1:20, 20:9, 158:7, 221:6

Without 49:9, 49:14, 49:18, 64:15, 68:18, 92:9, 108:17, 119:13, 121:3, 158:19, 160:9, 173:10, 181:18

WITNESS 4:3, 6:1, 6:3, 58:19, 59:4, 92:5, 123:12, 134:14, 135:12, 138:2, 144:4, 151:5, 153:2, 153:22, 153:23, 175:19, 177:2, 179:12, 179:24, 183:6, 189:16, 188:24, 200:16, 200:24, 201:16, 205:19, 208:20, 212:24, 214:6, 218:19, 221:10, 221:22

witnesses 155:13, 155:16, 155:22, 156:2, 178:4

Woods 3:15, 13:7

word 91:21, 113:3, 113:6, 133:17, 155:19

words 86:10, 86:21, 93:1, 90:2, 100:21, 101:19

work 14:11, 15:5, 15:9, 16:1, 18:8, 18:19, 19:1, 19:18, 19:22, 20:22, 21:8, 21:11, 25:4, 25:18, 26:12, 26:22,

writing 92:13...

witness 178:19, 191:13, 192:23, 193:7, 199:9

260

# Exhibit 41

**French, Kyle**

| | |
|---|---|
| From: | French, Kyle |
| Sent: | Wednesday, May 24, 2006 4:10 PM |
| To: | bmartin@villageofschillerpark.com |
| Subject: | Second Comcast subpoena |
| Attachments: | comcast subpoena2.doc |



comcast
ibpoena2.doc (39 Kl

Kyle G. French
Assistant Attorney General
State of Illinois
Office of the Attorney General
High Tech Crimes Bureau
100 West Randolph, 12th Floor
Chicago, Illinois 60601
312-814-1155 Voice
312-814-8283 Fax
kfrench@atg.state.il.us

2

AG000172

PLAINTIFF'S
DEPOSITION EXHIBIT

FRENCH

MELONGO_004265

**French, Kyle**

| | |
|---|---|
| From: | French, Kyle |
| Sent: | Thursday, May 25, 2006 9:08 AM |
| To: | bmartin@villageofschillerpark.com |
| Subject: | Search Warrant |
| | |
| Attachments: | Search Warrant for Yahoo account.doc |

Per your request, the Yahoo! Inc. Search Warrant for Save A Life that goes with the previously forwarded Complaint accompanies this email as a Word attachment. I am not used to doing warrants for Cook County, so may have to tweak its format to look like typical Cook County search warrants:



Search Warrant for
Yahoo accou...

(note that the document looks distorted in the "print view" but that it prints okay).

Kyle G. French
Assistant Attorney General
State of Illinois
Office of the Attorney General
High Tech Crimes Bureau
100 West Randolph, 12th Floor
Chicago, Illinois 60601
312-814-1155 Voice
312-814-8283 Fax
kfrench@atg.state.il.us

1

AG000171

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

MELONGO_004266

# Exhibit 42

(Court Branch)                (Court Date)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

(3-98 CCMC-1-219)          (1)

STATE OF ILLINOIS    } ss.              THE CIRCUIT COURT OF COOK COUNTY
COUNTY OF COOK       }

### COMPLAINT FOR SEARCH WARRANT

PAGE     1

On this day   . I, Detective William Martin #29, Police Officer, for Schiller Park, Cook County, .   Complainant
now appears before the undersigned Judge of the Circuit Court of Cook County and requests the issuance of a search
warrant to search  the person of:

**Not Applicable**

and:

the premises of Yahoo! Inc. Sunnyvale, California, 94089

and seize the following instruments, articles and things:

1)      all subscriber information, such as name and address, date account created, account status, Yahoo! email
address, alternate email address, registration from IP, date ID registered and last known IP addresses;

2)      the contents of any and all email stored in the subscriber's Yahoo! email account(s);

3)      electronic files that the subscriber has stored in the subscriber's Photos and Briefcase areas;  and

which have been used in the commission of, or which constitute evidence of the offense of:

### 720 ILCS 5/16-3 (a) (3) Computer Tampering

Complainant says he has probable cause to believe, based upon the following facts, that the above
listed things to be seized are now located upon the ( person and ) premises set forth above:

Now appears Detective William Martin, Affiant, before the undersigned Judge of the Circuit Court of Cook
County Illinois, requesting the issuance of a Search Warrant to search and there from to seize any and all of each
of the following instruments, articles and things which have been used in the commission or which constitute
evidence of the offense 720 ILCS 5/16D-3(a)(3) (Computer Tampering):

Any and all records of and accounts for the Yahoo! Inc. subscriber ID melongo_annabel regarding the
subscriber's identification and use of Yahoo! Inc.'s services to include:

1)      all subscriber information, such as name and address, date account created, account status, Yahoo!
email address, alternate email address, registration from IP, date ID registered and last known IP addresses;

2)      the contents of any and all email stored in the subscriber's Yahoo! email account(s);

3)      electronic files that the subscriber has stored in the subscriber's Photos and Briefcase areas;  and

PLAINTIFF'S
DEPOSITION EXHIBIT

FRENCH 7
4/5/18

............................................................  #29
                                                COMPLAINANT
Subscribed and sworn to before me on ..........  5-31-06 ......................................

.......................................... 256
                                     Judge        Judge's No.

(Court Branch)    (Court Date)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

(3-98 CCMC-1-219)    (2)

STATE OF ILLINOIS
COUNTY OF COOK } ss.

THE CIRCUIT COURT OF COOK COUNTY

COMPLAINT FOR SEARCH WARRANT - CONTINUED

PAGE ___2___

4)    methods of payment provided by the subscriber to Yahoo! for any premium services.

The terms "records," "information," "email," and "electronic files" include all of the foregoing items of evidence in whatever form and by whatever means such records, information, documentation or data may have been created or stored.

Based on the following facts and information, probable cause exists that the above identified instruments, articles and things are now in the possession and control of Yahoo! Inc. On 9 May 06, I sent a preservation of evidence request to Yahoo! Inc. for the above-referenced items of evidence. 18 U.S.C. § 2703(f) allows law enforcement to send preservation of evidence requests to Yahoo! Inc. pending issuance and service of process. Sending preservation letters helps to ensure that material electronic evidence is not deleted in the course of normal business operations while law enforcement obtains and serves process within ninety days.

## INTRODUCTION

I, William Martin, am employed as a Detective with the Village of Schiller Park Police Department. I am assigned to the Police Department's Cyber Crime Unit and have been a Schiller Park Police Officer for 12 years. I am trained in computer crime investigation and computer use. During my career as an investigator, I participated in investigations involving computer related offenses. In addition, I have participated in search warrant executions involving the search for and seizure of computers, computer equipment, computer software, and electronically stored information.

## II.    CRIMINAL VIOLATIONS

Based upon the information set forth herein, I believe that probable cause exists to issue a search warrant for the above-identified instruments, articles and things which have been used in the commission or which constitute evidence of the offense 720 ILCS 5/16D-3(a)(3) (Computer Tampering).

## III.    SOURCES OF INFORMATION RELATED IN THIS COMPLAINT

_Wm Mart #29_

COMPLAINANT

Subscribed and sworn to before me on ............ _5-31-06_ .....................................

............................ 256

Judge    Judge's No.

(Court Branch)     (Court Date)

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

(3-98 CCMC-1-219)     (2)

STATE OF ILLINOIS
COUNTY OF COOK     } ss.     THE CIRCUIT COURT OF COOK COUNTY

COMPLAINT FOR SEARCH WARRANT - CONTINUED

PAGE     3

The facts set forth in this Complaint are based on my personal knowledge and investigation. The Complaint is also based on knowledge I obtained from other individuals (including law enforcement officers), my review of documents related to this investigation, communications with others who have personal knowledge of the events and circumstances described in this Complaint, and information gained through my training and experience.

I submit this Complaint for the limited purpose showing that there is sufficient probable cause to support issuing a warrant to search the items identified in Subsection I. This Complaint does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this Complaint are related in substance and in part only.

### IV.     DESCRIPTION OF CRIMINAL ACTIVITIES

Save A Life Foundation (Save A Life) is a non-profit entity with its national headquarters located in Schiller Park, Illinois. Save a Life's mission is to train people, including children, in Life Supporting First Aid Skills to aid in an emergency.

On or about April 27, 2006, Save A Life terminated employee Annabel Melongo. Ms. Melongo provided computer programming, network support, and hardware/software maintenance for Save A Life. Ms. Melongo possesses intimate knowledge of Save A Life's computer network infrastructure and access methods. In addition, Ms. Melongo is currently in the United States on the authority of a Cameroon Student Visa.

Beginning at or about 1:00 a.m. on or about April 28, 2006, and continuing until about 3:30 a.m., an unknown person accessed Save A Life's computer network without the knowledge or authorization of Save A Life. During this period of time, the person permanently deleted, removed and/or altered hundreds of computer files critical to Save A Life's operations.

.............................................
_W. West #29_     COMPLAINANT

Subscribed and sworn to before me on ........ 5-31-06

.............................................     .............
_signature_     Judge     Judge's No.

[Court Branch]     [Court Date]

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

(3-98 CCMC-1-219)    (2)

STATE OF ILLINOIS } ss.        THE CIRCUIT COURT OF COOK COUNTY
COUNTY OF COOK

COMPLAINT FOR SEARCH WARRANT - CONTINUED

PAGE    4

On or about the morning of April 28, 2006, Save A life's employees were unable to access certain computer files and network resources. As a result, Save A Life retained True Consulting and Critical Technology Solutions to repair Save A Life's computer network and attempt to restore deleted computer files.

On or about May 1, 2006, a person accessed the email account of Carol Spizzirri <cspizzirri@salf.org>, the President and Founder of Save A Life Foundation, without the knowledge or permission of Carol Spizzirri or Save A Life Foundation. The person used Carol Spizzirri's email account to forward contents from Carol Spizzirri's email account to an email account located at the address <melongo_annabel@yahoo.com>.

On May 2, 2006, numerous Save A life employees received an email sent from "Melongo Annabel" at "melongo_annabel@yahoo.com." The email included content from an email message that was forwarded by the person who surreptitiously accessed Carol Spizzirri's account on or about May 1, 2006.

### V.    YAHOO INC'S SERVICES, RECORDS AND INFORMATION

Yahoo! Inc. is a publically owned American computer services company that operates various Internet World Wide Web Sites, a directory of Internet content and host of other services including free email accounts. In addition to offering free services, Yahoo! Inc. also offers numerous paid services for consumers and businesses such as classifieds advertising (Premium Services).

Yahoo! Inc.'s Compliance Guide For Law Enforcement states that Yahoo! Inc. maintains numerous records and information which can assist me in identifying who has used the <melongo_annabel@yahoo.com> email address in connection with the above-described computer tampering activities. Yahoo! Inc.'s records and information include when the account was created, what Internet Protocol (IP) addresses were used to create and subsequently access the account, the content of email sent to/from the account, and the content of the subscriber's Yahoo! Briefcase area.

### VI.    AUTHORITY, SERVICE AND ASSISTANCE

COMPLAINANT

Subscribed and sworn to before me on .................. 5-31-06 ..........................

Judge      Judge's No.

Melongo v. Podlasek, et al.        13-cv-4924        Attorney General 000091

(Court Branch)          (Court Date)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS.**

(3-98 CCMC-1-219)          (2)

STATE OF ILLINOIS  } ss.
COUNTY OF COOK     }

THE CIRCUIT COURT OF COOK COUNTY

COMPLAINT FOR SEARCH WARRANT - CONTINUED

PAGE    5

I am familiar with the federal statute that controls the legal process through which we are authorized to obtain electronic information from a service provider. In specific, the Electronic Communications Privacy Act, 18 U.S.C. § 2703, requires the use of a warrant to obtain information from an electronic service provider for the content of email maintained by that provider, and authorizes the use of a warrant to obtain other information such as IP addresses, subscriber information and related account information.

Warrants issued under the Electronic Communications Privacy Act normally operate as subpoenas: civilians from the ISP at which the information is maintained gather the information for the police in much the same way as banks or other large entities search through their records and obtain the appropriate information for police and investigators pursuant to subpoena. Therefore, I seek authorization for civilian assistance from Yahoo! Inc. representatives for the execution of this search warrant because their technical assistance will be necessary to obtain the information from Yahoo! Inc.'s files. Note that pursuant to 18 U.S.C. § 2703(f), my presence is not required for service or execution of a search warrant.

I'm also familiar with the California Penal Code § 1524.2 which states that all California Corporations, such as Yahoo! Inc., must honor legal process from foreign states when the foreign states are seeking electronic evidence under the terms of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2701 et seq.

**VII.    NON-DISCLOSURE**

If Yahoo! Inc. alerts the subscriber of the melongo_annabel account about the requested warrant, the subscriber may flee from prosecution, evidence may be destroyed or otherwise tampered with and/or the investigation of the above-identified activities may be seriously jeopardized. Accordingly, I request that the warrant not allow Yahoo! Inc. to notify anyone about the warrant other than people necessary to comply with the purposed search warrant.

This electronic message transmission contains information from the Schiller Park Police Department that may be proprietary, confidential and/or privileged.
The information is intended only for the use of the individual(s) or entity named above. If you are not the intended recipient, be
aware that any disclosure, copying or distribution or use of the contents of this information is prohibited. If you

#29

5-31-06

COMPLAINANT

Subscribed and sworn to before me on ..........................................................

