**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANNABEL K. MELONGO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 13 C 4924** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **ROBERT PODLASEK, JULIE GUNNIGLE,** | ) | |
| **KATE O'HARA, JAMES DILLON, ANTONIO** | ) | |
| **RUBINO, RICH LESIAK, KYLE FRENCH,** | ) | |
| **CAROL SPIZZIRRI, COOK COUNTY,** | ) | |
| **ILLINOIS, DETECTIVE WILLIAM MARTIN,** | ) | |
| **and VILLAGE OF SCHILLER PARK,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

In this action alleging various constitutional violations and state-law claims, Plaintiff Annabel K. Melongo has sued Assistant State's Attorneys Robert Podlasek and Julie Gunnigle; Investigators Kate O'Hara,[1] James Dillon, Antonio Rubino, and Rich Lesiak; Cook County; former Assistant Attorney General Kyle French; Schiller Park Detective William Martin; the Village of Schiller Park; and Carol Spizzirri.

Before the Court are four motions for summary judgment: one filed by Martin and Schiller Park (collectively, "the Schiller Park Defendants"); one filed by French; one filed by Spizzirri; and one filed by Podlasek, Gunnigle, O'Hara, Dillon, Rubino, Lesiak, and Cook County (collectively, "the County Defendants"). For the following reasons, the motions are granted in part and denied in part.

---

[1] The parties occasionally refer to O'Hara by her married name, Garcia. For clarity, the Court uses "O'Hara" throughout.

<u>**Background**</u>[2]

**I.     Melongo's Employment at the Save-A-Life Foundation**

In the spring of 2006, Melongo worked as a computer programmer and network administrator for the Save-A-Life Foundation ("SALF"), of which Spizzirri was the founder and president. Defs.' Combined LR 56.1 Stmt. ("Defs.' SOF") ¶ 8, ECF No. 267. In that role, Melongo had access to employees' usernames and passwords. *Id.* ¶¶ 9–10; Pl.'s LR 56.1 Stmt. ("Pl.'s SOF") ¶¶ 9–10, ECF No. 295. On certain occasions, Melongo logged into Spizzirri's email account, although Melongo asserts that this was done only at Spizzirri's direction. Defs.' SOF ¶ 11; Pl.'s SOF ¶ 11. While out of the office, SALF employees could access email remotely through an online email-hosting service. Defs.' SOF ¶ 12. Melongo asserts, however, that employees could not access the "data network" remotely. Pl.'s SOF ¶ 12.

On April 26, Melongo sent an email to Spizzirri and other employees, stating that she was aware that Spizzirri did not like her, and offered to resign. Defs.' SOF, Ex. E. She signed off with: "We never know the value of things, unless we [lose] them . . . ." *Id.* at CCSAO 003411. The following day, Melongo was fired. Defs.' SOF ¶ 16.

**II.     Missing SALF Computer Files**

The day after Melongo was fired—April 28, 2006—numerous files were discovered to be missing from the SALF servers. *Id.*, Ex. F ("Spizzirri Dep."), at 65:13–19. SALF hired Critical Technology Solutions and True Consulting, Inc. to address the issue. Defs.' SOF ¶ 18.

Based upon its investigation, True Consulting found that "two of the three [SALF] servers" crashed at 3:00 a.m. on April 28, 2006 ("the Server Intrusion"), *id.* ¶ 19, and determined two possible causes: (1) "changing passwords after the separation of a SALF employee," or (2)

---

[2]     The following facts are undisputed unless otherwise noted.

"virus/malicious intent." *Id.*, Ex. G, at 2. True Consulting stated that an employee, Christian Sass, would "try to establish an IP trace to better identify who/what may have been logged onto the server." *Id.* at 6.

### III. Email Issues on May 1, 2006

Melongo went to SALF's office on May 1, 2006, to pick up her final paycheck. Defs.' SOF ¶ 22. Later that day, she called Spizzirri and another employee and offered to help fix the system; however, Melongo states that she only learned of the computer problems after speaking with an employee in the SALF parking lot that day. *Id.*; Pl.'s SOF ¶ 22. The same day, Spizzirri emailed a True Consulting employee with the subject line "downed system" and stated: "Think we found who – Annabell called x4 and stopped in three – left message on my cell offering to fix our problem. Very similar to former IT who corrupted system. Have not spoke with her – she refused to speak with Christian [Sass] – go figure!" Defs.' SOF ¶ 23; *Id.*, Ex. H ("the 6:04 P.M. Email").[3] Spizzirri later testified that this was "not meant to accuse Ms. Melongo of being involved with the [Server] [I]ntrusion." Spizzirri Dep. at 170:21–24.

That evening, Melongo sent multiple SALF employees an email apparently intended for Spizzirri. Defs.' SOF ¶¶ 24, 26. The email referred to Spizzirri as a "pathological liar," stated that she "lie[d] too much just to get what [she] want[ed]," and ended with, "I will expose you." Pl.'s SOF, Ex. 1 ("the 8:18 P.M. Email").[4] The email also included the text of the 6:04 P.M. Email, which had apparently been forwarded from Spizzirri's SALF email account to Melongo's personal Yahoo account. *Id.*; 6:04 P.M. Email. Spizzirri became aware that the 6:04 P.M. Email had been forwarded from her account to Melongo (we will refer to the forwarding of the email as "the Email

---

[3] The parties refer to this email as "the Forwarded Email."

[4] Melongo refers to this email as "the Hey-Carol Email," while Defendants refer to it as "the Threatening Email."

Intrusion") when Sass forwarded the 8:18 P.M. Email to Spizzirri. Spizzirri Dep. at 82:18–83:18. The parties dispute whether Spizzirri's password had been changed since Melongo's termination; however, Spizzirri testified that she "would not have" changed it because she did not know how. *Id.* at 88:21–24.

## IV. Initial Contact with Schiller Park Police

On May 5, 2006, the Schiller Park Police Department received a complaint of computer tampering. Defs.' SOF, Ex. K ("Incident Report"). Officer Michael Marrazzo went to SALF's office and spoke to Spizzirri and several SALF employees. Defs.' SOF ¶ 30. Officer Marrazzo's report names Spizzirri as the complainant, although Spizzirri testified that she did not recall giving a statement to the police. Incident Report at 1; Spizzirri Dep. at 109:10–12.

The Incident Report states that: (1) Melongo was terminated on April 27, 2006; (2) an unknown offender hacked into SALF's server between 1:00 a.m. and 3:00 a.m. on April 28, 2007; (3) the offender deleted files on the server; and (4) an unknown offender accessed Spizzirri's email, forwarded emails to a Yahoo email address, and then responded to them from that address. Defs.' SOF ¶ 31; Incident Report at 2. The report also states that Spizzirri received a call from Melongo, indicating that she had heard SALF was having problems and offering to help. Incident Report at 2; Defs.' SOF ¶ 22. Furthermore, the report states that an employee did a "trace" showing that the Yahoo account belonged to Melongo. Incident Report at 2.

Later in the day on May 5, 2006, Detective Martin was assigned to the case and went to SALF's office to meet with Spizzirri. Defs.' SOF, Ex. D ("Martin Dep."), at 41:4–42:7. Spizzirri provided Martin with copies of emails that had been sent to and from her SALF account, including the one that had been forwarded to a Yahoo account. *Id.* at 43:3–23; 76:9–78:8; Pl.'s LR 56.1 Stmt. Add'l Facts ("Pl.'s SOAF") ¶ 144, ECF No. 295. Martin did not ask Spizzirri who had

administrator credentials after Melongo's termination, although he knew that anyone with those credentials could access any employee's email. Pl.'s SOAF ¶ 193. From the emails, Martin obtained an IP address ("the 102 IP Address") associated with the Yahoo account. Martin Dep. at 83:23–85:4. The 102 IP Address corresponded to the sender of the 8:18 P.M. Email. *Id.* at 89:3–12. Martin believed that the 102 IP Address was used to send an email from Spizzirri's account to the Yahoo account. *Id.* at 91:5–23; 103:2–8.

Based on discussions with Spizzirri and other employees, Martin thought it suspicious that Melongo had reached out to SALF to offer help; he testified that it was "like an arsonist watching a fire that he lit," or that Melongo was "trying to atone for something that she may have done." *Id.* at 282:13–283:7; Defs.' SOF ¶ 36. No other suspects were ever "developed" in relation to the Server Intrusion or Email Intrusion; Martin did investigate the theft of a SALF credit card several weeks after the Server Intrusion and Email Intrusion occurred, but could not prove who was involved. Pl.'s SOAF ¶¶ 145–47; Defs.' Resp. Pl.'s SOAF ¶¶ 145–46, ECF No. 309.