2/6

Judge          Judge's No.

Melongo v. Podlasek, et al.                    13-cv-4924                    Attorney General 000092

(Court Branch)      (Court Date)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

(3-98 CCMC-1-219)     (2)

STATE OF ILLINOIS     } SS.            THE CIRCUIT COURT OF COOK COUNTY
COUNTY OF COOK

COMPLAINT FOR SEARCH WARRANT - CONTINUED

PAGE   6

have received
this electronic transmission in error, please notify the sender immediately by replying to the address listed in the
"From:" field.

Subscribed and sworn to before me on ............... S-31-06

COMPLAINANT

Judge     Judge's No.

Melongo v. Podlasek, et al.         13-cv-4924         Attorney General 000093

# Exhibit 43

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page 1 of 1

**French, Kyle**

From:        Bill Martin [bmartin@villageofschillerpark.com]
Sent:        Friday, October 13, 2006 11:25 AM
To:          French, Kyle
Subject:     Report
Attachments: Spizzirri.doc

Kyle,

　　Here is the copy of my report so far. This is just the narrative for the actual report that I will finish after we meet with ASA Blestek.

Bill Martin

This electronic message transmission contains information from the Schiller Park Police Departme
The information is intended only for the use of the individual(s) or entity named above. If you
aware that any disclosure, copying or distribution or use of the contents of this information is
this electronic transmission in error, please notify the sender immediately by replying to the a



PLAINTIFF'S
DEPOSITION EXHIBIT
FRENCH    16
4/5/18        BD

MELONGO V. PODLASEK, et al., 13 C 4924
CCSAO 002234

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

R/I received a voice mail message and an email message from Mr. French. The email message contained two files, the complaint for the search warrant for Ms. Melongo's apartment and the search warrant for the apartment. R/I spoke with Mr. French who arraigned for Illinois Attorney General Computer Forensic Personnel to accompany R/I when serving the search warrant. R/I tentatively set the date for serving the warrant at the apartment for 20 Jul 06.

19 Jul 06

R/I went to Rolling Meadows courthouse to have the search warrant entered and signed by a judge. ASA Jim Pontrelli reviewed the warrant documents and approved them. R/I then went before Judge Etchingham, who also reviewed the complaint and search warrant. After doing so, Judge Etchingham signed the search warrant allowing R/I to search Ms. Melongo's apartment and seize any evidence relating to this crime along with her computer and any other computer equipment.

R/I then notified Shahna Monge of the computer crime task force for the Illinois Attorney General's Office (IAG), that the warrant had been signed by the judge. Ms. Monge then made arraignments with IAG personnel to meet R/I at Palatine P.D. at 0800 hours on 20 Jul in order to serve the warrant. R/I then contacted Cook County Sheriffs Office to notify them of the warrant service in order to have them participate in the warrant service if they so desired.

20 Jul 06

R/I, Det. Koch #11, Ms. Monge and her co-worker Amber Haqqani, went to Ms. Melongo's address in Palatine in an attempt to serve the search warrant. After several minutes on scene, Ms. Melongo drove up to the building. R/I immediately identified himself and had Ms. Melongo exit her vehicle and allow R/I and the others access to her apartment. R/I had Ms. Melongo sit in the kitchen and read her copy of the search warrant as Det. Koch monitored her. R/I along with Ms. Monge and Ms. Haqqani, search the apartment for items mentioned in the warrant. After extensive searches of the entire apartment, all items of evidentiary value were seized (refer to Schiller Park Police Department evidence sheets for a list of items removed from the apartment).

At 1015 hours, R/I read Ms. Melongo her Miranda rights from the voluntary statement form and had her initial said form. Ms. Melongo agreed to speak to R/I at that time, without the presence of an attorney. Ms. Melongo stated the following in summary but not verbatim. Ms. Melongo stated that she went to SALF on Monday, April 27th 2006, to pick up her pay check. While there, she overheard that the company was having a computer problem and offered to help. Ms. Spizzirri then accused Ms. Melongo of causing the problem. Ms. Melongo denied the allegations and stated that she only offered to help because her replacement was not as qualified as Ms. Melongo was with computers. Ms. Melongo stated that while employed at SALF she held the job titles of system administrator, web designer, and programmer. Ms. Melongo also stated that because of her job duties she had access to all passwords for all SALF employees, access

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

to the web server, and all of the company's passwords. Ms. Melongo also admitted to accessing the server to get her emails for up to two weeks, 27 Apr 06 to 14 May 06, after her exit interview on 27 Apr 06. Ms. Melongo claimed she was checking only her SALF email account and did not change any settings or system passwords. Ms. Melongo also admitted to viewing Ms. Spizzirri's emails in which Ms. Spizzirri blamed Ms. Melongo for the problems SALF was having with their computer systems. After she viewed those emails, Ms. Melongo then forwarded those emails to her yahoo email account melongo_annabel@yahoo.com. Ms. Melongo stated that no one else accesses her yahoo account but her.

On Monday, 1 May 06, Ms. Melongo spoke with Vince Davis from SALF, and again offered to fix the network problem. Ms. Melongo was informed that SALF was in the process of fixing the problem and that they no longer needed her services. On 3 May 06, Ms. Melongo stated she sent an email to Ms. Spizzirri in response to Ms. Spizzirri blaming Ms. Melongo for the system problems. Ms. Melongo stated that she had access to SALF's entire computer system and was responsible for everything computer related. Ms. Melongo stated that her replacement, Christian, was hired three weeks before she was fired. She believes that she was fired because Christian agreed to work for less money to do the same job as she but that he did not have the same networking skills as she did.

When asked about her residency, she claimed that she has lived in Palatine for approximately 18 months and initially had Comcast as her internet service provider until about four months ago when she switched to SBC Yahoo DSL as her current ISP. Prior to moving to Palatine, she lived in Willowbrook and Naperville.

When asked if she knew a Tanya Spears, Ms. Melongo stated that a Tanya Spears used to work for SALF at the front desk. Ms. Melongo also stated that she had spoken with Ms. Spears approximately two weeks ago in reference to a computer problem Ms. Spears had at her house. Ms. Melongo stated that she had yet to call Ms. Spears back about assisting her.

When asked about SALF and their company purchases, Ms. Melongo stated that company procedure was that all purchases are made through requisitions to Ms. Spizzirri and no one else. Ms. Melongo stated that SALF's servers contained business forms, pictures, etc., and that they were all divided up by department. Even though she was the system administrator, she claimed that she could not access anything in the accounting or executive file tree. Ms. Melongo stated that she was the one who designed the file security system for SALF from input and authorization of Ms. Spizzirri. Ms. Melongo also stated that she never had any access to SALF bank accounts or credit card numbers. That information was only accessible by those employees in the accounting department. Ms. Melongo stated that the only employees who had that information were Dane, Ms. Spizzirri, and Bruce Nawara, of Nawara Financial Advisors (708-448-7100). Ms. Melongo showed R/I a business card from Mr. Nawara and claimed that she was told by Ms. Spizzirri to give him a password to access the accounting files on the SALF servers and that he was allowed to remotely access the servers for the accounting files. Ms. Melongo claimed that when she found that he had been remotely accessing the servers on 25 Apr 06, she immediately notified Ms. Spizzirri.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

When asked if she knew a Saquan Gholar, Ms. Melongo stated that Mr. Gholar was an employee at SALF in the education department, Ms. Melongo stated that he was only an acquaintance and that she had no contact with him since she had been fired.

After R/I concluded the interview, R/I advised Ms. Melongo that she was not under arrest at that time and that R/I would be in contact with her after all of the evidence had been processed. All of the evidence that had been seized was brought back to SPPD where it was inventoried and placed in the evidence locker for safe keeping.

21 Jul 06-

R/I along with Det. Koch #11, collected the electronic/computer evidence and brought it to 188 E. Randolph, Chicago, IL, The Regional Computer Forensics Lab, to be processed by a certified computer evidence recovery technician. R/I's met with Ms. Monge and Ms. Haqqani there and released the items to Ms. Monge, so that she could process the items for any evidence relating to this incident. R/I had her sign the Schiller Park Property Inventory Control Sheet showing the chain of custody of the evidence.

28 Sep 06-

R/I was contacted by Ms. Monge, who advised that the forensic analysis on the items submitted was complete and the report and the items were ready to by returned to R/I. R/I and Det. Koch went to the RCFL in Chicago and recovered the items from Ms. Monge. R/I's then brought the evidence back to SPPD where it was returned to the evidence locker for safe keeping.

R/I then made a copy of Ms. Monge's cover letter and forensic report summary from the CD she provided R/I. The summary showed that Ms. Melongo did access the SALF server remotely, had a Comcast IP address of 24.15.202.102 on 28 Apr 06, having access to Ms. Spizzirri's email account and password, emails on her Roosevelt University email account with references to individuals at SALF, a word document containing the name Saquan Gholar, IP addresses associated with SALF Scantron System, images from the SALF website, database items from the SALF server.

13 Oct 06-

R/I spoke with Mr. French from the Illinois AG's Office. Mr. French advised that he has coordinated a meeting between himself, ASA Biestek, and R/I, so that ASA Biestek could review all of the evidence and to determine if there is enough evidence to charge Ms. Melongo with a felony in this case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5 May 06-

R/I was assigned the initial case report 06-3219 reporting an incident of Computer Tampering. R/I received copies of the emails that had been sent to and from Carol Spizzirri's email account. The headers on the emails showed that the offender had forwarded the suspected emails from Ms. Spizzirri's account to the Yahoo email account of melongo_annabel@yahoo.com. R/I then contacted Yahoo Subpoena Compliance Department and left them a message to contact R/I in reference to this investigation.

8 May 06-

R/I received a message from Michelle at Yahoo Legal Department, who advised R/I to fax a preservation letter to Yahoo asking for a snapshot of the Yahoo account at the time the fax was received and to advised them that a subpoena will be forthcoming.

9 May 06-

Det. Henn, #22, faxed the preservation letter to Yahoo asking Yahoo to preserve the account records of melongo_annabel@yahoo.com and take a snapshot of the account for the last thirty days and all days that follow until they receive the subpoena.

15 May 06-

R/I spoke with Comcast Cable Services Legal department about how to obtain the necessary account information related to the IP address that was found in the header of the emails that were forwarded to the Yahoo account in question and was assigned to the offender's computer at the time of the intrusion to Save-A-Life's computer, R/I was advised that R/I would need to fax them a preservation letter also and then a subpoena to follow in order for Comcast to release any information to R/I.

16 May 06-

R/I and Lt. Schulze, #30, met with Kyle French of the Illinois Attorney General's Office in reference to this investigation. Mr. French advised that he was available to assist with the investigation and had already sent preservation requests to Yahoo, Comcast, and Roosevelt University. Mr. French, after searching the internet found that the suspect, Ms. Annabel Melongo, was currently a student at Roosevelt University and that she had an email account issued to her by the University. Mr. French felt that it may be necessary for R/I to send another preservation letter to Comcast. Therefore, R/I prepared the letter and faxed it to Comcast.

R/I and Lt. Schulze went to the listed address for Ms. Melongo, 1218 East Long Valley Dr., Apt. #3A, in Palatine, IL. Ms. Melongo's name was on the mailbox but her vehicle was not in its assigned parking space.

17 May 06-

MELONGO V. PODLASEK, et al., 13 C 4924
CCSAO 002238

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

R/I and Lt. Schulze met with Robert Barnes and Vincent Davis of Save-A-Life Foundation (SALF). Both men were able to give R/I more information about Save-A-Life and there computer system. Mr. Barnes informed R/I that the times noted on the server logs are local times and that the system has automatic daylight savings time adjustment. Mr. Barnes also gave R/I more information on the suspect, Ms. Melongo. Mr. Barnes stated that Ms. Melongo had no prior knowledge that she was being fired on 27 Apr 06. Once her employment was terminated, Ms. Melongo had no further access to the computers from within the building and that an employee named Christian changed all of the pass codes to each of the servers after she left the building. Mr. Barnes stated he had no knowledge of Ms. Melongo having any other email accounts other that the yahoo mail account, but stated that she does have a laptop that she uses from time to time. Mr. Barnes also stated that he knew the suspect was a student at Roosevelt University. Mr. Barnes also believed the intrusion to the computer system occurred somehow through the web via the company's email server but he was unsure as to how this may have occurred because the company disconnected the DSL lines from the servers after the suspect's employment was terminated. Mr. Barnes advised R/I that the computer system's auto backup program was scheduled to begin at 0325 hours and may have kicked the suspect out of the server at that time.

Mr. Davis stated that only four employees at SALF knew about the trial that SALF is currently involved in with Robert Half and that the suspect was not one of them that he knew of. Mr. Davis believed the suspect had been monitoring SALF management's email for some time. Mr. Davis also gave R/I the name of the person who they called to repair the server on 1 May 06, Critical Technology Solutions.

R/I returned to SPPD and called Critical Technology Solutions and spoke with Don Peters, the president of the company. Mr. Peters stated that on 1 May 06, he was contracted by SALF to attempt to perform data recovery procedures on SALF's two computer servers. Mr. Peters advised R/I that he was told by Ms. Spizzirri that multiple personnel attempted recovery on the drives prior to him being contacted. Mr. Peters advised her that any evidence discovery would be questionable due to there being no clear chain of custody. Mr. Spizzirri's decision was to move forward with the recovery efforts when it was learned that the previous backups were incomplete or missing. R/I asked if Mr. Peters would fax R/I the letter he sent to Ms. Spizzirri, advising her of his recovery findings. Mr. Peters also sent an email to R/I, documenting the conversation he had with Ms. Spizzirri and her employees about the recovery vs. evidence preservation.