## V.     Preliminary Computer-Tampering Investigation

In the days after SALF first contacted the police, Spizzirri also contacted State's Attorney Dick Devine to "see if he would have any suggestions" for getting a prosecutor involved in the case. Spizzirri Dep. at 121:11–123:13. Spizzirri told others that Devine was a "personal friend." Pl.'s SOAF, Ex. 34. She wrote to Devine on May 8, 2006, asking for his "advise [sic] in this sensitive matter." Pl.'s SOAF, Ex. 35. Devine responded, indicating that he was forwarding the correspondence to Randy Roberts, Executive Assistant to the State's Attorney. Pl.'s SOAF ¶ 134. Devine also called Martin and "offer[ed] his assistance." Martin Dep. at 110:6–112:5. After receiving Devine's response, Spizzirri spoke to Roberts and indicated that she wanted to pursue charges; Roberts explained to her "how a case is investigated." Defs.' SOF, Ex. B ("Roberts

Dep."), at 33:10–34:23. Later, in November 2006, Spizzirri wrote Devine to thank him for the "relentless examination" by Roberts and Martin. Pl.'s SOAF ¶ 151.

Within days of his assignment to the case, Martin contacted Yahoo and Comcast (the host of the 102 IP address) for information regarding the Yahoo account and sent a preservation letter and search warrant to Yahoo. Defs.' SOF ¶ 37. A preservation letter was also sent to Comcast, although the parties dispute whether Martin personally sent it. Defs.' SOF ¶ 38; Pl.'s SOF ¶ 38.

Martin met with French, an Assistant Attorney General with the High Tech Crimes Bureau, on May 16, 2006, to discuss the Server Intrusion and Email Intrusion. Defs.' SOF ¶ 40. The next day, he met with two SALF employees. *Id.* ¶ 41; *Id.*, Ex. N ("Martin Report"). The employees showed Martin screenshots of files on the SALF server, indicating that the files were accessed between 1:00 a.m. and 3:00 a.m. on April 28, 2006. Martin Dep. at 118:19–24; 119:22–120:1. One employee told Martin that the "intrusion to the computer system occurred somehow through the web via the company's email server." *Id.* at 122:3–19. He admitted, however, that he was unsure how this could have happened because "the company disconnected the DSL lines from the servers" after Melongo was fired. Martin Report at 2. The other employee told Martin that he believed Melongo had been monitoring SALF management's email. Defs.' SOF ¶ 42. He gave Martin the name of Don Peters, the Critical Technology Solutions employee whom SALF had called to repair the server. Martin Dep. at 127:3–10.

Based on these conversations, as well as the documentation he reviewed from SALF, Martin believed that the Server Intrusion occurred when someone accessed a computer that was connected to the internet and the SALF computer network. *Id.* at 124:24–125:9. In Martin's view, this could be accomplished even if the SALF servers were not connected to the internet. *Id.* at

125:15–24.  Melongo disputes that Martin "could have actually, reasonably or rationally believed [these] assumptions."  Pl.'s SOF ¶ 43.

Martin spoke with Peters, who provided a copy of the Critical Technology Report related to the Server Intrusion.  Defs.' SOF ¶ 45.  According to the report, it was "not possible to state with complete certainty" that the "file tag information (dates, times, etc.) is accurate."  Martin Dep. at 130:7–23.  After they spoke, Peters sent Martin an email stating that, prior to attempting to recover the SALF files, he had advised Spizzirri that "the quality of any evidence discovery would be questionable at best," but that Spizzirri had decided to move forward with recovery efforts. Pl.'s SOF, Ex. 7.  Based on these communications, Martin understood that he would not be able to establish a chain of custody for evidence obtained from the SALF servers.  Defs.' SOF ¶ 46. Although the parties dispute Martin's reasons, it is undisputed that he did not undertake a search of the SALF servers.  *Id.*; Pl.'s SOF ¶ 46.

French and Martin prepared subpoenas to Comcast, which were sent on May 31, 2006. Defs.' SOF ¶¶ 48–49; Pl.'s SOF ¶ 48.  The subpoenas sought information as to the 102 IP Address and about Melongo.  Defs.' SOF ¶ 49.  On the day the subpoenas were sent, Martin also appeared before a judge, who signed a search warrant directed to Yahoo regarding Melongo's account.  *Id.*

Comcast responded to the subpoenas on June 5, 2006, indicating that it was "unable to find any responsive information" to each request, and that it could not identify the account associated with the 102 IP Address.  *Id.* ¶ 50; *id.*, Ex. O.  Martin prepared two revised subpoenas with more specific search requests, but the parties dispute whether they were sent to Comcast; Martin testified that he "sent the request," but that he didn't "believe they were ever sent out."  Martin Dep. at 160:9–11.  Martin's report states that he faxed the subpoenas to the SAO, but that the SAO indicated that they had not received them.  Martin Report at 4–5.

7

Martin received Yahoo's response to the search warrant on June 23, 2006, indicating that the Yahoo email account belonged to Melongo. Defs.' SOF ¶ 53. Yahoo's response also referenced multiple login attempts by Melongo's Yahoo account from the 102 IP Address. *Id.* ¶ 54; Pl.'s SOF ¶ 54. The response further stated that Yahoo had found the 102 IP Address in its search associated with Melongo's account on April 27, 2006 and April 29, 2006. Defs.' SOF ¶ 55; Pl.'s SOF ¶ 55. Based on these logins, Martin concluded that Melongo was online and logged into her Yahoo account during the Server Intrusion. Defs.' SOF ¶ 56; Pl.'s SOF ¶ 56.

Furthermore, Yahoo's response indicated that it had found the 102 IP Address in its search associated with Melongo's email account on May 1, 2006, prior to when the 6:04 P.M. and 8:18 P.M. Emails were sent. Defs.' SOF ¶ 57; Pl.'s SOF ¶ 57. Based on this information, Martin concluded that Melongo was online and logged into her account during the Email Intrusion. Defs.' SOF ¶ 58.

## VI. Search of Melongo's Home

Martin sent Yahoo's response to French on June 28, 2006. *Id.* ¶ 61. French reviewed it and told Martin that there was enough information to seek a search warrant for Melongo's home. *Id.* Martin then drafted a search warrant complaint, which restated information from his police report regarding the Server Intrusion and Email Intrusion, interactions with Comcast and Yahoo, and communications with SALF employees. *Id.* ¶ 62. Martin sought to search Melongo's residence and seize any computer-related evidence. *Id.* On July 19, 2006, he met with an Assistant Cook County State's Attorney ("ASA"), who approved the search warrant complaint. *Id.* ¶¶ 63– 64. Martin then appeared before a judge, who signed off on the warrant. *Id.* Martin and another detective executed the warrant on July 20, 2006. *Id.*

According to Martin's report, he spoke with Melongo during the search, and Melongo told him that she had gone to SALF to pick up her paycheck and overheard that SALF was having computer problems. Martin Report at 7. The report also states that Melongo: (1) admitted to having access to employees' passwords, the web server, and company passwords; (2) "admitted to accessing the server to get her emails for up to two weeks" after she was fired, though she denied changing any "settings or system passwords"; and (3) admitted to viewing Spizzirri's emails and forwarding emails to her Yahoo account. *Id.* at 7–8. Melongo denies making any of these statements and points out that, in his grand jury testimony, Martin testified that Melongo told him "another SALF employee" forwarded the emails to her. Pl.'s SOF ¶ 65. In Martin's deposition, he stated both that Melongo "didn't specifically say" that she forwarded emails from Spizzirri's account and that "[s]he did say, that's what – I wrote it." Martin Dep. at 186:4–187:4.

During the execution of the search warrant, a written list of SALF employee usernames and passwords was seized from Melongo's residence. Defs.' SOF ¶ 66. Melongo asserts that this list was "outdated" because "passwords were changed when [she] was terminated." Pl.'s SOF ¶ 66. Martin believed that Melongo "should not have had this document at her apartment at the time of the search warrant" because she had represented at her exit interview that all SALF property had been returned. Martin Dep. at 284:15–285:6. The list of passwords and usernames was found "next to" or "nearby" one of Melongo's computers. *Id.* at 284:10–14.

After the search of Melongo's residence, Shahna Monge[5], a computer specialist with the Attorney General's ("AG's") Office, performed a forensic analysis of computers seized from the residence and prepared a report and a summary of that report. Defs.' SOF ¶ 69; Pl.'s SOF ¶ 69. Although Martin had told Monge that Melongo had "confessed to the crime," he did not tell her

---

[5] The parties occasionally refer to Monge by her married name, Voita. For clarity, the Court uses "Monge" throughout.

what information to include in her report. Defs.' SOF, Ex. S ("Monge Dep."), at 125:9–23, 172:17–24. Monge located two "link files" on Melongo's computer for a "network connection to [SALF]." *Id.* at 73:18–74:12. However, her report does not provide date and time information for the files. *Id.* at 75:9–22. The computer also contained evidence that Melongo had installed a program called "Go To My PC," which allows a user to remotely access another computer. *Id.* at 75:24–76:6. Melongo testified that the program was installed on the computer *being accessed*; in other words, a user could install "Go To My PC" on a computer and then use another device to access the "Go To My PC" website, login to her account, and then retrieve files from the computer on which the program had been installed. Melongo Dep. at 275:4–20. In addition, Monge located a "cookie file" for the 102 IP Address on Melongo's computer, which reflected a connection through that IP address on April 28, 2006. Monge Dep. at 66:4–68:2. The report included several other references to the 102 IP Address. *Id.* 68:14–19.