R/I then contacted Roosevelt University. R/I spoke with the CIO of the University, who advised R/I that the suspect is a student there and that she does have an email account, amelongo@roosevelt.edu. He did state that he could not provide R/I with any other information about their email system.

R/I then contact Web HSP in Colorado, the web host for SALF's email server. R/I was advised to speak to Mike, the owner of the company. Mike informed R/I that the company should have the IP addresses of any computer accessing his company's servers and that he would send R/I the information collected for the dates of the intrusions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18 May 06-

R/I received the fax from Mr. Peters, which was a copy of the recovery overview that he sent to Ms. Spizzirri on 11 May 06. The overview showed the amount of files recovered from the Dell server and described the reasons for the inability to recover any files from the Sony server.

At 1700 hrs., R/I was contacted by Ms. Spizzirri who stated that she was informed about some unauthorized charges on the company's American Express account. Ms. Spizzirri advised R/I that SALF's bank account and credit card account information was contained on the server prior to the intrusion. R/I then sent a patrol officer to SALF to take the report from Ms. Spizzirri. Refer to report #06-3714.

19 May 06-

R/I received a copy of the report made by Ms. Spizzirri on 18 May 06. R/I then contacted American Express Fraud Department. R/I spoke with Bob Curran who stated he would fax R/I a copy of the account activity for the dates of 13 May 06 to 18 May 06.

R/I then contacted EBay's Fraud Investigation Team about the charge to the SALF AmEx account. R/I was advised that Ms. Melongo did have an account with them but there have been no purchases over $14 made on the account.

R/I then sent an email to Amazon.com's Fraud Department asking for information about the transaction that occurred on 18 May 06 involving SALF's AmEx account. R/I was later faxed a copy of the transaction record which showed all of the information the offender had to enter in order to complete the transaction, along with the list of items the offender attempted to purchase from Amazon.com.

R/I then attempted to contact all of the merchants listed on the AmEx account activity statement that R/I received from Mr. Curran. R/I was able to reach a customer service representative at Eastbay Inc. The representative, Amanda, advised R/I that she had no record of any transactions involving SALF's account number dating back to 2003. R/I then called and spoke to Tasha at Old Navy's customer research department. Tasha was able to provide R/I with the ship to name and address of Toni Smith, 700 Cynthia Ln., Glendale Heights, IL, and a phone number of 630-369-5489. The bill to name was Carol Spizzirri with a phone number of 847-829-2968. Tasha stated that the offender purchased 13 items that were expedited via Fed Ex and according to Old Navy's records, the package was left at the door for pickup and not signed for. Tasha further stated that four of the item purchased were gift cards that for some unknown reason, were never activated by the shipper and will never be able to be activated. Tasha stated that if R/I needed more information about the transaction, R/I would have to fax a subpoena to the charge back department of Old Navy.

R/I then contacted United Airlines, but got no answer at their fraud department. R/I then attempted to contact Triple Crown Publishing, Gift Certificates Center, E-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Fashion Consultants; Bakers Footwear; and Carson Pirie Scott in reference to the fraudulent transactions. R/I was only able to leave messages with these merchants.

R/I then contacted Ms. Spizzirri and asked if she knew a Toni Smith in Glendale Heights, which she did not, and whether or not she recognized any of the phone numbers that were associated with the fraudulent transactions.

22 May 06-

    R/I spoke with Susan Bostick of Bakers Shoes about the fraudulent transaction that had occurred online on 17 May 06 at 18:38:05 PDT on their website. Ms. Bostick stated she would fax R/I a copy of the order detail form showing the items purchased along with billing and shipping information. Ms. Bostick also advised R/I that the shipment had not yet been shipped to the customer because her fraud department flagged the order as possibly being fraudulent. R/I then asked for her not to ship the items so that R/I could contact Fed Ex in an attempt to set up a controlled delivery. Ms. Bostick stated that she would have to speak to her superiors before she could authorize the use of the merchandise for the delivery.

    R/I then called Consumerinfo.com's customer service department and spoke with a representative named Rose. Rose advised R/I that the $1 charge on the SALF AmEx account was a pre-authorization charge and the $5 charge was for a credit score for a particular individual. Rose claimed she could not give R/I any further information but she could give it to the customer (i.e. SALF), without a subpoena. R/I then left a message for Ms. Spizzirri requesting that she contact Consumer Info asking for any and all information that was disseminated to the offender.

    R/I again left messages with the other merchants requesting they contact R/I in reference to the fraudulent charges involving SALF's AmEx account. R/I, using various databases, was able to research the address of 700 Cynthia Ln. in Glendale Heights, along with the phone numbers given to Amazon and Bakers Shoes as contact numbers and the name Toni Smith. R/I found no connection to SALF at that time.

23 May 06-

    R/I received an email from Mr. French that contained the Grand Jury Subpoena request for Comcast and Yahoo.com. R/I then converted the files onto the proper forms and printed them out so that R/I could fax them to the state's attorney's office to be processed for court on 25 May 06.

25 May 06-

    R/I spoke with Brian Henry, an investigator for Experian Credit Bureau. Mr. Henry stated he was contacting R/I on behalf of Ms. Spizzirri, who had contacted Experian in reference to the charge to Consumer Info, which is owned by Experian. Mr. Henry explained the charges to R/I and the reasons for the two different amounts. Mr. Henry also gave R/I the name of the person whose credit score was purchased. Mr. Henry gave R/I the name of Saquan Gholar and advised R/I that the subject lives in Illinois. Mr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Henry could not give R/I any further information without a subpoena. Mr. Henry explained that with a subpoena, R/I could obtain more demographic information about Mr. Gholar such as email address, physical address, his mother's maiden name and his actual date of birth. R/I did a search through SOS and was able to obtain a photo of Mr. Gholar.

31 May 06-

R/I received the response to R/I's request for the Grand Jury subpoenas. R/I then faxed the subpoena to Comcast cable services requesting information on the assigned internet account of two of their IP addresses for the dates of the intrusion and the purchase from Amazon.com. A second subpoena was sent to Comcast requesting any account information for Ms. Melongo and her address of 1218 East Long Valley Dr., Apt. #3A, in Palatine, IL.

R/I also went in front of Judge Tobin who signed a request for a search warrant to be served on Yahoo.com requesting subscriber information and email account contents. R/I then faxed the search warrant to Yahoo legal compliance.

5 Jun 06-

R/I received a response from the subpoenas sent to Comcast. Comcast claimed that their records for the IP address of 24.15.202.102 for the dates and times requested by R/I were incomplete or contained an error associated with the cable modem or other device. Therefore, they could not give R/I any information as to which of their customers had that IP address at the times of the intrusions into SALF's servers. In response to the subpoena for account information for Ms. Melongo at 1218 East Long Valley Dr., Apt. #3A, in Palatine, IL, Comcast stated they have no information responsive to R/I's request. In response to the subpoena asking for account information for IP address of 71.57.72.196 on 17 May 06 at 20:11:42 PDT. Comcast gave R/I the name on the account as Andrea Smith, with and address of 229 S. 14th Ave. Apt. #1, Maywood, IL 60153, a telephone number of 708-369-2968. Along with email addresses of ttspears4@comcast.net and wookie91@comcast.net, and a Comcast account number of 8798200010470727.

7 Jun 06-

R/I contacted Comcast IP Services about them not having any information for Ms. Melongo or the listed address for her. R/I was advised that Comcast needed two separate subpoenas in order for them to search just the name and/or just the address. R/I then prepared those subpoenas as requested and faxed them to the State's Attorney's Office so that they could go in front of the Grand Jury on 8 Jun 06.

R/I, along with Det. Koch #11, went to 229 S. 14th Ave. in Maywood, IL and rang the bell but got no answer. R/I wrote down several license plates of vehicles parked in front of the building. R/I later ran those plates but none came back to Andrea Smith. R/I did a check of Andrea Smith through various databases and found a photo of an F/B that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

had an address of 134 S. 12th St. in Maywood, IL. The phone number given by Comcast came back to a cell phone owned by a Betty Spears.

R/I was contacted by Mr. Barnes from SALF. Mr. Barnes stated that the company found an unauthorized automated clearing house (ACH) debit on the company's Chase Bank account monthly statement. The ACH debit was to Comcast in the amount of $200.00 on 22 May 06. Mr. Barnes then faxed R/I a copy of the bank statement showing the debit in question along with the form sent to him by Chase showing the disputed charge. R/I contacted Chase Bank's Fraud Department in order to obtain more information about the transaction. R/I spoke to Terry Working who advised R/I that she could not tell for sure whether it was a check by phone transaction or if the offender actually made the payment in person at the Comcast Bill Payment Center. Ms. Working did state that the bank was in the process of refunding the money to SALF's account.

R/I then contacted Comcast Customer Service. The representative that R/I spoke with claim that she too could not give an indication how the bill was paid but did state the account that the payment was applied to was in the name of Andrea Chase at 229 S. 14th Ave. in Maywood, IL.

9 Jun 06-

R/I went back to Ms. Melongo's address in Palatine but again got no answer at the door and there was no vehicle in her assigned parking space.

14 Jun 06-

R/I and Det. Koch went to 229 S. 14th Ave. in Maywood, IL but again got no answer at the door.

15 Jun 06-

R/I and Det. Koch went to the address of 700 Cynthia Ln., in Glendale Heights. R/I wrote down several license plates of the vehicles in the driveway at that location and parked in front of the home.

20 Jun 06-

R/I again went to Ms. Melongo's apartment building in an attempt to speak with her, but again got no answer.

23 Jun 06-

R/I did a check of the license plates obtained from the address in Glendale Heights. One of the plates registered to a Reachelle Spears at that address. Ms. Spears has an extensive criminal background.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

R/I also contacted the State's Attorney's office in reference to the last subpoena request that were faxed to them on 7 Jun 06. R/I was advised that they never received those documents and therefore R/I had to resend them.

R/I received the response from the Yahoo search warrant. Yahoo's login tracker captured the IP address for Ms. Melongo's Yahoo account login at 21:46:03 GMT on 27 Apr 06 as being 24.15.202.102. Each time Ms. Melongo's yahoo account was logged into from that time to 2 May 06 at 16:47:23 GMT, it had that specific IP address.

Yahoo's account management tool showed all the information pertaining to Ms. Melongo's account along with its creation date, 7 May 2000, and the dates and times that her password was changes along with the IP address assigned at the time these changes were made. One of the changes occurred on 4 May 06 at 22:46:04 PST and the IP address assigned at that time was 24.15.202.102. Also included in the response (on CD-R) was the contents of the account's briefcase and a snapshot of the email accounts contents at the time the preservation letter was received.

One of the files recovered from the Yahoo briefcase was Ms. Melongo's resume, showing her work history up to September of 2005. Another file recovered was a letter that appeared to be written as a response to an investigation into some x-rated emails being sent to a Professor Oguz. The investigation was being performed by a Zauyah Waite. The letter was signed by Annabel, and in it she wrote that she blames Ms. Waite for being bias and personality conflicts for her being accused of sending the emails to the Professor.

R/I contacted Roosevelt University to verify whether or not they had a Professor Oguz on staff. R/I was informed that they did not have a Professor by that name. R/I then contacted the University of Missouri-Kansas City, where Ms. Melongo's resume stated she attended from January 2000 to March 2002. R/I spoke with Sgt. Leach at the U of M-KC Campus Police Department. Sgt. Leach advised R/I that the university did have a Professor Oguz and he was somewhat familiar with the investigation R/I had spoke to him about. Sgt. Leach stated that he would fax R/I a copy of the reports for the incident and also have the professor contact R/I for further information.

At approximately 1930 hours, R/I was contacted by Professor Oguz. Professor Oguz remember the incident and claimed that the reason Ms. Melongo was not charged with a crime was because the Campus Police could determine for sure that she had sent the emails because both she and her roommate at the time were both signed in to the University's email server at the exact time that the emails were sent anonymously to the professor.


28 Jun 06-

R/I faxed Yahoo's response to the search warrant to Mr. French. Later that day, R/I spoke to Mr. French who stated that he reviewed the information that R/I had sent him with his boss. After reviewing the information, both he and his boss believed that with this new information, there was enough evidence against Ms. Melongo for a search warrant for her home could be issued. Mr. French stated he would send R/I the request for the search warrant by 30 Jun 06 so that R/I could get it signed by a judge on 5 Jul 06. If the warrant was signed, Mr. French would arrange for R/I to be accompanied by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Immigration Customs Enforcement and personnel from the Attorney General's Office Computer Forensics Team when serving the warrant on 6 or 7 Jul 06.

5 Jul 06-

R/I received the subpoenas signed by the Grand Jury on 29 Jun 06. R/I then faxed them to Comcast requesting account information for the ACH debit transaction.

R/I also had not received the search warrant from Mr. French, so R/I contacted him and left him a message to contact R/I.