The analysis also revealed that http://mail.salf.org had previously been typed into the computer, and Spizzirri's email login and password were found on the computer; however, it was not clear when the URL and login information had been typed. Defs.' SOF ¶¶ 76–77; Pl.'s SOF ¶¶ 76–77. Martin did not request any additional forensic analysis. Pl.'s SOAF ¶ 143.

## VII.    Computer-Tampering Charges

On October 30, 2006, French and Monge met with an ASA to review the evidence against Melongo. Defs.' SOF ¶ 79. Martin testified that he also attended this meeting, although Monge testified that he was not present. Martin Dep. at 212:18–213:16; Monge Dep. at 96:6–17. It is unclear whether the decision to bring charges was made at this time; French testified that it was not, while Martin testified that the ASA "approved two felony counts of computer tampering." Defs.' SOF, Ex. L ("French Dep."), at 260:15–261:12; Martin Dep. at 217:1–7. Based on

Melongo's purported confession, French believed that a charge related to the Email Intrusion was the "most provable," but he recommended that "additional forensics be done" if the County proceeded with charges related to the Server Intrusion. French Dep. at 258:20–259:6, 271:7–12. French testified that he was not involved in the decision about what charges to bring beyond this initial meeting "handing off" the case. *Id.* at 67:8–18, 257:4–258:9.

An arrest warrant was issued on October 31, 2006. Defs.' SOF ¶ 81; Pl.'s SOF ¶ 81. Melongo was not arrested, however, because she voluntarily surrendered to the Schiller Park Police Department, where she was processed and released after several hours. Defs.' SOF ¶ 82.

In November 2006, ABC aired a report critical of SALF and Spizzirri. Pl.'s SOAF ¶ 148. Martin saw the report and asked Monge whether she thought the "case was shot now"; he also contacted Podlasek about the report. *Id.* ¶ 149. French was copied on emails from Monge about the report. *Id.* Eventually, in 2010, the AG's Office audited SALF, and Spizzirri contacted Podlasek and Gunnigle, seeking assistance. *Id.*, Ex. 52.

Martin testified before a grand jury on January 17, 2007, and the grand jury indicted Melongo on two counts of computer tampering. Defs.' SOF ¶¶ 83–84. That indictment was dismissed in 2008, and Melongo was reindicted on three counts of computer tampering. *Id.* ¶ 85. At the 2008 grand jury proceeding, Podlasek stated that the reason for the reindictment was to "split one of the counts into two counts so they're clearer for the Court and/or the Trier of Fact to understand." *Id.*, Ex. V, at 3. Martin testified before the 2008 grand jury as well. Defs.' SOF ¶ 86.

The parties dispute whether Melongo was arraigned on the computer-tampering charges on June 18, 2008, when she was subject to a recognizance bond. *Id.* ¶¶ 87–88; Pl.'s SOF ¶¶ 87–88. A docket sheet from that date indicates a court appearance, but does not state whether there

was an arraignment.  Pl.'s SOF, Ex. 8, at 1.  Melongo believes that the court transcript had been altered to reflect that she had been arraigned on that date, although (she contends) no arraignment occurred.  Pl.'s SOAF ¶ 172.  There had been a prior incident in the case in which the transcript had not accurately reflected what had occurred.  *Id.* ¶ 174.

As the case progressed, Spizzirri contacted various third parties, representing that Podlasek was seeking to "increase [Melongo's] charges . . . for more JAIL TIME and please the Judge who intends to use our case to create laws."  Pl.'s SOAF, Ex. 56.

**VIII.  Melongo's Website**

In November 2009, Melongo created a website, www.illinoiscorruption.net, to "chronicle her efforts at defending against the computer tampering charges."  Pl.'s SOAF ¶ 96.  Spizzirri repeatedly complained to Podlasek and Gunnigle about the website, seeking to have it taken down.  *Id.* ¶¶ 158–61.  The website eventually went offline because Melongo could not pay its fees during her incarceration, but it was reinstated after her release on electronic monitoring.  *Id.*

After reviewing the court transcript from June 18, 2008, the date on which she was allegedly arraigned, Melongo contacted the court reporter to inquire why the transcript indicated she had been present in court, when in fact she was not.  Defs.' SOF ¶ 98; Pl.'s SOAF ¶ 173.  Subsequently, on December 10, 2009, a supervisor in the court reporter's office, Pamela Taylor, directed Melongo not to contact the court reporter again.  Defs.' SOF ¶ 98; Pl.'s SOAF ¶ 173.  Melongo spoke with Taylor on December 10, 15, and 16, and recorded these conversations.  Defs.' SOF ¶ 99.  She did so because she suspected that Taylor was seeking to cover up a forged or altered transcript, and she described this belief on her website.  Pl.'s SOAF ¶¶ 175–76.  She posted the recordings on her website in December 2009, claiming that they fell within an exemption to the Illinois Eavesdropping Act, 720 Ill. Comp. Stat. 5/14-3(I).  Defs.' SOF ¶ 100; Pl.'s SOF ¶ 100.

Around this time, Melongo also attempted to remove the computer-tampering case to federal court, but the petition for removal was denied. Defs.' SOF ¶ 93.

Soon after the website was created, Podlasek emailed French about it, stating that they were "now part of a website on Illinois corruption in full gloriously detailed misrepresentations." Pl.'s SOAF ¶¶ 166, 179. Podlasek and Gunnigle did not believe that Melongo's criticisms of them on the website were fair. *Id.* ¶ 178; *Id.*, Ex. 40 ("Gunnigle Dep.") at 43:4–12. French asked a forensic examiner in the AG's office to preserve the website, which was "successfully captured on January 13, 2010," Pl.'s SOF, Ex. 15, at 2, although a copy produced by the SAO shows a date of March 8, 2010. Pl.'s SOF, Ex. 14.

## IX. April 13, 2010 Arrest

On March 3, 2010, the judge in Melongo's computer-tampering case ordered an examination to determine her fitness to stand trial and represent herself. Defs.' SOF ¶¶ 102, 106. Around the same time, Gunnigle was preparing to issue search warrants to Go Daddy and Yahoo. *Id.* To that end, she "[did] the work to gather the information that was contained in the search warrant complaints," then reviewed them line-by-line with O'Hara "[b]ecause a State's Attorney cannot swear out a search warrant." *Id.*, Ex. Z ("O'Hara Dep.") at 44:17–45:14. After reviewing the complaints, O'Hara signed them for submission to the judge. Defs.' SOF ¶ 103.

A judge issued a warrant for Melongo's arrest on April 13, 2010, for violation of the Illinois Eavesdropping Act. *Id.* ¶¶ 104–05. That same day, Melongo was examined and deemed fit to stand trial in her computer-tampering case. *Id.* ¶ 107. Following the examination, she was arrested. *Id.* Rubino, Lesiak, and Dillon were involved in the arrest and processing. *Id.*

The parties dispute the basis for Melongo's arrest. Defendants assert that she was arrested "pursuant to a judicially issued arrest warrant issued on April 13, 2010." *Id.* But Melongo was

arrested at 12:45 p.m., and the warrant was not signed until 2:49 p.m. Pl.'s SOF, Ex. 16 ("Arrest Report") at 2; Defs.' SOF, Ex. AA at 3. Furthermore, the arrest report states that Melongo was arrested for "threatening a public official," not eavesdropping. Arrest Report at 1. According to Melongo, she was not informed of the basis for her arrest. Pl.'s SOAF ¶ 181. After she was arrested, Melongo indicated that she felt ill and was taken to a hospital, where she was diagnosed with a headache. *Id.* ¶ 171; Defs.' Resp. Pl.'s SOAF ¶ 171.

After Melongo was arrested, the officers attempted to question her; however, Melongo asked for a lawyer, and the questioning stopped. Defs.' SOF ¶ 108. Melongo testified that two U.S. Marshals also attempted to question her about her website, including information she posted about the attempt to remove her case to federal court and the judge. Melongo Dep. at 214:15–215:16. The Marshal's Service also contacted Podlasek to discuss the website because they "are very careful when people start[] posting anything on-line about [the particular judge]." Defs.' SOF, Ex. U ("Podlasek Dep.") at 74:18–75:20. Melongo had also posted that she had a "big surprise in store for the court," which would "be known on April 14, 2010." *Id.* at 78:17–24. The Cook County Sheriff's Department generated an incident report related to the "big surprise" statement, classifying it as "inappropriate communication." Pl.'s SOF, Ex. 17.