10 Jul 06-

R/I called Mr. French in reference to the search warrant for Ms. Melongo's apartment. Mr. French stated that his boss reviewed his initial draft and stated that it needed more information in it. R/I then emailed Mr. French a copy of this report for him to refer to for the required information. Mr. French stated that he would attempt to get R/I the search warrant by 14 Jul 06.

12 Jul 06-

R/I received a call from Sharma Austin at Comcast Cable. Ms. Austin stated that there records showed the date of the ACH debit was on 21 May 06 and not 22 May as stated in the subpoena she received. R/I explained to her that the Chase Bank statement showed the ACH debit posted to the account on 22 May and that was the reason 22 May was written on the subpoena. Ms. Austin stated she would have to check with her superiors to verify whether or not R/I had to send them a new subpoena for the correct date or if she could just make the correction on the initial one and then send R/I the response to that initial subpoena.

R/I then contacted the state's attorney's office and left a message for ASA Northcutt advising him of the issue with the subpoena for Comcast and R/I's conversation with Ms. Austin.

13 Jul 06-

R/I received Comcast's response to the subpoena dated 29 Jun 06. Comcast's records showed that the account that the ACH Debit was applied to belongs to Andrea Smith with the same Comcast account number of 8798200010470727.

18 Jul 06-

# Exhibit 44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

FILED

DEC 0 3 2009

DOROTHY BROWN
CLERK OF CIRCUIT COURT

IN THE CIRCUIT COURT OF COOK COUNTY
COUNTY DEPARTMENT, CRIMINAL DIVISION

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 08CR10502 |
| | ) | |
| ANNABEL K. MELONGO, | ) | |
| Defendant | ) | |

**PEOPLE'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS**

The People of the State of Illinois, by and through their Attorney, ANITA

ALVAREZ, State's Attorney of Cook County, through her assistants, Robert Podlasek

and Julie R. Gunnigle; and LISA MADIGAN, Illinois Attorney General, by her assistant,

Kyle G. French, respond to Defendant's Motion to Dismiss as follows:

The Defendant's motion argues that the indictment should be dismissed under

sections 114-1(a)(12) and 114-1(a)(13) of the Code of Criminal Procedure for "failing to

correct perjury given at the grand jury" and "failure to inform the grand jury of the

existence of evidence exculpatory to the accused." Neither of these two sections of the

Code of Criminal Procedure exist. Taking the Defendant's claims more broadly, she has

not demonstrated any denial of her due process rights prejudicing her defense, and

therefore her motion to dismiss the indictment should be denied.

A trial court has limited authority to dismiss charges prior to trial. The court may

do so only under the grounds set forth in section 114-1(a) of the Code of Criminal

Procedure or "where there has been a clear denial of due process which prejudiced the

defendant." *People v. Knopp,* 557 N.E.2d 970, 973 (Ill. App. Ct. 1990). The Defendant

has not made such a showing.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

The defendant is claiming that Detective Martin perjured himself while testifying before the grand jury in January 2007 and May 2008. To commit perjury one must make a false statement, material to the issue or point in question, which one does not believe to be true. 720 Ill. Comp. Stat. 5/32-2. To the extent that Detective Martin answered the question "do you know why [Annabel Melongo] was terminated?" in two different ways, first by responding that she was terminated for stealing email and later responding "not off the top of my head, no," these differences do not constitute perjury. These statements are not contradictory on their face, nor are they material to the offense charged.

To the extent that the defendant disputes findings of Safe A Life Foundation's internal investigation, the amount of data actually deleted, the quality of Google's customer service, and Comcast's response to one of the many subpoenas issued in the course of the investigation, a motion to dismiss is not the appropriate way to address these concerns. "Grand jury proceeding are not intended to approximate a trial on the merits." *People v. Fassler*, 605 N.E.2d 576 (Ill. 1992). Indictments are proper when the People have presented *any* evidence from which an inference of criminal conduct can be drawn. *People v. Rodgers,* 442 N.E.2d 240, 245 (Ill. 1982). In this case, the People have provided ample evidence in the form of Detective Martin's testimony implicating the Defendant.

Wherefore, for all the foregoing reasons, the People urge this Honorable Court to deny Defendant's Motion to Dismiss the Indictment.

Respectfully submitted,
ANITA ALVAREZ
Cook County State's Attorney

By: _____        _____
Robert Podlasek                                    Julie Cunnigle

MELONGO V. PODLASEK, ET AL., 13 C 4924
CCSAO 009127

# Exhibit 45

## SCHILLER PARK POLICE DEPARTMENT

### REPORT OF INQUIRY

C.R. NO.    12-1890                                    DATE:  July 11, 2012

COMPLAINANT: Annabel Melongo      SEX: F   RACE:    AGE:

ADDRESS:                CITY & STATE             TELEPHONE

COMPLAINT RECEIVED BY: Lt. Ladonsky       DATE: March, 2012

MANNER COMPLAINT TAKEN:  IN PERSON     TELEPHONE    LETTER   X

COMPLAINT CATEGORY:

LOCATION OF INCIDENT: Grand Jury      DATE: January 2007 and May 2008

ACCUSED MEMBER: Detective Martin

WITNESSES:

NARRATIVE:

Complainant Melongo sent a sworn complaint via the U.S. Postal Service to the Schiller Park Police Department. Ms. Melongo was incarcerated at the time of the complaint. Contained in the affidavit were allegations against Detective Martin that he committed perjury during his testimony in front of the Grand Jury.

Detective Martin provided a written response to Ms. Melongo's complaints. Detective Martin was able to dispel the alleged discrepancies which appeared to be taken out of the context of the entire case compilation.

Ms. Melongo's trial is still pending at the time of this complaint. It appears that Ms. Melongo is utilizing the allegations as a tactic to attempt to have her charges dismissed.

The complaint is, at this time, determined to be 'Unfounded.'

Confidential-Subject to
Protective Order

# Exhibit 46



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** Voita, Shahna G [Shahna.G.Voita@ice.dhs.gov]
**Sent:** Monday, June 16, 2014 1:48 PM
**To:** ROBERT M PODLASEK (States Attorney)
**Subject:** Questions/concerns after review

I will start with the police report:

1. Page 1 "15 May 06 – R/I spoke with Comcast Cable Services Legal department about how to obtain the necessary account information related to the IP address that was found in the header of the emails that were forwarded to the Yahoo account in question...."
   a. I did not see a copy of this email, so I'm not sure if they were looking at the correct IP of the sender of the email. An email header will show several IP addresses, which is the path that it took from the sender to the receiver. If they did not look at the correct IP, they may have been requesting information for one of the stops along the way and not the originating IP address. I can explain further if this doesn't make sense.

2. Page 2, 9th line down: "yahoo mail account, but stated that she does have a laptop...."
   a. Was this laptop a company issued laptop or a personal laptop?
   b. If a personal laptop, was she supposed to be using this for work purposes?
   c. Also was she issued any USB drives? Images that appear to be ID card pictures were located on a USB drive seized as evidence. Where were these images stored on the company's server? Were they considered executive or accounting files? Melongo claimed in her interview that she did not have access to the accounting or executive file tree (page 8, line 27)

3. Page 2, 5th paragraph: "R/I then contact Web HSP in Colorado, the web host for SALF's email server."
   a. It is claimed in this paragraph that the company hosting SALF's email "should have the IP addresses of any computer accessing his company's servers" Was this information turned over to the PD?
   b. Did any of the accessing IP addresses in the email host company's report match the IP of 24.15.202.102 as Yahoo reported was used to login to Melongo's Yahoo account on April 27, 2006? (page 5, 10th paragraph)
   c. Because Comcast has no records for the owner of IP 24.15.202.102 and she claimed during her interview on July 20, 2006 that she did not currently have Comcast as her internet service provider and had switched from Comcast to SBC Yahoo DSL four months prior (which would make the last month she had Comcast as March of 2006), it may be hard to tie her to this IP address. We can go over the results in the forensic report that contain this IP when I am there.

4. Page 5, 10th paragraph: "R/I received the response from the Yahoo search warrant. Yahoo's login tracker captured the IP address for Ms. Melongo's Yahoo account login at 21:46:03 GMT (this would have been 4:46 pm CST) on 27 Apr 06 as being 24.15.202.102. Each time Ms. Melongo's yahoo account was logged into from that

MELONGO V. PODLASEK, et al., 13 C 4924
CCSAO 09868



PLAINTIFF'S
DEPOSITION EXHIBIT

VOITA 13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

time to 2 May 06 at 16:47:23 GMT, (this would have been 11:47:23 am, CST) it had that specific IP address.

    a. It should be asked of Melongo if anyone, at any time, had access to her Yahoo account login information. If not, that still doesn't prevent her from claiming that someone hacked into her Yahoo account.

5. Page 4, 3ʳᵈ paragraph: The name of the person whose credit score was purchased was Saquan Gholar.

    a. His name was only found as an employment/personal reference in a Word document and as part of a filename for a Text file (.txt) located on the USB drive. I don't have access to these .txt files, so I do not know what they contain. There are many .txt files with what appears to be employee last or first names. Is this information that she was supposed to have access to?

6. I didn't recover any information relating to the credit card fraud mentioned in the police report.

Now on to the forensic report: (this is the 555 page report, not the summary. For some reason the summary is not in order with the information contained in the Forensic Report. I would always summarize the forensic report in the order the information was shown, so I'm not sure what happened here.) We can go over each item when I'm there.

1. #1. Phone book entry for a VPN (virtual private network) showing the IP of 70.142.251.242, which was registered to SALF. Was she supposed to have access on her laptop to their servers? There are no dates/times associated with this phone book entry so this could be from a legitimate work purpose while she was employed.
2. #11. Did SALF have a SQL server named 'STUDENT-42R9YAS'? I was never given any information about their server setup.
3. #24. Was "herman" Carol's email password? Did they use CPanel software for web mail access?
4. #38. What was the SALF Scantron System? Was she supposed to have access to this system?

After tearing my report apart, there unfortunately isn't much there to prove that she was the one that accessed their system when she wasn't supposed to. There are dates and times not listed for files in the forensic report, so I can't say if the relevant files/programs were accessed/used after she was fired or before. We can go over this in detail when I'm there and I can show you my concerns. If I was doing the exam today and only found what is in the forensic report, I would have told the Detective that I didn't have enough to show that she committed the crimes she's been charged with. Other than if you can show that the email I found on her computer was on Carol's computer, or the company email server, and that Carol did not forward it to Melongo. But Melongo did confess to viewing Carol's emails and forwarding emails to her Yahoo email address.

Shahna

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 47

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** Voita, Shahna G [Shahna.G.Voita@ice.dhs.gov]
**Sent:** Tuesday, June 17, 2014 12:01 PM
**To:** ROBERT M PODLASEK (States Attorney)
**Subject:** RE: Questions/concerns after review

Corrections/additions:

      a. Because Comcast has no records for the owner of IP 24.15.202.102 and she
      claimed during her interview on July 20, 2006 that she did not currently have
      Comcast as her internet service provider and had switched from Comcast to SBC
      Yahoo DSL four months prior (which would make the last month she had
      Comcast as March of 2006), ~~it may be hard to tie her to this IP address.~~ We can
      go over the results in the forensic report that contain this IP when I am there.
She did have a Comcast IP of 24.15.202.102 during the time period of the intrusion/computer
tampering (04/27. I can show that she was using this IP during the time frame in question and
she also admitted to as much during her interview with the Detective. Sorry for my confusion
with the dates.

      a. It should be asked of Melongo if anyone, at any time, had access to her Yahoo
      account login information. If not, that still doesn't prevent her from claiming that
      someone hacked into her Yahoo account.

She did state during her interview with the Detective that "no one else accesses her yahoo
account but her."

With her confessions of accessing the email server at SALF for up to two weeks and forwarding
emails from Spizzirri's email account to her own Yahoo email account, and certain items in the
forensic report, this may turn out ok for us. I was really frustrated with my report yesterday.

- Username and possible password for Carol's SALF email account found on Melongo's
  laptop. (if you can confirm that herman was Carol's password)
- Emails found on Melongo's laptop confirming access to Yahoo email account including a
  listing of emails in a folder called "personals" that appears to show the forwarded emails
  from Carol's account on May 1, 2006 - filenames on my CD are "ShowFolder[3].htm" and
  "ShowLetter[1].htm"
- Who is Brian.Salerno@true-consult.com? "ShowLetter[1].htm" was sent to him on 01 May
  2006, in addition to Saquan Gholar, whom she claimed during her interview, was only an
  acquaintance and she never contacted him after she was fired. She also sent
  "ShowLetter8.htm" to Gholar. "ShowLetter[1]" started "Hey Carol,", but Carol's email
  address was not on the list of people the email was sent to. This is one of the emails that she
  forwarded to herself from Carol's account.



PLAINTIFF'S
DEPOSITION EXHIBIT

VOITA  16

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** Voita, Shahna G
**Sent:** Monday, June 16, 2014 1:48 PM
**To:** 'ROBERT M PODLASEK (States Attorney)'
**Subject:** Questions/concerns after review

I will start with the police report:

1. Page 1 "15 May 06 – R/I spoke with Comcast Cable Services Legal department about how to obtain the necessary account information related to the IP address that was found in the header of the emails that were forwarded to the Yahoo account in question…."
   a. I did not see a copy of this email, so I'm not sure if they were looking at the correct IP of the sender of the email. An email header will show several IP addresses, which is the path that it took from the sender to the receiver. If they did not look at the correct IP, they may have been requesting information for one of the stops along the way and not the originating IP address. I can explain further if this doesn't make sense.