## X.    Eavesdropping Charges

On April 27, 2010, Melongo was indicted on three counts of recording phone conversations and three counts of publishing the conversations. Defs.' SOF ¶ 111. Martin testified that he was not involved in the eavesdropping case, although he was aware of it. Martin Dep. at 271:15–24.

Melongo remained in custody because she was unable to post bail. Defs.' SOF ¶ 113. Her bail on the computer-tampering charges was $300,000, and bail on the eavesdropping charges was $30,000. Pl.'s SOF ¶ 113. During the time that Melongo was incarcerated, Spizzirri made

numerous complaints about her to Podlasek, Gunnigle, the AG's Office, a Chicago Tribune reporter, and an Illinois state senator. Pl.'s SOAF ¶¶ 159–60, 162–63. There was a trial on the eavesdropping charges in January 2011, which ended in a hung jury. *Id.* ¶ 180. Melongo was eventually released from jail and placed on electronic monitoring on October 20, 2011, approximately 20 months after her arrest. Defs.' SOF ¶ 114. While she was incarcerated, Melongo developed a medical condition that required a complete hysterectomy. Pl.'s SOAF ¶ 194.

## XI.    Release, Re-Arrest, and Attempts to Obtain Documentation

The parties dispute much of what occurred after Melongo was released on electronic monitoring. It is undisputed that Melongo went to the office of her former attorney, Nick Albukerk, and left with her case file. Pl.'s SOF ¶ 115. Defendants assert that she "stole" the file, while Melongo states that she believed she had permission to take it; in fact, Albukerk had only intended for her to copy the file. *Id.*; Defs.' SOF ¶ 115. On November 10, 2011, Melongo and Podlasek appeared in court, and Podlasek sought an order revoking Melongo's bond, based on his communications with Albukerk. Defs.' SOF ¶ 116.

The parties further dispute what occurred at (and directly after) this hearing. According to Defendants, the judge ordered Melongo back into custody because she had violated the terms of her electronic monitoring by visiting Albukerk's office. *Id.* ¶ 117. However, the transcript shows that the judge gave Melongo four days to respond to the motion, directing her to "[b]ring all [her] documents." Pl.'s SOF, Ex. 23, at 6–7. Melongo asserts that, nevertheless, she was arrested after leaving the hearing and was told it was because she took a file from the SAO. Pl.'s SOF, Ex. 6 at ¶ 17; Pl.'s SOF, Ex. 25. At the next court date, the judge informed Melongo that she could return to electronic monitoring if she brought the file from Albukerk's office to the next hearing; she agreed. Pl.'s SOAF ¶ 183. The judge did not allow Melongo to describe what she believed to be

improper about the November 10 arrest.  *Id.*  Melongo was returned to electronic monitoring on November 23, 2011, and she returned the file to the court a week later.  Defs.' SOF ¶ 118; Pl.'s SOAF ¶ 184.

Between December 2011 and February 2012, Podlasek tendered to Melongo certain discovery files from Albukerk, some of which were redacted.  Pl.'s SOAF ¶¶ 185–88.  As of mid-February, Podlasek had not fully completed his redactions of the documents.  *Id.* ¶ 189.

Over the next several months, Melongo sought from the SAO documents related to her case and reissued subpoenas.  In September 2012, she sent a FOIA request to the Sheriff's Police for records relating to the April 2010 arrest; she received a response on September 27, 2012, including police reports stating that she had been arrested for threatening a public official.  *Id.* ¶ 192.  This was the first time Melongo learned this fact; previously, she believed she had been arrested for eavesdropping.  *Id.*

## XII.  Resolution of Computer-Tampering and Eavesdropping Cases

On May 8, 2012, the Illinois Eavesdropping Act was declared unconstitutional.  Defs.' SOF ¶ 119.  The judge in Melongo's eavesdropping case granted a motion to dismiss the charges on June 19, 2012; a written ruling followed on July 26, 2012.  Pl.'s SOF ¶ 119.  The State appealed, but the Illinois Supreme Court affirmed in 2014.  *Id.*, Ex. 32.  While the appeal was pending, Spizzirri thanked the State's Attorney and AG for "standing firm on prosecuting."  Pl.'s SOAF ¶ 164.

The State dismissed two of the three computer-tampering charges in July 2014, and Melongo proceeded to trial on one felony charge.  Defs.' SOF ¶ 120.  Martin, Monge, and Spizzirri testified at the trial.  *Id.* ¶ 123.  Martin testified that Melongo had admitted to accessing SALF's server after her termination, and to accessing Spizzirri's email account and forwarding the 6:04

P.M. Email to herself. Pl.'s SOAF ¶ 138. Martin further testified that a list of SALF employee passwords was seized from Melongo's home. Defs.' SOF ¶ 121. Spizzirri testified that she did not know if Melongo had accessed her computer and forwarded emails, nor did she know how the SALF files were deleted. Pl.'s SOAF ¶ 165. At the close of the prosecution's case, Melongo moved for a directed verdict in her favor, which was granted on July 29, 2014. Defs.' SOF ¶¶ 125–27.

Melongo filed suit on July 10, 2013. *Id.* ¶ 128. She filed an amended complaint on June 5, 2014, and a second amended complaint on November 5, 2014, adding claims against Roberts, Martin, and Spizzirri. *Id.* ¶ 131. She filed her third amended complaint on January 23, 2018. *Id.*

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

**<u>Analysis</u>**

Melongo brings a false arrest claim against French, Podlasek, Gunnigle, O'Hara, Dillon, Lesiak, and Rubino (Count I); a First Amendment retaliation claim against French, Podlasek, Gunnigle, and O'Hara (Count II)[6]; a false arrest claim against Podlasek (Count III); an unlawful pretrial detention claim against French, Podlasek, Gunnigle, O'Hara, and Martin (Count IV)[7]; a due process claim against Martin (Count V); state-law claims for malicious prosecution, conspiracy, negligent infliction of emotional distress ("NIED") and intentional infliction of emotional distress ("IIED") against Podlasek, Gunnigle, Garcia, Dillon, Rubino, Lesiak, French, Martin, and Spizzirri (Count VI)[8]; a claim for indemnification against Cook County and Schiller Park (Count VII); and a claim for punitive damages against all Defendants.

## I.  Immunity Defenses

"[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976).  That said, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  And "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police

---

[6]    Although her complaint also names Dillon, Rubino, and Lesiak, Melongo has indicated that she no longer wishes to pursue this claim as to these Defendants.  Pl.'s Combined Resp. Opp. Mots. Summ. J. at 4, ECF No. 294.  As such, Count II is dismissed as to Dillon, Rubino, and Lesiak.

[7]    Although her complaint also names Dillon, Rubino, and Lesiak, Melongo's briefing omits any reference to such a claim against those Defendants.  Pl.'s Combined Resp. Opp. Mots. Summ. J. at 4–5.  As such, Count IV is dismissed as to Dillon, Rubino, and Lesiak.

[8]    Although her complaint also references state-law claims for false arrest and false imprisonment, Melongo has indicated that she no longer wishes to pursue such claims.  Pl.'s Combined Sur-Response at 12, ECF No. 318.  As such, Count VI is dismissed to the extent it is based on those claims.

officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other." *Id.* (quotation marks omitted). Accordingly, where a prosecutor searches for clues and corroboration to establish probable cause to initiate judicial proceedings, he may be protected by qualified immunity, rather than absolute immunity. *Id.*

Under these principles, "the official seeking absolute immunity bears the burden of showing that it is justified by the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). When a determination of a defendant's entitlement to absolute immunity rests on a dispute of fact, summary judgment should be denied. *See Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010); *Whitlock v. Brueggemann*, 682 F.3d 567, 578–79 (7th Cir. 2012).

On the other hand, "[q]ualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (internal quotation marks and emphasis omitted). When a defendant raises qualified immunity as a defense, the plaintiff has the burden of establishing that the defense is inapplicable. *Mustafa v. City of Chi.*, 442 F.3d 544, 548 (7th Cir. 2006). "[T]wo questions are pertinent to the defense of qualified immunity: whether the facts alleged show that the state actor violated a constitutional right, and whether that right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

### A.    Claims Arising from Melongo's April 13, 2010 Arrest (Counts I and II)

Podlasek and Gunnigle seek absolute immunity on Melongo's false arrest (Count I) and First Amendment retaliation (Count II) claims based on her April 13, 2010 arrest; in the alternative, they and the other County Defendants seek qualified immunity. French seeks absolute immunity as to Count II and argues that he is entitled to qualified immunity on both claims.