2. Page 2, 9th line down: "yahoo mail account, but stated that she does have a laptop…."
   a. Was this laptop a company issued laptop or a personal laptop?
   b. If a personal laptop, was she supposed to be using this for work purposes?
   c. Also was she issued any USB drives? Images that appear to be ID card pictures were located on a USB drive seized as evidence. Where were these images stored on the company's server? Were they considered executive or accounting files? Melongo claimed in her interview that she did not have access to the accounting or executive file tree (page 8, line 27)

3. Page 2, 5th paragraph: "R/I then contact Web HSP in Colorado, the web host for SALF's email server."
   a. It is claimed in this paragraph that the company hosting SALF's email "should have the IP addresses of any computer accessing his company's servers" Was this information turned over to the PD?
   b. Did any of the accessing IP addresses in the email host company's report match the IP of 24.15.202.102 as Yahoo reported was used to login to Melongo's Yahoo account on April 27, 2006? (page 5, 10th paragraph)
   c. Because Comcast has no records for the owner of IP 24.15.202.102 and she claimed during her interview on July 20, 2006 that she did not currently have Comcast as her internet service provider and had switched from Comcast to SBC Yahoo DSL four months prior (which would make the last month she had Comcast as March of 2006), ~~it may be hard to tie her to this IP address.~~ We can go over the results in the forensic report that contain this IP when I am there.

4. Page 5, 10th paragraph: "R/I received the response from the Yahoo search warrant. Yahoo's login tracker captured the IP address for Ms. Melongo's Yahoo account login at 21:46:03 GMT (this would have been 4:46 pm CST) on 27 Apr 06 as being 24.15.202.102. Each time Ms. Melongo's yahoo account was logged into from that time to 2 May 06 at 16:47:23 GMT, (this would have been 11:47:23 am, CST) it had that specific IP address.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

   a. It should be asked of Melongo if anyone, at any time, had access to her Yahoo
      account login information. If not, that still doesn't prevent her from claiming that
      someone hacked into her Yahoo account.

5. Page 4, 3ʳᵈ paragraph: The name of the person whose credit score was purchased was
   Saquan Gholar.
   a. His name was only found as an employment/personal reference in a Word
      document and as part of a filename for a Text file (.txt) located on the USB
      drive. I don't have access to these .txt files, so I do not know what they
      contain. There are many .txt files with what appears to be employee last or first
      names. Is this information that she was supposed to have access to?

6. I didn't recover any information relating to the credit card fraud mentioned in the police
   report.

Now on to the forensic report: (this is the 555 page report, not the summary. For some reason
the summary is not in order with the information contained in the Forensic Report. I would
always summarize the forensic report in the order the information was shown, so I'm not sure
what happened here.) We can go over each item when I'm there.

1. #1. Phone book entry for a VPN (virtual private network) showing the IP of
   70.142.251.242, which was registered to SALF. Was she supposed to have access on her
   laptop to their servers? There are no dates/times associated with this phone book entry so
   this could be from a legitimate work purpose while she was employed.
2. #11. Did SALF have a SQL server named 'STUDENT-42R9YAS'? I was never given
   any information about their server setup.
3. #24. Was "herman" Carol's email password? Did they use CPanel software for web
   mail access?
4. #38. What was the SALF Scantron System? Was she supposed to have access to this
   system?

After tearing my report apart, there unfortunately isn't much there to prove that she was the one
that accessed their system when she wasn't supposed to. There are dates and times not listed for
files in the forensic report, so I can't say if the relevant files/programs were accessed/used after
she was fired or before. We can go over this in detail when I'm there and I can show you my
concerns. If I was doing the exam today and only found what is in the forensic report, I would
have told the Detective that I didn't have enough to show that she committed the crimes she's
been charged with. Other than if you can show that the email I found on her computer was on
Carol's computer, or the company email server, and that Carol did not forward it to
Melongo. But Melongo did confess to viewing Carol's emails and forwarding emails to her
Yahoo email address.

Shahna

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

# Exhibit 48

**From:** Nick Albukerk (nick.albukerk@gmail.com)
**To:** melongo_annabel@yahoo.com;
**Date:** Thu, October 27, 2011 5:48:44 PM
**Cc:**
**Subject:** Re: My confidential file

3:30 November 7th see you then

On Thu, Oct 27, 2011 at 5:30 PM, Melongo Annabel
<melongo_annabel@yahoo.com> wrote:
> 3.30 pm?
>
>
> _____
> From: Nick Albukerk <nick.albukerk@gmail.com>
> To: Melongo Annabel <melongo_annabel@yahoo.com>
> Sent: Thu, October 27, 2011 5:25:58 PM
> Subject: Re: My confidential file
>
> sure - or earlier
>
> On Thu, Oct 27, 2011 at 5:25 PM, Melongo Annabel
> <melongo_annabel@yahoo.com> wrote:
>> What time? I should be back in Oak Lawn by 7pm. Would 4.30pm works?
>>
>> _____
>> From: Nick Albukerk <nick.albukerk@gmail.com>
>> To: Melongo Annabel <melongo_annabel@yahoo.com>
>> Sent: Thu, October 27, 2011 10:42:18 AM
>> Subject: Re: My confidential file
>>
>> The following Monday in the afternoon works - coming to my office would be
>> easiest I suppose - please come to my office just West of the loop at 1450
>> w. Randolph its right next to the Ashland Greenline stop of the "EL"
>>
>> On Oct 26, 2011 6:18 PM, "Melongo Annabel" <melongo_annabel@yahoo.com>
>> wrote:
>>>
>>> I don't care. As long as I don't miss my curfew...If you can't do it
>>> coming Monday, we can do it the Monday after that. It's not an urgency.
>>>
>>> _____
>>> From: Nick Albukerk <nick.albukerk@gmail.com>
>>> To: Melongo Annabel <melongo_annabel@yahoo.com>
>>> Sent: Wed, October 26, 2011 6:02:02 PM
>>> Subject: Re: My confidential file
>>>
>>> the 31st? I need to check, thats Halloween I may be busy with family
>>> stuff. Also, do you want to meet at the Daley Center or my office?
>>> whatever you want.
>>>
>>> On Wed, Oct 26, 2011 at 5:07 PM, Melongo Annabel
>>> <melongo_annabel@yahoo.com> wrote:
>>> > What about next Monday afternoon? Per the judge's order, I should do
>>> > research at the Daley Center on Mondays. So you can meet me there if
>>> > that's
>>> > convenient.
>>> >
>>> > Thanks.
>>> >
>>> > _____
>>> > From: Nick Albukerk <nick.albukerk@gmail.com>
>>> > To: Melongo Annabel <melongo_annabel@yahoo.com>
>>> > Sent: Wed, October 26, 2011 11:27:43 AM

Exhibit 8

11/12/11 9:06 /

MELONGO_014463

>>> > Subject: Re: My confidential file
>>> >
>>> > Any late afternoon would be fine
>>> >
>>> > On Oct 26, 2011 6:17 AM, "Melongo Annabel" <melongo_annabel@yahoo.com>
>>> > wrote:
>>> >>
>>> >> Dear Nick,
>>> >> Please let me know the manner, time and place convenient for you to
>>> >> get
>>> >> my
>>> >> confidential file.
>>> >>
>>> >> Thanks.
>>> >
>>>
>>>
>>>
>>> --
>>> Please make note of our new mailing address:
>>> J. Nicolas Albukerk
>>> Albukerk & Associates
>>> 1450 W. Randolph
>>> Chicago IL 60607
>>> Phone: 773 847 2600
>>> Fax: 773 847 0330
>>> Our phone and fax have not changed
>>
>
>
>
> --
> Please make note of our new mailing address:
> J. Nicolas Albukerk
> Albukerk & Associates
> 1450 W. Randolph
> Chicago IL 60607
> Phone: 773 847 2600
> Fax: 773 847 0330
> Our phone and fax have not changed
>


--
Please make note of our new mailing address:
J. Nicolas Albukerk
Albukerk & Associates
1450 W. Randolph
Chicago IL 60607
Phone: 773 847 2600
Fax: 773 847 0330
Our phone and fax have not changed

MELONGO_014464

# Exhibit 49

# SCHILLER PARK POLICE DEPARTMENT

**2. CASE** 06-3714

PAGE 1 OF 1

**GROUP A INCIDENT REPORT**

**1. DATE/TIME OF REPORT:** 18 May 06 1820

**3. REPORT TYPE:** ■ INITIAL REPORT ☐ SUPPLEMENTARY

**4. INCIDENT STATUS**
- 00 ☐ UNFOUNDED
- 01 ☐ REFER TO OTHER JURISDICTION
- 02 ☐ PENDING
- 03 ☐ CLEARED BY ARREST
- 04 ☐ CLEARED BY JUVENILE
- 05 ☐ ADMINISTRATIVELY CLOSED

**CLEARED EXCEPTIONALLY:**
- 05 ☐ DEATH OF OFFENDER
- 06 ☐ DENIED EXTRADITION
- 07 ☐ REFUSED TO COOPERATE
- 08 ☐ PROSECUTION DECLINED
- 10 ☐ JUVENILE NO CUSTODY
- ☐ NOT APPLICABLE

**6. COMPLAINANT:** (Last, First, Middle) Spizzirri, Carol J
**HOME TX:** 847-928-9683
**WORK TX:** 847-928-9683

**6. ADDRESS:** (Street, City, State) 9950 Lawrence Ave Suite 300, Schiller Park IL 60176

**7. LOCATION OF INCIDENT:** (Address Or Block No) AS #6
**BUSINESS NAME:**
**8. OFFENSE OR INCIDENT**
1. Credit Card Fraud
2. Credit Card Fraud
**ATTEMPT ?** **9. UCR CODE:** 1. 1150 2. 1150

**10. DATE(S) OF INCIDENT:** 18 May 06
**11. TIME(S) OF INCIDENT:** 0900-1700
**12. BIAS CODE:** ☐ RACIAL ☐ ETHNIC ☐ RELIGIOUS ☐ SEXUAL

**13. TYPE OF WEAPON/FORCE INVOLVED:** (Check up to three)
- 01 ☐ UNARMED
- 11 ☐ FIREARM
- 12 ☐ HANDGUN
- 16 ☐ KNIFE
- 17 ☐ CLUB / BLACKJACK
- 18 ☐ HANDTOOL
- 30 ☐ BLUNT OBJECT
- 35 ☐ MOTOR VEHICLE
- 40 ☐ PERSONAL WEAPON
- 60 ☐ EXPLOSIVE/S
- 65 ☐ FIRE / INCENDIARY
- ☐ OTHER

**14. OFFENDER(S) SUSPECTED OF USING:**
- A ☐ ALCOHOL
- D ☐ DRUGS
- C ☐ COMPUTER EQUIPMENT
- N ☐ NOT APPLICABLE

CHECK ALL THAT APPLY

**15. FOR BURGLARY OR HOME INVASION ONLY** NUMBER OF PREMISES ENTERED: ____ FORCED ENTRY ☐ YES ☐ NO ☐ N/A

**16. LOCATION OF OFFENSE:** (Check only one) Enter Code # For Offense #2 #3
- 01 ☐ APARTMENT
- 004 ☐ CONDOMINIUM
- 100 ☐ BANK
- 103 ☐ BAR/TAVERN
- 111 ☐ OFFICE BUILDING
- 144 ☐ CAR WASH
- 162 ☐ CONVENIENCE STORE
- 178 ☐ DRIVEWAY/RESIDENTIAL
- 190 ☐ DRUG STORE
- 209 ☐ FACTORY
- 210 ☐ GARAGE/RESIDENTIAL
- 215 ☐ GARAGE/AUTO REPAIR
- 220 ☐ GAS/SERVICE STATION
- 224 ☐ GROCERY
- 242 ☐ POLICE STATION
- 248 ☐ LIQUOR STORE
- 220 ☐ MEDICAL OFFICE
- 252 ☐ MOBILE HOME
- 258 ☐ VIDEO STORE
- 269 ☐ MOTEL, HOTEL
- 270 ☐ PARK
- 270 ☐ FOREST PRESERVE
- 277 ☐ PARKING LOT
- 290 ☐ RESIDENCE (PRIVATE)
- 291 ☐ RESIDENCE YARD
- 295 ☐ RESTAURANT(INDEPENDENT)
- 294 ☐ RESTAURANT(CHAIN)
- 300 ☐ SCHOOL
- 304 ☐ STREET
- 307 ☐ SWIMMING POOL
- 327 ☐ WAREHOUSE
- ☐ OTHER

**17. TYPE OF CRIMINAL ACTIVITY:** (Check Up To Three)
- B ☐ BUYING / RECEIVING
- C ☐ CULTIVATING / MANUFACTURING
- D ☐ DISTRIBUTING / SELLING
- E ☐ EXPLOITING CHILDREN
- O ☐ OPERATING / PROMOTING / ASSISTING
- P ☐ POSSESSING / CONCEALING
- T ☐ TRANSPORTING / TRANSMITTING / IMPORTING
- U ☐ USING / CONSUMING