### 1.       The County Defendants

The parties present conflicting accounts regarding Melongo's arrest. Podlasek and Gunnigle assert that they are entitled to absolute immunity because Melongo was arrested pursuant to a judicially executed warrant. Defs.' SOF ¶¶ 104–05, 107. But Melongo points out that the warrant was not signed by a judge until approximately two hours *after* she was arrested, along with the fact that an arrest report states that her arrest was for "threatening a public official"—a different offense than what was specified in the warrant. Arrest Report at 2; Defs.' SOF, Ex. AA, at 3. Furthermore, O'Hara testified that Melongo was arrested for threatening a public official because "we didn't obtain our warrant [to arrest for eavesdropping] yet." O'Hara Dep. at 123:17–19. O'Hara also recognized that the warrant was issued "after [Melongo's] initial detention." *Id.* at 123:21–23. From this, a reasonable jury could conclude that Podlasek and Gunnigle did not act pursuant to a judicially executed warrant. Because the determination of whether Podlasek and Gunnigle should be afforded absolute immunity rests on these disputes of fact, the Court denies summary judgment on this ground.

The County Defendants similarly argue that they are entitled to qualified immunity because they were executing a judicially issued arrest warrant. It is true that an officer is entitled to qualified immunity if his actions were reasonable and if he acted pursuant to a warrant that was authorized by a judge. *Archer v. Chisholm*, 870 F.3d 603, 614 (7th Cir. 2017). However, whether Melongo was arrested pursuant to a warrant is hotly contested. Given the underlying disputes of fact, the Court cannot say that the County Defendants are entitled to qualified immunity because they were executing a judicially issued arrest warrant.

Additionally, the County Defendants argue that they are entitled to qualified immunity on the false arrest claim (Count I) because they had probable cause for the arrest, even in the absence

of a warrant.  They state that, "because of the information provided by the U.S. Marshalls [sic], Defendants reasonably perceived [Melongo's] particular statement posted on her website that she had 'a big surprise in store for the Court' as potentially threatening[.]"  County Defs.' Mem. Supp. Summ. J. at 14, ECF No. 276.  Podlasek testified that he was contacted by the U.S. Marshal's Service regarding Melongo; however, it is not clear from his testimony when that occurred, and Melongo testified that the Marshal's Service spoke to her about the post *after* her arrest.  *See* Podlasek Dep. at 74:18–75:20; Melongo Dep. at 214:14–215:16.  Thus, this does not establish that any statements by the U.S. Marshals provided probable cause for Melongo's arrest.  Because the qualified-immunity issue ultimately rests on disputed questions of fact, the Court denies summary judgment on this ground.  *See Cole v. Village of Riverdale*, No. 14-cv-0019, 2016 WL 4505163, at *3 (N.D. Ill. Aug. 29, 2016) (denying summary judgment on qualified-immunity grounds where material factual disputes remained as to probable cause).

The County Defendants also seek qualified immunity on Count II.  As the County Defendants point out, it has not been "clearly established" that an arrest supported by probable cause can violate the First Amendment.  In *Thayer v. Chiczewski*, the Seventh Circuit noted that "neither our circuit nor the Supreme Court has recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause."  705 F.3d 237, 253 (7th Cir. 2012) (citations omitted).  Thus, qualified immunity bars Melongo's claim unless there was no probable cause for the arrest.  For the reasons previously stated, that determination turns on disputed facts, and the Court denies summary judgment in this regard.

### 2.      French

French also seeks absolute immunity as to Count II.  In his opening brief, he stated that he sought immunity only for his "conduct at [Melongo's] bond hearing" on the eavesdropping

charges. French Mem. Supp. Mot. Summ. J. at 7–8, ECF No. 270. Melongo did not respond to this argument, apparently not contesting French's entitlement to immunity for such conduct. Thus, French's motion is granted to the extent it seeks immunity for his conduct at Melongo's bond hearing. To the extent that Count II is based on French's other conduct, such as directing a forensic examiner in the AG's office to preserve Melongo's website, French has failed to seek immunity for that conduct, and summary judgment is denied.

Turning to qualified immunity, French argues as to Count I that there was probable cause to arrest and charge Melongo with computer tampering. But Melongo's false arrest claim is clearly based on her 2010 arrest for "threatening a public official" via a statement made on her website. Because the issue of French's role in that arrest is not adequately addressed in the briefing, the Court declines to grant French summary judgment on the basis of qualified immunity. And for the reasons previously stated, French is not entitled to qualified immunity on Count II because of underlying disputes of fact.

### B.    November 10, 2011 Arrest (Count III)

Podlasek seeks absolute immunity on Count III—Melongo's false arrest claim based on her November 10, 2011, arrest. Podlasek's argument is based on his motion to revoke Melongo's bond; however, Melongo does not argue that the motion caused her arrest. Rather, Melongo contends that Podlasek caused her arrest by falsely informing police that she had stolen a file from the SAO.

Melongo has pointed to evidence that: (1) she was arrested at the electronic-monitoring program office, directly adjacent to the courthouse, immediately after the November 10, 2011, hearing at which the judge refused to revoke her bond; (2) Podlasek sought to revoke the bond in part because Melongo had allegedly "stolen" a file from her attorney's office; and (3) Melongo's

arrest was effectuated because she was reported to have "stolen" a file from the SAO. Defs.' SOF ¶ 117; Pl.'s SOF, Ex. 6 at ¶ 17; Pl.'s SOF, Ex. 25. At his deposition, when asked whether he had told anyone in the Sheriff's office that Melongo had stolen a file, Podlasek merely stated that he had "no recollection" of doing so. Podlasek Dep. at 138:11–18. From this evidence and making all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that, when the judge did not immediately revoke Melongo's bond, Podlasek took matters into his own hands by falsely reporting that Melongo had stolen a file from the SAO, thus causing her arrest without probable cause. Because the determination of Podlasek's entitlement to absolute immunity rests on disputed issues of fact, the Court denies summary judgment on this ground.[9]

To the extent that Podlasek is not entitled to absolute immunity on Count III, he may be entitled to qualified immunity. But the Court cannot make that determination at this time because, again, the facts surrounding Melongo's arrest are disputed. For the reasons previously stated, a reasonable jury could conclude that Podlasek caused Melongo to be arrested without probable cause. Thus, summary judgment is denied as to Count III on qualified-immunity grounds.

### C.  Unlawful Pretrial Detention (Count IV)

Podlasek, Gunnigle, and French seek absolute immunity as to Count IV; in the alternative, they and O'Hara seek qualified immunity. Martin also seeks qualified immunity on this claim.[10]

#### 1.  The County Defendants

Count IV is based on Melongo's detention, beginning in April 2010, on the computer-tampering and eavesdropping charges. Melongo argues that Podlasek and Gunnigle are not entitled to absolute immunity because they knew that the evidence of her "confession" was

---

[9]     For the same reasons, the Court also denies summary judgment on the merits of this claim.

[10]    As to Martin, the Court need not decide the qualified immunity issue, because, for the reasons discussed in Section III.B.1, the Court concludes that Count IV is time-barred.

fabricated; there was otherwise no probable cause for the computer-tampering charges; and they had acted as investigators in the eavesdropping case.

The Court concludes that Podlasek and Gunnigle are entitled to absolute immunity on Count IV as to the computer-tampering case, because Melongo has failed to set forth any facts indicating that they had acted as investigators. Furthermore, absolute immunity extends to a prosecutor's knowing use of false testimony, so even if Podlasek and Gunnigle had known that Martin had fabricated the evidence of her confession, their actions would be covered by immunity. *Imbler*, 424 U.S. at 430 n.32. Thus, as to Podlasek and Gunnigle, summary judgment is granted on Count IV to the extent it is based on the computer-tampering charges.

As to the eavesdropping charges, Melongo points to evidence that, prior to any arrest or charge, Podlasek and Gunnigle had prepared search warrants, conducted online research, and coordinated with French to obtain a capture of Melongo's website, which was used at her eavesdropping trial. Pl.'s SOF ¶¶ 101–02. This, she contends, establishes that they acted as investigators, not prosecutors. On this point, the Court agrees. The evidence shows that Podlasek and Gunnigle acted outside the prosecutorial role; for example, Podlasek contacted French about the website, Pl.'s SOAF ¶¶ 166, 179, and Gunnigle drafted the search warrants to GoDaddy and Yahoo. O'Hara Dep. at 44:1–45:6. According to O'Hara, Gunnigle had "done the work to gather the information" contained in the search warrant complaints. *Id.* at 45:7–10. These actions, taken long before Melongo was charged with eavesdropping, are not acts "intimately associated with the judicial phase of the criminal process." *Imbler*, 424 U.S. at 430. Rather, they significantly predate the initiation of the judicial phase of Melongo's eavesdropping case. As such, the Court concludes that Podlasek and Gunnigle are not entitled to absolute immunity on Count IV to the extent it is based on the eavesdropping charges, and summary judgment is denied on this ground.