**18. VICTIM:** (Last, First, Middle) Save a Life Foundation
**HOME TX:** **WORK TX:** 847-928-9683

**19. ADDRESS:** (Street, City, State) As # 6
**20. EMPLOYER:** (Name, Address)

**21. TYPE OF VICTIM:** (Check Only One)
- B ■ BUSINESS
- F ☐ FINANCIAL INSTITUTION
- G ☐ GOVERNMENT
- R ☐ RELIGIOUS
- I ☐ INDIVIDUAL
- P ☐ POLICE OFFICER
- S ☐ SOCIETY/PUBLIC
- O ☐ OTHER
- U ☐ UNKNOWN

**22. RACE:**
- W ☐ WHITE
- B ☐ BLACK
- H ☐ HISPANIC
- I ☐ AMERICAN INDIAN
- A ☐ ASIAN
- U ☐ UNKNOWN

**23. SEX:**
- M ☐ MALE
- F ☐ FEMALE
- U ☐ UNKNOWN

**24. AGE**
**25. DOB**
**25. AGE OF VICTIM**

**27. RESIDENT**
- Y ■ YES
- N ☐ NO
- U ☐ UNKNOWN

**28. CIRCUMSTANCES** (Crimes Against Persons Check Up To Three)
- 01 ☐ ARGUMENT
- 02 ☐ ASSAULT ON LAW OFFICER
- 03 ☐ DRUG DEALING
- 04 ☐ GANGLAND
- 05 ☐ JUVENILE GANG
- 06 ☐ LOVERS QUARREL
- 07 ☐ MERCY KILLING
- 08 ☐ OTHER FELONY INVOLVED
- 09 ☐ OTHER CIRCUMSTANCES
- 10 ☐ OTHER NEGLIGENT

**29. INJURY TYPE:** (Check Up To Three)
- K ☐ KILLED
- N ☐ NONE
- B ☐ BROKEN BONES
- I ☐ POSS INT. INJURIES
- L ☐ SEVERE LACERATION
- M ☐ SHOT
- M ☐ MINOR INJURY
- O ☐ OTHER MAJOR INJURY
- T ☐ LOSS OF TOOTH
- U ☐ UNCONSCIOUSNESS

**30. VICTIM CONNECTED TO OFFENDER NUMBER:**
A ☐ B ☐ C ☐

**31. EMPLOYMENT**
- Y ■ EMPLOYED
- N ☐ UNEMPLOYED
- S ☐ STUDENT
- M ☐ MILITARY
- U ☐ UNKNOWN

**32. RELATIONSHIP OF VICTIM TO OFFENDER:** (For Multiple Relationships, Enter Offender Number(s) In Space)
- SE ☐ SPOUSE
- CS ☐ COMMON-LAW SPOUSE
- PA ☐ PARENT
- SB ☐ SIBLING
- CH ☐ CHILD
- GP ☐ GRANDPARENT
- GC ☐ GRANDCHILD
- IL ☐ IN-LAW
- SP ☐ STEPPARENT
- SC ☐ STEPCHILD
- SS ☐ STEP SIBLING
- OF ☐ OTHER FAMILY
- AQ ☐ ACQUAINTANCE
- FR ☐ FRIEND
- NG ☐ NEIGHBOR
- BE ☐ BABY-SITTER (BABY)
- BG ☐ BOYFRIEND / GIRLFRIEND
- CF ☐ CHILD OF BOY / GIRLFRIEND
- HR ☐ HOMOSEXUAL RELATIONSHIP
- XB ☐ EX-SPOUSE
- EE ☐ EMPLOYEE
- ER ☐ EMPLOYER
- OK ☐ OTHERWISE UNKNOWN
- ST ☐ STRANGER
- RU ☐ RELATIONSHIP UNKNOWN

| 33. TYPE PROPERTY LOSS / ETC. | CODE | QUANTITY | 34. PROPERTY DESCRIPTION Include Make, Model, Size, Type, Serial #, Color, Plate # and Expiration Date, Etc. | 35. DOLLAR VALUE | 36. DATE RECOVERED |
|---|---|---|---|---|---|
| 1 ☐ LOST | 099 | | Unknown Retail Merchandise (attempt) | 235.00 | |
| 2 ☐ NONE | 099 | | Unknown Retail Merchandise | 220.00 | |
| 3 ☐ BURNED | | | | | |
| 4 ☐ COUNTERFEITED / FORGED | | | | | |
| 5 ☐ DAMAGED / DESTROYED | | | | | |
| 6 ☐ RECOVERED | | | | | |
| 7 ☐ SEIZED | | | | | |
| 8 ☐ STOLEN | | | | | |
| 9 ☐ UNKNOWN | | | | | |
| 0 ☐ RECOVERED OTHER AGENCY | | | | | |
| ☐ OTHER | | | | | |

**37. PROPERTY DESCRIPTION CODE TABLE:** (Enter Number In Code Column Above)
- 470 AUTO PART / ACCESSORIES
- 480 BICYCLE
- 480 CELLULAR PHONE
- 490 CAMERA
- 500 CIGARETTES / TOBACCO
- 510 CLOTHING
- 515 COIN-OP WASHING MACHINE
- 531 COMPUTER EQUIPMENT
- 541 CREDIT CARDS
- 550 CURRENCY (U.S.C.)
- 555 DOOR
- 557 DRIVERS LICENSE
- 557 EXTERIOR OF BUILDING
- 558 ELECTRONIC EQUIPMENT
- 555 FOOD
- 602 GASOLINE (GALLONS)
- 610 HANDGUN
- 620 RIFLE
- 630 SHOTGUN
- 641 OTHER FIREARMS
- 642 INTERIOR OF BUILDING
- 643 GRASS OR SOD
- 650 JEWELRY
- 659 LAWN ORNAMENT
- 671 LAWN FURNITURE
- 679 LICENSE PLATES
- 680 LIQUOR
- 740 RADAR DETECTOR
- 740 PURSE / WALLET
- 741 RADIO
- 748 SNOW BLOWER
- 770 STEREO
- 782 TELEVISION
- 794 TELEPHONE
- 800 TOOLS
- 810 TIRES
- 811 TREE, SHRUBBERY, FLOWERS
- 813 VEHICLE/S
- 814 WHEEL COVER
- 817 VIDEO EQUIPMENT
- 820 VENDING MACHINE
- 827 AUTOMOBILE
- 827 MOTORCYCLE
- 831 TRUCK
- 832 MOTOR HOME
- 833 OTHER VEHICLE
- 834 WINDOW
- 000 OTHER

**38. LEADS#**

**38. OFFICER SIGNATURE** [signature] **STAR#** 68 **DATE / TIME OF ARRIVAL** 18 May 06 1734hrs **40. SUPERVISOR SIGNATURE** [signature] **STAR/RANK** 41/65

MELONGO V. PODLASEK, et al., 13 C 4924
CCSAO 000044

PLAINTIFF'S DEPOSITION EXHIBIT
MARTIN 32

CONFIDENTIAL SUBJECT of PROTECTIVE ORDER

| 41. OFFENDER / SUSPECT NAME: (Last, First, Middle) | | 42. ADDRESS: (Street, City, State) | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Melongo, Annabel K Ntyam | | 1218 E Long Valley Dr. | | | | | | |
| 43. DOB: | 44. AGE: | 45. SEX: | 46. RACE: | HEIGHT: | WEIGHT: | HAIR: | EYES: | CLOTHING: |
| REDACTED | 33 | ☐ MALE ☑ FEMALE | W ☐ WHITE  I ☐ INDIAN<br>B ☑ BLACK  A ☐ ASIAN<br>H ☐ HISPANIC U ☐ UNKNOWN | 505 | 120 | Bro | Bro | |

| 47. NAME: (Last, First, Middle) | ADDRESS: (Street, City, State) | | SEX / RACE | DOB: | HOME TX: | WORK TX: |
|---|---|---|---|---|---|---|
| (1) | | | | | | |
| (2) | | | | | | |
| (3) | | | | | | |
| (4) | | | | | | |

48. NARRATIVE: Describe Incident in Logical Order; Include Description of Evidence or Property Found Not Otherwise Listed; Summarize Statements of Victim, Complainants, or Witnesses; List Hospital Victim Taken To and Who Transported, Where Vehicle/s are Impounded, Etc.

R/o was dispatched to 9950 Lawrence ave for a credit card fraud. R/o spoke to the reverse listed victim, Carol Spizziri, who stated that she had been contacted earlier today by Amazon.com for a possible credit card fraud. The offender used an American Express card (# REDACTED to attempt to purchase $235.00 worth of merchandise. The offender could not verify the credit card and this is when Amazon.com contacted Spizziri. The transaction was not completed.

Spizziri then contacted American Express to follow-up on the matter and was informed that a purchase for Ebay merchandise in the amount of $220.00 had been charged today.

The possible offender, Melongo, is an ex-employee and has tampered with computer files upon termination of employment (refer to current investigation #06-3219).

*Schiller Park Police 2000*

Page 1

# Exhibit 50



## SALF
### Save A Life Foundation

**National Headquarters**
9950 W. Lawrence Ave Ste 300
Schiller Park, Illinois 60176-1216·
Ph: (847) 928-9683
Fax: (847) 928-9684
Website: www.salf.org

Carol J. Spizzirri
Founder / President

Tuesday, March 28, 2006

Harold M. Messner, Jr.
Chairman & Chief Executive Officer
Robert Half International, Inc.
2884 Sand Hill Road
Menlo Park, CA 94025

Regarding: Robert Half Technology Division Director Anthony Fernandez Schaumberg, IL & Victor Rodriguez Robert Half Technology Employee

Italic: Robert Half International Employment Agreement

Dear Mr. Messner, Jr.:

It is unfortunate that it has become necessary to contact you concerning the following matter. Save A Life Foundation (SALF) has been pleased with Office Team's temporary support since 1998. Since the latter part of last year our associations with Robert Half International Technology (RHIT), our business and staff have been gravely effected by its lack of professionalism.

Late September 2005 our IT manager passed away, after ten years of employment. We contacted RHIT to find temporary support for his position. October 17, 2005 Anthony Fernandez, RHIT Division Director, assigned a Victor Rodriguez to aid as our IT and Programmer at $60 hr.

Mr. Rodriguez roughly began his assignment with repeated tardiness and no shows the first few weeks. Mr. Fernandez himself was witness when scheduling a site visit at this office with Rodriguez and he didn't appear for work without calling in. About the second week into Rodriguez's assignment we noticed that he was conducting his own business on company time. Each time these matters were brought to Mr. Fernandez's attention, of which he advised that we relieve him of his duties, but also informed us that unfortunately he had no one to replace him. Out of desperation, we had to continue with Rodriguez just to keep our IT department maintained with a promise by Fernandez that he'd find someone to replace him as soon as possible.

*RHI Employment Agreement 1.d. Consultant shall not, during Consultant's period of employment by RHI Technology, perform any services for any other individual or company similar to the services being provided hereunder without obtaining RHIT's prior written consent.*

The problems worsen as Rodriguez relaxed his work duties and increased his disrespect towards management and fellow employees. By now Rodriguez controlled the passwords to all our computers and refused to release them. November 30th, our Education Data Assistant experienced the disappearance of our specialized data collection program while working with it. She asked that Mr. Rodriguez research the problem with no results. About 4pm, during an Executive closed door meeting, Mr. Rodriguez stormed in the room and demanded that we hire him or these computer problems would continue. At that, I relieved him from his duties and called Mr. Fernandez immediately.

*2. d. RHI Upon the termination of Consultant's assignment to any Client, Consultant agrees immediately to return to Client all information, data and any other materials supplied by or obtained from Client in the course of Consultant's assignment, along with all copies thereof in Consultant's*

297
melongo

Page 2
Save A Life Foundation
March 28, 2006

*possession and control.*

Fernandez told me he would find someone else to replace Mr. Rodriguez. On December 2, Ms. Annabell Melongo was assigned and reported for work. Ms. Melongo immediately discovered the lack of passwords didn't allow her access to any computers or servers and notified Mr. Fernandez. Fernandez called Rodriguez at home and Ms. Melongo soon received an email here with several bogus passwords. She than discovered that our missing Education Department data collection program had been hidden in a Trash File, which she recovered allowing our staff to continue their duties.

*2.c. Consultant agrees that any inventions, works of authorship or other intellectual property, including, but not limited to, source code and documentation, conceived, developed, originated, or reduced to practice by Consultant or under Consultant's direction during Consultant's assignment to Client shall be the sole and complete property of Client, whether as a work made for hire or otherwise. Consultant further agrees promptly and without prior request to disclose to Client all such inventions, works of authorship and other intellectual property.*

Not knowing that Ms. Melongo was able to retrieve the missing program, Mr. Rodriguez called several hours later and stated that if we were to hire him he would recover the missing program. I declined his request, but asked that he supply me with the missing passwords for our servers, which we had purchased a week earlier for over $5,000. To date we have not received that password nor has anyone from RHIT done anything so we can use the server.