Podlasek, Gunnigle, and O'Hara also seek qualified immunity for their actions in Melongo's eavesdropping case. Melongo argues that qualified immunity is inapplicable because there was no probable cause for the eavesdropping charges, because the publication of the recorded conversations fell within an exemption to the Illinois Eavesdropping Act and Podlasek, Gunnigle, and O'Hara all were aware of this. Melongo's website stated that the recordings were legally permissible because the Illinois Eavesdropping Act "provides an <u>exemption</u> at Sec. 14-3(i)." Pl.'s SOF, Ex. 14, at 17. Indeed, the Act exempts from criminal liability the "[r]ecording of a conversation made by . . . a person, who is a party to the conversation, under reasonable suspicion that another party to the conversation is committing . . . a criminal offense . . . , and there is reason to believe that evidence of the criminal offense may be obtained by the recording." 720 Ill. Comp. Stat. 5/14–3(i). According to Melongo, she had a reasonable suspicion that Taylor was falsifying court transcripts, based on the transcript from June 18, 2008.

This Court decided a substantially similar issue in *Moore v. City of Chicago*, where the plaintiff had also been charged with eavesdropping. No. 12 C 238, 2014 WL 1674194, at *4–5 (N.D. Ill. April 28, 2014). There, because "a rational jury could conclude that reasonable officers in [the defendants'] position would have known that [the plaintiff's] recording did not violate the Illinois eavesdropping statute because she had grounds to believe that they were [committing criminal offenses]," the Court concluded that summary judgment on qualified-immunity grounds was inappropriate. *Id.* at *5. The same is true here. Melongo explicitly asserted the exemption on her website, and Gunnigle stated that she and Podlasek considered whether it applied. Gunnigle Dep. at 64:10–66:13. Similarly, O'Hara stated that she was aware of the statutory exemption, that she was aware that Melongo had previously had concerns about the accuracy of the court transcripts in her case, and that falsifying a court transcript could be a crime. O'Hara Dep. at

104:24–107:12. Because a reasonable jury could conclude that Melongo's actions were exempt from the eavesdropping statute, the issue of probable cause turns on disputed facts. As such, the Court denies summary judgment on the issue of qualified immunity as to Count IV.[11]

### 2. French

Although French asserts in his reply brief that he is entitled to absolute immunity for all of his actions relating to the computer-tampering case, he makes no mention of this in his opening brief. Rather, French sought immunity only for his actions at Melongo's bond hearing. Any argument that he is entitled to absolute immunity for other actions is waived, having been raised for the first time in reply. *See Mendez v. Peria Dental*, 646 F.3d 420, 423–24 (7th Cir. 2011) (stating that arguments raised for the first time in a reply brief are waived).

French also argues that he is entitled to qualified immunity on Count IV because there was probable cause for the computer-tampering charges. Melongo disputes this, claiming that the "confession" was fabricated and no other evidence established probable cause. Here too the existence of probable cause turns on disputed questions of fact. Although Martin's police report stated that Melongo admitted to accessing Spizzirri's email and forwarding messages to herself, *see* Martin Report at 7–8, Melongo testified at her deposition that she never made any such statement. Melongo Dep. at 176:16–177:16, 300:2–14. Furthermore, Melongo points to Martin's grand jury testimony, in which he stated that Melongo told him during the search of her residence that *another SALF employee* had forwarded the emails to her. Pl.'s SOF ¶ 65. Thus, there are disputes of fact as to whether Melongo confessed to the Email Intrusion.

Setting aside the confession, French points to additional evidence that he argues is sufficient to establish probable cause, such as the information Martin received in the subpoena

---

[11]     For the same reasons, the Court also denies summary judgment on the merits of Count IV.

responses from Yahoo and Comcast, and the written list of SALF passwords recovered from Melongo's home. But a reasonable jury could conclude, based on French's statements that a charge related to the Email Intrusion was the "most provable" *because* of Melongo's purported confession, together with his statements recommending that further forensic testing be done, that French did not view the evidence, absent Melongo's confession, to be sufficient to establish probable cause. French Dep. at 258:20–259:6, 271:7–12. These and other factual disputes preclude summary judgment on this issue.

### D. State-Law Claims (Count VI)

Because the state-law claims in Count VI are based on the same events as Counts I through IV and involve the same disputes of fact, summary judgment is denied on qualified immunity grounds as to Count IV.

## III. Statute of Limitations

### A. Claims Based on April 13, 2010 Arrest (Counts I and II)

French and the County Defendants argue that they are entitled to summary judgment on the false arrest claim in Count I because it is time-barred. In Illinois, the statute of limitations for a § 1983 claim is two years. *Dominguez v. Hendley*, 545 F.3d 585, 588 (7th Cir. 2008) (citing 735 Ill. Comp. Stat. 5/13–202). "A § 1983 claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Hondo, Inc. v. Sterling*, 21 F.3d 775, 778 (7th Cir. 1994). Here, the arrest that forms the basis of Count I occurred on April 13, 2010; thus, the County Defendants and French argue, the statute of limitations for the claim expired on April 13, 2012. Because Melongo did not bring this lawsuit until July 10, 2013, the County Defendants and French contend that Count I is time-barred.

In response, Melongo argues that her claim is not time-barred because equitable tolling, equitable estoppel, and the discovery rule apply. The applicability of equitable tolling is governed by state law where a federal claim borrows the statute of limitations from state law. *Shropshear v. Corp. Counsel of City of Chi.*, 275 F.3d 593, 596 (7th Cir. 2001). Under Illinois law, equitable tolling suspends the statute of limitations when (1) a defendant has actively misled the plaintiff; (2) extraordinary circumstances prevented the plaintiff from asserting her rights; or (3) the plaintiff timely but mistakenly asserted her rights in the wrong forum. *Clay v. Kuhl*, 727 N.E.2d 217, 223 (Ill. 2000). Similarly, a plaintiff may invoke the doctrine of equitable estoppel if a defendant took "active steps to prevent the plaintiff from suing in time . . . above and beyond the wrongdoing upon which the plaintiff's claim is founded." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450–51 (7th Cir. 1990). Melongo asserts that these doctrines apply because Defendants "actively misled her about the basis for her arrest, concealing the fact [that] it was for allegedly threatening a public official, . . . and thus delaying the time when she had information essential to bringing the claim." Pl.'s Combined Resp. Defs.' Mots. Summ. J. at 56.

In support of this argument, Melongo points to the fact that she did not become aware until September 27, 2012, that her April 13, 2010 arrest was for allegedly threatening a public official. Pl.'s SOAF ¶ 192. Up until that point, she believed that she had been arrested for eavesdropping pursuant to a warrant, because that is what she was told. She further notes that Podlasek took months to return redacted documents from Albukerk's file. *Id.* ¶¶ 185–89.

The County Defendants fail to respond to these arguments. And French notes that "from the moment she was charged, Plaintiff strongly believed there was no basis for her arrest or the related criminal charges." French's Reply Supp. Mot. Summ. J. at 4, ECF No. 314.

The Seventh Circuit has made clear that a § 1983 unlawful arrest claim accrues on the date of the arrest. *Wallace v. City of Chi.*, 440 F.3d 421, 427 (7th Cir. 2006). However, doctrines such as equitable tolling can still "affect the time in which a particular suit may be brought," even after the date of accrual is determined. *Id.*

Here, it is undisputed that Melongo did not know until September 2012, that her arrest on April 13, 2010 was for "threatening a public official." Pl.'s SOAF ¶ 192; Defs.' Resp. Pl.'s SOAF ¶ 192. Furthermore, Podlasek tendered discovery materials to Melongo in batches, over a period of months, with redactions to which she objected. Pl.'s SOAF ¶¶ 185–89; Defs.' Resp. Pl.'s SOAF ¶¶ 185–89. These productions apparently did not include Melongo's April 13, 2010, arrest report, as Melongo was only able to obtain that report in response to a FOIA request in September 2012, approximately nine months after Podlasek first began providing her with documents. Pl.'s SOAF ¶ 192; Defs.' Resp. Pl.'s SOAF ¶ 192. By that point, more than two years had passed since her arrest. This evidence, viewed in the light most favorable to Melongo, is "sufficient to create a factual dispute concerning tolling of the statute of limitations, and thus prevents the Court from granting summary judgment." *Halperin v. Halperin*, No. 10 CV 4104, 2012 WL 832786, at *4 (N.D. Ill. Mar. 8, 2012); *see also Richardson v. City of Chi.*, 314 F. Supp. 3d 999, 1014 (N.D. Ill. 2018). As such, the County Defendants' and French's motions for summary judgment are denied to the extent they seek dismissal of Count I as being untimely.

Similarly, because the First Amendment retaliation claim in Count II also is based on the April 13, 2010 arrest, the Court denies summary judgment on statute of limitations grounds as to that claim for the same reasons.