*2.e. Consultant acknowledges and agrees that the disclosure of any Confidential Information or any other violation of the terms of Section 4 of this Agreement would cause immediate and irreparable injury, loss and damage to RHT, Client and/or its customers and that an adequate remedy at law for such injury, loss and damage may not exist, and that in the event of such disclosure or threatened disclosure, RHT, Client and/or its customers shall be entitled to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive relief to enforce a provision of this Agreement, without the necessity of proof of actual damage or loss.*

*2.f. The obligations contained in this Section 4 shall (i) be binding upon not only Consultant, but on Consultant's heirs, executors, administrators, successors and assigns and (ii) shall survive the termination of Consultant's assignment to any Client or this Agreement for whatever reason.*

Meanwhile, we contracted Edgar Ovalle as an illustrator from Creative Group. Both Mr. Ovalle and Ms. Melongo have evidence that most of our software is missing since Mr. Rodriguez was a consultant here i.e. Adobe, Illustrator, Coral, totally approximately $7,000

In light of the reconstruction costs we endured to put our IT department back as it was prior to Mr. Rodriguez's sabotage, by contracting Ms. Melongo at $48 hr. and two other technicians, (see attached) the missing software and unusable new server, we withheld the last three weeks of Mr. Rodriguez's salary until these issues were resolved, in the sum of $4,650.

After only a few weeks after Ms. Melongo became our Consultant, Mr. Fernandez became disgruntle with her and emailed me that he was going to be terminating her and to call him immediately, (see attached). A few weeks ago, Mr. Fernandez spoke with Mr. Vince Davis, our Director of Military Affairs, advising him that we should hire Ms. Melongo immediately and wouldn't ask for any buy out fees because he was about to terminate her any way.

Fernandez met with me yesterday regarding our out standing invoice for Mr. Rodriguez and stated that if I were to pay this balance in full, he would agree to place the same amount against a future

298
melongo

Page 3
Save A Life Foundation
March 28, 2006

temp to hire buyout. I disagreed, but would possibly consider paying one half. At that, he asked to speak to Ms. Melongo who was in her office. Fernandez closed her door and I later discovered, he told her that her consulting with us was terminated because I wasn't satisfied with her service and she should not report here for work the following morning.

This morning, Anthony called me and demanded that I pay the invoice in full immediately or he would relieve every Robert Half Tech., Office Team and/or Creative Group employee from our office immediately. I promptly called the Office Team office in Rosemont, Illinois, and spoke with Chris Knowles. While on the phone, each RHI employee started walking into my office after receiving a call from Mr. Fernandez who told them to leave. Mr. Knowles assured each to continue working, and that he would resolve this matter.

It is now 8:30 pm CT and Ms. Melongo just called me at the office stating that Mr. Fernandez called her twice at home instructing her to call in sick tomorrow and not report to work here.

I have business to perform and have no time for these silly issues. We pay for work to be preformed and not for black mail, nor sabotage. Unless I'm mistaken, SALF has been a customer in good standings for 8 years and customer relations should be a priority by any vendor. At least that is what our standards are here.

We are a non-for-profit, thus everything we've lost by additional salaries, hardware, software, time, we're accountable to not only to our board, but our donors, the federal and state government who funds us. Additionally, we serve children. The fewer funds we have, the fewer children we serve.

This matter has devastated us financially, emotionally, reduced productivity by each member of my staff who now are unsure of their position and/or what to expect the next time they answer the phone.

Sincerely,

Carol J. Spizziri
President/Founder

cc: V. Davis
    S. Anderson

Encl.

# Exhibit 51

## French, Kyle

**From:** Monge, Shahna G.
**Sent:** Monday, November 20, 2006 11:37 AM
**To:** Haslett, David P.; Ferraro, Daniel
**Cc:** French, Kyle
**Subject:** FW: Melongo

This is just great!

Dan,
This is the hacking case involving Annabel Melongo who's the lady from Cameroon on a student visa who is accused of hacking into their servers and destroying files and tampering with email.

---

**From:** Bill Martin [mailto:bmartin@villageofschillerpark.com]
**Sent:** Monday, November 20, 2006 11:24 AM
**To:** Monge, Shahna G.
**Subject:** RE: Melongo

Shahna,

Thanks for the info. Did you see Ms. Spizzirri on the ABC news last Thursday night? If you didn't, check out the link below. You think our case is shot now?

http://abclocal.go.com/wls/story?section=investigative&id=4770490

Either way, thanks for all the hard work. I'll see you on the 8th.

Bill Martin

This electronic message transmission contains information from the Schiller Park Pol
The information is intended only for the use of the individual(s) or entity named ab
aware that any disclosure, copying or distribution or use of the contents of this in
this electronic transmission in error, please notify the sender immediately by reply

-----Original Message-----
**From:** Monge, Shahna G. [mailto:SMonge@atg.state.il.us]
**Sent:** Monday, November 20, 2006 10:56 AM
**To:** bmartin@villageofschillerpark.com
**Subject:** Melongo

Just thought I'd let you know that Annabel must still live in the Palatine area somewhere because I saw her getting on the train this morning at Arlington Park, which is the stop just after Palatine.

Shahna

*Shahna G. Monge, EnCE*
*Senior Computer Evidence Recovery Technician*



PLAINTIFF'S
DEPOSITION EXHIBIT

FRENCH 19
4/5/18

Melongo v. Podlasek, et al.          13-cv-4924          Attorney General 001846

Illinois Office of the Attorney General
High Tech Crimes Bureau
100 W. Randolph St. - Chicago, IL 60601
312-814-3762 / 312-814-8283

# Exhibit 52

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**From:** Cjean [snowy@probelle.net]
**Sent:** Thursday, August 5, 2010 4:52 PM
**To:** Robert Podlasek;JULIE GUNNIGLE (States Attorney)
**Subject:** AG's office
**Attachments:** CDCFOIArequestbyPeterHeimlich2-2010.jpg;
CDCFOIArequestbyPeterHeimlich2-2010 001.jpg; CDCFOIArequestbyPeterHeimlich2-2010
002.jpg; CDCFOIArequestbyPeterHeimlich2-2010 003.jpg;
Personal2007TaxDonationCheckstoSALF.jpg; Personal2007TaxDonationCheckstoSALF
002.jpg; Personal2007TaxDonationCheckstoSALF 004.jpg

August 3rd letter I received today which I immediately called, left message – return call from
Trudy and Karolina and a CPA (name don't remember if mentioned)
Apparently Trudy sent a letter June 29th – which I didn't received.

I did receive a letter from Karolina two weeks prior to June 29th – spoke with Karolina- asked
her for list of everything she wanted – which she did and I sent by cert mail a week later
including the list of money I loaned SALF - never was reimbursed –

Added copies of checks FYI 2008-09 (attached) which wasn't calculated in the FY2007-08 audit.

If I was stealing – why would I give more to SALF. I asked Karolina her stated "If Organization
didn't receive contributions totally $150,000 or more, no filing was necessary – she
agreed. Why did she need more when I filed in timely manner SALF's Tax Statement filed out
by a CPA – and copy of IRS report?

She said if I just send her what she requested they'd be satisfied.


Thank you –

If need be I can forward everything by email I sent Karolina.



PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI 29
5-11-18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



OFFICE OF THE ATTORNEY GENERAL
STATE OF ILLINOIS

August 3, 2010

Lisa Madigan
ATTORNEY GENERAL

*Via Fax: (847) 984-2917 and Certified and Regular Mail*

Ms. Carol J. Spizziri, President          Ms. Carol J. Spizziri, President
Save A Life Foundation                     Save A Life Foundation
REDACTED                                    9950 W. Lawrence, No. 300
                                            Schiller Park, Il 60176

Re:   Save A Life Foundation Inc.   Period Ending June 30, 2009
      CO# 01-026498

Dear Ms. Spizzirri,

On June 29, 2010 our Office sent a letter (copy enclosed) requesting, among other things, information we need to close the Save A Life Foundation's ("SALF") charitable registration file. To date we have not received a response though one was requested by July 9, 2010. Instead of a response to our letter, you sent a letter dated July 8, 2010 to Karolina Szezerba, Office Assistant. This letter was non-responsive to our June 29, 2010 letter, but raised further questions regarding the Organization's finances.

Please respond to each item requested in our June 29, 2010 letter, and in addition, provide the following additional information:

1.   Your letter dated July 8, 2010 to Karolina Szezerba does not properly explain how the June 30, 2008 net fund balance of $152,112 went to $0 by June 30, 2009. You attached W-2 forms for salaries paid in 2008 totaling $239,410.70 and 2009 totaling $39,606.58. The AG 990 submitted to our office reported $0 in disbursements for the fiscal year ended June 30, 2009, yet W-2 forms you provided contradict this AG 990 IL. Again, we require a complete accounting of the Organization before we can close its file;

2.   Your letter dated July 8, 2010 to Karolina Szezerba does not properly explain the disposition of the organizations fixed assets, including the building it owned in Springfield and its equipment. The disposition of these assets was not reported on the AG 990 IL for June 30, 2009. Again, we require a complete accounting of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Organization before we can close its file;

3.   Your letter dated July 8, 2010 to Karolina Szczerba stated that copies of personal checks covering salaries if $169,511.41 were enclosed. These salary checks were not enclosed with your letter. You did enclose a copy of a personal check dated November 12, 2007 for $10,000 and November 28, 2007 for $30,000 to Save a Life Foundation. These checks are not salary checks paid subsequent to June 30, 2008. Please provide our Office with copies of the salary checks totaling $169,511.41. Again, we require a complete accounting of the Organization before we can close its file;

4.   Please provide a schedule detailing all Government funds received by the Organization, including the total amounts received from the US Department of Health & Human Service Center of Disease Control since its inception;

5.   Please provide a list of all bank accounts used by the Organization since its inception;

6.   Form IRS 990 for June 30, 2008 submitted to our Office reported in Statement 10 that the Organization "was granted $590,000 to train 170 emergency medical service providers". Where is this amount reported in the Organization's IRS 990 and audited financials;

In addition to the above, provide our Office with your current address and telephone number.

Please submit the above information to the attention of the undersigned no later than August 13, 2010 to avoid further action by our Office.

Very truly yours,

Trudy Motyka
Accountant
Charitable Trusts Bureau
100 West Randolph St., 11th Floor
Chicago, Illinois 60601-3175
(312) 814-3934
(312) 814-2596 Fax

enclosures

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



OFFICE OF THE ATTORNEY GENERAL
STATE OF ILLINOIS

June 29, 2010

Lisa Madigan
ATTORNEY GENERAL

Ms. Carol J. Spizziri, President
Save A Life Foundation



Ms. Carol J. Spizziri, President
Save A Life Foundation
9950 W. Lawrence, No. 300
Schiller Park, Il 60176

Re:   Save A Life Foundation Inc.    Period Ending June 30, 2009
      CO# 01-026498

Dear Ms. Spizziri,

On June 10, 2010 our Office received a response to our letter dated April 20, 2010. We subsequently sent a letter dated June 25, 2010 asking for additional information. Copies of our letters sent are attached. In order for us to close Save A Life Foundation's ("SALF") registration file we need the following additional information;

1.   The date solicitations ceased. If SALF was soliciting after June 30, 2008, provide an accounting. If solicitations were greater than $150,000, an audit is also required;

2.   All documents relating to the purchase of the building located at 520 E. Capital Ave., Springfield, Illinois and the source of the funds used for the purchase (grants, etc.) and any rents received or paid;

3.   All documents relating to the sale of the above building and the use of any and all sale proceeds. If the building was not sold, provide information on its current use;

4.   SALF'S June 30, 2008 financial report filed with our office reported net assets of $152,112. The report shows assets of $451,741 which include cash, equipment and building, and liabilities of $299,629 which include accounts payable and loans from Carol Spizziri. Please provide an accounting of these balance sheet items;

5.   Provide an accounting of the loans to SALF from Carol Spizziri, including any payoff amount received by Carol Spizziri when SALF dissolved.

6.   A final AG990 IL and IRS 990 ( and audit if required) which provides a final accounting to the date the organization dissolved (9/17/09).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7   If SALF solicited or had assets after June 30, 2009, provide an AG 990 IL (and IRS 990 and audit if required).

Please provide the above information to the attention of the undersigned by July 9, 2010 to avoid further action by our Office.

Very truly yours,

Trudy Motyka
Accountant
Charitable Trusts Bureau
100 West Randolph St., 11ᵗʰ Floor
Chicago, Illinois 60601-3175
(312) 814-3934
(312) 814-2596 Fax

enclosures

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER





CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



REDACTED

# Exhibit 53



**SALF**

**Save A Life Foundation**

Carol J. Spizzirri
Founder / President

*National Headquarters*
9950 W. Lawrence Ave Ste 300
Schiller Park, Illinois 60176-1216
Ph: (847) 928-9683
Fax: (847) 928-9684
Website: www.salf.org

*Clerks office*

November 2, 2006

Richard A. Devine
Illinois State Attorney of Cook County
2650 S. California
Chicago, IL 60608

Dear Honorable Devine:

It is with extreme appreciation I write to inform you that due to the professionalism by your Executive Assistant Randy Roberts, working with Detective Martin of the Schiller Park Police Department a warrant has been issued for the arrest of the party who destroyed our computer service. Due to the fear of a flight risk, ICE was also notified. In fact, I've been informed that not only were they able to positively identify the person who committed the crime, reimburse charges made against our American Express credit card and the party who received the purchases, but secured some of the lose data which is so vital for this Foundation.

The web world is a new wave for crime, which takes a great deal of effort to monitor, with few laws to protect the citizen. It is only with the conscious dedication by, like, these two individuals a crime was solved so others can be protected.

The relentless examination by Mr. Roberts and Schiller Park Detective Martin is a credit to you as Illinois State's Attorney for the perseverance in stopping crime.

Congratulations.