### B. Unlawful Pretrial Detention (Count IV)

#### 1. Schiller Park Defendants

The Schiller Park Defendants argue that, as to Martin, Count IV is time-barred. In *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018), the Seventh Circuit concluded that a claim for unlawful pretrial detention accrues when the period of illegal detention ends. Melongo was released on a recognizance bond on June 19, 2012, but she did not add her pretrial detention claim against Martin until she filed a second amended complaint on November 5, 2014. Thus, Martin argues, Count IV is time-barred unless it relates back to Melongo's prior complaints.

The Schiller Park Defendants focus on the fact that, at the time Melongo initiated this lawsuit in 2013—and, indeed, long before—she was aware of her belief that Martin committed perjury. As Melongo points out, however, the relevant inquiries are whether Martin "knew or should have known that [Melongo], had it not been for a mistake, would have sued him instead or in addition to suing the named defendant," and whether, "even if so, the delay in the [Melongo's] discovering [her] mistake impaired [Martin's] ability to defend himself." *Joseph v. Elan Motorsports Techs. Racing Corp.*, 638 F.3d 555, 559–60 (7th Cir. 2011). The relation-back analysis asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Krupski v. Costa Cociere S.p.A.*, 560 U.S. 538, 548 (2010) (emphasis in original).

That said, the Court agrees with the Schiller Park Defendants that there is no basis to conclude that Martin knew or should have known, prior to the filing of Melongo's second amended complaint, that she intended to sue him. First, there is no evidence that the Schiller Park Defendants had actual notice of Melongo's lawsuit until they were added as defendants in the second amended complaint. Although Melongo attempts to establish this by stating that their

briefing "does not dispute that [Martin] had timely notice of Ms. Melongo's prior complaints," Pl.'s Combined Sur-Response at 3, 6, this is insufficient to establish actual notice, because "facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion." *Gray v. Cannon*, 974 F. Supp. 2d 1150, 1162 (N.D. Ill. 2013).

As for constructive notice, as the Schiller Park Defendants point out, their alleged actions were not described in either the original complaint or the first amended complaint. Rather, Melongo's original complaint contained a single reference to the fact that the Schiller Park Police Department investigated the computer-tampering charges, and one reference to Melongo's attempt to dismiss those charges based on her belief that Martin had committed perjury. Compl. ¶¶ 21, 35, ECF No. 1. The amended complaint was even less specific, containing only one reference to "Schiller Park Police" involvement in the computer-tampering investigation. Am. Compl. ¶ 25, ECF No. 24. These cursory references to Schiller Park are insufficient to establish that Martin "knew or should have known," at the time that either of the prior complaints was filed, that Melongo would have sued him if not for a mistake. *See Krupski*, 560 U.S. at 548. Thus, the Court finds that, as to Martin, Count IV does not relate back and is untimely. The Schiller Park Defendants' motion is therefore granted as to Count IV.

### 2. French

French also argues that Count IV is time-barred, but this argument is meritless given that Melongo was not released from jail on electronic monitoring until October 2011, and was not released from electronic monitoring until June 2012. At the *earliest*, then, Melongo's unlawful pretrial detention claim accrued in October 2011, but she filed suit within two years, in July 2013. Thus, the claim is timely. Although French purports to adopt Martin's relation-back arguments,

*see* French Reply Supp. Mot. Summ. J. at 3–4, those arguments do not apply to French, who was named in Melongo's initial complaint.

### C.       State-Law Claims (Count VI)

#### 1.       IIED and NIED

All Defendants argue that Melongo's IIED and NIED claims are time-barred because they accrued on the date of her arrest in April 2010 (or, in the case of Spizzirri, she argues that the claims accrued in 2006, when she reported the Server and Email Intrusions). Melongo does not specifically address the timeliness of these claims; rather, she argues that *all* claims based on her 2010 arrest are timely because various tolling doctrines apply. But while that argument makes sense in the context of her false-arrest claim (as discussed in in Section III.A), it is unpersuasive as to her emotional-distress claims. The Seventh Circuit has made clear that "a claim of [IIED] in the course of arrest and prosecution accrues on the date of arrest." *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013). This is true even when the distress is "intertwined" with a claim for malicious prosecution. *See Friends-Smiley v. City of Chi.*, No. 16-CV-5646, 2016 WL 6092637, at *2 (N.D. Ill. Oct. 19, 2016) (collecting cases). To the extent that Melongo contends that the claim is not time-barred because of continuing violations, that argument is foreclosed by *Bridewell*. 730 F.3d at 678 (holding that IIED is not a continuing wrong for statute-of-limitations purposes). Thus, summary judgment is granted on the IIED claim in Count VI as to all Defendants.

The Court need not address the timeliness of Melongo's NIED claim because, for the reasons stated in Section IV.C.2, that claim fails on the merits.

#### 2.       Malicious Prosecution and Conspiracy

The County Defendants challenge the timeliness of Melongo's malicious prosecution and conspiracy claims, to the extent that they are based on the eavesdropping charges. They contend

that the claims are time-barred because the eavesdropping charges were dismissed on June 19, 2012, while this lawsuit was not filed until July 10, 2013. Melongo disagrees, arguing that the charges were not actually dismissed until July 26, 2012, when the judge issued his written ruling. Pl.'s SOF ¶ 119. The Court agrees. Although the judge orally granted a motion to dismiss the charges on June 19, 2012, *see id.*, Ex. 28 at 14, he later stated that his ruling was "stayed" pending a written decision. Pl.'s SOF, Ex. 30, at 2:12–13. The only plausible interpretation of this statement is that the judge's oral ruling did not effectively dismiss the charges; rather, they were dismissed on July 26, 2012, when he issued his written ruling. Thus, the Court concludes that the conspiracy and malicious prosecution claims based on the eavesdropping charges are timely filed.

Spizzirri is the only Defendant to challenge the timeliness of the malicious prosecution and conspiracy claims to the extent they are based on the computer-tampering charges. She argues that the claims are untimely as against her, because she made her complaints to the Schiller Park Police Department in 2006—seven years before the initiation of this lawsuit. But this is incorrect. A malicious prosecution claim, as well as a conspiracy claim based on malicious prosecution, does not accrue until "the criminal proceeding on which it is based has been terminated in the plaintiff's favor." *Ferguson v. City of Chi.*, 820 N.E.2d 455, 459 (Ill. 2004); *Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 894 (Ill. App. Ct. 2013). Thus, the malicious prosecution claim, and the conspiracy claim based on the same facts, are timely.

## IV. Merits of Melongo's Claims

### A. First Amendment Retaliation (Count II)

The County Defendants argue that Count II must fail on the merits because Melongo has shown no evidence of retaliatory animus. Melongo disagrees, identifying evidence that Podlasek and Gunnigle believed her criticisms of them were unfair, and that Podlasek complained about the

website to French. Pl.'s SOAF ¶¶ 178–79. Furthermore, she points to a post on her website from December 2009, where she recounted a conversation with Podlasek in which he threatened to "to go [the judge]" if Melongo continued to call him corrupt. *Id.* ¶ 167. Melongo also points to the fact that, while she was incarcerated, the website was taken down because she could not pay the fees to maintain it. *Id.* ¶ 161.

Construing the record in Melongo's favor (as it must do), the Court concludes that a reasonable jury could find that the County Defendants' April 13, 2010, arrest of Melongo was motivated, at least in part, by the negative statements about them on her website. At the summary-judgment stage, the relevant inquiry is whether a reasonable finder of fact would be compelled to credit the defendant's non-retaliatory explanation. *See Massey v. Johnson*, 457 F.3d 711, 720 (7th Cir. 2006). Based on the record, the Court cannot conclude that a rational jury would be compelled to credit the County Defendants' position over Melongo's explanation that she was arrested in retaliation for posting about them online. As such, summary judgment is denied as to Count II.

**B.     Due Process (Count V)**

Martin contends that Count V is foreclosed by the Seventh Circuit's recent decision in *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019). In that case, the Court of Appeals held that "all § 1983 claims for wrongful pretrial detention—whether based on fabricated evidence or some other defect—sound in the Fourth Amendment." *Id.* at 479. The Court of Appeals clarified that a plaintiff cannot state a due-process claim based on an unlawful pretrial detention, although it recognized that "convictions premised on deliberately fabricated evidence will always violate" the right to due process. *Id.* (quoting *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017)). Because Melongo was not convicted, Martin argues, she cannot state a due-process claim.