Sincerely

*Your Friend Carol*

Carol J. Spizzirri
President/Founder

PLAINTIFF'S
DEPOSITION EXHIBIT

SPIZZIRRI  17
5-1-18   sc

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

229

MELONGO_004398

# Exhibit 54

arol Spizzirri

**ubject:** FW: RHI

**From:** Carol [mailto:cspizzirri@salf.org]
**Sent:** Tuesday, December 12, 2006 7:33 PM
**To:** 'McFadden & Dillon, PC'
**Subject:** RE: RHI

Dear Tom - you asked that I have our other attorney review RHI agreement....

He advised, since Annabelle Melongo was employed by RHI who assigned her to SALF for the purpose of fixing Victor's destruction, and there after, she committed One count of computer destruction/email tampering (police report #06-3219) and One count, credit card fraud (police report #06-3714)...we should hold off on any settlement until after the court trial. **Bank Fraud is pending (#06-9149).**

Annabelle was arrested and prosecuted by the state of Illinois County of Cook County (Court # 06-MC3006880) Court date is Jan. 10th at the Cook County Circuit Court, Arlington Heights, IL. Since SALF is aware of these charges - SALF can not agree to paragraphs #3 & #5 & #6 & #7 & #8 & #9 of RHI's agreement.

Cook County State Attorney and Schiller Park Police Computer Fraud Units worked feverously for several months to successfully crack this case. Only when they had enough evidence to prosecute was SALF notified. I appeared in court a week later where the Judge signed the arrest order, ICE was notified for flight risk and bail was set. I wasn't allowed to divulge any of this during the investigation, for obvious reasons, and notified you as soon as I could.

Our attorney also stated that RHI could be responsible for a great deal more then $12,000 plus waiving balance SALF may owe RHI for the placement of their Candidates.

Please advise.
Carol

**From:** McFadden & Dillon, PC [mailto:mcfaddendillonlaw@ameritech.net]
**Sent:** Tuesday, December 12, 2006 4:29 PM
**To:** Carol Spizzirri
**Subject:** RHI

Dear Carol:

Please call me upon your receipt and review of the attached revised Settlement Agreement.

Sincerely,

Thomas J. Dillon
McFadden & Dillon, P.C.
312-201-8300

Confidentiality Notice: This email message is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sec. 2510-2521 and is legally privileged. Unauthorized review, use, disclosure or distribution is strictly prohibited. If you are

1

413
melongo

312-201-8300 or by reply email and destroy all copies of the

ot the intended recipient, please contact the sender at

riginal message. Thank you.

2

414
melongo

# Exhibit 55

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Robert Half International Temporary Employee**
**Cyber Sabotage Activities**
by
**Annabel K. Molongo**
Between
**October 17, 2005 to Present**

Thursday, December 01, 2005 7:27 PM Robert Half International Temporary Employment, Anthony Fernandez emailed Carol Spizzirri Founder/CEO Save A Life Foundation that he gave his assurance that Melongo was an honest Temporary candidate.

**December 2, 2005** Robert Half International assigned **Annabel K. Melongo** to SALF no resume provided Her duties were t to go around and re-set passwords previous set by RHI Temp Victor Rodriquez who lock out SALF from their computer system  and connect SALF's Scantron System to network with appropriate work stations.

December 21, 2005 – SALF staff and Melongo received Christmas bonus – Melongo Ck #8646 for $25

Monday, Dec. 5th RHI sent in Dan Figueroa (+Resume) to  break into server RHI's Rodriguez's sabotage

Thursday, January 05, 2006 4:43 PM SALF Ex Sec Cindy Reid discribs Melongo's anger

Friday, January 06, 2006 6:48 PM SALF staff complaints of confrontations with Melongo

Monday, January 09, 2006 Dan Figueroa excised from SALF due to Melongo's complaints about him

Thursday, January 12, 2006 10:20 AM RHI Anthony Fernandez emailed Melongo's salary requirements

Tuesday, January 17, 2006 11:58 AM RHI Fernandez emailed concerns of Melongo

February 20, 2006 2:39 PM Melongo re-configured IP addresses

March 03, 2006 9:38 PM Data starting to disappear

Thursday, March 09, 2006 9:18 AM Melongo still can't re-set passwords can't get into computers

Thursday, March 23, 2006 8:48 PM Melongo disputing w/other employees continue to mount

Friday, March 24, 2006 Melongo told Accountant Melongo had purchased software and licenses needed to do her work totally $2005.08. Accountant said she needed approved requisition/purchase order before she could purchase. Melongo got mad, demanding payment. Account refused

Tuesday, March 28, 2006 9:06 AM RHI Fernandez urgent email about Melongo needs Spizziri to call

Tuesday, March 28, 2006 9:42 AM RHI Fernandez Notice of Melongo's Termination

Wednesday, March 29, 2006 1:26 PM Melongo's emailed RHI Fernandez refusing to be terminated unless it was in writing.  Melongo came to work and emailed Spizzirri her refusal to terminate response to RHI Fernandez. Spizzirri phoned Fernandez said she was fearful Melongo would do same as Rodriquez and change passwords. Fernandez agreed this Termination could cause Melongo to retaliate and offered to continue to retain her as RHI employee, until they could find someone to replace her to prevent her from causing further damage.

Wednesday, March 29, 2006 2:11 PM RHI Michael Shapow Regional Vice President enters picture into to Rich Kline to get break-in computers and re-set passwords

Wednesday, March 29, 2006 7:11 PM Still down

Thursday, March 30, 2006 10:00 AM RHI Rich Kline finally broke into system and re-set passwords

Friday April 13, 2006 Melongo complained she hadn't been paid by RHI and needed money to pay rent would reimburse upon receipt of RHI check, issued her check #8889 for $2,000. SALF accountant notified RHI, SALF would deduct sum from RHI's invoice.

Friday April 13, 2006 Spizzirri left message for RHI Fernandez questioning if they'd found a replacement for Melongo

Friday April 13, 2006 RHI Fernandez responded the were still looking for replacement

1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Friday April 20, 2006 8:00 AM Spizzirri entered SALF's locked office, found Melongo already in office. Asked how she was able to enter, if Management opened door for her? She admitted she had found the key laying on another employee's desk. Spizzirri asked Melongo to return key to her.

Friday April 20, 2006 6:00 PM Spizzirri & Vince Davis checked Computer room discovered a SALF picture ID Melongo had manufactured for her personal use.   (copy enclosed)

Monday April 23, 2006 8:00 AM Melongo, no show nor call

Monday April 23, 2006 10:00 AM, or there abouts, notified Building Management to change door locks

Monday April 23,2006 4:30 PM RHI Fernandez phoned Spizzirri, said Melongo had caused RHI too much aggravation and had terminated her in writing. RHI unable to find a replacement

Tuesday April 25, 2006 Melongo no show at SALF nor call

Tuesday April 25, 2006 3:30 PM Building Management replaced all door locks/keys

Wednesday April 26, 2006 Melongo no show at SALF nor call

Wednesday April 26, 2006 Melongo emailed a disgruntle email to Spizzirri and staff, using SALF email address and her Roosevelt University email address.

Thursday April 27, 2006 8:45 AM Melongo arrived at SALF, front desk announces Melongo's arrival to Spizzirri.  Spizzirri told Melongo RHI said Melongo had been terminated and asked Melongo to gather personal belongings and leave. Melongo demanded her $2005.08 or make SALF suffer. Spizzirri told Melongo SALF's Accounting cuts checks April 28th and would forward it so she would exit peacefully.  Spizzirri stayed with Melongo as she gathered personal property and left front door.

Thursday, April 27, 2006 4:45PM Melongo came back to SALF demanding $2005.08 payment or would cause SALF much grief, was told she'd be paid when accountant cut checks April 28[th.] Melongo said she wouldn't leave without check. Took her threats serious, Spizzirri directed Accountant to cut check #8909 for $2,005.08 fearing Melongo would malicious harm to staff or property.

Friday, April 28, 2006 8:00AM SALF staff turned on their computers discovered their files empty. Thinking computer system crashed, Christian Sass, True Consultants Temp, began to troubleshoot to discover the entire server blank.  He called True Consultants' owner Brian J. Salerno who came in and worked with Sass and Vince Davis to solve the problem.  5hrs later Salerno called another True Consultant's IT employee for assistance. All spent the entire weekend 24hrs ea day problem solving with no success

Friday, April 28, 2006 8:30AM Melongo left a message on Spizzirri's cell phone, understood SALF was having computer problems, offering to come in to fix it in turn for a job with SALF. Spizzirri did not erase message nor return call – but let Det. Martin listen.

Monday, May 01, 2006 True Consultants' Salerno called Peter & Associates and Critical Technology Solutions and Business Technology Partners for assistance

Monday, May 01, 2006 8:18 PM Spizzirri and SALF staff received x2 emails from Melongo that included Spizzirri's private email with disgruntle comments from Melongo.

Thursday, May 04, 2006 9:41 PM Christian Sass True Consultants Temp traced and printed those emails footprints from Spizzirri's emails to Melongo's email server and back to Spizzirri and SALF staff

Friday May 5, 2006 Discovered server's hard drive had been wiped clean by a perpetrator from outside (see Schiller Park Police Report).

Friday  May 5, 2006 9:55 AM Schiller Park Police Department was called Cyber Unit Det. William Martin interviewed Case#063219 Computer Tampering

Monday, May 08, 2006 2:04 PM Melongo emailed Spizzirri and SALF's staff a disgruntle email

May 18, 2006 5:34PM Schiller Park Police Dept. Case#06-3714 Credit Card Fraud X2, Bank Fraud pending (#06-9149)

June 22, 2006 X2 credit AX card charges totally $375.42 called Schiller Park Police Det. Martin – canceled card.

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Friday, November 17, 2006 3:01 AM Using SALF.ORG email address received email from Kharma Trouvailles Vous - kharma@salf.org [mailto:kharma@salf.org] ABC7Chicago.com: The Maneuver news about SALF. There was no SALF employee with the address or name.

Tuesday, December 12, 2006 7:33 PM One count, credit card fraud Police report #06-3714 Bank Fraud #06-9149

April 2, 2007 Schiller Park Police # 07-2491 American Express unauthorized us of card $2,886.00 and $3,801.00 discovered Melongo had access to front desk computer where all credit card transactions were preformed for travel. (see AT&T/Yahoo attachment) Canceled card – cancel Melongo's access.

April 10, 2007 IRS 013577167 Ltr # LTR00623C complainant Annabel Melongo – 1218 E. Long Valley Dr Apt 3a Palatine, IL 60074-3329 against SALF for W-2 non-compliance stated she was a former employee of SALF.

April 16, 2007 SALF Accountant replied to IRS, Melongo a RHI temporary employee and complaint was in retaliation to a pending criminal case against Melongo. No further correspondence by IRS.

*August 24, 2007 (DISCOVERY) LVNV Funding LLC (Collection Agency for CITIBANK) Judgment against Melongo $10,555.94*

July 09,2008 Mercury Consultants discovered on 10-04-07 SALF's DSL service was changed from static to dynamic the notes for the account listed Nic Pro Dynamic the only one who'd have access was the Account originator Annabel Melongo, who was the only person having the password information to change the account (see Mercury document)

July 22, 2008 3:35PM Mercury Consultants discovered administer cpanel no longer working and DSL line changed. Mercury contacted SALF's Host WebHSP, discovered Melongo had assigned herself as administer prior to leaving. WebHSP reset password (see Mercury notes) Melongo actions allow her complete access to front desk computer where AX card charges originated and explained why each time AX re-issued a new card/number it was compromised because Melongo had access four occurances – police reports filed. Melongo also had total access to SALF's Website to make changes to content at will and all SALF's staff emails.

August 27, 2008 Grand Jurors found Annabel K. Melongo committed the offense of Computer Tampering (see Circuit Court of Cook County doc)

**Damages Attached**

1. Receipts for damages by Annabel Melongo between 2006 to 2007 $286,154.13 (ongoing damages found by Mercury Consultants in 2008 not included)

After Computer Tamper Sabotage Spizzirri was the only person who knew each document, taking her two years & hundreds of hours, to replace each recovered file and place it back into appropriate file folder. All 1993-1998 files were deleted permanently as were hundreds of 1999-2008 files missing. Also explains changes and deleted pages made to SALF's Website.

Wednesday, November 15, 2006 5:32 PM Det. Martin Schiller Park Police Cyber Unit - Melongo arrested court date Jan 10th 2007

**Also Attached:**

1. RHI's Hourly Employment Agreement their Temporaries sign before assigned to a Client.
2. Certified Statement of Conviction/Disposition #06300688001 & 07CR0234101 & 08CR1050201

3

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3.  Melongo's Blog linking co-conspirators Gordy Pratt - Peter Heimlich/Robert Baratz/Jason Haap (SALF sued Baratz/Haap/Heimlich in 2007)
4.  Critical Technology Solutions' Captured image of deleted SALF documents 4/28/06
5.  Copy of one AX credit card used fraudulently
6.  Copy of unauthorized SALF ID by Annabel Melongo
7.  Melongo is not US citizen yet lists her social security # as                (ck'g)
8.  SALF Checks issued to Melongo # 8646 $25...12/21/05...#8889 $2,000..4/14/06 #8909 $2,005.08 4/28/06
9.  Clerk of Circuit Court Case # 2007-MI-184233 CITIBANK vs MELONGO
10. Name to keep an ear open for – Julia Rickert law student maybe helping Melongo

4