Melongo acknowledges that *Lewis* limits her due-process claim; she contends, however, that "[f]abricated evidence contributing to an indictment and continued prosecution is an injury distinct from fabricated evidence contributing to pretrial detention." Pl.'s Combined Sur-Response at 1. But Melongo cites no case to support such a proposition, and *Lewis* does not appear to contemplate such a distinction. The Court of Appeals clarified in *Lewis* that its decision did not affect the viability of a due-process claim in a case resulting in a *conviction* and recognized that fabricated evidence that results in a conviction may form the basis of a claim under *Brady v. Maryland*, 373 U.S. 83 (1963); but it stopped there. *Lewis*, 914 F.3d at 479–80. Melongo's position ignores the fact that "there is no such thing as a constitutional right not to be prosecuted without probable cause." *Serino v. Hensley*, 735 F.3d 588, 593 (7th Cir. 2013). Because *Lewis* makes clear that, in cases not involving convictions, a pretrial detention claim sounds only in the Fourth Amendment, Melongo's due-process claim fails as a matter of law. The Court therefore grants summary judgment on Count V. [12]

## C.      State-Law Claims (Count VI)

### 1.      NIED

Spizzirri and Martin challenge Melongo's NIED claim on the merits, arguing that Melongo has failed to establish the elements of the claim. To establish NIED, a plaintiff must prove that: (1) the defendant owed her a duty; (2) the defendant breached that duty; and (3) the breach caused injury to the plaintiff. *Parks v. Kownacki*, 737 N.E.2d 287, 296–97 (Ill. 1991). Furthermore, a plaintiff must also show a "contemporaneous physical injury or impact" that caused the emotional distress. *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 59–60 (Ill. 2016).

---

[12]      Because the Court concludes that Melongo cannot maintain a due-process claim against Martin, the Court does not address Martin's argument that he is entitled to qualified immunity on Count V.

Based on the summary judgment record, the Court agrees that Spizzirri and Martin are entitled to summary judgment on Melongo's NIED claim. Even if Melongo could establish the other requirements of a negligence claim (breach, duty, and causation), no reasonable jury could find that she suffered a contemporaneous physical injury or impact. Melongo states that "her arrest and detention on April [13], 2010 caused her to feel so ill that she had to go to the hospital." Pl.'s Combined Resp. Opp. Mots. Summ. J. at 49. But the arrest report from April 13 merely states that she requested medical treatment, was taken to the hospital, and was "diagnosed . . . with a headache." Arrest Report at 2. Indeed, Melongo's own declaration states that she was experiencing a headache and nausea. Pl.'s SOF, Ex. 6, at ¶ 12. Such symptoms are insufficient to satisfy the impact rule. *See, e.g.*, *Miller v. Zaruba*, No. 10 C 6533, 2011 WL 1630679, at *3 (N.D. Ill. Apr. 28, 2011) (finding headaches and motion sickness insufficient); *Robbins v. Kass*, 516 N.E.2d 1023, 1027–28 (Ill. App. Ct. 1987) (finding headaches insufficient). The Restatement (Second) of Torts supports the same conclusion, providing that the impact rule does not contemplate liability for "transitory, non-recurring physical phenomena" such as nausea or dizziness, but recognizing potential liability for "*long continued* nausea or headaches." Restatement (Second) of Torts § 436A, cmt. c. (1965). Here, Melongo experienced a headache and nausea after being arrested, but there is no evidence that those symptoms were prolonged or recurring. Thus, Melongo has failed to satisfy the impact rule as required under Illinois law.

To the extent that Melongo seeks to hold Martin and Spizzirri liable for NIED based on the fact that she later developed a fibroid that required a hysterectomy, there is simply no evidence in the record from which a reasonable jury could conclude that this condition was caused by Martin and Spizzirri's actions or Melongo's incarceration. Melongo admits that no medical professional has ever told her that her incarceration caused the fibroid, and that her belief is based on her own

"research."  Melongo Dep. at 244:17–245:24.  Thus, because causation is unsupported by any evidence in the record, the Court grants Spizzirri and Martin's motions for summary judgment on the NIED claim.  The same analysis applies equally to the other Defendants; therefore, summary judgment is granted on the NIED claim as to all Defendants.

### 2.  Malicious Prosecution

All Defendants raise arguments about the sufficiency of Melongo's malicious prosecution claim, focusing on the presence of probable cause for the computer-tampering and eavesdropping charges.  For the reasons stated above in Section I.C, a jury could reasonably conclude that Defendants lacked probable cause to charge Melongo with computer tampering and/or eavesdropping; there are numerous disputes of fact that preclude summary judgment on those grounds.

Furthermore, although Spizzirri argues that she cannot be held liable for malicious prosecution, she is incorrect.  A private individual may be held liable if she "initiated a criminal proceeding or [her] participation in it [was] of so active and positive a character as to amount to advice and cooperation."  *Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (Ill. App. Ct. 1986).  Spizzirri initiated the criminal proceedings by making the complaint to the Schiller Park Police Department in 2006.  Incident Report at 1.  She attempted to get the State's Attorney personally involved in the investigation.  Spizzirri Dep. at 121:11–123:13; Pl.'s SOAF, Ex. 35.  She contacted third parties seeking information to attempt to "increase [Melongo's] charges," allegedly at Podlasek's request.  Pl.'s SOAF, Ex. 56.  She attempted to file additional charges against Melongo for issues with messages disappearing from her Blackberry.  Pl.'s SOAF ¶ 159.  She repeatedly sought to have Melongo's website taken down, and several months later, Podlasek, Gunnigle, O'Hara, and French investigated and charged Melongo with eavesdropping, resulting in the

website going offline.  *Id.* ¶¶ 158, 161.  Spizzirri continued to complain about Melongo to other individuals, including a reporter and a state senator.  *Id.* ¶¶ 162–63.  And, she testified at the computer-tampering trial.  Defs.' SOF ¶ 123.  From this evidence, a reasonable jury could conclude that Spizzirri was actively involved in the criminal proceedings against Melongo between 2006 and 2014.  As such, summary judgment is denied on the malicious prosecution claim.

### 3.    Conspiracy

Spizzirri is the only Defendant to challenge the sufficiency of the conspiracy claim.  Martin argues that the claim cannot stand absent an underlying tort, but as stated above, the malicious prosecution claim in Count VI survives summary judgment.  For her part, Spizzirri argues that the claim should be dismissed because there is no evidence that she was acting in concert with the other Defendants.

To establish civil conspiracy, a plaintiff must prove the existence of "(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means, and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff."  *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007).  Here, Spizzirri challenges the first element, arguing that there is no evidence of an agreement between her and the other Defendants to charge and prosecute Melongo with computer tampering and eavesdropping.  But the record does contain evidence from which a reasonable jury could conclude that such an agreement existed.  As already described, there is evidence from which a reasonable jury could conclude that the charges were not supported by probable cause; that Melongo was arrested without probable cause on April 13, 2010; and that Defendants concealed from Melongo the basis for her arrest on April 13, 2010.  Further, as detailed in Section IV.C.2, there is evidence that Spizzirri repeatedly contacted the

other Defendants about Melongo and represented to third parties that Podlasek had asked her to solicit additional information to charge Melongo with further crimes. Additionally, when a news report critical of Spizzirri and SALF aired, Defendants were concerned about the continued viability of the case against Melongo. Pl.'s SOAF ¶¶ 148–49. Of course, none of this evidence directly establishes the existence of a conspiracy, but "[d]irect proof . . . is rarely available since conspiracies are by their very nature secretive." *Patrick v. City of Chi.*, 213 F. Supp. 3d 1033, 1057 (N.D. Ill. 2016). Thus, "the existence of a conspiracy may be inferred through the combination of common sense and circumstantial evidence." *Id.* Altogether, the circumstantial evidence is sufficient for a jury to conclude that Defendants conspired against Melongo. As such, summary judgment is denied on the conspiracy claim in Count VI.

## V.     Punitive Damages (Count VIII)

Spizzirri seeks summary judgment as to the request for punitive damages in Count VIII. In § 1983 cases, "[p]unitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *Hendrickson v. Cooper*, 589 F.3d 887, 894 (7th Cir. 2009). Because the Court has concluded that there is sufficient evidence from which a jury could conclude that Spizzirri maliciously prosecuted Melongo and conspired to do so, the Court finds that the evidence in the record is sufficient to place the issue of punitive damages before a jury. As such, the request for summary judgment on this issue is denied.

<u>Conclusion</u>

For the reasons stated herein, the Schiller Park Defendants' motion for summary judgment is granted as to Counts IV and V. French's motion is granted insofar as he is entitled to absolute immunity for his conduct at Melongo's bond hearing. The County Defendants' motion is granted insofar as Podlasek and Gunnigle are entitled to absolute immunity to the extent that Count IV is

based on the computer-tampering case.  Spizzirri's motion is granted as to the NIED claim in Count VI, and that claim is dismissed as to all Defendants.  Defendants' motions are also granted as to the IIED claim in Count VI.  Counts II and IV are dismissed as to Dillon, Rubino, and Lesiak. To the extent that Count VI encompasses state-law claims for false arrest and false imprisonment, those claims are dismissed.  In all other respects, summary judgment is denied.  A status hearing is set for 4/23/19 at 9:15 a.m.

**SO ORDERED**                                    **ENTERED    3/19/19**

_____

**John Z. Lee**
**United States District Judge**